TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
202-353-1389 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> v.<br><br>THE STATE OF ALASKA, THE ALASKA DEPARTMENT OF FISH & GAME, and DOUG VINCENT-LANG, in his official capacity as Commissioner of the Alaska Department of Fish & Game,<br><br>    Defendants, | Case No. 1:22-cv-00054-SLG |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND COMBINED MEMORANDUM IN SUPPORT

## <u>INTRODUCTION</u>

The United States brings this suit to address Defendants' repeated actions that

*United States v. Alaska*           Case No. 1:22-cv-00054-SLG
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION         1

Case 1:22-cv-00054-SLG  Document 5  Filed 05/24/22  Page 1 of 23

contradict and interfere with federal orders taken to implement the rural subsistence priority established by Title VIII of the Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371, 2371-2551 (1980) (codified at 16 U.S.C. §§ 3111-3126) ("ANILCA"). This dispute focuses on gillnet harvest of salmon for subsistence use from the lower 180 miles of the Kuskokwim River located within the Yukon Delta National Wildlife Refuge ("Refuge"). Local rural residents depend on these salmon for their physical, economic, traditional, and cultural existence. However, in recent years it has become necessary to impose gillnet harvest restrictions to address conservation concerns for Kuskokwim River Chinook and chum salmon. ANILCA makes clear that any conflict between different uses of scarce or finite resources must be resolved in favor of the federal subsistence priority, which explicitly prioritizes rural Alaskans' use. Defendants, however, continue to authorize harvest in conflict with ANILCA, refusing to limit such harvest to local rural residents as required by federal orders effectuating that legally required priority. The United States hereby moves under Fed. R. Civ. P. 65 for a preliminary injunction, and separately for a temporary restraining order, to prohibit Defendants from continuing to authorize or implement actions that contravene the rural Alaskan subsistence priority and are preempted by federal law.

## **LEGAL BACKGROUND**

Through ANILCA, Congress sought "to preserve Alaska's natural resources, historic sites, and ecosystems, while also providing the continued opportunity for rural residents to engage in a subsistence way of life." *Dep't of Fish & Game v. Fed.*

*Subsistence Bd.*, No. 3:20-cv-00195-SLG, 2020 WL 5625897, at *5 (D. Alaska Sept. 18, 2020) (citing *Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1091 (9th Cir. 2008)).

The Federal Subsistence Board ("FSB") administers the federal subsistence program in accordance with Title VIII of ANILCA, to preserve a way of life "essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence." 16 U.S.C. § 3111(1). Congress directed that "nonwasteful subsistence uses of fish and wildlife . . . shall be the priority consumptive uses of all such resources on the public lands of Alaska" and that, when it is necessary to restrict taking of fish and wildlife for enumerated reasons, "the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses." 16 U.S.C. § 3112(2). While establishing the rural subsistence priority, Congress made it clear that even subsistence uses must yield to conservation of healthy populations of fish and wildlife. *See* 16 U.S.C. § 3125(1).

ANILCA defines "subsistence uses" to mean:

the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife . . . ; for barter, or sharing for personal or family consumption; and for customary trade.

16 U.S.C. § 3113. This definition specifies that the priority applies only to *rural* Alaskans. Also, the term "customary and traditional uses" carries significant weight, because "[i]n the course of its administration, the FSB '[d]etermine[s] which rural Alaska areas or communities have customary and traditional subsistence uses of specific fish and

wildlife populations.'" *Alaska*, 544 F.3d at 1092 (quoting 50 C.F.R. § 100.10(d)(4)(iii)).

The term "federally qualified users" typically describes users meeting these criteria.

"Congress authorized the Secretary of the Interior and the Secretary of Agriculture to promulgate regulations in furtherance of its directives; they created the FSB and charged it with 'administering the subsistence taking and uses of fish and wildlife on public lands.'" *Dep't of Fish & Game v. Fed. Subsistence Bd.*, 501 F. Supp. 3d 671, 683 (D. Alaska 2020) (quoting *Fed. Subsistence Bd.*, 544 F.3d at 1092 n.1); *see* 50 C.F.R. Part 100.[1] These regulations empower the FSB and federal officials to implement the federal subsistence priority, and otherwise manage subsistence taking and uses on public lands as required by ANILCA. *See* 50 C.F.R § 100.10(d)(4).

