TREG R. TAYLOR
ATTORNEY GENERAL

Margaret Paton-Walsh (Alaska Bar No. 0411074)
Chief Assistant Attorney General
Aaron C. Peterson (Alaska Bar No. 1011087)
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov
        aaron.peterson@alaska.gov

Attorneys for the State of Alaska

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 1:22-cv-00054-SLG |
| | ) |
| State of Alaska; Alaska Department of | ) |
| Fish & Game; Doug Vincent-Lang, | ) **OPPOSITION TO MOTION FOR** |
| Commissioner, | ) **RESTRAINING ORDER** |
| | ) |
| Defendants. | ) |

## INTRODUCTION

The United States determined this issue was ripe to litigate in mid-2021.

Yet, despite this, the United States waited until mere days before the State's first

scheduled subsistence fishing opener to file an expedited motion for a temporary

restraining order to prevent the State from managing fisheries in the Kuskokwim River.

1

The United States proposed that the State of Alaska should have 72 hours to respond and the Court only a single business day to issue an order. Because this compressed timeline is entirely the fault of the United States, and because its motion entirely fails to prove that it will suffer *any harm*, much less irreparable harm, if a restraining order is not issued before the preliminary injunction motion can be heard, the State asks this Court to deny the motion.

## BACKGROUND

### A. The State of Alaska is the Primary Fisheries Manager

Alaska's successful management of complex multi-stock salmon fisheries relies in large part on the constitutionally mandated sustained yield principle.[1] As described in the State's Policy for the Management of Sustainable Salmon Fisheries, "wild salmon stocks and the salmon's habitats should be maintained at levels of resource productivity that assure sustained yields."[2] And despite the challenging nature of managing mixed-stock fisheries, the State's sustained yield management structure is why Alaska's wild salmon fisheries are experiencing historic success.[3]

Self-management of natural resources, including Alaska's fisheries resources, was a driving force behind Alaska statehood; fish and wildlife are the property of the State

---

[1]     Alaska Const. art VIII, § 4; Alaska Statute 16.05.251(d).

[2]     5 AAC 39.222(c).

[3]     *See e.g.*
https://www.adfg.alaska.gov/index.cfm?adfg=pressreleases.pr&release=2021_11_01, last visited May 23, 2022.

held in trust for the benefit of all residents.[4] Ownership of the resources passed to Alaska upon statehood under the Alaska Statehood Act.[5] General management authority over fish and wildlife within Alaska passed from the federal government to Alaska shortly after Alaska's adoption of a comprehensive fish and game code in 1959.[6]

The Alaska Board of Fisheries ("Board") is responsible for "the conservation and development of the fishery resources of the state" of Alaska.[7] The Board regulates the resource by "establishing open and closed seasons and areas for the taking of fish,[8] "setting quotas, bag limits, [and] harvest levels,"[9] establishing means and methods restrictions,[10] and "regulating commercial, sport, guided sport, subsistence, and personal use fishing as needed for the conservation, development, and utilization of fisheries,"[11] among its other responsibilities.

The Alaska Department of Fish and Game ("ADF&G"), led by its Commissioner, administers regulations adopted by the Board in accordance with the statutory duty to "promote fishing, hunting, and trapping and preserve the heritage of fishing, hunting, and

---

[4]    *See, e.g.*, *Pullen v. Ulmer*, 923 P.2d 54, 57 n.5 (Alaska 1996); *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 47 (1962).

[5]    Pub. L. No. 85-508, 72 Stat. 339 (1958).

[6]    *See* 25 Fed. Reg. 33 (Dec. 29, 1959) (transferring management of fish and wildlife resources to the State); *see also Metlakatla Indian Cmty.*, 369 U.S. at 47 n.2.

[7]    AS 16.05.221(a).

[8]    AS 16.05.251(a)(2).

[9]    AS 16.05.251(a)(3).

[10]    AS 16.05.251(a)(4).

