TREG R. TAYLOR
ATTORNEY GENERAL

Margaret Paton-Walsh (Alaska Bar No. 0411074)
Chief Assistant Attorney General
Aaron C. Peterson (Alaska Bar No. 1011087)
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov
          aaron.peterson@alaska.gov

Attorneys for the State of Alaska

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:22-cv-00054-SLG |
| | ) | |
| State of Alaska; Alaska Department of | ) | |
| Fish & Game; Doug Vincent-Lang, | ) | **OPPOSITION TO MOTION FOR** |
| Commissioner, | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| Defendants. | ) | |

## I.     INTRODUCTION

The United States has sued the State of Alaska asking this Court to enjoin the

State from actively managing the fisheries of the lower Kuskokwim River in the

Yukon Delta National Wildlife Refuge. The United States seeks to replace state

management with federal management, counter to the Statehood Compact that granted

*United States v. Alaska*                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                    1
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 1 of 42

the State the right to manage its fish and game resources. The attempt to federalize state fisheries also runs counter to the intent of the Alaska National Interest Lands Conservation Act (ANILCA) and the refuge Comprehensive Conservation Plan, which recognizes the State as the principal manager of the fisheries. Neither envisions completely replacing state management with federal management. Instead, they contemplate limited federal involvement—allowing the United States to restrict or close fisheries—to ensure that the needs of rural users are being met, not the wholesale replacement of state management with federal management.

The United States has requested a preliminary injunction to prohibit the State from issuing emergency orders to effectuate state management decisions on the Kuskokwim River. Issuance of such an injunction would upset the balance of management in this and other rivers across Alaska, expand federal authority beyond any statutory justification, and undermine the careful balance between state and federal authority reached in ANILCA.

The United States has a high burden to obtain such preliminary relief; a burden it has failed to meet. Indeed, it has not established either of the major requirements for a preliminary injunction: a probability of success on the merits and irreparable harm absent injunctive relief. The Court should deny the motion.

## II. BACKGROUND

### A. ANILCA provided for a rural subsistence priority on public lands.

In Title VIII of ANILCA, Congress provided that subsistence uses of fish and wildlife should receive priority among consumptive uses for rural residents on public

*United States v. Alaska*
Opp. to Motion for Preliminary Injunction
Case No. 1:22-cv-00054-SLG
2
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 2 of 42

lands only "when it is necessary to restrict taking in order to assure continued viability of a fish or wildlife population or the continuation of subsistence uses of that population."[1] Title VIII of ANILCA lays out the framework pursuant to which the Secretaries of Interior and Agriculture were to implement this rural subsistence priority.

Section 802 directs federal agencies to "cooperate with adjacent landowners and land managers, including Native Corporations, appropriate State and Federal agencies and other nations."[2] Section 805 provides for the creation of "regional advisory councils," in each subsistence resource region.[3] The councils exist to facilitate public participation and to make recommendations regarding proposals for regulations, policies, management plans, and other matters relating to the subsistence uses on federal lands in Alaska.[4] However, Section 805 makes clear that the Secretary is not bound by the councils' recommendations.[5] And Section 805 does not authorize the subdelegation of decision making or other managerial authority to outside parties.[6] The only delegation outside a federal agency authorized by Congress is the delegation to the State found in

---

[1]     16 U.S.C § 3112(2); *see also* §§ 3114, 3125(3).

[2]     16 U.S.C § 3112(3).

[3]     16 U.S.C § 3115; *see also* 50 C.F.R. §100.22. The 10 subsistence resource regions are the Southeast Region, Southcentral Region, Kodiak/Aleutians Region, Bristol Bay Region, Yukon-Kuskokwim Delta Region, Western Interior Region, Seward Peninsula Region, Northwest Arctic Region, Eastern Interior Region, and North Slope Region.

[4]     16 U.S.C § 3115; *see also* 50 C.F.R. § 100.11.

[5]     16 U.S.C § 3115(c).

[6]     16 U.S.C § 3115(a).

*United States v. Alaska*                                          Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                          3
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 3 of 42

Section 805(d).[7]

Delegation aside, Section 809 allows the Secretary to "enter into cooperative agreements or otherwise cooperate with other Federal agencies, the State, Native Corporations, other appropriate persons and organizations, and acting through the Secretary of State, other nations to effectuate the purposes and policies of this title."[8] And though cooperative agreements are often appropriate, any delegation of management authority to any entity other than the State is plainly unlawful.

Finally, in ANILCA Congress expressly recognized and maintained the State's management authority except as limited in Title VIII,[9] and Title VIII expressly does not "authoriz[e] a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands (other than national parks and park monuments) *unless necessary* for the conservation of healthy populations of fish and wildlife, for the reasons set forth in § 816, to continue subsistence uses of such population, or pursuant to other applicable law."[10] Thus, any authority regarding fish and wildlife not specifically granted by Congress in Title VIII[11] remains with the State.

---

[7]     16 U.S.C § 3115(d).

[8]     16 U.S.C § 3119; *see also* 16 U.S.C. § 3112(3).

[9]     16 U.S.C. § 3202.

[10]     16 U.S.C. § 3125.

[11]     Of course, generally applicable statutes affecting fish and wildlife—e.g. the Endangered Species Act, 16 U.S.C. ch. 35, and the Marine Mammal Protection Act, 16 U.S.C. ch. 31—apply.

*United States v. Alaska*                                         Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                    4
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 4 of 42

## B. The Secretaries created the Federal Subsistence Board and assigned to it the responsibility for administering the federal subsistence program.

The Secretaries of Interior and Agriculture by regulation established the Federal Subsistence Board ("FSB") to implement ANILCA's subsistence preference and delegated their authority to it.[12] The FSB is composed of eight voting members.[13] The Chair and two other members of the public "who possess personal knowledge of and direct experience with subsistence uses in rural Alaska" are appointed by the Secretary of Interior with the concurrence of the Secretary of Agriculture.[14] The remaining five seats are filled by the Alaska Regional Directors of the U.S. Fish and Wildlife Service, National Park Service, U.S. Forest Service, Bureau of Land Management, and the Bureau of Indian Affairs.[15] The State does not have a voting seat on the FSB, despite retaining management authorities.

The regulations "empower[]" the Board "to the extent necessary to implement Title VIII of ANILCA," to, among other things,:

- issue regulations for the management of subsistence taking and uses of fish and wildlife on public lands;…
- [a]llocate subsistence uses of fish and wildlife populations on public lands;…
- [e]nsure that the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes;…
- [r]estrict the taking of fish and wildlife on public lands for

---

[12]  57 *Federal Register* 22940-22964, May 29, 1992; 50 C.F.R. §100.10.

[13]  50 C.F.R. §100.10(b)(1).

[14]  *Id.*

[15]  *Id.*

*United States v. Alaska*                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                    5
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 5 of 42

nonsubsistence uses or close public lands to the take of fish and
wildlife for nonsubsistence uses *when necessary* for the conservation
of healthy populations of fish or wildlife, to continue subsistence
uses of fish or wildlife, or for reasons of public safety or
administration;…

- establish priorities for the subsistence taking of fish and wildlife on public
  lands among rural Alaska residents; [and]
- [r]eview and respond to proposals for regulations, management plans,
  policies, and other matters related to subsistence taking and uses of fish and
  wildlife….[16]

The Secretaries have also enacted regulations governing emergency management

measures: emergency special actions and temporary special actions.[17] Those regulations

provide that when the FSB enacts an emergency special action, it may seek

recommendations from the regional council on the proposed action,[18] and when the FSB

enacts a temporary special action it is required to consult with the State and the Chairs of

the regional councils of the affected regions.[19]

According to the regulations established by the Secretaries, the "decision of the

Board on any proposed special action will constitute its final administrative action."[20]

**C.    The Board has delegated its authority to issue emergency special actions to
effect in-season management decisions related to subsistence fishing on the
Kuskokwim to the Yukon Delta National Wildlife Refuge Manager.**

In a letter dated March 13, 2018, the FSB subdelegated its responsibility pursuant

---

[16]    50 C.F.R. § 100.10(d)(4)(i), (iv), (v), (vi), (viii), (xv) (emphasis added).

