TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
202-353-1389 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-00054-SLG |
| THE STATE OF ALASKA, THE ALASKA DEPARTMENT OF FISH & GAME, and DOUG VINCENT-LANG, in his official capacity as Commissioner of the Alaska Department of Fish & Game, | |
| Defendants, | |

## REPLY IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Case 1:22-cv-00054-SLG   Document 21   Filed 06/14/22   Page 1 of 19

Rural Alaskans have in recent years been unable to harvest sufficient salmon from the Kuskokwim River to meet their recognized subsistence needs. Attaining these needs is a congressionally recognized priority under Title VIII of the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3111-3126 ("ANILCA"), and the Federal Subsistence Board ("FSB") has long been charged with effectuating this rural subsistence priority. To that end, federal managers, acting under FSB authorization, have taken action to balance ANILCA's statutory directive against conservation concerns for Chinook and chum salmon on the Kuskokwim River within the Yukon Delta National Wildlife Refuge (the "Refuge"). The federally chosen approach has been to prohibit subsistence harvest of Chinook and chum salmon inside the Refuge generally, while offering narrowly prescribed gillnet fishing opportunities solely for rural Alaskans so that they might attain even a fraction of their recognized subsistence needs and maintain their cultural traditions and identity.

Flatly contradicting the federal orders prohibiting such harvests, the State of Alaska has authorized competing subsistence harvest opportunities without regard to ANILCA's priority for rural Alaskans. The State cannot reconcile its actions with any plausible reading of ANILCA Title VIII, as clarified through decades of analysis by this Court. The State does not even try, and its collateral attacks under the Appointments Clause have no merit. And, insofar as the State seeks to avoid preemption by collaterally attacking the FSB's management actions as arbitrary and capricious, those arguments are

Case 1:22-cv-00054-SLG   Document 21   Filed 06/14/22   Page 2 of 19

misplaced here.  The State may commence its own civil action asserting claims under the Administrative Procedure Act ("APA"), and it may seek vacatur of the FSB's management actions in that context.  The State, however, may not simply flout federal regulatory actions it contends are arbitrary.

Having attempted other means of addressing these concerns without success, the United States brought this action to stem further harm to federally qualified subsistence users and to restore the ANILCA-outlined management scheme.  This matter is now before the Court on Plaintiff's motion for preliminary injunction.  The Court should enter summary judgment addressing the straightforward legal issue – that FSB actions pursuant to ANILCA Title VIII preempt conflicting state actions.  Alternatively, the Court should enter a preliminary injunction to avert another season of conflict at the expense of rural residents, and require the State to carry its burden under the APA should it seek to challenge the FSB's management efforts under ANILCA.

## **ARGUMENT**

Plaintiff has demonstrated it should prevail.  The Court should consolidate the hearing on the preliminary injunction with its determination of the merits, and rule in Plaintiff's favor on its straightforward conflict preemption claim.  Alternatively, Plaintiff meets the requirements for a preliminary injunction, and the Court should enjoin further State actions that conflict with federal actions taken pursuant to ANILCA Title VIII.

## A.    Plaintiff is Likely to Prevail on the Merits

Defendants continue to forego any response to Plaintiff's preemption claim, instead choosing to assert a shifting array of theories contesting the validity of the federal orders. But "the plaintiff is the master of the complaint," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987), and its claim here is supported by undisputed precedent demonstrating that federal action taken pursuant to ANILCA Title VIII preempts contradictory state action within the Refuge. *See* Pl.'s Mot. for Prelim. Inj. 12-17, ECF No. 5; *Alaska v. Bernhardt*, 500 F. Supp. 3d 889, 910-15 (D. Alaska 2020), *aff'd sub nom. Safari Club Int'l v. Haaland*, 31 F.4th 1157 (9th Cir. 2022). As this Court has recognized, the FSB acts well within the scope of its congressionally delegated authority when it administers the federal subsistence program. Specifically, "Congress authorized the Secretary of the Interior and the Secretary of Agriculture to promulgate regulations in furtherance of its directives" in Title VIII of ANILCA, and the Secretaries in turn "created the FSB and charged it with 'administering the subsistence taking and uses of fish and wildlife on public lands.'" *Dep't of Fish & Game v. Fed. Subsistence Bd*., 501 F. Supp. 3d 671, 683 (D. Alaska 2020).

