TREG TAYLOR
ATTORNEY GENERAL

Margaret Paton-Walsh (Alaska Bar No. 0411074)
Aaron C. Peterson (Alaska Bar No. 1011087)
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
margaret.paton-walsh@alaska.gov
aaron.peterson@alaska.gov

J. Michael Connolly (*pro hac vice pending*)
Steven C. Begakis (*pro hac vice pending*)
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com

*Attorneys for the State of Alaska*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>　　　　*Plaintiff*, | ) ) ) | |
| KUSKOKWIM RIVER INTER-TRIBAL<br>FISH COMMISSION, *et al.*,<br>　　　　*Intervenor Plaintiffs*, | ) ) ) ) ) | Case No.: 1:22-cv-54 (SLG) |
| v. | ) ) | |
| STATE OF ALASKA, *et al.*,<br>　　　　*Defendants*. | ) ) ) ) | |

## DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT, MEMORANDUM IN SUPPORT, AND OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................... iii

BACKGROUND .............................................................................................................. 3

I. The State's Constitutional and Statutory Obligations When
Managing Alaska's Waters ................................................................................. 3

II. The State's Regulation of the Kuskokwim River ............................................... 7

III. The Federal Government's Regulation of "Public Lands" in Alaska. .................... 9

    A. The Alaska National Interest Lands Conservation Act ................................. 9

    B. The Federal Subsistence Board ................................................................. 10

IV. The Regulation of "Public Lands" and the *Katie John* Cases ............................... 14

V. The Regulation of "Public Lands" after *Sturgeon v. Frost* .................................... 17

VI. The State's Efforts to Protect Salmon and Provide for Subsistence Fishing
on the Kuskokwim River During the 2021 and 2022 Salmon Seasons ................ 20

VII. Procedural History .......................................................................................... 26

LEGAL STANDARD .................................................................................................... 27

ARGUMENT ................................................................................................................. 27

I. The State's orders are not preempted because the Kuskokwim River
is not "public land" under ANILCA. ................................................................. 27

II. The State's orders are not preempted because the FSB members were not
properly appointed. .......................................................................................... 33

    A. Federal orders that violate the Appointments Clause have no effect .......... 33

    B. The FSB members are "officers of the United States." ............................... 35

    C. The FSB's members are unconstitutionally appointed because the
FSB is not established "by Law." ............................................................... 37

    D. The FSB members are "principal" officers who were not appointed
by the President with the advice and consent of the Senate ........................ 39

CONCLUSION .............................................................................................................. 43

CERTIFICATE OF SERVICE ....................................................................................... 44

CERTIFICATE OF COMPLIANCE .............................................................................. 45

*United States v. Alaska*
Defs' Mot. for Sum. J.; Mem. in Support; and Opp. to Mot. for Sum. J.

Case No.: 1:22-cv-54-SLG

ii

Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 2 of 52

# TABLE OF AUTHORITIES

## CASES

*ADF&G v. Fed. Subsistence Bd.*,
  62 F.4th 1177 (9th Cir. 2023) ...................................................................... 26

*Alaska v. Babbitt*,
  72 F.3d 698 (9th Cir. 1995) ........................................................... 14, 15, 31

*Alfa Int'l Seafood v. Ross*,
  264 F. Supp. 3d 23 (D.D.C. 2017) ............................................................... 37

*Beal v. United States*,
  182 F.2d 565 (6th Cir. 1950) ....................................................................... 38

*Braidwood Mgmt. Inc. v. Becerra*,
  No. 20-cv-283, 2023 WL 2703229 (N.D. Tex. Mar. 30, 2023) ................... 35

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ........................................................................... 35, 36, 37

*Cappaert v. United States*,
  426 U.S. 128 (1976) ..................................................................................... 19

*Carlucci v. Doe*,
  488 U.S. 93 (1988) ....................................................................................... 13

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ........................................................................ 35

*Cody v. Kijakazi*,
  48 F.4th 956 (9th Cir. 2022) ........................................................................ 34

*Collins v. Yellen*,
  141 S.Ct. 1761 (2021) .................................................................................. 35

*Edmond v. United States*,
  520 U.S. 651 (1997) ................................................................. 34, 40, 41, 42

*Esparraguera v. Dep't of the Army*,
  981 F.3d 1328 (Fed. Cir. 2020) ................................................................... 13

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) .............................................................................. 33, 42

*Freytag v. CIR*,
  501 U.S. 868 (1991) .............................................................................. 35, 36

*In re Benny*,
  812 F.2d 1133 (9th Cir. 1987) ..................................................................... 38

*In re Slatkin*,
  525 F.3d 805 (9th Cir. 2008) ....................................................................... 27

*United States v. Alaska*                                  Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J.; Mem. in Support, and Opp. to Mot. for Sum. J.        iii

Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 3 of 52

*John v. United States*,
    247 F.3d 1032 (9th Cir. 2002)................................................................ 15, 31

*John v. United States*,
    720 F.3d 1214 (9th Cir. 2013)................................................... 10, 16, 31, 39

*Lucia v. SEC*,
    138 S.Ct. 2044 (2018) ......................................................................*passim*

*McDowell v. State*,
    785 P.2d 1 (Alaska 1989)........................................................................ 6, 22

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003)................................................................. 31, 32

*Morrison v. Olson*,
    487 U.S. 654 (1988)......................................................................... 40, 41, 42

*OPM v. Richmond*,
    496 U.S. 414 (1990)................................................................................... 38

*Riley's Am. Heritage Farms v. Elsasser*,
    32 F.4th 707 (9th Cir. 2022)..................................................................... 27

*Sackett v. EPA*,
    143 S.Ct. 1341 (2023) ........................................................................ 30, 31

*Samuels, Kramer & Co. v. CIR*,
    930 F.2d 975 (2d Cir. 1991)..................................................................... 36

*Seila Law LLC v. CFPB*,
    140 S.Ct. 2183 (2020) ................................................................. 33, 41, 42

*Sidak v. ITC*,
    No. 23-cv-325, 2023 WL 3275635 (D.D.C. May 5, 2023)........................ 35

*State v. Kenaitze Indian Tribe*,
    894 P.2d 632 (Alaska 1995)........................................................................ 7

*Sturgeon v. Frost*,
    139 S.Ct. 1066 (2019) .......................................................................*passim*

*Sturgeon v. Frost*,
    577 U.S. 424 (2016) ................................................................................. 10

*Sturgeon v. Frost*,
    872 F.3d 927 (9th Cir. 2017)....................................................... 17, 18, 31

*SWANCC v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ................................................................................... 3

*Totemoff v. State*,
    905 P.2d 954 (Alaska 1995).............................................................*passim*

*United States v. Arthrex, Inc.*,
  141 S.Ct. 1970 (2021) ......................................................................*passim*

*United States v. Donziger*,
  38 F.4th 290 (2d Cir. 2022) .................................................................... 36

*United States v. Germaine*,
  99 U.S. 508 (1879) .................................................................................. 35

*United States v. Janssen*,
  73 M.J. 221 (C.A.A.F. 2014) .................................................................. 39

*United States v. Maurice*,
  26 F. Cas 1211 (C.C. Va. 1823) ............................................................. 38

*USFS v. Cowpasture River Preservation Ass'n*,
  140 S.Ct. 1837 (2020) ............................................................................ 30

*West v. State, Bd. of Game*,
  248 P.3d 689 (Alaska 2010) ...................................................................... 4

## STATUTES

16 U.S.C. §3102 ................................................................. 10, 18, 28, 29

16 U.S.C. §3113 ........................................................................................ 10

16 U.S.C. §3114 ........................................................................................ 10

43 U.S.C. §1311 ........................................................................................ 28

AS §16.05.020 ............................................................................................. 3

AS §16.05.251 ............................................................................................. 3

AS §16.05.258 ......................................................................................... 5, 7

AS §16.05.940 ......................................................................................... 5, 7

Pub. L. 96-487, 94 Stat. 2371 (1980) ...................................................... 11

## OTHER AUTHORITIES

Alaska Amicus Br., *Sturgeon II* (U.S. Aug. 14, 2018) ............................ 20

Brief of *Amici Curiae* Alaska Native Subsistence Users,
  *Sturgeon II* (U.S. Sept. 18, 2018) ......................................................... 20

E.S. Corwin, *The President: Offices and Powers* (1948) ......................... 38

Kevin Sholette, *The American Czars*, 20 Cornell J.L. & Pub. Pol'y 219 (2010) ............. 38

*Limitations on Presidential Power to Create a New Executive Branch Entity*,
  9 Op. O.L.C. 76 (1985) .............................................................. 37, 38, 39

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J.; Mem. in Support, and Opp. to Mot. for Sum. J.            v

Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 5 of 52

*Officers of the United States Within the Meaning of the Appointments Clause*,
    31 Op. O.L.C. 73 (2007) ............................................................................ 38

Reply Br., *Sturgeon II* (U.S. Oct. 11, 2018) .............................................. 20

Respondents' Br., *Sturgeon II* (U.S. Sept. 11, 2018) ............................ 19, 32

Respondents' Br. in Opp., *Sturgeon II* (U.S. May 7, 2018) ....................... 19

Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as
    Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87 (2019) ........... 37, 38, 39

*The Constitution of the United States of America, Analysis and Interpretation*,
    92d Cong., 2d Sess. 523 (1973) ................................................................ 38

*The Debate Over Selected Presidential Assistants and Advisors*,
    Cong. Rsch. Serv. (2014), bit.ly/3QzpGEr ............................................... 37

## RULES

Fed. R. Civ. P. 56 ...................................................................................... 27

## REGULATIONS

36 C.F.R. §242.1 ....................................................................................... 12

36 C.F.R. §242.10 ..................................................................................... 12

5 AAC 07.365 ............................................................................................. 8, 9

5 AAC 39.222 ............................................................................................. 4, 9

50 C.F.R. §100.1 ....................................................................................... 12

50 C.F.R. §100.10 ............................................................................... *passim*

50 C.F.R. §100.13 ................................................................................ 13, 41

50 C.F.R. §100.19 ........................................................................... 12, 13, 41

50 C.F.R. §100.20 ............................................................................... 13, 41

50 C.F.R. §100.22 ..................................................................................... 12

50 C.F.R. §100.3 ....................................................................................... 16

57 Fed. Reg. 22940 (1992) ........................................................................ 14

## CONSTITUTIONAL PROVISIONS

Alaska Const. art. VIII, §3 ......................................................................... 6

Alaska Const. art. VIII, §4 ......................................................................... 4

Alaska Const. art. VIII, §15 ....................................................................... 6

Alaska Const. art. VIII, §17 ....................................................................... 6

U.S. Const. art. II, §1 ................................................................. 33

U.S. Const. art. II, §2 ................................................... 34, 35, 38, 40

U.S. Const. art. II, §3 ................................................................. 33

Under the U.S. Constitution, the State of Alaska has traditional and primary power to regulate fishing on its navigable waters. The Alaska Constitution and state law, in turn, require the State to pursue three primary goals when regulating its waters: sustain its fish resources for future generations, provide priority subsistence fishing opportunities for all Alaskans, and offer commercial, sport and personal-use fishing opportunities when harvestable surpluses exist. For years, the federal government deferred to the State's management decisions on its navigable waters, allowing the State to achieve its goals.

