
**RESOURCE DEVELOPMENT COUNCIL**
Growing Alaska Through Responsible Resource Development

Member Login 🔒

| Home | About RDC | Our Industries | Our Work | Events | Contact |

## ALASKA'S FISHING INDUSTRY
**BACKGROUND** • **FACTS** • **LINKS**
**SOURCES** • **COMMENTS**

Search



**Quick Links**

Legislative Efforts

Comments and Testimony

Newsletters

### BACKGROUND

With over 3 million lakes, 12,000 rivers, 6,640 miles of coastline, and 47,300 miles of estimated tidal shoreline, Alaska is one of the most bountiful fishing regions in the world, producing a wide variety of seafood. With a coastline longer than all other states combined, Alaska is the only state to have a coast on three different seas: Arctic Ocean, Pacific Ocean and the Bering Sea. It also boasts over 40% of the nation's surface water. Overall, Alaska produces about 60% of the nation's commercial fisheries – a vast array of seafood, including all five species of Pacific salmon, four species of crab, Pacific cod, various types of groundfish, shrimp, herring, sablefish (black cod), pollock, and Pacific halibut are all harvested from Alaska.

The fisheries of Alaska are recognized as some of the best managed in the world, providing tens of thousands of seasonal and full-time jobs and a vital, long term economic engine for Alaska communities and the state. The seafood industry is one of the largest employment and economic drivers in Alaska,

**Upcoming Events**

Wed Aug 16, 2023
Executive Committee Meeting 8/16/23
Category Execut ve Comm ttee Meet ng

Wed Sep 20, 2023
Executive Committee Meeting 9/20/23
Category Execut ve Comm ttee Meet ng

Thu Sep 21, 2023
RDC Breakfast Forum 09/21/2023

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 1 of 106          Exhibit A
Page 1 of 5

directly employing 58,700 people, creating an additional 10,000 secondary jobs, and producing more than $5 billion in economic activity in Alaska every year.

Five of Alaska's fishing ports consistently rank in the top 10 ports in the country in terms of volume of seafood landed. Dutch Harbor/Unalaska has taken the number one spot every year since 1996, landing 763 million pounds in 2018. In addition, the Aleutian Islands, Kodiak, Naknek, the Alaska Peninsula (False Pass/Sand Point), other Bristol Bay communities, Cordova, Sitka, Ketchikan, and Petersburg are all in the top 25 for pounds landed in the U.S.

In terms of the 2018 value of U.S. seafood landed, Alaska also holds five of the top 10 spots in the U.S., with Naknek and Dutch Harbor/Unalaska at second and third, with values of $195 million and $182 million, respectively. In addition, the Aleutian Islands, Bristol Bay, Kodiak, the Alaska Peninsula (False Pass/Sand Point), and Sitka are all in the top 20 for the value of seafood landed in the U.S.

Alaska's success over time is due to its constitutionally mandated commitment to sustainable management practices, which ensures that all Alaska commercially harvested seafood species are sustainable for both current and future generations. Fishing resources are renewable due to responsible management, and it is the mission of both state and federal fishery management agencies to sustainably manage and maximize the economic benefits from these resources for generations to come.

Commercial fishing permit holders live in over 210 communities throughout the state and seafood is the core economy for much of coastal Alaska where fish harvesting and processing often provide the only significant opportunities for private sector employment. In addition, commercial fisheries provide the largest source of local government revenue in most fishing communities through state and local fish taxes, not to mention property, business, and sales taxes paid by processors, fishermen, and fisheries support sector businesses. Shoreside processors are typically the largest property taxpayer in coastal fishing communities.

Alaska's seafood industry, directly and indirectly, employs tens of thousands of individuals producing billions of pounds of seafood for Alaskans, the U.S., and the world. Commercial fishing permit holders and vessel owners are primarily small and family-owned business, supporting dozens of other service businesses such as hardware and marine suppliers, fuel distributors, air and water travel, barge lines, shipping, boatbuilders, hatcheries, restaurants, grocery stores, scientists, accountants, educators, and

Category  Breakfast Forum

Thu Oct 5, 2023
RDC Breakfast Forum 10/5/2023
Category  Breakfast Forum

Wed Oct 18, 2023
Executive Committee Meeting 10/18/23
Category  Execut ve Comm ttee Meet ng

View Full Calendar

## Sign Up to Receive our E –News

Receive emails about current RDC issues, upcoming events, and much more.

Get Updates

## Join Now

Help us grow Alaska through responsible resource development.

Join Today

## Social

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 2 of 106

Exhibit A
Page 2 of 5

administrators. The seafood industry provides Alaskans and the public with critical access to local seafood through restaurants, grocery stores, and seafood markets.

In addition, the volume and diversity of Alaska's seafood make it a high quality, healthy, and desirable option for the world's seafood consumers. Seafood is Alaska's largest export, making up more than half of all export value. Investment in value-added products, full utilization, and marketing serve to expand both domestic and foreign markets for Alaska seafood, which increases the value overall. The vast fishery resources of Alaska are of much importance to the economies of the state and the nation.

**BACK TO TOP**

**FACTS & ECONOMIC IMPACT**

- Alaska's seafood industry created $5.6 billion in total annual economic activity for Alaska (2017-2018 average).
- The seafood industry directly employed approximately 58,700 people and created an additional 10,000 secondary jobs in 2018.
- Over $172 million in commercial fishing taxes, fees, and self-assessments were collected in 2018 of which 43% went to the State ($73 million), 30% to local governments ($51 million), 23% to salmon hatchery management ($40 million) and 5% to the federal government ($8 million).
- Direct seafood industry jobs, 58,700:
  - Fishermen jobs, 29,400, including 16,300 Alaska residents
  - Processor jobs, 26,000
  - Management & other jobs, 3,100
  - $2.1 billion in annual labor income (2017-2018 average)
- Seafood harvesters live in over 210 communities throughout the state.
- More than 9,000 commercial vessels are home-ported in Alaska.
- There are more than 120 shoreside processing plants throughout the state.
- Seafood processing is the largest manufacturing sector in Alaska, accounting for 70% of Alaska's manufacturing employment.
- Annual seafood harvest in Alaska is consistently between 5 to 6 billion pounds, accounting for about 60 percent of total U.S. seafood harvests. Ton average 2017-2018 harvest value (ex-vessel revenue,

**Tweets from @alaskardc**



# Nothing to see here - yet

When they Tweet, their Tweets will show up here.

View on Twitter

the price paid to fishermen at the dock) was $2 billion, and first wholesale value was approximately $4.7 billion.

- Salmon accounts for the majority of the value of Alaska seafood, while pollock represents the majority of the volume harvested.
- The U.S. is the largest single market for Alaska seafood, followed by China, Japan, Europe, South Korea, and Canada.
- Seafood has been and remains Alaska's top export, comprising over half of Alaska's annual export value. The export value over the past decade has averaged $3.3 billion annually. Alaska's top exports are pollock, surimi, and fillets – a combined $845 million – and frozen sockeye salmon ($313 million).
- Alaska's seafood industry has been disproportionately impacted by the ongoing trade war with China. Exports to China, which in 2018 accounted for 32 percent of Alaska's seafood sales and 23 percent of the value, dropped 20 percent due to the ongoing trade war.
- Alaska seafood maintains the #1 ranking as the most commonly named protein brand called out on restaurant menus, followed by Angus beef.
- The seafood industry provides an important "backhaul" for shippers that otherwise primarily bring goods and supplies north to Alaska. One major shipping company has estimated freight rates to Alaska would be 10 percent higher without the backhaul of seafood shipped out of Alaska. The majority of Alaskans are impacted by this important benefit.
- Alaska's state fish, the king salmon, or Chinook, can weigh up to 100 pounds.
- Alaska's tidal shoreline (at low tide) is estimated to be 47,300 miles.

**[BACK TO TOP](#)**

## WEB LINKS

- [Alaska Seafood Marketing Institute](#)
- [McDowell Group](#)
- [http://www.adfg.state.ak.us/](http://www.adfg.state.ak.us/)
- [http://www.labor.state.ak.us/](http://www.labor.state.ak.us/)
- [http://dnr.alaska.gov/mlw/water/hydro/components/water-facts.cfm](http://dnr.alaska.gov/mlw/water/hydro/components/water-facts.cfm)
- [http://www.ufafish.org/fishing-facts/](http://www.ufafish.org/fishing-facts/)
- [https://www.pspafish.net](https://www.pspafish.net)

- https://www.atsea.org
- https://www.fisheries.noaa.gov/resource/document/fisheries-united-states-2018-report

**BACK TO TOP**

**SOURCES**

- Alaska Department of Fish & Game
- Alaska Department of Labor
- Alaska Department of Natural Resources
- Alaska Seafood Marketing Institute
- McDowell Group
- NOAA Report Fisheries of the United States, 2018

**BACK TO TOP**



© Resource Development Council for Alaska, Inc.

121 West Fireweed Lane, Suite 250 Anchorage, AK 99503

Email: resources@akrdc.org Phone: 907.276.0700

Site Map

Back to top ⌃

powered by  MemberClicks



# Alaska

| Overview |
|---|
| Science |
| Fisheries |
| Protected Marine Life |
| Habitat |
| Species |

# Alaska

Alaska's dynamic, often ice-covered seas are home to a remarkable diversity of life—crustaceans, fish, seals, sea lions, porpoises, whales, and more. Few places in the world offer such beauty and bounty. This region of nearly 1.5 million square miles includes waters in the Gulf of Alaska, Bering Sea, Aleutian Islands, Chukchi Sea, and Beaufort Sea.

Alaska produces more than half the fish caught in waters off the coast of the United States, with an average wholesale value of nearly $4.5 billion a year. Alaska's fisheries are among the best-managed, most sustainable in the world. Alaska resources provide jobs and a stable food supply for the nation, while supporting a traditional way of life for Alaska Native and local fishing communities.

Together, NOAA Fisheries Alaska Regional Office and Alaska Fisheries Science Center help ensure the sustainability of these marine resources for generations.



**FEATURE STORY**

## Introducing the New Pacific Cod Trawl Cooperative Program
Alaska

**FEATURE STORY**

## NOAA Fisheries Releases National Seafood Strategy
Alaska, New England/Mid-Atlantic, Pacific Islands, Southeast, West Coast, National

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 7 of 106

**Exhibit B**
**Page 2 of 10**

**FEATURE STORY**

## Help Stop Illegal Shootings of Sea Lions and Seals Near the Copper River Delta

Alaska

**Exhibit B**
**Page 3 of 10**

**FEATURE STORY**

# Humpback Calf Disentangled Near Juneau
Alaska

**FEATURE STORY**

# Scientists Identify More Efficient Means to Determine the Age of Fish Using AI and Near-Infrared Technology
Alaska

## Notices & Rules

**FISHERIES**

**Bering Sea and Aleutian Islands Crab Rationalization Cost Recovery Program and Fee Percentages**
Alaska

**FISHERIES**

**Limited Access for the Western Gulf of Alaska and Bering Sea and Aleutian Islands Trawl Groundfish Fisheries**
Alaska

**FISHERIES**

**Individual Fishing Quota (IFQ) Program in Alaska Federal Register Rules and Notices 2004–Present**

Alaska

---

**PROTECTED RESOURCES**

**Incidental Take Authorization: Alaska Department of Transportation and Public Facilities' Tongass Narrows Project (2023)**

Alaska

---

**PROTECTED RESOURCES**

**Alaska Department of Transportation and Public Facilities Hydaburg Seaplane Base Refurbishment Project in Hydaburg, Alaska**

Alaska

---

**More Fisheries Notices & Rules** ❯

**More Protected Resources Regs & Actions** ❯

## Upcoming Events

**Summertime Hours at NOAA's Ted Stevens Marine Research Institute**

*Jun 1, 2023 - Aug 31, 2023*

Alaska

---

**2023 Belugas Count!**

*Sep 23, 2023*

Alaska

---

**More Events** ❯

## Bulletins

**IB 23-37: NMFS Prohibits Retention of "Other Rockfish" in the Aleutian Islands Subarea of the Bering Sea and Aleutian Islands**

Alaska

---

**IB 23-26: NMFS Prohibits Directed Fishing for Pacific Cod by Vessels using Jig Gear in the Western Regulatory Area of the Gulf of Alaska**

Alaska

---

**IB 23-25: NMFS Prohibits Retention of Pacific Cod by Catcher/Processors Using Trawl Gear in the Central Regulatory Area of the Gulf of Alaska**

Alaska

---

**IB 23-34: NMFS Opens Directed Fishing for Pacific Ocean Perch in the Bering Sea Subarea of the Bering Sea and Aleutian Islands Management Area**

Alaska

**IB 23-33: NMFS Prohibits Retention of Longnose Skates in the Eastern Regulatory Area of the Gulf of Alaska**
Alaska

**More Bulletins >**

## Open Funding Opportunities

**Saltonstall-Kennedy Grant Competition**
Alaska, New England/Mid-Atlantic, Pacific Islands, Southeast, West Coast, National

**Restoring Tribal Priority Fish Passage through Barrier Removal Grants**
National

**Restoring Fish Passage through Barrier Removal Grants**
National

**FY 2021–2023: Broad Agency Announcement**
National

**Species Recovery Grants to States**
Alaska, New England/Mid-Atlantic, Pacific Islands, Southeast, West Coast, National

**More Opportunities >**

# Featured Highlights

## Public Benefits of Recovering Endangered Beluga Whale Outweigh Costs

Alaska

## The Endangered Species Act: 50 Years of Conserving Species

Alaska, New England/Mid-Atlantic, Pacific Islands, Southeast, West Coast, National

# Statement on U.S. District Court Decision Remanding 2019 Biological Opinion Regarding Southeast Alaska Salmon Fisheries

Alaska, West Coast

# Alaska Salmon Research Task Force

# Alaska Fisheries Science Center

Our high quality research supports sustainable management and conservation of Alaska marine species with economic and cultural benefits for the nation. Alaska waters support some of the most important commercial fisheries in the world. Large and diverse populations of whales, seals, sea lions, and porpoises and Alaska native hunting and fishing communities also share these waters.

We study the health and size of marine animal populations. We also study the key areas where these animals feed, breed, and grow. To study ocean habitats, we monitor environmental conditions important to sustain marine life. For instance, we regularly monitor sea surface temperatures in the Bering Sea, Aleutian Islands and Gulf of Alaska. We analyze biological, oceanographic and ecological data collected during research surveys and by trained fisheries observers in our laboratories. From this, we learn more about marine animal diets, age, growth and reproduction, food web dynamics and the role of humans in marine ecosystems. We use this and other information to monitor changes to marine animal populations and Alaska ecosystems over time.

# Sustainable Fisheries

The Alaska Regional Office works with the Alaska Fisheries Science Center and the North Pacific Fishery Management Council to manage Alaska's sustainable fisheries. Using the best available science, we work through the Council process authorized under the Magnuson-Stevens Fishery Conservation and Management Act to develop measures for best management of Alaska's fisheries, considering a range of factors such as the health of the fish stocks and economic impact of fishery practices. Once fishing levels and regulations are adopted and approved, the Alaska Regional Office works to implement the Council decisions. The goal is to allow fishermen to harvest the optimum amount of fish while leaving enough in the ocean to reproduce and provide future fishing opportunities in perpetuity.

# Protected Marine Life

The Protected Resources Division works to conserve and recover marine mammals in close coordination with the State of Alaska and other partners. To manage protected marine species, as required under the Marine Mammal Protection Act, Endangered Species Act, and Fur Seal Act, the Alaska Region advances recovery of threatened and endangered species and the conservation of marine mammals, including whales, seals, and sea lions. We work to minimize interactions between marine mammals and commercial fisheries; promote responsible marine mammal viewing practices; coordinate response to stranded or entangled marine mammals; consult with federal agencies to minimize project effects on threatened and endangered species; and cooperatively manage

subsistence use of marine mammals through [co-management agreements](#) with Alaska Native organizations.

# Habitat Conservation

NOAA Fisheries conducts and reviews environmental analyses for a large variety of activities ranging from commercial fishing, to coastal development, to large transportation and energy projects. Working with industries, stakeholder groups, government agencies, and private citizens, we ensure that these activities have minimal impact on essential fish habitat and marine life in Alaska. Our habitat conservation activities include protecting essential fish habitat, mitigating damage to and enhancing habitat affected by hydropower project construction and operations, removing invasive species, and restoring habitat that has been affected by development, oil spills, and other human activities. We focus on habitats used by federally-managed fish species located offshore, nearshore, in estuaries, and in freshwater areas important to migratory salmon.

# Featured Species

Alaska's coastal communities depend on healthy marine resources to support commercial and recreational fisheries, tourism, and the Alaskan way of life. Our mission at NOAA Fisheries Alaska Regional Office is the science-based stewardship of Alaska's marine resources and their habitats in the Gulf of Alaska, eastern Bering Sea, and Arctic oceans. We are responsible for supporting sustainable fisheries, recovering and conserving protected species, such as whales and seals, and promoting healthy ecosystems and resilient Alaska coastal communities.



# FISHERIES MANAGEMENT

## Alaska serves as the gold standard



**Alaska pioneered applying successful, science-based sustainable fisheries management practices.**

Now Alaska serves as a worldwide leader and sets the gold standard for fisheries management. State, federal and international management programs share the goal of sustainability; each has a legal mandate to prevent overfishing or harm to ecosystems and communities. The Alaska seafood industry is committed to the future health and resiliency of fish populations and the surrounding marine ecosystem for generations to come through transparent, collaborative, careful, science-based and strict resource management.



Alaska Seafood's Sustainability Story: Fisheries Management



### State

Alaska Department of
Fish and Game

### Federal

NOAA Fisheries

### International

International Pacific
Halibut Commission

Pacific Salmon Treaty

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 17 of 106

Exhibit C
Page 2 of 6



## Ecosystem-based Management

Each season, scientists determine the optimal harvest levels for the health of individual species and the entire ecosystem. Fisheries managers in Alaska are on the forefront of implementing adaptive management tools in response to climate driven ecosystem change. This precautionary and adaptive approach is a cornerstone of sustainable fisheries management and allows the ecosystem and seafood species to continue to replenish year after year.

## In Alaska, it's the law

Sustainable fishing has been the law since 1959 when Alaska became the only state with sustainability written into its constitution. Article VIII institutes the practice of "Sustained Yield."



"Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses." – Article VIII, Alaska State Constitution



## Regulation and Enforcement

Regulations, surveys and scientific data are ways that the State of Alaska enforces the legal mandate set forth at statehood.

# Scientific Data



### Every aspect of fishing in Alaska is based on the latest scientific data

This data is tracked and managed by a joint effort among state, federal and international bodies. View their sites below, or learn more from the ASMI sustainability white paper.

**Read the white paper**

# Allowable Catch



### Alaska sets harvests to prioritize the stability of the marine ecosystems.

Managers conduct annual test fisheries or 'surveys' and use the data to determine the "total available" population, identify the "allowable catch" and set a lower "actual catch" limit. This precautionary approach takes considers the surrounding ecosystem and changing environmental conditions to support the sustainability of wild populations in Alaska's waters.

# Regulations



**All fisheries in Alaska are regulated.**

**Subsistence** – harvesting or possessing seafood by a resident of Alaska for subsistence, or noncommercial, customary and traditional uses

**Personal** – the harvesting or possessing of seafood by a resident of Alaska for personal use and not for sale or barter

**Sport** – fishing for personal use and not for sale or barter

**Commercial** – harvesting seafood for commercial, non-personal or subsistence uses

# DID YOU KNOW?

ALASKA HAS NEVER HAD A SPECIES OF COMMERCIALLY HARVESTED SEAFOOD ON THE ENDANGERED SPECIES LIST.
By monitoring stocks closely, and fishing responsibly, Alaska ensures its seafood can be enjoyed for generations to come.

**Learn about Certification**



## Resource Utilization

**Learn More**



## Social Responsibility

**Learn More**



## Certification

**Learn More**

# GET UPDATES FROM ALASKA SEAFOOD MARKETING INSTITUTE IN YOUR INBOX.

Subscribe

© 2023 Alaska Seafood Marketing Institute | Privacy Policy | Terms & Conditions | Accessibility          Website Design and Development by SiteCrafting



# Subsistence Uses of Resources in Alaska: An Overview of Federal Management

April 20, 2023

Congressional Research Service

https://crsreports.congress.gov

R47511

**CRS REPORT**
Prepared for Members and
Committees of Congress

**Congressional Research Service**
Informing the legislative debate since 1914

**SUMMARY**

R47511

April 20, 2023

**Mark K. DeSantis**
Analyst in Natural
Resources Policy

**Erin H. Ward**
Legislative Attorney

# Subsistence Uses of Resources in Alaska: An Overview of Federal Management

Certain federal statutes provide avenues for individuals to engage in subsistence uses of natural resources. The term *subsistence uses* or *subsistence* in federal statutes and regulations generally refers to the practice of relying on the surrounding environment as a source of food and materials for daily life. For some, the term *subsistence uses* includes only such nutritional or economic purposes. For others, the concept of subsistence use extends beyond sustenance to encompass activities tied to their historical and cultural identities.

More than any other state, Alaska's residents rely on subsistence uses of natural resources—including the hunting, fishing, harvesting, trading, and consumption of fish, wildlife, and plant life—for their daily nutritional needs. According to federal estimates, rural Alaskans harvest approximately 18,000 tons of wild foods annually for subsistence uses. Although the State of Alaska generally manages subsistence harvests on state lands and certain private lands, the federal government is responsible for managing subsistence uses on federal lands and waters and across all lands for certain species.

Congress has passed numerous statutes that either directly or indirectly provide for the protection and/or recognition of subsistence uses on lands and waters in Alaska. Some of these laws, such as the Alaska National Interest Lands Conservation Act (ANILCA; P.L. 96-487), apply only to subsistence uses of resources located on lands owned and managed by the federal government. Other federal laws may apply to subsistence uses of specific species both on and off federal lands. For example, the Endangered Species Act (ESA; 16 U.S.C. §§1531-1544), the Marine Mammal Protection Act (MMPA; 16 U.S.C. §§1361 et seq.), and the Migratory Bird Treaty Act (MBTA; 16 U.S.C. §§703-712) provide exceptions from certain prohibited activities under the acts to allow qualifying individuals in Alaska to engage in specified subsistence uses of species protected by the acts.

Given the cultural and economic importance of subsistence uses in Alaska, issues related to the protection and management of subsistence use are of significant interest at the local, state, and federal levels. Many of these issues revolve around whether, or the degree to which, the federal government should have a role in managing the subsistence use of resources. Others relate to the extent of the federal government's jurisdiction and whether the federal government has the authority to regulate certain lands and waters for subsistence use purposes. Additional concerns have arisen when state and federal regulations for subsistence uses conflict, particularly in instances when state and federal lands are abutting. Federal agencies also may face challenges balancing their statutory obligations under the various laws that govern the management of lands under their jurisdiction, some of which they may view as conflicting with subsistence hunting, fishing, harvesting and other related subsistence use activities.

Other issues in recent years have focused on the importance of subsistence uses to Alaska Native communities. In particular, some Alaska Native communities have criticized the term *subsistence* for not adequately capturing how such practices are integrated into their cultural, religious, and social systems. These communities also have raised concerns as to whether the current statutory framework adequately protects and prioritizes their traditional subsistence practices and culture. Some Alaska Native communities have suggested that the extension of subsistence use priorities or exemptions under federal law to non-Alaska Native communities does not satisfy commitments the federal government made to Alaska Native communities.

Other concerns have been raised regarding the federal government's ability to regulate subsistence uses effectively due to the size of the federal estate, the complexity of the subsistence use legal framework, and general law enforcement challenges in Alaska. In addition, issues related to climate change have created challenges for traditional subsistence use practices in Alaska and have potential implications for federal land management agencies' subsistence use responsibilities.

# Contents

What Does *Subsistence Uses* Mean? ........................................................................................... 2

Brief History and Background ..................................................................................................... 3

    Alaska Native Land Claims and Subsistence Use Rights ........................................................ 4

Selected Federal Statutes Governing Subsistence Uses of Resources in Alaska ............................ 5

    Alaska National Interest Lands Conservation Act ................................................................. 5

        Federal Management of Subsistence Uses Under ANILCA ................................................ 6

    Endangered Species Act ..................................................................................................... 7

    Migratory Bird Treaty Act .................................................................................................. 9

    Marine Mammal Protection Act ......................................................................................... 10

Issues for Congress ................................................................................................................. 11

    Federal Versus Nonfederal Management ............................................................................. 11

    Multiple Land Management Mandates and Jurisdictional Questions ...................................... 13

    Access to Subsistence Rights or Exemptions ...................................................................... 16

        Rural Priority Determination ......................................................................................... 16

        Differences in Subsistence Use Eligibility Across Statutes ............................................... 18

        Alaska Native Versus Non-Alaska Native Eligibility ...................................................... 19

    Enforcement .................................................................................................................... 21

    Climate Change ............................................................................................................... 22

Conclusion .............................................................................................................................. 23

# Figures

Figure 1. Federal Subsistence Board Non-rural and Rural Determinations ................................... 17

# Contacts

Author Information .................................................................................................................. 23

S
ubsistence uses—including the hunting, fishing, harvesting, trading, and consumption of
fish, wildlife, and plant life—are necessary for the livelihood of many residents of Alaska.
More than the residents of any other state, Alaska's residents rely on subsistence uses of
fish, wildlife, and plant life for their daily nutritional needs. In particular, subsistence harvests
provide Alaska's numerous rural communities with a large share of their food supply. These
communities may not have regular access to commercial food sources due to their distance from
urban centers and the high cost of flying foods into some areas. In addition, for many Alaskans,
the role of subsistence uses is about more than food consumption and economics; it is directly
tied to their history and central to their customs and traditions. In many Alaska Native
communities, subsistence uses are vital not only as a source for food but also as they relate to
clothing, transportation, trade, ceremonial activities, and other purposes.[1]

Given the cultural and economic importance of subsistence uses to certain communities in
Alaska, and the potential for protections of such uses to affect other resource priorities, issues
related to the management of subsistence use are of significant interest at the local, state, and
federal levels. Both state and federal law have recognized and protected the usage of resources
from Alaska's lands and waters for subsistence purposes. The State of Alaska generally manages
subsistence uses on state lands, Alaska Native Corporation (ANC) lands, and other private lands.[2]
The federal government manages these practices both on federal lands and in the territorial sea
and exclusive economic zone in offshore waters beyond state waters (i.e., generally from 3 to 200
nautical miles from the baseline of low sea level).[3] In addition, the federal government may
exercise authority to manage subsistence uses outside federal boundaries when concerning a
particular species or a specific region in Alaska.

This report begins with an overview of subsistence uses of resources in Alaska and the traditional
and current practices of those who partake in such activities. The report then discusses selected
federal statutes that apply to subsistence uses of fish, wildlife, and plant life; their application in
Alaska; and how federal agencies implement and administer these statutory requirements. Federal
management of subsistence uses of natural resources in Alaska is complex and governed by
various laws depending on the type of species involved, where such activities take place, and
other factors; this report highlights only certain federal statutes of congressional interest. As part
of this discussion, the report explores whether, or to what degree, such statutes provide a
preference for certain groups in protecting the right to subsistence practices. Finally, the report
examines various issues in which Congress may have, or has previously expressed, an interest.

---

[1] For example, see National Park Service (NPS), "Subsistence: Preserving a Way of Life," at https://www.nps.gov/gaar/
learn/historyculture/subsistence htm. See also Bureau of Indian Affairs, "Subsistence Branch," at https://www.bia.gov/
regional-offices/alaska/subsistence-branch; and Testimony from Rosita Worl, Alaska Federation of Natives, in U.S.
Congress, Senate Committee on Energy and Natural Resources, *Subsistence, To Examine Wildlife Management
Authority within the State of Alaska Under the Alaska National Interest Lands Act and the Alaska Native Claims
Settlement Act*, 113th Cong., 1st sess., September 19, 2013, S. Hrg. 113-118 (Washington: GPO, 2013). Hereinafter
referred to as S. Hrg. 113-118.

[2] For more information on Alaska Native Corporations, see CRS Report R46997, *Alaska Native Lands and the Alaska
Native Claims Settlement Act (ANCSA): Overview and Selected Issues for Congress*, by Mariel J. Murray.