## FACTUAL BACKGROUND

### A. The Kuskokwim River and Salmon Conservation

At over 700 miles long, the Kuskokwim River is the longest free-flowing river in the United States. It drains a remote area of the Alaska interior on the north and west side of the Alaska Range and flows generally westward into Kuskokwim Bay on the Bering Sea. There are numerous subsistence-dependent rural villages along the river and its tributaries, comprised primarily of members of the 33 different federally recognized Tribes located in the Kuskokwim drainage area. The lower 180 river miles are within the

---

[1]     Identical regulations promulgated by the Department of Agriculture are found at 36 C.F.R. Part 242. Citations here are to the Department of the Interior regulations at Title 50 of the Code of Federal Regulations.

boundaries of the Refuge.  *See* Decl. of Boyd Blihovde ¶¶ 3, 7, ECF No. 5-1.

The Kuskokwim River supports stocks of Chinook (or king), chum (dog), sockeye (red), humpback (pink), and coho (silver) salmon.  To conserve healthy populations of salmon, the State of Alaska, through its Department of Fish & Game ("ADF&G"), sets minimum goals for escapement of the five species of salmon to allow them to spawn.[2] For instance, the State's escapement goal for Chinook on the Kuskokwim is a range of between 65,000 and 120,000 fish.  *Id*. ¶ 4.  However, both the federal in-season manager and the Kuskokwim River Inter-Tribal Fish Commission ("Inter-Tribal Fish Commission"), comprised of local residents with traditional ecological knowledge of salmon fisheries as well as a former federal biologist, have concluded that the escapement goal for Chinook must be set at a minimum of 110,000 to preserve and enhance future run strength.[3]  *Id*. ¶¶ 10, 11.  While the 25-year average escapement is 243,000 Chinook, even the minimum State escapement goal was unmet in 2010, 2011, 2012, and 2013, and

---

[2]     Escapement refers to the number of fish allowed to escape the active fishery and reach traditional spawning areas.  Blihovde Decl. ¶ 4.  Fish counts occur using sonar transducers on the river bottom that allow for imaging and logging the numbers and species of passing fish, through visual counts at weirs on several tributaries, through an established test gillnet fishery, and through aerial surveys throughout the lower, middle, and headwater tributaries.

[3]     The 33 Kuskokwim area tribes formed the Inter-Tribal Fish Commission (often referred to as "KRITFC") to provide traditional knowledge and input to federal fisheries managers.  Blihovde Decl. ¶ 7.  While federal regulations do not prescribe escapement numbers, the federal in-season manager concurs with the Inter-Tribal Fish Commission that managing for escapement of 110,000 Chinook is appropriate to ensure long-term conservation.  *Id*. ¶ 10.

was just barely met in several other recent years, despite conservation efforts. *Id.* ¶ 5.  In

2020, roughly 116,000 Chinook salmon returned, with escapement estimated at 88,000.

*See* https://www.adfg.alaska.gov/static/applications/dcfnewsrelease/1229575804.pdf at 4

(last visited May 24, 2022) ("2020 Report").  In 2021, the total Chinook return numbered

about 129,000 Chinook, with escapement estimated by roughly 101,000 of them.  *See*

https://www.adfg.alaska.gov/static/applications/dcfnewsrelease/1345527186.pdf at 4 (last

visited May 24, 2022) ("2021 Report").

As for chum salmon, estimated 2020 escapement of 19,032 – described as "weak

but adequate" – fell towards the bottom range of ADFG's goal of 15,000-49,000 fish.

2020 Report at 4.  And in 2021, chum salmon escapement was "the lowest on record"

with only 4,153 fish tallied at the historical reference point, well below the 15,000-fish

lower end of ADF&G's target escapement range.  2021 Report at 4.