[11]    AS 16.05.251(a)(12).

trapping in the state."[12] In the Alaska National Interest Lands Conservation Act ("ANILCA"), Congress expressly recognized and maintained the State's management authority except as limited in Title VIII,[13] thus any authority regarding fish and wildlife not specifically granted by Congress in Title VIII remains with the State.

The State has an obligation to provide for a subsistence priority, and the opener announcement challenged by the United States plainly expresses the State's scientifically supportable conclusion that the openers will not negatively impact that preference or federally qualified users ability to meet their subsistence needs.[14]

### B. The Federal Subsistence Board

In ANILCA, Congress provided that subsistence uses of fish shall receive priority among consumptive uses for rural residents only "when it is necessary to restrict taking in order to assure continued viability of a fish or wildlife population or the continuation of subsistence uses of that population for subsistence purposes."[15] Pursuant to that duty, the Secretaries of Interior and Agriculture established the Federal Subsistence Board ("FSB") and delegated their authority to implement ANILCA's subsistence preference to the FSB.[16]

---

[12]     AS 16.05.050(a)(19).

[13]     16 U.S.C. § 3202.

[14]     Dkt. 1-2, p. 19.

[15]     16 USC 3112(2).

[16]     57 *Federal Register* 22940-22964, May 29, 1992; 50 CFR §100.10.

The FSB is composed of eight voting members.[17] The Chair and two members of the public "who possess personal knowledge of and direct experience with subsistence uses in rural Alaska" are appointed by the Secretary of Interior with the concurrence of the Secretary of Agriculture.[18] The remaining five seats are filled by the Alaska Regional Directors of the U.S. Fish and Wildlife Service, National Park Service, U.S. Forest Service, Bureau of Land Management, and the Bureau of Indian Affairs.[19] The State does not have a voting seat on the FSB, despite retaining management authorities.

Among the FSB's purported powers enumerated by regulation are the power to "issue regulations for the management of subsistence taking and uses of fish and wildlife on public lands;…[a]llocate subsistence uses of fish and wildlife populations on public lands;…[e]nsure that the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes;…[r]estrict the taking of fish and wildlife on public lands for nonsubsistence uses or close public lands to the take of fish and wildlife for nonsubsistence uses *when necessary* for the conservation of healthy populations of fish or wildlife, to continue subsistence uses of fish or wildlife, or for reasons of public safety or administration;…establish priorities for the subsistence taking of fish and wildlife on public lands among rural Alaska residents;…[and r]eview and respond to proposals for

---

[17]     50 C.F.R. §100.10(b)(1).

[18]     *Id.*

[19]     *Id.*

regulations, management plans, policies, and other matters related to subsistence taking and uses of fish and wildlife…."[20]

On May 7, 2021, the Yukon Delta National Wildlife Refuge Manager claimed the authority to unilaterally close "Federal public waters of the Kuskokwim River within and adjacent to the exterior boundaries of the Yukon Delta National Wildlife Refuge."[21] The Refuge Manager explained that he had such broad authority as a result of a "delegation of authority letter from the Federal Subsistence Board."[22] The Refuge Manager also ordered that he would reopen the river, for federally qualified users only, on several occasions in June.[23] The order did not contain any analyses of why this action was necessary although the federal government is required to manage fisheries according to "recognized scientific principles."[24] The entire 2021 season was managed by both State and Federal managers opening and closing the river to subsistence users at various times.[25]

Exhibiting the conservative management principles required to sustainably manage salmon runs, the State instituted a front-end closure of salmon fishing on the Kuskokwim beginning on June 1, 2022.[26] The State will continue to review inseason data

---

[20]    50 C.F.R. § 100.10(d)(4)(i), (iv), (v), (vi), (viii), (xv) (emphasis added).

[21]    Dkt 1-1, Ex. 1, p. 2. Emergency Special Action No.: 3-KS-01-21,

[22]    *Id.*

[23]    *Id.* at 3.

[24]    16 USC 3101(c); 16 USC 3111(1).

[25]    *See e.g.* Dkt. 1-1, Ex. 1, p. 2-9.; Dkt. 1-2, Ex. 2, p. 2-16.