[17]    50 C.F.R. § 100.19(a), (b).

[18]    50 C.F.R. § 100.19(a)(1).

[19]    50 C.F.R. § 100.19(b)(2).

[20]    50 C.F.R. § 100.19.

*United States v. Alaska*                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                          6
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 6 of 42

to ANILCA's subsistence preference to manage fish and wildlife on the public lands in the Yukon Delta National Wildlife to the Refuge Manager.[21] The delegation effectively transfers the authority delegated to the FSB by the Secretaries to the sole discretion of the Refuge Manager. The delegation letter explains that the Refuge Manager may issue emergency special actions (ESAs) "when necessary to ensure the conservation of a healthy fish population, to continue subsistence uses of fish, for the continued viability of a fish population, or for public safety reasons."[22] It further states that the delegation "only applies to Federal public waters subject to" ANILCA in the Kuskokwim Area, including the Goodnews and Kanektok River.[23]

While the FSB signaled its intention that the Refuge Manager coordinate with Regional Advisory Councils, the Kuskokwim River Inter-tribal Fish Commission, the Office of Subsistence Management, and the Alaska Department of Fish and Game, it did not require any such coordination and no such coordination occurred, at least not with ADF&G, in the matter now before this Court.[24]

The delegation letter specifically stated that a public hearing is not required when the Refuge Manager issues emergency special actions.[25] And while the emergency action

---

[21]     *See* Ex. E, p. 1.

[22]     *Id.*

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*, p. 2.

*United States v. Alaska*                                              Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                         7
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 7 of 42

may not be extended, it may last up to 60 days.[26] Thus, FSB purported to grant the Refuge Manager authority to make unreviewable dictates that could endure for an entire salmon run.

But that is not all. The FSB further explained to the Refuge Manager that he may "close and re-open Federal public waters to nonsubsistence fishing."[27] So long as the Refuge Manager believes it is "necessary to conserve healthy populations of fish or to ensure the continuation of subsistence uses" he can assume management authority over state commercial, sport, and personal use fisheries that are near the fisheries the Secretaries tasked the FSB with managing.[28] And all of this seemingly limitless authority to manage fisheries inseason is effective from the date of the letter, May 13, 2018, "and continues until superseded or rescinded."[29]

**D.    The USFWS has signed a Memorandum of Understanding with the Kuskokwim River Inter-Tribal Fish Commission to co-manage fisheries in the Kuskokwim River drainage.**

In 2016, the USFWS entered into a Memorandum of Understanding (MOU) with KRITFC that purported to "formalize the fishery management partnership between the United States" and KRITFC.[30] The MOU specifically states that it "begins to address the long-standing desire of Alaska Native Tribes in the Kuskokwim Drainage to engage as

---

[26]    *Id.*

[27]    *Id.*

[28]    *Id.*

[29]    *Id.*

[30]    *See* Ex. F, p. 1.

co-managers of fish resources."[31] The MOU states that it "integrates Alaska Natives into Federal fishery management into the decision-making process."[32] As part of the agreement, the Refuge Manager must "consult with [KRITFC] for the purpose of collaboratively making fisheries management decisions" and must "provide a timely written *justification* to [KRITFC] when the Refuge Manager is unable to reach consensus with [KRITFC] regarding Kuskokwim fisheries in-season management decisions."[33] In return for the USFWS outsourcing its responsibility to manage in accordance with ANILCA, KRITFC agreed to "recognize the Refuge Manager … as the Federal in-season manager to the extent such authority has been delegated by the Board, including delegated authority to issue emergency special actions for the management of fish within the Federal public waters of the Kuskokwim River drainage" and to provide data to the USFWS.[34]

Notably, the MOU is signed by the USFWS Director and the Refuge Manager, not by the Secretaries or even by the members of the FSB.[35]

### III.   LEGAL STANDARD.

"A preliminary injunction is an extraordinary and drastic remedy, one that should

---

[31]    *Id*.

[32]    *Id*.

[33]    *Id*. p. 3 (emphasis added).

[34]    *Id*.

[35]    *Id*. p. 7.

*United States v. Alaska*                                              Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                        9
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 9 of 42

not be granted unless the movant, by a clear showing, carries the burden of persuasion."[36] To meet this burden, a plaintiff must show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in the plaintiff's favor, and (4) an injunction is in the public interest.[37]

If a plaintiff fails to show it is likely to succeed on the merits, the Court should then look to see if it can show "serious questions going to the merits."[38] If so, "a preliminary injunction may still issue if the 'balance of hardships *tips sharply* in the plaintiff's favor,'" the plaintiff will suffer irreparable harm, *and* the injunction is in the public interest.[39]

## IV. ARGUMENT

This case raises two questions: first, whether the FSB may legally attempt to manage fisheries on the Kuskokwim River;[40] second, whether, if the FSB has the authority it claims, the Yukon Delta National Wildlife Refuge Manager has validly exercised authority delegated to him, consistent with the requirements of the APA. If the Court answers either of these questions "no," then the United States' pre-emption

---

[36] *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted). *See also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

[37] *Winter*, 555 U.S. at 20.

[38] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

[39] *Id*. (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011))(emphasis added).

[40] The State notes, to preserve the argument for appeal, that the FSB's jurisdiction over the river—a navigable state waterway—is doubtful in the wake of *Sturgeon v. Frost*, 139 S.Ct. 1966 (2019).

*United States v. Alaska*                                        Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                      10

argument fails.

This *motion* asks the Court to decide first, whether the United States is likely to prevail on these issues; and second, whether the United States has shown that it will be irreparably harmed if an injunction is not granted while the parties litigate the legal and factual questions related to FSB authority and the validity of the Refuge Manager's specific orders. Because the United States has failed to establish either a probability of success on the merits or that it will suffer irreparable harm absent an injunction, this Court should deny its motion.

In its May 31, 2022 order the Court asked whether it would be appropriate to consolidate the hearing on the preliminary injunction motion with a trial on the merits pursuant to F.R.C.P. 65(a)(2). The State opposes consolidation because discovery may be necessary to establish the contours of the Board's relationship with the Secretaries and the status of the members of the Board for the Appointments Clause arguments, and the State needs access to the administrative record purporting to justify the emergency special action at the center of the current dispute in order to make its arguments under the Administrative Procedure Act.[41]

## A.     The United States cannot establish a probability of success on the merits.

The United States asserts that it will succeed on the merits in this lawsuit because the State's management decisions related to the Kuskokwim Chinook and Chum salmon

---

[41]     The State recognizes that it must challenge the emergency special actions under the Administrative Procedure Act, 5 U.S.C. §§ 701- 706, and will include a counter-claim in its answer to that effect.

*United States v. Alaska*                                            Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                    11
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 11 of 42

fisheries conflict with federal emergency special actions and that, under the supremacy clause, federal law preempts conflicting state laws thereby invalidating the State's emergency orders. But the United States has failed to show that the federal emergency special actions are valid and invalid federal actions do not preempt valid state management authority.