Because the State has no response to these cases and arguments, it instead asks this Court to determine whether the relevant FSB actions are "arbitrary and capricious." *See* Defs.' Opp'n to Mot. for Prelim. Inj. 10, 27-34, ECF No. 17 ("Defs.' Opp'n"). But that would be a different case, in which the State is plaintiff. Notably, the State has challenged FSB actions in the past by duly filing a complaint where it asserts claims

under the APA and ANILCA, and seeking temporary or preliminary injunctive relief in that context. *See*, *e.g.*, *Dept. of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-CV-00195-SLG, 2021 WL 5756381 (D. Alaska Dec. 3, 2021) (challenging FSB closure order and related emergency authorization allowing hunting only by federally-qualified subsistence users). It could have done the same here, but chose not to. The State has not yet invoked the APA's right of action or its waiver of sovereign immunity, *see* 5 U.S.C. §702. Thus, there has been no occasion to probe the reasonableness of the FSB's actions under the APA's judicial review standards, 5 U.S.C. § 706, or for the United States to compile and lodge an administrative record. And a court may not simply presume an agency's actions were arbitrary and capricious unless a plaintiff first asserts (and prevails on) an APA claim. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (holding that agencies are "entitled to a presumption of regularity"); *Ethyl Corp. v. Env't Prot. Agency*, 541 F.2d 1, 34 (D.C. Cir. 1976) (recognizing that the APA "presumes agency action to be valid").

Not surprisingly, then, the State concedes "that it must challenge the emergency special actions under the [APA]," and it states that it "will include a counter-claim in its answer to that effect." Defs.' Opp'n 11 n.41; *see also* Reply in Supp. of Pl.'s Mot. for T.R.O. 3-4, ECF No. 10 ("TRO Reply"). But any such claims are not yet before the Court, so their assertion here is premature. And Defendants cite no authority for the proposition that proving the reasonableness of its regulatory action under 5 U.S.C. § 706(2)(A) is part of a federal plaintiff's burden in asserting preemption.

The State seems unlikely to satisfy jurisdictional and prudential requirements for its anticipated Appointments Clause claims. For example, the State is unlikely able to demonstrate standing to dismantle or suspend operations of the FSB if "[w]hatever constitutional infirmity may inhere in the [FSB's] structure has not caused the injury of which [the State] complains." *Nw. Env't Def. Ctr. v. Brennen*, 958 F.2d 930, 937 (9th Cir. 1992). Additionally, the State is precluded from now bringing some or all of its Appointments Clause claims since it previously challenged the authority of the FSB in a context where it could have presented the same claims. *See Dep't of Fish & Game*, 2021 WL 5756381 at *7 (rejecting challenge to FSB structure and operations by finding, in part, that "the FSB is clearly not a 'collegial body' as defined by § 552b [of the Federal Sunshine Act] because none of its members are appointed by the President with the advice and consent of the Senate"); *Alaska Legislative Council v. Babbitt*, 15 F. Supp. 2d 19, 22-23 (D.D.C. 1998), *aff'd,* 181 F.3d 1333 (D.C. Cir. 1999) (finding claim preclusion in an ANILCA case where "[t]he State did not articulate the same broad Constitutional theories in [an earlier] case as are pleaded in this one, but challenges based on the Commerce Clause, the Property Clause, and the Tenth and Eleventh Amendments *could have been* presented in that action." (emphasis in original)). The State's Appointments Clause arguments could have been raised much earlier, and should here be similarly dismissed.

The State also challenges the relevant federal orders on grounds that the FSB's very existence, and its delegation of certain authority to Refuge Manager, violates the

Appointments Clause.  Even assuming these arguments are not jurisdictionally deficient or premature, Plaintiff has amply demonstrated that the federal actions at issue here are within the scope of congressionally delegated authority, and the State's Appointments Clause arguments to the contrary have no merit.

The State argues in this context that the FSB operates, and apparently has always operated, in violation of that Clause.  *See* Defs.' Opp'n 12-19.  The upshot of this argument is that FSB members, such as the Alaska Regional Forester or BLM State Director, are "officers" performing their roles on the FSB without complying with the Appointments Clause.  The argument fails because FSB members are not officers, much less principal officers, and thus are not subject to the requirements of the Appointments Clause.