That all changed in the spring of 2021. In response to low salmon forecasts, the State issued orders restricting salmon fishing on the Kuskokwim River except for certain dates on which qualifying Alaskans could engage in limited subsistence fishing. But the federal government attempted to override the State's orders. The federal refuge manager, acting by delegation of authority from the Federal Subsistence Board ("FSB"), issued his own orders restricting subsistence fishing to only "rural" residents. The refuge manager issued these orders despite having no evidence that the small number of non-rural subsistence fishers would have any negative impact on the salmon population. Even worse, in 2022, the refuge manager issued orders contradicting the State's fishing restrictions by *opening* the Kuskokwim to subsistence fishing, despite the State's determination that the salmon population was too low and uncertain to support fishing on these dates.

Yet it is the United States that has now sued the State, claiming that the State's orders over its waters are preempted. That is wrong for two primary reasons.

*First*, the federal government has no regulatory authority over the Kuskokwim. ANILCA authorizes the United States to implement a subsistence priority only on "public

*United States v. Alaska*  Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.  1
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 8 of 52

lands," which are "lands, waters, and interests therein … the title to which is in the United States." But the Kuskokwim does not fit this definition. The United States has no "title" over the "lands" under the Kuskokwim because Alaska gained ownership of these lands when it joined the Union in 1959. The United States has no "title" over the "waters" in the Kuskokwim because running waters cannot be owned. And the only possible "interests" the United States could have would be reserved water rights. But as the Supreme Court recognized in *Sturgeon v. Frost*, the United States cannot have "title" over reserved water rights, and even if it could, that would give it the power only to take a specific "amount of water," which has no application here. Because no other statute gives the United States authority over the Kuskokwim, the State's orders governing the river cannot be preempted.

*Second*, even if the United States could lawfully regulate the Kuskokwim, it has not done so here. Although ANILCA charges the Secretaries of the Interior and Agriculture with implementing the subsistence priority, they have delegated their responsibility to the FSB. But under the Appointments Clause, all officers (whether principal or inferior) must have their positions established "by Law," *i.e.*, through a statute. And the FSB was created through a *regulation*, not through an act of Congress. Moreover, given the FSB's enormous powers and authority, FSB members are unquestionably "principal" officers. Yet they assumed their positions without ever being nominated by the President and confirmed by the Senate. Because the refuge manager's orders were tainted with this Appointments Clause violation, they are void and cannot preempt the State's orders.

The Court should deny the United States' and Intervenors' motions for summary judgment, and it should grant Alaska summary judgment.

*United States v. Alaska*                                          Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    2
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 9 of 52

# BACKGROUND

## I.     The State's Constitutional and Statutory Obligations When Managing Alaska's Waters

Alaska, like all States, has "traditional and primary power" over its waters.[1] This regulatory power extends to the State's navigable waters, such as the Kuskokwim River. Alaska has "regulatory authority over 'navigation, fishing, and other public uses'" in these waters because Alaska received "'title to and ownership of the lands beneath navigable waters'" when it joined the Union.[2] Under Alaska law, the Alaska Department of Fish and Game ("ADF&G") and the Board of Fisheries are charged with implementing the State's fishing priorities.[3]

The Alaska Constitution and state law direct the State to pursue three primary goals when managing its waters: (1) sustain its fish for future generations (maintaining "sustained yield"); (2) provide priority subsistence fishing opportunities for all Alaskans; and (3) offer commercial, sport and personal-use fishing opportunities when harvestable surpluses exist.

*Sustaining Yield for Future Generations*. Protecting fish for future generations is the State's highest priority. Alaska is "one of the most bountiful fishing regions in the world," containing more than three million lakes, 12,000 rivers, and 6,640 miles of coastline.[4] "Alaska's fisheries are among the best-managed, most sustainable in the

---

[1] *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001).
[2] *Sturgeon v. Frost*, 139 S.Ct. 1066, 1074 (2019) ("*Sturgeon II*").
[3] AS §§16.05.020, 16.05.251.
[4] Begakis Decl., Ex. A at 1.

*United States v. Alaska*                                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    3
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 10 of 52

world."[5] They support "tens of thousands of seasonal and full-time jobs" and thus serve as "a vital, long term economic engine for Alaska communities and the state."[6] The State's fisheries are certified by the Marine Stewardship Council as sustainable.[7]

"Alaska's success over time is due to its constitutionally mandated commitment to sustainable management practices."[8] Under Alaska's constitution, all fish must be "utilized, developed, and maintained on the sustained yield principle."[9] This principle balances "'maximum use of natural resources with their continued availability to future generations.'"[10] State regulations implement this sustained-yield requirement based on the best available scientific data.[11] The State's "precautionary and adaptive approach" is "the gold standard" of "sustainable fisheries management and allows the ecosystem and seafood species to continue to replenish year after year."[12]

*Providing Priority Subsistence Fishing Opportunities for All Alaskans*. "More than the residents of any other state, Alaska's residents rely on subsistence uses of fish, wildlife, and plant life for their daily nutritional needs."[13] Subsistence uses of wild resources "are especially important for most rural families, who depend on subsistence

---

[5] Begakis Decl., Ex. B at 1; Vincent-Lang Decl. ¶15.
[6] Begakis Decl., Exs. A at 1, BB.
[7] Vincent-Lang Decl. ¶15.
[8] Begakis Decl., Ex. A at 2.
[9] Alaska Const. art. VIII, §4.
[10] *West v. State, Bd. of Game*, 248 P.3d 689, 696 (Alaska 2010).
[11] 5 AAC 39.222(c); Vincent-Lang Decl. ¶¶35-38.
[12] Begakis Decl., Ex. C at 1, 3.
[13] Begakis Decl., Ex. D at 4.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.            4
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 11 of 52

hunting and fishing as sources of nutrition and cultural practices."[14] Rural subsistence users harvest about 36.9 million pounds of wild foods each year.[15]

For many Alaskans, "the role of subsistence uses is about more than food consumption and economics; it is directly tied to their history and central to their customs and traditions."[16] Alaska Natives "have depended on the harvest and use of natural resources for food, shelter, clothing, transportation and handicrafts, trade, barter and sharing for thousands of years."[17] These subsistence practices are "interwoven with their unique cultural identities and social ways of life."[18] In more recent history, "non-Native peoples living in rural Alaska have come to rely on natural resources for their social and economic livelihoods as well."[19]

To preserve the subsistence way of life, state law mandates that ADF&G provide reasonable opportunities for subsistence fishing and a priority for subsistence fishing over other uses.[20] The State defines "subsistence uses" as the "noncommercial, customary and traditional uses of wild, renewable resources" for, among other things, "direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation."[21]

---

[14] Begakis Decl., Ex. E at 1.
[15] *Id.*
[16] Begakis Decl., Ex. D at 4.
[17] Begakis Decl., Ex. CC at 10.
[18] *Id.*
[19] *Id.*
[20] AS §16.05.258.
[21] AS §16.05.940(34).

*United States v. Alaska*                                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                        5
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 12 of 52

Importantly, under the Alaska Constitution, all Alaskans (not just rural residents) may engage in subsistence fishing.[22] While most subsistence fishing is done by rural residents, "some who are domiciled in other parts of Alaska return annually to assist family or friends [that] harvest or process salmon."[23] Many Alaskans have cultural ties to rural fisheries but have been displaced to urban areas of the state for health, education, economic, or other reasons.[24] Today, 60% of Alaska Natives reside in the state's urban cities, not its rural villages, and 87% live outside of tribal areas.[25] State laws and regulations protecting subsistence fishing for all Alaskans ensure that individuals can return "home" to practice their culture and traditions.

*Offering Commercial, Sport, and Personal-Use Fishing Opportunities When Harvestable Surpluses Exist.* Last, when there are harvestable surpluses of fish, the State provides opportunities for commercial, sport, and personal-use fishing. Commercial fishing is "one of the largest employment and economic drivers in Alaska," employing tens of thousands of Alaskans and producing more than $5 billion in economic activity

---

[22] *McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989) (citing Alaska Const. art. VIII, §§3, 15, 17); Begakis Decl., Ex. F.

[23] Begakis Decl., Ex. G at 13; Vincent-Lang Decl. ¶¶17, 55-58; *e.g.*, Begakis Decl., Ex. DD at 4 (former FSB member Gene Peltola, Jr., was "stationed in Anchorage" but would return to the Kuskokwim River to assist in subsistence fishing); *McDowell*, 785 P.2d at 4 (discussing Alaska's "urban residents who have lived a subsistence lifestyle and desire to continue to do so").

[24] Begakis Decl., Ex. G at 13; Vincent-Lang Decl. ¶¶17, 58; Dkt. 5-2 at 8.

[25] Begakis Decl., Ex. H at 7; *see also id.*, Ex. CC at 53 (Alaska resident urging Congress to amend ANILCA because the law "can no longer deliver on the promise and intent to protect Alaska Native hunting, fishing, and gathering rights [when] more than 52.4 percent of Alaska Native peoples [are] now living in non-subsistence areas of Alaska").