[3] States are generally responsible for managing offshore waters up to 3 nautical miles (nm) from shore. Federal
management of offshore waters generally extends from 3 nautical miles (nm) to 200 nm from shore. This includes
territorial seas up to 12 nm seaward of the baseline and the exclusive economic zone (EEZ), which extends up to 200
nm from the baseline. For more information on offshore jurisdictional zones, see CRS Report R45952, *U.S. Offshore
Aquaculture Regulation and Development*, by Anthony R. Marshak.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 25 of 106
Exhibit D
Page 4 of 26

# What Does *Subsistence Uses* Mean?

Although usage varies, generally speaking, the term *subsistence uses* or *subsistence* in federal statutes and regulations refers to the practice of relying on the surrounding environment as a source of food and materials for daily life. For some, the term *subsistence uses* includes only such nutritional or economic purposes. For others, the concept of subsistence use extends beyond sustenance to encompass activities tied to their historical and cultural identity. In particular, some Alaska Native communities have criticized the term *subsistence* and its usage for not adequately capturing how such practices are integrated into their cultural, religious, and social systems.[4] For many Alaska Natives, subsistence uses of fish, wildlife, and plant life are directly tied to their way of life and rooted in their historical and cultural identities.[5] Beyond relying on these resources for food, these communities may rely on harvesting and processing wild resources for clothing, fuel, transportation, construction, traditional arts and crafts, customary trade, and other purposes.

Certain federal laws and regulations—including those that directly address land management in Alaska—include definitions for *subsistence* or *subsistence uses*.[6] For example, the Alaska National Interest Lands Conservation Act (ANILCA), the primary statute governing subsistence activities on federal lands in Alaska, defines *subsistence uses* as

"the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade."[7]

ANILCA does not define *wild, renewable resources*, but agencies generally have interpreted the law to apply to animals; plants, including timber and berries; and other living resources, such as fungi.[8] Other statutes and regulations define *subsistence* similarly but may be narrower in scope due to the applicability of the law in question. For example, implementing regulations for the Migratory Bird Treaty Act (MBTA) define *subsistence* to mean "the customary and traditional harvest or use of migratory birds and their eggs by eligible indigenous inhabitants for their own nutritional and other essential needs."[9] (See "Selected Federal Statutes Governing Subsistence Uses of Resources in Alaska" for more information.) Generally, laws distinguish between hunting, fishing, or harvesting in the *customary and traditional* nature of subsistence practices and for recreational or commercial purposes.[10]

---

[4] S. Hrg. 113-118. See also Isaac Stone Simonelli, "The Subsistence Economy Is More Than Cash and Calories," *Alaska Native Magazine*, May 16, 2022.

[5] Meghan Sullivan, "Can Indigenous Subsistence Rights Still Be Protected in Alaska?" *KTOO*, October 28, 2021. Hereinafter referred to as Sullivan, "Indigenous Subsistence Rights."

[6] For the purposes of this report, *subsistence* is used in the context of management of natural resources and the harvesting of such resources for personal or traditional purposes. Other federal laws define *subsistence* for different purposes unrelated to the topics discussed in this report.

[7] 16 U.S.C. § 3113.

[8] See implementing regulations for the Alaska National Interest Lands Conservation Act (ANILCA; P.L. 96-487) at 36 C.F.R. Part 242 and 50 C.F.R. Part 100.

[9] 50 C.F.R. §92.4.

[10] 36 C.F.R. §242.4 defines *customary and traditional use* for the purposes of ANILCA to mean a long-established, consistent pattern of use, incorporating beliefs and customs that have been transmitted from generation to generation, that plays an important role in the economy of the community. Regulations outline an eight-part criteria for determining customary and traditional use at 50 C.F.R. §100.16.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 26 of 106

Exhibit D
Page 5 of 26

For the purposes of this report, the term *subsistence* is used throughout for consistency and due to the legal significance of the term and its general use within and across federal statutes. However, the usage and description of *subsistence* herein may not fully encompass all aspects of the term or its meaning across all stakeholder groups. CRS recognizes that *subsistence* may have different applicability based on statutory context and that some stakeholders may raise concerns about the adequacy of the term or its scope based on their specific perspectives and interests.

# Brief History and Background

Alaska Native communities have relied on harvesting fish and wildlife resources for subsistence for thousands of years. Various birds, fish, marine mammals, land mammals, and plants have all been historical sources of food and supplies, with some communities more reliant on certain resources due to their geographic location, seasonality, and cultural traditions. Today, both Alaska Native communities and non-Alaska Natives use natural resources for subsistence purposes. Subsistence harvesting of fish and wildlife resources is particularly critical in rural Alaska, where it remains a cornerstone of food security and daily life. This is due, in part, to many rural Alaskans' limited access to commercial centers and the often high cost of retail food across many parts of the state.[11] According to federal estimates, approximately 18,000 tons of wild foods are harvested annually by rural Alaskans for subsistence uses.[12] The largest share comes from harvesting fish, which makes up roughly 56% of the subsistence harvest statewide.[13]

From 1867 (the year the United States purchased Alaska) until Alaska's statehood in 1959, the federal government was primarily responsible for managing Alaska's fish and wildlife resources. Starting in the early 20th century, Congress passed numerous laws aimed at restricting hunting practices to protect certain species. Many of these laws expressly exempted hunting and fishing for subsistence uses from such limitations or seasonal closures. For example, the Alaskan Game Law of 1902 restricted the taking of game animals but exempted hunting for food or clothing by "native Indians or Eskimos or by miners, explorers, or travelers on a journey when in need of food."[14] Upon Alaska's statehood, the federal government transferred the general authority to manage fish and wildlife to the new state government, consistent with the traditional role of states in managing such resources, and the Alaskan government subsequently enacted laws recognizing subsistence harvesting of fish and wildlife resources.[15]

In the 1970s and early 1980s, Congress passed legislation that reasserted a federal role in protecting and managing subsistence uses in Alaska for certain species or lands. When Congress

---

[11] James A. Fall and Marylynne L. Kostick, "Food Security and Wild Resource Harvests in Alaska," Alaska Department of Fish and Game, Division of Subsistence, July 2018.

[12] Department of the Interior (DOI), "Federal Subsistence Management Program," at https://www.doi.gov/subsistence. Estimates from the Alaska Department of Fish and Game are generally similar to those provided by DOI. Estimates for total subsistence harvests can be difficult to track, as most estimates are reliant on self-reporting from communities and individuals. As a result, precise estimates for annual subsistence harvests are not readily available.

[13] Ibid.

[14] Act of June 7, 1902, 32 Stat. 327, amended, Act of May 11, 1908, 35 Stat. 102. Here and throughout this report, the term *Eskimo* is used due to its inclusion in legal significance under federal laws. CRS recognizes that the term may be considered derogatory or offensive to some Alaska Native communities.

[15] For example, the Act of Apr. 16, 1960, Alaska Sess. Laws 179, recognized subsistence fishing and placed limitations on such practices (e.g., requiring subsistence fishers to obtain a license and establishing income limitations for issuing such licenses). For more information on states' role in managing fish and wildlife resources both on and off federal lands and waters, see CRS Report R45103, *Hunting and Fishing on Federal Lands and Waters: Overview and Issues for Congress*, by Christopher R. Field, and CRS Report R44267, *State Management of Federal Lands: Frequently Asked Questions*, by Carol Hardy Vincent.

passed or amended laws protecting certain species on a national scale and passed a law to manage species on federal lands in Alaska, it included specific exemptions for subsistence users—particularly those in Alaska—from certain otherwise prohibited activities. The sections below discuss a selection of these laws.

## Alaska Native Land Claims and Subsistence Use Rights

Matters involving the resource rights of American Indians and other Indigenous communities often are complex and may require consideration of treaties, executive orders, acts of Congress, regulations, case law, and deeds or other land title documents. For many American Indians in the lower 48 states, hunting and fishing rights (including hunting and fishing for subsistence uses) were preserved and generally are governed by long-standing treaties with the federal government. In Alaska, however, the federal government used a different approach to resolving land claims and established a land entitlement system distinct from the reservation system in place for many tribes in the lower 48 states.

The Alaska Native Claims Settlement Act (ANCSA), enacted in 1971, extinguished Alaska Natives' claims to over 360 million acres of land.[16] In exchange, Alaska Natives received approximately 45 million acres of land and a settlement payment of $962.5 million (roughly $5.24 billion in current dollars). Pursuant to ANCSA, the majority of this land and cash settlement was divided among ANCs, which include more than 200 village corporations and 12 regional corporations. Unlike tribal governments, which have government-to-government relationships with the United States, ANCs are business entities organized under the laws of Alaska. Once an ANC receives title to land under ANCSA, the land is considered private property. This ownership structure differs from most tribal lands in the lower 48 states, which are owned by the federal government and held in trust for the benefit of the tribe communally or tribal members individually. Accordingly, whereas tribal lands in the lower 48 states are generally federal lands managed pursuant to a federal trust relationship, ANC and village corporation lands in Alaska are private lands managed by the corporations and governed under federal, state, and local laws.[17]

In addition to extinguishing prior title and land claims held by Alaska Natives, ANCSA extinguished "any aboriginal hunting or fishing rights" on lands in Alaska.[18] As a result, federal hunting and fishing rights of most Alaska Native communities are determined by various laws enacted after ANCSA's passage rather than pursuant to preexisting rights preserved in treaties. These governing laws include those discussed in this report.

---

[16] Alaska Native Claims Settlement Act (ANCSA; P.L. 92-203, codified at 43 U.S.C. §§1601 et seq., as amended). For more information on Alaska Native land claims and ANCSA, see CRS Report R46997, *Alaska Native Lands and the Alaska Native Claims Settlement Act (ANCSA): Overview and Selected Issues for Congress*, by Mariel J. Murray.

[17] Although most Alaska Native communities ceded their tribal land—and subsequently their hunting and fishing rights to those lands—to the federal government under ANCSA, there were some exceptions. The Metlakatla Tribe opted not to join the ANCSA settlement. The Metlakatla Reservation near Ketchikan is the only federal reservation in Alaska, established by Congress in 1891. As a result, courts have interpreted that the Metlakatla retained certain rights to hunt and fish both within their reservation boundaries and in certain off-reservation waters where the tribe had traditionally fished. For more information, see Metlakatla Indian Community v. Dunleavy, No. 21-35185 (9th Cir. Sept. 8, 2022).

[18] 43 U.S.C. §1603(b).

Case 1:22-cv-00054-SLG    Document 75-1    Filed 09/01/23    Page 28 of 106

Exhibit D
Page 7 of 26

# Selected Federal Statutes Governing Subsistence Uses of Resources in Alaska

Although the State of Alaska generally manages subsistence uses of resources on state lands and certain private lands, including Native allotments and ANC lands,[19] the federal government plays a significant role in managing subsistence uses in Alaska. Congress has passed a number of statutes that either directly or indirectly provide for the protection and/or recognition of subsistence uses. Some of these laws, such as such as ANILCA, apply only to the harvesting and use of resources located on lands owned and managed by the federal government.[20] Other federal laws may apply when concerning subsistence uses of specific species both on and off federal lands. For example, the Endangered Species Act (ESA) includes an exemption that generally allows Alaska Natives to harvest listed species for food or for crafting certain traditional handicrafts, the Marine Mammal Protection Act (MMPA) governs subsistence harvests of marine mammals, and the Migratory Bird Treaty Act (MBTA) governs the harvest of migratory birds in certain areas in Alaska.[21] The applicability and enforcement of these statutes extend beyond the federal lands and inland waters that are generally covered under ANILCA.

This section provides a brief overview of selected federal statutes that govern subsistence uses of resources in Alaska. It discusses their applicability, as well as the role of the federal government in enforcing relevant subsistence use provisions. Because federal management of subsistence uses in Alaska is complex and can depend on various factors, this report highlights only certain federal statutes that may be of interest to Congress.[22]

## Alaska National Interest Lands Conservation Act

Enacted in 1980, ANILCA is the primary statute governing the management of federal lands within Alaska. ANILCA designated more than 100 million acres of federal land in Alaska as new or expanded *conservation system units* that included national parks and preserves, national wildlife refuges, wilderness areas, and other designations.[23] Among its many provisions, ANILCA specifically recognized and protected subsistence uses on the newly designated lands, as well as all conservation system units in Alaska established prior to and after ANILCA's enactment.

---

[19] *Native allotments* are private lands conveyed to Alaska Natives pursuant to the Native Allotment Act of 1906 (34 Stat. 197) or the Native Townsite Act of May 25, 1926 (44 Stat. 629). Under these laws, Alaska Natives were authorized to acquire individual allotments of up to 160-acre parcels of unreserved, unappropriated land.

[20] ANILCA is codified at 16 U.S.C. §§3101 et seq.

[21] The Endangered Species Act (ESA) is codified at 16 U.S.C. §§1531 et seq.; the Marine Mammal Protection Act (MMPA) is codified at 16 U.S.C. §§1361 et seq.; and the Migratory Bird Treaty Act (MBTA) is codified at 16 U.S.C. §§703-712.

[22] Other statutes that may be applicable to certain species or in specific geographic areas are not be included here but still may impact subsistence uses of resources in Alaska. For example, the Northern Pacific Halibut Act of 1982 (16 U.S.C. §§773-773k) can govern subsistence fishing of Pacific halibut in waters in and off Alaska, whereas, the Fur Seal Act of 1966 (16 U.S.C. §1153) provides exceptions for "subsistence uses" for the taking of fur seals for "Aleuts, Eskimos, and Indians" residing on the coasts of the North Pacific Ocean.

[23]. ANILCA defines *conservation system unit* to mean "any unit in Alaska of the National Park System, National Wildlife Refuge System, National Wild and Scenic Rivers Systems, National Trails System, National Wilderness Preservation System, or a National Forest Monument." This includes units in existence prior to the enactment of ANILCA; units established, designated, or expanded pursuant to ANILCA, as well as additions to such units; and any such unit established moving forward (16 U.S.C. §3102(4). For information on these and other federal land designations, see CRS Report R45340, *Federal Land Designations: A Brief Guide*, coordinated by Laura B. Comay.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 29 of 106

Exhibit D
Page 8 of 26

ANILCA governs subsistence use of "wild, renewable resources" on federal lands in Alaska (for more information on the extent of ANILCA's applicability, see "Multiple Land Management Mandates and Jurisdictional Questions").[24] Title VIII of the law specifically provides for preference to be given to "the taking on public lands of fish and wildlife for nonwasteful subsistence uses" over the taking of fish and wildlife for other purposes.[25] Specifically, the law mandates that "rural residents of Alaska, including both Natives and non-Natives," be given priority for subsistence uses of fish and wildlife on federal public lands and waters in Alaska.[26] It further requires that the Secretary of the Interior "ensure that rural residents engaged in subsistence uses shall have reasonable access to subsistence resources on the public lands."[27]

ANILCA's priority for subsistence uses authorizes federal agencies to limit or restrict the taking of fish and wildlife for other purposes to protect the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population.[28] In addition, ANILCA requires federal agencies to consider potential adverse impacts upon subsistence uses and resources that may result from land use decisions. For example, if a federal agency proposes to dispose of or lease public lands in a way that would significantly restrict subsistence uses, the agency is required to hold a hearing in the vicinity of the proposed action. In addition, the agency must make a determination as to the necessity of the impending action and steps it would take to minimize any adverse impact upon subsistence uses.[29]

## Federal Management of Subsistence Uses Under ANILCA

Title VIII of ANILCA provides the opportunity to manage subsistence hunting and fishing on Alaskan federal lands to the State of Alaska in lieu of the federal government.[30] Under ANILCA, such management is contingent upon the state legislature enacting laws consistent with certain provisions and terms of the legislation. This includes ANILCA's requirements for establishing a priority for subsistence hunting and fishing for rural Alaskans. Following the enactment of ANILCA, the State of Alaska enacted a law that limited the definition of *subsistence uses* to residents of "rural areas," thereby complying with Title VIII of ANILCA.[31] Pursuant to Title VIII, the State of Alaska, through the state Board of Fisheries and Board of Game, managed subsistence uses on federal lands for the first decade following ANILCA's enactment. Then in 1989, the Alaska Supreme Court held that the rural residency preference established by state law (and required under ANILCA) violated the equal access clause of the Alaska state constitution.[32] Pursuant to the ruling, the state removed the rural preference from its subsistence use law, which caused the law to no longer comply with the requirements of Title VIII of ANILCA for state management on federal lands. Because the Alaska state constitution prevents the state from

---

[24] 16 U.S.C. §3113. ANILCA does not define *wild, renewable resources*, but, as discussed above, agency regulations have interpreted the term to apply to animals (including non-living parts), plants, fungi, timber, berries, and other renewable resources found in nature.

[25] 16 U.S.C. §3114. ANILCA defines *take* or *taking* to mean to "pursue, hunt, shoot, trap, net capture, collect, kill, harm, or attempt to engage in any such conduct" (16 U.S.C. §3102).

[26] 16 U.S.C. §§3111-3126.

[27] 16 U.S.C. §3121(a).

[28] 16 U.S.C. §3114.

[29] 16 U.S.C. §3120(a)

[30] 16 U.S.C. §3115(d). ANILCA does not impact the state's ability to exercise its own jurisdiction over state and private lands.

[31] Act of May 30, 1986, ch. 52, 1986 Alaska Sess. Laws 1.

[32] McDowell v. State of Alaska, 785 P.2d 1, 1 (Alaska 1989).

---

enacting a law to manage subsistence uses that is consistent with Title VIII of ANILCA, the federal government has managed subsistence uses on federal lands in Alaska since Alaska changed its state law in 1990.

At that time, the Department of the Interior (DOI) and the Department of Agriculture (USDA) determined that federal management of subsistence uses on the public lands required "an administrative structure ... to execute the Secretaries' subsistence responsibilities and perform functions specific to public lands."[33] In light of the federal responsibilities at stake, the Secretaries of the Interior and Agriculture established the Federal Subsistence Board (FSB) in 1992, delegating to the FSB the authority to oversee subsistence use programs authorized under Title VIII of ANILCA.[34]

DOI and USDA promulgated regulations outlining the FSB's authorities and responsibilities. These include issuing rules and regulations for the management of subsistence harvests of fish and wildlife on Alaska public lands and waters, setting open season dates and harvest limits, making determinations of rural and non-rural communities and areas, and determining customary and traditional subsistence uses.[35] The authority of the FSB extends only to Alaska federal lands, primarily those administered by the U.S. Fish and Wildlife Service (FWS), the National Park Service (NPS), the Bureau of Land Management (BLM), and the U.S. Forest Service (FS).[36] Certain waters within or adjacent to federal public lands also have been under the FSB's jurisdiction since 1995, when the U.S. Court of Appeals for the Ninth Circuit held that "subsistence priority applies to navigable waters in which the United States has reserved water rights" pursuant to the reserved water rights doctrine.[37] The reserved water rights doctrine provides that when the United States withdraws land from the public domain for a particular federal purpose, it implicitly reserves appurtenant waters that have not otherwise been appropriated, though only to the extent necessary to fulfill the reservation's purpose.[38]

## Endangered Species Act

The ESA (16 U.S.C. §§1531 et seq.) aims to conserve species and their ecosystems by identifying certain species in danger of extinction, either presently or in the foreseeable future. Those species are then listed as endangered or threatened and are subject to certain statutory and regulatory protections.[39] Among other things, the act prohibits any individual from *taking* or importing an

---

[33] U.S. Fish and Wildlife Service (FWS) and U.S. Forest Service (FS), "Temporary Subsistence Management Regulations for Public Lands in Alaska," 55 *Federal Register* 27118, June 29, 1990.

[34] FWS and FS, "Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C," 57 *Federal Register* 22940-22964, May 29, 1992.

[35] Federal subsistence regulations outlining the authorities of the Federal Subsistence Board (FSB) can be found at 36 C.F.R. Part 242 and 50 C.F.R. Part 100. *Open season* means the time when wildlife may be taken by hunting or trapping; an open season includes the first and last days of the prescribed season period (36 C.F.R. §242.25). Regulations require the FSB to consider traditional use patterns when establishing harvest levels, open season dates, and methods and means of harvesting.

[36] ANILCA defines *public lands* generally to include all lands under federal ownership following the enactment of ANILCA, with certain exclusions. Exclusions include certain lands owned by the federal government pending conveyance to the state, Native corporations, or individuals under certain federal statutes (e.g., the Alaska Statehood Act and the Alaska Native Claims Settlement Act). 16 U.S.C. §3102(3).

[37] Alaska v. Babbitt (Katie John I), 72 F.3d 698, 700 (9th Cir. 1995). Prior to this decision, the federal government had taken the position that the term *public lands*, as used in ANILCA, did not include navigable waters and, therefore, the state retained fish and game management authority of subsistence fishing in navigable waters in Alaska.

[38] *Katie John I*, 72 F.3d 698, 703 (9th Cir. 1995).

[39] 16 U.S.C. §§1531, 1532, 1533, 1539. For more information on the ESA, see CRS Report R46677, *The Endangered*

Case 1:22-cv-00054-SLG    Document 75-1    Filed 09/01/23    Page 31 of 106    Exhibit D
Page 10 of 26

endangered species.[40] Under the act, *taking* means harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting the species, or attempting to do the same.[41] The prohibitions that apply to endangered species generally may be extended to threatened species by regulation.[42]

The ESA allows for certain exceptions from one or more of the act's prohibitions, including an exception for Alaska Natives.[43] Under the exception, any "Indian, Aleut, or Eskimo" who is native to and resides in Alaska, and any non-Alaska Native who is a permanent resident of an Alaskan Native village and who primarily depends on taking fish and wildlife for consumption or for creating authentic native articles of handicraft and clothing, is not prohibited from taking endangered or threatened species or from importing any species so taken.[44] Any such taking must be "primarily for subsistence purposes" and "not accomplished in a wasteful manner."[45] The act does not define *subsistence* in general but does specify that subsistence includes selling edible portions of the fish or wildlife, so long as these portions are sold and consumed in Alaskan Native villages and towns.[46]

The act also allows nonedible byproducts of such fish and wildlife to be sold in interstate commerce when they are turned into "authentic native articles of handicrafts and clothing".[47] To qualify, the handicrafts or clothing must be wholly or in a significant respect composed of natural materials and must be made or decorated "in the exercise of traditional native handicrafts" without using any pantographs, multiple carvers, or mass copying devices.[48] Examples of such crafts include weaving, beading, or drawing.[49]

FWS or the National Marine Fisheries Service (as applicable) can regulate taking of listed species by "Indian[s], Aleut[s], or Eskimo[s]," or non-Alaska Native residents of Alaskan Native villages, when either agency determines that such taking is "materially and negatively" affecting the listed species.[50] Any such regulations may specify the geographical area and season for taking the species and any other factors related to why the regulation is being implemented.[51] The regulations must be removed once the reason for imposing them no longer exists.[52]

---

*Species Act: Overview and Implementation*, by Pervaze A. Sheikh and Erin H. Ward.

[40] 16 U.S.C. §§1533(d), 1539.

[41] 16 U.S.C. §1532(19).

[42] 16 U.S.C. §1533(d).

[43] 16 U.S.C. §1539.

[44] 16 U.S.C. §1539(e). See also 50 C.F.R. §17.5.

[45] 16 U.S.C. §1539(e). See also 50 C.F.R. §17.5.

[46] 16 U.S.C. §1539(e)(3)(i).

[47] 16 U.S.C. §1539(e)(1).

[48] 16 U.S.C. §1539(e)(3)(ii).

[49] Ibid.

[50] 16 U.S.C. §1539(e)(4). FWS administers the ESA for terrestrial, freshwater species, and catadromous species (e.g., eels that spawn in saltwater and live in freshwater as adults) and the National Marine Fisheries Service administers the ESA for marine and anadromous species (e.g., salmon that spawn in freshwater and live in saltwater as adults).

[51] 16 U.S.C. §1539(e)(4).

[52] Ibid.

# Migratory Bird Treaty Act

The MBTA implements four bilateral treaties governing migratory birds. These treaties between the United States and Canada, Japan, Mexico, and Russia generally include similar—but distinct—provisions. In general, each treaty requires the party nations to provide for the protection of certain migratory birds, allowing for the designation of hunting seasons for certain game birds and providing for certain exceptions.[53] Exceptions for Alaska Native subsistence uses differ across each treaty. The treaties with Russia and Japan include general exceptions from the treaties' prohibitions for Alaska Natives for subsistence needs.[54] The original treaty with Canada included a limited exception for specific species of nongame birds, and the original treaty with Mexico did not contain an exception for Alaska Natives.[55] In the 1990s, the treaties with Canada and Mexico were amended to allow for seasonal subsistence harvesting for Alaska Natives.[56]

The MBTA was initially enacted in 1918 to implement the bilateral treaty with Canada and has been amended to reflect the subsequent treaties and amendments to these agreements. In general, the MBTA prohibits hunting, taking, capturing, killing, or engaging in an array of commerce-related activities with respect to specific migratory birds unless that activity is authorized pursuant to prescribed migratory bird hunting regulations or permits issued for specific purposes.[57] As an exception to these prohibitions, the MBTA authorizes FWS to issue regulations as needed to ensure the Indigenous inhabitants of Alaska may take migratory birds and collect their eggs for their own nutritional and other essential needs during seasons established by FWS.[58]

FWS has issued regulations implementing this exception for Alaska Natives.[59] These regulations must be consistent with all four treaties.[60] To assist with implementation, FWS established the Alaska Migratory Bird Co-management Council.[61] The council comprises representatives from

---

[53] Convention Between the United States and Great Britain for the Protection of Migratory Birds, U.S.-Gr. Brit., August 16, 1916, 39 Stat. 1702 [U.S.-Canadian Treaty]; Convention Between the United States of America and Mexico for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., February 7, 1936, 50 Stat. 1311 [U.S.-Mexico Treaty]; Convention Between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, U.S.-Japan, March 4, 1972, 25 U.S.T. 3329 [U.S.-Japan Treaty]; Convention Between the United States of America and the Union of Soviet Socialist Republics [Russia] Concerning the Conservation of Migratory Birds and Their Environment, U.S.-U.S.S.R., November 26, 1976, 29 U.S.T. 4674 [U.S.-Russia Treaty]. See also U.S. Department of State, Treaties in Force, 238, 296 (2020) (listing subsequent amendments to the treaty).

[54] U.S.-Japan Treaty, art. III, 1(e); U.S.-Russia Treaty, art. II, 1(c). The treaty with Japan used the phrase "for their own food and clothing" and the treaty with Russia used the phrase "for their own nutritional and other essential needs."

[55] U.S.-Canadian Treaty, art. II, cl. 3.

[56] Protocol Between the Government of the United States of America and the Government of Canada Amending the 1916 Convention Between the United Kingdom and the United States of America for the Protection of Migratory Birds in Canada and the United States, U.S.-Can., December 14, 1995, S. Treaty Doc. No. 104–28, 2473 U.N.T.S. 329; Protocol Between the Government of the United States of America and the Government of the United Mexican States Amending the Convention for the Protection of Migratory Birds and Game Mammals, May 5, 1997, S. Treaty Doc. 105-26.

[57] 16 U.S.C. §§703-704.

[58] 16 U.S.C. §712. This section of the MBTA was added by the Fish and Wildlife Improvement Act of 1978 (P.L. 95-616, §3(h)(2), (3), Nov. 8, 1978, 92 Stat. 3112).

[59] 50 C.F.R. part 92.

[60] See Alaska Fish and Wildlife Federation and Outdoor Council, Inc. v. Dunkle, 829 F.2d 933, 940-41 (9th Cir. 1987); S. Rep. No. 1175, 95th Cong., 2d Sess., reprinted in 1978 U.S. Code Cong. & Admin. News 7641.

[61] 50 C.F.R. §92.10(a).

**Exhibit D**
**Page 12 of 26**

the federal government, Alaska, and Alaska Natives from 12 regional management areas.[62] The council develops recommendations for regulations related to the subsistence harvest; procedures and criteria for areas and communities to become eligible; and recommendations for other areas, such as law enforcement policies, population monitoring, research and use of traditional knowledge, and habitat protection.[63] The council holds public meetings at least twice a year that provide an opportunity for public comment.[64]

FWS regulations identify certain subsistence harvest areas and allow other areas to be designated as such upon recommendation by the Alaska Migratory Bird Co-management Council.[65] Permanent residents of villages in subsistence harvest areas are eligible to harvest migratory birds and eggs for subsistence purposes; immediate family members of such residents also may assist with the customary spring and summer subsistence harvest with permission of the village's or tribe's council, as applicable.[66] The regulations identify which species are eligible for subsistence harvesting and provide region- and species-specific periods during which harvest may occur. They also prohibit certain methods and means of harvesting the birds or eggs.[67] The regulations reserve FWS's right to close or temporarily suspend any regulations as needed to address imminent threats to the conservation of any listed species or migratory bird population.[68]

FWS's regulations for migratory bird subsistence harvesting in Alaska apply only during the closed season (March 10 to September 1 each year), when hunting otherwise would be prohibited.[69] During the open season, the regulations that govern the hunting of migratory game birds apply equally to subsistence harvesting.[70]

## Marine Mammal Protection Act

The MMPA prohibits taking or importing marine mammals or marine mammal products except as provided for in the act.[71] The act provides an exemption from the taking prohibition for Alaska Natives.[72] The exemption applies to "any Indian, Aleut, or Eskimo who resides in Alaska" along the Arctic Ocean or north Pacific Ocean coasts.[73] To qualify, the Alaska Native must take the marine mammal for "subsistence purposes" or to create and sell authentic native articles of handicrafts and clothing.[74] The taking also must be accomplished in a manner that is not wasteful.[75] Alaska Natives may sell edible components of marine mammals only in Alaska Native

---

[62] 50 C.F.R. §§92.10, 92.11.