Conservation efforts are further complicated by the fact that the run timing of

these different species sufficiently overlap to make it impossible to selectively harvest

more healthy species without inadvertently catching those subject to conservation

concerns.  Blihovde Decl. ¶ 12.  Gillnetting is the only practical method for catching

enough salmon to meet subsistence needs on the Kuskokwim, but gillnets lethally

intercept returning fish and do not allow for selective return of any fish to the river

unharmed.  *Id.*

### B.    Federal Management Decisions and Conflicting State Actions

Every year since 2012, both federal and state managers have agreed that a

downward trend in the Chinook salmon population and consistently low pre-season run projections necessitate emergency closures to gillnet fishing at the start of the season for a period of at least several weeks until run strength can be verified and adequate escapement assured. Federal managers have authorized short openings during those extended closures to subsistence fishing by federally qualified users to address the ANILCA Title VIII priority. Federal decision-making always follows pre-season and in-season coordination between state and federal managers, and consultation with the Inter-Tribal Fish Commission, the Kuskokwim River Salmon Management Working Group, and the Chair of the local Subsistence Regional Advisory Council.[4]

Starting in late 2020 and into the first half of 2021, the Refuge manager (and federal in-season manager), Boyd Blihovde, participated in a number of discussions with the Inter-Tribal Fish Commission, ADF&G representatives, and interested stakeholders in preparation for the upcoming season. Blihovde Decl. ¶ 9. Mr. Blihovde issued a federal emergency special action on May 7, 2021, in which he closed the Kuskokwim River main stem to the harvest of all salmon using gillnets, and also closed various tributaries to the harvest of Chinook and the use of all gillnets effective June 1, 2021. *See* Emergency Special Action ("ESA") #3-KS-01-21; Compl. Ex. 1 at 2, ECF No. 1-1. Only federally qualified users were permitted to conduct subsistence fishing for salmon, using

---

[4] Ten subsistence regional advisory councils comprised of local residents with traditional knowledge of fish and wildlife in their respective regions provide input into the FSB's decision-making process. The State formed the Kuskokwim River Salmon Management Working Group for consultation and coordination purposes, which also consists of local residents.

dip nets, rod and reel, and other methods allowing for the live release of Chinook. *Id*. at 3. Except for federal subsistence-only openings, the federal closure remained in effect until July 22, 2021. In making his closure decision, Mr. Blihovde relied heavily on both ADF&G's preseason forecast of 94,000-155,000 Chinook and the historical Chinook subsistence harvest range of 67,200-109,800, which, if unrestricted, would mean an escapement projection ranging from 0 to 87,800, well under federal escapement goals even under the best-case scenario. *Id*. at 4. Moreover, much of that escapement range would fall below even the State's goal of 65,000, which the State has deemed necessary to maintain the Chinook salmon population. *See* Blihovde Decl. ¶ 13.

The same May 7 ESA prescribed limited subsistence harvest opportunities for federally qualified subsistence users only, through the use of nearshore set gillnets on June 2, 5, and 9; and the use of set or drift gillnets during 12-hour periods on June 12 and 15. *Id*. at 3. Mr. Blihovde subsequently announced additional openings to federally qualified subsistence users, starting with an ESA allowing harvest with set or drift gillnets for 12 hours on June 19. *See* ESA #3-KS-02-21, Compl. Ex. 1 at 5. He further announced openings to the use of set or drift gillnets downstream of Kalskag Bluffs during 9 or 12-hour periods on July 2, 9, and 16; and harvest with nearshore set gillnets only on July 10-11, and 17-18. *See* ESA #3-KS-03-21, Compl. Ex. 1 at 7-8.

Defendants undermined these federal closure orders in 2021 by issuing their own orders purporting to open the River to all Alaskans. ADF&G first announced a closure to the use of gillnets on the Kuskokwim within the Refuge from June 1 until further notice