[26]    Dkt. 1-2, pp. 17-18.

and determine when opening the fishery is appropriate and consistent with sustained yield of the resource.[27]

On May 2, 2022, the Yukon Delta National Wildlife Refuge Manager again purported to close large sections of navigable waters of the Kuskokwim River to all users.[28] But the order also stated that the river would be open for federally qualified users to fish during three periods:

• June 1, 2022 from 06:00 a.m. to 10:00 p.m.
• June 4, 2022 from 06:00 a.m. to 10:00 p.m.
• June 8, 2022 from 06:00 a.m. to 10:00 p.m.[29]

The Refuge Manager also ordered that set or drift gillnets could be used on two occasions:

• June 12, 2022 06:00 a.m. to 06:00 p.m.
• June 16, 2022 06:00 a.m. to 06:00 p.m.[30]

The order did not contain any analyses to justify the necessity of the actions.

The order specifically states that "Federally qualified subsistence users may retain all salmon during these periods…."[31] Reflecting the Refuge Manager's apparent lack of concern for the sustainability of the salmon runs, he also ordered that "[a]lternative gear types – dip nets, beach seines, fish wheels, and rod and reel – may be used throughout gillnet closures, and Federally qualified subsistence users may retain all salmon caught

---

27      *Id.*, p. 18.

28      Dkt 1-1, Ex. 1, p. 10. Emergency Special Action No.: 3-KS-01-22,

29      *Id.*

30      *Id.*

31      *Id.*

using these alternative gear types."[32] In other words, while the State has closed the Kuskokwim to all directed salmon fishing—at least unless and until in-season data demonstrates that continued closure is unnecessary to protect the run—the Refuge Manager has decided to permit targeting salmon before there is any information at all about the actual strength of the run.

ADF&G Commissioner Vincent-Lang was concerned enough about this action and the lack of supporting analysis that he sent a letter to the USFWS Regional Director noting that the directed harvest of Chinook was allowed under the Federal Manager's order, even if only when taken with selective gear.[33] The letter further explained that, at the projected run strength, it was "premature to announce two 12-hour fishing periods on June 12 and 16" and doing so "without any knowledge of the in season run strength except for the State's preseason outlook, as 3-KS-01-22 does, is irresponsible management."[34] No response or analysis was provided.

## PRESENT LAWSUIT

The United States filed the present lawsuit on May 17, seeking permanent and preliminary injunctive relief[35] in the form of a court order barring the State from

---

[32]     *Id.*

[33]     Exhibit A, May 12, 2022 letter from Comm. Vincent-Lang to USFWS Regional Director.

[34]     *Id.*

[35]     Dkt. 1.

8

managing fisheries on *state waterways over state-owned submerged lands*.[36] The United States then filed a Motion for a Temporary Restraining Order on May 24.[37]

The United States is purportedly concerned that three state announced early-June subsistence setnet openers on the Kuskokwim will cause "confusion" and negatively impact the sustainability of Chinook salmon.[38] This concern is misplaced, as the three state openers in early June target non-salmon species, primarily whitefish, and will harvest very few Chinook salmon.[39] Moreover, under the State's Emergency Order opening the fishery, all salmon species harvested with alternative gear must be returned to the water alive.[40] Meanwhile, the United States, through its Refuge Manager, is opening the same periods to fishing for Chinook salmon *while also allowing retention of Chinook salmon caught with alternative gear*.[41] This is the very species that the United States seeks to convince this Court is so imperiled that a potential catch of only a few hundred fish could irreversibly crash the fishery. And, critically, the United States is

---

[36] In 1995 the Ninth Circuit held that "the definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine." *State of Alaska v. Babbit*, 72 F.3d 698, 703-4 (9th Cir. 1995). In 2013, the Ninth Circuit again held that many of Alaska's navigable waterways are "public lands" under Title VIII of ANILCA. *John v. United States*, 720 F.3d 1214 (9th Cir. 2013). But in 2019, the Supreme Court held that Alaska's navigable waterways are not "public lands" under ANILCA. *Sturgeon v. Frost*, 139 S. Ct. 1066 (2019). At the request of parties, the Supreme Court left the above-referenced Ninth Circuit holdings undisturbed, while invalidating the legal basis for the decisions. *Id*. at 1080, n.2.