The federal emergency special actions are defective for a series of reasons: first, the Federal Subsistence Board is not validly constituted and violates the Appointments Clause; second, even if the Board survives scrutiny under the Appointments Clause, its delegation—more accurately described as an abdication—of authority to the Refuge Manager violates the Appointments Clause; third, the USF&WS and the Refuge Manager have violated both the terms of the delegation and ANILCA by entering into a "co-management agreement" with the Kuskokwim River Inter-Tribal Fish Commission and the resulting emergency special actions are therefore arbitrary and capricious and violate the Administrative Procedures Act; and finally, the Refuge Manager's special actions lack any scientific justification or support and are arbitrary and capricious in violation of the Administrative Procedures Act.

### 1. The Federal Subsistence Board violates the Appointments Clause.

The Appointments Clause of Article II of the United States Constitution provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the

Courts of Law, or in the Heads of Departments.[42]

In applying the Appointments Clause, the United States Supreme Court has distinguished between "principal officers"—who must be appointed by the President with advice and consent of the Senate—and "inferior officers" who are covered by the second clause.[43] Congress can assign the power to appoint "such inferior officers" by statute to the President, the courts, or the heads of departments.[44] When analyzing an Appointments Clause issue, courts first ask whether an individual is an "officer of the United States" or merely an employee, and then, if the person *is* an officer, whether she is a principal or inferior officer to determine what is required to comply with the Appointments Clause. The analysis of the FSB is complicated by its mix of public members and *ex officio* members.

But the threshold question is whether the clause applies to the FSB at all—in other words, are Board members "officers of the United States" or merely "employees"?[45] The Supreme Court has explained that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II]."[46] And the

---

[42]    U.S. Const., Art. II, § 2, cl. 2.

[43]    *See e.g.*, *United States v. Arthrex, Inc.*, 141 S.Ct. 1970, 1979 (2021).

[44]    *Id*.

[45]    *See e.g.*, *Freytag v. C.I.R.*, 501 U.S. 868, 880 (1991) (noting that if federal official "is only an employee, petitioners' challenge fails, for such 'lesser functionaries' need not be selected in compliance with the strict requirements of Article II." Citing *Buckley v. Valeo*, 424 U.S. 1, 126, n.162 (1976)).

[46]    *Buckley*, 424 U.S. at 126.

*United States v. Alaska*                                              Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                              13
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 13 of 42

D.C. Circuit has noted that "the main criteria for drawing the line between inferior Officers and employees not covered by the clause are (1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions."[47] Applying these criteria to the FSB, it is clear that the Board members are officers of the United States.

First, the Board surely "exercises significant authority pursuant to the laws of the United States"—the secretaries have assigned to it the responsibility for implementing the rural subsistence priority,[48] which is the primary focus of an entire title of an important federal statute. Moreover, the Board claims the power to preempt traditional state authorities to manage fish and game in approximately 61 percent of the largest state in the union. The Board's regulations require it to determine who will be eligible for the rural subsistence priority, when action must be taken to protect the priority, and whether to restrict or close public lands to non-subsistence and subsistence uses.[49] Second, the regulations do not provide for any routine oversight or review of the Board's work by the Secretaries.[50] Thus, the Board exercises fulsome discretion. Finally, the regulations also provide that Board actions constitute "final administrative action[s];"[51] and that "[t]he Board is the final administrative authority on the promulgation of subparts C and D

---

[47]     *Tucker v. C.I.R.*, 676 F.3d 1129, 1134 (D.C. Cir. 2012).

[48]     *See* 50 C.F.R. § 100.10; 36 C.F.R. § 242.10.

[49]     *See id.* at subsection (d)(4)(i)-(xx).

[50]     *See* 50 C.F.R. §100.1 *et seq.*

[51]     *See* 50 C.F.R. § 100.19(e); 50 C.F.R. § 100.20(g).

*United States v. Alaska*                                      Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                        14
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 14 of 42

regulations relating to the subsistence taking of fish and wildlife on public lands."[52] The Board thus meets all the criteria for "officers of the United States" and is therefore subject to the requirements of the Appointments Clause.

The next question is whether the Board members are principal or inferior officers. Notably, the Board exercises authority that Congress gave directly to the Secretaries—i.e. the power of a principal officer. But the analysis here is complicated by the mixed composition of the Board—three public members, five *ex officio* members—because the criteria for distinguishing between principal and inferior officers read differently for the public members than the *ex officio* members.

Most of the cases attempting to distinguish between principal and inferior officers involve military or administrative tribunals,[53] which makes analogizing to the FSB rather difficult. But there appear to be two primary attributes of inferior officers: their "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate,"[54] they can be removed without

---

[52]     50 C.F.R. § 100.13(a)(2).

[53]     *See e.g.*, *Edmond v. U.S.*, 520 U.S. 651 (1997) (holding Judges of the Coast Guard Court of Criminal Appeals are inferior officers); *Seila LLC v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183 (2020) (holding director of the Consumer Financial Protection Bureau was improperly-appointed principal officer); *U.S. v. Arthrex, Inc.*, 141 S.Ct. 1970 (2021) (holding Patent Appeals Board judges were improperly-appointed principal officers where they could be removed only "for cause" and their decisions were not reviewable within the executive branch).

[54]     *Edmond*, 520 U.S. at 663.

*United States v. Alaska*                                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                    15
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 15 of 42

cause;[55] and they do not issue final decisions unreviewable by a superior officer.[56]

Here, although the Secretaries appoint the public members together—and the *ex officio* members individually—they neither direct nor supervise the work of the Board in any meaningful way. The Board establishes its own rules and procedures;[57] and the Secretaries have assigned to the Board the power to promulgate and sign changes to some of its governing regulations.[58] Although the Secretaries indirectly supervise the *ex officio* members of the Board through their department chain of command, the work of the public members is not "directed and supervised" by the Secretaries at *any* level. As the Supreme Court has explained: "Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior."[59] Although the Secretaries appoint the public members, the Secretaries have no ongoing relationship with the public members after the appointment. They have no opportunity to give feedback, recommendations or other advice to the public members on an ongoing basis. Further, because the public member position is unpaid, the threat of removal without cause does not carry the same implications of incentive and control that it carries

---

[55]     *Id*. at 664 ("The power to remove officers, we have recognized, is a powerful tool for control.")

[56]     *See e.g.*, *Arthrex, Inc.*, 141 S.Ct. at 1980 (citing *Edmond*, 520 U.S. at 665).

[57]     50 C.F.R. § 100.10(d)(4)(xiv).

[58]     50 C.F.R. § 100.10(a) (assigning the Board responsibility for "the related promulgation and signature authority for regulations of subparts C [Board Determinations] and D [Subsistence Taking of Fish and Wildlife] of this part.")

[59]     *Edmond,* 520 U.S. at 662.

*United States v. Alaska*                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                    16
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 16 of 42

for the *ex officio* members.

Most significantly, the Secretaries do not engage in review of Board decisions before they become final. In *Arthrex, Inc.*, Chief Justice Roberts found the lack of "direct[ion] and supervis[ion]" of the work by which Patent Trial and Appeal Board judges "exercise[ed] 'significant authority'" critical in holding that they were improperly-appointed principal officers.[60] Like the APJs in *Arthrex, Inc.*, the Board has "the 'power to render a final decision on behalf of the United States' without any … review by their nominal superior or any other principal officer in the Executive Branch."[61] In effect, the Secretaries have promulgated regulations creating the Board and outlining its powers and duties; and then left the Board to it. It thus operates like a principal officer.