The Appointments Clause requires that "officers" be appointed by, and ultimately responsible to, the President.  *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).  If FSB members are "not officers at all, but instead non-officer employees . . . the Appointments Clause cares not a whit about who named them." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018).  An "officer" is one "exercising significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).  The term "embraces the ideas of tenure, duration, emolument, and duties" and an officer exercises duties that are "continuing and permanent, not occasional or temporary[.]" *United States v. Germaine*, 99 U.S. 508, 511-12 (1878).  The duty of an officer cannot be limited in scope, "carefully circumscribed" or "specific in its objects."

*U.S. ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 98 (D.D.C. 2004).

Applying these principles, FSB members are not constitutional officers. Created solely by regulation rather than statute, the FSB is comprised of a chair and two public members possessing knowledge and experience about subsistence uses in rural Alaska who are appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture. *See* 50 C.F.R. § 100.10(b)(1). The remaining members are four federal agency officials from within the Department of the Interior, *e.g.*, Regional Directors of the National Park Service and Bureau of Indian Affairs, and the Alaska Regional Forester within the Department of Agriculture. *Id*. They perform specifically described duties confined to administering subsistence harvest of fish and wildlife on public lands in Alaska under ANILCA Title VIII. *See id*. §§ 100.15 through 100.19. In doing so, they consider the views and authority of various committees, councils, and other agencies, including the State's Department of Fish & Game. *See id*. §§ 100.11 through 100.14. Defendants offer no authority suggesting one in such a position is an officer under the Appointments Clause.[1]

Even assuming that any FSB member(s) were a constitutional officer, however, they would be "inferior officers" because they have a "'a superior' other than the

---

[1] Defendants' cited authority addresses recurring and readily distinguishable concerns involving persons exercising quasi-judicial functions with significant consequences throughout the United States, in positions authorized by statute. *See e.g*. *United States v. Arthrex, Inc*., 141 S. Ct. 1970 (2021) (Administrative Patent judges); *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) (SEC Administrative Law Judges possessing "indeed, nearly all the tools of federal trial judges").

Case 1:22-cv-00054-SLG   Document 21   Filed 06/14/22   Page 8 of 19

President" and they are "'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Arthrex, Inc*., 141 S. Ct. at 1980 (quoting *Edmond v. United States*, 520 U.S. 651, 662-63 (1997)). There exists no "rigid test . . . to decide whether an inferior officer exceeds the permissible scope of her duties" but the Supreme Court has outlined several significant factors, including whether the officer renders final decisions or decisions subject to review or reversal by a superior officer, and "the degree of supervision/oversight vested in the superior officer (*e.g.*, the Secretary)[.]" *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, No. CV 21-00634 (FLW), 2021 WL 5150464, at *24 (D.N.J. Nov. 5, 2021) (internal quotation marks and citations omitted). And here Defendants' argument fails, because the Secretary does retain and exercise meaningful direction over the FSB. *See* Decl. of Stephen Wackowski, *Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-CV-00195-SLG, ECF No. 15-4 (describing Secretary-imposed "pause" on all FSB activities).[2] The public members of the FSB serve at the pleasure of the Secretary of the Interior, and the FSB agency members are subject to removal by their agency supervisors at the behest of the Secretaries of the Interior or Agriculture.

---

[2]     There is no merit to the State's suggestion that the selection of Board members somehow violates the Appointments Clause. *See* Defs.' Opp'n 18-19. Those serving at the pleasure of the President have direct and active supervision of FSB members, providing the "Executive Branch sufficient control over [FSB members] to ensure that the President is able to perform his constitutionally assigned duties." *Morrison v. Olson*, 487 U.S. 654, 695-96 (1988) (rejecting Appointments Clause challenge involving independent counsel positions, because while neither the President nor Attorney General chose the counsel, the Attorney General retained supervisory authority and the ability to remove them for "good cause").

The State's argument contending the Refuge Manager is operating in violation of the Appointments Clause, Defs.' Opp'n 19-22, fails for the same reasons. Far from acting as the "king of the river" as the State erroneously contends, *id.* 20, the Refuge Manager answers to even further layers of review and supervision, not only within the structure of the FSB but also in his qualifying position within the U.S. Fish and Wildlife Service ("FWS"). Nor does the Refuge Manager "seek[ ] to replace state management with federal management" of fish and wildlife throughout Alaska. *Id.* 1-2. Instead, the Refuge Manager has made a reasoned determination, consistent with ANILCA, to address the balance of conservation concerns and subsistence use by rural Alaskans within a particular portion of the Refuge. There can be little dispute that ANILCA "specifically contemplates that federal law will apply to [the Refuge], and where there is a clear conflict between federal and state law, the federal law controls." *Bernhardt*, 500 F. Supp. 3d at 914. The Refuge Manager is a federal employee addressing specified functions in a geographically-prescribed area like hundreds of other federal land managers. He is not a constitutional officer, and nothing about his service or actions here violates the Appointments Clause.