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                 6
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 13 of 52

every year.[26] Alaska also is "a world-renowned sport fishing destination," which drives tourism and creates jobs for Alaskans.[27] And Alaskans, of course, have a long history of fishing for "personal use."[28]

Importantly, however, subsistence fishing has statutory priority over these other uses.[29] Thus, when a fish population is "insufficient to supply all consumptive uses consistent with the sustained yield principle, nonsubsistence uses must be restricted," and "when a population is sufficient only to supply subsistence uses, nonsubsistence uses must be eliminated."[30]

## II. The State's Regulation of the Kuskokwim River

Running more than 700 miles in southwest Alaska before it ends in the Bering Sea, the Kuskokwim River is the longest free-flowing river in the United States that is contained entirely within one state.[31] Approximately 180 miles of the Kuskokwim River runs within the Yukon Delta National Wildlife Refuge beginning at the mouth of the river.[32] The "entire length of the Kuskokwim River [is] navigable from its mouth to the

---

[26] Begakis Decl., Ex. A at 1; *id.*, Ex. BB.
[27] Begakis Decl., Ex. EE at 1.
[28] AS §16.05.940.
[29] *State v. Kenaitze Indian Tribe*, 894 P.2d 632, 633 (Alaska 1995); *see* AS §16.05.258(b).
[30] *Kenaitze Indian Tribe*, 894 P.2d at 633.
[31] Dkt. 11 at 2.
[32] *Id.*

*United States v. Alaska*                                                          Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                              7
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 14 of 52

confluence of its North and South Forks."[33] Accordingly, "[t]itle to the bed of the river transferred to the State of Alaska" when it entered the Union.[34]

There are five species of salmon that are harvested in the Kuskokwim: chum, sockeye, coho, chinook, and pink. Every salmon goes through the same lifecycle. Salmon begin their life as a fertilized egg in gravel in freshwater. When the egg hatches, the fish grows and matures in the freshwater before migrating to the ocean. After spending their adult years in the ocean, the salmon return to the Kuskokwim River to spawn (reproduce). Each species of salmon enters the Kuskokwim at different times of the year (between May and October) to begin the journey upriver to reach their spawning ground. When the salmon reach their spawning grounds, the female deposits her eggs in gravel and the male fertilizes them. After spawning, the salmon die, completing their lifecycle.[35]

The State has been managing and protecting salmon in the Kuskokwim River since statehood.[36] Today, the State manages salmon through its "Kuskokwim River Salmon Management Plan."[37] Per the Plan, the State manages salmon stocks "in a conservative manner" so the State can achieve three primary objectives: (1) maintain the salmon population by meeting "escapement goals," (2) provide a subsistence priority for all Alaskans, and (3) offer commercial, sport and personal-use fishing opportunities when

---

[33] Begakis Decl., Ex. I at 6.
[34] *Id*. at 10; Begakis Decl., Ex. J at 1 ("[T]he United States claims no real property interest in the lands underlying the water body comprising the Kuskokwim River.").
[35] Begakis Decl., Ex. K at 1-2; Vincent-Lang Decl. ¶25.
[36] Vincent-Lang Decl. ¶31; Administrative Record ("AR") 2453.
[37] 5 AAC 07.365; Vincent-Lang Decl. ¶¶35-42.

*United States v. Alaska*                                          Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    8
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 15 of 52

harvestable surpluses exist.[38] An "escapement goal" is the number of salmon in a particular stock the State hopes will "escape" (*i.e.*, not get caught by fisheries) and thus return to their spawning ground.[39]

To determine if its escapement goals are being achieved, the State measures salmon run strength through a variety of methods, including sonar, aerial studies, test fisheries, computer modeling, and subsistence-harvest reports from rural fisherman.[40] In addition, the State regularly meets with and receives input from the Kuskokwim River Salmon Management Working Group, a 14-member advisory board that includes, among others, "elders, subsistence fishermen, processors, commercial fishermen, sport fishermen, [and the] Kuskokwim River Inter-Tribal Fish Commission."[41] Based on these data, analyses, and feedback, the State will, if necessary, limit the dates, methods, and locations of salmon fishing to ensure that its escapement goals and subsistence priorities are met throughout the entire drainage.[42]

## III. The Federal Government's Regulation of "Public Lands" in Alaska.

### A. The Alaska National Interest Lands Conservation Act

The United States is the largest landowner in Alaska, owning about 60% of the total area (more than 200 million acres). These lands include, among others, national

---

[38] 5 AAC 07.365; AR 568.
[39] Vincent-Lang Decl. ¶¶32-33.
[40] Vincent-Lang Decl. ¶36; AR 568, 1029; Begakis Decl., Ex. L; 5 AAC 07.365.
[41] Begakis Decl., Ex. M; Vincent-Lang Decl. ¶12; *e.g.,* AR 512.
[42] 5 AAC 07.365; *see also* 5 AAC 39.222.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    9
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 16 of 52

parks, wildlife refuges, national forests, and more. Most of the federally owned lands in Alaska have been set aside for public use.[43]

In 1980, Congress passed the Alaska National Interest Lands Conservation Act ("ANILCA"), which "set aside 104 million acres of land in Alaska for preservation purposes" and "creat[ed] ten new national parks, preserves, and monuments," including the Yukon Delta National Wildlife Preserve.[44] Under Title VIII of ANILCA, Congress gave a priority to "rural" Alaskans for subsistence uses on "public lands."[45] ANILCA defines "public lands" as "lands, waters, and interests therein … the title to which is in the United States."[46] ANILCA orders the Secretaries of Agriculture and Interior to "restrict the taking of populations of fish and wildlife" on "public lands" when necessary to "protect the continued viability of such populations, or to continue such uses."[47]

## B. The Federal Subsistence Board

Although ANILCA "charges the Secretaries with implementing its rural subsistence priority,"[48] the Secretaries do not, in fact, implement the priority. Instead, the Secretaries have "establish[ed] a Federal Subsistence Board" (the "FSB") and "assign[ed]

---

[43] Begakis Decl., Ex. N at 2.
[44] *Sturgeon v. Frost*, 577 U.S. 424, 431 (2016) (*Sturgeon I*).
[45] 16 U.S.C. §§3113, 3114.
[46] 16 U.S.C. §3102(1)-(3); *Sturgeon II*, 139 S.Ct. at 1076-77.
[47] 16 U.S.C. §3114.
[48] *John v. United States*, 720 F.3d 1214, 1219 (9th Cir. 2013) (*Katie John III*).

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.            10
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 17 of 52

it responsibility for administering the subsistence taking and uses of fish and wildlife on public lands."[49] ANILCA neither contemplated nor created the FSB.[50]

The FSB is composed of eight members. A Chair and two "public members" are appointed by the Secretary of the Interior, with the concurrence of the Secretary of the Agriculture. The remaining five members are appointed automatically based on their positions within the Departments. These five members are the Alaska Regional Director for the U.S. Fish and Wildlife Service; the Alaska Regional Director for the National Park Service; the Alaska Regional Forester for the U.S. Forest Service; the Alaska State Director for the Bureau of Land Management; and the Alaska Regional Director for the Bureau of Indian Affairs.[51] The FSB currently has the following members:

- **Anthony Christianson**, *Chair of the Board*. Christianson was appointed to the FSB in November 2016 by Secretary Jewell, with Secretary Vilsack concurring.[52]

- **Charles Brower**, *Public Member of the Board*. Brower was appointed to the FSB in February 2012 by Secretary Salazar, with Secretary Vilsack concurring.[53]

- **Rhonda Pitka**, *Public Member of the Board*. Pitka was appointed to the FSB in January 2017 by Secretary Jewell, with Secretary Vilsack concurring.[54]

- **Glenn Chen**, *Acting Alaska Regional Director for the Bureau of Indian Affairs*. Chen was appointed as the Acting Regional Director in July 2022 by agency staff.[55]

---

[49] 50 C.F.R. §100.10(a); *see also id.* §100.10(d)(4) ("The [FSB] is empowered … to implement Title VIII of ANILCA.").

[50] *See generally* Pub. L. 96-487, 94 Stat. 2371 (1980).

[51] *See* 50 C.F.R. §100.10(b)(1).

[52] Begakis Decl., Exs. O, P, Q.

[53] Begakis Decl., Exs. O, R.

[54] Begakis Decl., Exs. O, S.

[55] Begakis Decl., Exs. O, T.

*United States v. Alaska*                                                        Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    11
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 18 of 52

- **Steven M. Cohn**, *Alaska State Director for the Bureau of Land Management*. Cohn was appointed to State Director in May 2022 by agency staff.[56]

- **Sarah Creachbaum**, *Alaska Regional Director for the National Park Service*. Creachbaum was appointed to Regional Director in December 2021 by agency staff.[57]

- **Sara D. Boario**, *Alaska Regional Director for the U.S. Fish & Wildlife Service*. Boario was appointed to Regional Director in March 2022 by agency staff.[58]

- **David Schmid**, *Alaska Regional Forester for the U.S. Forest Service*. Schmid was appointed to Regional Forester in November 2018 by agency staff.[59]

The Secretaries have given the FSB enormous powers.[60] The FSB can, among other things, issue regulations managing subsistence uses, determine which communities or areas qualify for the subsistence priority, close public lands to nonsubsistence uses, establish priorities for subsistence taking, and more.[61] Through this delegation, the FSB has promulgated extensive regulations on subsistence fishing and hunting in Alaska.[62] The FSB also claims regulatory power to issue orders in "emergency situation[s]" to, among other things, "open or close public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for take for subsistence uses."[63]

---

[56] Begakis Decl., Exs. O, U.

[57] Begakis Decl., Exs. O, V.

[58] Begakis Decl., Exs. O, W.

[59] Begakis Decl., Exs. O, X.

[60] 50 C.F.R. §100.10(d)(4); 36 C.F.R. §242.10(d)(4). The Secretaries have each adopted similar regulations. *See* 36 C.F.R. §§242.1-242.28; 50 C.F.R. §§100.1-100.28.

[61] 50 C.F.R. §100.10(d)(4).

[62] *See* 50 C.F.R. §§100.22-100.28.

[63] 50 C.F.R. §100.19(a).