[63] 50 C.F.R. §92.10(c).

[64] 50 C.F.R. §92.10(d).

[65] 50 C.F.R. §92.5(a), (c).

[66] 50 C.F.R. §92.5(a), (d).

[67] 50 C.F.R. §§92.20, 92.22, 92.31.

[68] 50 C.F.R. §92.21.

[69] 50 C.F.R. §92.3.

[70] Ibid. The regulations that govern hunting migratory game birds and crows during the regular open season for non-subsistence use are found in 50 C.F.R. part 20.

[71] 16 U.S.C. §1371(a).

[72] 16 U.S.C. §1371(b); 50 C.F.R. §§18.23, 216.23.

[73] 16 U.S.C. §1371(b).

[74] 16 U.S.C. §1371(b)(1)-(2).

[75] 16 U.S.C. §1371(b)(3).

villages and towns or for native consumption, but they may sell native handicrafts and clothing in interstate commerce.[76]

Take by Alaskan Natives may be regulated with respect to species or stocks of marine mammals that are determined to be *depleted* under the MMPA.[77] A species or stock is depleted when it is listed as endangered or threatened under the ESA or when an appropriate federal or state agency determines the species or stock is below its *optimum sustainable population*.[78] The optimum sustainable population of a species or stock is the population level that will maximize the species' or stock's productivity, based on its habitat and the health of its ecosystem.[79] Any such regulations may establish particular geographical areas or seasons for taking, as well as any other factors related to the reason for imposing the restriction.[80] The regulations must be removed once the reason for imposing them no longer exists. The National Marine Fisheries Service has enacted regulations governing the take of beluga whales in Cook Inlet and fur seals on the Pribilof Islands.[81] FWS has enacted regulations governing take of the Pacific walrus.[82]

# Issues for Congress

Subsistence hunting and fishing in Alaska has long been an issue of congressional and stakeholder interest. Over the years, various groups, including Alaska Native communities, rural residents, and other interest groups, have identified an array of issues pertaining to subsistence use. These issues range from general concerns, such as the role of the federal government in managing such activities or the impacts of climate change on communities that engage in subsistence use practices, to more specific concerns regarding priority access and harvesting limits. This section provides an overview of selected issues that have been of interest to Congress in recent years.

## Federal Versus Nonfederal Management

The role of the federal government in overseeing subsistence uses in Alaska is an ongoing issue of congressional interest. Some concerns generally relate to federal ownership and management of land, such as whether Congress should transfer ownership of some lands or delegate some resource management responsibilities to the State of Alaska. Other concerns are specific to federal programs addressing subsistence uses, such as federal management under the FSB, and federal engagement and cooperation with local and Alaska Native communities.

In general, the federal government has recognized states' traditional authority to manage fish and resident wildlife within their borders. That authority typically extends to federal lands, barring specific preemptions.[83] For subsistence harvests in Alaska, however, the federal government—primarily through ANILCA—asserted authority over certain aspects of natural resource

---

[76] 16 U.S.C. §1371(b).

[77] 16 U.S.C. §1371(b).

[78] 16 U.S.C. §1362(1).

[79] 16 U.S.C. §1362(9).

[80] 16 U.S.C. §1371(b).

[81] 50 C.F.R. §§216.23, 216.71-216.74.

[82] 50 C.F.R. §18.23(c).

[83] Examples include the closure of certain national park units and national wildlife refuges to hunting and fishing under federal laws, as well as the limitations on taking certain species under other federal wildlife laws.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 35 of 106   Exhibit D
Page 14 of 26

management on federal lands. To address this potential conflict, Title VIII of ANILCA provides the state with the opportunity to manage subsistence harvesting on federal lands in place of the federal government so long as state subsistence laws are in compliance with ANILCA. However, following the aforementioned legal decisions in the late 1980s (see "Federal Management of Subsistence Uses Under ANILCA"), the federal government has overseen management of fish, wildlife, and plant life for subsistence purposes through the FSB since 1990. This management transfer to the FSB has continued to be an issue of ongoing debate.[84]

Initially, some stakeholders and state lawmakers assumed federal management under ANILCA would be temporary until the state came into compliance through legislative or administrative action.[85] The initial regulations for the FSB were promulgated as temporary rules "in anticipation of the State returning to compliance with Title VIII."[86] The agencies further stated that "it is preferable to have [subsistence fish and game] management responsibility lie with the State."[87] However, since the state has not resolved the question of compliance with both Title VIII and the Alaska state constitution, federal management under the FSB has continued despite opposition from some stakeholders. For example, some have suggested that because a federal management entity was not envisioned by ANILCA (it is not explicitly mentioned or alluded to in the law), the FSB's management role is out of step with Congress's initial intent in enacting ANILCA.[88] Others have suggested expanding the federal government's role in managing subsistence uses. This approach has included proposals for the federal government, rather than the state, to manage subsistence on the roughly 45.5 million acres of Alaska Native-owned land conveyed under ANCSA.[89]

In addition to concerns regarding the extent of the federal government's authority, some stakeholders have questioned the federal government's ability to provide for adequate subsistence harvests for qualified users. They have raised questions of whether the federal government can adequately manage the substantial land area subject to ANILCA (more than 60% of land in Alaska is under federal jurisdiction). Others have suggested that the FSB and other federal agencies have failed to prioritize land management decisions that ensure healthy and abundant populations are available for continued subsistence use.[90] To address these issues, stakeholders have advocated for allowing state managers to conduct management activities on federal lands.[91] Others have argued that implementation of state wildlife strategies—and in particular, *intensive* or active management approaches—would directly conflict with the statutory mandate some federal agencies have in managing wildlife resources (see "Multiple Land Management Mandates and Jurisdictional Questions" for more information).[92]

---

[84] S. Hrg. 113-118.

[85] Frank Norris, "Alaska Subsistence: A National Park Service Management History," DOI, 2002.

[86] FWS and FS, "Temporary Subsistence Management Regulations for Public Lands in Alaska," 55 *Federal Register* 27114, June 29, 1990.

[87] Ibid.

[88] Kyle Joly, Sanford P. Rabinowitch, and Julie Lurman Joly, "Dual Management of Wildlife in Alaska: Making Federal Practice Align with Federal Mandates," *The George Wright Forum*, vol. 32, no. 1 (2015), pp. 18-24.

[89] Kyle Hopkins and Sean Cockerham, "Subsistence Rights Expected to Headline AFN Convention," *Anchorage Daily News*, October 19, 2009, updated September 17, 2016.

[90] S. Hrg. 113-118, p 16. Testimony from Craig Fleener, Deputy Commissioner, Alaska Department of Fish and Game.

[91] Ibid.

[92] Coalition to Protect America's Parks, "Coalition Condemns Cynical Proposal to Repeal NPS Alaska Hunting Regulations," September 24, 2018.

Case 1:22-cv-00054-SLG Document 75-1 Filed 09/01/23 Page 36 of 106

**Exhibit D**
**Page 15 of 26**

Other concerns pertain to the manner in which the federal government engages and interacts with local and Alaska Native communities. Some Alaska Native stakeholders have pointed to past failures by federal agencies to allow traditional subsistence harvest practices as a source of ongoing distrust and frustration between these communities and the government.[93] Still others have suggested federal agencies should strengthen resource management partnerships via cooperative agreements and comanagement relationships with Alaska Native and local communities.[94] Alaska Native communities have called on federal agencies to incorporate and prioritize Indigenous knowledge into federal fish and wildlife management, monitoring, and research programs.[95] The federal government has conducted reviews of its programs managing subsistence harvesting of resources and has made changes in response to some of these concerns. Past Administrations also have pointed to the "bottom-up management" approach provided by regional advisory councils—administrative bodies that provide advice and recommendations to the FSB about subsistence hunting and fishing issues in Alaska.[96] Pursuant to regulations, these councils must have representation from local communities within the applicable region with knowledge of issues relating to subsistence harvest, which some argue allows for local residents to have a substantial role in guiding the federal subsistence program.[97]

## Multiple Land Management Mandates and Jurisdictional Questions

Although ANILCA and other statutes establish a management priority (or exemption) for subsistence uses, the federal government is required to balance these requirements with other management provisions established under other laws (e.g., the National Wildlife Refuge System Administration Act for FWS and the National Park Service Organic Act of 1916 for NPS).[98] The purposes and mandates of these laws are not always easily balanced, and at times agencies may be directed to engage in activities that seem at odds with one another. As a result, some agencies have been reluctant to engage in certain activities that support subsistence uses but may not advance the management goals established under other authorities. In particular, some agencies have declined, at times, to pursue the type of *active* or *intensive* management of fish and wildlife populations (e.g., predator control, habitat enhancements) that some stakeholders claim is necessary to sustain subsistence needs.[99] For example, stakeholders and state management officials have suggested NPS and FWS have resisted these types of management practices in Alaska because of their interpretation of the NPS Organic Act of 1916 (NPS) and the National

---

[93] For example, in 2018, FWS issued a formal apology to Indigenous Alaskans for regulations implemented pursuant to the MBTA in the 1960s and 1970s that severely impacted these communities' ability to harvest birds and eggs during the spring season. See FWS and Alaska Department of Fish and Game, "Apology for Harmful Impacts of Past Bird Harvest Prohibitions," September 13, 2018, at https://www.fws.gov/node/267704.

[94] DOI and USDA, *Federal Subsistence Policy Consultation Summary Report*, June 14, 2022, at https://www.bia.gov/sites/default/files/dup/tcinfo/final-subsistence-consultation-summary-report_6.10.22_508.pdf. Hereinafter referred to as DOI and USDA, *Federal Subsistence Policy*.

[95] Ibid. See also Isabella Turilli, "Survival, Subsistence, and Food Sovereignty in Alaska," *Think Global Health*, January 17, 2023.

[96] S.Hrg. 113-118, p. 11. Testimony of Beth Pendleton, Regional Forester, Alaska Region, FS.

[97] Ibid. Membership requirements for the FSB and the regional advisory councils can be found at 36 C.F.R. §242.10 and 36 C.F.R. §242.11, respectively.

[98] The National Wildlife Refuge System Administration Act is codified at 16 U.S.C. §§668dd-668ee, and the NPS Organic Act of 1916 is codified at 54 U.S.C. §§100101 et seq.

[99] S.Hrg. 113-118. See also Tim Bodony, "State Sues Federal Land Managers over Predator Hunting Restrictions," *Alaska Public Media*, January 18, 2017.

Exhibit D
Page 16 of 26

Wildlife Refuge System Administration Act (FWS) and those laws' emphasis on "park values" and "natural diversity," respectively.[100] Agencies generally have highlighted the difficulty in balancing the demands of subsistence users with multiple legal mandates and other public interests.[101] In other instances, agencies such as FS and BLM are explicitly required by statute to manage lands and resources under their jurisdiction for multiple uses, including energy development, livestock grazing, recreation, and timber harvesting, which some have claimed prevents subsistence use from being properly prioritized. Specifically, some stakeholders have pointed to BLM's onshore oil and gas leasing program as having potential harmful impacts to subsistence users.[102] Others, including some Alaska Native stakeholders, suggest that present and future oil and gas development is the foundation of a sustained local economy and must be balanced with ensuring future subsistence use.[103]

Other challenges include balancing competing objectives within the same statute, as some laws that require protection of migratory birds or threatened or endangered species also authorize subsistence harvests. To address some of these concerns, DOI has established policies requiring agencies to consult with Alaska Native communities when regulating subsistence harvest of endangered or threatened species.[104] These consultation requirements aim to preserve subsistence harvest rights while minimizing adverse impacts on listed species.

In addition to conflicting mandates, some stakeholders have argued that sustainable resource management challenges are compounded when multiple governmental entities (state and/or federal) have jurisdiction over the same or similar resources. In particular, the "dual regulation of fish and game resources where state and federal jurisdictions intersect" has created confusion among subsistence and rural communities in Alaska, according to some stakeholders.[105] For example, in instances where state and federal regulations have different limits for a certain species, subsistence users must be aware of the jurisdiction in which they are hunting or fishing to know whether they are harvesting in accordance with applicable regulations. This exercise can become further complicated when hunting or fishing near the boundary between such lands, particularly if no clear markers delineate the federal-state boundary. In addition, some have argued that implementing a federal regulatory framework alongside a similar state system increases administrative costs that might otherwise be avoided with a single regulatory body.[106]

Other jurisdictional concerns relate specifically to whether and where the federal government has jurisdiction over inland waters, bringing them under the definition of *public lands* for purposes of ANILCA and therefore requiring subsistence use management of the inland waters and their

---

[100] S.Hrg. 113-118, Testimony from Craig Fleener, Deputy Commissioner, Alaska Department of Fish and Game, p. 18.

[101] S.Hrg. 113-118, Testimony from Gene Peltola, Assistant Regional Director, Office of Subsistence Management, FWS.

[102] For example, see Scott Streater, "Biden Plan Could Advance Massive Arctic Oil Project," *E&E News*, July 11, 2022. Additional concerns have been raised regarding potential oil and gas development in the Arctic National Wildlife Refuge. For information on this issue, see CRS In Focus IF12006, *Arctic National Wildlife Refuge: Status of Oil and Gas Program*, by Laura B. Comay.

[103] For example, see Testimony of Richard Glenn, Arctic Slope Regional Corporation, U.S. Congress, House Committee on Natural Resources, Subcommittee on Energy and Mineral Resources, *Promoting Onshore Oil and Gas Development in Alaska*, 115th Cong., 1st sess., July 18, 2017, S. Hrg 115-17 (Washington: GPO, 2017).

[104] See for example, DOI, Secretarial Order No. 3225, *Endangered Species Act and Subsistence Uses in Alaska (Supplement to Secretarial Order No. 3206)*, January 19, 2001.

[105] S.Hrg. 113-118, p. 20.

[106] S.Hrg. 113-118, Testimony from Craig Fleener, Deputy Commissioner, Alaska Department of Fish and Game.

Exhibit D
Page 17 of 26

fishery stocks. As noted below, waters within or adjacent to federal public lands have been under the jurisdiction of the FSB since a Ninth Circuit decision in 1995 (for more information, see text box "The *Katie John* Litigation").[107] Since that decision, the degree or extent to which ANILCA's subsistence use priority—and in, turn, FSB regulations—applies to waters and fishery stocks has been the subject of litigation and concern for some stakeholders.[108] In some instances, state and federal officials have issued conflicting orders opening and/or closing fishing in these same waters. For example, in 2021, the Alaska Department of Fish and Game opened driftnet salmon fishing on the lower Kuskokwim River within the Yukon Delta National Wildlife Refuge on certain days to all Alaskans through an emergency order, but FWS had opened fishing only to qualified subsistence users under ANILCA.[109] In May 2022, the federal government sued the state to block the state's emergency order; the U.S. District Court of Alaska later granted an injunction preventing the state from implementing the order.[110]

---

### Navigable Waters and Alaska National Interest Lands Conservation Act (ANILCA): The *Katie John* Litigation

The *Katie John* trilogy, a series of decisions by the U.S. Court of Appeals for the Ninth Circuit, has been influential in establishing the balance between federal and state authority in the management of subsistence fisheries in the state. Together, these cases reinforce the existence of Alaska Native subsistence fishing rights and outline the federal government's trust responsibility to protect those rights. They also provide important interpretations of ANILCA's provisions.

In the initial years following ANILCA's enactment, the federal government played a minimal role in the management of fish populations for subsistence purposes. Instead, Alaska's navigable waters were managed by the state, much like the navigable waters throughout the rest of the country. Even following the transfer of federal management to the Federal Subsistence Board in 1990, agencies specifically excluded federal jurisdiction over navigable waters, which were defined as "those waters used or susceptible of being used in their ordinary condition as highways for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water" (55 *Federal Register* 27114).

Katie John, an Alaska Native elder, and other members of her community filed their first federal lawsuit in 1983 to argue that the State of Alaska was violating their subsistence fishing rights through regulatory actions such as restricting access to fishing areas and imposing permit requirements. The ensuing litigation spanned several decades and multiple cases and appeals. Three final decisions by the U.S. Court of Appeals for the Ninth Circuit are sometimes referred to as *Katie John I, II,* and *III,* or the *Katie John* trilogy.

In 1995's *Katie John I,* the Ninth Circuit held that Alaska navigable waters were not entirely under either federal or state control. Instead, the court concluded that ANILCA's definition of "'public lands' includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine." The reserved water rights doctrine provides that when the United States withdraws land from the public domain for a particular federal purpose, it implicitly reserves appurtenant waters that have not otherwise been appropriated, though only to the extent necessary to fulfill the reservation's purpose. In the context of Alaska Native subsistence use rights, that means that certain—though not all—waters in Alaska that otherwise would be subject to state management are instead subject to ANILCA's rural subsistence use priority.

In its decision, the court also held that the federal agencies administering ANILCA's subsistence use priority are responsible for identifying those waters, despite that "heavy administrative burden." The U.S. Fish and Wildlife Service (FWS) and the U.S. Forest Service (FS) subsequently tried to identify the navigable waters subject to reserved water rights. The Ninth Circuit reviewed their efforts in 2001's *Katie John II.* Although a majority of the

---

[107] Federal responsibility to manage subsistence fisheries was added following the Ninth Circuit Court of Appeals decision in Alaska v. Babbitt, in 1995; however, federal subsistence fisheries regulations did not become effective until 1999 (64 *Federal Register* 1276).

[108] See, for example, See Alaska v. Babbitt, 72 F.3d 698 (1995); John v. United States, 247 F.3d 1032 (2001) (en banc); John v. United States, 720 F.3d 1214 (2013);

[109] Greg Kim, "State announces Kuskokwim fishing opening, but feds say it's illegitimate," *KTOO*, June 25, 2021, at https://www.ktoo.org/2021/06/25/state-announces-kuskokwim-fishing-opening-but-feds-say-its-illegitimate/.

[110] United States v. State, Dep't of Fish & Game, Case No. 1:22-cv-00054-SLG, 2022 WL 2274545 (D. Alaska June 23, 2022).

**Exhibit D**

**Page 18 of 26**

court agreed that *Katie John I* was incorrectly decided, the court "could not come to a controlling agreement about why that was true." The court therefore concluded that *Katie John I* "should not be disturbed or altered," and it remains controlling law.

Finally, in 2013's *Katie John III*, the Ninth Circuit upheld FWS and FS's determination that the "public lands" subject to ANILCA's rural subsistence use priority "included waters within and adjacent to federal reservations" but that reserved water rights for Alaska Native Settlement allotments were "best determined on a case-by-case basis." Accordingly, certain inland waters in or appurtenant to federal lands in Alaska are subject to ANILCA and its subsistence fishing provisions, but federal agencies must make these determinations on a case-by-case basis.

For further reading about the *Katie John* litigation, see generally Robert T. Anderson, "The Katie John Litigation: A Continuing Search for Alaska Native Fishing Rights After ANILCA," *Arizona State Law Journal*, vol. 51, no. 845 (2019), pp. 846-877.

**Sources:** State of Alaska v. Babbitt, 72 F.3d 698, 703–04 (9th Cir. 1995) ("Katie John I"); John v. United States, 247 F.3d 1032 (9th Cir. 2001) (en banc) ("Katie John II"); John v. United States, 720 F.3d 1214, 1226 (9th Cir. 2013) ("Katie John III").

## Access to Subsistence Rights or Exemptions

Another issue raised by some stakeholders concerns which Alaska residents are eligible for subsistence use priority or exemptions. Some of these concerns relate to how the government determines or defines eligibility under certain laws. In particular, the process by which the FSB determines *rural* status in Alaska under ANILCA has come under scrutiny. Other concerns relate to potential confusion caused by the varying eligibility standards established for subsistence use priorities or exemptions across multiple statutes. Finally, some Alaska Native communities have suggested that the extension of subsistence use priorities or exemptions to non-Alaska Native communities does not adequately protect their traditional subsistence practices and culture.

### Rural Priority Determination

Title VIII of ANILCA establishes a priority use of federal lands for subsistence purposes that applies only to "rural residents of Alaska." Because ANILCA does not define which individuals or communities qualify as *rural*, the FSB determines when a community or area of Alaska should or should not be considered rural using guidelines and characteristics defined by the Secretaries (see **Figure 1**).[111] Determinations of *non-rural* status—and subsequent ineligibility for the Title VIII subsistence priority—have been the subject of debate at times.

---

[111] Communities determined to be non-rural can be found at 36 C.F.R. §242.23 and 50 C.F.R. §100.23.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 40 of 106

**Exhibit D**

**Page 19 of 26**

**Figure 1. Federal Subsistence Board Non-rural and Rural Determinations**
(as of December 2022)



**Source:** Department of the Interior, "Federal Subsistence Management Program, Non-rural Areas," p. 1, at https://www.doi.gov/sites/doi.gov/files/non-rural-areas.pdf.

One specific issue that has generated concern is the factors that the FSB considers in making such a determination. Under previous regulations, the FSB would determine if a community was rural or non-rural based primarily on set population ranges (e.g., communities of 2,500 or fewer residents were deemed rural).[112] The regulations required these determinations to be reviewed every 10 years. Through this review process, the FSB had determined that a number of rural areas had become non-rural and therefore would become ineligible for the Title VIII subsistence use priority.[113] After stakeholders raised concerns about the implications of individuals becoming ineligible, the federal government promulgated new regulations in 2015 that removed specific guidelines for the non-rural determination process, including requirements regarding population data, the aggregation of communities, and the decennial review.[114] According to the agencies, these new regulations provide the FSB with more discretion in making decisions by taking into account regional differences across Alaska and allow for greater input from relevant stakeholders.[115] Even with the new regulations, certain stakeholders believe the revised regulations continue to exclude certain residents—especially Alaska Native residents living in non-rural areas—for whom subsistence uses on federal lands are important to maintaining a

---

[112] FWS and FS, "Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C," 57 *Federal Register* 22940-22964, May 29, 1992. Under these regulations, the FSB was required to take into consideration community or area "characteristics" when evaluating rural or non-rural status. These characteristics could include the use of fish and wildlife in daily life, the development and diversity of the economy, community infrastructure, and other factors.

[113] See, for example, a 2007 decision to list Prudhoe Bay as *non-rural* (FS, FWS, "Subsistence Management Regulations for Public Lands in Alaska, Subpart C; Nonrural Determinations," 72 *Federal Register* 25688, May 7, 2007) and the proposed rule to change the status of the Kodiak area from *rural* to *non-rural* (71 *Federal Register* 46416, August 14, 2006).

[114] 80 *Federal Register* 68245-68248.

[115] DOI, "Federal Subsistence Board Adopts Policy on Nonrural Determinations," press release, January 18, 2017, at https://www.doi.gov/sites/doi.gov/files/uploads/fsb_nonrural.pdf.

connection with their culture and traditional practice (see "Alaska Native Versus Non-Alaska Native Eligibility").[116]

## Differences in Subsistence Use Eligibility Across Statutes

Each of the statutes discussed in this report establishes explicit exemptions or priority use for certain subsistence practices across Alaska. How and when these exemptions or priorities apply vary depending on the law in question. Some statutes establish subsistence priorities or exemptions based on the racial or ethnic identity of the user, whereas others base applicability on certain geographic regions. Still others some consider both racial and geographic factors. For example, the ESA explicitly exempts "native Alaskans" from prohibitions on taking or importing endangered or threatened species for subsistence purposes.[117] Under the law, *native Alaskan* includes any "Indian, Aleut, or Eskimo" who resides in Alaska—as well as non-Alaska Native individuals who are permanent residents of Alaskan Native villages.[118] Meanwhile, the subsistence use exemption under the MMPA applies only to "Indian, Aleut, or Eskimo" individuals and further limits the exemption to only those individuals living "on the coast of the North Pacific Ocean or the Arctic Ocean."[119] Non-Alaska Native individuals are not eligible for an exemption under the MMPA.

By contrast, the MBTA and ANILCA do not specifically limit subsistence use rights on the basis of race or racial heritage. The MBTA exemption applies to "indigenous inhabitants of the State of Alaska," and FWS regulations define the term to mean "a permanent resident of a village within a subsistence harvest area, regardless of race."[120] Similarly, although ANILCA recognizes the importance of subsistence uses to "Native physical, economic, traditional, and cultural existence," the law does not restrict subsistence hunting and fishing on federal lands to Alaska Natives or grant priority rights for such practices on the basis of tribal or Native affiliation. Instead, the law defined *subsistence uses* in terms of the customary and traditional uses by "rural Alaska residents," effectively extending the subsistence use priority on federal lands to both Alaska Native and non-Alaska Native residents.[121]

Given the complexity of this statutory framework, and the manner in which these laws may overlap and apply different qualifying standards, when and for whom subsistence use rights and exemptions apply can cause confusion. For example, an individual eligible for subsistence use priority under ANILCA may not be able to continue subsistence harvest practices with respect to a particular species if the species is subsequently listed as endangered or threatened under the ESA. Similarly, although FWS has indicated that no migratory birds open for harvest during the subsistence season in Alaska are currently threatened or endangered species, a future listing could cause a person previously eligible to hunt a species under the MBTA to no longer be eligible to hunt it under the ESA due to the differing eligibility provisions of the two statutes.

---

[116] See, for example Raegan Miller, "Advisory Council Advances Proposal to Open Federal Subsistence Hunts and Fisheries to Ketchikan Residents," KRDB Community Radio, October 27, 2022.

[117] 16 U.S.C. §1539(e).

[118] As discussed above, the term *Eskimo* may be considered derogatory or offensive to some Native Alaskan communities but is used due to its legal significance under federal laws (see footnote 14.

[119] 16 U.S.C. §1371(b).

[120] 50 C.F.R. §92.4

[121] 16 U.S.C. §3114.

**Exhibit D**

**Page 21 of 26**

## Alaska Native Versus Non-Alaska Native Eligibility

Another issue that has been a topic of debate is whether, or the degree to which, subsistence use priorities or exemptions apply to non-Alaska Native communities. Only the MMPA subsistence use exemption applies exclusively to "Indian, Aleut, or Eskimo" individuals (and only when those individuals are living on the coast of the North Pacific Ocean or the Arctic Ocean). Other subsistence-related statutes generally apply to both Alaska Native and non-Alaska Native individuals. Some Alaska Native communities object to the extension of subsistence use rights and exemptions to non-Alaska Native communities, claiming this approach risks not adequately ensuring and protecting Alaska Native subsistence practices and culture.[122] The lack of explicit protections or priority for Alaska Native subsistence users in ANILCA (which instead confers such benefits to "rural Alaska residents") in particular has been an issue of concern for some Alaska Native communities.

With the passage of ANCSA in 1971, aboriginal hunting and fishing rights were extinguished for participating Alaska Native communities.[123] Although the conference report for ANCSA indicates that Congress may have expected that the Secretary of the Interior and the State of Alaska would use their authorities to protect specifically Alaska Native interests in subsistence activities,[124] following the law's passage many stakeholders expressed dissatisfaction with any such limitation.[125] The passage of ANILCA in 1980 was intended, in part, to resolve the issues of Alaska Native subsistence uses through Title VIII's rural priority provision,[126] which extends to both Alaska Natives and non-Alaska Natives. Since then, some Alaska Native communities have contended that ANILCA insufficiently protects the continuation of Alaska Native subsistence use rights and have advocated for amending the law to provide an explicit Alaska Native priority or higher priority for Alaska Natives, which they believe would better protect their traditions and culture.[127]

By contrast, some have highlighted that subsistence uses are also vitally important to the food security of non-Alaska Natives in rural communities and therefore have advocated for a modified rural priority under ANILCA.[128] Under this approach, ANILCA's subsistence use priority would

---

[122] Sullivan, Indigenous Subsistence Rights."

[123] As mentioned above, not all Alaska Native communities ceded their land claims—and subsequently their hunting and fishing rights to those lands—to the federal government under ANCSA.