consistent with the federal closure. *See* Emergency Order ("EO") #3-S-WR-01-21, Compl. Ex. 2 at 2-4, ECF No. 1-2. But the State then proceeded to adopt several emergency orders purporting to authorize gillnet openings to all Alaskans[5] on Refuge waters during some of the same periods that Mr. Blihovde had announced openings only for federally qualified subsistence users. On May 11, ADF&G adopted an order providing subsistence fishing opportunities for all Alaskans along the entire length of the river within the Refuge with nearshore set gillnets on June 2, 5, and 9. *See* EO #3-S-WR-02-21, Compl. Ex. 2 at 5-6. On June 10, ADF&G ordered subsistence fishing opportunities for all Alaskans with set or drift gillnets along the entire length of the river within the Refuge on June 12 and 15. *See* EO #3-S-WR-04-21, Compl. Ex. 2 at 7-8. On June 18, ADF&G adopted an order allowing opportunities for set or drift gillnet fishing in the easternmost section of the Kuskokwim River within the Refuge (known as section 3) starting on June 19 until further notice even though the federal closure remained in effect. *See* EO #3-S-WR-06-21, Compl. Ex. 2 at 9-10. On July 1, ADF&G adopted an order allowing multiple openings, including using set or drift gillnets in the main stem downstream of Kalskag Bluffs during 9 or 12-hour periods on July 2, 9, and 16 and using nearshore set gillnets on July 10 and 17. *See* EO #3-S-WR-08-21, Compl. Ex. 2 at 14-16.

This pattern prompted communications between the FSB and ADF&G. *See*

---

[5] ADF&G interprets "subsistence use" to include "all Alaska residents[.]" *See* https://www.adfg.alaska.gov/index.cfm?adfg=subsistence.definition#:~:text=Both%20Al aska%20state%20law%20(AS,%2C%20barter%2C%20and%20customary%20trade (citing Alaska Stat. § 16.05.940(32)) (last visited May 24, 2022).

*generally* Compl. Ex. 3, ECF No. 1-3.  On May 27, 2021, the Board wrote a letter to "invite discussion" between federal and state officials to more effectively collaborate, and observed that collaboration "has improved significantly[.]"  *Id.* at 10-11.  In a response dated June 3, 2021, Commissioner Vincent-Lang declined to address the ANILCA rural subsistence priority, but instead conveyed the State's conclusion that there are sufficient salmon to allow harvest by all Alaskans and discussed his perceived obligation pursuant to the Alaska State Constitution to provide for all Alaskans.  *Id.* at 13.

In a response dated June 24, 2021, FSB Chair Anthony Christianson reiterated the FSB's rationale and legal obligations under ANILCA Title VIII, while expressing the need for the FSB and the State to work together to attempt to meet both state and federal mandates through coordinated planning efforts.  *Id.* at 16-17.  The next day, the ADF&G announced an opportunity for subsistence gillnet harvest by all Alaskans to occur on June 28.  *See* EO #3-S-WR-07-21, Compl. Ex. 2 at 12-13.  There was no opportunity for gillnet harvest on that date for federally qualified subsistence users.

A similar pattern has begun for the 2022 Kuskokwim River salmon fishery. Following similar coordination and outreach as occurred leading up to the 2021 season, Mr. Blihovde issued a federal emergency special action on May 2, 2022, in which he closed the Kuskokwim River main stem to the gillnet harvest of all salmon effective June 1, 2022.  *See* ESA #3-KS-01-22, Compl. Ex. 1 at 10.  As in 2021, this same announcement included limited openings for federally qualified users to harvest salmon by set gillnet on June 1, 4 and 8, 2022, and to harvest salmon by set and drift gillnet on

June 12 and 16, 2022. *Id.* at 11. In similar fashion, as in 2021, ADF&G announced on May 13, 2022, a closure to the use of gillnets on the Kuskokwim within the Refuge for reasons of conservation from June 1 until further notice consistent with the federal closure. *See* EO #3-S-WR-01-22, Compl. Ex. 2 at 17-18. And then ADF&G issued a second announcement on the same day, purporting to authorize gillnet openings to all Alaskans on Refuge waters on June 1, 4, and 8, 2022, during three of the same periods that Mr. Blihovde had announced openings only for federally qualified subsistence users. *See* EO #3-S-WR-02-22, Compl. Ex. 2 at 19-20; Blihovde Decl. ¶ 16.

Plaintiff has engaged meaningful efforts to resolve the underlying dispute, including in 2022. *See* Decl. of Raina Thiele ¶¶ 2-6, ECF No. 5-2. Unfortunately, the parties have not reached sufficient agreement, making it necessary for Plaintiff to file this action, and the instant motion. *Id.* ¶¶ 9-10.