[37] Dkt. 6.

[38] *Id*. at 3.

[39] *See* Dkt. 1-2, p. 19.

[40] *Id*.

[41] Dkt. 1-1, p. 12.

opening two set or drift gillnet opportunities, on June 12 and June 16, using much larger gear that is more easily able to target Chinook.[42] The drift gillnets are longer, indiscriminate, and target the deep channels of the river that the Chinook prefer. Furthermore, fish cannot be released from them alive. The State objected to the Refuge Manager's preseason decision—made before a single salmon had entered the river—to announce early season drift openers directed at Chinook in such quick succession because the management action is unsupported by the available scientific data and could negatively impact upriver subsistence users' ability to meet their subsistence needs.[43]

## LEGAL STANDARD

The standards for issuing a temporary restraining order and a preliminary injunction are "substantially identical."[44] "A preliminary injunction is an extraordinary remedy never awarded as of right."[45] Plaintiffs seeking preliminary injunctive relief bear the heavy burden of establishing that: (1) their claims are likely to succeed on the merits; (2) they will likely suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.[46] Alternatively, "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips

---

[42]    *Id*.

[43]    Exhibit A.

[44]    *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

[45]    *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[46]    *Id*. at 20.

sharply in the plaintiff's favor."[47] Plaintiffs carry the burden to establish that all four factors tip in their favor.[48]

The purpose of a temporary restraining order is to "preserv[e] the status quo and prevent[] irreparable harm *just so long as is necessary to hold a hearing*" on a motion for preliminary injunction.[49] Thus, to obtain a temporary restraining order, the United States must establish that it will suffer irreparable harm if an injunction does not issue before the Court can hear its preliminary injunction motion—i.e. in the next few weeks.

## ARGUMENT

### A. The United States unreasonably delayed filing its complaint and request for injunction, manufacturing the alleged need for a restraining order.

Both the complaint and the United States' motion for preliminary injunction point to inconsistent emergency orders issued in 2021 by the Yukon Delta National Wildlife Refuge Manager and ADF&G regarding subsistence fishing on the Kuskokwim as the factual basis for this lawsuit.[50] The Federal Subsistence Board voted to sue the State on July 9, 2021.[51] Yet the federal government never entered into meaningful discussions

---

[47] *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted).

[48] *Id*. at 1135.

[49] *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974) (emphasis added). *See also*, *Samuelson v. Treadwell*, 2012 WL 2236637 at 2 (D.Alaska 2012) (declining to issue restraining order in advance of convening of three-judge panel because plaintiffs failed to show irreparable harm would occur before the panel could convene).

[50] Dkt. 1, p. 19-24; Dkt. 5, p. 7-10.

[51] Exhibit B, Decl. of Deputy Commissioner Ben Mulligan.

with the State to resolve the issues and instead waited until one week before the start of the 2022 fishing season to request an emergency order against ADF&G, forcing the State to brief the issue on an extremely expedited basis and the Court to decide the question over a holiday weekend. Because the alleged emergency requiring such an expedited process was manufactured by the United States, this Court should be skeptical of the United States' claims of harm. If the government genuinely believed that it was essential to have an injunction in place before the start of the fishing season, it could have filed in time to obtain that injunction under a normal briefing schedule.

After all, the Department of Justice sent the State a letter threatening to file this lawsuit and a motion for a preliminary injunction on April 6, 2022.[52] The Regional Solicitor met with the Commissioner of ADF&G on April 25, but that meeting failed to resolve the situation. On April 29, the Alaska Fish and Game Kuskokwim Working Group met and discussed June openers for the king salmon fishery.[53] No analyses were provided by the United States at this meeting to justify the subsequent actions taken.

If the United States had filed its complaint and motion for preliminary injunction at the end of April—nine months after the FSB voted to file a lawsuit—this Court could have had the benefit of full briefing and argument before the start of the fishing season, but inexplicably the United States continued to delay.