As for removal of Board members, the regulations do not even establish a term of office for the public members, much less address how they might be removed. The Supreme Court has noted that "as a matter of statutory interpretation,…absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment,'"[62] so likely the Board members can be removed without cause. But there is a wrinkle: because the public members and the Chair are "appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture,"[63] it would

---

[60]     *Arthrex, Inc.*, 141 S.Ct. 1970, 1980 (2021).

[61]     *Id*. at 1981.

[62]     *Carlucci v. Doe*, 488 U.S. 93, 95 (1988) (quoting *Keim v. United States*, 177 U.S. 290, 293 (1900).

[63]     50 C.F.R. § 100.10(b)(1).

*United States v. Alaska*                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                    17
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 17 of 42

presumably require the concurrence of both secretaries to remove them. And if one of the secretaries was unhappy with the performance of an *ex officio* Board member who was not from her department, she would lack the ability to remove that person.

Moreover, by delegating their authority to a mixed board of public members and federal officials from more than one department, the secretaries have created a sort of collective immunity for these officers because none of them is individually responsible for anything that the Board does. "This 'diffusion of power carries with it a diffusion of accountability.'"[64] Thus, the secretaries' removal power is constrained and diluted by the very structure of the Board they have created.

In sum, the Board exercises "significant authority pursuant to the laws of the United States" without direction and supervision from the Secretaries, who lack straightforward removal powers, and the Board has the "power to render a final decision on behalf of the United States"[65] without review by the Secretaries. Therefore, the Board members—especially the public members—function as principal officers, who must be appointed by the President with the advice and consent of the Senate. And they were not.

Nor is the problem resolved if the Court thinks that the Board members are really "inferior officers" rather than principal officers. Inferior officers must still be appointed consistent with the Appointments Clause, which requires that "Congress … *by Law* vest the Appointment of such inferior Officers, as they think proper, in the President alone, in

---

[64]    *Arthrex, Inc.*, 141 S.Ct. at 1981 (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010)).

[65]    *Edmond*, 520 U.S. at 665.

*United States v. Alaska*                                          Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                              18
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 18 of 42

the Courts of Law, or in the Heads of Departments." And Congress has not "by law

vested the appointment of" any of the Board members "in the President, in the Courts of

Law, or in the Heads of Departments." To the contrary, Congress did not even

contemplate the existence of the Board when it enacted ANILCA. Instead, the Board is a

creature of regulation only, and Congress has not "by law" vested appointment authority

in the Secretaries. The federal government may not evade the requirements of the

U.S. constitution for such officers simply by creating their positions in regulation,

especially because the Appointments Clause was "designed to preserve political

accountability relative to important government assignments…"[66]

Because the Board has not been appointed consistent with the direction of the

Appointments Clause, it does not validly exercise executive power and cannot enforce

the rural subsistence priority created in ANILCA.

### 2. The Federal Subsistence Board's purported delegation of authority to the Refuge Manager violates the Appointments Clause.

Even if this Court finds that the Board members are not principal officers and that

the lack of specific congressional authorization for the heads of departments to appoint

---

[66]     *Edmond v. U.S.*, 520 U.S. 651, 663 (1997). *But see*, *Commonwealth of Pennsylvania, Dep't. of Public Welfare v. U.S. Dep't of Health and Human Servs.*, 80 F.3d 796 (3rd Cir. 1996) in which the Third Circuit held that the Secretary of the Department of Health and Human Services could create an Appeals Board in regulation and appoint its members, even though Congress had not expressly vested such appointment power in the Secretary. However, that decision rested on a general grant of appointment power to the Secretary to "appoint and fix the compensation of such officers and employees…as may be necessary for carrying out the functions of the Secretary under this chapter." *Id*. at 804 (citing 42 U.S.C. § 913). ANILCA contains no comparable grant of authority to either the Secretary of Interior or Agriculture to appoint inferior officers.

*United States v. Alaska*                                      Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                              19
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 19 of 42

Board members does not violate the Appointments Clause, the Board's delegation of authority to the Refuge Manager cannot be reconciled with that constitutional requirement. Under the terms of the delegation, the Refuge Manager exercises unchecked executive authority with effectively no accountability. The Board cannot create a king of the river to exercise power that ANILCA gives to the Secretary, especially without retaining meaningful oversight or control.

The terms of the delegation are essential to understand the scope of the power delegated and the lack of practical review retained by the Board. The delegation letter "delegates specific regulatory authority from the Federal Subsistence Board … to the … Refuge Manager to issue emergency special actions when necessary to ensure the conservation of a healthy fish population, to continue subsistence uses of fish, for the continued viability of a fish population, or for public safety reasons."[67] It further authorizes the Refuge Manager "to open or close Federal subsistence fishing periods or areas provided under codified regulations… [;]to specify methods and means; to specify permit requirements; and to set harvest and possession limits for Federal subsistence fisheries[; and]…to close and re-open Federal public waters to nonsubsistence fishing…"[68] In other words, the Board has delegated the full scope of its in-season management authority over fishing on public lands in the refuge each year. This is a

---

[67] Ex. E, p. 2, delegation letter. The State notes that the United States failed to provide a copy of any letter of delegation in support of its motion for a preliminary injunction, so it is possible that the letter in the State's possession is not the current delegation.

[68] *Id*.

serious matter, because the regulations also provide that violation of the Board's regulations—which include emergency special actions[69]—is punishable with fines or imprisonment.[70] Thus, the delegation gives the Refuge Manager "significant authority pursuant to the laws of the United States,"[71] including the authority to modify and implement regulations typically reserved for the top agency executive.

And although the delegation outlines a variety of guidelines to assist the Refuge Manager in deciding whether to take an emergency special action,[72] these guidelines identify topics to be considered rather than setting meaningful criteria as to when information related to that topic should counsel taking or not taking a particular special action. In other words, there is little check on the Refuge Manager's discretion in exercising this delegated authority.[73]

The last part of the test for whether the Refuge Manager is an "office of the United States" or merely an employee relates to the "finality" of his decisions.[74] Under 50 C.F.R. § 100.19(e), "[t]he decision of the Board on any proposed special action

---

[69]     *See e.g.*, Dkt 1-1 at 2 (showing the emergency special action amends 50 C.F.R 100.27(e)(4)(ii)).

[70]     *See* 50 C.F.R. § 100.8, which provides: "If you are convicted of violating any provision of 50 CFR Part 100 or 36 CFR Part 242, you may be punished by a fine or by imprisonment in accordance with the penalty provisions applicable to the public land where the violation occurred."

[71]     *Buckley*, 424 U.S. at 126.

[72]     Ex. E, p. 3.

[73]     *See Tucker*, 676 F.3d at 1134 (D.C. Cir. 2012).

[74]     *Id.*

*United States v. Alaska*                                        Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                        21
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 21 of 42

will constitute its final administrative action." And the letter of delegation, citing on

50 C.F.R. § 100.19(a), indicates that any emergency action taken by the Refuge Manager

"may not exceed 60 days, and may not be extended."[75] In practical terms, moreover, as

the emergency special actions in this case demonstrate,[76] in-season management

decisions are often made only weeks, or even days, in advance of fishing opportunities,

and once closing or opening periods have expired, the clock cannot be turned back.

And despite this, the Board's delegation only requires the Refuge Manager to compile a

record justifying his decisions to provide to the Office of Subsistence Management "no

later than sixty days after development of the document."[77] As a result, even if the

Board's delegation contemplated some kind of in-season review of the Refuge Manager's

decisions—and it does not—the Board would be unable to initiate any review until after

the action had already expired. Thus, the Refuge Manager's decisions are final.