Finally, the State contends that the Refuge Manager "relied on factors which Congress has not intended [him] to consider by participating in a co-management relationship with [the Kuskokwim River Inter-Tribal Fish Commission] that is not authorized by ANILCA or by the FSB's delegation of authority." Defs.' Opp'n 23-27 (internal quotation marks and citation omitted). Insofar as the State contends the Refuge

Manager's decision was arbitrary and capricious on this basis, this too is an anticipatory APA claim. The State has not yet invoked the APA's right of action or its waiver of sovereign immunity with respect to this claim, *see* 5 U.S.C. §702, and there is no administrative record. Accordingly, the State's arguments in this respect are premature and, more fundamentally, ignore that any contrary State order is preempted by federal law.

Even insofar as this argument may timely probe whether the Refuge Manager acted within the scope of his delegated authority, however, the argument fails on the merits. Underpinning this argument is a Memorandum of Understanding ("MOU") between the Commission and FWS. *See* ECF No. 17-2. Such MOUs are common, as illustrated by another of the State's exhibits, *i.e.*, a similar MOU between its Department of Fish & Game and FWS. *See* ECF No. 17-3. The Refuge Manager actively participates in a collaborative process with these entities, and other stakeholders. Decl. of Boyd Blihovde ¶¶ 6-7, 9, ECF No. 5-1. This reflects the reasonableness of his decision, not its illegality. And insofar as the State suggests that the MOU reflects dispositive legal direction and/or nefarious intent, that argument has been raised and rejected. *See Bernhardt*, 500 F. Supp. 3d at 915 ("both the State and the Service recognized and agreed in the [MOU] that the Service retained ultimate authority to manage [the Refuge] in accordance with the purposes set forth in ANILCA").

In sum, Plaintiff has amply demonstrated that it should prevail on the merits. Accordingly, this Court should enter summary judgment for Plaintiff or, alternatively,

should preliminarily enjoin the State to stem further harm to rural subsistence users and to restore the ANILCA-directed management scheme.

## B. The State's Conflicting Orders are Causing Irreparable Injury

Plaintiff has not only shown that the State's orders are unlawful, but that their implementation would likely result in needless irreparable injury that could be avoided through an injunction. The Court identified several questions and shortcomings in Plaintiff's presentation of this issue, in the context of the TRO motion. *See* Order Denying Pl.'s Mot. for T.R.O. 10-17, ECF No. 11 ("TRO Order"). Plaintiff now addresses those questions and amplifies its demonstration of irreparable injury.

The foremost instance of irreparable injury involves the inability of rural Alaskans to meet their subsistence needs, and attendant loss of food security and cultural identity. Between 67,200 and 109,800 Chinook are needed each year to satisfy the needs of the relevant rural subsistence community, according to the State-defined "amount reasonably necessary for subsistence uses" or "ANS."[3] *See* Decl. of Nicholas Smith ("Smith Decl.") ¶ 10, ECF No. 9-3; *see also* Decl. of Mike Williams, Sr. ("Williams Decl.") ¶ 4, ECF No.14-1. But available data show that rural Alaskans have in recent years been unable to harvest anywhere near sufficient salmon from the Kuskokwim River to meet their

_____

[3]     *See* https://www.adfg.alaska.gov/index.cfm?adfg=subsistence.reasonable (last visited June 14, 2022). The State's approach and resulting figure are disputed by many, and particularly rural residents, with those objectors contending the figure is too low. But the salient point is that even the State's figure has not been met and cannot foreseeably be met in the Kuskokwim salmon fishery.

Case 1:22-cv-00054-SLG   Document 21   Filed 06/14/22   Page 12 of 19

recognized subsistence needs, with an estimated subsistence harvest of only 41,475 Chinook in 2020.[4]  And those data understate the present situation, because they do not reflect the poorest ever-recorded chum run in 2021, and harvest tallies alone fail to address the relative size and value of different species.  Chinook are particularly important – an average Chinook provides far greater nutritive value than an average sockeye.  The shortfall against the Chinook ANS is therefore not easily offset by sockeye or coho harvest, and Kuskokwim Chinook are becoming smaller, meaning they provide fewer calories and carry fewer and smaller eggs, further deepening the subsistence and fisheries management challenges.  *See* KRITFC 2021 Draft Management Strategy, ECF No. 5-1 at 45-46.