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                12
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 19 of 52

The FSB's regulations are the "final administrative authority."[64] Any requests for reconsideration must go to the FSB alone, and "[i]f the request is denied, the decision of the [FSB] represents the final administrative action."[65] The regulations contain no mechanism for affected parties to ask the Secretaries to review or overrule the FSB's decision. The Chair and the two public members of the Board can be removed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture.[66] The other five FSB members can be removed only for cause.[67]

Per the Secretaries' regulations, the FSB has authorized the Yukon Delta National Wildlife Refuge Manager to issue "emergency special actions" to, among other things, "close and re-open Federal public waters to nonsubsistence fishing" and "open or close Federal subsistence fishing periods."[68] Boyd Blihovde has served as the Refuge Manager since August 2020.[69]

---

[64] 50 C.F.R. §100.13(a)(2); *see also id.* §100.19(e) (emergency special actions are "final administrative action").

[65] 50 C.F.R. §100.20.

[66] *See Carlucci v. Doe*, 488 U.S. 93, 95 (1988) ("[A]bsent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'").

[67] Because the regulations require that the individuals in five positions must serve on the FSB, *see* 50 C.F.R. §100.10(b)(1), the only way to remove them from the FSB is to remove them from their primary positions. Each of these positions is designated as a career "Senior Executive Service" role. Begakis Decl., Ex. Y at 5, 7-8, 11-15. Such individuals can be removed from their positions only for cause. *See Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1330-31 (Fed. Cir. 2020).

[68] 50 C.F.R. §§100.10(d)(6), 100.19(a); Dkt. 17-1 at 2.

[69] Begakis Decl., Ex. Z at 2.

*United States v. Alaska*    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.    13
Case 1:22-cv-00054-SLG    Document 73    Filed 09/01/23    Page 20 of 52

## IV. The Regulation of "Public Lands" and the *Katie John* Cases

The United States previously concluded that ANILCA's definition of "public lands" did not extend to Alaska's navigable waters. That is because "public lands" include only those lands "the title to which is in the United States" and the United States "does not generally own title to the submerged lands beneath navigable waters in Alaska."[70] But the United States reversed its position in the 1990s, asserting during litigation that it could regulate navigable waters "in which the federal government has an interest under the reserved water rights doctrine."[71] Under the reserved water rights doctrine, "'when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.'"[72]

In October 1995, the Alaska Supreme Court held in *Totemoff v. State* that ANILCA "does not give the federal government power to regulate hunting and fishing in navigable waters."[73] ANILCA's definition of "public lands" excluded navigable waters because the Submerged Lands Act "gives Alaska ownership of, title to, and management power over … lands beneath the navigable waters of Alaska, the navigable waters themselves, and fish and other marine life located in Alaska's navigable waters."[74] The court rejected the argument that the federal government could regulate navigable waters under the reserved

---

[70] 57 Fed. Reg. 22940, 22942, 22952 (1992).

[71] *Alaska v. Babbitt*, 72 F.3d 698, 701 (9th Cir. 1995) (*Katie John I*).

[72] *Sturgeon II*, 139 S.Ct. at 1078 (cleaned up).

[73] 905 P.2d 954, 965 (Alaska 1995).

[74] *Id.* at 964

*United States v. Alaska*                                      Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                14
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 21 of 52

water rights doctrine, concluding that "reserved water rights are not the type of property interest to which title can be held."[75]

But two months later, in *Katie John I*, the Ninth Circuit deferred to the federal government's interpretation of ANILCA under *Chevron*, holding that ANILCA's definition of "public lands" includes those "navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine."[76] In dissent, Judge Hall found that navigable waters were not "public lands," rejecting the majority's reliance on the reserved water rights doctrine. Because "[t]he federal government can only reserve waters running over land that it owns" and "*Alaska* has title to its navigable waters under the Submerged Lands Act," the United States "cannot reserve these waters."[77]

In *Katie John II*, the Ninth Circuit, sitting en banc, declined to reconsider *Katie John I*, even though a majority of the en banc court rejected the use of the reserved water rights doctrine to determine "public lands" under ANILCA.[78] Writing for the dissent, Judge Kozinski argued that navigable waters were not "public lands" because the reserved water rights doctrine created only a "usufructuary right to waters" and "a usufructuary right does not give the United States *title* to the waters or the lands beneath those waters."[79]

---

[75] *Id.*
[76] *Katie John I*, 72 F.3d at 701-04.
[77] *Id*. at 706 (Hall, J., dissenting).
[78] *John v. United States*, 247 F.3d 1032, 1033 (9th Cir. 2002) (*Katie John II*); *see id.* at 1034, 1038 (Tallman, J., concurring in the judgment); *id.* at 1046-47 (Kozinski, J., dissenting).
[79] *Id.* at 1046-47 (Kozinski, J., dissenting).

*United States v. Alaska*                                            Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                15
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 22 of 52

Finally, in *Katie John III*, the Ninth Circuit upheld the federal government's regulations identifying which waters in Alaska were "public lands" under the reserved waters rights doctrine.[80] In doing so, it recognized that *Katie John I* had applied the reserved water rights doctrine in a "novel way" because "previous applications of the federal reserved water rights doctrine … focused on the amount of water needed for a specific federal reservation, rather than the locations of water sources that might generally be needed for subsistence living from many such reservations."[81] *Katie John I* was a "problematic solution" that had "sanctioned the use of a doctrine ill-fitted to determining which Alaskan waters are 'public lands' to be managed for rural subsistence priority under ANILCA."[82]

The *Katie John* cases led to a balkanized regulatory regime over Alaska's navigable waters. For example, the federal government claimed authority to regulate fisheries in a significant portion of the Kuskokwim River, from the river mouth to the rural village of Aniak at the edge of the Yukon Delta National Wildlife Refuge.[83] But the State remained responsible for sustaining yield and protecting subsistence and other uses for the *entire* Kuskokwim River, including those portions that are upstream from the federal refuge. These conflicting regulatory regimes created a serious conflict when salmon populations

---

[80] *Katie John III*, 720 F.3d at 1218.

[81] *Id.* at 1226; *see also id.* at 1227 ("[T]he 1999 Rules identify the bodies of water in which the Secretaries believe the United States has a federal reserved water rights interest … [but] the rules do not purport to assert rights over a particular amount of water.").

[82] *Id.* at 1235.

[83] *See* 50 C.F.R. §100.3(b)(4); *e.g.*, Begakis Decl., Ex. AA.

*United States v. Alaska*                                      Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                 16
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 23 of 52

were low and the State was forced to implement restrictions.[84] During periods of weak runs in the Kuskokwim, "the State must limit early fishing opportunities for lower Kuskokwim subsistence fishers while run strength and timing are still uncertain to prevent overfishing to ensure for escapement and to preserve subsistence fishing opportunities for those in the upper Kuskokwim."[85] But the federal government "does not have to take those factors into consideration."[86] This regulatory narrowness has "led to overfishing within federal preserves and corresponding harms to those living upstream."[87]

## V.    The Regulation of "Public Lands" after *Sturgeon v. Frost*

In 2007, the United States threatened to fine an Alaskan hunter, John Sturgeon, for using a hovercraft on the Nation River within the Yukon-Charley Rivers National Preserve. Sturgeon sued, arguing that the United States "has no power to regulate lands or waters that [it] does not own" and could regulate only "public lands" in national parks under ANILCA.[88] And because the Nation River, as a navigable water, is not "public land" under ANILCA, the United States could not prohibit him from using his hovercraft on the river.[89] The district court ruled for the United States and the Ninth Circuit affirmed, holding that it was "bound under [its] *Katie John* precedent" to find that the Nation River was "public land" under ANILCA.[90] Because "ANILCA's definition of 'public lands'

---

[84] Vincent-Lang Decl. ¶46.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Sturgeon II*, 139 S.Ct. at 1073.
[89] *Id.*
[90] *Sturgeon v. Frost*, 872 F.3d 927, 934 (9th Cir. 2017).

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                17
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 24 of 52

applies throughout the statute," the Ninth Circuit explained, it would be "anomalous" if the definition of "public lands" in Title VIII of ANILCA "employ[ed] a different construction of 'public lands' than applicable elsewhere in ANILCA."[91]

Concurring in the judgment, Judges Nguyen and Nelson wrote that it was "unfortunate" that the court was "bound by [its] *Katie John* decisions to analyze this case under the reserved water doctrine."[92] The Court in *Katie John I* had erred because a "reserved water right" is only "the right to a sufficient *volume* of water for use in an appropriate federal purpose."[93] The concurring judges preferred to abandon *Katie John I* "[r]ather than continuing to shove a square peg into a hole we acknowledge is round."[94]

The Supreme Court granted certiorari and ruled for Sturgeon, rejecting the United States' argument that the Nation River was "public land" under the reserved water rights doctrine. The Court found "no evidence that the Congress enacting ANILCA" intended to allow the United States to "hold 'title' … to reserved water rights."[95] These rights instead are "'usufructuary' in nature, meaning that they are rights for the Government to use—whether by withdrawing or maintaining—certain waters it does not own."[96] Pointing to the Alaska Supreme Court's decision in *Totemoff*, the Court emphasized the "common understanding" that "'reserved water rights are not the type of property interests

---

[91] *Id.*

[92] *Id.* at 937 (Nguyen J., concurring).

[93] *Id.*

[94] *Id.* at 938.

[95] *Sturgeon II*, 139 S.Ct. at 1079 (quoting 16 U.S.C. §3102(2)).

[96] *Id.*

*United States v. Alaska*                                          Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    18
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 25 of 52

to which title can be held.'"[97] Moreover, even if it were possible to hold "title" to reserved water rights, the interest would "merely enabl[e] the Government to take or maintain the specific 'amount of water'—and 'no more'—required to 'fulfill the purpose of [its land] reservation.'"[98] But hovercrafts do not "deplete or divert any water," and the hovercraft rule was designed to address "concerns not related to safeguarding the water."[99] So even if the United States had held "title to a reserved water right in the Nation River," it still could not prevent Sturgeon from using his hovercraft on the river.[100]

Before the Supreme Court, the United States repeatedly argued that Sturgeon's position was irreconcilable with the *Katie John* precedent. Because ANILCA "contains a definitional section that sets out the meaning of 'public lands' throughout ANILCA," the United States explained, the statute "forecloses" the argument that the term "public lands" can be given "one meaning in the context of the subsistence-use-related sections of ANILCA and a different meaning" elsewhere.[101] Various Alaska native subsistence users

---

[97] *Id.* (quoting *Totemoff*, 905 P.2d at 965).

[98] *Id.* (quoting *Cappaert v. United States*, 426 U.S. 128, 141 (1976)).

[99] *Id.* at 1080 (cleaned up).