[124] H.Rept. 92-746, 91st Cong., 1st sess. (1970), reprinted in 1971 *U.S. Code Cong. & Adm. News* 2247, 2248. ("The conference committee, after careful consideration, believes that all Native interests in subsistence resource lands can and will be protected by the Secretary through the exercise of his existing withdrawal authority.")

[125] David S. Case and David A. Voluck, *Alaska Natives and American Laws*, 3rd ed., Fairbanks, AK: University of Alaska Press, 2012), pp. 292-293 ("Some nine years later it was compellingly clear that neither the state nor the Secretary were likely to protect subsistence in the manner Congress had contemplated"). See also Kristin McCarrey, "Alaska Natives: Possessing Inherent Rights to Self-Governance and Self-Governing from Time Immemorial to Present Day," *American Indian Law Journal,* vol. 2, no. 1 (May 2017), pp. 437-452.

[126] The legislative history of ANILCA indicates that Alaska Native subsistence use was an overriding concern in developing the Title VIII provision. See, for example, U.S. Congress, House Committee on Interior and Insular Affairs, *Alaska National Interest Lands Conservation Act of 1979*, 96th Cong., 1st sess., April 18, 1979 (Washington: GPO, 1979), p. 230 ("The importance of subsistence uses ... to the physical, economic and cultural well-being of Alaska Natives and other rural residents has been exhaustively chronicled in testimony presented at hearings, town meetings and workshops held by the committee during consideration of both the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act.").

[127] For example, see Alaska Federation of Natives, "Subsistence Action," at https://www.nativefederation.org/subsistence-action-workshops/.

[128] Miranda Strong, "Alaska National Interest Lands Conservation Act Compliance & Nonsubsistence Areas: How Can

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 43 of 106   Exhibit D
Page 22 of 26

extend to Alaska Natives living in both rural and urban communities—as well as to non-Alaska Natives living in rural designated areas. According to these advocates, such a proposal would recognize that Alaska Natives in urban communities maintain a customary and traditional connection to subsistence activities, while also ensuring rural, non-Alaska Natives have access to subsistence practices that are vital to their food security. Other stakeholders oppose any subsistence use priority based on an individual's race or tribal affiliation and claim that federal lands in Alaska should be open to anyone, as Alaska's state constitution would provide.[129]

---

### *Haaland v. Brackeen* and Equal Protection: Should Laws Benefiting Tribes Be Subject to Strict Scrutiny?

In *Haaland v. Brackeen*, argued before the Supreme Court in November 2022 during the October 2022 term, the Court is considering, among other issues, an equal protection challenge to Congress's establishment of special rules that apply to "Indian children" in the Indian Child Welfare Act (25 U.S.C. §§1901 et seq.). The Fourteenth Amendment's Equal Protection Clause prohibits state government actors from denying "any person within its jurisdiction the equal protection of the laws." Although the Fourteenth Amendment applies only to state governments, the Court has analyzed federal equal protection claims under the Fifth Amendment "precisely the same" as those brought under the Fourteenth Amendment. These equal protection provisions, according to the Supreme Court, require that "all persons similarly situated should be treated alike."

The challenges before the Court allege that Congress violated the Fifth Amendment's guarantee of equal protection by distinguishing between "Indian children" and other children in the Indian Child Welfare Act, thereby treating individuals differently based on race in a way that does not hold up to strict scrutiny. *Strict scrutiny* is a legal test that asks whether a classification in a law, such by race, (1) serves a compelling government interest and (2) is narrowly tailored to further that interest. This challenge relies primarily on two Supreme Court precedents. First, in *Adarand Constructors v. Peña*, the Supreme Court established that any time the federal government subjects individuals to unequal treatment based on their race, that action is subject to "strict scrutiny." Second, in *Rice v. Cayetano*, the Supreme Court recognized that "[a]ncestry can be a proxy for race" and therefore subject to the same constitutional limitations as explicitly race-based classifications. Based on these two cases, the plaintiffs in *Brackeen* argue that classifications based on Native American ancestry must satisfy strict scrutiny.

On the other side, the federal and tribal defendants argue that such classifications require only a rational basis. The defendants argue that Supreme Court jurisprudence has established that the federal government's relationship with federally recognized Indian tribes is based on a *political*, rather than racial, categorization. Political classifications are not among the classes subject to heightened scrutiny. The Constitution's Indian Commerce Clause provides authority for Congress to "regulate Commerce ... with the Indian tribes" and is the principal constitutional basis for many statutes and regulations governing the federal relationship with tribal sovereigns. For example, in *Morton v. Mancari*, the Court upheld a Bureau of Indian Affairs' employment preference for members of federally recognized tribes because the preference was a political classification: that is, it applied to members of tribal entities who have a unique relationship with the federal government, not all persons with Native American heritage. The Supreme Court further opined that because "[l]iterally every piece of legislation dealing with Indian tribes" is "explicitly designed to help only Indians," deeming such legislation as invidious racial discrimination would jeopardize "the solemn commitment of the Government toward the Indians."

Assuming the Court reaches this issue, its decision may clarify the question of how equal protection principles apply to federal Indian legislation. Of the 574 current federally recognized tribes that may be affected by this litigation, 227 are Alaska Native entities.

**Sources:** Nos. 21-376, 21-377, 21-378, and 21-380 (U.S.); U.S. Const. amend. XIV; Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975); City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); U.S. Const. art. 1, § 2; Adarand Constructors v. Peña, 515 U.S. 200, 226 (1995); Rice v. Cayetano, 528 U.S. 495, 496 (2000); U.S. Const., art. I, § 8, cl. 3; Morton v. Mancari, 417 U.S. 535 (1974); 87 *Federal Register* 4637 (Jan. 28, 2022).

---

Alaska Thaw Out Rural & Alaska Native Subsistence Rights," *Alaska Law Review*, vol. 30, no. 1 (2013), pp. 71-94.

[129] For example, see Alaska Outdoor Council (AOC), "AOC Views," at https://alaskaoutdoorcouncil.org/aoc-views/. For a discussion of the equal access clause in the Alaska Constitution and its applicability to federal management under ANILCA, see "Federal Management of Subsistence Uses Under ANILCA."

Case 1:22-cv-00054-SLG    Document 75-1    Filed 09/01/23    Page 44 of 106

Exhibit D

Page 23 of 26

# Enforcement

Other potential challenges facing federal agencies involve the enforcement of subsistence use provisions under the law. Some of these issues are not specific to subsistence use but rather reflect overall challenges regarding the enforcement of wildlife and conservation laws, particularly in Alaska.[130] As mentioned, more than 60% of land in Alaska is under federal jurisdiction, comprising more than a third of the entire federal estate.[131] Many of these lands are in remote regions, making enforcement and oversight challenging. In some cases—due, in part, to the sheer scale of their jurisdictional boundaries—federal agencies rely on citizen reports and/or whistleblowers to identify crimes and enforce penalties.[132] Some Members of Congress have introduced legislation that would aim to improve the protection of whistleblowers and support funding of certain wildlife and conservation statutes.[133]

Other potential law enforcement challenges may be more specific to subsistence uses and harvests. For example, agencies may run into difficulties verifying for whom and when subsistence use privileges or exceptions apply. Although the harvest and taking of certain species for subsistence purposes may require a permit from the state, other subsistence practices only require eligible individuals to provide identification or some other proof of residency.[134] This could create challenges in ensuring or verifying eligibility for subsistence users. Verification challenges have been of particular concern for subsistence use provisions under the MMPA, which (as discussed in "Alaska Native Versus Non-Alaska Native Eligibility") are limited to "Indian, Aleut, or Eskimo" individuals living on the coast of the North Pacific Ocean or the Arctic Ocean.[135] Other challenges have involved the limits, or reach, of federal enforcement due to litigation around the jurisdictional authority provided under federal laws (see also "Multiple Land Management Mandates and Jurisdictional Questions").[136] Still others, primarily subsistence users and Alaska Native communities, have suggested that some enforcement practices from both state and federal agencies have been overly aggressive and have focused too much on subsistence users, who make up a small percentage of Alaska's annual resource harvest.[137]

---

[130] For general issues regarding challenges in enforcing wildlife laws, see Kenneth J. Peak, "Enforcing the Laws of Wildlife and Recreation (Part One)," *Law Enforcement Bulletin*, September 27, 2017.

[131] See CRS Report R42346, *Federal Land Ownership: Overview and Data*, by Carol Hardy Vincent and Laura A. Hanson.

[132] For example, see National Whistleblower Network, *Special Report: The Critical Role in Whistleblowers in Enforcing Wildlife Protection Laws*, September 14, 2019, at https://www.whistleblowers.org/wp-content/uploads/2019/09/Wildlife_Report-Sept-2019.pdf; see also Tinker Ready, "Guest Post: Whistleblowers Could Help Expose Wildlife Criminals in Remote Alaska-Yukon," Whistleblower Network News, August 25, 2019.

[133] For example, H.R. 6059, the Wildlife Conservation and Anti-Trafficking Act of 2021, in the 117th Congress. In 2018, the Government Accountability Office (GAO) published a report looking into the use of financial awards specifically for the purposes of wildlife trafficking; such findings could be relevant to broader wildlife and conservation statutes. See U.S. Government Accountability Office, *Combating Wildlife Trafficking: Opportunities Exist to Improve the Use of Financial Rewards*, GAO-18-279, April 2018, at https://www.gao.gov/assets/gao-18-279.pdf.

[134] For regulations regarding permit requirements for subsistence purposes under ANILCA, see 50 C.F.R. §100.6.

[135] Steve J. Langdon, "Determination of Alaska Native Status Under the Marine Mammal Protection Act," Sealaska Heritage Institute, August 2016.

[136] Elliot Louthen, "Subsistence and Sturgeon: Federal Enforcement on Alaska's Rivers," *Alaska Law Review*, vol. 36, no. 2 (June 4, 2020), pp. 179-192. This law review article discusses potential challenges facing federal law enforcement of ANILCA's subsistence provisions in light of the Supreme Court's ruling in Sturgeon v. Frost, 139 S. Ct. 1066 (2019), holding that navigable waters within Alaska's national parks are outside the scope of the NPS's normal regulatory authority.

[137] For example, see 74 *Federal Register* 23336 ("[FWS] received nine comments regarding the enforcement of the

---

# Climate Change

Issues related to climate change also may impact subsistence use practices in Alaska and may have implications for federal land management and agencies' subsistence use responsibilities. For example, in Arctic regions, studies have shown that climate-related stressors such as sea ice retreat and melting permafrost have shifted patterns in animal migration and impacted people's ability to reach animals overland or safely on sea ice.[138] In addition, changing climate conditions—such as changes in terrestrial conditions, seasonality, and fire regimes—may affect populations of wildlife and fish stocks upon which subsistence users customarily have relied.[139] Climate change also may result in potentially harmful alterations to a subsistence species' habitat, such as fluctuations in water salinity and shifts in vegetation growth. In addition to shifting and impeding access to subsistence species, climate change may complicate food preservation, a vital component of subsistence practices for many rural Alaskans.[140] For example, melting permafrost could affect the ability to store food in traditional ice cellars and may leave food more susceptible to pathogens that can cause food-borne illnesses.

In light of these changes, federal agencies may wish to reconsider or reevaluate their approach to land management to provide continued access to traditional subsistence resources affected by climate change. For example, in response to concerns raised by regional advisory councils across Alaska, the FSB encouraged federal land management agencies to "develop investigative plans that examine how recent changes in the environment affect fish and wildlife populations."[141] The FSB also may change harvest stock limits in response to declines in population for certain species, as it did in 2019 for the Mulchatna caribou herd.[142] Some rural Alaskans view changes in harvest limits as a direct threat to their ability to source food and nutrients, whereas others argue that additional limits are necessary to ensure the sustainability of future stocks.[143] Some stakeholders also have called for greater federal support for climate resilience programs in Alaska to address future threats to subsistence practices.[144]

---

migratory bird subsistence regulations in the Barrow area. Commenters indicated that they believe enforcement was 'too aggressive,'…and that the community and the Service should work together to find solutions and not resort to law enforcement."). See also DOI and USDA, *Federal Subsistence Policy.*

[138] Kristen M. Green et al., "Climate Change Stressors and Social-Ecological Factors Mediating Access to Subsistence Resources in Arctic Alaska," *Ecology and Society,* vol. 26, no. 4 (2021), at https://doi.org/10.5751/ES-12783-260415.

[139] Alaska Department of Fish and Game, "Climate Change Strategy," November 2010, at https://www.adfg.alaska.gov/static/lands/ecosystems/pdfs/climatechangestrategy.pdf.

[140] E. Barrett Ristroph, "Still Melting: How Climate Change and Subsistence Laws Constrain Alaska Native Village Adaptation," *Colorado Natural Resources, Energy & Environmental Law Review*, vol. 30, no. 2 (2019), pp. 248-249.

[141] Letter from Anthony Christianson, Chair, Federal Subsistence Board, to Nancy Morris Lyon, Chair, Bristol Bay Subsistence Regional Advisory Council, September 16, 2020, at https://www.doi.gov/sites/doi.gov/files/13-board-final-r4-bbrac-fy19-arr-enclosure-508.pdf.

[142] DOI, "Federal Subsistence Board Takes Action on Temporary Wildlife Special Action Requests WSA19-07 (Mulchatna Caribou) and WSA19-08 (Unit 13E Ptarmigan)," November 8, 2019, at https://www.doi.gov/subsistence/news/general/federal-subsistence-board-takes-action-temporary-wildlife-special-action-0.

[143] For perspectives on federal harvest limits, see Jacob Resneck, "Hearing Anxiety over Food Security, Subsistence Council Recommends Tighter Hunting Rules in Rural Southeast Alaska," KCAW, October 14, 2021; Isabelle Ross, "Federal Board Reduces Mulchatna Caribou Harvest Limit," Alaska Public Media, November 8, 2019.

[144] Ibid.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 46 of 106   Exhibit D
Page 25 of 26

# Conclusion

Fish and wildlife management across the United States requires balancing a variety of uses by different stakeholders for many different purposes, all against a backdrop of changing populations and ecosystems as species and landscapes adjust to climate change. In Alaska, such issues are further complicated by the protection of certain fishing and hunting rights through various statutory authorities rather than guarantees through treaties. Additional complicating factors in Alaska include the expansiveness of the landscape (which creates both resource scarcity and enforcement challenges), the large extent of federal land ownership, and the extent to which climate change might affect subsistence use resources and practices. Alaska Natives seek to preserve their ability to sustain themselves through fishing and hunting and their culture, religious practices, and way of life. Rural non-Alaska Natives may rely on subsistence hunting and fishing to survive in remote areas with limited access to channels of commerce. Many stakeholders have interests in preserving threatened and endangered species, marine mammals, migratory birds, and other species at risk of overuse. Finally, federal and state interests may not always align, and the split or shared jurisdiction has been a frequent subject of dispute. Congress may consider whether or to what degree the federal government should play a role in managing use of Alaska's fish and wildlife for subsistence purposes and how federal agencies should balance different interests and priorities when considering subsistence uses.

# Author Information

Mark K. DeSantis
Analyst in Natural Resources Policy

Erin H. Ward
Legislative Attorney

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 47 of 106

Exhibit D

Page 26 of 26

 Alaska Department of Fish and Game

# Subsistence in Alaska



*When we speak of 'subsistence,' we don't just mean using the resource, but using tribal methods and acting out culture and complying with those values, and we do those things because they are a measure of protection for the land and its resources. – A Venetie hunter*

**What is Subsistence use?**

Subsistence fishing and subsistence hunting are important for the economies and cultures of many families and communities in Alaska. Subsistence uses of wild resources exist alongside other important uses of fish and game in Alaska and are especially important for most rural families, who depend on subsistence hunting and fishing as sources of nutrition and cultural practices. An estimated 36.9 million pounds of wild foods are harvested annually by rural subsistence users. Residents of more populated urban areas harvest about 13.4 million pounds of wild food under subsistence, personal use, and sport regulations.

Learn more about subsistence in Alaska.

## Quick Links

Research

FAQs

Regulatory Announcements

Staff Contacts

Alaska Boards of Fisheries and Game

Subsistence in Alaska, A Year 2017 Update

[Food Security and Wild Resource Harvests in Alaska](#)

## Subsistence Use Information



- [Subsistence Fishing](#)

- [Subsistence Hunting](#)

- [Federal Subsistence](#)

- [Nonsubsistence Use Areas](#)

## Regulations & Permits



- [Subsistence & Personal Use Fishing Regulations](#)

- [Hunting and Trapping Regulations](#)

- [Permits for Cultural and Subsistence Harvest (Hunting)](#)

## Harvest Data and Reports



- [Community Subsistence Information System (CSIS)](#)

- [The Technical Papers and Special Publications Series](#)

**Exhibit E**
**Page 4 of 5**

- [Alaska Migratory Bird Co-management Council, Harvest Assessment Program (AMBCC-HAP)](#)

**Exhibit E**
**Page 5 of 5**

 Alaska Department of Fish and Game

ADF&G Home » Licenses & Permits » Subsistence & Personal Use

# Subsistence and Personal Use
## Fishing Licenses & Permits

All Alaska residents, and ONLY Alaska residents, are eligible to participate in both Subsistence and Personal Use fisheries. Subsistence and Personal Use fisheries are managed under different regulations. A valid Resident Sport Fishing License is required to participate in Personal Use fisheries, but is not required to participate in Subsistence fisheries.

- Some Subsistence and Personal Use fisheries require a permit issued by ADF&G and some do not.
  (See the Interior, Southcentral,and Southeast information in the left column for additional information.)
- Some waters are closed to Subsistence fishing and/or Personal Use fishing.
- All Subsistence halibut fisheries are managed by the federal government. For additional information see NOAA's Subsistence Halibut Fishing in Alaska Information.
- Some fisheries have season, gear, and bag limit restrictions.
- Always contact the closest regional or area ADF&G offices prior to harvesting fish or shellfish under Subsistence finfish fishery regulations or Personal Use fishing regulations.

Permits for the Chitina and Upper Cook Inlet Salmon Personal Use fisheries are now available at the Fish and Game Store.

## Online Permits & Reporting

- Online Permits
- Online Harvest Reporting

**Technical Paper No. 313**

# Subsistence Salmon Harvest Monitoring Report, Kuskokwim Fisheries Management Area, Alaska, 2004

**by**

**Jim Simon,**

**Tracie Krauthoefer,**

**David Koster,**

**and**

**David Caylor**

**August 2007**

**Alaska Department of Fish and Game**          **Division of Subsistence**



# Symbols and Abbreviations

The following symbols and abbreviations, and others approved for the Système International d'Unités (SI), are used without definition in the following reports by the Divisions of Sport Fish and of Commercial Fisheries: Fishery Manuscripts, Fishery Data Series Reports, Fishery Management Reports, and Special Publications. All others, including deviations from definitions listed below, are noted in the text at first mention, as well as in the titles or footnotes of tables, and in figure or figure captions.

**Weights and measures (metric)**

| | |
|---|---|
| centimeter | cm |
| deciliter | dL |
| gram | g |
| hectare | ha |
| kilogram | kg |
| kilometer | km |
| liter | L |
| meter | m |
| milliliter | mL |
| millimeter | mm |

**Weights and measures (English)**

| | |
|---|---|
| cubic feet per second | ft³/s |
| foot | ft |
| gallon | gal |
| inch | in |
| mile | mi |
| nautical mile | nmi |
| ounce | oz |
| pound | lb |
| quart | qt |
| yard | yd |

**Time and temperature**

| | |
|---|---|
| day | d |
| degrees Celsius | C |
| degrees Fahrenheit | F |
| degrees kelvin | K |
| hour | h |
| minute | min |
| second | s |

**Physics and chemistry**

| | |
|---|---|
| all atomic symbols | |
| alternating current | AC |
| ampere | A |
| calorie | cal |
| direct current | DC |
| hertz | Hz |
| horsepower | hp |
| hydrogen ion activity (negative log of) | pH |
| parts per million | ppm |
| parts per thousand | ppt, ‰ |
| volts | V |
| watts | W |

**General**

| | |
|---|---|
| Alaska Administrative Code | AAC |
| all commonly accepted abbreviations | e.g., Mr., Mrs., AM, PM, etc. |
| all commonly accepted professional titles | e.g., Dr., Ph.D., R.N., etc. |
| at | @ |
| compass directions: | |
| east | E |
| north | N |
| south | S |
| west | W |
| copyright | © |
| corporate suffixes: | |
| Company | Co. |
| Corporation | Corp. |
| Incorporated | Inc. |
| Limited | Ltd. |
| District of Columbia | D.C. |
| et alii (and others) | et al. |
| et cetera (and so forth) | etc. |
| exempli gratia (for example) | e.g. |
| Federal Information Code | FIC |
| id est (that is) | i.e. |
| latitude or longitude | lat. or long. |
| monetary symbols (U.S.) | $, ¢ |
| months (tables and figures): first three letters | Jan,...,Dec |
| registered trademark | ® |
| trademark | ™ |
| United States (adjective) | U.S. |
| United States of America (noun) | USA |
| U.S.C. | United States Code |
| U.S. state | use two-letter abbreviations (e.g., AK, WA) |

**Measures (fisheries)**

| | |
|---|---|
| fork length | FL |
| mideye-to-fork | MEF |
| mideye-to-tail-fork | METF |
| standard length | SL |
| total length | TL |

**Mathematics, statistics**

| | |
|---|---|
| all standard mathematical signs, symbols and abbreviations | |
| alternate hypothesis | $H_A$ |
| base of natural logarithm | $e$ |
| catch per unit effort | CPUE |
| coefficient of variation | CV |
| common test statistics | $(F, t, \chi^2, \text{etc.})$ |
| confidence interval | CI |
| correlation coefficient (multiple) | R |
| correlation coefficient (simple) | r |
| covariance | cov |
| degree (angular) | ° |
| degrees of freedom | df |
| expected value | $E$ |
| greater than | > |
| greater than or equal to | ≥ |
| harvest per unit effort | HPUE |
| less than | < |
| less than or equal to | ≤ |
| logarithm (natural) | ln |
| logarithm (base 10) | log |
| logarithm (specify base) | $\log_2$, etc. |
| minute (angular) | ' |
| not significant | NS |
| null hypothesis | $H_O$ |
| percent | % |
| probability | P |
| probability of a type I error (rejection of the null hypothesis when true) | $\alpha$ |
| probability of a type II error (acceptance of the null hypothesis when false) | $\beta$ |
| second (angular) | " |
| standard deviation | SD |
| standard error | SE |
| variance | |
| population | Var |
| sample | var |

*TECHNICAL PAPER NO. 313*

## SUBSISTENCE SALMON HARVEST MONITORING REPORT, KUSKOKWIM FISHERIES MANAGEMENT AREA, ALASKA, 2004

by

Jim Simon
Alaska Department of Fish and Game, Division of Subsistence, Fairbanks

Tracie Krauthoefer
Alaska Department of Fish and Game, Division of Subsistence, Anchorage

David Koster
Alaska Department of Fish and Game, Division of Subsistence, Anchorage

and

David Caylor
Alaska Department of Fish and Game, Division of Subsistence, Anchorage

Alaska Department of Fish and Game
Division of Subsistence
PO Box 115526, Juneau, Alaska, 99811-5526

August 2007

Final Report to the U.S. Fish and Wildlife Service, Office of Subsistence Management, Fisheries Resource Monitoring Program, to fulfill obligations for Study No. FIS 04-359 under agreement 701814J335.

The Division of Subsistence Technical Paper Series was established in 1979 and represents the most complete collection of information about customary and traditional uses of fish and wildlife resources in Alaska. The papers cover all regions of the state. Some papers were written in response to specific fish and game management issues. Others provide detailed, basic information on the subsistence uses of particular communities which pertain to a large number of scientific and policy questions. Technical Paper Series reports are available through the Alaska State Library and on the Internet: http://www.subsistence.adfg.state.ak.us/

*Jim Simon,*
*Alaska Department of Fish and Game, Division of Subsistence,*
*1300 College Road, Fairbanks, Alaska 99701-1599 USA*
*and*
*Tracie Krauthoefer, David Koster, and David Caylor,*
*Alaska Department of Fish and Game, Division of Subsistence,*
*333 Raspberry Road, Anchorage, Alaska, 99518-1599 USA*

*This document should be cited as:*
*Simon, J., T. Krauthoefer, D. Koster, and D. Caylor. 2007. Subsistence salmon harvest monitoring report,*
*    Kuskokwim Fisheries Management Area, Alaska, 2004. Alaska Department of Fish and Game, Division of*
*    Subsistence Technical Paper No. 313. Juneau.*

The Alaska Department of Fish and Game (ADF&G) administers all programs and activities free from discrimination based on race, color, national origin, age, sex, religion, marital status, pregnancy, parenthood, or disability. The department administers all programs and activities in compliance with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act (ADA) of 1990, the Age Discrimination Act of 1975, and Title IX of the Education Amendments of 1972.