## LEGAL STANDARD

Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (quoting *U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987)). A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013)

(citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

Plaintiff meets its burden here because: (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary injunctive relief; (3) the balance of equities favors preliminary injunctive relief; and (4) a preliminary injunction serves the public interest. *See Winter*, 555 U.S. at 20.

### A.  Plaintiff is Likely to Prevail on the Merits

Federal law preempts the State's orders addressing subsistence fishing within the Refuge. There exists an actual and ongoing controversy, and the Court can "declare the rights and other legal relations" of the parties in accordance with the Declaratory Judgment Act. 28 U.S.C. § 2201.

The Supremacy Clause states: "[t]his Constitution, and the laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause "provides 'a rule of decision' for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (quoting *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015)). Equitable relief "is traditionally available to enforce federal law." *Armstrong*, 575 U.S. at 327, 329 (2015).[6] The Supreme Court has

---

[6]     The Supreme Court in *Armstrong* explained that the Supremacy Clause "does not create a cause of action. It instructs courts what to do when state and federal law clash,

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 12 of 23

"identified three different types of preemption – conflict, express, and field – but all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018) (internal quotation marks and citation omitted); *see also Chamber of Com. of United States v. Bonta*, 13 F.4th 766, 773-74 (9th Cir. 2021).

This dispute raises issues of conflict preemption. "Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991) (internal quotation marks and citations omitted). In this case, the State's management actions on the Kuskokwim River within the Refuge contradict federal management efforts and create an obstacle to ANILCA's federal purposes and objectives of prioritizing the subsistence use of Chinook and chum salmon within the Refuge over all other uses.

"ANILCA, read as a whole, clearly expresses Congress's intent to create a federal regulatory scheme 'to protect the resources related to subsistence needs' and 'to provide

---

but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." 575 U.S. at 325. This holding does not constrain the United States' ability to "enforce federal laws in court." Rather, the holding appears to limit the ability of private litigants to enforce federal statutes. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 13 of 23

the opportunity for rural residents engaged in a subsistence way of life to continue to do so.'" *John v. United States*, 247 F.3d 1032, 1036 (9th Cir. 2001) (en banc) (Tallman, J., concurring) (quoting 16 U.S.C. § 3101(b)-(c)). This Court has recognized that "Title VIII of ANILCA expressly provides that the FSB has the authority to restrict the taking of wildlife on federal public lands . . . [and] that by its plain language Section 815 of ANILCA gives the FSB the authority to adopt restrictions on nonsubsistence uses" as appropriate to ensure continued subsistence use. *Dep't of Fish & Game*, 2020 WL 5625897, at *8. Indeed, courts have enforced the subsistence mandate upon finding that the FSB insufficiently prioritized federally qualified subsistence users over non-federally qualified users. *See Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1195 (9th Cir. 2000) (upholding validity of a ten-day "advance season" but finding that two days failed to "qualify as a priority" for subsistence hunting).

ANILCA, thus, not only contemplates, but also prescribes the outcome of "a clash of lifestyles and a dispute over who gets to fish. Congress, using clear language, has resolved this dispute in favor of the [federally qualified users] who choose to pursue the traditional subsistence way of life by giving them priority in federal waters." *Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312, 318 (9th Cir. 1988). As in *Kenaitze*, Defendants here "ha[ve] attempted to take away what Congress has given[.]" *Id*.

Finally, insofar as Defendants may contend that their management actions are not preempted because ANILCA recognizes a role for Alaska in the management of natural resources, this view does not alter the legal analysis. The Ninth and Tenth Circuits have

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 14 of 23

rejected similar arguments in the context of the statutory scheme addressing the National

Wildlife System.[7]  *See Nat'l Audubon Society, Inc. v. Davis*, 307 F.3d 835 (9th Cir.