---

[52]    Dkt. 5-2.

[53]    Exhibit C, Decl. of Nicholas Smith.

The United States suggests that this delay resulted from its attempts to avoid the need for expedited proceedings, claiming that it "engaged Defendants in efforts to resolve the need for immediate injunctive relief."[54] But Ms. Thiele's declaration reveals, to the contrary, that the United States refused to discuss the scientific bases for its management decisions with the State—something that might actually have produced compromise; and instead, its "efforts" consisted merely of demanding that the State permit the federal takeover of the Kuskokwim fishery or be sued.[55] Moreover, even after filing its lawsuit on May 17, seeking a "*preliminary* and permanent injunction against the State of Alaska,"[56] the United States further delayed actually filing the motion for preliminary injunction and the present motion for TRO for another week, in the meantime repeating its threat to move for a preliminary injunction unless the State capitulated to the plaintiff's assertion of control over the fishery.[57] Thus, these "efforts to resolve the need for immediate injunctive relief" were performative, at best, resulting only in unnecessary delay prejudicing the State's ability to respond.

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action."[58] Thus, the United States' conduct

---

[54] Dkt. 6, p. 3.

[55] Dkt. 5-2.

[56] Dkt. 1, p. 24.

[57] Dkt. 5-2, at ¶ 10.

[58] *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) (considering First Amendment claim); *see also Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d

belies its claim that a temporary restraining order is necessary lest irreparable harm is inflicted on the Chinook fishery on the Kuskokwim.

## B. The United States has failed to establish that irreparable harm will result from the minimal delay required for this Court to decide its motion for a preliminary injunction.

The United States has not and cannot establish that it will suffer any irreparable harm in the absence of a temporary restraining order. It claims the "requested TRO would avoid the confusion, uncertainty, and irreparable harm to resources that would occur if Defendants' actions take effect."[59] Not so.

First, the State fishery does not and will not cause any confusion or uncertainty. The State's opener announcements use plain language of the same kind that has been used in similar orders for decades—the language speaks for itself and has not resulted in confusion or uncertainty for the users in the past.[60] And the United States' suggestion that "Kuskokwim rural residents" will "face the dilemma" of whether to take advantage of the State's openings at the risk of "being found in violation of federal orders" simply ignores the fact that the state openers coincide with the federal openers and contain the same gear

---

1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

[59]     Dkt. 6, p. 3.

[60]     Dkt. 1-2, pp. 2-20.

restrictions.[61] In other words, a Kuskokwim rural resident fishing under the state openers will not be violating the federal orders. This is an invented harm, not a real one.

Second, the United States' claim that a lawful State fishery, occurring on state waterways, that primarily targets non-salmon species would irreversibly damage future Chinook salmon returns is scientifically unsupportable. This is doubtless why the United States does not cite any evidence, scientific or otherwise, to support its claim that an unspecified number of non-federally qualified users potentially taking a few hundred Chinook will cause "irreparable harm to resources."[62] The burden lies with the United States to prove that there is a "likelihood of irreparable injury" and that the injunction is in the public interest.[63] And here, the United States falls woefully short of that burden of proof, failing to offer even a scintilla of supporting evidence.

Moreover, the United States' own actions belie its claim that the State's three early season setnet openers—which target non-salmon species—will "irreparably" damage Kuskokwim Chinook sustainability. If it believed Chinook were so critically depressed, it would not—indeed, it *could not* consistent with its obligations under ANILCA—have announced two drift openers for June, with larger gear that more easily targets Chinook and purposefully removes salmon (over the State's objection) from the allegedly

---

[61]     *See* Dkt. 1-1, p. 12, Dkt. 1-2, p. 19.

[62]     Dkt. 6, p. 3.