In effect, then, the Board's delegation makes the Refuge Manager at least an

inferior officer, but that delegation is not equivalent to or a substitute for appointment by

the head of department and thus violates the Appointments Clause.[78] Nor does the fact

that the Refuge Manager is otherwise a simple employee alter the analysis. To the

contrary, "the unchecked exercise of executive power by an officer buried many layers

---

[75]   Ex. E, p. 2.

[76]   *See* Dkt. 1-1, Ex. 1, pp. 2-13.

[77]   Ex. E, p. 4.

[78]   Nor does 50 C.F.R. § 100.10(d)(6), which authorizes the Board to delegate certain powers to "agency field officials," constitute exercise of the appointing authority contemplated by Article II.

*United States v. Alaska*                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                          22

beneath the President poses more, not less, of a constitutional problem."[79]

Thus, even if the Board itself does not violate the Appointments Clause, its

delegation of unreviewable executive power to the Refuge Manager surely does.

### 3. The Refuge Manager has exceeded the scope of the FSB's delegation in violation of the APA.

Agency action is arbitrary and capricious if the agency "relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, [or] offered an explanation for its decision that runs counter to the evidence

before the agency."[80] But it appears that the Refuge Manager has "relied on factors which

Congress has not intended [him] to consider" by participating in a co-management

relationship with KRITFC that is not authorized by ANILCA or by the FSB's delegation

of authority.

According to the Justification section of the Emergency Special Action 3-KS-01-

22, the Refuge Manager relied on a Draft Kuskokwim River Salmon Management

Strategy developed in consultation with KRITFC.[81] KRITFC's outsized influence on the

Refuge Manager is also reflected in his affidavit in support of the United States' motion,

describing "at least twenty different occasions" in 2021 on which he consulted with

KRITFC, including attending a two day meeting of the Commission, compared with

---

[79]     *Arthrex*, 141 S.Ct. at 1983.

[80]     *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 33 F.4th 1202,
1216 (9th Cir. 2022) (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

[81]     Dkt. 1-1, p. 12.

*United States v. Alaska*                                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                              23
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 23 of 42

"more than five" consultations with ADF&G.[82] It also appears possible that the Refuge Manager will do whatever KRITFC wants in order to avoid conflict.[83] And KRITFC has stated in its motion to intervene that "during the 2021 and 2022 fishing seasons, the Commission co-managed the Kuskokwim salmon fishery with the U.S. Fish and Wildlife Service within the Refuge."[84]

But the Board's delegation to the Refuge Manager does not authorize him to enter into a "co-management" agreement[85] with KRITFC or, indeed, anyone else. In fact, the delegation expressly limits his authority: "The regulatory authority hereby delegated *is limited to the issuance of emergency special actions* as defined by 36 C.F.R. 242.19(a) and 50 C.F.R. 100.19(a)."[86]

Nor does the Memorandum of Understanding between KRITFC and the U.S. Fish and Wildlife Service Alaska Region appear remotely consistent with the Secretary's authority and obligations under ANILCA. Title VIII of ANILCA does not establish federal control of fisheries—not even those that are on public lands. To the contrary, ANILCA leaves the State as the primary manager of its fisheries,[87] something that the

---

[82]     Dkt. 5-1, Declaration of Boyd Blihovde, at 4, ¶ 9.

[83]     *See* Dkt. 9-3, Declaration of Nicholas Smith, at 8, ¶ 15.

[84]     Dkt. 12, p. 8.

[85]     *See* Dkt. 14 at 2-3. The State notes that the Court has not yet granted KRITFC's motion to intervene, which was not expedited, and thus, the Commission's joinder motion is improper.

[86]     Ex. E, p. 2.

[87]     16 U.S.C § 3125.

*United States v. Alaska*                                          Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                   24
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 24 of 42

U.S. Fish and Wildlife Service has acknowledged in an MOU with the State of Alaska.[88]

And nothing in ANILCA or the Board's regulations authorizes the Secretary or the

Board, much less the Alaska Region of the US Fish and Wildlife Service and the

Yukon Delta National Wildlife Refuge Manager, to enter into a preferential collaborative

agreement with a private organization to develop a "management strategy" for the

Kuskokwim River fisheries to the exclusion of other input, including from the State of

Alaska.[89]

Granted, Section 809 of ANILCA permits "cooperative agreements" between the

Secretary and "other Federal agencies, the State, Native Corporations, [and] other

appropriate persons and organizations…"[90] But while "cooperation" is allowed "co-

---

[88]      Ex. G, p. 2, ¶ 1, in which the Fish and Wildlife Service "agrees 1. To recognize the [Alaska] Department [of Fish and Game] as the agency *with the primary responsibility to manage fish and resident wildlife within the State of Alaska*."

[89]      Granted, Sec. 810 authorizes the Secretary to "enter into cooperative agreements or otherwise cooperate with other Federal agencies, the State, Native Corporations, other appropriate persons and organizations…to effectuate the purposes and policies of this title." 16 U.S.C. § 3119. But the purposes of Title VIII are to establish and implement a rural subsistence priority on public lands, not to attempt a takeover of fulltime management of state fisheries.

[90]      16 U.S.C. § 3119.

*United States v. Alaska*            Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction          25
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 25 of 42

management"[91] is not.[92] Regardless, ANILCA provides that "the Secretary" may enter

into such cooperative agreements and 50 C.F.R. § 100.10(a) "assigns" to the FSB—not

the Fish and Wildlife Service—"responsibility for administering the subsistence taking

and uses of fish and wildlife on public lands." And, despite language in the MOU

suggesting otherwise,[93] the Board has not delegated to the Refuge Manager the authority

to enter into cooperative agreements as contemplated by ANILCA. Thus, the MOU

touted by KRITFC is outside the scope of the Refuge Manager's authority.

　　This matters for purposes of determining the validity of the Refuge Manager's

emergency special actions because the Refuge Manager relies on the "management

strategy" developed with KRITFC to justify those actions. It also raises potential

subdelegation issues. "A federal agency may not 'abdicate its statutory duties' by

---

[91]　　Dkt 14, p. 3.

[92]　　*See*, preamble to Subsistence Management Regulations for Public Lands in
Alaska, Subparts A, B, and C, 57 FR 22940-01 ("Co-management and delegation of
management authority to regional or local entities were suggested by several
commenters. Local entities mentioned included Indian Reorganization Act (IRA)
councils, traditional councils and tribal governments. The Alaska Eskimo Whaling
Commission was cited as an example of successful co-management. *Because ANILCA
does not authorize the Secretaries to delegate their title VIII responsibilities to private
persons or groups*, these regulations do not authorize the Board to delegate such
responsibilities to private persons or groups." Emphasis added.)

[93]　　The MOU notes in its "authority" section that the FSB "is vested with authority
delegated by the Secretaries of Interior and Agriculture to manage subsistence uses and
resources on the Federal public lands in Alaska[; and that t]he Board may delegate
specific regulatory authority related to the in-season management of fish species for the
Federal public waters in the Kuskokwim Area. The manager of the Yukon Delta National
Wildlife Refuge … is currently delegated this authority." MOU at 2.