Thus, rural Alaskans already catch far fewer fish than they need from the relevant stretch of the Kuskokwim River, and each fish diverted to a non-federally qualified user under these circumstances due to illegal openings by the State causes the subsistence community irreparable harm.  For this reason, *Native Village of Quinhagak v. United States*, 35 F.3d 388 (9th Cir. 1994), is far more applicable here than it appeared in the

---

[4]     The ANS for Chinook is 67,200 to 109,800, for chum it is 41,200 to 116,400, and for all salmon species combined it is 168,500 to 344,500.  *See* Smith Decl. ¶ 10.  The most current formal harvest estimate is for 2020.  *See* Subsistence Fisheries Harvest Monitoring Report, Kuskokwim Fisheries Management Area, Alaska, 2020 (ADF&G Tech. Paper No. 483) at 26, available at http://www.adfg.alaska.gov/techpap/TP483.pdf (last visited June 14, 2022).  The estimated subsistence harvest in 2020 was 41,475 Chinook, 28,036 chum, 46,830 sockeye, 34,254 coho, and 1,092 pink for a total estimated harvest of 151,687 salmon.  *Id*.  The Kuskokwim Chinook ANS has not been met since 2010.  *See* KRITFC 2021 Draft Management Strategy (Fig. 2), ECF No. 5-1 at 41; *see also id*. at 27 (stating that ten-year average Chinook harvest "is in the range of 20,000-40,000 fish").

earlier TRO proceedings. TRO Order 12-13. While it is true that *Quinhagak* involved a prohibition on harvest by federally qualified users, the common element is interference with attainment of rural subsistence needs. Kuskokwim village residents have suffered a severe shortfall against their subsistence needs. Williams Decl. ¶¶ 3-4; Decl. of Vivian Korthius ¶¶ 7-14, ECF No. 19-3; 2020 Subsistence Harvest Report at 4 (describing Kuskokwim subsistence salmon fishery as one of the largest in Alaska, contributing forty percent of subsistence harvest (in edible pounds) for lower River communities, and sixty-five percent for middle river communities). Rural residents will not "take more than [they] need" but they "need more than is available right now." ECF No. 5-1 at 13, 27.

Second, neither *Quinhagak* nor any other authority suggests there must be some further threshold crossed before subsistence deprivation constitutes irreparable injury. Whether injury is irreparable depends first on whether it can be redressed by a legal remedy. *See Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) ("Purely economic harms are generally not irreparable, as money lost may be recovered later, in the ordinary course of litigation."); *Nationstar Mortg. LLC v. Saticoy Bay LLC, Series 9229 Millikan Ave.*, 996 F.3d 950, 958-59 (9th Cir. 2021) (real property interests); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (loss of prospective customers or goodwill). An additional important attribute is timing – the alleged injury must occur within the timeframe it would take to resolve the case. *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014) (affirming denial of injunction because movant failed to demonstrate injury would occur given "seasonal

timing of the [disputed] burns").  With these factors in mind, impending injury to Kuskokwim subsistence users is irreparable.  Rural communities include young members who may face critical nutritional needs, or elderly members who may not see the next fishing season.  As well as members who may be choosing, during this fishing season or before the next, between participating in or foregoing continued subsistence fishing against the acknowledged pull to a more urban lifestyle.  These interests are transitory and pivotal.  By its nature, their disruption is irreparable.

Third, because Congress has expressed a clear preference and explicitly prioritized the needs of rural subsistence users, this Court should not credit the implication that there is some tolerable level of State interference in the FSB's implementation of ANILCA's rural subsistence priority.  Any interference with the FSB's actions to effectuate the rural subsistence priority can, itself, constitute irreparable injury.  *See United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded,* 567 U.S. 387, (2012); *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (suggesting irreparable injury can be the inherent result of a state action that is preempted on its face); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-59 (9th Cir. 2009) (a constitutional injury causing some damages can constitute irreparable injury); *Henderson v. Gen. Teamsters Loc. 959, State of Alaska*, No. A78-296 CIV, 1978 WL 14025, at *3 (D. Alaska Nov. 17, 1978).