[100] *Id.*

[101] Respondents' Br. 49, *Sturgeon II* (U.S. Sept. 11, 2018); *see also* Respondents' Br. in Opp. 17, *Sturgeon II* (U.S. May 7, 2018) ("Petitioner's approach, in which waters with associated federal reserved water rights would be 'public lands' for some ANILCA purposes, but not for others, *cannot be squared* with ANILCA's single definition of 'public lands' that applies across the Act's subsistence-use and conservation provisions." (emphasis added)); *id.* ("ANILCA *leaves no room* for an argument that the federal government has reserved water rights in the navigable waters within the National Park System for purposes of subsistence use, but not for purposes of conserving park ecosystems." (emphasis added)); *id.* ("[I]t cannot seriously be contended that ANILCA's subsistence-use purposes require reservation of appurtenant waters, but its conservation purposes do not.").

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.          19
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 26 of 52

similarly argued as *amici* that a ruling for Sturgeon would "undermine the foundation on which the *Katie John* rulings stand," since any "attempt to distinguish the definition of 'public lands' for subsistence and other purposes is not persuasive."[102] In response to these arguments, both Sturgeon and the State of Alaska (participating as *amicus curiae*) argued that there was "no need for [the] Court to address the *Katie John* line of decisions" because it was "beyond the scope of the question presented."[103] The Supreme Court agreed with Sturgeon and the State and declined to explicitly address the issue, stating in a footnote that ANILCA's subsistence-fishing provisions were "not at issue in this case" and so the Court was "not disturb[ing] the Ninth Circuit's holdings."[104]

Following *Sturgeon*, the United States continued to assert regulatory authority over Alaska's navigable waters, including the Kuskokwim River. This legal issue never reached a breaking point, however, because it was "Federal policy to defer to State management of the federal portion of the Kuskokwim River whenever possible."[105]

## VI. The State's Efforts to Protect Salmon and Provide for Subsistence Fishing on the Kuskokwim River During the 2021 and 2022 Salmon Seasons

This cooperation ended in the spring of 2021. In May 2021, as the salmon season approached, the State projected that the Chinook salmon run in the Kuskokwim would be

---

[102] Brief of *Amici Curiae* Alaska Native Subsistence Users 22-23, *Sturgeon II* (U.S. Sept. 18, 2018).

[103] Reply Br. 20-21, *Sturgeon II* (U.S. Oct. 11, 2018); Alaska Amicus Br. 29-35, *Sturgeon II* (U.S. Aug. 14, 2018) ("The *Katie John* decisions are not at issue in this appeal" and so "this Court need not directly address the prior circuit holdings in order to resolve this appeal.").

[104] *Sturgeon II*, 139 S.Ct. at 1080 n.2.

[105] Begakis Decl., Ex. CC at 22 (Statement of Mary S. Peltola); Vincent-Lang Decl. ¶47; AR 569.

*United States v. Alaska*                                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    20
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 27 of 52

in the range of 94,000-150,000.[106] Consistent with its management plan, the State was preparing to restrict fishing along the Kuskokwim to protect the Chinook population to ensure escapement throughout the entire drainage while also providing limited subsistence fishing opportunities for all Alaskans.[107]

On May 7, before the State issued its orders, Boyd Blihovde (the federal Refuge Manager) issued an "emergency special action" ordering that "Federal public waters of the Kuskokwim River within and adjacent to the exterior boundaries of the Yukon Delta National Wildlife Refuge" would be "closed to the harvest of all salmon by using gillnets by all users effective June 01, 2021."[108] The emergency special action created an exception for "Federally qualified subsistence users," authorizing them to use gillnets in "the main stem in the Kuskokwim River" on June 2, 5, 9, 12, and 15.[109] Blihovde issued this order "[b]y delegation from the Federal Subsistence Board."[110]

The State took a more conservative approach and waited for additional inseason salmon-run data before issuing its emergency orders.[111] On May 11, the State issued emergency orders that prohibited subsistence fishing with gillnets throughout the Kuskokwim River starting on June 1, 2021.[112] But the State authorized limited subsistence fishing on various dates and locations along the Kuskokwim, including "[s]ubsistence

---

[106] AR 512.
[107] Vincent-Lang Decl. ¶49.
[108] AR 506.
[109] AR 507.
[110] AR 508.
[111] Vincent-Lang Decl. ¶¶51-52.
[112] AR 512-14.

*United States v. Alaska*                                      Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                21
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 28 of 52

fishing with set gillnets" in parts of the river within the Yukon Delta Refuge on June 2, 5, and 9.[113] Unlike Blihovde's orders, the State's orders authorized subsistence fishing for all Alaskans that qualified for subsistence fishing, not just rural Alaskans, as required by the Alaska Constitution.[114]

On May 27, the FSB wrote a letter to the State asserting that the State's orders put "non-federally qualified fishers at legal risk" because Blihovde's orders "tak[e] precedence" over the State's.[115] On June 3, Doug Vincent-Lang, the Commissioner of the ADF&G, responded to the FSB's letter, explaining that he had a legal obligation "to provide for the subsistence needs of Alaskans when harvestable surpluses allow," and that, based on the State's data and assessments, "there [were] sufficient resources to provide subsistence opportunities for all Alaskans while still managing Chinook salmon stocks conservatively."[116] The State "never received any evidence from the federal government showing that [its] orders had any meaningful impact on subsistence fishing for rural residents."[117] On June 10, after collecting additional inseason data, the State issued another executive order authorizing "subsistence fishing with gillnets" on parts of the Kuskokwim River within the Yukon Delta Refuge on June 12 and 15.[118]

---

[113] AR 512-16.
[114] AR 515-16; see *McDowell*, 785 P.2d at 9.
[115] AR 544-45.
[116] AR 568.
[117] Vincent-Lang Decl. ¶55.
[118] AR 634.

*United States v. Alaska*                                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    22
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 29 of 52

On June 17, Blihovde issued another emergency action authorizing "federally qualified subsistence users" to use gillnets in "[f]ederal public waters in the main stem of the Kuskokwim River" on June 19.[119] The State did not support Blihovde's actions, which were unsupported by the State's scientific data and analysis.[120]

On June 24, after receiving data showing that "the chinook salmon run abundance was adequate to provide additional harvest," the State issued an emergency order authorizing subsistence fishing with gillnets along parts of the Kuskokwim River within the Yukon Delta Refuge on June 28.[121] The next day, the FSB wrote to the State, asserting that the State's order was unlawful because Blihovde had "closed the mainstem and several tributaries of [the] Kuskokwim River within the exterior boundaries of the [federal] refuge to gillnet fishing" and his order "supersedes [the] State's authority."[122]

On June 30, the State responded, emphasizing that "the State of Alaska has a constitutional responsibility to manage for sustainable salmon runs and provide a subsistence opportunity for Alaskans when there is a harvestable surplus of salmon."[123] The State had concluded, based on its "up-to-date science, biology, and experience," that there were "sufficient fish available to allow Alaskans an opportunity to subsistence fish to feed their families and practice their cultural way of life."[124] The State noted that

---

[119] AR 738-39.
[120] Vincent-Lang Decl. ¶60.
[121] Vincent-Lang Decl. ¶61; AR 859, 919-20.
[122] AR 911
[123] AR 1029.
[124] AR 1029.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                23
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 30 of 52

Blihovde had not "provided any scientific or biologic data to [the State] that would call [its] information and science into question."[125] Without "credible evidence" contradicting its approach, the State would "continue to manage the river and fishery based on its assessment of run strength."[126]

On July 1, after receiving additional inseason data, the State issued another emergency order permitting subsistence fishing with gillnets along parts of the Kuskokwim River within the Yukon Delta Refuge on five dates in July.[127] The State concluded that these limited fishing opportunities would "conserve chum and king salmon while providing subsistence harvest opportunity for other species."[128] The same day, Blihovde issued another emergency special action, which purported to authorize subsistence fishing with gillnets on the same five dates, but only for "Federally qualified subsistence users."[129]

On April 6, 2022, in advance of the 2022 salmon season, the United States sent a letter to the State threatening legal action if the State continued to "authorize subsistence harvest by all Alaskans on a day when no comparable federal opening exist[s]" or issued any other orders "authoriz[ing] harvest of Kuskokwim salmon within the [Yukon Delta National Wildlife] Refuge in a manner contrary to the Board's actions."[130] In response,

---

[125] AR 1030.
[126] Id.
[127] AR 1112-13.
[128] AR 1112.
[129] AR 1042-43.
[130] AR 2422-23.

United States v. Alaska                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.        24
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 31 of 52

Alaska wrote that protecting subsistence fishing for all Alaskans was critical because "many of the users who are not federally qualified have cultural ties to the Kuskokwim fishery but have been displaced to urban areas of the state," and the State again emphasized that it was legally required "to provide a subsistence opportunity for [these] users when a harvestable surplus exists."[131]

The following month, the State was preparing to issue new orders restricting gillnet fishing due to the "historically low levels" of chum salmon escapements the prior year.[132] Yet on May 2, Blihovde issued an emergency special action inexplicably authorizing federally qualified subsistence users to fish using gillnets on June 1, 4, 8, 12 and 16.[133]

The State strongly opposed Blihovde's order.[134] In a May 12 letter to Blihovde, the State warned that opening fishing on June 12 and 16 "prior to any inseason assessment" was "premature," "highly illogical and scientifically unsupportable," and "irresponsible management," because "run strength … [was] still highly uncertain."[135] The State asked the FSB to provide a "biological justification" for its actions.[136] The FSB never responded.[137]

On May 13, consistent with these concerns, the State issued emergency orders that prohibited subsistence fishing with gillnets in the Kuskokwim River beginning on June 1,

---

[131] Dkt. 5-2 at 8; Vincent-Lang Decl. ¶66; AR 2453-54.
[132] Vincent-Lang Decl. ¶67; Dkt. 9-3 at 4.
[133] AR 2487-88.
[134] Vincent-Lang Decl. ¶68.
[135] Dkt. 9-1 at 1-2.
[136] *Id.* at 3.
[137] Vincent-Lang Decl. ¶69.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                 25
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 32 of 52

but opened subsistence fishing on parts of the river within the Yukon National Refuge for all subsistence users only on June 1, 4, and 8.[138] Unlike Blihovde's order, the State did not permit gillnet fishing on June 12 and 16.[139]

## VII. Procedural History

On May 17, four days after the State issued its orders, the United States sued the State of Alaska. The United States sought a declaration that the State's "emergency orders purporting to open harvest on the public waters of the Kuskokwim River during the federal closure in 2021 and 2022, and any similar actions interfering with or in contravention on federal orders addressing ANILCA Title VIII and applicable regulations, are invalid, null, and void."[140] The United States also sought a preliminary and permanent injunction preventing the State "from taking similar actions interfering with or in contravention of federal orders addressing ANILCA Title VIII and applicable regulations."[141] The Court granted a preliminary injunction,[142] after which three sets of plaintiffs intervened, raising similar claims and seeking similar relief.[143] All parties now move for summary judgment.[144]

---

[138] AR 2516-20.

[139] *Id.*; Vincent-Lang Decl. ¶70.

[140] Dkt. 1 at 24.

[141] *Id.*

[142] Dkt. 35.

[143] *See* Dkts. 12-1, 19-2, 38-1.

[144] The State had previously raised counterclaims asserting, among other things, that ANILCA did not authorize the Secretaries to open fisheries to subsistence fishing. Dkt. 33 at 15. The State voluntarily dismissed its claims following the Ninth Circuit's decision in *ADF&G v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1181 (9th Cir. 2023) (holding that Alaska's claim that "ANILCA does not authorize the federal government to open emergency hunting seasons" was not moot and remanding the issue to the district court).

*United States v. Alaska*                                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                          26
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 33 of 52

## LEGAL STANDARD

"Summary judgment must be granted 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"[145]

## ARGUMENT

The State is entitled to summary judgment for two primary reasons. First, the Kuskokwim River is not "public land" under ANILCA, so the federal government cannot preempt the State's orders. Second, the FSB violates the Appointments Clause because it was not established "by Law" and its members are "principal" officers who were not nominated by the President and confirmed by the Senate.

For the same reasons, the Court should deny the United States' and Intervenors' motions for summary judgment. Their motions fail to prove that the United States has regulatory authority over the Kuskokwim and that the FSB can lawfully issue orders consistent with the Appointments Clause. And because the United States and the Intervenors cannot succeed on the merits, their requests for a permanent injunction should likewise be denied.[146]

## I. The State's orders are not preempted because the Kuskokwim River is not "public land" under ANILCA.

ANILCA authorizes the United States to implement a subsistence priority on "public lands," which are "lands, waters, and interests therein … the title to which is in the

---

[145] *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).
[146] *See Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 730 (9th Cir. 2022).

*United States v. Alaska*                                      Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    27
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 34 of 52

United States."[147] But the Kuskokwim River is not "public land" because the United States has no "title" over "lands, waters, [or] interests" in the river. Accordingly, the United States cannot issue orders imposing a subsistence priority on the Kuskokwim River.

To begin, "the United States does not have 'title' … to the [Kuskokwim] River in the ordinary sense."[148] That is because "running waters cannot be owned—whether by a government or by a private party."[149] Nor does the United States have "title" to "the lands beneath" the navigable waters.[150] That is because "the Submerged Lands Act gives each State 'title to and ownership of the lands beneath [its] navigable waters.'"[151] Because the Kuskokwim is a navigable river,[152] "[t]hat means Alaska, not the United States, has title to the lands beneath the [Kuskokwim] River."[153]

The United States and the Intervenors will likely argue that the Kuskokwim River is "public land" because the United States has "title" to an "interest" in the river under the reserved water rights doctrine. But this argument fails under *Sturgeon*.

The United States cannot hold "title" to reserved water rights.[154] Under the reserved water rights doctrine, "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves

---

[147] 16 U.S.C §3102(1)-(3); *Sturgeon II*, 139 S.Ct. at 1076-77.
[148] *Sturgeon II*, 139 S.Ct. at 1078.
[149] *Id*.
[150] *Id*.
[151] *Id.* (quoting 43 U.S.C. §1311).
[152] Begakis Decl., Ex. I at 6, 10; Begakis Decl., Ex. J at 1.
[153] *Sturgeon II*, 139 S.Ct. at 1078.
[154] *Id.* at 1078-79.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.          28
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 35 of 52

appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation."[155] These rights "are 'usufructuary' in nature, meaning that they are rights for the Government to use—whether by withdrawing or maintaining—certain waters *it does not own*."[156] The term "title" instead applies to "'fee ownership of property' and (sometimes) to 'possessory interests' in property like those granted by a lease.'"[157] There is "no evidence that the Congress enacting ANILCA meant to use the term in any less customary and more capacious sense."[158]

But even if the United States could hold "title" in reserved water rights, the Kuskokwim River still would not be "public land."[159] Under ANILCA's definition, the "public land" at issue would "consist only of the Federal Government's specific 'interest' in the River—that is, its reserved water right."[160] And "that reserved right, by its nature, is limited. It does not give the Government plenary authority over the waterway to which it attaches."[161] Instead, "the interest merely enables the Government to take or maintain the specific 'amount of water'—and 'no more'—required to 'fulfill the purpose of [its land] reservation.'"[162] For example, the United States "could control only the volume of water necessary for the tribe to farm or the fish to survive."[163]

---

[155] *Id.* (cleaned up).
[156] *Id.* at 1079 (emphasis added).
[157] *Id.* (quoting *Totemoff*, 904 P.2d at 965).
[158] *Id.*
[159] *Id.*
[160] *Id.* (quoting 16 U.S.C. §3102(1), (3)).
[161] *Id.*
[162] *Id.*
[163] *Id.*

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    29
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 36 of 52

Here, that means that the United States "could protect 'only th[e] amount of water' in the [Kuskokwim] River needed to 'accomplish the purpose of the [Yukon Delta Refuge] reservation.'"[164] But "whatever that volume, the Government's (purported) reserved right could not justify applying [Blihovde's orders] on the [Kuskokwim] River."[165] That right "would support a regulation preventing the 'depletion or diversion' of waters in the River (up to the amount required to achieve the [Yukon Delta Refuge's] purposes)."[166] But Blihovde's orders in 2021 and 2022 did "nothing of that kind."[167] Gillnet fishing takes salmon out of the river; it does not "deplete or divert any water."[168] Nor has the United States explained Blihovde's orders "as an effort to protect the [Kuskokwim] River from pollution or other similar harm."[169] To the contrary, the United States' orders address subsistence fishing—"concerns not related to safeguarding the water."[170]

The Supreme Court's recent decision in *Sackett v. EPA* further confirms that "public lands" do not include navigable waters. In rejecting an expansive definition of "waters of the United States," the Court emphasized that Congress must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power,'" and the "[r]egulation of land and water use lies at the core of traditional state authority."[171]

---

[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.* at 1079-80.
[168] *Id.* at 1080 (cleaned up).
[169] *Id.*
[170] *Id.*
[171] *Sackett v. EPA*, 143 S.Ct. 1341 (2023) (quoting *USFS v. Cowpasture River Preservation Ass'n*, 140 S.Ct. 1837, 1949-50 (2020)).

*United States v. Alaska*                                          Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                30
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 37 of 52

Here, as in *Sackett*, an "overly broad interpretation of [ANILCA's] reach would impinge on this authority."[172] At a minimum, then, there is no "'exceedingly clear language'" in ANILCA authorizing the federal government to impose a subsistence priority on navigable waters, including the Kuskokwim.[173]

The United States and the Intervenors will likely argue that the *Katie John* cases are still controlling precedent because they were not explicitly overruled in *Sturgeon.* But Ninth Circuit precedent "can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent."[174] When that happens, a district court "should consider [itself] bound by the intervening higher authority and reject the prior opinion … as having been effectively overruled."[175]

Here, the Ninth Circuit's reasoning in *Katie John* was nearly identical to the reasoning *rejected* by the Supreme Court in *Sturgeon*.[176] And the Supreme Court's reasoning in *Sturgeon* was nearly *identical* to the arguments of the numerous judges who have maintained that *Katie John* was wrongly decided.[177] Indeed, the Supreme Court in *Sturgeon* adopted the reasoning of the Alaska Supreme Court in *Totemoff*, which had

---

[172] *Id.* at 680.

[173] *Id.*

[174] *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003).

[175] *Id.* at 900.

[176] *See Katie John I*, 72 F.3d at 703-04; *see also Katie John III*, 720 F.3d at 1226-27.

[177] *See Totemoff*, 905 P.2d at 961-68; *Katie John I*, 72 F.3d at 706 (Hall, J., dissenting); *Katie John II*, 247 F.3d at 1044 (Kozinski, J. dissenting); *Sturgeon*, 872 F.3d at 937 (Nguyen, J., concurring); *see also Katie John III*, 720 F.3d at 1245.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.            31
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 38 of 52

rejected *Katie John*'s reliance on the reserved water rights doctrine.[178] This Court thus should follow *Sturgeon*, not the Ninth Circuit's *Katie John* precedent.

To be sure, the Supreme Court in *Sturgeon* stated in a footnote that ANILCA's subsistence-fishing provisions were "not at issue" in the case and so the Court was not "disturb[ing] the Ninth Circuit's holdings."[179] But the Supreme Court did not hold that *Katie John* was correct or reconcilable with *Sturgeon*. It simply refrained from explicitly addressing the issue, declining to address the United States' argument that the term "public lands" cannot be given "one meaning in the context of the subsistence-use-related sections of ANILCA and a different meaning" elsewhere.[180]

But this Court has no such luxury. Whether the *Katie John* cases are good law after *Sturgeon* is squarely presented here. Because *Sturgeon* "undercut[s] the theory [and] reasoning underlying" *Katie John*, the two decisions are "clearly irreconcilable" and so this Court should not follow *Katie John*.[181] Instead, the Court should follow *Sturgeon* and hold that the Kuskokwim River is not "public land" under ANILCA and so the United States cannot impose a subsistence priority on the river under ANILCA.

---

[178] *Sturgeon II*, 139 S.Ct. at 1079 (quoting *Totemoff*, 905 P.2d at 965).
[179] *Id*. at 1080 n.2.
[180] Respondents' Br. 49, *Sturgeon II* (U.S. Sept. 11, 2018).
[181] *Miller*, 335 F.3d at 900.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    32
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 39 of 52

## II. The State's orders are not preempted because the FSB members were not properly appointed.

Blihovde's orders were issued "[b]y delegation from the Federal Subsistence Board."[182] But the FSB members were not properly appointed under the Constitution. Accordingly, Blihovde's orders have no effect and cannot preempt the State's orders.

### A. Federal orders that violate the Appointments Clause have no effect.

Under the Constitution, "[t]he executive Power" is vested in the President, who must "take Care that the Laws be faithfully executed."[183] The President thus is "responsible for the actions of the Executive Branch and cannot delegate that ultimate responsibility or the active obligation to supervise that goes with it."[184] It is "*his* responsibility."[185]

The Framers recognized, however, that "no single person could fulfill that responsibility alone," and they "expected that the President would rely on subordinate officers for assistance."[186] "Today, thousands of officers wield executive power on behalf of the President in the name of the United States."[187] "That power acquires its legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote."[188]

The appointment of these "Officers" is governed by the Appointments Clause in the U.S. Constitution, which provides:

---

[182] *E.g.*, AR 508; *see* Dkt. 17-1.

[183] U.S. Const. art. II, §§1, 3.

[184] *United States v. Arthrex, Inc.*, 141 S.Ct. 1970, 1978-79 (2021) (cleaned up).

[185] *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 493 (2010) (emphasis in original).

[186] *Seila Law LLC v. CFPB*, 140 S.Ct. 2183, 2191 (2020).

[187] *Arthrex*, 141 S.Ct. at 1979.

[188] *Id*. (quoting *Free Enter. Fund*, 561 U.S. at 498).

*United States v. Alaska*                                          Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    33
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 40 of 52

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … all … Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone … or in the Heads of Departments.[189]

Under the Appointments Clause, then, only the President, with the advice and consent of the Senate, "can appoint noninferior officers, called 'principal' officers as shorthand in [the Court's] cases."[190] The Clause "permits Congress to dispense with joint appointment … only for inferior officers."[191] In addition, no officer (whether principal or inferior) may be appointed unless Congress has first established the position "by Law."[192]

The Appointments Clause is "more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme."[193] Violations of the Appointments Clause "erode political accountability" by giving power to "unelected and insulated lower-level officials."[194] "Given its importance within our Constitution's structure, the Supreme Court has established remedies with bite for Appointments Clause violations."[195] At a minimum, orders that are "tainted with an appointments violation" are invalid and have no effect.[196] Accordingly, if the FSB's members were appointed in

---

[189] U.S. Const. art. II, §2, cl. 2.
[190] *Arthrex*, 141 S.Ct. at 1979.
[191] *Id.*
[192] U.S. Const. art. II, §2, cl. 2.
[193] *Edmond v. United States*, 520 U.S. 651, 659 (1997).
[194] *Cody v. Kijakazi*, 48 F.4th 956, 960 (9th Cir. 2022).
[195] *Id.*
[196] *Lucia v. SEC*, 138 S.Ct. 2044, 2055 (2018).

*United States v. Alaska*                     Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.          34
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 41 of 52

violation of the Appointments Clause, then the FSB's orders—which were issued by delegation through Blihovde—are invalid and cannot preempt the State's orders.[197]

## B. The FSB members are "officers of the United States."

The Appointments Clause "prescribes the exclusive means of appointing 'Officers.'"[198] But the Clause does not apply to "non-officer employees" of the Federal Government.[199] The Supreme Court has identified two considerations for determining whether an individual is an officer: (1) whether the individual's duties are "'continuing and permanent,'" rather than "'occasional or temporary'";[200] and (2) whether the individual exercises "'significant authority pursuant to the laws of the United States.'"[201] Under these considerations, the FSB members are clearly "officers" and not merely "employees."

*First*, the FSB positions are "'continuing and permanent,'" not "'occasional or temporary.'"[202] The Secretaries' regulations have no term limits for service on the FSB.[203]

_____

[197] *See id.*; *see also Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 642 (5th Cir. 2022) ("[A]gency actions that involve 'a Government actor's exercise of power that the actor did not lawfully possess'" because of an Appointments Clause violation must be "invalidat[ed]." (quoting *Collins v. Yellen*, 141 S.Ct. 1761, 1787-88 (2021)); *Sidak v. ITC*, No. 23-cv-325, 2023 WL 3275635, at *13 (D.D.C. May 5, 2023) (actions "'tainted with an appointments violation'" are "'void'"); *Braidwood Mgmt. Inc. v. Becerra*, No. 20-cv-283, 2023 WL 2703229, at *14 (N.D. Tex. Mar. 30, 2023) (enjoining "Defendants and their officers, agents, servants, and employees from" taking certain actions because they "have not been appointed in a manner consistent with Article II's Appointments Clause").

[198] *Lucia*, 138 S.Ct. at 2051 (quoting U.S. Const. art. II, §2, cl.2).

[199] *Id.*; *see Arthrex*, 141 S.Ct. at 1980 (same).

[200] *Lucia*, 138 S.Ct. at 2051 (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1879)).

[201] *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)); *see also Freytag v. CIR*, 501 U.S. 868, 881 (1991) (applying the "'significant authority'" test).

[202] *Lucia*, 138 S.Ct. at 2051 (quoting *Germaine*, 99 U.S. at 511-12).

[203] *See* 50 C.F.R. §100.10.

*United States v. Alaska*                                                  Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                      35
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 42 of 52

Indeed, the current FSB members have been collectively appointed under multiple presidencies, and one of them (Brower) has served on the FSB for more than a decade.[204] And because FSB positions are set by regulation, they are each an "institution distinct from the person holding it" and will "persist beyond an individual's incumbency."[205]

*Second*, the FSB members exercise "'significant authority pursuant to the laws of the United States.'"[206] The Secretaries' regulations give the FSB enormous powers "to implement Title VIII of ANILCA."[207] The FSB can, among other things, "[i]ssue regulations for the management of subsistence taking and uses of fish and wildlife on public lands," "[d]etermine which communities" qualify for the subsistence priority; "[a]llocate subsistence uses of fish and wildlife populations on public lands;" "[r]estrict the taking of fish and wildlife on public lands for nonsubsistence uses or close public lands to the take of fish and wildlife for nonsubsistence uses," and much more.[208]

The FSB thus unquestionably "exercise[s] a great deal of discretion and perform[s] important functions, characteristics that [are] … inconsistent with the classifications of a 'lesser functionary' or mere employee."[209] Indeed, the FSB's power to "[i]ssue regulations" is dispositive.[210] "The Supreme Court has held that, under the Constitution, only 'Officers,'

---

[204] *Supra* 11-12.

[205] *United States v. Donziger*, 38 F.4th 290, 297 n.3 (2d Cir. 2022) (cleaned up).

[206] *Lucia*, 138 S.Ct. at 2051 (quoting *Buckley*, 424 U.S. at 126).

[207] 50 C.F.R. §100.10(d)(4).

[208] *Id.*

[209] *Samuels, Kramer & Co. v. CIR*, 930 F.2d 975, 986 (2d Cir. 1991) (quoting *Buckley*, 424 U.S. at 126 n.162); *see Freytag*, 501 U.S. at 881-82 (officers carry out "important functions" and "perform more than ministerial tasks").

[210] 50 C.F.R. §100.10(d)(4)(i).

*United States v. Alaska*                                   Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    36
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 43 of 52

both principal and inferior, have the power to issue rules; employees do not."[211] "[R]ulemaking" is too "significant [of a] governmental duty" to be done by employees.[212] And the FSB's decisions are not just "significant"; they are also the "last[] word" on the matters.[213] Simply put, if "a postmaster first class … and the clerk of a district court" are officers, then "surely" the FSB members are too.[214]

### C.  The FSB's members are unconstitutionally appointed because the FSB is not established "by Law."

The Constitution "does not give the President or the heads of executive departments the power to create any offices and to appoint any officers who they deem appropriate for any purpose."[215] Instead, "new offices of the United States must be created or authorized by Congress through enactment of legislation."[216] Specifically, the Appointments Clause provides that both principal and inferior offices "shall be

---

[211] *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 41 (D.D.C. 2017) (citing *Buckley*, 424 U.S. at 141).

[212] *Buckley*, 424 U.S. at 141.

[213] *Lucia*, 138 S.Ct. at 2052-54.

[214] *Buckley*, 424 U.S. at 126.

[215] Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87, 101 (2019).

[216] *Limitations on Presidential Power to Create a New Executive Branch Entity*, 9 Op. O.L.C. 76, 76 (1985); *see* Calabresi & Lawson at 100 ("Congress has the *exclusive* constitutional power to create federal offices. The Constitution … requires that Congress first create all offices to which federal officers, superior or inferior, can be appointed."); *The Debate Over Selected Presidential Assistants and Advisors* 19 & n.94, Cong. Rsch. Serv. (2014), bit.ly/3QzpGEr ("[I]t is clear that the Framers intended to vest the task of creating the governmental structure in Congress alone …. [T]he President cannot establish executive offices.").

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.              37
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 44 of 52

established *by Law*."[217] The "Law" that establishes the office "must be a statute."[218] A "regulation or executive (or judicial) order does not constitute the kind of 'law' that can create an office under the Appointments Clause."[219]

That the Constitution "'distinguishes between the *creation* of an office and *appointment* thereto for the generality of national offices has never been questioned.'"[220] Indeed, Chief Justice Marshall long ago "rejected the idea that the president could create offices, stating that 'the general spirit of the constitution … seems to have arranged the creation of office among legislative powers.'"[221] This "dichotomy between creation of the office and appointment to the office is consistent with the historic view of the Executive

---

[217] U.S. Const. art. II, §2, cl. 2 (emphasis added).

[218] Calabresi & Lawson at 101-02 & nn.78-79; *OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("The Appropriations Clause … provides that: 'No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'…. [I]n other words, the payment of money from the Treasury must be authorized by a statute."); *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 117 (2007) ("The Appointments Clause … provide[s] that offices not recognized by the Constitution itself 'shall be established by Law,' thus lodging in Congress ultimate authority over the creation of most offices."); *In re Benny*, 812 F.2d 1133, 1143 (9th Cir. 1987) (Norris, J., concurring in the judgment) ("The Appointments Clause mandates that public *offices* be 'established by Law'—that is, by Act of Congress,"); *Beal v. United States*, 182 F.2d 565, 568 (6th Cir. 1950) ("[A]n office of the United States does not exist unless it is created by some specific Act of the Congress.").

[219] Calabresi & Lawson at 101-102.

[220] *Limitations on Presidential Power to Create a New Executive Branch Entity*, 9 Op. O.L.C. at 77 (emphasis added) (quoting *The Constitution of the United States of America, Analysis and Interpretation*, 92d Cong., 2d Sess. 523 (1973)); *id.* ("The Constitution … by the 'necessary and proper' clause assigns the power to *create* offices to Congress, while it deals with the *appointing power* in the [Appointments Clause]." (quoting E.S. Corwin, *The President: Offices and Powers* 83 (1948))).

[221] Kevin Sholette, *The American Czars*, 20 Cornell J.L. & Pub. Pol'y 219, 240 (2010) (quoting *United States v. Maurice*, 26 F. Cas 1211, 1213 (C.C. Va. 1823)).

*United States v. Alaska*                                          Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    38
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 45 of 52

and Legislative Branches" and "respects the proper division of constitutional responsibility."[222] Congress has "provided by statute for the establishment of Executive Branch agencies and particular positions within those agencies, and the President or heads of those agencies select individuals to fill those positions."[223] In short, an "appointment" is "'to an *existing* office, and one which owes its existence to an act of Congress.'"[224]

Here, no statute creates the FSB. Indeed, the United States has conceded that the FSB was "[c]reated solely by regulation rather than statute."[225] ANILCA instead "charges the *Secretaries* with implementing its rural subsistence priority."[226] Accordingly, because the FSB members are "officers" whose positions were not established "by Law," they were not properly appointed.[227]

### D. The FSB members are "principal" officers who were not appointed by the President with the advice and consent of the Senate.

Even if Congress had established the FSB "by Law," the FSB members were not properly appointed. The Appointments Clause requires that all principal officers must be "nominate[d]" by the President and confirmed through the "Advice and Consent" of the

---

[222] *Limitations on Presidential Power to Create a New Executive Branch Entity*, 9 Op. O.L.C. at 77.

[223] *Id*. at 77-78.

[224] *Id.*; Calabresi & Lawson at 102 ("If there is no establishment of an office by statute, there is no office to which someone can be appointed").

[225] Dkt. 21 at 8.

[226] *Katie John III*, 720 F.3d at 1219 (emphasis added).

[227] *See, e.g.*, *United States v. Janssen*, 73 M.J. 221, 225 (C.A.A.F. 2014) ("While Congress certainly has the authority under the Appointments Clause to authorize the Secretary of Defense to appoint appellate military judges … it has not done so…. Since this was not done, [the judge's] appointment as an appellate military judge is invalid and of no effect.").

*United States v. Alaska*                                Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.        39
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 46 of 52

Senate.[228] The Supreme Court has "not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes."[229] But the "starting point" for determining whether someone is an "inferior" officer is "'whether he has a superior' other than the President."[230] An inferior officer must be "'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'"[231]

Here, because the FSB members are not "directed and supervised" by the Secretaries, they are "principal" officers that must be appointed by the President with the advice and consent of the Senate. FSB members are principal officers for at least three reasons.

*First*, the Secretaries do not "'exercis[e] administrative oversight'" over the FSB by "prescribing rules" and "formulating policies" for the FSB to implement.[232] To the contrary, the FSB has complete, unilateral discretion to "[i]ssue regulations for the management of subsistence taking and uses of fish and wildlife on public lands" as it sees fit to "implement … ANILCA."[233] And that is just one of its many wide-ranging and

---

[228] U.S. Const. art. II, §2, cl. 2.
[229] *Edmond*, 520 U.S. at 661.
[230] *Arthrex*, 141 S.Ct. at 1980 (quoting *Edmond*, 520 U.S. at 662).
[231] *Id.* (quoting *Edmond*, 520 U.S. at 663).
[232] *Id.* (quoting *Edmond*, 520 U.S. at 664-65); *see Morrison v. Olson*, 487 U.S. 654, 671 (1988) (finding individual to be an inferior officer because he could not "formulate policy for the Government or the Executive Branch").
[233] 50 C.F.R. §100.10(d)(4).

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.          40
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 47 of 52

independent "duties."[234] Because the FSB has "policymaking [and] administrative authority" and has "the sole responsibility to administer" Title VIII of ANILCA, "[e]veryone [should] agre[e]" that the FSB members are principal officers.[235]

*Second*, the FSB has the "'power to render a final decision on behalf of the United States'" without any "review by [a] nominal superior or any other principal officer in the Executive Branch."[236] The Supreme Court has stressed that "adequate supervision entails review of decisions issued by inferior officers."[237] But the FSB's decisions are final and cannot be appealed to the Secretaries.[238] This lack of oversight is a "'significant'" factor indicating that the FSB members are principal officers.[239] The "restrictions on review relieve the [Secretaries] of responsibility for the final decisions rendered by [the FSB] purportedly under [their] charge."[240] The "unreviewable authority wielded by [the FSB]" is simply "incompatible with their appointment by the Secretar[ies] to an inferior office."[241]

---

[234] *Lucia*, 138 S.Ct. at 2051-54; *Edmond*, 520 U.S. at 661 (independent counsel in *Morrison* was inferior officer in part because he "performed only limited duties" (citing *Morrison*, 487 U.S. at 671-72)); *see* 50 C.F.R. §100.10(d)(4).

[235] *Seila Law*, 140 S.Ct. at 2200; *see* 50 C.F.R. §100.10(a) ("The Secretary of the Interior and Secretary of Agriculture hereby establish a Federal Subsistence Board, and *assign it responsibility* for administering the subsistence taking and uses of fish and wildlife on public lands." (emphasis added)).

[236] *Arthrex*, 141 S.Ct. at 1981 (quoting *Edmond*, 520 U.S. at 665).

[237] *Id.* at 1983.

[238] 50 C.F.R. §§100.13(a)(2), 100.19(e), 100.20(b), (g).

[239] *Arthrex*, 141 S.Ct. at 1981 (quoting *Edmond*, 520 U.S. at 665).

[240] *Id.* at 1981.

[241] *Id.* at 1985.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    41
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 48 of 52

*Third*, the FSB members "occupy a permanent office" and the majority of them can be removed only "for cause."[242] Because five of the FSB members are automatically appointed based on their other positions, the only way to remove them from the FSB is to remove them from their other positions (*e.g.*, as Alaska Regional Director for BLM).[243] But all five members have for-cause removal protection.[244] Because the majority of the FSB can be removed only for cause, neither the sitting President nor his Secretaries can "meaningfully contro[l]" the Board members.[245] Indeed, the current FSB members were appointed over multiple Presidencies.[246] Accordingly, "an unlucky President might get elected" on a certain environmental or conservation "platform and enter office only to find herself saddled with … holdover [members] from a competing political party who [are] dead set *against* that agenda."[247] This regime violates the constitutional structure.[248]

Accordingly, even if the FSB had been established "by Law," the FSB members are still principal officers who must be appointed by the President with the advice and consent of the Senate. But none were appointed through this process: three were appointed by the Secretaries, and five were appointed by agency staff.[249] Because none of them were

---

[242] *Id.*; *Edmond*, 520 U.S. at 661 (independent counsel in *Morrison* was an inferior officer in part because he was "subject to removal by a higher officer" and his "tenure was limited" (citing *Morrison*, 487 U.S. at 671-72)).
[243] 50 C.F.R. §100.10(b)(1).
[244] *Supra* 13 n.67.
[245] *Seila Law*, 140 S.Ct. at 2203.
[246] *Supra* 11-12.
[247] *Seila Law*, 140 S.Ct. at 2204.
[248] *See Free Enter. Fund*, 561 U.S. at 496.
[249] *Supra* 11-12.

*United States v. Alaska*　　　　　　　　　　　　　　　　　Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.　　　42
Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 49 of 52

properly appointed, they had no lawful authority to direct the Refuge Manager to implement ANILCA, and so his orders were ultra vires and void.[250]

## CONCLUSION

For these reasons, the Court should deny the United States' and Intervenors' motions for summary judgment and grant Defendants' motion for summary judgment.

DATED: September 1, 2023

Respectfully Submitted,

TREG TAYLOR
ATTORNEY GENERAL

By: */s/ Margaret Paton-Walsh*

| | |
|---|---|
| J. Michael Connolly (*pro hac vice pending*) | Margaret Paton-Walsh |
| Steven C. Begakis (*pro hac vice pending)* | (Alaska Bar No. 0411074) |
| Consovoy McCarthy PLLC | Chief Assistant Attorney General |
| 1600 Wilson Boulevard, Suite 700 | */s/ Aaron C. Peterson* |
| Arlington, VA 22209 | Aaron C. Peterson |
| Telephone: (703) 243-9423 | (Alaska Bar No. 1011087) |
| mike@consovoymccarthy.com | Senior Assistant Attorney General |
| steven@consovoymccarthy.com | Department of Law |
| | 1031 West Fourth Avenue, Suite 200 |
| | Anchorage, AK 99501 |
| | Telephone: (907) 269-5232 |
| | Facsimile: (907) 276-3697 |
| | margaret.paton-walsh@alaska.gov |
| | aaron.peterson@alaska.gov |

*Attorneys for the State of Alaska*

---

[250] *See supra* 34-35.

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                43

Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 50 of 52

## CERTIFICATE OF SERVICE

I certify that on September 1, 2023, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, serving all counsel of record.

*/s/ Margaret Paton-Walsh*
Margaret Paton-Walsh

*United States v. Alaska*                                           Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.                    44

Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 51 of 52

## CERTIFICATE OF COMPLIANCE

Per Local Civil Rule 7.4(a)(3), I certify that this memorandum complies with the type-volume limitation of 7.4(a)(1) and contains 43 pages, excluding the parts exempted by Local Civil Rule 7.4(a)(4), in compliance with the page limit requested in Plaintiffs' Unopposed Motion for Leave to File Excess Pages, which was filed concurrently.

*/s/ Margaret Paton-Walsh*
Margaret Paton-Walsh

*United States v. Alaska*                                    Case No.: 1:22-cv-54-SLG
Defs' Mot. for Sum. J., Mem. in Support, and Opp. to Mot. for Sum. J.            45

Case 1:22-cv-00054-SLG   Document 73   Filed 09/01/23   Page 52 of 52