**If you believe you have been discriminated against in any program, activity, or facility please write**:

ADF&G ADA Coordinator, P.O. Box 115526, Juneau AK 99811-5526

U.S. Fish and Wildlife Service, 4040 N. Fairfax Drive, Suite 300 Webb, Arlington VA 22203

Office of Equal Opportunity, U.S. Department of the Interior, Washington DC 20240

**The department's ADA Coordinator can be reached via phone at the following numbers:**

(VOICE) 907-465-6077, (Statewide Telecommunication Device for the Deaf) 1-800-478-3648, (Juneau TDD) 907-465-3646, or (FAX) 907-465-6078

**For information on alternative formats and questions on this publication, please contact**:

ADF&G, Division of Subsistence, Website: http://www.subsistence.adfg.state.ak.us/

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .................................................................................................................. i

LIST OF TABLES ......................................................................................................................... ii

LIST OF FIGURES ....................................................................................................................... iii

ABSTRACT .................................................................................................................................. 1

INTRODUCTION .......................................................................................................................... 1

The Study Area ........................................................................................................................... 3
Background:  Kuskokwim area Subsistence Salmon Harvest Monitoring .................................... 3
  Program History ...................................................................................................................... 3
    1960-1987 ........................................................................................................................ 3
    1988-2003 ........................................................................................................................ 4
  Regulatory Context .................................................................................................................. 5
    Licenses, Permits, and Harvest Limits .............................................................................. 5
    Fishing Gear ..................................................................................................................... 6
    Subsistence Salmon Fishing Schedule .............................................................................. 6
    2004 Subsistence Salmon Fishing Season ......................................................................... 7
    Subsistence Closures During the Commercial Fishery ....................................................... 7

PROJECT OBJECTIVES ............................................................................................................... 7

HARVEST MONITORING METHODS .......................................................................................... 8

Harvest Calendars ........................................................................................................................ 11
Household Surveys:  Interviews .................................................................................................... 11
Postcard Surveys .......................................................................................................................... 13

2004 SAMPLING SUMMARY ...................................................................................................... 13

Communities and Households Contacted ....................................................................................... 13
  Harvest Calendars .................................................................................................................... 14
  Households Interviews (Surveys) .............................................................................................. 14
  Postcards ................................................................................................................................. 14

2004 Regional Sampling ............................................................................................................... 14
2004 Sampling Compared to 1989-2003 Monitoring Efforts .......................................................... 16

RESULTS OF SUBSISTENCE SALMON HARVEST MONITORING FOR 2004 ........................... 16

Areawide Harvest Estimates Summary, 2004 ................................................................................. 16
  Salmon for Dog Food .............................................................................................................. 17
  Fishing Gear ........................................................................................................................... 17
  Salmon Retained from Commercial Fishing for Subsistence Use ................................................ 18

Regional Harvest Summary, 2004 ................................................................................................. 18
Other Fish Harvested .................................................................................................................... 19
  Bethel Non-Salmon Fish Harvests, 2004 .................................................................................. 19

DISCUSSION AND CONCLUSIONS ............................................................................................ 20

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 58 of 106

Exhibit G
Page 5 of 41

2004 Harvest Estimates Compared to 1989-2003 Subsistence Salmon Harvest Monitoring Estimates....................20
    Areawide Subsistence Salmon Harvest Assessment, 2004 .....................................................................................20

            Chinook Salmon ...........................................................................................................................20
            Chum Salmon ...............................................................................................................................20
            Sockeye Salmon ...........................................................................................................................21
            Coho Salmon ................................................................................................................................21

    Regional Harvest Assessment, 2004 ...................................................................................................................21

            Chinook Salmon ...........................................................................................................................21
            Chum Salmon ...............................................................................................................................22
            Sockeye Salmon ...........................................................................................................................23
            Coho Salmon ................................................................................................................................24

    Interregional Salmon Harvest Composition Comparisons among Species, 2004 ...............................................25

Non-Salmon Fish Harvests .......................................................................................................................................26

RECOMMENDATIONS ...........................................................................................................................................27

    Monitoring Harvests ...........................................................................................................................................27
    Assessment .........................................................................................................................................................28

ACKNOWLEDGEMENTS .......................................................................................................................................29

LITERATURE CITED ..............................................................................................................................................30

APPENDIX A.  HARVEST CALENDAR FOR 2004 .............................................................................................57

APPENDIX B.  KUSKOKWIM AREA VILLAGE SURVEY FORM, 2004 (LOWER RIVER EXAMPLE) .........63

APPENDIX D.  POSTCARD SURVEY FOR 2004 .................................................................................................71

# LIST OF TABLES

| Table | | Page |
|-------|--|------|
| 1. | Kuskokwim area community sampling rates, 2004....................................................................... | 34 |
| 2. | Kuskokwim area harvest monitoring program sampling summaries, 1989-2004. ........................ | 35 |
| 3. | Kuskokwim community harvest monitoring participation, 1989-2004........................................ | 36 |
| 4. | Subsistence salmon harvest by community, Kuskokwim area, 2004. ........................................... | 37 |
| 5. | Estimated and reported subsistence harvest of Chinook salmon, Kuskokwim area, 2004. .......... | 38 |
| 6. | Estimated and reported subsistence harvest of chum salmon, Kuskokwim area, 2004. .............. | 39 |
| 7. | Estimated and reported subsistence harvest of sockeye salmon, Kuskokwim area, 2004. .......... | 40 |
| 8. | Estimated and reported subsistence harvest of coho salmon, Kuskokwim area, 2004. ............... | 41 |
| 9. | Gear types used for subsistence salmon fishing, Kuskokwim area, 2004. ................................... | 42 |
| 10. | Subsistence Chinook salmon gillnet mesh sizes used by residence of communities (number of households). ................................................................................................................................... | 43 |
| 11. | Commercially harvested salmon retained for subsistence use, Kuskokwim area, 2004............... | 44 |
| 12. | Estimated subsistence salmon and non-salmon harvest, Bethel, 2004. ....................................... | 45 |
| 13. | Historic subsistence salmon harvest, Kuskokwim area, 1989-2004............................................ | 46 |
| 14. | Kuskokwim area community subsistence Chinook salmon harvest estimates, 1989-2004........... | 47 |
| 15. | Kuskokwim area community subsistence chum salmon harvest estimates, 1989-2004................ | 48 |
| 16. | Kuskokwim area community subsistence sockeye salmon harvest estimates, 1989-2004............ | 49 |
| 17. | Kuskokwim area community subsistence coho salmon harvest estimates, 1989-2004. ............... | 50 |

# LIST OF FIGURES

**Figure**                                                                                                          **Page**

1. Kuskokwim Management Area commercial fishing districts........................................................................51
2. Bethel non-salmon fish relative harvest contribution by species and pounds usable weight, 2004. ...........52
3. Composition of estimated subsistence salmon harvest, north Kuskokwim Bay, 2004....................................53
4. Composition of estimated subsistence salmon harvest, lower Kuskokwim River, 2004................................53
5. Composition of estimated subsistence salmon harvest, middle Kuskokwim River, 2004.............................54
6. Composition of estimated subsistence salmon harvest, upper Kuskokwim River, 2004...............................54
7. Composition of estimated subsistence salmon harvest, south Kuskokwim Bay, 2004. ...............................55

**Exhibit G**

**Page 7 of 41**

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 61 of 106

# ABSTRACT

This final report documents subsistence salmon harvest estimates for the Kuskokwim Fisheries Management Area for the year 2004, on the basis of surveys in 30 communities along the Kuskokwim River and Kuskokwim Bay, including Nelson Island. Methods used to collect salmon harvest information included household surveys, harvest calendars and postcard surveys; household surveys in Bethel also gathered information on non-salmon fish harvested for subsistence purposes. Data include numbers of salmon harvested for subsistence uses, gear used, numbers of salmon used for dog food, and numbers of salmon retained from commercial catches. Estimates of the subsistence salmon harvest for communities contacted in the Kuskokwim area in 2004 were 85,086 Chinook salmon (*Oncorhynchus tshawytscha*), 55,575 chum salmon (*O. keta*), 34,892 sockeye salmon (*O. nerka*), and 39,406 coho salmon (*O. kisutch*), for a total of 214,959 salmon. These harvest estimates were within, or were higher than, the amounts that the Alaska Board of Fisheries considered reasonably necessary to provide for customary and traditional uses. Compared to 2003 harvest estimates, harvests increased, with the exception of sockeye salmon, demonstrating again the importance of salmon for subsistence in this area. In Bethel, non-salmon fish comprised about 18% of total fish harvested for subsistence. This salmon harvest monitoring research continues to be critical for fisheries managers for their use in planning for adequate salmon escapement and providing continued uses of salmon for subsistence purposes.

Key words: Kuskokwim River, Kuskokwim Bay, Yukon-Kuskokwim Delta, Bethel, subsistence, salmon harvest monitoring, Chinook, *Oncorhynchus tshawytscha*, coho, *Oncorhynchus kisutch*, pink, *Oncorhynchus gorbuscha*, chum, *Oncorhynchus keta*, sockeye, *Oncorhynchus nerka*.

# INTRODUCTION

This report presents the results of the subsistence salmon harvest monitoring program in the Kuskokwim Fisheries Management Area for the 2004 salmon fishing season, following the methods established by Alaska Department of Fish and Game (ADF&G), Division of Subsistence (Subsistence) in 1988 and 1989 (Francisco et al. 1989; Walker and Coffing 1993).

The Kuskokwim area (Figure 1) subsistence salmon fishery is one of the largest in the state in terms of amounts harvested. From June through October, the daily activities of many Kuskokwim area households revolve around harvesting, processing, and preserving salmon for "customary and traditional uses," or subsistence. The movement of families from permanent winter residences to summer fish camps situated along rivers and sloughs continues to be very important in annual subsistence harvest efforts.

The significance of salmon and other fish harvested and used for subsistence in this area is well documented by ADF&G Subsistence studies in the region. They indicate that fish contribute 68% to 85% of the total pounds of fish and wildlife harvested in a community; salmon contribute 49% to 53% of the total annual wild food harvest. The harvest of salmon for subsistence ranges from 241 lbs usable weight per capita in some communities (e.g., Nunapitchuk, 1983) to 446 lbs (e.g., Kwethluk, 1986) and 649 lbs (e.g., Akiachak, 1998) per capita in other Kuskokwim River communities (e.g., Andrews 1989, 1994; Coffing 1991; Coffing et al. 2001; see also Community Subsistence Information System [CSIS] [ADF&G 2007]). Kuskokwim area communities are heavily reliant upon the annual returns of salmon, not only for basic nutrition, but also for maintenance of cultural identity and cultural values, in addition to economic opportunities for commercial sales (e.g., Andrews 1989:154; Andrews and Coffing 1986; Barker 1993; Coffing 1991; Fienup-Riordan 1990:184ff, 1994:120, 123; Himmelheber 1987:32; Oswalt 1963a, 1963b, 1990; Pete 1993; Senecal-Albrecht 1990, 1998; Walker and Coffing 1993; Wolfe et al. 1984).

The significance of subsistence salmon fisheries to residents of the Kuskokwim Management Area becomes much more obvious when compared to estimates of U.S. per capita salmon

consumption. For example, Professor Gunnar Knapp of the University of Alaska's Institute of Social and Economic Research, has estimated U.S. salmon consumption in 1990 at less than 1 lb per person, increasing during the 1990s to almost 2 lbs per person in 1999 (Knapp 2000). The U.S. National Marine Fisheries Service estimated the U.S. consumption of fishery products (not just salmon) at 17 lbs of edible meat per person in 2004 (U.S. National Marine Fisheries Service 2005).

Between 1989 and 2003, an average of 1,443 households annually subsistence fished for salmon, representing an average of 39% of the estimated total households in the Kuskokwim Management Area. In 2004, an estimated 1,503 households subsistence fished for salmon (Table 1). Many people not directly involved in harvesting salmon assisted family and friends with cutting, drying, smoking, and other associated preservation activities, such as salting, canning, and freezing. Annual household subsistence surveys, like the 2004 harvest survey reported in this publication, gather summary harvest data on Chinook salmon (*Oncorhynchus tshawytscha*), chum salmon (*O. keta)*, sockeye salmon (*O. nerka*), and coho salmon (*O. kisutch*), including numbers of fish of each species harvested and types of fishing gear. Because of the relatively low harvest of pink salmon (*O. gorbuscha*), data on this species have not been collected (Walker and Coffing 1993:58).

The results of these surveys are important for state and federal fisheries management to plan for adequate salmon escapement and continued uses of salmon for subsistence purposes. In those streams of the Kuskokwim Management Area in which no commercial fishing occurs, subsistence salmon harvest estimates provide information on the exploitation of salmon runs to those particular streams. Without estimates of subsistence salmon harvests, fishery managers are not able to estimate escapement for those streams.

Data on non-salmon fish harvests have been collected intermittently in various parts of the Kuskokwim Management Area, but are not a standard component of the annual harvest monitoring program. For example, surveys on subsistence-caught Pacific herring (*Clupea pallasi*) were conducted in the mid-1980s through the early 1990s in the Nelson Island region (Pete 1984, 1989, 1991a, 1991b, 1992). Non-salmon fish harvest estimates also have been provided for communities such as Kwethluk (Coffing et al. 2001), Nunapitchuk (Andrews 1989, 1994; Coffing 1991), Akiachak, Nikolai, McGrath, Telida, and Takotna (Stokes 1985), and Goodnews Bay and Quinhagak (Wolfe et al. 1984) from community baseline surveys conducted in the Kuskokwim region in the 1980s and 1990s. More recently, studies have documented non-salmon fish harvests by residents of Lake Minchumina and Nikolai (Holen et al. 2006), Aniak (Coffing et al. 2003), Bethel (Simon et al. 2007), and both Aniak and Chuathbaluk (Krauthoefer et al. 2007). Some additional information was collected in 2004 on subsistence harvests of freshwater and anadromous non-salmon fish by residents of Bethel.

Information on specific salmon harvest locations has not been annually collected, although ADF&G Subsistence research conducted largely in the 1980s documented harvest location information for a number of Kuskokwim area communities (e.g., Andrews 1989; Brelsford et al. 1987; Coffing 1991; Coffing et al. 2001, 2003; Charnley 1982, 1984; Kari 1983, 1985; Pennoyer et al. 1965; Pete 1984, 1989, 1991a, 1991b, 1992; Stickney 1981; Stokes 1982, 1985; Williams et al. 2005). Rather, the annual Kuskokwim salmon harvest monitoring program focused on estimating total community harvests, with some recent exceptions. For example, limited information on harvest locations and fishing gear has been collected from Aniak and Bethel fishers in recent years (cf. Coffing et al. 2003; Krauthoefer et al. 2007). Despite the absence of

data on specific harvest locations, general harvest areas regularly used by residents of various Kuskokwim area communities are characterized below to provide a context for patterns of subsistence salmon harvests in the region.

## THE STUDY AREA

There are 38 communities in the Kuskokwim Management Area. In 2004, the total number of estimated households in these 38 communities was approximately 4,670 (Table 1). Most (77%) are situated within the Kuskokwim River drainage.

Residents in Bethel, the largest community in the region with approximately 1,874 households in 2004, typically harvested salmon from the Kuskokwim River.

Residents of the northern Kuskokwim Bay communities of Kwigillingok, Kongiganak, and Kipnuk, which together had roughly 354 households in 2004, harvested salmon primarily from the Kuskokwim River, but may have also harvested salmon from coastal areas and local tributaries (Himmelheber 1987:7; Stickney 1984:60-61; Walker and Coffing 1993:1).

Residents of Quinhagak, Goodnews Bay, and Platinum, located along the southern shore of Kuskokwim Bay (approximately 227 households in 2004), harvested salmon primarily from the drainages of the Kanektok River, Arolik River, and Goodnews River (e.g., Wolfe et al. 1984:321-322; Walker and Coffing 1993:1).

The Bering Sea coastal communities of Newtok, Tununak, Toksook Bay, Nightmute, and Chefornak (composed of approximately 435 households in 2004), and the village of Mekoryuk (79 households in 2004), located on Nunivak Island, harvested salmon from local rivers and coastal waters, which likely included coastal stocks as well as mixed stocks that were not bound for the Kuskokwim River (e.g., Fienup-Riordan 1983:112; Walker and Coffing 1993:1).

## BACKGROUND: KUSKOKWIM AREA SUBSISTENCE SALMON HARVEST MONITORING

### Program History

#### 1960-1987

Data on the subsistence harvest of salmon from the Kuskokwim Management Area have been collected by ADF&G annually since 1960 using a variety of methods. The Division of Commercial Fisheries (CF) began conducting subsistence salmon harvest surveys among Kuskokwim River fishers in the early 1960s; surveys were subsequently broadened to include the southern Kuskokwim Bay communities of Quinhagak in 1967 and Goodnews Bay and Platinum in 1979. The Division of Commercial Fisheries first developed harvest estimates through "smokehouse counts" conducted immediately following the Chinook salmon run (e.g., Jonrowe et al. 1979). For example, the CF 1969 "Annual Management Report" presented a discussion of how subsistence salmon harvest was documented along the Kuskokwim River:

> The annual survey of the Kuskokwim River subsistence fishery was initiated in 1960. During July and August a Department crew surveys all villages and fish camps from Eek to the fish camps at Swift River belonging to residents of Stony River . . . catch calendars for May through September are mailed to all known families who fish for subsistence purposes in the Kuskokwim River . . . survey methods have changed somewhat over the past few years and the present method, used since 1968, is thought to be the most

3

accurate and comprehensive means of coverage of the subsistence fishery (Regnart et al. 1970:25).

Information was obtained from families who were known to fish through harvest calendars and household interviews conducted immediately after the Chinook salmon run; the coho salmon harvest was incompletely documented. Prior to 1985, subsistence salmon catches were lumped into one of two categories: "king salmon" and "small salmon" (e.g., Walker and Coffing 1993:49).

The total number of fishing households in a particular community was estimated by comparing the average harvests of households known to fish with the estimated total number of fishing households (see discussion in Walker and Coffing 1993:35). However, during 1983, 1984, 1986, and 1987, funding was insufficient to conduct surveys in all Kuskokwim Management Area communities; instead, subsets of villages were sampled and then these data were expanded to produce an estimate of the salmon harvests by other Kuskokwim area communities. For example, in 1987, due to budget shortfalls, CF researchers were able to interview only those Kuskokwim River drainage fishing families who were available in the first two weeks of August (425 households). These results were expanded to produce an estimate of the total Chinook salmon catch based on previous years' harvests (Francisco et al. 1988: 28). Therefore, while subsistence salmon harvest information from 1960 to 1988 is available, the data are not necessarily comparable from year to year because the statistical methods used to expand the harvest data and produce total harvest estimates of Kuskokwim area salmon were not fully documented (Andrews and Coffing 1986; Walker and Coffing 1993:5).

**1988-2003**

The Division of Subsistence assumed responsibility for the annual subsistence salmon harvest monitoring program in the Kuskokwim Management Area in 1988, under an agreement with the Division of Commercial Fisheries, and has collected and analyzed the data since then. Survey methods were refined during the 1988 field season through the development of a comprehensive community household database, as described in the 1988 "Annual Management Report for the Kuskokwim Management Area" (Francisco et al. 1989:7):

> This database identified households residing in the study communities and was developed from three sources. First, households identified as "fishing families" in 1987 by the Division of Commercial Fisheries were added to the database. A fishing family represented at least one household unit, but more in some cases. These households were the basis of sampling and estimation of subsistence salmon harvests for the Kuskokwim Area during recent years. Second, any household which had returned Kuskokwim River subsistence salmon catch calendars between 1981 and 1986 was also added. Some attempt was made to eliminate obvious duplications and to associate households with the community in which they were last known to have lived. Finally, researchers within the Division of Subsistence provided community census lists which were used during the course of the surveys conducted during the last few years (Francisco et al. 1989:7).

Subsistence salmon harvests are estimated based on the total number of households in a community, not just the number of fishing households as in the previous method. Not only are households that "usually fish" tracked on an annual basis, but households that "usually do not fish" are also tracked annually as well as sampled during postseason harvest monitoring activities. This stratified method of estimating total community harvests results in more

4

complete data for all salmon species harvested for most communities in the Kuskokwim Management Area (see discussion in the "Methods" section, below). Walker and Coffing (1993) compared this new method with the previous method and found that the earlier method significantly overestimated subsistence salmon harvests, due likely to the overemphasis on fishing households in the reporting of harvest information. While the degree of reliability was greater for some salmon species harvested and for certain fishing areas, levels of confidence for estimated total salmon harvests in 1989 were within 7% of the estimated totals (Walker and Coffing 1993:58; see Walker and Coffing 1993 for more discussion on this methodological analysis).

In 1989, the postseason survey was refined further to produce more accurate estimates of the total number of the different salmon species harvested for subsistence uses (e.g., Francisco et al. 1990:5; Walker and Coffing 1993). The timing of the postseason household surveys shifted from July and August to October and November, after the coho salmon run, which is the last salmon run of the season. Subsistence and CF "determined that the later survey timing was necessary to get more complete catch data, particularly on coho salmon" (Francisco et al. 1990:5). Harvest monitoring program methods are described in more detail below.

While Subsistence assumed responsibility in 1988 for operating the Kuskokwim postseason subsistence salmon harvest monitoring program, CF continued to provide funding support to operate the program due to the importance of the data for salmon management. Beginning July 1, 2003, however, CF eliminated funding support for the survey program as a result of budget reductions. Subsistence continued the program for the 2003 and 2004 salmon fishing seasons primarily with funds from U. S. Fish and Wildlife (FWS) Fisheries Resource Monitoring Program (FRMP) as well as with special, one-year funding from the Arctic-Yukon-Kuskokwim Sustainable Salmon Initiative (AYK SSI).

## Regulatory Context

Under federal regulations, individuals must be Kuskokwim-area residents to participate in the Kuskokwim subsistence salmon fishery. Under state regulations, fishers must be Alaskan residents for the preceding 12 months before harvesting salmon for subsistence use. Prior to 1990, there were additional restrictions related to the state's rural priority for subsistence, which subsequently was determined by the Alaska Supreme Court to be unconstitutional (e.g., Francisco et al. 1989:5). As a result, the federal government established the federal subsistence program to provide continuing subsistence uses for qualified rural residents on applicable federal public lands and in applicable federal public waters. Most subsistence salmon fishers in the region continue to be primarily Kuskokwim area residents, but some who are domiciled in other parts of Alaska return annually to assist family or friends harvest or process salmon.

### Licenses, Permits, and Harvest Limits

Licenses and permits have never been required under state or federal subsistence salmon fishing regulations in the Kuskokwim area. However, there are restrictions on the methods and means of salmon harvest, and, in a few cases, there are also seasonal bag limits. Under state regulations, for example, from June 1 through August 31, hook and line subsistence fishers upstream of Doestock Creek on the Aniak River are limited to a combined daily bag limit of six fish. No more than three of these may be salmon, and no more than two of those may be Chinook salmon; further, neither chum salmon nor rainbow trout (*O. mykiss*) may be retained (5 AAC 01.295). Otherwise, there are no restrictions on the number of salmon that may be

harvested by individual fishers or households for subsistence uses in the Kuskokwim Management Area. In the absence of permits that track harvest data, subsistence salmon harvest information is collected through other harvest monitoring methods. Community and household participation in the harvest monitoring effort continues to be voluntary.

**Fishing Gear**

In 2004, under both state and federal regulations, salmon could be harvested for subsistence use by set and drift gillnets, beach seines, fish wheels, and hook and line attached to a rod or pole, or "rod and reel." Spears could be used only in the drainages of the Holitna, Kanektok, Arolik, and Goodnews rivers. A set or drift gillnet could not exceed a total length of 50 fathoms (300 feet). Gillnets used for harvesting salmon could have any size mesh. However, nets with 6-inch or smaller mesh could not be more than 45 meshes deep, and nets with mesh greater than 6 inches could not be more than 35 meshes deep. Fishers were required to have their names and addresses attached to their gillnets and fish wheels.

**Subsistence Salmon Fishing Schedule**

Following declines in Chinook and chum salmon returns to the Kuskokwim River beginning in 1997, and, in anticipation of poor returns in 2001, the Alaska Board of Fisheries (BOF) designated both species as stocks of concern (specifically, "yield concerns") under the "Policy for the Management of Sustainable Salmon Fisheries" (5 AAC 39.222) in September 2000. To guide the department in the management of these stocks of concern, the Board replaced the "Kuskokwim River Salmon Management Plan" in January 2001 with the "Kuskokwim River Salmon Rebuilding Management Plan" (Rebuilding Plan) (5 AAC 07.365). Under the Rebuilding Plan, Kuskokwim River salmon stocks are to be managed conservatively, especially for the months of June and July. The Federal Subsistence Board (FSB) adopted this designation and Rebuilding Plan in 2001.

The Rebuilding Plan provides direction for implementing a subsistence fishing schedule, which allows salmon net (with mesh size greater than 4 inches) and fish wheel fisheries to operate for four consecutive days per week in June and July, as announced by emergency order (EO), and implemented in association with salmon run-timing in a step-wise progression upstream. The subsistence fishing schedule is based on run strength, and is regulated by EO to achieve escapement goals. Once escapement goals are projected to be met for Chinook and chum salmon, subsistence fishing can be allowed seven days per week.

State and federal fisheries representatives polled communities throughout the Kuskokwim River drainage in 2001 for guidance on which three days would be the most desirable for the subsistence fishing closures. Based on community response, the recommendation of the Kuskokwim River Salmon Management Working Group (Working Group) was to close the Kuskokwim River to subsistence net and fish wheel fisheries Sunday, Monday, and Tuesday. Subsistence fishing with a hook and line attached to a rod or pole, or "rod and reel," was not included in this schedule, nor were Kuskokwim Bay subsistence salmon fisheries. It is important to note, however, that subsistence salmon fishing prior to 2001 also adhered to a schedule: there were subsistence closures 16 hours before, 16 hours during, and 6 hours after commercial fishing periods (e.g., ADF&G 2001:46; ADF&G 2002:50).

**2004 Subsistence Salmon Fishing Season**

In 2004, the Kuskokwim River subsistence salmon fishing schedule began June 6 in District 1 (the lower Kuskokwim River), which extended from the mouth of the Kuskokwim River upstream to Bogus Creek, which is 9 miles upstream of Tuluksak, and which included the Eek, Kwethluk, Kisaralik, Kasigluk, and Tuluksak salmon spawning tributaries (Figure 1). On June 13, the schedule was expanded to District 2, which included all waters downstream of Chuathbaluk. There were no subsistence salmon fishing restrictions upstream of Chuathbaluk in 2004.

During the subsistence salmon fishing closures on the lower Kuskokwim River, fishing for fish other than salmon was allowed only with hook and line gear and with gillnets that had 4-inch or smaller mesh and that were 60 feet or less in length. However, subsistence salmon fishing regulations did not apply to fishing for fish other than salmon in non-salmon tributaries 100 yards upstream from their confluences with the Kuskokwim River. Non-salmon tributaries include the Gweek, Johnson, Kinak, Kialik, and Tagayarak rivers (ADF&G 2004).

Based on a recommendation from the Working Group, state and federal managers established a seven-day-per-week subsistence fishing schedule on June 20, when salmon run strength was anticipated to be large enough to meet escapement goals.

**Subsistence Closures During the Commercial Fishery**

In January 2004, the Alaska Board of Fisheries granted ADF&G discretionary EO authority to close the subsistence salmon fishery before and after commercial salmon fishing periods in Districts 1 and 2. Prior to this action, areas within commercial salmon fishing districts were closed to subsistence salmon net and fish wheel gear 16 hours before, 16 hours during, and 6 hours after commercial fishing periods as described in 5 AAC 01.260. Many fishers participating in the Kuskokwim commercial fisheries were area residents who also subsistence fished. The intent of these closures was to discourage illegal fishing activity, such as the sale of subsistence-caught salmon in the commercial fishery.

On June 28, 2004, the Department issued an EO that decreased the duration of subsistence closures associated with commercial fishing in District 1 to 6 hours before, 6 hours during, and 3 hours after commercial fishing periods. The purpose of this EO was to allow adequate opportunity for fishers to subsistence fish during the commercial fishing season. The specific waters closed to subsistence fishing varied district to district.

In 2004, there were 26 commercial fishing periods in District 1. Four periods occurred between June 30 and July 7, during which fishers harvested Chinook salmon, chum salmon, and sockeye salmon. Subsistence fishing was subject to the June 28, 2004, EO (see above). Twenty-two commercial periods targeting coho salmon occurred in District 1 between July 28 and September 8. There were also weekly scheduled commercial periods and associated subsistence fishing closures in both District 4 (Quinhagak) and District 5 (Goodnews Bay and Platinum) from June through September.

# PROJECT OBJECTIVES

This study addressed the following research objectives:

1. Determine the total number of households in each community within the Kuskokwim Fisheries Management Area.

2. Identify the number of households that harvested salmon as well as the number of households that did not harvest salmon for subsistence use.

3. Estimate the number of Chinook salmon, chum salmon, sockeye salmon, and coho salmon harvested for subsistence use by each community.

4. In Bethel and Aniak, estimate the amount and species of non-salmon fish harvested.

5. Update the community household lists so that subsistence fishing households can be mailed subsistence salmon harvest calendars the following season.

6. Identify the types of salmon fishing gear used by residents.

7. In Bethel and Aniak, identify harvest locations used when fishing with hook and line gear through the ice and also in open water.

Five of the seven objectives were met. However, Aniak non-salmon fish harvest information was not collected and harvest locations for hook and line gear were not collected in Bethel or Aniak. Reasons for this are addressed in the "Discussion" section of this report.

# HARVEST MONITORING METHODS

The Division of Subsistence conducts an annual postseason harvest monitoring program to document the majority of Kuskokwim River subsistence salmon harvests using the individual household as the primary unit of data collection (see "Background" discussion, above). Community subsistence harvest monitoring research uses a household survey instrument as the primary means of collecting data, although some data are also gathered through harvest calendars and postcard surveys. Households in the Kuskokwim Management Area are assigned a "household identification number" (HHID) to aid in tracking an individual household's subsistence harvest over time. Household level data remain confidential, and household participation is voluntary. Household data are analyzed to develop estimates of subsistence salmon harvests by each participating community in the Kuskokwim Management Area. If no households are contacted in a community, then a community estimate is not developed.

Harvest information collected from postseason surveys is compared to harvest calendars. If a household was surveyed and also returned a harvest calendar, the reported harvest in the postseason survey is used for estimating total harvest. Where double information exists (postseason survey and harvest calendar), harvest calendars provide harvest timing data only. If a harvest calendar was returned for a household not surveyed, the calendar data are used for estimating household harvest. If a calendar could not be matched to a household, only the harvest timing information is used. In the rare instance that data are collected on both calendars and postcard surveys, project analysts manually assess whether this information can be combined, or whether one source of information should supersede the other (Walker *in prep*).

The development of community subsistence harvest estimates for the Kuskokwim Management Area relies upon a stratified sampling design which categorizes a community's households into two strata: "usually fish" and "usually do not fish." This is done to improve precision by ensuring that known fishing households are contacted without violating the "random sample" assumption (Walker and Coffing 1993:12).

Stratification is updated annually. Based on knowledge of a household's fishing activities from previous years' surveys, survey technicians, in consultation with community representatives,

place households in the "usually fish" stratum immediately if they have fished in the most recent survey year. Households are placed in the "usually do not fish" stratum immediately if they had not fished during each of the most recent three consecutive survey years. Households that have not fished in two of the past three years are placed in the "usually do not fish" stratum unless additional household harvest history implies the household is most appropriately assigned to the "usually fish" stratum. Households that are surveyed for the first time are asked to identify if their household usually fishes or does not fish for subsistence salmon, and are placed accordingly in the appropriate stratum (Walker *in prep*).

The harvest information collected from households allows researchers to calculate for particular communities: 1) the mean household harvest for each species of salmon, and 2) the total community harvest estimate of each species of salmon as well as for all salmon combined. If no households are contacted in a particular community, then no community estimate is developed.

The mean household harvest is calculated by adding the combined reported harvests of a particular resource by all the surveyed households, R, in a particular stratum, k, and dividing that total by the number of surveyed households, n, in each stratum, as expressed by the following formula:

$$\overline{h}_k = \frac{\sum R_k}{n_k} \tag{1}$$

Estimates are computed independently for each stratum and then summed to develop a single community subsistence salmon harvest estimate. Total community estimates, E, are extrapolated by the application of weighted means: mean household harvest calculations are weighted based upon the size of the samples, n (e.g., Cochran 1977), as illustrated in the following formula:

$$E_{i,j} = \sum_{k=1}^{2} \left( \left( \frac{N_{i,k}}{n_{i,k}} \right) R_{i,j,k} \right) \tag{2}$$

where j represents species of salmon harvested by a particular community, I; and E is the estimated harvest; R represents the reported harvest; N represents the total number of households in the stratum; n equals the number of sampled households in the stratum; and k represents each of the two strata, "usually fish" and "usually do not fish" households (see also Brown et al. 2005:211, where these methods were previously identified). The estimated total community harvest of all species is a summation of each individual species.

When applying this method of expansion, the project information manager requires that the sample size be at least 30 households or be greater than 50% of the total number of households assigned to the stratum. Subsistence harvest data are not normally distributed; as a result, these rules are applied to ensure that sample sizes are large enough to assume the data approximate a normal distribution. This assumption allows computation of a confidence interval for the estimate. When the sample size is not large enough to compute a confidence interval, no expansion is done because there is no measure for its accuracy; as a result, only reported harvests

are presented in these cases. The rule of 30 households comes from the Central Limit Theorem.[1] In cases where the community is too small for the Central Limit Theorem to apply, the rule of 50% is applied. In study years subsequent to the development of this analysis methodology (Walker and Coffing 1993), the 30 household rule was presumably created based upon known community characteristics. The Division of Subsistence intends to revisit the application of this rule as part of a larger departmental review of subsistence fisheries harvest monitoring programs.

The step-by-step process by which subsistence salmon harvest estimates are produced can be recapitulated as follows:

1. Each species of salmon harvested is computed separately by stratum and community.

2. The total number of households sampled in the stratum is verified to be either greater than 30, <u>or</u> the sample is verified to have more than 50% of the households in the stratum.

3. If step 2 is verified, the <u>total</u> number of households in a stratum is multiplied by the average harvest of that stratum. If step 2 is not verified, then the number of <u>sampled</u> households is instead multiplied by the average. This is done for each stratum in a community, and for each community for which harvest data are obtained.

4. The two stratum estimates are summed for each species and for each community.

5. The individual species estimates are summed in order to arrive at the total salmon harvest estimate for each community.

6. If no household harvest data were obtained for a community, then a community estimate is not developed, since total area estimated harvest amounts do not include communities lacking household harvest data.

The principal assumption associated with extrapolating harvest estimates is that the portion of the community not sampled has the same distribution of successfully harvesting households as the portion of the community that was sampled. The reason this assumption is proven is that researchers are careful to ensure that households that participated in group harvest activities have their portion of the harvest counted separately. The missing values associated with unsurveyed households are replaced with the sample mean of the stratum to which they belong. This allows the sample harvest to be expanded to estimate the total harvest of the entire community. The estimate is always calculated after the data have been summed to the stratum level. Using the standard deviation for each stratum, it is also possible to develop confidence intervals and measures of variance. If a confidence interval is required for the entire community, the variance of each stratum is calculated using the formula below.

$$V_i = \frac{1}{N_i^2} \sum_{k=1}^{2} N_k (N_k - n_k) \frac{S_k^2}{n_k} \qquad (3)$$

Where $V_i$ is the variance for community i; $N_i$ is the total number of households in the community; $N_k$ is the total number of households in stratum k; $n_k$ is the sampled households in stratum k; and $S_k^2$ is the variance for stratum k.

---

[1] Further details about the Central Limit Theorem may be found in Box et al. 1978.

## HARVEST CALENDARS

In May 2004, subsistence salmon harvest calendars were mailed to all Kuskokwim Management Area households that had been identified as "usually fish" and to those that fished the previous season (see Appendix A). This included 2,199 households; 275 returned their calendars, which represented a return rate of 13% (Table 1).

Three similar harvest calendars were designed to record the daily catches of each salmon species harvested for subsistence. Communities along the Bering Sea coast; north Kuskokwim Bay; and lower, middle, and upper Kuskokwim River areas (as far upstream as Stony River) received one edition of the calendar. A second edition was sent to the remaining households in the upper Kuskokwim River drainage. The third edition was sent to households in Quinhagak, Goodnews Bay, and Platinum. The calendars captured information on species availability, salmon run timing, and seasonal timing of subsistence fishing activities. They were mailed to post office boxes when addresses were available; otherwise, calendars were sent via general delivery to the post office clerk for distribution. Each calendar was postage-paid and return-addressed to the Division of Subsistence office in Bethel. Completed subsistence salmon harvest calendars that had not been returned to the department, if available, were collected during household interviews.

## HOUSEHOLD SURVEYS: INTERVIEWS

The primary method of collecting subsistence salmon harvest information in 2004 was postseason household interviews (see Appendix B). In 2004, 2,297 Kuskokwim area households were surveyed; Bethel households (956) were 42% of the interviewed households (Table 1).

Surveyors traveled to communities and conducted house-to-house interviews with residents about their fishing efforts. Kuskokwim communities were grouped into four categories based on geographic location: 1) lower Kuskokwim, 2) middle Kuskokwim, 3) upper Kuskokwim, and 4) Bering Sea coast. Color-coded forms were used to survey the majority of the communities. Except for local names used for the salmon species, identical survey questions were asked in each region. This survey also asked questions to clarify gear types used for subsistence harvesting and the salmon harvest from each gear type. Bethel surveys also included questions about subsistence harvest of non-salmon species (see Appendix C).

In 2004, Subsistence researchers and technicians conducted house-to-house interviews in 30 communities (Table 2). As has been true since 1991, Kasigluk, along with Kipnuk and Kwigillingok, did not consent to participate in the survey program in 2004 (Table 3). However, for the first time in the history of the program, household salmon surveys were conducted in the Nelson Island community of Toksook Bay. This community was added in order to begin to develop baseline salmon harvest information from Nelson Island and the central Bering Sea region.

The Division of Subsistence implemented the postseason subsistence salmon harvest monitoring program from 1988 to 1998 without the involvement of other Kuskokwim area organizations. Then, in 1999, the Orutsararmiut Native Council (ONC) began surveying Bethel households in partnership with ADF&G, using federal funding administered through the Alaska Department of Community and Regional Affairs (Burkey et al. 2000). Since then, ONC has continued Bethel household surveys with funding received from the FRMP (e.g., Study No. FIS 00-009, Study No. FIS 01-024, Study No. FIS 04-359). The Kuskokwim Native Association (KNA) began

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 72 of 106   Exhibit G
Page 19 of 41

conducting annual household harvest surveys in Aniak in 2002 (Coffing et al. 2003; Ward et al. 2003), and has continued to do so since, again in partnership with ADF&G and with funding received from FRMP (e.g., Study No. FIS 02-036, Study No. FIS 04-359). Subsistence staff continues to conduct the household surveys in most Kuskokwim Management Area communities (other than the communities of Bethel and Aniak). In recent years, this annual harvest monitoring program has been largely funded by FRMP.

Orutsararmiut Native Council hired two survey technicians to conduct house-to-house surveys in Bethel in 2004. Similarly, KNA received funding through this project to hire technicians for postseason surveys in Aniak. Subsistence trained the technicians for both projects and oversaw their survey efforts. Data collected by both ONC and KNA followed methods and protocols developed by Subsistence. Project funds received through the FRMP were, and continue to be instrumental in supporting such capacity-building efforts.

In 2004, interviews in the Kuskokwim Management Area communities occurred over two months, beginning in early October. By this time, most residents had completed salmon fishing for the season and most hunters had returned from fall moose and caribou hunts. Communities in which residents usually harvest salmon through October were surveyed in November. Prior to beginning community surveys, efforts were made to inform and prepare residents for the arrival of surveyors. This was done weeks or days in advance through letters to city, tribal, or traditional council offices; radio announcements; posters placed in public buildings; and telephone calls to community officials. Prior to traveling to each community, surveyors identified households that had already returned their salmon harvest calendars.

Upon arrival in a community, the surveyors introduced themselves to local community officials and outlined their task. Household checklists were used to identify residents to contact for surveys. Each checklist included all known households in the community, identified those households that were reported to have subsistence fished for salmon during the previous year (2003), and indicated which households were mailed 2004 harvest calendars. Knowledgeable individuals in the community helped to update the community household list, identified households that "usually fish" and households that "usually do not fish," and households that subsistence fished for salmon in 2004. Following review of the household list with community officials, surveyors began the door-to-door survey.

Attempts were made to contact all households in each community, and, in particular, those households identified as "usually fish" or known to have fished for salmon for subsistence use during 2004. Time spent on community surveys varied from one-half to two days per community, depending on community size, with the exception of Bethel, the largest community with the largest number of subsistence salmon fishers in the area.

In Bethel, house-to-house interviews were conducted over an 11-week period. Unlike other communities, Bethel had no agency or organization that could provide a current household list. While Subsistence often uses Alaska Permanent Fund Dividend (PFD) applications to generate household lists, these data are not sufficient to provide a household list for Bethel due to the high level of transience in that community: 35% between 2001 and 2002, for example (Walker *in prep*:13). A map of the community, originally developed by the Bethel Fire Department, was used to identify household street addresses and to organize survey efforts according to housing subdivisions. All Bethel households identified through previous surveys, as well as those that had returned harvest calendars, were categorized by subdivision. Each of the two surveyors was

then assigned responsibility for specific subdivisions. As with the smaller communities, an effort was made to contact every occupied household in Bethel.

## POSTCARD SURVEYS

The third method of collecting subsistence salmon harvest information was postcard surveys that collected data on how many salmon of each species were caught for subsistence, the type of fishing gear used, and each household's qualitative evaluation of the subsistence fishery (see Appendix D). The return portion of the postcard was postage-paid and addressed to the Division of Subsistence in Bethel. Postcard surveys were the primary method for obtaining harvest data from households in Newtok, Tununak, Chefornak, and Nightmute, as well as from households in Kuskokwim area communities where there was no face-to-face contact. In 2004, 265 households in the region were mailed postcard surveys; 81 were returned, which represented a good return rate (31%) compared with previous years (Table 1). No postcards were distributed in Bethel or Aniak in 2004 because household surveyors were conducting face-to-face interviews.

# 2004 SAMPLING SUMMARY

## COMMUNITIES AND HOUSEHOLDS CONTACTED

At least some form of contact was made in 2004 in the 38 communities located in the Kuskokwim Management Area, although this contact was limited to a small number of returned postcards for a number of communities (Table 1). During the 15-year period from 1989 to 2003, the average number of Kuskokwim area communities contacted was 34, and ranged from a low of 29 communities contacted in 1995 to a high of 38 in 2004, which is the only year since 1989 when some form of contact occurred with each Kuskokwim Management Area community (Table 2).

Of an estimated 4,670 households in the Kuskokwim Management Area in 2004, contact was made with a little more than one-half (2,432 households, or 52%), through a combination of household surveys, returned calendars and/or postcards (Table 1).[2] Relative to household contact rates during the previous 15 years of the monitoring program, the number of households contacted during the 2004 survey season was typical: an average of 2,087 Kuskokwim area households were contacted annually between 1989 and 2003, representing an average contact rate of 56% during this 15-year period (Table 2).

Of the 2,432 households contacted in 2004, harvest data were obtained from 2,396 households, which included those households that fished and those that did not fish, which represented a high degree of cooperation from community residents. The remaining 36 contacted households did not provide any fishing or harvest data, returning only address and household demographic information. Based on community and household participation in the survey, 1,503, or nearly one-third (32%), of total estimated Kuskokwim area households were identified as having subsistence fished for salmon in 2004 (Table 1), which is consistent with the 15-year annual average of 1,443 households estimated to have subsistence fished in the Kuskokwim

---

[2] In many instances, households that returned calendars were also surveyed in person. However, the numbers under "Total Contacts" in Table 1 are not a summation of the total number of calendars returned, postcards returned, and households surveyed since a household is only counted once as a contact.

Management Area, or an average of 39% of area households annually from 1989 to 2003 (Table 2).

**Harvest Calendars**

Thirteen percent (275) of the 2,199 subsistence salmon harvest calendars mailed in 2004 were returned or were obtained during household surveys (Table 1). The recent 5-year average (1999-2003) return rate of harvest calendars is 14%, with a mean of 274 returned calendars. The return rate ranges from a low of 12% in 2001, when 290 calendars were returned, to a high of 17% in 1999, when 252 calendars were returned. The 15-year average harvest calendar return rate is 15%, with an average of 270 calendars returned (Table 2).

**Households Interviews (Surveys)**

Of the 38 communities in the Kuskokwim Management Area, household surveys were conducted in 30 (79%) in 2004 (Table 2). Compared to the previous 15 years of monitoring program data, the 2004 survey effort was exceptional. In no other year were household surveys conducted in 30 communities: the 15-year average is 26 communities, or 68% of area communities (Table 2).

In 2004, 2,297 Kuskokwim-area households were interviewed, including 956 households in Bethel, which represented 42% of the total survey sample (Table 1). Compared to the 15-year average of 1,463 households interviewed, the 2004 survey effort was significant, as it was the third largest number of households interviewed in any single year since 1989; the only years when more household surveys were conducted were 2000 and 2002. It is important to note, however, that the average number of households interviewed from 1989-1998 was only 1,040 (Table 2). In 1999, the Kuskokwim subsistence salmon harvest monitoring program was expanded to include household surveys of all Bethel households, whereas Bethel salmon harvests had previously been estimated based upon postcard returns or telephone surveys alone. The result was a dramatic increase in the number of Kuskokwim area households surveyed: between 1999 and 2003, the average number of households surveyed annually increased to 2,308 households, more than double the average number of households surveyed between 1989 and 1998 (Table 2).

**Postcards**

Of the 265 postcards mailed to Kuskokwim area households in 2004, 81 (31%) were returned (Table 1). From 1989 to 2003, an average of 1,313 postcards were mailed annually. The 15-year average (1989-2003) return rate of postcard surveys was 18%, and ranges from a low of 6% in 2001, when 1,638 postcards were mailed, to a high of 50% in 1990, when 609 postcards were mailed (Table 2). Beginning in 2003, the number of postcards produced and distributed was significantly reduced due to costs of production and mailing, the fact that Bethel households began to be interviewed in 1999, as well as the historically low postcard return rates. The result in 2003 was that, of the 368 postcards distributed, only 28 were returned. In contrast, the dramatic increase in the 2004 postcard return rate was surprising.

**2004 REGIONAL SAMPLING**

Within the Kuskokwim River drainage, 2,185 (56%) of 3,929 households were contacted in 2004, including communities in north Kuskokwim Bay, which represented 90% of the total households contacted from all regions combined (Table 1). This area had 84% of the estimated total households, and its households were heavily involved with salmon fishing for subsistence.

14

Eighty-seven percent of the households identified as fishing in the Kuskokwim area, or 1,308 of 1,503, were in the north Kuskokwim Bay area.  Eighty-eight percent of the harvest calendars returned in 2004 originated from households that regularly harvested salmon from the Kuskokwim River.  Of the total number of Kuskokwim area households that were interviewed (2,297), 90% were households that regularly subsistence fished for salmon in the Kuskokwim River.  Finally, of the 81 postcards returned, 72% came from Kuskokwim River fishers.

Thus, the majority of salmon fishing for subsistence takes place by residents of communities located on the lower Kuskokwim River.  This area had an estimated total of 2,962 households, or 63% of all Kuskokwim-area households.  In 2004, 65% of returned harvest calendars, 70% of interviewed households, and 35% of returned postcards were from lower Kuskokwim River communities.  Of the 1,503 identified households that subsistence fished for salmon in 2004, 960, or 64%, were from lower Kuskokwim River communities (Table 1).

The north Kuskokwim Bay communities of Kipnuk, Kwigillingok, and Kongiganak together contained an estimated 354 households, which represented 8% of the estimated total households in the Kuskokwim area. Forty-nine households (14%) were contacted in 2004, representing 2% of the total households contacted.  In 2004, two harvest calendars were received from north Kuskokwim Bay communities; 37 households were interviewed, which represented 2% of all interviewed households; and 12 postcard surveys were received, which represented 15% of all returned postcards.  Of the 1,503 identified households that subsistence fished for salmon in 2004, 40, or 3%, were from north Kuskokwim Bay communities (Table 1).

The middle Kuskokwim communities of Lower Kalskag, Upper Kalskag, Aniak, and Chuathbaluk contained an estimated 305 households, or 7% of the estimated total households in the Kuskokwim Management Area. Two hundred twenty-nine households (75%) were contacted in 2004, which represented 9% of the total households contacted.  In 2004, 15% of returned harvest calendars, 9% of interviewed households, and 4% of returned postcard surveys were from middle Kuskokwim River communities.  Of 1,503 identified households that subsistence fished for salmon in 2004, 176, or 12%, were from middle Kuskokwim River communities (Table 1).

Similarly, the upper portion of the river, consisting of nine communities, contained approximately 308 households, or 7% of the estimated total number of households in the Kuskokwim area. In this area, 240 households (78%) were contacted in 2004, which represented 10% of total households contacted.  In 2004, 7% of returned harvest calendars, 10% of interviewed households, and 19% of returned postcard surveys were from upper Kuskokwim River communities.  Of the 1,503 identified households that subsistence fished for salmon in 2004, 132, or 9%, were from upper Kuskokwim River communities (Table 1).

In the south Kuskokwim Bay region (Quinhagak, Goodnews Bay, and Platinum), 159 (70%) of 227 households were contacted in 2004, which represented 7% of Kuskokwim area households contacted.  This area had 5% of the estimated total households in the Kuskokwim Management Area.  Of the estimated total of 227 households in south Kuskokwim Bay, 124 households (55%) subsistence fished in 2004, which represented 8% of total identified subsistence salmon fishing households in the Kuskokwim area.  Ten percent of harvest calendars returned in 2004 originated from south Kuskokwim Bay households.  Of the total number of Kuskokwim area households that were interviewed, 7% were south Kuskokwim Bay households.  Finally, of the 81 postcards returned, 5% came from south Kuskokwim Bay fishers (Table 1).

The Bering Sea coastal communities of Mekoryuk, Newtok, Nightmute, Toksook Bay, Tununak, and Chefornak contained 514 estimated households, or 11% of the estimated total households in the Kuskokwim Management Area. In 2004, contact was made with a total of 88 households (17%), which represented 11% of the total Kuskokwim area households contacted. Of the estimated 514 households in the Bering Sea coastal region, 71 households (14%) subsistence fished for salmon in 2004, which represented 5% of total identified subsistence salmon fishing households in the Kuskokwim area. Two percent of harvest calendars returned in 2004 originated from households on the Bering Sea coast. Of the total number of Kuskokwim area households that were interviewed, 68 (3%) were households in Bering Sea coastal communities, and all were from Toksook Bay. Finally, of the 81 postcards returned, 23% came from fishers from the Bering Sea coast (Table 1).

For many years, Bering Sea coastal communities had not been surveyed door-to-door (Tables 2 and 3). However, in 2004, ADF&G conducted household surveys in Toksook Bay in response to a reported strong community desire to participate. This also provided an opportunity to expand knowledge about the subsistence salmon fishery on the Bering Sea coast. Subsistence salmon fishing data from other coastal communities were obtained by postcard surveys and calendar returns. However, based on the low sampling rate, participation in salmon fishing by residents of Bering Sea coastal communities was likely significantly greater than was reported.

## 2004 SAMPLING COMPARED TO 1989-2003 MONITORING EFFORTS

Table 2 provides historical sampling data for the annual harvest monitoring program from 1989 to 2004 for each community in the Kuskokwim Management Area, including the total number of households contacted, total number of households that returned harvest calendars, total number of households interviewed, total number of households that returned postcard surveys, and estimated total number of fishing households.

Table 3 summarizes the history of community participation in the Kuskokwim subsistence harvest monitoring program from 1989 to 2004. This table illustrates, for each of the 38 communities in the management area, when 100% of the subsistence salmon harvest was reported; when sufficient household data were collected to warrant extrapolating total harvest estimates for particular communities; when sample sizes were insufficient such that only reported harvests were presented; and when no contact was made for specific communities. This table provides a comprehensive summary of monitoring program consistency and the relative contribution of communities to total annual subsistence salmon harvest estimates from 1989 to 2004.

# RESULTS OF SUBSISTENCE SALMON HARVEST MONITORING FOR 2004

## AREAWIDE HARVEST ESTIMATES SUMMARY, 2004

A summary of the subsistence salmon harvest estimates by community and fishing area is presented in Table 4. The estimated 2004 subsistence salmon harvest for the communities contacted in the Kuskokwim Management Area was 85,086 Chinook salmon, 55,575 chum salmon, 34,892 sockeye salmon, and 39,406 coho salmon, for a minimum estimated total of 214,959 salmon. These total estimates represent minimums for the management area because they include both reported household harvests and expanded community harvest estimates, and because they do not include subsistence salmon harvest information from communities where

there was no contact with households. Tables 5, 6, 7, and 8 summarize 2004 Kuskokwim Management Area harvest estimates of Chinook, chum, sockeye, and coho salmon, respectively. Tables 5, 6, 7, and 8 also include the number of households assigned to the "do not usually fish" and "usually fish" strata, as well as the number of households contacted in 2004 from each stratum; also included are standard deviations for each stratum and confidence intervals for each community estimate.

In 2004, estimates of all salmon species harvested in the subsistence fisheries fell within or surpassed the ranges of the amounts reasonably necessary for subsistence uses (ANS), which was determined by the Alaska Board of Fisheries in 2001 and codified in 5 AAC 01.286.[3] The Alaska Board of Fisheries set ANS ranges based in part on the results of the harvest monitoring program described in this report.

## Salmon for Dog Food

Historically, salmon (usually chum or coho) harvested for dog food was a significant portion of the total harvest. In the last 15 years, however, the number of households reporting the harvest of salmon specifically for dog food has declined. This may be related to decreased use of dog teams for transportation; reduced abundance, in some years, of salmon used for dog food; and the availability of commercial dog food.

During 2004, 97 households reported harvesting salmon specifically for dog food. These harvests included 6,381 chum salmon, 4,367 coho salmon, and 892 sockeye salmon. While households do not specifically target Chinook salmon for dog food, some Chinook salmon unfit for human consumption is given to dogs. People commonly feed scraps, backbones, and entrails to their dogs, and 271 households reported using salmon this way in 2004.

## Fishing Gear

Fishing households often use more than one type of gear (i.e., set gillnet, drift gillnet, fish wheel, or rod and reel) when harvesting salmon (Table 9). During 2004, most households (1,004) used drift gillnets for subsistence salmon harvests; others used rod and reel (366) or set gillnets (261). The drift gillnet was the primary fishing gear used by households from Crooked Creek downstream to the coastal communities of Kuskokwim Bay. Set gillnets were generally used when fishers were targeting Chinook salmon early in the run. Interestingly, upper Kuskokwim River fishing households reported more use of set gillnets than other regions within the Kuskokwim Management Area: 54 out of 132 (41%) fishing households used set gillnets. In contrast, only 14% of lower Kuskokwim River fishing households used set gillnets, while 75% used drift gillnets. Fishing households along the Bering Sea coast also preferred using drift gillnets (63%), as did north Kuskokwim Bay fishing households (83%), and middle Kuskokwim River fishing households (56%) (Table 9).

Gillnet mesh size information was collected in 2004, including the number of households that reported using a net with a mesh sized to catch Chinook salmon for subsistence. From the estimated total of 1,503 Kuskokwim area subsistence salmon fishing households in 2004, 846 households provided gear size data. The most popular mesh size used to harvest Chinook

---

[3] ANS ranges are 64,500-83,000 Chinook salmon, 39,500-75,500 chum salmon, 27,500-39,500 sockeye salmon, and 24,500-35,000 coho salmon in the Kuskokwim River drainage and 7,500-13,500 salmon (all species combined) in the remainder of the Kuskokwim area.

salmon was 8-inch (46%), followed by 6-inch mesh (13%), 5 ½-inch mesh (9%), and then 8 ¼-inch mesh (8%). Forty-two percent (357 households) of reporting Kuskokwim area households harvested Chinook salmon with gillnets with mesh sizes smaller than 8 inches in 2004; 58% reported harvesting Chinook salmon with 8-inch or larger gear, and 36 households reported using 8 ½-inch gear (Table 10).

Households throughout the area also used rod and reel for subsistence fishing. Rods and reels were used by families who had no access to other gear types, by fishers in areas where other gear types are not as effective, or by fishers who chose them as a more selective gear type to harvest just a few fish. In 2004, 366 Kuskokwim area households in 29 communities reported using rod and reel gear for subsistence salmon fishing, 43% of which were from lower Kuskokwim River communities (67 Bethel households), 20% from the middle Kuskokwim, 17% from the upper Kuskokwim, 16% from south Kuskokwim Bay, and 4% from fishing households along the Bering Sea coast; no rod and reel subsistence fishing was reported from north Kuskokwim Bay communities (Table 9).

Only one household reported using fish wheel gear for harvesting subsistence salmon in 2004 (Table 9). Generally, one or two fish wheels were operated by households in Aniak and McGrath. In 2004, surveyors were unable to contact any other household that usually operated a fish wheel. One household in Napaskiak reported using seine gear to harvest salmon for subsistence, and one household in Aniak reported the use of spears for harvesting subsistence salmon. A total of 233 fishing households did not report the type of gear they used for subsistence fishing, which represented 16% of the estimated total number of subsistence salmon fishing households in 2004.

## Salmon Retained from Commercial Fishing for Subsistence Use

Households involved in commercial salmon fishing sometimes keep a portion of their catch for subsistence use; however, the number of salmon retained is usually relatively small (Table 11). During 2004, 17% of commercial fishing households (55 of 317) reported retaining a total of 582 commercially-caught salmon for subsistence use. In total, 118 Chinook salmon, 49 chum salmon, 90 sockeye salmon, and 325 coho salmon were retained from commercial harvests.

## REGIONAL HARVEST SUMMARY, 2004

Lower Kuskokwim River communities, including Bethel, which represented 64% of the estimated total number of subsistence fishing households in 2004, harvested 74% of the estimated total 2004 subsistence salmon harvest in the Kuskokwim Management Area, including 78% of the Chinook salmon, 71% of the chum salmon, 73% of the sockeye salmon, and 71% of the coho salmon (Tables 4, 5, 6, 7, and 8). In 2004, Bethel households alone, which represented 26% of the total fishing households in 2004, harvested 30% of the total Kuskokwim Management Area subsistence salmon catch, including 32% of the total Chinook salmon, 22% of the total chum salmon, 30% of the total sockeye salmon, and 38% of the total coho salmon (Tables 4, 5, 6, 7, and 8).

The middle Kuskokwim River communities, which represented approximately 12% of the total subsistence fishing households in the area, harvested 10% of the estimated total 2004 subsistence salmon harvest in the Kuskokwim area, including 9% of the Chinook salmon, 12% of the chum salmon, 7% of the sockeye salmon, and 9% of the coho salmon (Tables 4, 5, 6, 7, and 8).

18

The upper Kuskokwim River communities, which represented 9% of the subsistence fishing households identified in 2004, harvested 7% of the estimated total 2004 subsistence harvest in the Kuskokwim area, including 4% of the total Chinook salmon, 7% of the chum salmon, 9% of the sockeye salmon, and 9% of the coho salmon (Tables 4, 5, 6, 7, and 8).

North Kuskokwim Bay communities, which represented 3% of fishing households identified in 2004, harvested 3% of the estimated total 2004 subsistence harvest in the Kuskokwim Management Area, including 2% of the Chinook salmon, 3% of the chum salmon, 3% of the sockeye salmon, and 2% of the coho salmon (Tables 4, 5, 6, 7, and 8).

South Kuskokwim Bay communities, which represented 8% of the subsistence salmon fishing households identified in 2004, harvested 5% of the estimated total 2004 subsistence harvest in the Kuskokwim Management Area, including 6% of the Chinook salmon, 2% of the chum salmon, 6% of the sockeye salmon, and 7% of the total coho salmon (Tables 4, 5, 6, 7, and 8).

Finally, the Bering Sea coastal communities, which represented 5% of area subsistence salmon fishing households in 2004, harvested 2% of the estimated total 2004 subsistence salmon harvest in the Kuskokwim Management Area, which included less than 1% of the Chinook salmon, 3% of the chum salmon, 1% of the sockeye salmon, and 2% of the total coho salmon (Tables 4, 5, 6, 7, and 8).

## OTHER FISH HARVESTED

One of the project objectives was to arrive at an estimate of the number of non-salmon fish, by species, harvested by residents of Bethel and Aniak. These data were collected only in Bethel in order to be certain that there were enough resources to complete the salmon survey and resulting data analysis.

### Bethel Non-Salmon Fish Harvests, 2004

Bethel residents harvested an estimated 35,430 non-salmon fish of various species, or an estimated total of 136,241 lbs usable weight of non-salmon fish, as summarized in Table 12 and Figure 2. By far the most significant non-salmon fish harvested by Bethel residents was northern pike (*Esox lucius*): a total estimate of 20,631 pike were harvested in 2004, representing 59% of the total non-salmon fish harvest by usable weight. Smelt (*Thaleichthys pacificus*) and burbot (*Lota lota*) represented the second and third most harvested non-salmon species. An estimated total of 3,005 burbot and 2,454 gallons of smelt were harvested, which represented 10% and 9%, respectively, of the overall non-salmon Bethel harvest in 2004 by usable weight. Bethel residents also harvested an estimated total of 2,597 broad whitefish (*Coregonus nasus*) and 4,849 humpback whitefish (*C. oidschian*), which represented 7% and 6%, respectively, of the 2004 non-salmon fish harvest by usable weight. Bering cisco (*C. laurettae*), round whitefish (*Prosopium cylindraceum*), unknown whitefish (*Prosopium* or *Coregonus* sp.), Arctic grayling (*Thymallus arcticus*), rainbow trout, lake trout (*Salvelinus namaycush*), and lamprey (*Lampetra* sp.) each represented less than 1% of the 2004 Bethel non-salmon fish harvest by usable weight (Table 12, Figure 2).

Bethel fishers used drift gillnets to harvest only 3% of the total number of non-salmon species harvested; most (62%) non-salmon fish were caught by hooking through the ice with jigging

gear[4], or by rod and reel in open water, especially northern pike and burbot (Table 12). Twenty-six percent of the non-salmon fish harvest came from the use of set gillnets in open water (mainly targeting whitefishes and northern pike). Ten percent of the non-salmon fish harvest came from the use of gillnets set under the ice (mainly targeting northern pike and humpback whitefish). Smelt were harvested exclusively with dipnets, and Alaska blackfish (*Dallia pectoralis*) were harvested using small, locally-made fish traps called *taluuyaq*.

# DISCUSSION AND CONCLUSIONS

## 2004 HARVEST ESTIMATES COMPARED TO 1989-2003 SUBSISTENCE SALMON HARVEST MONITORING ESTIMATES

### Areawide Subsistence Salmon Harvest Assessment, 2004

Estimated subsistence salmon harvests in the Kuskokwim Management Area in 2004 exceeded those of 2003, with the exception of sockeye salmon (Table 13). The estimated 2004 total salmon harvest in the Kuskokwim area of 214,959 fish exceeded the recent 5-year (1999-2003) average of 203,908 salmon harvested, but fell below the 10-year average harvest of 216,617, and the 15-year average harvest of 239,443 salmon (Table 13). This trend was largely driven by chum salmon subsistence harvests, as discussed below. It is important to note that the total subsistence harvest estimates discussed here represent minimum totals because the harvest figures for the entire management area included both expanded community estimates and some reported household harvests. Furthermore, these total estimates represent minimums because they did not include subsistence salmon harvests from communities in which no households were contacted.

### Chinook Salmon

The estimated 2004 Chinook salmon subsistence harvest of 85,086 fish exceeded the previous 5-year (1999-2003) average of 73,358 Chinook salmon harvested, as well as the 10-year (1994-2003) average of 81,854, and the 15-year (1989-2003) of 83,146 Chinook salmon harvested in the Kuskokwim area (Table 13). The 2004 Chinook salmon subsistence harvest was 17% larger than the estimated 2003 harvest - Kuskokwim subsistence fishers harvested 12,588 more Chinook salmon in 2004 than in 2003 - and it was the largest since 1998 (Table 14).

### Chum Salmon

The estimated 2004 chum salmon subsistence harvest of 55,575 fish exceeded the recent 5-year average harvest of 54,725 chum salmon, but fell below the recent 10-year and 15-year averages of 61,841 and 76,840 chum salmon, respectively (Tables 13 and 15). Kuskokwim subsistence salmon fishers harvested 9,284 more chum salmon in 2004 than in 2003 (Tables 13 and 15). The 2004 chum salmon harvest continued a trend that differed significantly from the much higher annual chum salmon harvests documented in the late 1980s and early 1990s (Tables 13 and 15). The decrease in chum salmon harvests for subsistence uses was likely related to the reduction in the number of dogs kept for transportation, the availability of commercial dog food, and the possible shifting of subsistence patterns resulting from recent years of poor chum salmon returns. However, many more factors may have been involved; for example, given the importance of

---

[4] Jigging gear consists of a line or lines with lures or baited hooks that are operated during periods of ice cover from holes cut in the ice and which are drawn through the water by hand (5 AAC 01.010(2)).

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 81 of 106

Exhibit G
Page 28 of 41

chum salmon as a dried fish product, an increased use of freezers may also help to explain lower chum salmon harvests. This is a question for additional research.

**Sockeye Salmon**

The estimated 2004 sockeye salmon subsistence harvest of 34,892 fish fell below the recent 5-year (1993-2003) average of 42,162 sockeye salmon harvested, as well as the 10-year (1994-2003) average of 39,258 fish and the 15-year average of 40,750 sockeye salmon harvested in the Kuskokwim area. Kuskokwim subsistence salmon fishers harvested 2,002 fewer sockeye salmon in 2004 than in 2003. The 2004 estimated sockeye salmon harvest was the fourth-lowest harvest documented since 1989; sockeye salmon harvests were estimated to be lower only in 1992, 1995, and 2002 (Tables 13 and 16).

**Coho Salmon**

The estimated 2004 coho salmon subsistence harvest of 39,406 fish exceeded the recent 5-year average harvest of 33,663 coho salmon harvested, the recent 10-year average of 33,664 fish, and the 15-year average harvest of 38,707 coho salmon harvested in the Kuskokwim area. Kuskokwim salmon fishers harvested an estimated 615 more coho salmon in 2004 than in 2003, and had the largest coho harvest since 1992. The 2004 harvest was the fifth-largest subsistence coho harvest documented by the harvest monitoring program, following larger harvests documented in 1989-1992 (Tables 13 and 17).

## Regional Harvest Assessment, 2004

Data describing the harvest of salmon for subsistence differed interregionally for a variety of reasons, including differences in stock migration patterns, run abundances, run timings, community dietary preferences, and other cultural patterns, such as different salmon preservation techniques (e.g., Chinook salmon were frozen and chum salmon were dried). While specific causes of different patterns of salmon fishing methods, harvest, and uses were not investigated through the Kuskokwim harvest monitoring program, interregional harvest patterns are summarized below and compared to previous harvest monitoring results to provide an overall regional assessment of 2004 subsistence salmon harvests. It is important to note that the total salmon harvest for subsistence estimates discussed here represent minimum totals because the harvest figures included both reported household harvests and some expanded community estimates.

**Chinook Salmon**

Chinook salmon harvests in 2004 exceeded historical averages in all regions of the Kuskokwim Management Area, which suggests that 2004 Chinook salmon harvest levels reflected overall stock abundance (Table 14).

Chinook salmon subsistence harvests from the Kuskokwim River drainage in 2004 (including harvests by north Kuskokwim Bay communities) were estimated at 80,065 fish, which exceeded the recent 5-year average of 69,258 Chinook salmon harvested, as well as the 10-year average harvest of 77,687 fish and the 15-year average harvest of 78,892 fish (Table 14).

With respect to Chinook salmon harvested by the residents of north Kuskokwim Bay communities, total community harvest estimates were developed only for Kongiganak because the sample size of contacted households in Kipnuk and Kwigillingok was too small to warrant data expansion. Kongiganak salmon fishing households harvested an estimated total of 1,872

Chinook salmon in 2004, which exceeded the recent 5-year average harvest of 1,294 fish, as well as the 10-year average of 1,266 fish and the 15-year average of 1,244 Chinook salmon harvested (Table 14).

Lower Kuskokwim River communities harvested an estimated 66,687 Chinook salmon in 2004, which exceeded the recent 5-year average harvest of 59,063 fish, as well as the recent 10-year and 15-year average harvests of 64,901 and 65,466 Chinook salmon, respectively (Table 14).

The Middle Kuskokwim River communities of Lower Kalskag, Upper Kalskag, Aniak, and Chuathbaluk harvested an estimated total of 8,007 Chinook salmon in 2004, which exceeded the recent 5-year and 10-year average harvests of 6,383 and 8,009 fish, respectively; but which did not exceed the 15-year average harvest of 8,447 fish (Table 14).

Those Kuskokwim River communities upstream of Crooked Creek harvested an estimated total of 3,499 Chinook salmon in 2004, which exceeded the recent 5-year average harvest of 2,519 fish, but not the recent 10-year and 15-year average harvests of 3,512 and 3,636 Chinook salmon, respectively (Table 14).

The south Kuskokwim Bay communities of Quinhagak, Goodnews Bay, and Platinum harvested an estimated total of 4,680 Chinook salmon in 2004, which exceeded the recent 5-year, 10-year, and 15-year average harvests of 3,926 fish, 4,017 fish, and 4,216 Chinook salmon, respectively (Table 14).

Bering Sea coastal communities reported harvesting 341 Chinook salmon in 2004 (Table 14); however, given the fact that the Kuskokwim area harvest monitoring program rarely contacted these communities, development of total community harvest estimates was infrequent. In fact, total community harvest estimates have been developed only twice in the history of the existing harvest monitoring program: both of which were for Toksook Bay, first in 2000 and then again in 2004 (Table 3). The lack of total community estimates in the Bering Sea coastal region means that an assessment of 2004 Chinook salmon (and other species harvests) was not possible.

**Chum Salmon**

Chum salmon subsistence harvests from the Kuskokwim River drainage in 2004 (including harvests by north Kuskokwim Bay communities) was estimated at 52,374 fish, which exceeded the recent 5-year average of 51,502 chum salmon harvested, but fell below the 10-year average harvest of 58,988 fish and the 15-year average harvest of 73,668 fish (Table 15).

With respect to chum salmon harvested by residents of north Kuskokwim Bay communities, total community harvest estimates were developed only for Kongiganak because sample sizes of contacted households in Kipnuk and Kwigillingok were too small to warrant data expansion. Kongiganak salmon fishing households harvested an estimated total of 1,587 chum salmon in 2004, which was identical to the recent 5-year average and which exceeded the 10-year and 15-year average harvests of 1,443 and 1,383 chum salmon (Table 15). The increase in chum harvest in the north Kuskokwim Bay may have been attributable to a relatively more abundant chum run in 2004. Run size had been increasing since 2001, which had resulted in above-average to record escapements in recent years as well as underutilized harvestable surpluses (e.g., Linderman and Bergstrom 2006); however, this increase may have also reflected different fishing practices as well.

Lower Kuskokwim River communities harvested an estimated 39,540 chum salmon in 2004, which fell below the recent 5-year average harvest of 40,998 fish, as well as below the 10-year and 15-year average harvests of 45,720 fish and 56,142 chum salmon (Table 15).

The Middle Kuskokwim River communities of Lower Kalskag, Upper Kalskag, Aniak, and Chuathbaluk harvested an estimated total of 6,930 chum salmon in 2004, which exceeded the recent 5-year average harvest of 6,025 fish, but not the recent 10-year and 15-year average harvests of 7,406 fish, and 10,004 chum salmon, respectively (Table 15).

Upper Kuskokwim River communities upstream of Crooked Creek harvested an estimated total of 4,001 chum salmon in 2004, which exceeded the recent 5-year average harvest of 2,831 fish, but not the recent 10-year and 15-year average harvests of 4,328 fish, and 5,975 chum salmon, respectively. Chum salmon are the most harvested species of salmon by Upper Kuskokwim River communities (Table 15).

The South Kuskokwim Bay communities of Quinhagak, Goodnews Bay, and Platinum harvested an estimated total of 1,369 chum salmon in 2004, which fell below the recent 5-year, 10-year, and 15-year average harvests of 1,578 fish, 1,430 fish, and 1,733 chum salmon, respectively (Table 15).

Bering Sea coastal communities reported harvesting 1,832 chum salmon in 2004; however, a community estimate was developed only for Toksook Bay (938 chum salmon) due to insufficient household contact in other Bering Sea coastal communities. The lack of total community estimates in the Bering Sea coast region meant that an assessment of 2004 chum salmon harvest relative to previous years was not possible (Table 15).

**Sockeye Salmon**

The fact that subsistence sockeye harvests fell below regional average harvests throughout the management area suggested that 2004 harvest levels likely resulted from a decreased run abundance (Tables 13 and 16).

Sockeye salmon subsistence harvests from the Kuskokwim River drainage in 2004 (including harvests by north Kuskokwim Bay communities) were estimated at 32,433 fish, which fell below the recent 5-year, 10-year, and 15-year average harvests of 39,695 fish, 37,314 fish, and 38,602 sockeye salmon, respectively (Table 16).

With respect to sockeye salmon harvested by residents of north Kuskokwim Bay communities, total community harvest estimates were developed only for Kongiganak because sample sizes of contacted households in Kipnuk and Kwigillingok were too small to warrant data expansion. Kongiganak salmon fishing households harvested an estimated total of 876 sockeye salmon in 2004, which fell below the recent 5-year average harvest of 1,130 fish and the 10-year average harvest of 962 fish, but exceeded the 15-year average harvest of 856 sockeye salmon (Table 16).

Lower Kuskokwim River communities harvested an estimated total of 25,606 sockeye salmon in 2004, which fell below the recent 5-year average harvest of 32,254 fish, as well as below the 10-year and 15-year average harvests of 29,406 fish and 29,806 sockeye salmon (Table 16).

The Middle Kuskokwim River communities of Lower Kalskag, Upper Kalskag, Aniak, and Chuathbaluk harvested an estimated total of 2,528 sockeye salmon in 2004, which fell below the recent 5-year average harvest of 2,800 fish, but not below the recent 10-year and 15-year average harvests of 2,830 fish, and 2,632 sockeye salmon, respectively (Table 16).

23

Kuskokwim River communities upstream of Crooked Creek harvested an estimated total of 3,264 sockeye salmon in 2004, which fell below the recent 5-year, 10-year, and 15-year average harvests of 3,461 fish, 4,054 fish, and 4,740 sockeye salmon, respectively (Table 16).

The south Kuskokwim Bay communities of Quinhagak, Goodnews Bay, and Platinum harvested an estimated total of 2,046 sockeye salmon in 2004, which fell below the recent 5-year average harvest of 2,251 fish, but which exceeded the recent 10-year and 15-year average harvests of 1,783 fish and 1,964 sockeye salmon, respectively (Table 16).

Bering Sea coastal communities reported harvesting 413 sockeye salmon in 2004; however, a community estimate was developed only for Toksook Bay (359 sockeye salmon) due to insufficient household contact in other Bering Sea coastal communities.  The lack of total community estimates in the Bering Sea coastal region means that an assessment of 2004 sockeye salmon harvest relative to previous years was not possible (Table 16).

**Coho Salmon**

Coho harvests in 2004 exceeded historical averages in all regions of the Kuskokwim Management Area, which suggested that the 2004 subsistence coho salmon harvest levels reflected overall run abundance.

Coho salmon subsistence harvests from the Kuskokwim River drainage in 2004 (including harvests by north Kuskokwim Bay communities) was estimated at 35,735 fish, which exceeded the recent 5-year, 10-year, and 15-year average harvests of 31,263 fish, 31,228 fish, and 35,484 coho salmon, respectively (Table 17).

North Kuskokwim Bay subsistence fishers harvested at least 856 coho salmon in 2004; however, total community harvest estimates were developed only for Kongiganak because sample sizes of contacted households in Kipnuk and Kwigillingok were too small to warrant data expansion. Kongiganak salmon fishing households harvested an estimated total of 551 coho salmon in 2004, which fell below the recent 5-year average harvest of 570 fish, as well as the 10-year average harvest of 534 fish and the 15-year average of 527 coho salmon (Table 17).

Lower Kuskokwim River communities harvested an estimated 28,025 coho salmon in 2004, which exceeded the recent 5-year average harvest of 24,598 fish, as well as the recent 10-year and 15-year average harvests of 23,592 and 27,045 coho salmon, respectively (Table 17).

The middle Kuskokwim River communities of Lower Kalskag, Upper Kalskag, Aniak, and Chuathbaluk harvested an estimated total of 3,487 coho salmon in 2004, which exceeded the recent 5-year, 10-year, and 15-year average harvests of 3,172 fish, 3,171 fish, and 3,179 coho salmon, respectively (Table 17).

Those Kuskokwim River communities upstream of Crooked Creek harvested an estimated total of 3,367 coho salmon in 2004, which exceeded the recent 5-year average harvest of 2,834 fish, but fell below the 10-year and 15-year average harvests of 3,855 fish, and 4,630 coho salmon, respectively (Table 17).

The south Kuskokwim Bay communities of Quinhagak, Goodnews Bay, and Platinum harvested an estimated total of 2,826 coho salmon in 2004, which exceeded the recent 5-year and 10-year average harvests of 2,222 fish and 2,274 fish respectively, but which fell below the recent 15-year average harvest of 3,067 coho salmon (Table 17).

24

Bering Sea coastal communities reported harvesting 845 coho salmon in 2004; however, given the fact that little contact had occurred with these communities during annual harvest monitoring activities, development of total community harvest estimates was infrequent. The lack of total community estimates in the Bering Sea coastal region meant that an assessment of 2004 coho salmon harvests relative to previous years' harvests was not possible (Table 17).

**Interregional Salmon Harvest Composition Comparisons among Species, 2004**

Salmon harvests by residents of north Kuskokwim Bay, the lower Kuskokwim River, and the middle Kuskokwim River communities demonstrated a similar species composition pattern among these three regions. Chinook salmon and chum salmon comprised approximately 70% of the harvest in each region, and coho salmon and sockeye salmon represented the remaining 30% (Figures 3, 4 and 5).

Harvests in the upper Kuskokwim River and south Kuskokwim Bay regions were markedly different from other regions. In the upper Kuskokwim, for example, each of the four species of salmon harvested in the area accounted for nearly 25% of the total harvest (Figure 6). South Kuskokwim Bay subsistence salmon harvest was largely Chinook salmon (42%), and residents of this area had the largest proportion of coho salmon harvests (26%) in the Kuskokwim Management Area (Figure 7).

Despite the dramatic decline in chum salmon subsistence harvests in the Kuskokwim area, not all regions were harvesting fewer chum salmon. The north Kuskokwim Bay communities experienced greater chum salmon harvests in 2004 than their historical 5-year, 10-year, and 15-year average harvests (Table 15). On the other hand, lower Kuskokwim River communities and south Kuskokwim Bay communities harvested fewer chum salmon for subsistence uses in 2004 than their historical 5-year, 10-year, and 15-year averages. This interregional pattern suggests that investigations into the causes of the dramatic decline in chum salmon harvests during the past two decades should focus on the lower Kuskokwim River and south Kuskokwim Bay communities. Such investigations, however, also should attempt to evaluate the effect of "windowed" subsistence fishing on decreased chum salmon harvests in the lower river relative to the increasing harvests of chum salmon in the middle and upper Kuskokwim River communities.

Harvest compositions varied dramatically, reflecting a community's access to each species. For example, households in Lime Village, located along the Stony River, harvested an estimated 66 Chinook salmon, 189 chum salmon, 831 sockeye salmon, and 220 coho salmon; while those in Nikolai, who have no access to sockeye salmon runs, harvested an estimated 510 Chinook salmon, 260 chum salmon, and 156 coho salmon in 2004 (Tables 14, 15, 16, and 17). The differences between these two examples were likely attributable to the large number of sockeye salmon that spawn in the drainages of the Stony and Holitna rivers, both of which are tributaries of the Kuskokwim River well downstream of the communities of Nikolai, McGrath, Telida, and Takotna. The significance of comparisons like these is that species run strengths, viewed from an areawide perspective, affected communities in different ways, depending on customary and traditional dependence on particular salmon stocks.

Tables 14, 15, 16, and 17 provide harvest estimates for each community in the Kuskokwim Management Area from 1989 through 2004, and illustrate the recent 5-year, 10-year and 15-year harvest averages for each Kuskokwim area community that had a consistent total community estimate during the 15 years of the harvest monitoring program. The Bering Sea coastal communities, however, were not associated with average harvest rates due to the fact that most

harvest monitoring data represent sample sizes were not large enough to estimate total community harvests. Tables 14, 15, 16, and 17 provide a means to assess specific community harvest estimates from 1989 through 2004.

## NON-SALMON FISH HARVESTS

Although the focus of this project was on collecting salmon subsistence harvest information, non-salmon fish subsistence harvest information was also collected in the hub community of Bethel (see the "Results" section of this report). The non-salmon harvest data collected in Bethel represent the only non-salmon fish subsistence harvest information collected in the Kuskokwim area in 2004. The Bethel household survey data suggested that 82% (695,637 lbs) of the total fish subsistence harvested by usable weight (850,761 lbs) were salmon, while non-salmon comprised 18% (155,124 lbs) of the total fish harvest by weight.

The results of the non-salmon fish survey indicated that, in 2004, non-salmon fish species contributed significantly to Bethel area subsistence fish harvests (Table 12). Previous research in other communities on the Kuskokwim River also demonstrated the significance of non-salmon to Kuskokwim area subsistence fishers (e.g., Andrews 1989, 1994; Coffing 1991; Coffing et al. 2001; Coffing et al. 2003; Holen et al. 2006; Krauthoefer et al. 2007; Pete 1984, 1989, 1991a, 1991b, 1992; Simon et al. 2007; Stokes 1985; Wolfe et al. 1984). However, it is important to note that much of this research was timed to survey residents at times other than immediately after the conclusion of the salmon fishing season. Recently, Brown, Burr, Elkin, and Walker (2005) compared non-salmon harvest estimates identified during a postseason salmon survey with estimates from a non-salmon harvest assessment project that took place in the lower- and middle-Yukon regions (specifically, Grayling, Anvik, Shageluk, and Holy Cross) at approximately the same time period. The comparison found that postseason household surveys implemented immediately following the salmon fishing season may not have produced the most reliable results for non-salmon harvest given the considerable differences in non-salmon harvest estimates resulting from the two harvest assessment projects (Brown et al. 2005:154).

Additionally, the postseason salmon survey program along the Kuskokwim River and in Bethel targeted those households that usually participated in salmon fishing for subsistence. It may be that these households differed from those involved in fishing for non-salmon, and thus using a similar method would not have produced accurate estimates of non-salmon fish subsistence harvest. The harvest estimates for non-salmon fish resulting from this project should therefore be viewed as minimum totals; furthermore, a project focused on assessing the annual subsistence harvest and use patterns of non-salmon fish might lead to more accurate estimates of non-salmon harvest. It is recommended that further methodological assessment of salmon and non-salmon fish harvest estimates be considered in future research.

Finally, as previously stated, this project did not achieve two of the investigation plan objectives, both of which were related to non-salmon harvest monitoring. These included estimating the amount and species of non-salmon fish harvested in Aniak, and identifying harvest locations for hook and line gear for Bethel and Aniak households. The lack of harvest estimates and harvest location information for Aniak was partially offset by the results of Study No. FIS 01-112, "The harvest of non-salmon fish by residents of Aniak and Chuathbaluk, Alaska, 2001-2003" (Krauthoefer et al. 2007).

ADF&G emphasized documenting salmon subsistence harvests in the Kuskokwim Management Area in 2004, recognizing that salmon harvest data were the primary information need identified

by the Yukon-Kuskokwim Delta Regional Advisory Council, the Kuskokwim Fisheries Resource Coalition, and FRMP. ADF&G determined that there was insufficient time and resources to conduct the data entry and analysis necessary to complete all objectives. While originally intending to also document Bethel and Aniak non-salmon fish harvest and non-salmon fishing locations, the loss of Commercial Fisheries' financial support after the proposal for this project had been submitted necessitated exercising cost-savings measures to account for the decrease in state funds available for this program. Additional challenges included the fact that Division of Subsistence investigators and information management staff were new to the project at the time of implementation. Furthermore, information management staff concluded that time was insufficient to create a new database for analysis of the Aniak non-salmon fish and hook and line harvest location information in addition to revising the existing Bethel non-salmon fish harvest location database.

In spite of these unmet objectives, this project successfully accomplished the principal objectives identified in the investigation plan: to document subsistence harvests of Kuskokwim salmon in 2004 in one of the largest subsistence fisheries in Alaska in terms of amounts harvested. The 2004 salmon harvest monitoring efforts resulted in a higher-than-average number of communities from which subsistence salmon harvest information was collected. Household surveys were conducted in more Kuskokwim area communities than in any previous year since the program began in 1989; similarly, the number of households interviewed in 2004 was the third largest since 1989. In conclusion, the 2004 Kuskokwim area subsistence salmon monitoring program resulted in representative harvest estimates that were comparable to previous harvest monitoring results, with the exception of the Bering Sea coastal region and a few communities in the other regions.

# RECOMMENDATIONS

Subsistence salmon harvest surveys of one type or another have been conducted in the Kuskokwim region for a number of decades. The current annual Kuskokwim area postseason subsistence salmon harvest monitoring program and its associated methods have been in place since 1989. There are several recommendations related to monitoring harvests, and four recommendations related to assessment of these salmon resources.[5]

## MONITORING HARVESTS

Considering the magnitude and importance of this fishery, and the need for management consistent with the sustained yield principle and other statutory requirements, a scientifically-based annual harvest monitoring program is necessary for managing Kuskokwim Management Area salmon. It is, therefore, recommended that the annual subsistence salmon harvest in the Kuskokwim Management Area should continue to be monitored by ADF&G. Survey data on subsistence salmon harvests should be collected annually, using the methods developed by Subsistence to ensure data comparability through time.

State and federal agencies should continue to partner in funding the Kuskokwim area subsistence salmon harvest monitoring program as monitoring results are vital to both state fisheries

---

[5] The American Heritage Dictionary defines "monitoring" as keeping track of systematically with a view to collecting information. In contrast, "assessment" refers to the evaluation of the information.

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 88 of 106   **Exhibit G**
**Page 35 of 41**

management and federal subsistence programs. Cost efficiencies should continue to be explored, but in keeping with the existing methodology to ensure data comparability across years.

Chinook and chum salmon, in particular, are major food sources for residents in the Kuskokwim Management Area and account for a significant part of the total harvest of wild resources in any given year (ADF&G 2007). Most of the Chinook salmon caught in the state for subsistence purposes are harvested here; one of every two subsistence-caught Chinook in the state is harvested in the Kuskokwim Management Area. Their escapement numbers often fluctuate, sometimes considerably in any 10-year period (Whitmore et al. 2005). It is important for fisheries management purposes to know what the total harvest of these species is relative to total run size on an annual basis and to identify trends in the fishery. It is, therefore, also recommended that biological monitoring of escapement numbers in index streams be continued and expanded.

It is also recommended that information about the subsistence harvest of non-salmon fish should be collected whenever possible, given their significance in the annual subsistence harvest in the Kuskokwim area, as demonstrated in this survey and in others. A survey, independent of salmon surveys, should be conducted in representative communities throughout the Kuskokwim Management Area. The FRMP-funded study No. FIS 01-112, which documented the harvest of non-salmon fish by residents of Aniak and Chuathbaluk from 2001-2003, provided information for a portion of the middle Kuskokwim River region. Similarly, FRMP Study No. FIS 06-351 documented subsistence harvests of non-salmon fish for one year by residents of Eek, Nunapitchuk, and Tuntutuliak on the lower Kuskokwim River. Residents have also expressed concerns about changes in whitefish populations, which would be better understood through additional research in harvest monitoring and traditional ecological knowledge, as well as through the continuation of stock status and trends projects.

## ASSESSMENT

Many of the tables included in this report compare the 2004 harvest monitoring results (sampling results and harvest estimates) with previous monitoring results by area, region, and salmon species to annually assess 1) the relative efficacy of community samples and resulting harvest estimates, 2) the relative contribution of a particular region's or a particular community's subsistence salmon harvests to the areawide estimate, and 3) whether any trends could be observed in a particular subsistence salmon fishery. Future harvest monitoring efforts should continue to build upon this effort in order to contribute to the evaluation and assessment of the annual harvest monitoring program sampling results and harvest estimates.

A research project should be designed to identify the variables that contribute to temporal changes in the magnitude of subsistence salmon harvests. For example, is the magnitude of salmon harvests related to changes in population size in a community? Is there a certain per capita subsistence use of salmon that is maintained by adjusting harvests of individual species to run strength? The Division of Subsistence is considering the development of a retrospective patterns and trends project proposal to pursue this line of investigation in the Kuskokwim Management Area.

Comparing Kuskokwim subsistence chum salmon harvests in 2004 with historical chum salmon harvest estimates demonstrated a dramatic decrease in the number of chum salmon harvested for subsistence uses on the Lower Kuskokwim River, but increased harvests in the Upper Kuskokwim region. One hypothesis posed is that this trend relates to a decline in the number of

dogs kept for transportation purposes. A research project could be designed to investigate why Kuskokwim area households no longer harvest the numbers of chum salmon that they did in the 1980s and early 1990s.

Finally, mineral and gas development in the area need to be monitored in terms of its potential impacts on the Kuskokwim salmon fishery, given the significance of salmon to residents.

# ACKNOWLEDGEMENTS

The authors would like to thank the residents of the Kuskokwim Management Area communities for their continued participation in this project. Sincere thanks to Susan K. McNeil, Chris Bach, Chris Nevak, and Charles Active for their tireless and enthusiastic work conducting surveys in Kuskokwim area communities. Additionally, many thanks to David Orabutt, Dave Cannon, Kimberly Ward and Mary Kvamme at KNA for their work on the surveys in Aniak. Thanks also are due to Elizabeth Andrews, Jim Fall, Pippa Kenner, Anne Shinkwin, and Lisa Olson for technical and editorial assistance. Finally, the U.S. Fish and Wildlife Service, Office of Subsistence Management, provided $158,424 in funding support for this project through the Fisheries Resource Monitoring Program, under agreement 701814J335. Additional financial support was provided by a gap-funding grant from the Arctic-Yukon-Kuskokwim Sustainable Salmon Initiative (AYK SSI).

29

# LITERATURE CITED

ADF&G (Alaska Department of Fish and Game). 2001. Alaska subsistence fisheries 1999 annual report. Division of Subsistence Technical Paper No. 300, Juneau.

ADF&G (Alaska Department of Fish and Game). 2002. Alaska subsistence fisheries 2000 annual report. Division of Subsistence Technical Paper No. 306, Juneau.

ADF&G (Alaska Department of Fish and Game). 2004. 2004 Kuskokwim River salmon fishery news release #14, issued May 19, 2004. Alaska Department of Fish and Game, Division of Commercial Fisheries, Bethel.

ADF&G (Alaska Department of Fish and Game). 2005. 2004 Alaska commercial salmon harvests and exvessel values. Alaska Department of Fish and Game, Division of Commercial Fisheries, Juneau. http://www.cf.adfg.state.ak.us/geninfo/finfish/salmon/catchval/blusheet/04exvesl.pdf, accessed June 22, 2007.

ADF&G (Alaska Department of Fish and Game). 2007. Community subsistence information system. Division of Subsistence, Juneau. http://www.subsistence.adfg.state.ak.us/CSIS/.

Andrews, E. 1989. The *Akulmiut*: territorial dimensions of the Yup'ik Eskimo. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 177, Juneau.

Andrews, E. 1994. Territoriality and land use among the *Akulmiut* of western Alaska. Pages 65-93 in E.S. Burch Jr. and L.J. Ellanna, editors, Key issues in hunter-gatherer research. Berg Publishers, Inc., Oxford.

Andrews, E., and M. Coffing. 1986. Kuskokwim River subsistence Chinook fisheries: an overview. Report to the Alaska Board of Fisheries, Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 146, Juneau.

Barker, J. H. 1993. Always getting ready *upterrlainarluta*: Yup'ik Eskimo subsistence in Southwest Alaska. University of Washington Press, Seattle.

Box, George E. P., W. G. Hunter, and J. S. Hunter. 1978. Statistics for experimenters: An introduction to design, data analysis, and model building. John Wiley & Sons, Inc., New York.

Brelsford, T., R. Peterson, and T. L. Haynes. 1987. An overview of resource use patterns in three central Kuskokwim communities: Aniak, Crooked Creek, and Red Devil. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 141, Juneau.

Brown, C. L., J. Burr, K. Elkin, and R. J. Walker. 2005. Contemporary subsistence uses and population distribution of non-salmon fish in Grayling, Anvik, Shageluk, and Holy Cross. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 289, Juneau.

Brown, C., D. Caylor, J. Dizard, J. A. Fall, S. Georgette, T. Krauthoefer, and M. Turek. 2005. Alaska subsistence fisheries 2003 annual report. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 316, Juneau.

Burkey, C. Jr., M. Coffing, J. Menard, D. B. Molyneaux, P. Salamone, C. Utermohle, and T. Vania. 2000. Annual management report for the subsistence and commercial fisheries of the Kuskokwim area, 1999. Alaska Department of Fish and Game, Division of Commercial Fisheries, Regional Information Report No. 3A00-29, AYK Region, Anchorage.

Charnley, S. 1984. Human ecology of two central Kuskokwim communities: Chuathbaluk and Sleetmute. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 81, Juneau.

Cochran, W. G. 1977. Sampling techniques. John Wiley & Sons, New York.

Coffing, M. W. 1991. Kwethluk subsistence: contemporary land use patterns, wild resource harvest and use and the subsistence economy of a lower Kuskokwim River area community. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 157, Juneau.

Coffing, M. W., L. Brown, G. Jennings, and C. J. Utermohle. 2001. The subsistence harvest and use of wild resources in Akiachak, Alaska, 1998. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 258, Juneau.

Coffing, M. W., W. Morgan, and L. Rank. 2003. Aniak area postseason subsistence fishery harvest household surveys. Final report to the U.S. Fish and Wildlife Service, Office of Subsistence Management, to fulfill obligations for Study No. FIS 02-036. Alaska Department of Fish and Game, Division of Subsistence, Juneau.

Fienup-Riordan, A. 1983. The Nelson Island Eskimo: social structure and ritual distribution. Alaska Pacific University Press, Anchorage.

Fienup-Riordan, A. 1990. Eskimo essays: Yup'ik lives and how we see them. Rutgers University Press, New Brunswick.

Fienup-Riordan, A. 1994. Boundaries and passages: rule and ritual in Yup'ik Eskimo oral tradition. University of Oklahoma Press, Norman.

Francisco, R. K., K. Schultz, D. J. Schneiderhan, D. Huttunen, and R. Cannon. 1988. Annual management report, Kuskokwim area, 1987. Alaska Department of Fish and Game, Division of Commercial Fisheries, Regional Information Report No. 3B88-35, AYK Region, Bethel.

Francisco, R. K., K. Schultz, D. J. Schneiderhan, D. Huttunen, C. Burkey, Jr., H. H. Hamner, and R. Walker. 1989. Annual management report, Kuskokwim area, 1988. Alaska Department of Fish and Game, Division of Commercial Fisheries, Regional Information Report No. 3B89-08, AYK Region, Anchorage.

Francisco, R. K., C. Burkey Jr., D. B. Molyneaux, C. J. Anderson, H. H. Hamner, D. J. Schneiderhan, M. W. Coffing, R. J. Walker, and K. E. Hyer. 1990. Annual management report, Kuskokwim area, 1989. Alaska Department of Fish and Game, Division of Commercial Fisheries, Regional Information Report No. 3B90-25, AYK Region, Anchorage.

Himmelheber, H. 1987. [English translation of 1938 German edition] Eskimo artists (Fieldwork in Alaska, June 1936 until April 1937). Museum Rietberg Zurich, Zurich.

Holen, D. L., W. E. Simeone, and L. Williams. 2006. Wild resource harvests and uses by residents of Lake Minchumina and Nikolai, Alaska, 2001-2002. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 296, Juneau.

Jonrowe, M., R. Baxter, and D. Schneiderhan. 1979. Annual salmon management report, 1979, Kuskokwim District. Alaska Department of Fish and Game, Division of Commercial Fisheries, Bethel and Anchorage.

Kari, P. R. 1983. Land use and economy of Lime Village. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 80, Juneau.

Kari, P. R. 1985. Wild resource use and economy of Stony River Village. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 108, Juneau.

Knapp, G. 2000. Estimates of United States production and consumption of salmon. University of Alaska Institute of Social and Economic Research. http://www.iser.uaa.alaska.edu/iser/people/knapp/usmark02 htm, accessed June 22, 2007.

Krauthoefer, T., J. Simon, M. W. Coffing, M. Kerlin, and W. Morgan. 2007. The harvest of non-salmon fish by residents of Aniak and Chuathbaluk, Alaska, 2001-2003. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 299, Juneau.

Linderman, J. C., and D. J. Bergstrom. 2006. Kuskokwim River Chinook and chum salmon stock status and Kuskokwim area fisheries, a report to the Alaska Board of Fisheries. Alaska Department of Fish and Game, Division of Commercial Fisheries, Special Publication No. 06-35, Juneau.

Oswalt, W. H. 1963a. Mission of change in Alaska: Eskimos and Moravians on the Kuskokwim. The Huntington Library, San Marino, California.

Oswalt, W. H. 1963b. Napaskiak: an Alaskan Eskimo community. University of Arizona Press, Tucson.

Oswalt, W. H. 1990. Bashful no longer: an Alaskan Eskimo ethnohistory, 1778-1988. University of Oklahoma Press, Norman.

Pennoyer, S., K. R. Middleton, and M. E. Morris, Jr. 1965. Arctic-Yukon-Kuskokwim area salmon fishing history. Alaska Department of Fish and Game, Division of Commercial Fisheries Informational Leaflet No. 70, Juneau.

Pete, M. C. 1984. Subsistence use of herring in the Nelson Island region of Alaska. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 113, Juneau.

Pete, M. C. 1989. Subsistence herring fishing in the Nelson Island and Nunivak Island Districts, 1990. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 196, Juneau.

Pete, M. C. 1991a. Subsistence herring fishing in the eastern Bering Sea region: Nelson Island, Nunivak Island, and Kuskokwim Bay. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 192, Juneau.

Pete, M. C. 1991b. Subsistence herring fishing in the Nelson and Nunivak Island Districts, 1991. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 211, Juneau.

Pete, M. C. 1992. Subsistence herring fishing in the Nelson Island and Nunivak Island Districts, 1992. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 221, Juneau.

Pete, M. C. 1993. On our own terms. Pages 5-10 in J.H. Barker, Always getting ready *upterrlainarluta*: Yup'ik Eskimo subsistence in Southwest Alaska. University of Washington Press. Seattle.

Regnart, R. I., R. Baxter, and C. Yanagawa. 1970. Annual management report, 1969, Arctic-Yukon-Kuskokwim area. Alaska Department of Fish and Game, Division of Commercial Fisheries, Anchorage.

Senecal-Albrecht, D. E. 1990. Co-management as transaction: the Kuskokwim River Salmon Management Working Group. M.A. thesis. Department of Anthropology, McGill University, Montreal.

Senecal-Albrecht, D. E. 1998. "Don't wait for Boldt": building co-management from the ground up: the success of salmon fishermen's groups in western Alaska. Paper presented at "Crossing Boundaries," the seventh annual conference of the International Association for the Study of Common Property, Vancouver, British Columbia, Canada, June 10-14, 1998.

Simon, J., T. Krauthoefer, D. Koster, M. Coffing, and D. Caylor. 2007. Bethel subsistence fishing harvest monitoring report, Kuskokwim Fisheries Management Area, Alaska, 2001-2003. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 330, Juneau.

Stickney, A. 1981. Subsistence resource utilization: Nikolai and Telida – interim report II. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 21, Juneau.

Stickney, A. 1984. Coastal ecology and wild resource use in the central Bering Sea area: Hooper Bay and Kwigillingok. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 85, Juneau.

Stokes, J. W. 1982. Subsistence salmon fishing in the upper Kuskokwim River system, 1981-1982. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 23, Juneau.

Stokes, J. W. 1985. Natural resource utilization of four upper Kuskokwim communities. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 86, Juneau.

U.S. National Marine Fisheries Service. 2005. Fisheries of the United States 2004. Office of Science and Technology, Fisheries Statistics Division, Current Fishery Statistics No. 2004, November 2005. Silver Springs, Maryland.

Walker, R. J. *In prep*. The validity and reliability of fisheries harvest monitoring methods, Western Alaska. Draft final report to the U.S. Fish and Wildlife Service, Office of Subsistence Management, to fulfill obligations for Study No. FIS 01-106. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 287, Juneau.

Walker, R. J., and M. W. Coffing. 1993. Subsistence salmon harvests in the Kuskokwim area during 1989. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 189, Juneau.

Ward, T. C., M. Coffing, J. L. Estensen, R. L. Fisher, and D. B. Molyneaux. 2003. Annual management report for the subsistence and commercial fisheries of the Kuskokwim area, 2002. Alaska Department of Fish and Game, Division of Commercial Fisheries, Regional Information Report No. 3A03-27, AYK Region, Anchorage.

Whitmore, C., M. M. Martz, D. G. Bue, J. C. Linderman, and R. L. Fisher. 2005. Annual management report for the subsistence and commercial fisheries of the Kuskokwim area, 2003. Alaska Department of Fish and Game, Divisions of Sport Fish and Commercial Fisheries, Fishery Management Report No. 05-72, Anchorage.

Williams, L., C. Venechuk, D. L. Holen, and W. E. Simeone. 2005. Lake Minchumina, Telida, Nikolai, and Cantwell subsistence community use profiles and traditional fisheries use. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 295, Juneau.

Wolfe, R. J., J. J. Gross, S. J. Langdon, J. M. Wright, G. K. Sherrod, L. J. Ellanna, V. Sumida, and P. J. Usher. 1984. Subsistence-based economies in coastal communities of Southwest Alaska. Alaska Department of Fish and Game, Division of Subsistence Technical Paper No. 89, Juneau.



**MIPPA Resource Center for Professionals**

# American Indians and Alaska Natives: Key Demographics and Characteristics

Jan 10, 2023  |  5 min read

  **International Association for Indigenous Aging**

Case 1:22-cv-00054-SLG   Document 75-1   Filed 09/01/23   Page 95 of 106

Exhibit H
Page 1 of 12

## Key Takeaways

> In 2021, there were 9.7 million American Indian/Alaska Native (AI/AN) people; 10.2% were age 65+.
>
> AI/AN people rank at, or near the bottom of, nearly every social, health, and economic indicator. Lower life expectancy and disproportionate disease burden are a result of inadequate education, disproportionate poverty, discrimination in the delivery of health services, and cultural differences.
>
> There are 574 federally recognized American Indian/Alaska Native nations. In 2022, there were 324 federally recognized American Indian reservations.

C ompared with other racial and ethnic groups in the United States, people who are American Indian or Alaska Native (AI/AN) make up a relatively small part of the population. Thus, AI/AN people are often considered an "invisible minority," which makes recognition by established government-reported tracking scales ineffective and outdated.

### A snapshot of the U.S. American Indian/Alaska Native population

Race, like all other US Census data, is self-reported. Since 2000, the US Census allowed people to indicate more than one race. Those who marked "American Indian or Alaska Native" along with one or more additional races are classified as "American Indian or Alaska Native in combination." Those who marked only "American Indian or Alaska Native" are categorized as "American Indian or Alaska Native alone."

In 2021, there were 9.7 million AI/AN people (alone or in combination), comprising 2.9% of the total U.S. population of 329.5 million. This is an increase

of 86.5% from the last Census.[1]

## Age

- According to Census data, 10.2% of AI/AN (alone) people are 65 or older, compared to 16.8% for the United States overall.

- Approximately 27% of AI/AN people are under the age of 18, compared to 18.9% of the non-Hispanic white U.S. population.[2]

## Veteran status

- American Indian and Alaska Native people have served with distinction in the U.S. military in every major conflict for over 200 years.

- AI/AN people serve in the military at five times the national average.

- Today, nearly 20% of all AI/AN service members are women, compared to 15.6% of all service members who are women.[3]

## Geography and tribal communities

In 2022, there were 324 federally recognized American Indian reservations.[4]

- An Indian reservation is an area of land managed by an AI/AN tribe under the United States Department of the Interior's Bureau of Indian Affairs.

- There are 574 federally recognized American Indian and Alaska Native tribes. Not all recognized tribes have a reservation—some have more than one reservation, some share reservations, and others have none.

- The collective geographical area of all reservations is 56.2 million acres, representing 2.3% of the United States' 3.794 million square miles.[5]



Map of AI/AN Reservations, Federal Trust Lands,
Tribal Statistical Areas (2020)

- The following are the 10 largest Indian tribes: Navajo Nation (399,567), Cherokee Nation (292,555), Choctaw Nation (255,677), Chippewa (214,026), Sioux (207,684), Blackfeet (159,394), White Mountain Apache (15,791), Muscogee Nation (108,368), Haudenosaunee Nations (114,568), Blackfeet Nation (17,321).[6]

- As of 2021, the largest Alaskan Native communities were the Yup'ik (33,900) and Inupiat (33,400). Other large AN groups include the Tlingit-Haida (26,100), Alaska Athabaskan (22,500), Aleut (19,300), and Tsimschian (3,800).[7]

- Approximately 22% of AI/AN populations live on tribal lands.[8]

The 10 states with the largest percentage of AI/AN people in 2020 were:

  - Alaska (21.9%)

  - Oklahoma (16.0%)

  - New Mexico (12.4%)

- South Dakota (11.1%)

- Montana (9.3%)

- North Dakota (7.2%)

- Arizona (6.3%)

- Wyoming (4.8%)

- Oregon (4.4%)

- Washington (4.1%)[9]

## Socioeconomic characteristics

AI/AN people rank at, or near the bottom of, nearly every social, health, and economic indicator.

### Income

- Compared to all other race or ethnic populations, AI/AN populations have the highest **poverty rates <https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines>** (24.1%)—almost twice the national rate (12.8%).[10]

- In 2020, the median income of AI/AN (alone) households was $45,877 compared to $64,994 for the entire nation.[11]

- In 2019, 18.7% of AI/AN adults age 65+ lived at the poverty level, which is more than double the poverty rate for all older Americans (8.9%).[12]

## Food security

- Food insecurity has disproportionately affected AI/AN households, especially during the COVID-19 pandemic. One study found that 56% of AI/AN individuals across the country experienced food insecurity, with 31% reporting very low food security (the most severe level of food hardship).[13]

## Employment

- In 2019, the overall unemployment rate for AI/AN people was 6.1%, compared to 3.7% nationwide.[14]

- In 2016-2018, among all AI/AN people, those living in tribal areas had an unemployment rate of 11.4%, compared to 6.6% for those who did not live in tribal areas.[15]

## Education

According to the Bureau of Indian Affairs, in 2019, 84.4% of AI/AN people (alone or in combination) had at least a high school diploma or equivalent.[16]

Closely tied with education and literacy levels is **health literacy <https://www.hrsa.gov/about/organization/bureaus/ohe/health-literacy>** , which is the degree to which individuals have the ability to obtain, process, and understand basic health information and make appropriate decisions. Low health literacy is more common among older adults, minority populations, those who have low socioeconomic status, and medically underserved people.[17] Therefore, given the socio-economic and educational disparities AI/AN people face, AI/AN elders likely have a greater propensity for health literacy issues.

## Housing

Housing problems for AI/AN households relate to the quantity, quality, and price of housing.

- According to a study from 2017, 12% of homes in tribal areas had heating deficiencies, 7% had kitchen deficiencies, and 6% had inadequate plumbing. Nationwide, only 1-2% of homes suffer each of these conditions.

- Housing affordability is the most common problem for AI/AN households. Approximately 38% of AI/AN households were cost-burdened, meaning more than 30% of their income goes towards paying for housing, compared to 36% nationally.

Homelessness in tribal areas often leads to overcrowding (having more than one person per room).

- In a study from 2017, approximately 42,000-85,000 people in Native American communities stayed with friends or relatives because they had no place of their own.

- Among all AI/AN households in tribal areas, 16% are overcrowded, compared to 2% of all US households.[18]

## Economic disparities among urban American Indians

AI/AN migration to urban areas represents one of the most significant demographic shifts in U.S. history. In 1970, 38% of all AI/AN people lived in urban areas.[19]  In 2020, 87% of all AI/AN people identified in the Census lived outside of tribal statistical areas, with 60% living in metropolitan areas.[8,16]

- The unemployment rate of urban American Indians is 11.2% compared to 4.9% of non-Hispanic whites (NHW) in urban areas.

- About 79.5% of urban American Indians had at least a high school

diploma, compared to 94.5% of NHW in urban areas.

- Nearly one-quarter (24.5%) of AI/AN individuals lived in poverty compared to 8.9% of NHW individuals.

- Long-term economic stability is also undermined by the fact that:

  - Urban AI/AN indviduals are more likely to rent (54.7%) than own (45.3%) their housing unit.

  - In contrast, among NHW, 33.8% rented, and 66.2% owned their housing unit.[20]

## Health disparities

American Indians and Alaska Natives continue to die at higher rates than other Americans in many categories and have long experienced lower health status when compared with other Americans. Although disparities in health outcomes have been demonstrated over time among AI/AN communities, interpretation of these findings has been limited due to underreporting and misreporting. Lower life expectancy and the disproportionate disease burden are a result of inadequate education, disproportionate poverty, discrimination in the delivery of health services, and cultural differences. These are broad quality of life issues rooted in economic adversity and poor social conditions.[21]

- Life expectancy at birth for American Indians/Alaska Natives in 2021 was 65.2 years, which is equal to the life expectancy of the total population in 1944. In comparison, for the total U.S. population in 2021, the projected life expectancy at birth was 76.1 years.[22]

- In 2018, the prevalence of heart disease among adults aged 18 and over for AI/AN (alone) was 8.2% compared to 5.6% for NHWs.[23]

- There was a 5.8% death rate linked to diabetes for AI/ANs compared with 3.0% for the general population.[24]

**Exhibit H**
**Page 8 of 12**

- A study of death certificate data revealed that mental health and substance use disorders continue to be a major cause of premature deaths among AI/AN populations, mainly due to liver disease, suicides, and injuries.[25]

- According to a study by the National Resource Center on Native American Aging, 79.1% of elders (aged 55+) surveyed reported 1-4 chronic illnesses. The most commonly reported illness was high blood pressure (58.1%). [26]

## Acknowledgments

Special thanks to the following who provided feedback on this fact sheet:

- Dr. J. Neil Henderson, Professor Emeritus, Department of Family Medicine & Biobehavioral Health, University of Minnesota Medical School, Duluth Campus

- Cynthia LaCounte, Office for American Indians, Alaskan Natives and Native Hawaiian Programs, Administration on Aging/Administration for Community Living

## Sources

1. U.S. Census Bureau. (2022, October 11). Facts for Features: American Indian and Alaska Native Heritage Month: November 2022. https://www.census.gov/newsroom/facts-for-features/2022/aian-month.html

2. National Congress of American Indians. June 1, 2020. Demographics. Found on the internet at https://www.ncai.org/about-tribes/demographics

3. National Indian Council on Aging. November 8, 2019. American Indian Veterans Have Highest Record of Military Service. Found on the internet at https://www.nicoa.org/american-indian-veterans-have-highest-record-of-military-service/

4. U.S. Census Bureau. 2021, October 4, 2021. Facts for Features: American Indian and Alaska Native Heritage Month: November 2021. Found on the internet at https://www.census.gov/newsroom/facts-for-features/2021/aian-month.html

5. U.S. Department of the Interior Bureau of Indian Affairs. August 19, 2017. What is a Federal Indian Reservation? Found on the internet at https://www.bia.gov/faqs/what-federal-indian-reservation

6. Trinidad, K. November 5, 2021. Biggest Native American Tribes in the U.S. Today. Stacker. Found on the internet at https://stacker.com/stories/3437/biggest-native-american-tribes-us-today

7. Minority Rights Group International. (n.d.). Alaska Natives. Found on the internet at https://minorityrights.org/minorities/alaska-natives/

8. U.S. Census Bureau. (2020). American Indian and Alaska Native (AIAN) Heritage Month: AIAN Alone or in Combination by State: 2020.
 https://www.census.gov/content/dam/Census/library/visualizations/2022/comm/aian-month.pdf

9.  Rezal, A. November 26, 2021. Where Most Native Americans Live. U.S. News.  Found on the internet at https://www.usnews.com/news/best-states/articles/the-states-where-the-most-native-americans-live

10.  U.S. Census Bureau. 2020. 2020 ACS 5-year estimates [S1701 - Poverty Status in the Past 12 Months]. Found on the internet at  https://data.census.gov/cedsci/table?q=Income%20and%20Poverty&tid=ACSST5Y2020.S1701

11.  U.S. Census Bureau. 2020. 2020 ACS 5-year estimates [S1903 - Median Income in the Past 12 Months]. Found on the internet at  https://data.census.gov/cedsci/table?q=Income%20%28Households,%20Families,%20Individuals%29&tid=ACSST5Y2020.S1903

12. U.S. Administration for Community Living. 2020. 2020 Profile of American Indians and Alaska Natives Age 65 and Older. Found on the internet at https://acl.gov/sites/default/files/Profile%20of%20OA/AIANProfileReport2021.pdf

13. Maillacheruvu, S.U. October 4, 2022. The Historical Determinants of Food Insecurity in Native Communities. Center on Budget and Policy Priorities. Found on the internet at

**Exhibit H**
**Page 10 of 12**

https://www.cbpp.org/research/food-assistance/the-historical-determinants-of-food-insecurity-in-native-communities

14. U.S. Bureau of Labor Statistics. December 2020. Labor force characteristics by race and ethnicity, 2019. (Report 1088). Found on the internet at https://www.bls.gov/opub/reports/race-and-ethnicity/2019/home.htm

15. Allard, M.D. & Brundage, V., Jr. November 2019. American Indians and Alaska Natives in the US Labor Force. US Bureau of Labor Statistics. Found on the internet at https://www.bls.gov/opub/mlr/2019/article/american-indians-and-alaska-natives-in-the-u-s-labor-force.htm

16. U.S. Department of Health and Human Services Office of Minority Health. January 11, 2022. Profile: American Indian/Alaska Native. Found on the internet at https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=3&lvlid=62

17. Health Resources and Services Administration. 2019. Health Literacy. Found on the internet at https://www.hrsa.gov/about/organization/bureaus/ohe/health-literacy

18. Walters, A. 2022. Native American, Alaska Native, and Native Hawaiian Housing Programs. National Low Income Housing Coalition. Found on the internet at https://nlihc.org/sites/default/files/2022-03/2022AG_5-05_Native-American-Alaska-Native-Native-Hawaiian-Housing-Programs.pdf

19.   The Annie E. Casey Foundation. January 1, 2008. Urban Indian America: The status of American Indian and Alaska Native children and families. Baltimore, MD: The National Urban Indian Family Coalition. Found on the internet at https://www.aecf.org/resources/urban-indian-america

20. Urban Indian Health Institute, Seattle Indian Health Board. October 29, 2021. Community Health Profile: National Aggregate of Urban Indian Organization Service Areas. Found on the internet at https://www.uihi.org/resources/community-health-profile-national-aggregate-of-urban-indian-organization-service-areas/

21. Indian Health Service. 2019. Disparities [fact sheet].  Found on the internet at https://www.ihs.gov/newsroom/factsheets/disparities/

22. National Center for Health Statistics. August 31, 2022. Life Expectancy in the U.S. Dropped for the Second Year in a Row in 2021 [Press release]. Found on the internet at https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/20220831.htm

23. National Center for Health Statistics. 2021. Health, United States, [2020-2021]: Table HDPrv.   Found on the internet at https://www.cdc.gov/nchs/data/hus/2020-2021/HDPrv.pdf

24. Carron, R. 2020. Health Disparities in American Indians/Alaska Natives: Implications for nurse practitioners. The Nurse Practitioner, 45(6), 26-32. Found on the internet at https://doi.org/10.1097/01.NPR.0000666188.79797.a7

25. Kruse, G., Lopez-Carmen, V. A., Jenson, A., Hardie, L., & Sequist, T. D. January 26, 2022. The Indian Health Service and American Indian/Alaska Native Health Outcomes. Annual Review of Public Health. Found on the internet at https://pubmed.ncbi.nlm.nih.gov/35081315/

26. National Resource Center on Native American Aging. (2021). Title VI Needs Assessment Survey: Identifying Our Needs: A Survey of Elders Cycle VII (2017-2020) [data book]. https://www.nrcnaa.org/assets/4748-21205/2021-data-booklet.pdf