2002), *amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002) (concluding that a

California law purporting to ban the use of leghold traps within units of the Refuge

System was preempted by contrary authorizations issued by federal managers); *Wyoming*

*v. United States*, 279 F.3d 1214 (10th Cir. 2002) (upholding FWS's refusal of the State of

Wyoming's request to vaccinate wild elk against brucellosis on the National Elk Refuge

near Jackson, Wyoming).  Both courts rejected arguments based on the Refuge Act's

savings clause.[8]  While acknowledging the traditional role of the states in managing

wildlife within their borders, the Tenth Circuit ultimately affirmed the district court's

dismissal of the Wyoming's claim:

> If we construed the [Refuge Act] to grant the State of Wyoming the

---

[7]     That statute is the National Wildlife Refuge System Improvement Act of 1997 ("Refuge Act"), Pub. L. No. 105-57, 111 Stat. 1252-1260 (codified at 16 U.S.C. §§ 668dd-668ee) (as amended) (amending the National Wildlife Refuge System Administration Act of 1966, Pub. L. No. 89-669, 80 Stat. 926-930 (as amended)).

[8]     The Refuge Act savings clause provides:

> Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System.  Regulations permitting hunting or fishing of fish and resident wildlife within the System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans.

16 U.S.C. § 668dd(m); *see Wyoming*, 279 F.3d at 1229.

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 15 of 23

sweeping power it claims, the State would be free to manage and regulate the [Elk Refuge] in a manner the FWS deemed incompatible with the [Refuge]'s purpose. But the Secretary alone is authorized, "under such regulations as he may prescribe," to "permit the use of any area within the System for any purpose . . . whenever he determines that such uses are compatible with the major purposes for which such areas were established[.]"

*Id*. at 1234 (quoting 16 U.S.C. § 668dd(d)(1)(A)).

This Court relied upon *National Audubon Society* and *Wyoming* in extending a similar conflict preemption analysis to ANILCA. In *Alaska v. Bernhardt*, 500 F. Supp. 3d 889 (D. Alaska 2020), *aff'd sub nom. Safari Club Int'l v. Haaland*, 31 F.4th 1157 (9th Cir. 2022), the State attempted to employ ANILCA's savings clause[9] as a foothold establishing State sovereignty, from which to invert the preemption analysis and overturn a federal statutory management scheme for the Kenai National Wildlife Refuge. 500 F. Supp. 3d at 910-11. The Court rejected the argument and determined that ANILCA "§ 1314 specifically contemplates that federal law will apply to NWRs, and where there is a clear conflict between federal and state law, the federal law controls." *Id*. at 914. The Court concluded that ANILCA represents a "careful regulatory scheme established by federal law" and "that § 1314(a) 'was not meant to eviscerate the primacy of federal

---

[9]     This savings clause is found in the "administrative provisions" ANILCA Title XIII, codified at 16 U.S.C. § 3202. It states, "[n]othing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in subchapter II of this chapter [(providing for subsistence management)], or to amend the Alaska constitution," *id*. (a), and further states that taking of fish and wildlife in conservation system units "shall be carried out in accordance with the provisions of this Act and other applicable State and Federal law[,]" *id*. (c).

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 16 of 23

authority over [national wildlife refuge] management' and instead reflects Congress's intent that 'ordinary principles of conflict preemption apply' to disputes involving ANILCA." *Id*. at 915 (quoting *Nat'l Audubon Soc'y*, 307 F.3d at 854, and *Wyoming*, 279 F.3d at 1234).

Finally, Alaska attempted a similar argument in *Department of Fish & Game v. Federal Subsistence Board*, No. 3:20-CV-00195-SLG, 2021 WL 5756381 (D. Alaska Dec. 3, 2021), which this Court also rejected. In challenging subsistence-based federal closure orders similar to the ones at issue here, Alaska argued that ANILCA "expressly protects the State's authority to manage wildlife, including on federal public lands." *Id*. at *16 (internal quotations omitted). This Court disagreed, and held instead that, "[b]y granting to federal agencies the authority to impose closures under certain circumstances, ANILCA necessarily tolerates some level of federal interference with state authority if an action is otherwise permissible under section 815." *Id*. The same is true here.

In sum, Defendants' actions opening the River to fishing in contravention of federal closure orders both violate the federal orders and stand as an obstacle to the accomplishment and execution of Congress's full purposes in Title VIII of ANILCA. Accordingly, Plaintiff has a likelihood of succeeding on the merits of its preemption claim for purposes of obtaining preliminary injunctive relief.

### B. Irreparable Injury is Likely Absent Immediate Injunctive Relief

Irreparable injury is likely in the absence of preliminary injunctive relief. This injury occurs through erosion of cultural identity that Congress sought to preserve

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 17 of 23

through ANILCA, as well as through threats to declining fisheries resources.

Interference with the FSB's ability to provide for federally qualified subsistence use constitutes irreparable injury to affected rural Alaskans. For local villages comprised almost entirely of federally qualified users, both native and non-native, salmon is a critically important food source. *See* Blihovde Decl. ¶ 8 (and attached KRITFC Report); *Native Vill. of Quinhagak v. United States*, 35 F.3d 388, 393 (9th Cir. 1994). Each opportunity for harvest with a priority over others is important, and cannot be regained once gone. Moreover, every salmon harvested by non-federally qualified users is one less salmon available to upstream rural residents. This compounds existing threats to subsistence use, and local cultural identity, relating to multiple factors affecting Kuskokwim salmon, including the threat of overharvest. *See* Blihovde Decl. at 17-18, 27-28. "Many Alaska natives who are not fully part of the modern economy rely on fishing for subsistence. If their right to fish is destroyed, so too is their traditional way of life." *United States v. Alexander*, 938 F.2d 942, 945 (9th Cir. 1991). It is enough to show that the State's regulations "interfere with [the villages'] way of life and cultural identity" – they need "to prove nothing more in light of the clear congressional directive to protect the cultural aspects of subsistence living." *Native Vill. of Quinhagak*, 35 F.3d at 394 (quoting 16 U.S.C. § 3111(1)).

The State's concerted approach to this controversy also creates uncertainty and confusion rising to the level of irreparable injury. The State's openings create a practical risk that large numbers of Alaskans will arrive at the State-appointed times to set gillnets

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 18 of 23

on the Kuskokwim, resulting in unpredictable and extensive harvest of the depleted

fisheries.  And Kuskokwim rural residents face the dilemma of coming closer to their

historical subsistence harvest of salmon by capitalizing on the possibility of additional

harvest under the State's openings, while facing possible enforcement action or other

consequences of being found in violation of federal orders prohibiting such harvest.  The

State, moreover, seemingly intends to fuel, not resolve, these uncertainties.  *See* Compl.

Ex. 3 at 21-22 (ADF&G Commissioner admonishing that "*[i]rrespective of federal*

*authorities*, the State of Alaska has a constitutional responsibility to manage for

sustainable salmon runs and provide a subsistence opportunity for Alaskans when there is

a harvestable surplus of salmon" and cautioning that the State "will continue to manage

the river and fishery based on *its* assessment of run strength") (emphasis added).

Furthermore, the imperiled Kuskokwim salmon runs likely face irreparable harm

if Defendants' actions are not enjoined.  Courts often find that sufficiently likely

"environmental" injury, such as to the depleted Kuskokwim Chinook and chum salmon

populations, provides a basis for injunctive relief.  *See United States v. Oregon*, 718 F.2d

299, 305 (9th Cir. 1983) (allocating treaty and non-treaty fishing rights); *Nw. Env't Def.*

*Ctr. v. U.S Army Corps of Eng'rs & Nat'l Marine Fisheries Serv.*, 558 F. Supp. 3d 1056,

1063-64 (D. Or. 2021); *cf. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d

803, 822 (9th Cir. 2018) (analyzing impacts to listed species under the ESA).  A State

manager's opinions about species abundance do not control analysis of the likelihood of

irreparable injury.  *See Confederated Tribes & Bands of Yakama Indian Nation v.*

*Baldrige*, 898 F. Supp. 1477, 1489 (W.D. Wash. 1995) (finding "possibility of an excessive harvest" under challenged plan), *aff'd,* 95 F.3d 1157 (9th Cir. 1996), and *aff'd,* 91 F.3d 1366 (9th Cir. 1996). But even to the extent the State's views on species abundance are relevant to this Court's inquiry, the State's views are best evidenced by its recent request for a federal "fishery disaster determination" for the 2021 Kuskokwim River salmon fishery under the Magnuson-Stevens Fishery Conservation and Management Act. *See* https://media.fisheries.noaa.gov/2022-05/121_Dunleavy%202021%20Kuskokwim%20salmon.pdf (last visited May 24, 2022).

This dispute arises in the context of the ANILCA Title VIII subsistence use priority. Kuskokwim Chinook and chum salmon populations are in decline, and face risk of overharvest. The State's efforts to provide harvest opportunities for all Alaskans undermine the federal subsistence priority, diminish subsistence uses and cultural identity, and threaten the resources. Plaintiff has shown sufficient likelihood of irreparable injury to enjoin Defendants' actions during the impending 2022 Kuskokwim fishing season.

### C. The Equities and Public Interest Favor an Injunction

In the unique context of this dispute, ANILCA provides a clear indication that the equities and public interest tip in favor of an injunction. When the federal government is a party, "the balance of equities factor and the public interest factor merge." *Jones v. Bonta*, No. 20-56174, 2022 WL 1485187, at *5 (9th Cir. May 11, 2022).

When it promulgated Title VIII in 1980, Congress established a national policy –

and with it, a determination of equities – that on public lands, conservation and subsistence uses by rural Alaskans be given priority over other consumptive uses. *See* 16 U.S.C. § 3112(2), 3114. It adopted this policy because "the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, . . . is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence." 16 U.S.C. § 3111(1).

In his communications with the FSB, Commissioner Vincent-Lang points to the Alaska State Constitution as ADF&G's basis for taking actions that undermine federal law. *See* Compl. Ex. 3 at 9 (opining there exists "no reason to restrict opportunity for state qualified users"); 13 (justifying Kuskokwim openings to all Alaskans as addressing "my constitutional obligations"). But nothing in a state's constitution can authorize any state official to contravene a national policy expressed through a federal statute adopted with the long-term goals of requiring conservation of resources and protecting the interests of rural Alaskans in meeting their subsistence needs, preserving their culture, and continuing their way of life. *See Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1169 (9th Cir. 2022). The State's own Working Group, made up of elders, those who practice subsistence, commercial and sport fishing, processors, and others, recommends against state actions that undermine the federal priority. *See* http://www.adfg.alaska.gov/static-f/fishing/PDFs/commercial/krsmwg/2021/05_03-04_21_summary.pdf at 4 (describing motion "to recommend to ADF&G to not have concurrent setnet and driftnet openers to

those announced by the US Fish and Wildlife Service during a Federal Special Action"
passed by vote of 6 yes, 1 no, 2 abstentions) (last visited May 24, 2022).

The State cannot plausibly dispute that the federal subsistence priority requires
establishment of a "meaningful use preference." *Ninilchik Traditional Council*, 227 F.3d
at 1193. Yet here, the State has threatened and continues to threaten those very things
that Congress sought to safeguard through the Title VIII rural subsistence priority. For
these reasons, the Court should find that the balance of equities and public interest tip
strongly in favor of preliminary injunctive relief.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant its
motion, and enter a preliminary injunction enjoining implementation of Defendants' EO
#3-S-WR-02-22, or from taking similar actions interfering with or contravening federal
orders issued pursuant to ANILCA Title VIII.

Respectfully submitted,

DATED: May 24, 2022.                    TODD KIM
                                        Assistant Attorney General
                                        United States Department of Justice
                                        Environment and Natural Resources Division

                                        */s/ Paul A. Turcke*
                                        PAUL A. TURCKE
                                        Idaho Bar No. 4759
                                        Trial Attorney, Natural Resources Section
                                        P.O. Box 7611 Washington, D.C. 20044
                                        202-353-1389 || 202-305-0275 (fax)
                                        paul.turcke@usdoj.gov

                                        *Counsel for Plaintiff*

Of Counsel:

Kenneth M. Lord
Office of the Regional Solicitor
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508
907-271-4184
ken.lord@sol.doi.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(2), because this memorandum contains 5,633 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word 2016 (16.0.5290.1000) MSO (16.0.5278.1000) 32-bit.

*/s/ Paul A. Turcke*
Paul A. Turcke

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2022, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke

Case 1:22-cv-00054-SLG   Document 5   Filed 05/24/22   Page 23 of 23