[63]     *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

critically depressed stock.[64] The United States cannot have it both ways: if the small number of Chinook caught incidentally during the State's limited non-salmon opener could do irreparable harm to the Kuskokwim salmon runs,[65] then the federal drift openers targeting Chinook authorized by the Refuge Manager[66] would do much worse, in violation of ANILCA.[67] The United States' willingness to open the river to salmon drift nets—before a single salmon has entered the river—is flatly inconsistent with its representations to this Court that the state's non-salmon opener risks irreparable harm to the run.

Notably, the United States does not allege that non-federally qualified users *will in fact* catch fish in numbers that will impact federally qualified users' ability to meet their subsistence needs. Nor does it present any data that would support such an argument or conclusion. Instead, the United States raises the specter that the "State's openings create a

---

[64] Dkt. 1-1, p. 11. The State manages the fishery in-season based on apparent run strength as supported by sonar, weir counts, test fisheries and aerial survey programs (i.e. based on real data rather than estimates). *See* Ex. C, Smith Dec. at ¶¶ 8-9.

[65] Dkt. 5, p. 19.

[66] Dkt. 1-1, pp.11-12.

[67] 16 USC 3112:

It is hereby declared to be the policy of Congress that [] *consistent with sound management principles, and the conservation of healthy populations of fish and wildlife*, the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands, *consistent with management of fish and wildlife in accordance with recognized scientific principles* and the purposes for each unit established, designated, or expanded by or pursuant to titles II through VII of this Act, the purpose of this title is to provide the opportunity for rural residents engaged in a subsistence way of life to do so… (emphasis added)

practical risk that large numbers of Alaskans will arrive at the State-appointed times to set gillnets on the Kuskokwim, resulting in unpredictable and extensive harvest of the depleted fisheries."[68] But this is disingenuous. The fact of the matter is that the vast majority of subsistence fishers on the Kuskokwim are locals with setnets and knowledge of where to place them.[69] The suggestion that hordes of urban fishers are going to descend on Bethel, obtain setnets, learn where to place them, transport the nets to the location, then fish them to catch whitefish and *possibly* a small number of salmon is pure fantasy. Rather, as explained in the State's fishery announcement, there are a small number of "individuals who have been displaced to the urban areas of Alaska for educational, social, health or other reasons" who may wish to return "to practice their traditional and cultural subsistence way of life that is closely tied to the Kuskokwim River."[70] It is these former residents of the Kuskokwim that the United States is seeking to harm by preventing them from engaging in subsistence fishing.

Moreover, the United States presents no data whatsoever in support of its conclusion that the salmon take by non-federally qualified users while participating in the State opener will result in less salmon available to upstream rural residents. In fact, the United States does not present any evidence that non-federally qualified users have taken

---

[68]   Dkt. 5, pp. 18-19.

[69]   *See e.g.* Exhibit C, ¶ 15 ("During the June 28, 2021 subsistence fishing period announced by the State of Alaska there is no evidence that I am aware of that any non-federally qualified subsistence users participated in the taking of salmon.")

[70]   Dkt. 1-2, Ex. 2, p. 19. (Kuskokwim River Salmon Fishery Announcement #2)

in the past or will take in the future *a single salmon* during State openers.[71] As the party moving for the TRO, the United States "bears the burden of persuasion and must make a clear showing that it is entitled to such relief,"[72] yet it does not present an iota of evidence to support its claimed injury.

Finally, the State requested numerous times to see any analysis held by the United States demonstrating that the state openers negatively impact the subsistence fishing opportunities of federally qualified users. The State also asked repeatedly to see analyses showing how the federal openers could affect the ability of the State to meet the subsistence needs of upriver areas managed by the State and how federal openers potentially impact the ability of the State to meet upriver escapement goals. No analyses were provided to the State, nor to the Working Group. In sum, the United States has consistently refused to provide the State with any scientific support for the Refuge Manager's decision; nor has it offered any such evidence to this Court. It has thus failed to establish a likelihood of harm justifying a temporary restraining order.

### C. The United States has not established a probability of success on the merits.

The United States asserts that a conflict exists between its federal closure orders for the Kuskokwim River and the State's openers and that federal law preempts state law,

---

[71]     *Id*. Although the State's set gillnet opener notice indicates that 720 king salmon were harvested in the three 2021 set gillnet periods, there is no evidence to establish how many, if any, of those fish were harvested by non-federally qualified users.

[72]     *Winter*, 555 U.S. at 22, 129 S.Ct. 365.

so therefore they will prevail on the merits.[73] But its argument presupposes the validity of the federal closure orders, which the United States has not demonstrated in its pleadings. In its opposition to the United States' motion for preliminary injunction, the State will discuss a variety of reasons to doubt that the orders are valid, including the scope of the delegation of authority both to the FSB and from the FSB to the Refuge Manager and the manner in which the Refuge Manager has exercised his delegated authority.[74] Notably, the United States has not provided either a copy of the FSB's delegation to the Refuge Manager or any evidence showing that the Refuge Manager complied with the guidelines in the delegation when making his decisions.

The United States' failure to provide data or analysis supporting the refuge manager's decision also violates the Comprehensive Conservation Plan (CCP) for the Yukon Delta Refuge. ANILCA requires the United States to manage according to the CCP. The CCP, adopted under ANILCA Sec. 304(g)(1), contains numerous references to management of fish according to scientific principles and the facts.

The CCP also contains a MOU with the State (Appendix J) stating that DOI recognizes the State as the lead and primary manager of fish resources. Such MOUs are specifically allowed for in ANILCA.[75] ANILCA also requires DOI to "cooperate with …

---

[73]      Dkt. 5, pp. 12-17.

[74]      The State notes that although this Court is bound by *John v. United States*, 720 F.3d 1214 (9th Cir. 2013), the FSB's jurisdiction over the river—a navigable state waterway—is far from clear in the wake of *Sturgeon v. Frost*, 139 S.Ct. 1966 (2019).

[75]      Pub L. No. 96-487, 94 Stat. 2394, at § 304(f), not codified.

appropriate State … agencies."[76] This principle is also incorporated in the CCP. Unilateral assertion of control of a fishery without any facts or science to support such action is definitely not "cooperation" with the State.

**D. The balance of equities and the public interest weigh against a temporary restraining order.**

The United States asserts in its memorandum in support of its preliminary injunction that the equities and the public interest favor an injunction, but its arguments do not apply to the motion for a temporary restraining order currently before the Court. With respect to that motion, the equities are different. The United States delayed filing its lawsuit and its motion for temporary restraining order until the last minute, proposing that the State should brief issues in days after the federal government had months to prepare its own pleadings. And despite this advantage, the United States' pleadings are notably devoid of the scientific data or analysis necessary to support its claims of harm that will result if the state openers proceed.

Finally, the United States notes that the "purpose of a TRO is to preserve the status quo pending a full hearing on a preliminary injunction,"[77] but ignores the fact that the status quo consists of *both* state and federal orders regarding fishing opportunities on the Kuskokwim in June. Thus, this Court should reject the United States' claims regarding the equities and the public interest when considering its request for a temporary restraining order.

---

[76]      16 USC 3112(3).

[77]      Dkt. 6, p. 2.

## CONCLUSION

Because the requested restraining order does not serve the purpose of a TRO, and the United States has failed to meet its burden to obtain such an order, the State respectfully asks this Court to deny the motion.

DATED: May 27, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

By: s/ Margaret Paton-Walsh
      Margaret Paton-Walsh
      (Alaska Bar No. 0411074)
      Chief Assistant Attorney General

      s/Aaron C. Peterson
      Aaron C. Peterson
      (Alaska Bar No. 1011087)
      Senior Assistant Attorney General
      Office of the Attorney General
      Natural Resources Section
      Department of Law
      1031 West Fourth Avenue, Ste. 200
      Anchorage, AK 99501
      margaret.paton-walsh@alaska.gov
      aaron.peterson@alaska.gov
      Phone: (907) 269-5232
      Facsimile: (907) 276-3697

      Attorneys for the State of Alaska

## CERTIFICATE OF SERVICE

I hereby certify that on **May 27, 2022**, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

s/ Leilani J. Tufaga
Leilani J. Tufaga
Law Office Assistant II