*United States v. Alaska*　　　　　　　　　　　　　　Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction　　　　　　　　　　　　　　　26
Case 1:22-cv-00054-SLG　Document 17　Filed 06/07/22　Page 26 of 42

delegating them to a private entity."[94] Although the possible delegation of decision-making authority here is less direct than it was in *Dep't of Fish and Game v. Federal Subsistence Board*,[95] it is also far more expansive. Rather than simply selecting participants for a hunt, KRITFC asserts "co-management authority" over Kuskokwim River fisheries. As a result, the State believes additional discovery and briefing will be necessary to develop the argument that the Refuge Manager's "co-management" of the fishery with KRITFC violates the APA.

### 4. The Refuge Manager's emergency special action is arbitrary and capricious.

The Administrative Procedure Act ("APA") requires courts to set aside agency actions found to be "arbitrary, capricious, [or] an abuse of discretion."[96] Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency."[97] In reviewing whether an agency decision is arbitrary or capricious, courts are to "ensure that the agency considered the relevant factors and articulated a rational connection

---

[94]    *State v. Rettig*, 987 F.3d 518, 531 (C.A.5 (Tex.), 2021).

[95]    The State will seek discovery to explore this matter, if this Court does not reject the United States' claims on other grounds.

[96]    5 U.S.C. § 706(2)(A).

[97]    *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 33 F.4th 1202, 1216 (9th Cir. 2022) (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

*United States v. Alaska*                                          Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                              27
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 27 of 42

between the facts found and the choices made."[98] The court's review is limited to "the grounds that the agency invoked when it took the action."[99]

Title VIII of ANILCA requires conservation of fish and wildlife, as well as managing in accordance with sound scientific principles, as a predicate to any action taken pursuant to the authority granted therein.[100] Similarly, the regulations establishing the FSB state that the board may restrict the nonsubsistence take of fish and wildlife on public lands "when necessary for the conservation of healthy populations of fish or wildlife, to continue subsistence uses of fish and wildlife, or for reasons of public safety,"[101] and may "close public lands to the take of fish and wildlife for subsistence uses… when necessary to ensure the continued viability of a fish or wildlife population…."[102]

---

[98] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018).

[99] *Michigan v. EPA*, 576 U.S. 743, 758 (2015).

[100] *See e.g.* 16 U.S.C. § 3111(5) ("The Congress finds and declares that—the national interest in the proper regulation, *protection, and conservation of fish and wildlife* on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by residents of rural Alaska…"); 16 U.S.C. § 3112(1) ("It is hereby declared to be the policy of Congress that—consistent with *sound management principles, and the conservation of healthy populations of fish and wildlife*, the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands, *consistent with management of fish and wildlife in accordance with recognized scientific principles*…"); 16 U.S.C. § 3112(2) ("nonwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources on the public lands of Alaska when it is necessary to restrict taking in order to assure the *continued viability of a fish or wildlife* population or the continuation of subsistence uses of such population…").

[101] 50 C.F.R. § 100.10(d)(4)(vi).

[102] 50 C.F.R. § 100.10(d)(4)(vii).

All five Pacific salmon species make their way through the Kuskokwim in varying abundance and overlapping run timing.[103] For example, the midpoint of the Chinook salmon run is generally June 22, while the midpoint of the sockeye and chum runs are June 30 and July 5 respectively, and coho salmon run later in the season.[104] The State has worked with stakeholders to establish amounts reasonably necessary for subsistence for each of the salmon species and, during times of low abundance, spreads harvest equally across the runs to harvest surplus salmon in excess of escapement needs.[105] Due to a recent period of low Chinook salmon productivity, the State suspends directed subsistence fishing for king salmon in the Kuskokwim River until after June 11—this closed period is referred to as the "front-end closure."[106] During the closure, the State actively monitors escapement and opens fishing opportunity as appropriate consistent with sustained yield.[107]

The entire 2021 fishing season on the Kuskokwim River was managed by both State and Federal managers, opening and closing the river to subsistence users at various times.[108] But in May of 2022, the Refuge Manager purported to close the "Kuskokwim River main stem within the boundaries of the Yukon Delta National Wildlife Refuge,"

---

[103] *See* Dkt. 9-3, Decl. of Nicholas Smith, p. 6.

[104] *Id.* at p. 3.

[105] *Id.* at p. 6.

[106] *Id.* at p. 11.

[107] *Id.* at p. 8.

[108] *See e.g.* Dkt. 1-1, Ex. 1, pp. 2-9.; Dkt. 1-2, Ex. 2, pp. 2-16.

*United States v. Alaska*                                      Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                      29
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 29 of 42

after determining "that Federal management is necessary for the conservation and the continuation of subsistence uses for Chinook salmon."[109] The Refuge Manager explained that he had such broad authority as a result of a "delegation of authority letter from the Federal Subsistence Board."[110] The order also stated that the Refuge Manager would reopen the river, for federally qualified users only, on several occasions in June.[111] Specifically, the order stated that the river would be open for federally qualified users to fish using set gillnets during three 16 hour periods on June 1, June 4, and June 8.[112] Incredibly, the Refuge Manager also ordered that set or *drift gillnets* could be deployed on yet two more twelve hour openers on June 12 and June 16.[113]

The order specifically stated that "Federally qualified subsistence users may retain all salmon during these periods…."[114] Reflecting the Refuge Manager's apparent lack of concern for the sustainability of the salmon runs, he also ordered that "[a]lternative gear types – dip nets, beach seines, fish wheels, and rod and reel – may be used throughout gillnet closures, and Federally qualified subsistence users may retain all salmon caught using these alternative gear types."[115] While the State has closed the Kuskokwim to all

---

[109]  Dkt. 1-1, Ex. 1, p. 10. Emergency Special Action No.: 3-KS-01-22.

[110]  *Id.*

[111]  Dkt. 1-1, Ex. 1, p. 11.

[112]  *Id.*

[113]  *Id.*

[114]  *Id.*

[115]  Dkt. 1-1, p. 12.

*United States v. Alaska*                                              Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                      30
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 30 of 42

directed salmon fishing[116]—at least unless and until in-season data demonstrates that continued closure is unnecessary to protect the run—the Refuge Manager has decided to permit significant targeting of Chinook salmon before there is any in-season information at all about the actual strength of the run.

The order does not contain any analyses explaining why the action was necessary or appropriate, despite the fact that the Secretaries are required to manage according to "recognized scientific principles."[117] Moreover, the order fails to explain how restricting the fishery to federally qualified users only, then providing significant opportunity to take fish from the purportedly depleted stock, is "necessary for the conservation of healthy populations of fish or wildlife," a justification that is required by the Board's own regulations.[118]

ADF&G Commissioner Vincent-Lang, who is tasked by both the Alaska Constitution and Alaska Statutes to conserve fisheries consistent with the sustained yield principle of management,[119] was concerned enough by this action and the lack of supporting analysis that he sent a letter to the USFWS Regional Director noting that the directed harvest of Chinook was allowed under the Federal Manager's order, even if only when taken with selective gear.[120] The letter explained that, at the projected

---

[116]     Dkt. 1-2, p. 19.

[117]     16 U.S.C. 3112(1).

[118]     Dkt. 1-1, Ex. 1, p. 12; 50 C.F.R. § 100.10(d)(4)(vi).

[119]     Alaska Const. art VIII, § 4; AS 16.05.010.

[120]     Dkt. 9-1, Ex. A, May 12, 2022 letter from Comm. Vincent-Lang to USFWS Regional Director.

*United States v. Alaska*                                    Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                    31
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 31 of 42

run strength, it was "premature to announce two 12-hour fishing periods on June 12 and 16" and doing so "without any knowledge of the in-season run strength except for the State's preseason outlook, as 3-KS-01-22 does, is irresponsible management."[121] No response or analysis was provided.

Without any evidence, the United States argues that "imperiled Kuskokwim salmon runs likely face irreparable harm if Defendants' actions are not enjoined."[122] Meanwhile, their own Refuge Manager is opening drift net fisheries targeting those same imperiled Kuskokwim salmon before a single fish had been recorded in the river. Further, the Refuge Manager purports to allow Federally qualified users with alternative gear types to take and keep unlimited Chinook from the Kuskokwim,[123] while the State's Emergency Order requires users with alternative gear to return salmon to the water alive.[124] In essence, the Refuge Manager decided—without supporting evidence—that the run will be sufficient to permit two drift gillnet openers and harvest using alternative gear before a single salmon showed up in the river, but not sufficient to allow the State's openers, which do not target salmon. It appears then that the Refuge Manager is prioritizing subsistence uses over sustainability by deciding in advance of any in-season data to permit subsistence harvest of Chinook. But this has ANILCA's priorities backwards: ANILCA directs that subsistence use must give way to "protect the continued

---

[121]    *Id.*

[122]    Dkt. 5, p. 19.

[123]    Dkt. 1-1, p. 12.

[124]    Dkt. 1-2, p. 19.

viability of [fish] populations," not that subsistence openers should be announced in advance of reliable information about the strength of the run.

As mentioned above, this Court is tasked with "ensur[ing] that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."[125] Therefore, here, the Court should consider whether "it is necessary to restrict the taking of populations of fish and wildlife on [public] lands for subsistence uses in order to protect the continued viability of such populations…"[126] and whether the Refuge Manager articulated a rational connection between that goal and the ESA. The answer is that the United States plainly does not explain how closing the fishery to some unknown, but likely insignificant, number of non-federally qualified users while allowing substantial effort, and likely substantial catch, of those same fish by federally qualified users was consistent with "protect the continued viability of such populations." The United States cannot explain this because it is internally contradictory.

If the United States, pursuant to Title VIII of ANILCA, must assert jurisdiction to ensure the continued viability of Kuskokwim chinook, or the continued viability of subsistence uses of Kuskokwim chinook, then opening the fishery to round-the-clock[127]

---

[125]    *Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1067.

[126]    16 U.S.C. § 3114.

[127]    Although the drift gillnet openings are limited to two 12-hour periods, the federal order provides that: "Alternative gear types – dip nets, beach seines, fish wheels, and rod and reel – *may be used throughout gillnet closures,* and Federally qualified subsistence users may *retain all salmon* caught using these alternative gear types." Dkt. 1-1, p. 12. In contrast, the State has ordered that any Chinook salmon caught using alternative gear during the more limited state openers must be returned unharmed to the river. Dkt. 1-2, p. 20.

take by nearly everyone who participates in the fishery is an indefensible management decision. Indeed, it makes so little sense that the Commissioner of ADF&G felt compelled to inquire about the scientific support for the action and make plain the State's objection to the reckless measure.

In sum, there is no rational connection between the United States' purported goal, preserving the "imperiled Kuskokwim salmon runs," and the action taken by the Refuge Manager. Because the United States failed to articulate a connection between the science, i.e. the 2022 Kuskokwim salmon preseason projections, and ESA 3-KS-01-22, the action should be declared arbitrary and capricious and in violation of the APA and set aside.

In addition to violating the APA, the ESA violates ANILCA § 802, which requires that fish be managed "in accordance with recognized scientific principles."[128] Again, the United States' position is internally contradictory. According to the United States, it must usurp State management of fisheries on state waterways because the State-announced fishery might negatively impact the sustainability of Chinook salmon[129] while, at the same time, allowing two drift gillnet openers which will result in the unrestricted take of Chinook. And because the Emergency Special Action is completely bereft of scientific support, it violates § 802 of ANILCA.

---

[128]    16 U.S.C § 3112.

[129]    Dkt. 6.

*United States v. Alaska*                                  Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                          34
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 34 of 42

**B.    The United States has not shown that it will suffer irreparable harm.**

The United States argues that it will be irreparably harmed if an injunction does

not issue because the State's actions will, it claims, lead to an "erosion of cultural identity

that Congress sought to preserve through ANILCA, as well as through threats to

declining fisheries resources."[130] But although the United States presents these things as

if they were separate harms, in essence they are really a single—alleged—harm: that the

State's attempt to manage the Kuskokwim River fisheries consistent with its authority

will deplete the resource.[131] After all, ANILCA's rural subsistence priority does not

allow—much less require—the closure or restriction of fisheries in times of abundance,

when there is enough fish for everyone.[132] "[S]ubsistence values and cultural identity"[133]

are threatened by collapsing salmon runs, not by fisheries management. And, critically,

the United States has presented *no evidence* that the State's actions in allowing limited

openers on the Kuskokwim River will have a negative effect on the sustainability of the

Chinook or chum runs.

The burden lies with the United States to prove that there is a "likelihood of

irreparable injury" absent an injunction.[134] But the United States cannot meet its burden

---

[130]    Dkt. 5, pp. 17-18.

[131]    *See* Dkt. 5, p. 18 (alleging "threat of overharvest"); *id*. at 19 (alleging "unpredictable and extensive harvest of the depleted fisheries"); *id* (alleging "the imperiled Kuskokwim salmon runs likely face irreparable harm if the [State's] actions are not enjoined"); *id*. at 20 (alleging that State efforts "threaten the resources.")

[132]    *See* Sec. 815(3).

[133]    Dkt. 10, p. 6.

[134]    *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

*United States v. Alaska*                                              Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                      35
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 35 of 42

to show irreparable harm simply by asserting that state openers—that target non-salmon species—will take some fish out of the river. And it has done no more than that here.

Indeed, the United States' own actions belie its claim that the State's actions will "irreparably" damage Kuskokwim Chinook sustainability. If it believed Chinook were so critically depressed, it would not—indeed, it *could not* consistent with its obligations under ANILCA—have announced two drift openers for June, with larger gear that more easily targets Chinook and purposefully removes salmon (over the State's objection) from the allegedly critically depressed stock.[135] The United States cannot have it both ways: if the de minimis number of Chinook caught incidentally during the State's limited non-salmon openers could do irreparable harm to the Kuskokwim salmon runs,[136] then the federal drift openers targeting Chinook authorized by the Refuge Manager[137] would do much worse, in violation of ANILCA.[138] The United States' willingness to open the

---

[135]     Dkt. 1-1, p. 11. The State manages the fishery in-season based on apparent run strength as supported by sonar, weir counts, test fisheries and aerial survey programs (i.e. based on real data rather than estimates). *See* Ex. C, Smith Dec. at ¶¶ 8-9.

[136]     Dkt. 5, p. 19.

[137]     Dkt. 1-1, pp.11-12.

[138]     16 USC 3112:

It is hereby declared to be the policy of Congress that [] *consistent with sound management principles, and the conservation of healthy populations of fish and wildlife*, the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands, *consistent with management of fish and wildlife in accordance with recognized scientific principles* and the purposes for each unit established, designated, or expanded by or pursuant to titles II through VII of this Act, the purpose of this title is to provide the opportunity for rural residents engaged in a subsistence way of life to do so… (emphasis added)

river to salmon drift nets—before a single salmon has entered the river—is flatly inconsistent with its representations to this Court that state actions risk irreparable harm to the run.

The Court should be similarly skeptical of the claim that the potential harvest of fish by non-federally qualified users will cause irreparable harm. Not only has the United States failed to offer evidence showing that *any fish* will be harvested by non-federally qualified users, but the alleged harm to "subsistence values and cultural identity" is also not supported by any evidence. To the contrary, and as the State noted in its opening order, the intent of the state opener is to "allow those individuals who have been displaced to urban areas of Alaska for educational, social, health or other reasons to practice their traditional and cultural subsistence way of life that is closely tied to the Kuskokwim River."[139] It is hard to see how Alaskans returning to fish with their families would undermine "subsistence values and cultural identity." Instead, the involvement of such non-federally qualified users provides vital assistance for rural residents.

For example, in comments made to the Yukon Kuskokwim Delta Subsistence Regional Advisory Council on March 2, 2022, then Executive Director of the KRITFC, Mary Peltola explained:

> One of the kind of myths that was out there was that families can't come back and help if they don't live -- if they're not designated as a Federally-qualified user, and on the Kuskokwim, you know, I use the example of our -- the fish camp that my husband and his dad and I work on together …So it's my father-in-law who lives in Bethel year-round, me and my kids that go to school in Bethel, and then my husband, he -- many of you know him,

---

[139]     Dkt. 1-2, pp. 18, 19.

*United States v. Alaska*                                           Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                      37
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 37 of 42

his name is Gene Peltola, Jr., he works for the BIA[140] right now and he's stationed in Anchorage so he is not a Federally-qualified user so he is not able to participate in the take of the fish. That means he can't drive the boat, he can't set the net, he can't pull the net and he can't pull the fish out of the net. But he does help with gas. He gets all of our boats ready, and trailers, he makes sure our fish camp structures are all good, he gets all the smoke wood, he helps cut fish, he does everything except the take of the fish, and then Gene, Sr., and I fish together and our teenage kids help.

And then another question they had on the Yukon is they had heard that if you are not a Federally-qualified user you can't -- even if you're helping, you can't take any fish home. And that is not -- that has not been our experience on the Kusko either. The way we divide our fish is in thirds. Buzzy gets a third, or Gene, Jr., gets a third, Gene, Sr., gets a third, and I get a third.

So, you know, for those of us who rely on people who don't live -- who are not Federally qualified users, they can still participate in the cultural components and everything except the actual take.[141]

Thus, allowing non-federally qualified users to participate in subsistence fishing on the Kuskokwim does not undermine "subsistence values and cultural identity," but rather allows families to preserve and pass on those cultural traditions even when some family members have had to relocate.

The United States also argues that conflicting state and federal orders "create[] uncertainty and confusion rising to the level of irreparable injury."[142] But the United States does not explain how much uncertainty and confusion is required to reach "the

---

[140]    Gene Peltola, Jr. is the Regional Director of the Bureau of Indian Affairs and, thus, an *ex officio* member of the FSB.

[141]    *See* Transcript of Proceedings, Yukon Kuskokwim Delta Subsistence Regional Advisory Council, Public Meeting, March 2, 2022, p. 195, lines 13-49; available at https://www.doi.gov/sites/doi.gov/files/region-5-2-mar-22.pdf (last visited June 6, 2022).

[142]    Dkt. 5, p. 4.

*United States v. Alaska*                                     Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                         38

level of irreparable injury," and it cites no authority for the proposition that confusion and uncertainty can by themselves constitute irreparable harm.[143] Moreover, the United States has simply asserted that confusion and uncertainty will result; it has not presented any evidence to support that claim, much less that any harm resulted, even though, as the Court observed, the same situation prevailed on the River last summer.[144]

One final reason for the Court to be skeptical of the United States' claims of irreparable harm is that—as it explains in its motion—the conflict between state and federal openers occurred last year[145] and yet the United States took no action then. "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action."[146]

---

[143]  Even in trademark cases, confusion is no longer enough for an automatic finding of irreparable harm. *See e.g.*, *Herb Reed Enterprises, LLC v. Fla. Entertainment Management, Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

[144]  As the State pointed out in its opposition to the Motion for Temporary Restraining the United States' suggestion that "Kuskokwim rural residents" will "face the dilemma" of whether to take advantage of the State's openings at the risk of "being found in violation of federal orders" simply ignores the fact that the state openers coincide with the federal openers and contain the same gear restrictions. *See* Dkt. 1-1, p. 12, Dkt. 1-2, p. 19. In other words, a Kuskokwim rural resident fishing under the state openers will not be violating the federal orders. This is an invented harm, not a real one.

[145]  Dkt. 5, p. 7-10.

[146]  *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) (considering First Amendment claim); *see also Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

*United States v. Alaska*                                      Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                              39
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 39 of 42

Because the United States has failed to meet its burden to show that it will be irreparably harmed absent an injunction, this Court should deny its motion.

## C. The balance of hardships does not tip in favor of the United States, nor is an injunction in the public interest.

The United States claims that "[w]hen the federal government is a party, 'the balance of equities factor and the public interest factor merge.'"[147] But the case it cites for this proposition—*Jones v. Bonta*[148]—does not involve the federal government at all. Rather the rule applies whenever "the government is party," and because both the plaintiff and the defendant in this action are "governments," the rule is not especially helpful here.

Moreover, the United States' analysis of these two parts of the test boils down to balancing the national interest represented by ANILCA against the State interest in complying with its constitution, and arguing that a state constitutional provision cannot justify the "contraven[tion of] a national policy expressed through a federal statute."[149] But this assumes the outcome of the litigation—in effect, merging not just the equities and public interest, but also the probability of success on the merits prong of the preliminary injunction standard: if the State is correct that the Board lacks jurisdiction, or was invalidly appointed, or invalidly delegated its authority, or that the Refuge Manager's orders are arbitrary and capricious, the national policy expressed in

---

147    Dkt. 5, p. 20.

148    2022 WL 1485187 at 5 (9th Cir. May 11, 2022).

149    Dkt. 5, p. 21.

*United States v. Alaska*                                                   Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                                   40
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 40 of 42

ANILCA has not been contravened and neither the equities nor the public interest support an injunction.

The United States wishes to avoid a proper balancing of the equities here, because that inquiry only highlights the failure of its proof of harm. Without any evidence to support the United States' assertions that without an injunction the Chinook salmon fishery will be irreparably harmed, the equities cannot "tip sharply in [the United States'] favor,"[150] nor is the public served by a preliminary injunction.

## V.    CONCLUSION

Because the United States has failed to meet its burden to obtain a preliminary injunction, the State respectfully asks this Court to deny the motion.

DATED: June 7, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

By: s/ Margaret Paton-Walsh
     Margaret Paton-Walsh
     (Alaska Bar No. 0411074)
     Chief Assistant Attorney General
     s/Aaron C. Peterson
     Aaron C. Peterson
     (Alaska Bar No. 1011087)
     Senior Assistant Attorney General
     Office of the Attorney General
     Natural Resources Section
     Department of Law
     1031 West Fourth Avenue, Ste. 200
     Anchorage, AK 99501
     margaret.paton-walsh@alaska.gov
     aaron.peterson@alaska.gov
     Phone: (907) 269-5232
     Facsimile: (907) 276-3697
     Attorneys for the State of Alaska

---

[150]    *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 41 of 42

**CERTIFICATE OF SERVICE**

I hereby certify that on **June 7, 2022**, I caused the foregoing document to be

electronically filed with the Clerk of the Court using the CM/ECF system, which will

serve all counsel of record.


/s/ Leilani J. Tufaga
Leilani J. Tufaga
Law Office Assistant II

*United States v. Alaska*                                      Case No. 1:22-cv-00054-SLG
Opp. to Motion for Preliminary Injunction                                              42
Case 1:22-cv-00054-SLG   Document 17   Filed 06/07/22   Page 42 of 42