Fourth, there is no merit to the State's further suggestion that any claim of irreparable harm is belied by the fact that Plaintiff did not sue in 2021.  *See* Defs.' Opp'n

39. Plaintiff has fully rebutted this contention. *See* TRO Reply 6-8. Among several reasons, Plaintiff's persistent effort to engage a reasoned dialogue with the State while allowing for the possibility that legal and factual developments would cause the State to refrain from repeating its 2021 behavior amply justify Plaintiff's choices in bringing this action when it did.

### C. The Equities and Public Interest Favor Injunctive Relief

Defendants argue that the public interest analysis presumes the outcome and "boils down to balancing the national interest represented by ANILCA against the State interest in complying with its constitution[.]" *See* Defs.' Opp'n 40-41. And the answer to that question is straightforward – the national interest prevails. *See Safari Club Int'l*, 31 F.4th at 1169 (9th Cir. 2022). "[A]llowing a state to enforce a state law in violation of the Supremacy Clause is neither equitable nor in the public interest." *United States v. Arizona*, 703 F. Supp. 2d 980, 1007 (D. Ariz. 2010), *aff'd*, 641 F.3d 339 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded,* 567 U.S. 387 (2012), and *aff'd in part, rev'd in part,* 689 F.3d 1132 (9th Cir. 2012).

### D. The Court May Properly Now Reach the Merits

The Court instructed the parties to address their "position as to the propriety of the Court's consolidating the hearing on the motion for a preliminary injunction with a trial on the merits[.]" *See* TRO Order 17 (citing Fed. R. Civ. P. 65(a)(2)). The Court would be well within its discretion to do so here, and multiple factors favor consolidation.

The Court is empowered "to consolidate a hearing for a preliminary injunction

into one on the merits." *See Morris v. D.C.*, 38 F. Supp. 3d 57, 62-63 (D.D.C. 2014).

The essential prerequisite for doing so is notice to the parties, which here the Court has provided. *Id*.; *Slidewaters LLC v. Washington State Dep't of Lab. & Indus.*, 4 F.4th 747, 759-60 (9th Cir. 2021), *cert. denied sub nom. Slidewaters LLC v. Washington Dep't of Lab. & Indus.*, 142 S. Ct. 779 (2022). "Such action may be taken by stipulation, motion, or even sua sponte so long as the procedures do not result in prejudice to either party." *Glacier Park Found. v. Watt*, 663 F.2d 882, 886 (9th Cir. 1981).

Various factors can influence whether to consolidate the determination of a motion for preliminary injunction with the merits. Ultimately, "[t]he general point is that when the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994). These can include a preliminary injunction that resolves all the issues in the case, requests the same relief as that requested by the complaint, involves undisputed facts or review on an administrative record, or addresses exigent circumstances. *Morris*, 38 F. Supp. 3d at 63 (summarizing cases).

The State opposes consolidation, claiming that "discovery may be necessary" to develop its Appointments Clause arguments, "and the State needs access to the administrative record purporting to justify the emergency special action at the center of the current dispute in order to make its arguments under the [APA]." Defs.' Opp'n 11. But discovery is generally not available in an APA case and the State's request to

develop Appointments Clause arguments is both hypothetical and fails to "identif[y] any discovery that might [matter]" because "[t]he issues raised by the complaint [are] legal." *Slidewaters LLC*, 4 F.4th at 760. The State's attempt to shift the burden and advance a separate case against the FSB is not a reason to stall the progress of Plaintiff's case.

Alternatively, the Court might decide that the more appropriate path is to decline to reach the merits, but to forestall further conflict or injury by entering an injunction. *See Kloosterboer Int'l Forwarding LLC v. United States*, No. 3:21-CV-00198-SLG, 2021 WL 4729303, at *9 (D. Alaska Oct. 10, 2021) (declining motion to consolidate under Rule 65(a)(2) due to "the Court's ruling herein that the entry of preliminary injunctive relief is warranted at this time").

## <u>CONCLUSION</u>

For the foregoing reasons, and those previously presented, Plaintiff respectfully requests that the Court enter summary judgment for Plaintiff or, alternatively, grant its motion for preliminary injunction.

Respectfully submitted,

DATED: June 14, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Paul A. Turcke*
PAUL A. TURCKE
Trial Attorney, Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-353-1389 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Counsel for Plaintiff*

Of Counsel:

KENNETH M. LORD
Office of the Regional Solicitor
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508
907-271-4184
ken.lord@sol.doi.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2022, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke