# The Service's new Alaska Regional Director Announced

Mar 2, 2022

T he U.S. Fish and Wildlife Service (Service) Director Martha Williams announced the selection of Sara Boario to serve as the Regional Director for the Service's Alaska Region. Sara comes to this role with nearly 20 years of public service experience in Alaska, including 16 as a leader in conservation and public lands stewardship. During that time, she has earned a reputation for strategic vision-setting, creative partnerships, and prioritizing the ways we listen, share, and build relationships both inside and outside the Service. She begins her new role on March 14.



Case 1:22-cv-00054-SLG   Document 75-5   Filed 09/01/23   Page 1 of 107
Exhibit W
Page 1 of 5

Image Details

"Sara was raised across Alaska and has a deep commitment to working with all of Alaska's communities as shared stewards of fish, wildlife, and habitat," said Martha Williams, FWS Director. "Her abilities and passion for Alaska and its people will make her an excellent leader for the Region and our many dedicated public servants there."

Since 2014, Boario has served as Assistant Regional Director for External Affairs and recently as acting Deputy Regional Director. In these positions, she has been a senior advisor on the region's highest profile policy challenges and provided critical leadership on efforts to strengthen and heal relationships with Indigenous peoples, elevate the voices of young Alaskans in international Arctic discussions, and connect with urban partners. She has also pioneered new ways to connect the public with the Service's work and mission through creative virtual programs, including the award-winning Arctic Refuge Virtual Bird Fest ↗.

Prior to her time with the Service, Boario established a reputation as a collaborative leader. She began her federal career as a Presidential Management Fellow with the U.S. Forest Service, Chugach National Forest, where she served in multiple roles, and led creation of the Chugach Children's Forest, the Classrooms for Climate partnership with the University of Alaska Anchorage, and a multi-disciplinary planning process in Prince William Sound. Her earlier public service included work as Chief of Staff for Alaska State Senator Georgianna Lincoln.

"I grew up learning from Alaskans, and in my career I've had the privilege to work alongside countless partners across the state on a wide-range of projects and issues. It is an honor to contribute my experience and passion for the state, its people, our agency, and the wildness that sustains us all," Boario said.

Boario has deep roots in Alaska.  She was raised in welcoming communities across Alaska – Yakutat, Wrangell, Sand Point, Fairbanks - where she grew up living with and from the natural world. Her experiences in these places and the people she learned from, shaped her personal and professional values, and set the stage for her commitment to long-lasting, successful partnerships. She also leads the Service on critical diversity and inclusion challenges, both within and outside the agency, including her role as a prominent voice on LGBTQ+ issues.

Boario comes from a large, spirited, music-loving, and adventurous family that stretches from Juneau to Fairbanks. She loves exploring the outdoors and playing sports with her two sons, Leo and Raineri.

**Published**

Mar 2, 2022

**Featured in the Story**

Sara Boario

# Latest Stories



👤 **For Parents and Educators**

FAC Quilt at Mammoth Spring National Fish Hatchery

Aug 10, 2023



On the Minestrone-ness of Bird Subspecies

Aug 10, 2023

Case 1:22-cv-00054-SLG   Document 75-5   Filed 09/01/23   Page 4 of 107
**Exhibit W**
**Page 4 of 5**



Our People    1    2    3    4    5    6    7    8    9

USFWS at EAA AirVenture

Aug 10, 2023

Case 1:22-cv-00054-SLG   Document 75-5   Filed 09/01/23   Page 5 of 107

Exhibit W
Page 5 of 5

 An official website of the United States government
Here's how you know ⌄

  **Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

MENU

Home  ▸  news  ▸  News releases  ▸
Forest Service Chief announces new Regional Forester for Alaska Region

# Forest Service Chief announces new Regional Forester for Alaska Region

**November 30, 2018 - Contact: (202) 205-1005**

**Twitter:** **@forestservice**

**WASHINGTON, Nov. 30, 2018 —** USDA Forest Service Chief Vicki Christiansen announced today the appointment of David Schmid as regional forester for the Forest Service's Alaska Region. As regional forester, Schmid will oversee management of more than 22 million acres of National Forest System lands in Southcentral and Southeast Alaska.

Schmid has been acting regional forester in Alaska for the last eight months filling in behind Beth Pendleton who retired in April.

"David's more than 30 years of experience and his commitment to maintaining strong relationships with people, stakeholders and communities make him exceptionally well qualified for this job," Christiansen said. "I'm also pleased that he's bringing both his leadership skills and 23 years of experience on the Chugach and Tongass National Forests to this role."

David joined the Forest Service first as a volunteer in Minnesota. After graduating college, he worked as a fisheries and watershed program leader on the Chugach National Forest and as a district ranger on the Tongass National Forest. Following his time in Alaska, he served as the national fish program leader in Washington DC, and as the director of biological and physical resources in the Southern Region.  For the last four years he has served as the Deputy Regional Forester in the Northern Region based in Missoula, Montana.

The mission of the USDA Forest Service is to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations. The agency manages the 193 million acres of National Forest System land, provides stewardship

assistance to non-federal forest landowners, and maintains the largest forestry research organization in the world.

For more information about the U.S. Forest Service visit http://www.fs.fed.us/.

# About the Agency

Contact Us

Agency Leadership

Budget and Performance

Equity Action Plan

Faces of the Forest Service

National Programs and Offices

**Newsroom**

**News releases**

Success Stories

Feature stories

Speeches

Testimony

Publications

Regulations and Policies

Directives Search

This is Who We Are

# Popular Tags

CALIFORNIA   CLIMATE

CHANGE   CONSERVATION   EDUCATION   EMPLOYEES   FACES OF THE

FOREST   FIRE   FORESTRY   FOREST SERVICE   FS   INSIDE THE

FOREST SERVICE   NATIONAL FOREST   PRESCRIBED

FIRE   RECREATION   RESEARCH   RESTORATION   SCIENCE   TREES   USDA

FOREST SERVICE   WILDFIRE

**Visit Us**

**Managing the Land**

**Learn**

**Science and Technology**

**Working with Us**

**About the Agency**

**Inside the FS**

| | |
|---|---|
| askUSDA | Open |
| Contact Us | FOIA |
| Sitemap | Accessibility Statement |
| Policies & Links | Privacy Policy |
| Our Performance | Non-Discrimination Statement |
| Careers | USDA Anti-Harassment Policy |
| Report Fraud on USDA Contracts | Forest Service Anti-Harassment Policy |
| Visit OIG | Information Quality |
| Plain Writing | USA.gov |

Whitehouse.gov                              Feedback

eGov                                        No FEAR Act Data


**Forest Service**
U.S. DEPARTMENT OF
AGRICULTURE

    

UNITED STATES GOVERNMENT

# Policy and Supporting Positions

Committee on Oversight
and Reform

U.S. House of Representatives

116th Congress, 2d Session



DECEMBER 2020

Available via http://www.govinfo.gov

Printed for the use of the
Committee on Oversight and Reform

# U.S. GOVERNMENT POLICY AND SUPPORTING POSITIONS—2020

**Exhibit Y**
**Page 2 of 15**

UNITED STATES GOVERNMENT

# Policy and Supporting Positions

Committee on Oversight
and Reform

## U.S. House of Representatives
116th Congress, 2d Session



DECEMBER 2020

Available via http://www.govinfo.gov

Printed for the use of the
Committee on Oversight and Reform

U.S. GOVERNMENT PUBLISHING OFFICE

WASHINGTON, D.C.  :  2020

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov    Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax (202) 512–2104    Mail: Stop IDCC, Washington, DC 20402–0001

42–150 PDF

# COMMITTEE ON OVERSIGHT AND REFORM

CAROLYN B. MALONEY, New York, *Chairwoman*

ELEANOR HOLMES NORTON, District of
  Columbia
WM. LACY CLAY, Missouri
STEPHEN F. LYNCH, Massachusetts
JIM COOPER, Tennessee
GERALD E. CONNOLLY, Virginia
RAJA KRISHNAMOORTHI, Illinois
JAMIE RASKIN, Maryland
HARLEY ROUDA, California
RO KHANNA, California
KWEISI MFUME, Maryland
DEBBIE WASSERMAN SCHULTZ, Florida
JOHN P. SARBANES, Maryland
PETER WELCH, Vermont
JACKIE SPEIER, California
ROBIN L. KELLY, Illinois
MARK DESAULNIER, California
BRENDA L. LAWRENCE, Michigan
STACEY E. PLASKETT, Virgin Islands
JIMMY GOMEZ, California
ALEXANDRIA OCASIO-CORTEZ, New York
AYANNA PRESSLEY, Massachusetts
RASHIDA TLAIB, Michigan
KATIE PORTER, California

JAMES COMER, Kentucky, *Ranking Minority
  Member*
JIM JORDAN, Ohio
PAUL A. GOSAR, Arizona
VIRGINIA FOXX, North Carolina
THOMAS MASSIE, Kentucky
JODY B. HICE, Georgia
GLENN GROTHMAN, Wisconsin
GARY PALMER, Alabama
MICHAEL CLOUD, Texas
BOB GIBBS, Ohio
CLAY HIGGINS, Louisiana
RALPH NORMAN, South Carolina
CHIP ROY, Texas
CAROL D. MILLER, West Virginia
MARK E. GREEN, Tennessee
KELLY ARMSTRONG, North Dakota
W. GREGORY STEUBE, Florida
FRED KELLER, Pennsylvania

DAVID RAPALLO, *Staff Director*
ELISA LANIER, *Chief Clerk*
AMY STRATTON, *Clerk*
CONTACT NUMBER: 202-225-5051
MARK MARIN, *Minority Staff Director*

# FOREWORD

———

Every four years, just after the Presidential election, the "United States Government Policy and Supporting Positions," commonly known as the *Plum Book*, is published, alternately, by the Senate Committee on Homeland Security and Governmental Affairs and the House Committee on Oversight and Reform.

This publication contains data (as of June 30, 2020) on over 9,000 Federal civil service leadership and support positions in the legislative and executive branches of the Federal Government that may be subject to noncompetitive appointment (e.g., positions such as agency heads and their immediate subordinates, policy executives and advisors, and aides who report to these officials). The duties of many such positions may involve advocacy of Administration policies and programs and the incumbents usually have a close and confidential working relationship with the agency head or other key officials.

Following are the major categories of positions listed:

- Executive Schedule and salary-equivalent positions paid at the rates established for levels I through V of the Executive Schedule;

- Senior Executive Service (SES) "General" positions;

- Senior Foreign Service positions;

- Schedule C positions excepted from the competitive service by the President, or by the Director, Office of Personnel Management, because of the confidential or policy-determining nature of the position duties; and

- Other positions at the GS–14 and above level excepted from the competitive civil service by law because of the confidential or policy-determining nature of the position duties.

See Appendix 2 for more details on SES appointments and Appendix 3 for more details on Schedule C appointments. Additional information on the positions listed and the Federal salary schedules under which they are paid is provided in the appendices. The Legend on the following page shows the codes and acronyms used in this publication.

**DISCLAIMER**

**The information for this committee print was provided by the U.S. Office of Personnel Management [OPM].**

# LEGEND

_____

**Position Location (Column 1)**

Listed are the cities, States/Provinces and foreign countries in which the positions are located. Countries and cities (or other subdivisions) are shown for overseas posts. Note that "Washington, DC" includes positions in the entire metropolitan area and therefore may include certain cities and counties in the States of Maryland and Virginia.

**Position Title (Column 2)**

Listed are the position titles and the names of the organizations in which they are located.

**Name of Incumbent (Column 3)**

Listed are the names of individuals serving under other than career appointments. The phrase "Career Incumbent" is shown for positions incumbered by career appointees. The term "Vacant" is shown for positions that were not occupied on June 30, 2020, the "as of" date of this publication.

Note the law requires "member" positions in certain agencies (e.g., boards, committees, and commissions) be filled on a bipartisan basis. For such positions, the following letter codes are shown in parentheses following the name of the incumbent:

(D) = Democrat      (I) = Independent      (R) = Republican

**Type of Appointment (Column 4)**

Listed are letter codes that denote the type of appointment under which the position incumbent is serving. Note that several categories of positions can be filled by more than one type of appointment, e.g., SES positions listed in this publication may be filled by using career, noncareer, limited emergency, or limited term appointment authorities. Therefore, no "Type of Appointment" is shown for such positions when they are vacant.

| | | |
|---|---|---|
| PAS | = | Presidential Appointment with Senate Confirmation |
| PA | = | Presidential Appointment (without Senate Confirmation) |
| CA | = | Career Appointment |
| NA | = | Noncareer Appointment |
| EA | = | Limited Emergency Appointment |
| TA | = | Limited Term Appointment |
| SC | = | Schedule C Excepted Appointment |
| XS | = | Appointment Excepted by Statute |

**Exhibit Y**
**Page 7 of 15**

**Pay Plan (Column 5)**

Listed are letter codes that denote the Federal salary schedule or pay system under which the position incumbents are going to be paid. Tables showing the salary range for major pay systems are contained in Appendix 4.

| | | |
|---|---|---|
| AD | = | Administratively Determined Rates |
| ES | = | Senior Executive Service |
| EX | = | Executive Schedule |
| FA | = | Foreign Service Chiefs of Mission |
| FE | = | Senior Foreign Service |
| FP | = | Foreign Service Specialist |
| GS | = | General Schedule |
| PD | = | Daily Pay Rate* (per diem) |
| SL | = | Senior Level |
| TM | = | Federal Housing Finance Board Merit Pay |
| VH | = | Farm Credit Administration Pay Plan |
| WC | = | Without Compensation* |
| OT | = | Other Pay Plan* (all those not listed separately) |

* Although not pay plans, these codes are shown for information purposes.

**Level, Grade, or Pay (Column 6)**

Listed are numerical and letter codes that denote the level, grade or salary of the position incumbered:

Levels I through V of the Executive Schedule

Grades 1 through 15 of the General Schedule

Annual Salary in Dollars

Daily Pay Rate in Dollars

If there is no entry in this column, the position does not have an established level, grade, or pay rate. For example, the pay rate for Senior Executive Service and Senior Level positions is "personal," i.e., attached to the incumbent, not the position. The pay rate for each new appointee is set by the appointing authority (usually the agency head) on a case-by-case basis. Annual salary schedules and pay ranges for such positions are shown in Appendix 4.

**Tenure (Column 7)**

Listed are the terms or durations of the appointment in years. If there is no entry in this column, the appointment has no fixed term.

**Expires (Column 8)**

Listed are the expiration dates for time-limited appointments. If there is no entry in this column, the incumbent is not serving under a time-limited appointment. However, many member positions on agency advisory boards, councils, and commissions are filled initially for a fixed term, but the incumbents may (and often do) serve beyond the expiration date until they are replaced. In such cases, no expiration date is shown.

# CONTENTS

|                                                                 | Page |
|-----------------------------------------------------------------|------|
| FOREWORD                                                        | iii  |
| LEGEND                                                          | v    |

## LEGISLATIVE BRANCH

| Architect of the Capitol                                        | 1    |
| Government Accountability Office                                | 1    |
| Government Publishing Office                                    | 1    |
| Library of Congress                                             | 1    |

## EXECUTIVE BRANCH

| Executive Office of the President                               | 2    |

### DEPARTMENTS

| Department of Agriculture                                       | 10   |
| Department of Commerce                                         | 20   |
| Department of Commerce Office of the Inspector General         | 29   |
| Department of Defense                                          | 30   |
| Department of Education                                        | 49   |
| Department of Education Office of the Inspector General         | 52   |
| Department of Energy                                           | 52   |
| Department of Energy Office of the Inspector General           | 60   |
| Department of Health and Human Services                        | 60   |
| Department of Health and Human Services Office of the Inspector General | 72 |
| Department of Homeland Security                               | 72   |
| Department of Homeland Security Office of the Inspector General | 82   |
| Department of Housing and Urban Development                   | 82   |
| Department of Housing and Urban Development Office of the Inspector General | 88 |
| Department of Justice                                         | 88   |
| Department of Justice Office of the Inspector General          | 99   |
| Department of Labor                                           | 99   |
| Department of Labor Office of Inspector General                | 103  |
| Department of State                                           | 103  |
| Department of State Office of the Inspector General            | 114  |
| Department of the Interior                                     | 115  |
| Department of the Interior Office of the Inspector General     | 121  |
| Department of the Treasury                                     | 122  |
| Department of the Treasury Office of the Inspector General     | 127  |
| Department of the Treasury Special Inspector General for the Troubled Asset Relief Program | 127 |
| Department of the Treasury Tax Administration Office of the Inspector General | 127 |
| Department of Transportation                                   | 128  |
| Department of Transportation Office of the Inspector General   | 136  |
| Department of Veterans Affairs                                 | 136  |
| Department of Veterans Affairs Office of the Inspector General | 147  |

### INDEPENDENT AGENCIES AND GOVERNMENT CORPORATIONS

| Advisory Council on Historic Preservation                       | 148  |
| African Development Foundation                                 | 148  |
| American Battle Monuments Commission                          | 148  |
| Appalachian Regional Commission                                | 148  |
| Arctic Research Commission                                     | 148  |
| Armed Forces Retirement Home                                   | 149  |
| Barry Goldwater Scholarship and Excellence in Education Foundation | 149 |
| Central Intelligence Agency                                    | 149  |
| Chemical Safety and Hazard Investigation Board                 | 149  |
| Christopher Columbus Fellowship Foundation                     | 149  |

|                                                                 | Page |
|-----------------------------------------------------------------|------|
| Commission of Fine Arts                                        | 150  |
| Commission on Civil Rights                                     | 150  |
| Committee for Purchase From People who are Blind or Severely Disabled | 150 |
| Commodity Futures Trading Commission                          | 151  |
| Consumer Financial Protection Bureau                          | 151  |
| Consumer Product Safety Commission                            | 151  |
| Corporation for National and Community Service                | 152  |
| Council of Inspectors General on Integrity and Efficiency     | 153  |
| Court Services and Offender Supervision Agency for the District of Columbia | 153 |
| Defense Nuclear Facilities Safety Board                        | 153  |
| Delaware River Basin Commission                               | 153  |
| Delta Regional Authority                                      | 153  |
| Denali Commission                                            | 153  |
| Dwight D Eisenhower Memorial Commission                       | 153  |
| Environmental Protection Agency                               | 154  |
| Environmental Protection Agency Office of the Inspector General | 159 |
| Equal Employment Opportunity Commission                      | 159  |
| Export-Import Bank                                           | 160  |
| Export-Import Bank Office of the Inspector General            | 161  |
| Farm Credit Administration                                   | 161  |
| Federal Communications Commission                            | 161  |
| Federal Deposit Insurance Corporation                        | 162  |
| Federal Election Commission                                  | 162  |
| Federal Election Commission Office of the Inspector General  | 163  |
| Federal Energy Regulatory Commission                         | 163  |
| Federal Housing Finance Agency                               | 164  |
| Federal Housing Finance Board                                | 165  |
| Federal Labor Relations Authority                            | 165  |
| Federal Maritime Commission                                  | 165  |
| Federal Mediation and Conciliation Service                   | 165  |
| Federal Mine Safety and Health Review Commission            | 166  |
| Federal Permitting Improvement Steering Council             | 166  |
| Federal Reserve System                                      | 166  |
| Federal Retirement Thrift Investment Board                   | 166  |
| Federal Trade Commission                                     | 167  |
| General Services Administration                              | 168  |
| General Services Administration Office of the Inspector General | 169 |
| Great Lakes Fishery Commission                               | 169  |
| Gulf Coast Ecosystem Restoration Council                     | 170  |
| Harry S Truman Scholarship Foundation                        | 170  |
| Institute of Museum and Library Services                     | 170  |
| Intellectual Property Enforcement Coordinator               | 170  |
| Inter-american Foundation                                    | 171  |
| Interagency Council on the Homeless                          | 171  |
| International Boundary and Water Commission                  | 171  |
| International Joint Commission                               | 171  |
| Interstate Commission on the Potomac River Basin            | 171  |
| James Madison Memorial Fellowship Foundation                | 172  |
| Japan United States Friendship Commission                   | 172  |
| Marine Mammal Commission                                     | 172  |
| Medicaid and Chip Payment and Access Commission             | 172  |
| Medicare Payment Advisory Commission                        | 172  |
| Merit Systems Protection Board                               | 173  |
| Millennium Challenge Corporation                            | 173  |
| Morris K Udall Scholarship and Excellence in National Environmental Policy Foundation | 174 |
| National Aeronautics and Space Administration               | 174  |
| National Aeronautics and Space Administration Office of the Inspector General | 175 |
| National Archives and Records Administration                | 176  |
| National Capital Planning Commission                        | 176  |
| National Council on Disability                              | 176  |

Case 1:22-cv-00054-SLG   Document 75-5   Filed 09/01/23   Page 18 of 107   **Exhibit Y**
**Page 9 of 15**

Page

National Credit Union Administration ............................ 176
National Endowment for the Arts .................................. 177
National Endowment for the Humanities ....................... 177
National Endowment for the Humanities Office of the Inspector General ................................................................... 178
National Labor Relations Board ...................................... 178
National Mediation Board ............................................... 179
National Science Foundation .......................................... 179
National Science Foundation Office of the Inspector General ............................................................................... 182
National Transportation Safety Board ............................ 182
Northern Border Regional Commission .......................... 183
Nuclear Regulatory Commission .................................... 183
Nuclear Regulatory Commission Office of the Inspector General ................................................................... 186
Nuclear Waste Technical Review Board ........................... 186
Occupational Safety and Health Review Commission ...... 186
Office of Government Ethics ........................................... 187
Office of Navajo and Hopi Indian Relocation .................. 187
Office of Personnel Management .................................... 187
Office of Personnel Management Office of the Inspector General ................................................................... 189
Office of Special Counsel ............................................... 189
Office of the Secretary of Defense Office of the Inspector General ................................................................... 189
Peace Corps .................................................................. 189
Pension Benefit Guaranty Corporation ........................... 190
Pension Benefit Guaranty Corporation Office of Inspector General ................................................................... 190
Postal Regulatory Commission ...................................... 191
Public Buildings Reform Board ...................................... 191
Railroad Retirement Board ............................................ 191
Railroad Retirement Board Office of the Inspector General ................................................................... 192
Securities and Exchange Commission ............................ 192
Selective Service System ............................................... 192
Small Business Administration ...................................... 192
Small Business Administration Office of the Inspector General ................................................................... 194

Page

Smithsonian Institution ................................................. 194
Social Security Administration ...................................... 194
Social Security Administration Office of the Inspector General ................................................................... 199
Surface Transportation Board ........................................ 199
Tennessee Valley Authority ........................................... 199
Trade and Development Agency ...................................... 199
U.S. Agency for Global Media ........................................ 199
United States – China Economic and Security Review Commission ................................................................. 200
United States Agency for International Development ......... 200
United States Agency for International Development Office of the Inspector General .......................................... 203
United States Commission for the Preservation of America's Heritage Abroad ................................................ 203
United States Commission on International Religious Freedom ...................................................................... 203
United States Election Assistance Commission ............... 203
United States Holocaust Memorial Council ..................... 204
United States Institute of Peace ..................................... 204
United States International Development Finance Corporation ........................................................................ 204
United States International Trade Commission ................ 205
United States International Trade Commission Office of the Inspector General .......................................... 206
United States Postal Service .......................................... 206
United States Semiquincentennial Commission .............. 206
Vietnam Education Foundation ...................................... 206
Women's Suffrage Centennial Commission ..................... 207
Woodrow Wilson International Center for Scholars ......... 207
World War I Centennial Commission .............................. 207

APPENDICES

1. Summary of Positions Subject to Noncompetitive Appointment ................................................................. 209
2. Senior Executive Service ............................................ 213
3. Schedule C Positions ................................................. 215
4. Federal Salary Schedules for 2020 ............................. 216

## DEPARTMENT OF AGRICULTURE—Continued

| Location | Position Title | Name of Incumbent | Type of Appt. | Pay Plan | Level, Grade, or Pay | Tenure | Expires |
|---|---|---|---|---|---|---|---|
| Washington, DC ..... | Deputy Director, Institute of Youth, Family and Community. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Deputy Director, Institute of Food Production and Sustainability. | ......do ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Policy Advisor ........................... | Laney Copeland...................... | SC | GS | 11 | ............... | |
| | **OFFICE OF UNDER SECRETARY FOR NATURAL RESOURCES AND ENVIRONMENT** | | | | | | |
| Do .................... | Under Secretary for Natural Resources and Environment. | James Edward Hubbard ...... | PAS | EX | III | ............... | |
| Do .................... | Deputy Under Secretary for Natural Resources and Environment. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | ......do .............................. | ......do ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Chief of Staff ........................... | Christopher Marklund ............ | NA | ES | ............... | ............... | |
| Do .................... | Senior Policy Advisor ................. | Robert Macgregor ................... | SC | GS | 13 | ............... | |
| Do .................... | Staff Assistant ........................... | William Guy............................. | SC | GS | 7 | ............... | |
| | *Forest Service* | | | | | | |
| Do .................... | Chief Forester ........................... | Career Incumbent ................. | CA | ES | ............... | ............... | |
| Do .................... | Associate Chief ........................... | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Chief of Staff ........................... | Career Incumbent ................. | CA | ES | ............... | ............... | |
| Do .................... | Associate Deputy Chief, Business Operations ... | Career Incumbent ................. | CA | ES | ............... | ............... | |
| Do .................... | Associate Deputy Chief, Business Operations, Policy. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Associate Deputy Chief, Research and Development. | ......do ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Deputy Chief for State and Private Forestry..... | Career Incumbent ................. | CA | ES | ............... | ............... | |
| Do .................... | Director, Human Resources Management..... | ......do ...................................... | CA | ES | ............... | ............... | |
| Do .................... | Chief Information Officer................. | ......do ...................................... | CA | ES | ............... | ............... | |
| Do .................... | Assistant Chief Information Officer ........ | ......do ...................................... | CA | ES | ............... | ............... | |
| Do .................... | Director, Senior Youth and Volunteer Programs. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Albuquerque, NM..... | Director, Albuquerque Service Center-Budget and Finance. | Career Incumbent ................. | CA | ES | ............... | ............... | |
| Washington, DC ..... | Director, Strategic Planning and Budget Accountability. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Director Work Environment and Performance.. | Career Incumbent ................. | CA | ES | ............... | ............... | |
| Do .................... | Director, Civil Rights Staff................ | ......do ...................................... | CA | ES | ............... | ............... | |
| Do .................... | Director, Sustainability and Climate Change..... | ......do ...................................... | CA | ES | ............... | ............... | |
| Lakewood, CO ......... | Director, National Job Corps............. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Washington, DC ..... | Director, Emergency Medical Services ......... | Career Incumbent ................. | CA | ES | ............... | ............... | |
| | *National Forest System* | | | | | | |
| Do .................... | Deputy Chief, National Forest System....... | ......do ...................................... | CA | ES | ............... | ............... | |
| Do .................... | Associate Deputy Chief, National Forest System. | ......do ...................................... | CA | ES | ............... | ............... | |
| Do .................... | ......do ...................................... | ......do ...................................... | CA | ES | ............... | ............... | |
| Do .................... | ......do ...................................... | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | Director, Recreation and Heritage Resources ... | ......do ...................................... | ............. | ES | ............... | ............... | |
| | *International Forest System* | | | | | | |
| Do .................... | Director of International Programs......... | Career Incumbent ................. | CA | ES | ............... | ............... | |
| | *State and Private Forestry* | | | | | | |
| Do .................... | Associate Deputy Chief, State and Private Forestry. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Do .................... | ......do ...................................... | Career Incumbent ................. | CA | ES | ............... | ............... | |
| | *Field Units* | | | | | | |
| Missoula, MT........... | Regional Forester, Region 1, Northern Region, Missoula. | ......do ...................................... | CA | ES | ............... | ............... | |
| Lakewood, CO ........ | Regional Forester, Rocky Mountain Region .... | ......do ...................................... | CA | ES | ............... | ............... | |
| Albuquerque, NM..... | Regional Forester, Region 3, Southwest Region, Albuquerque. | ......do ...................................... | CA | ES | ............... | ............... | |
| Ogden, UT ............... | Regional Forester, Region 4, Intermountain Region, Ogden. | Vacant ...................................... | ............. | ES | ............... | ............... | |
| San Francisco, CA... | Regional Forester, Region 5, Pacific Southwest Region, Vallejo. | Career Incumbent ................. | CA | ES | ............... | ............... | |
| Portland, OR............ | Regional Forester, Region 6, Pacific Northwest Region, (Portland). | ......do ...................................... | CA | ES | ............... | ............... | |
| Atlanta, GA ............. | Regional Forester, Region 8,Southern Region, Atlanta. | ......do ...................................... | CA | ES | ............... | ............... | |
| Milwaukee, WI ........ | Regional Forester, Region 9, Eastern Region .... | Vacant ...................................... | ............. | ES | ............... | ............... | |
| Juneau, AK............... | Regional Forester, Region 10, (Juneau) ....... | ......do ...................................... | ............. | ES | ............... | ............... | |

## DEPARTMENT OF THE INTERIOR—Continued

| Location | Position Title | Name of Incumbent | Type of Appt. | Pay Plan | Level, Grade, or Pay | Tenure | Expires |
|---|---|---|---|---|---|---|---|
| | **ASSISTANT SECRETARY - FISH AND WILDLIFE AND PARKS** | | | | | | |
| Washington, DC ..... | Assistant Secretary - Fish and Wildlife and Parks. | George R Wallace.................. | PAS | EX | IV | ............... | |
| Do ..................... | Principal Deputy Assistant Secretary for Fish and Wildlife and Parks. | John Richard Tanner............ | NA | ES | ............... | ............ | |
| Do ..................... | Deputy Assistant Secretary - Fish and Wildlife and Parks. | Ryan Hambleton.................. | NA | ES | ............... | ............ | |
| Do ..................... | .....do ............................................. | Vacant ............................... | ............ | ES | ............... | ............ | |
| Do ..................... | .....do ............................................. | ..... do ............................. | ............ | ES | ............... | ............ | |
| Miami, FL............ | Director Everglades Restoration Initiatives/Executive Director South Florida Ecosystem Restoration Task Force. | Career Incumbent ............ | CA | ES | ............... | ............ | |
| Washington, DC ..... | Counselor to the Assistant Secretary-Fish and Wildlife and Parks. | Katie Mills .......................... | SC | GS | 14 | ............... | |
| | *United States Fish and Wildlife Service* | | | | | | |
| Do ..................... | Director, United States Fish and Wildlife Service. | Aurelia Nmn Skipwith......... | PAS | EX | V | ............... | |
| Do ..................... | Principal Deputy Director, Us Fish and Wildlife Service. | Margaret Emma Everson ..... | NA | ES | ............... | ............ | |
| Do ..................... | Deputy Director - Operations............................. | Career Incumbent ............ | CA | ES | ............... | ............ | |
| Do ..................... | Deputy Director - Program Management and Policy. | ..... do ............................. | CA | ES | ............... | ............ | |
| Do ..................... | Assistant Director - Fisheries and Aquatic Conservation. | ..... do ............................. | CA | ES | ............... | ............ | |
| Do ..................... | Assistant Director - International Affairs........ | ..... do ............................. | CA | ES | ............... | ............ | |
| Do ..................... | Assistant Director - External Affairs ............. | ..... do ............................. | CA | ES | ............... | ............ | |
| Baileys Crossroads, VA. | Assistant Director - Migratory Bird Programs.. | ..... do ............................. | CA | ES | ............... | ............ | |
| Washington, DC ..... | Assistant Director - Ecological Services........... | ..... do ............................. | CA | ES | ............... | ............ | |
| Do ..................... | Assistant Director - Wildlife and Sportfish Restoration Programs. | ..... do ............................. | CA | ES | ............... | ............ | |
| Falls Church, VA.... | Assistant Director - Science Application........... | ..... do ............................. | CA | ES | ............... | ............ | |
| Washington, DC ..... | Assistant Director - Management and Administration. | ..... do ............................. | CA | ES | ............... | ............ | |
| Shepherdstown, WV. | Director, National Conservation Training Center. | ..... do ............................. | CA | ES | ............... | ............ | |
| Washington, DC ..... | Chief, National Wildlife Refuge System ............ | ..... do ............................. | CA | ES | ............... | ............ | |
| Do ..................... | Senior Advisor - Energy Policy ........................ | ..... do ............................. | CA | ES | ............... | ............ | |
| Baileys Crossroads, VA. | Associate Chief Information Officer .................. | ..... do ............................. | CA | ES | ............... | ............ | |
| Denver, CO ............ | Advisor.............................................................. | Zachariah James Gambill... | SC | GS | 12 | ............... | |
| | *Field Offices - Fws* | | | | | | |
| Hadley, MA............ | Regional Director - Interior Unified Region 1 .. | Career Incumbent ............ | CA | ES | ............... | ............ | |
| Atlanta, GA .......... | Regional Director - Interior Unified Regions 2 & 4. | ..... do ............................. | CA | ES | ............... | ............ | |
| Minneapolis, MN.... | Regional Director - Interior Unified Region 3 ... | ..... do ............................. | CA | ES | ............... | ............ | |
| Lakewood, CO ........ | Regional Director - Interior Unified Region 5 ... | ..... do ............................. | CA | ES | ............... | ............ | |
| Albuquerque, NM... | Regional Director - Interior Unified Regions 6 & 8. | ..... do ............................. | CA | ES | ............... | ............ | |
| Portland, OR.......... | Regional Director - Interior Unified Regions 9 & 12. | ..... do ............................. | CA | ES | ............... | ............ | |
| Sacramento, CA..... | Regional Director - Interior Unified Region 10 . | ..... do ............................. | CA | ES | ............... | ............ | |
| Anchorage, AK....... | Regional Director - Interior Unified Region 11 . | ..... do ............................. | CA | ES | ............... | ............ | |
| | *National Park Service* | | | | | | |
| Washington, DC ..... | Director, National Park Service ........................ | Vacant ............................... | PAS | EX | V | ............... | |
| Do ..................... | Deputy Director, Operations ............................. | Career Incumbent ............ | CA | ES | ............... | ............ | |
| Do ..................... | Deputy Director for Congressional and External Relations. | Vacant ............................... | ............ | ES | ............... | ............ | |
| Do ..................... | Associate Director, Parks Planning, Facilities and Lands. | Career Incumbent ............ | CA | ES | ............... | ............ | |
| Do ..................... | Associate Director, Workforce Management...... | Vacant ............................... | ............ | ES | ............... | ............ | |
| Do ..................... | Associate Director, Visitor Resource and Protection. | Career Incumbent ............ | CA | ES | ............... | ............ | |
| Do ..................... | Associate Director, Business Services ............. | Vacant ............................... | ............ | ES | ............... | ............ | |
| Do ..................... | Associate Director, Cultural Resources .......... | ..... do ............................. | ............ | ES | ............... | ............ | |
| Do ..................... | Associate Director, Natural Resource Stewardship and Science. | Career Incumbent ............ | CA | ES | ............... | ............ | |
| Do ..................... | Associate Chief Information Officer .................. | ..... do ............................. | CA | ES | ............... | ............ | |
| Do ..................... | Assistant Director for Congressional Relations. | Charles Laudner.................. | SC | GS | 15 | ............... | |
| Do ..................... | Special Assistant.............................................. | Nicholas Erick Davis........... | SC | GS | 9 | ............... | |

## DEPARTMENT OF THE INTERIOR—Continued

| Location | Position Title | Name of Incumbent | Type of Appt. | Pay Plan | Level, Grade, or Pay | Tenure | Expires |
|---|---|---|---|---|---|---|---|
| | *Field Offices - NPS* | | | | | | |
| Lakewood, CO ........ | Director, Denver Service Center ................ | Career Incumbent ............... | CA | ES | .............. | ............ | |
| Washington, DC .... | National Capital Area Director ................... | Vacant ...................... | ............ | ES | .............. | ............ | |
| Philadelphia, PA.. | Regional Director, Interior Unified Region 1 .... | Career Incumbent ............... | CA | ES | .............. | ............ | |
| Atlanta, GA ............ | Regional Director, Interior Unified Region 2 .... | ...... do ...................... | CA | ES | .............. | ............ | |
| Omaha, NE ............ | Regional Director, Interior Unified Regions 3, 4 & 5. | ...... do ...................... | CA | ES | .............. | ............ | |
| Oakland, CA............ | Regional Director, Interior Unified Regions 9, 10 & 12. | Vacant ...................... | ............ | ES | .............. | ............ | |
| Lakewood, CO ........ | Regional Director, Interior Unified Regions 6, 7 & 8. | Career Incumbent ............... | CA | ES | .............. | ............ | |
| Anchorage, AK........ | Regional Director, Interior Unified Region 11 .. | Vacant ...................... | ............ | ES | .............. | ............ | |
| Yosemite Natl Park, CA. | Park Manager, Yosemite National Park ............ | ...... do ...................... | ............ | ES | .............. | ............ | |
| Gatlinburg, TN ........ | Park Manager, Great Smoky Mountains National Park. | Career Incumbent ............... | CA | ES | .............. | ............ | |
| San Francisco, CA.. | Park Manager, Golden Gate National Recreation Area. | ...... do ...................... | CA | ES | .............. | ............ | |
| Boulder City, NV .... | Park Manager, Lake Mead National Recreation Area. | ...... do ...................... | CA | ES | .............. | ............ | |
| Miami, FL ............ | Park Manager, Everglades National Park ........ | ...... do ...................... | CA | ES | .............. | ............ | |
| Washington, DC .... | Park Manager, National Mall and Memorial Parks. | ...... do ...................... | CA | ES | .............. | ............ | |
| Moose, WY ............ | Park Manager, Grand Teton National Park ........ | Vacant ...................... | ............ | ES | .............. | ............ | |
| New York New York, NY. | Executive Director, National Parks of New York Harbor. | ...... do ...................... | ............ | ES | .............. | ............ | |
| | **ASSISTANT SECRETARY - WATER AND SCIENCE** | | | | | | |
| Washington, DC ..... | Assistant Secretary - Water and Science ........ | Tim R Petty........................ | PAS | EX | IV | ............ | |
| Do ...................... | Principal Deputy Assistant Secretary- Water and Science. | Kiel Paul Weaver .............. | NA | ES | .............. | ............ | |
| Do ...................... | Principal Deputy Assistant Secretary - Water and Science. | Vacant ...................... | ............ | ES | .............. | ............ | |
| Do ...................... | Deputy Assistant Secretary- Water and Science. | Aubrey Bettencourt .......... | NA | ES | .............. | ............ | |
| Do ...................... | Deputy Assistant Secretary - Water and Science. | Vacant ...................... | ............ | ES | .............. | ............ | |
| Do ...................... | Senior Advisor to the Assistant Secretary for Water and Science. | Ryan C Nichols...................... | SC | GS | 14 | ............ | |
| | *Bureau of Reclamation* | | | | | | |
| Do ...................... | Commissioner Bureau of Reclamation ............ | Brenda W Burman ............ | PAS | EX | V | ............ | |
| Do ...................... | Deputy Commissioner ........................... | Shelby Lynne Hagenauer .... | NA | ES | .............. | ............ | |
| Do ...................... | Deputy Commissioner - Operations ................. | Career Incumbent ............... | CA | ES | .............. | ............ | |
| Do ...................... | Director, Program and Budget ..................... | ...... do ...................... | CA | ES | .............. | ............ | |
| Do ...................... | Deputy Commissioner, Program, Administration and Budget. | ...... do ...................... | CA | ES | .............. | ............ | |
| Lakewood, CO ........ | Director, Policy and Programs ................... | ...... do ...................... | CA | ES | .............. | ............ | |
| Do ...................... | Director, Technical Service Center.................. | Vacant ...................... | ............ | ES | .............. | ............ | |
| Do ...................... | Associate Chief Infomation Officer.................. | Career Incumbent ............... | CA | ES | .............. | ............ | |
| Do ...................... | Senior Advisor ............................. | ...... do ...................... | CA | ES | .............. | ............ | |
| Do ...................... | Chief Engineer ............................. | ...... do ...................... | CA | ES | .............. | ............ | |
| Washington, DC .... | Advisor .................................... | James William Young........... | SC | GS | 11 | ............ | |
| Lakewood, CO ........ | ...... do ...................... | Alexander Sterhan ............ | SC | GS | 11 | ............ | |
| | *Field Offices - BOR* | | | | | | |
| Boulder City, NV .... | Regional Director, Interior Unified Region 8 .... | Career Incumbent ............... | CA | ES | .............. | ............ | |
| Sacramento, CA...... | ...... do ...................... | ...... do ...................... | CA | ES | .............. | ............ | |
| Salt Lake City, UT .. | Regional Director, Upper Colorado Basin Region. | Vacant ...................... | ............ | ES | .............. | ............ | |
| Billings, MT............ | Regional Director, Interior Unified Region 5 & 6. | Career Incumbent ............... | CA | ES | .............. | ............ | |
| Boise, ID ............ | Regional Director, Interior Unified Region 9 .... | ...... do ...................... | CA | ES | .............. | ............ | |
| | *United States Geological Survey* | | | | | | |
| Reston, VA .............. | Director, U.S. Geological Survey ................... | James Reilly ..................... | PAS | EX | V | ............ | |
| Washington, DC .... | Senior Advisor to the Director ..................... | Robert Earl Gordon Jr........ | NA | ES | .............. | ............ | |
| | **ASSISTANT SECRETARY - LAND AND MINERALS MANAGEMENT** | | | | | | |
| Do ...................... | Assistant Secretary-Land and Minerals Management. | Vacant ...................... | PAS | EX | IV | ............ | |
| Do ...................... | Principal Deputy Assistant Secretary - Land and Minerals Management. | Casey B Hammond ............ | NA | ES | .............. | ............ | |

## DEPARTMENT OF THE INTERIOR—Continued

| Location | Position Title | Name of Incumbent | Type of Appt. | Pay Plan | Level, Grade, or Pay | Tenure | Expires |
|---|---|---|---|---|---|---|---|
| Washington, DC ...... | Deputy Assistant Secretary - Land and Minerals Management. | Vacant .................................... | ............ | ES | .............. | .............. | |
| Do .................... | ......do .................................... | Vacant .................................... | ............ | ES | .............. | .............. | |
| Do .................... | Counselor to the Assistant Secretary- Land and Minerals Management. | Matthew J Flynn.................. | SC | GS | 15 | .......... | |
| Do .................... | Advisor.................................... | Thomas P Baptiste.............. | SC | GS | 13 | .......... | |
| Do .................... | ......do .................................... | William Thomas Dove ........ | SC | GS | 13 | .......... | |
| | *Bureau of Land Management* | | | | | | |
| Do .................... | Director Bureau of Land Management .... | Vacant .................................... | PAS | EX | V | .......... | |
| Grand Junction, CO. | Deputy Director - Operations............................ | Career Incumbent ................ | CA | ES | .............. | .............. | |
| Washington, DC ...... | Deputy Director, Programs and Policy .......... | William P Pendley............. | NA | ES | .............. | .............. | |
| Do .................... | Senior Advisor.................................... | Kathleen M. F. Benedetto .... | NA | ES | .............. | .............. | |
| Grand Junction, CO. | Assistant Director, Resources and Planning..... | Vacant .................................... | ............ | ES | .............. | .............. | |
| Do .................... | Assistant Director, Energy, Minerals and Realty Management. | Career Incumbent ................ | CA | ES | .............. | .............. | |
| Do .................... | Assistant Director, Business and Fiscal Resources Management. | ......do .................................... | CA | ES | .............. | .............. | |
| Do .................... | Assistant Director, Communications and Public Relations. | Vacant .................................... | ............ | ES | .............. | .............. | |
| Boise, ID ............. | Assistant Director, Fire and Aviation........... | Career Incumbent ................ | CA | ES | .............. | .............. | |
| Grand Junction, CO. | Assistant Director, National Conservation Lands and Community Partnerships. | Vacant .................................... | ............ | ES | .............. | .............. | |
| Washington, DC ...... | Senior Advisor.................................... | Amanda E Kaster .............. | SC | GS | 14 | .......... | |
| Do .................... | Special Assistant.................................... | William Henry King.......... | SC | GS | 9 | .......... | |
| | *Field Offices - BLM* | | | | | | |
| Falls Church, VA .... | State Director, Eastern States ............... | Vacant .................................... | ............ | ES | .............. | .............. | |
| Salt Lake City, UT .. | State Director, Utah.................................... | ......do .................................... | ............ | ES | .............. | .............. | |
| Cheyenne, WY ........ | State Director, Wyoming ............................ | ......do .................................... | ............ | ES | .............. | .............. | |
| Billings, MT........... | State Director, Montana ............................ | Career Incumbent ................ | CA | ES | .............. | .............. | |
| Sacramento, CA...... | State Director, California ............................ | ......do .................................... | CA | ES | .............. | .............. | |
| Anchorage, AK....... | State Director, Alaska.................................... | ......do .................................... | CA | ES | .............. | .............. | |
| Portland, OR.......... | State Director, Oregon ............................ | ......do .................................... | CA | ES | .............. | .............. | |
| Phoenix, AZ ........... | State Director, Arizona ............................ | ......do .................................... | CA | ES | .............. | .............. | |
| Santa Fe, NM ........ | State Director, New Mexico .................... | ......do .................................... | CA | ES | .............. | .............. | |
| Boise, ID .............. | State Director, Idaho.................................... | ......do .................................... | CA | ES | .............. | .............. | |
| Reno, NV................ | State Director, Nevada ............................ | ......do .................................... | CA | ES | .............. | .............. | |
| Denver, CO ............ | State Director, Colorado ............................ | ......do .................................... | CA | ES | .............. | .............. | |
| | *Office of Surface Mining* | | | | | | |
| Washington, DC ...... | Director Office of Surface Mining Reclamation and Enforcement. | Vacant .................................... | PAS | EX | V | .......... | |
| Do .................... | Principal Deputy Director, Osmre .......... | Lanny Erdos ...................... | NA | ES | .............. | .............. | |
| Do .................... | Deputy Director .................................... | Career Incumbent ................ | CA | ES | .............. | .............. | |
| Do .................... | Assistant Director, Program Support .......... | ......do .................................... | CA | ES | .............. | .............. | |
| Do .................... | Assistant Director, Finance and Administration. | ......do .................................... | CA | ES | .............. | .............. | |
| Do .................... | Senior Advisor.................................... | Christian Robert Palich ...... | SC | GS | 15 | .......... | |
| | *Field Offices - OSM* | | | | | | |
| Denver, CO ............. | Regional Director, Interior Unified Region 7 ..... | Career Incumbent ................ | CA | ES | .............. | .............. | |
| | *Bureau of Safety and Environmental Enforcement* | | | | | | |
| Washington, DC ...... | Director, Bureau of Safety and Environmental Enforcement. | Scott Anthony Angelle........ | NA | ES | .............. | .............. | |
| Do .................... | Deputy Director .................................... | Vacant .................................... | ............ | ES | .............. | .............. | |
| Sterling, VA ........... | Associate Director for Administration............... | Career Incumbent ................ | CA | ES | .............. | .............. | |
| Washington, DC ...... | Regulatory Programs Chief............................ | Vacant .................................... | ............ | ES | .............. | .............. | |
| Do .................... | Senior Advisor to the Director - Bureau of Environmental Enforcement. | Preston Richard Beard........ | SC | GS | 14 | .......... | |
| | *Field Offices - BSEE* | | | | | | |
| Jefferson, LA .......... | Regional Director, Interior Unified Region 2 & 6. | Career Incumbent ................ | CA | ES | .............. | .............. | |
| | *Bureau of Ocean Energy Management* | | | | | | |
| Washington, DC ...... | Director, Bureau of Ocean Energy Management. | Vacant .................................... | ............ | ES | .............. | .............. | |
| Do .................... | Deputy Director .................................... | Career Incumbent ................ | CA | ES | .............. | .............. | |
| Do .................... | Chief Environmental Officer.......................... | ......do .................................... | CA | ES | .............. | .............. | |
| Do .................... | Program Manager, Office of Budget and Program Coordination. | ......do .................................... | CA | ES | .............. | .............. | |

## DEPARTMENT OF THE INTERIOR—Continued

| Location | Position Title | Name of Incumbent | Type of Appt. | Pay Plan | Level, Grade, or Pay | Tenure | Expires |
|---|---|---|---|---|---|---|---|
| Washington, DC ..... | Senior Advisor to the Director -Bureau of Ocean Energy Management. | James R Schindler................ | SC | GS | 14 | ............... | |
| | *Field Offices - BOEM* | | | | | | |
| Jefferson, LA ........... | Regional Director, Interior Unified Regions 1, 2, 4 & 6. | Career Incumbent ................ | CA | ES | ............... | | |
| Anchorage, AK........ | Regional Director, Interior Unified Region 11 ... | ......do ............................... | CA | ES | ............... | | |
| | **ASSISTANT SECRETARY - INDIAN AFFAIRS** | | | | | | |
| Washington, DC ..... | Assistant Secretary - Indian Affairs.................. | Tara Mac Lean Sweeney...... | PAS | EX | IV | ............... | |
| Do ...................... | Principal Deputy Assistant Secretary - Indian Affairs. | John Tahsuda III................. | NA | ES | ............... | | |
| Do ...................... | Deputy Assistant Secretary - Policy and Economic Development. | Mark Antonio Cruz ............ | NA | ES | | | |
| Do ...................... | Chief of Staff to the Assistant Secretary - Indian Affairs. | Career Incumbent ................ | CA | ES | | | |
| Do ...................... | Deputy Assistant Secretary - Indian Affairs (Management). | ......do ............................... | CA | ES | | | |
| Reston, VA .............. | Chief Financial Officer ................................ | ......do ............................... | CA | ES | | | |
| Washington, DC ..... | Director, Office of Indian Gaming Management. | ......do ............................... | CA | ES | | | |
| Do ...................... | Budget Officer ............................................ | ......do ............................... | CA | ES | | | |
| Reston, VA .............. | Director, Facilities, Property and Safety Management. | ......do ............................... | CA | ES | | | |
| Washington, DC ..... | Director, Indian Energy and Economic Development. | Vacant .............................. | ............ | ES | | | |
| Do ...................... | Director, Office of Self-Governance .................... | Career Incumbent ................ | CA | ES | | | |
| | *Bureau of Indian Affairs* | | | | | | |
| Do ...................... | Director, Bureau of Indian Affairs .................. | ......do ............................... | CA | ES | | | |
| Albuquerque, NM... | Deputy Director, Field Operations .................. | ......do ............................... | CA | ES | | | |
| Washington, DC ..... | Deputy Director, Indian Services .................. | ......do ............................... | CA | ES | | | |
| Do ...................... | Deputy Director, Justice Services .................. | ......do ............................... | CA | ES | | | |
| Do ...................... | Deputy Director, Trust Services.................. | ......do ............................... | CA | ES | | | |
| | *Field Offices - BIA* | | | | | | |
| Muskogee, OK ........ | Regional Director - Eastern Oklahoma Region . | ......do ............................... | CA | ES | | | |
| Anadarko, OK........ | Regional Director - Southern Plains Region .. | ......do ............................... | CA | ES | | | |
| Anchorage, AK........ | Regional Director - Alaska Region .................. | ......do ............................... | CA | ES | | | |
| Sacramento, CA...... | Regional Director - Pacific Region .................. | ......do ............................... | CA | ES | | | |
| Bloomington, MN... | Regional Director - Midwest Region .................. | ......do ............................... | CA | ES | | | |
| Nashville, TN.......... | Regional Director - Eastern Region .................. | Vacant .............................. | ............ | ES | | | |
| Aberdeen, SD.......... | Regional Director - Great Plains Region .......... | Career Incumbent ................ | CA | ES | | | |
| Billings, MT............ | Regional Director - Rocky Mountain Region... | ......do ............................... | CA | ES | | | |
| Gallup, NM ............ | Regional Director - Navajo Region .................. | ......do ............................... | CA | ES | | | |
| Albuquerque, NM... | Regional Director - Southwest ....................... | ......do ............................... | CA | ES | | | |
| Portland, OR........... | Regional Director - Northwest ....................... | ......do ............................... | CA | ES | | | |
| Phoenix, AZ ............ | Regional Director - Western Region .................. | ......do ............................... | CA | ES | | | |
| | *Bureau of Indian Education* | | | | | | |
| Washington, DC ..... | Director - Bureau of Indian Education.............. | ......do ............................... | CA | ES | | | |
| Albuquerque, NM... | Deputy Director - School Operations.................. | ......do ............................... | CA | ES | | | |
| Bloomington, MN... | Associate Deputy Director - Tribally Controlled Schools. | Vacant .............................. | ............ | ES | | | |
| Window Rock, AZ ... | Associate Deputy Director - Navajo.................. | ......do ............................... | ............ | ES | | | |
| Washington, DC ..... | Associate Deputy Director - Performance and Accountability. | ......do ............................... | ............ | ES | | | |
| Albuquerque, NM... | Associate Deputy Director - Bie Operated Schools. | Career Incumbent ................ | CA | ES | | | |
| Do ...................... | Chief Academic Officer ................................ | ......do ............................... | CA | ES | | | |

## DEPARTMENT OF THE INTERIOR OFFICE OF THE INSPECTOR GENERAL

| Location | Position Title | Name of Incumbent | Type of Appt. | Pay Plan | Level, Grade, or Pay | Tenure | Expires |
|---|---|---|---|---|---|---|---|
| Washington, DC ..... | **OFFICE OF THE INSPECTOR GENERAL** Inspector General ................................................ | Mark Lee Greenblatt ............ | PAS | EX | III | ............... | |

**Exhibit Y**
**Page 15 of 15**

  



# Boyd Blihovde

 Add friend      Message     

Posts   **About**   Friends   Photos   Videos   Check-ins   More ▾     ...

## About

**Overview**

Work and education

Places lived

Contact and basic info

Family and relationships

Details About Boyd

  

 Wildlife Refuge Manager at **U.S. Fish and Wildlife Service**
August 9, 2020 to present



## Friends

**All friends**      Recently Added      Work      Current city      Following

**See all**

## Photos

**Boyd's Photos**      Albums







# Subsistence Fishing Opportunities In Yukon Delta National Wildlife Refuge

**KYUK | By U.S. Fish and Wildlife Service**
Published May 29, 2019 at 12:41 PM AKDT

  



*Yukon Delta National Wildlife Refuge*

These restrictions apply to users fishing from Yukon Delta boundary at Kuskokwim River mouth to ADF&G regulatory marker ½ mile above Tuluksak River:

- **May 28 – June 1, 2019**: 6 inch or less gillnets for federally qualified users.
  - When using 6 inch or smaller mesh, gillnet depth may not be more than 45 meshes deep. Also, net length may not exceed 50 fathoms (300 feet).
- **June 1 – June 11, 2019:** Harvest of Chinook Salmon allowable with Dip Nets, Beach Seines, Fish Wheels & Rod and Reel in mainstem Kuskokwim River.
  - **\*\*Gillnets in mainstem not allowed until announced\*\***



KYUK
**Contemporary Americana**

Case 1:22-cv-00054-SLG   Document 75-5   Filed 09/01/23   Page 27 of 107

Exhibit AA
Page 1 of 3

- **\*\*Gillnets in non-salmon spawning tributaries allowed above 100 yards\*\***

These restrictions apply to users fishing at ADF&G regulatory marker ½ mile above Tuluksak River to Yukon Delta National Wildlife boundary above Aniak:

- **May 28 - June 1, 2019**: No restrictions.
  - When using 6 inch or smaller mesh, gillnet depth may not be more than 45 meshes deep. If using greater than 6 inch gillnets, depth may not exceed 35 meshes deep.

- **June 1 –June 11, 2019**: Harvest of Chinook Salmon allowable with Dip Nets, Beach Seines, Fish Wheels & Rod and Reel in mainstem Kuskokwim River.
  - **\*\*Gillnets in mainstem not allowed until announced\*\***
  - **\*\*Gillnets and all other methods in salmon spawning tributaries not allowed for Chinook Salmon\*\***
  - **\*\*Gillnets in non-salmon spawning tributaries allowed above 100 yards\*\***

Hunting & Fishing

   



© 2023 KYUK

Careers and Opportunities

Media Sharing Policy

KYUK
**Contemporary Americana**

Contact Us

Reports



Case 1:22-cv-00054-SLG   Document 75-5   Filed 09/01/23   Page 29 of 107

**Exhibit AA**
**Page 3 of 3**

 Alaska Department of Fish and Game

ADF&G Home › About Us › Divisions

# Commissioner's Office
## Budget

| Overview | Budget | Commissioner | Staff and Contacts |

The Office of the Commissioner is responsible for the development and oversight of the department's Budgets and Performance.

The department's budget investment yields significant returns. The department manages Alaska's fish and wildlife as a sustainable and renewable resource to provide current and future economic benefits. Annually, for every dollar the department receives it returns over $30 in economic benefits to the state.

Our well managed fish and wildlife produce more jobs and economic value than any other sector of the economy. Tens of thousands of jobs and hundreds of small businesses rely on activities and opportunities associated with Alaska's fish and wildlife resources. Alaska has the most valuable commercial fishing industry in the nation; is the foundation of Alaska's booming tourism industry; provides world class hunting, sport fishing, and wildlife viewing opportunities; and supports an equaled subsistence culture and economy.



S. Hrg. 115–415

# KEEP WHAT YOU CATCH: PROMOTING TRADITIONAL SUBSISTENCE ACTIVITIES IN NATIVE COMMUNITIES

## HEARING

BEFORE THE

## COMMITTEE ON INDIAN AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

SECOND SESSION

———

JUNE 20, 2018

———

Printed for the use of the Committee on Indian Affairs



U.S. GOVERNMENT PUBLISHING OFFICE

33–836 PDF          WASHINGTON : 2019

COMMITTEE ON INDIAN AFFAIRS

JOHN HOEVEN, North Dakota, *Chairman*
TOM UDALL, New Mexico, *Vice Chairman*

| | |
|---|---|
| JOHN BARRASSO, Wyoming | MARIA CANTWELL, Washington |
| JOHN McCAIN, Arizona | JON TESTER, Montana, |
| LISA MURKOWSKI, Alaska | BRIAN SCHATZ, Hawaii |
| JAMES LANKFORD, Oklahoma | HEIDI HEITKAMP, North Dakota |
| STEVE DAINES, Montana | CATHERINE CORTEZ MASTO, Nevada |
| MIKE CRAPO, Idaho | TINA SMITH, Minnesota |
| JERRY MORAN, Kansas | |

T. MICHAEL ANDREWS, *Majority Staff Director and Chief Counsel*
JENNIFER ROMERO, *Minority Staff Director and Chief Counsel*

# CONTENTS

————

|  | Page |
|---|---|
| Hearing held on June 20, 2018 | 1 |
| Statement of Senator Barrasso | 5 |
| Statement of Senator Hoeven | 1 |
| Statement of Senator Murkowski | 4 |
| Statement of Senator Smith | 42 |
| Statement of Senator Udall | 2 |
| Prepared statement | 3 |

## WITNESSES

| | |
|---|---|
| Brown, Hon. Roy B., Chairman, Northern Arapaho Tribe | 11 |
| Prepared statement | 13 |
| Hardin, Jennifer, Ph.D., Subsistence Policy Coordinator, Office of Subsistence Management, U.S. Fish and Wildlife Service | 6 |
| Prepared statement | 8 |
| Peltola, Mary Sattler, Executive Director, Kuskokwim River Inter-Tribal Fish Commission | 15 |
| Prepared statement | 16 |
| Romero-Briones, A-Dae, J.D., LL.M, Director of Programs, Native Agriculture and Food Systems, First Nations Development Institute | 25 |
| Prepared statement | 26 |

## APPENDIX

| | |
|---|---|
| Bartley, Kevin, Rural Resident of Alaska, prepared statement | 47 |
| Linnell, Karen, Executive Director, Ahtna Intertribal Resource Commission, prepared statement | 51 |
| Response to written questions submitted by Hon. Catherine Cortez Masto to: | |
| Jennifer Hardin, Ph.D. | 63 |
| A-Dae Romero-Briones | 60 |
| Mary Sattler Peltola | 52 |
| Written questions submitted by Hon. Catherine Cortez Masto to Hon. Roy B. Brown | 66 |

(III)

Exhibit CC
Page 4 of 70

# KEEP WHAT YOU CATCH: PROMOTING TRADITIONAL SUBSISTENCE ACTIVITIES IN NATIVE COMMUNITIES

---

**WEDNESDAY, JUNE 20, 2018**

U.S. SENATE,
COMMITTEE ON INDIAN AFFAIRS,
*Washington, DC.*

The Committee met, pursuant to notice, at 2:30 p.m. in room 628, Dirksen Senate Office Building, Hon. John Hoeven, Chairman of the Committee, presiding.

## OPENING STATEMENT OF HON. JOHN HOEVEN, U.S. SENATOR FROM NORTH DAKOTA

The CHAIRMAN. I call the meeting to order.

Good afternoon. I would like to thank our witnesses for being here.

Today, we will examine subsistence hunting and fishing in tribal communities and evaluate how Congress, the Administration, tribes, and tribal organizations can work together to alleviate regulatory limitations on this traditional way of life.

Subsistence involves the harvest of local resources for local consumption. Many Indian tribes across the Country have practiced and maintained a subsistence lifestyle for thousands of years. This way of life has provided fundamental benefits, from supplying critical food sources to preserving culture. Subsistence is prevalent among Indian communities across the Country.

In the Pacific Northwest, American Indians and Alaska Natives harvest, process, distribute and consume millions of pounds of wild animals, fish and plants. These practices are critical for the cultural longevity and economic vitality of these tribal communities. In the Midwest, tribes engage in traditional hunting and fishing, something I enjoy very much myself.

All over the Nation, Native communities show tremendous care for the land and environment. However, government policy can often limit their ability to live out this subsistence lifestyle.

As the original stewards, tribes have demonstrated conservation practices for their natural resources. It is important that the Federal Government enact subsistence policies that promote the interests of their communities.

Both overregulation and lack of oversight can affect the availability of, and access to, tribal resources. Federal involvement in

(1)

natural resource management, through laws such as the Endangered Species Act, must be balanced.

The government should not dictate what Native communities can or cannot do on their own lands or disrupt the exercise of their hunting and fishing treaty rights. It has been several Congresses since this Committee has held a hearing examining this important topic.

I want to thank our witnesses for being with us this afternoon.

Subsistence policies that fully accommodate tribal interests are vital to the health and cultural survival of tribal communities. I look forward to hearing the recommendations of our witnesses on how this Committee and this Congress can help support subsistence and traditional ways of life in Indian Country.

With that, I will now turn to Vice Chairman Udall for his opening comments.

### STATEMENT OF HON. TOM UDALL,
### U.S. SENATOR FROM NEW MEXICO

Senator UDALL. Thank you, Chairman Hoeven, for calling today's hearing on traditional subsistence practices.

Subsistence not only means nourishing communities with traditional foods but also feeding generations with traditional knowledge that sustains, grows and keeps Native communities together.

To begin, I would like to give a special welcome to today's witness from the First Nations Development Institute, A-Dae Romero-Briones. A-Dae is originally from beautiful Cochiti Pueblo in my home State of New Mexico. Thank you very much for being here.

Today's hearing is a great opportunity to highlight the importance of traditional, ecological knowledge, or TEK, as a way to promote and maintain traditional subsistence practices in Native communities. TEK is used by tribes, Federal agencies and others stakeholders to overcome environmental barriers to subsistence on a collaborative basis. TEK is a body of knowledge, beliefs and practices passed down from generation to generation in indigenous communities around the globe.

In the U.S., Native communities use TEK-based techniques to achieve balance and sustainability in cultivating traditional foods while also providing for spiritual and cultural well being. For example, Tsuki Pueblo in New Mexico is creating tribal seed banks to ensure that heirloom seeds are available for both sustenance and ceremonies.

Despite the enormously important role TEK and subsistence plays in Indian Country, climate change poses a grave threat to the ability of Native communities to access traditional foods. That loss goes beyond sustenance and eliminates a community's way of life like hunting, fishing, trapping, farming and forestry. Drought, in particular, has threatened traditional farming practices in my home State which are renowned as a benchmark for sustainable agriculture in an arid environment.

Decreased snow pack increases the occurrence of devastating wildfires causing ripple effects far and wide, including the loss of plans and wildlife important to subsistence uses. Coastal tribal communities from the Wampanoag in Massachusetts to the

Exhibit CC
Page 6 of 70

Quileute in Washington are experiencing the damaging effects of climate change on their water and subsistence rights.

Ancient Hawaiian fish ponds are another ecologically and culturally significant subsistence resource that is vulnerable to climate change impacts including ocean acidification and sea level rise.

All of these examples are serious threats to the ability of Native communities to gather, hunt and cultivate traditional foods. That is why we in Congress should do all we can to promote and work with tribes to develop TEK-based solutions to climate change and other threats to traditional subsistence practices.

This Congress, I have worked with others on this Committee to support the use of regional and community-specific TEK solutions. S. 2804, CROPS for Indian Country, promotes TEK-based solutions for food programs and forestry management by authorizing tribes to use 638 contracting to manage food programs and forestry activities at the USDA. It also directs the Government Accountability Office to investigate marketplace protections for traditional tribal foods.

The legislative provisions in the CROPS Act put important tools for environmental management back into the hands of tribes and advance TEK-based solutions for the effects of climate change on customary and traditional subsistence practices. We can take important legislative steps, like the CROPS Act, to support tribal food sovereignty but we must also use today's hearing to discuss how we can support greater use of TEK to address the effects of climate change.

I look forward to this panel's testimony.

Mr. Chairman, I would also like to put a statement into the record dealing with the issue of family separation. I am just going to put it in the record.

This has caused great concern within my Native communities in New Mexico. We have heard from the National Congress of American Indians which feels this goes back to a very sad chapter in their lives.

I just want to put that statement into the record, with your permission.

The CHAIRMAN. Without objection.

[The prepared statement of Senator Udall follows:]

PREPARED STATEMENT OF HON. TOM UDALL, U.S. SENATOR FROM NEW MEXICO

Subsistence is a way of life for tribal communities that depends on passing traditional ecological knowledge down between generations. Today, we are going to talk about modern threats to subsistence, such as climate change. But, it was not that long ago that the major threat to subsistence—to all traditional practices—was the federal Boarding School policy.

Members of this Committee are well aware that the Boarding School Era is one of this country's most tragic periods—when Presidents and Congress allowed Native children to bear the brunt of federal policies designed to solve the "Indian problem".

And, even though we are decades removed from that misguided era, the impacts of cultural and community disruption still reverberate today. We hear it repeatedly in the testimony of Tribal leaders and Native youth who come to speak with the Committee.

Our response, as Members of Congress, has always been to pledge: "never again".

Well, we are now called to uphold that pledge. The Trump Administration actions are an attempt to write another chapter of the Boarding School era, this time for immigrant families. It is once again putting forward a federal policy that tears chil-

**Exhibit CC**
**Page 7 of 70**

dren from the arms of their mother and fathers—this time to solve the "border problem."

We cannot—in good conscience and as Members of this Committee—let this practice disrupt another generation. While the President just announced he would sign an Executive Order ending his inhumane policy of separating families at the border, I remind my colleagues here today that we cannot be too vigilant.

And, we must not consider this matter settled until the details of this Order are known and every last child is returned to their families.

Senator UDALL. Thank you.

The CHAIRMAN. I will turn to Senator Barrasso in a minute for purposes of an introduction but are there other opening statements before we proceed to the witnesses? Senator Murkowski.

Senator MURKOWSKI. Mr. Chairman, I, too, would like to be able to introduce the Alaska witnesses. Whatever is the Chairman's preference, now or later?

The CHAIRMAN. Are there other opening statements?

[No audible response.]

The CHAIRMAN. We will proceed to the witnesses. I will defer on Dr. Hardin and Chairman Brown. We will start, Senator Murkowski, with you.

## STATEMENT OF HON. LISA MURKOWSKI,
## U.S. SENATOR FROM ALASKA

Senator MURKOWSKI. Thank you, Chairman. I appreciate the Committee scheduling this hearing today to examine the importance of traditional and customary subsistence activities in our Native communities.

I want to recognize Dr. Hardin, the Subsistence Policy Coordinator at the Office of Subsistence Management for Fish and Wildlife in Anchorage. I am pleased that you are here.

I would also like to thank my friend, Mary Sattler Peltola, for being here before the Committee to testify today. Mary's is the first Executive Director of the Kuskokwim River Inter-Tribal Fish Commission.

This fish commission was established in 2015 and has been doing good and important work for us since that time.

Mary was born and raised in Kwethluk, a pretty small Yupik village located on the Kuskokwim River. She has been a subsistence fisherman her entire life, I think, and is raising a young family also very engaged in subsistence fishing as her ancestors did for thousands of years.

She is a leader in her community, in her region and in the State. I had the privilege of serving with Mary when we were both in the Alaska State Legislature. I think it is fair to say that we were favorites, we liked one another and worked very well together.

Today, you will hear from Mary how vitally, vitally important fish and wildlife resources are to the food security of Alaska Natives and how these resources are really the cornerstone of Alaska Native cultures and our economic systems in rural Alaska.

Sometimes the Federal and State governments exclude our tribes from the subsistence management of these resources. Many of you may know and some may not know Alaska's fish and wildlife resources are dually-managed with different management systems or regimes on State and Federal lands.

Exhibit CC
Page 8 of 70

This causes some confusion and frustration for many residents around the State. The Federal Subsistence Board was created through regulation to manage the Federal side of this dual regime and continues to be a point of contention among many, including the view the Federal Government has failed to prioritize management decisions for subsistence to ensure we are seeing healthy and abundant populations for consumption.

You will hear from Mary this afternoon about the significance of priority for protecting the subsistence way of life through maximum self-determination and how critical that is to our tribes.

Organizations, like the Kuskokwim River Inter-Tribal Fish Commission, are a great opportunity for Alaska and our tribal communities to coordinate the management of our fish and wildlife resources, to work to get the information moving smoothly, and to integrate the traditional knowledge that is so key and important with our State and Federal research.

I thank you, Mary, for being here, for traveling the long distance, for your leadership, and for really helping to show the way when it comes to co-management of our resources. Thank you so much.

Thank you, Mr. Chairman.

The CHAIRMAN. Senator Barrasso.

## STATEMENT OF HON. JOHN BARRASSO, U.S. SENATOR FROM WYOMING

Senator BARRASSO. Thank you, Mr. Chairman. I appreciate your holding this hearing today and the opportunity I have to introduce Chairman Roy Brown.

As Chairman of the Northern Arapaho Tribe in Wyoming, Chairman Brown is uniquely qualified to discuss the ways culture, ecology and wildlife management affect life along the Wind River Range.

Wyoming is home to a wide variety of wildlife, elk, mule deer, pronghorn, sage grouse and the Wind River Reservation is no exception. Situated along the east face of the Wind River Range, the reservation has vast grasslands, rich riparian areas, and mountainous terrain.

Managing each of those ecosystems is carefully done, both in the tradition and with the knowledge of the Northern Arapaho and Eastern Shoshone wildlife managers, but also in cooperation with the U.S. Fish and Wildlife Service and the Wyoming Game and Fish Department.

That careful management is complicated by many natural factors, including drought, fire and flood. Management has also been made more difficult by the failure to manage other factors as well.

I know today Chairman Brown plans to share with us the ecological damage that wild and feral horses have had in Wyoming. This situation is not unique to the Wind River Reservation. A number of other tribes and States have grappled with the challenge of managing horse populations on tribal lands and in areas managed by the Bureau of Land Management.

Across the grasslands of Wyoming, forage is a valuable commodity. The elk, pronghorn, and the bison were reintroduced to the Wind River in 2017. When forage quantity wanes, then wildlife moves on.

**Exhibit CC**
**Page 9 of 70**

Changes to migration patterns have a ripple effect throughout the food chain and fundamentally, change the generations' long tradition of subsistence activities. Hunting also plays an integral part in the food security in Wyoming where snowstorms and other inclement weather can delay deliveries to local grocery stores.

Chairman Brown will relate similar challenges on the Wind River. I know he will make clear that subsistence is not limited to Alaska and the Pacific Northwest. The tradition, the value and the importance of subsistence activities continue to be evident in Wyoming.

Last year, the Northern Arapaho and Eastern Shoshone partnered with a number of groups, including the University of Wyoming, to plan a research project to understand the role of elk on the Wind River Reservation.

As we talk about the importance of continuity in migration corridors and effective wildlife management, it is more important than ever to recognize the historic and cultural impacts wildlife management can bring.

Chairman Brown, thank you for traveling through delayed flights and storms yesterday to share your perspective with us today.

Thank you, Chairman Hoeven, for holding the hearing.

The CHAIRMAN. Thank you, Senator Barrasso.

We will turn to our witnesses. Again, I want to thank all of our witnesses for being here, Dr. Hardin, Chairman Brown, Ms. Peltola and also Ms. Romero-Briones. Thank you all for joining us.

We will begin with Dr. Hardin.

## STATEMENT OF JENNIFER HARDIN, Ph.D., SUBSISTENCE POLICY COORDINATOR, OFFICE OF SUBSISTENCE MANAGEMENT, U.S. FISH AND WILDLIFE SERVICE

Dr. HARDIN. Thank you, Chairman Hoeven, Vice Chairman Udall and members of the Committee, for the opportunity testify today on the subsistence harvest of natural resources on Federal public lands in Alaska under the Alaska National Interest Lands Conservation Act of 1980, ANILCA.

Alaska Native peoples have depended on have depended on the harvest and use of natural resources for food, shelter, clothing, transportation and handicrafts, trade, barter and sharing for thousands of years. These subsistence practices are interwoven with their unique cultural identities and social ways of life. In more recent history, non-Native peoples living in rural Alaska have come to rely on natural resources for their social and economic livelihoods as well.

My testimony today focuses on the Federal Subsistence Management Program which oversees the subsistence harvest of wildlife and fish on Federal public lands and waters by rural Alaska residents in compliance with Title VIII of ANILCA.

ANILCA prioritized the taking of fish and wildlife for non-wasteful subsistence purposes over the taking of those resources for other purposes on Federal public lands in Alaska. As a result of the State Supreme Court ruling, the Federal Government has managed subsistence harvest on Federal public lands and waters since 1990.

ANILCA emphasizes the need to balance subsistence opportunities with the conservation of healthy populations of fish and wild-

life in order to ensure the continuation of a subsistence way of life for future generations.

Striking this balance is also a central tenet of the traditional ecological knowledge expressed by rural Alaskans engaged in a subsistence way of life. In Title VIII, subsistence priority encompasses approximately 50 percent of the land within the State of Alaska and applies to both Alaska Native and non-Native rural residents.

The subsistence hunting and fishing practices Title VIII protects reflect the vital relationships between land, culture, cultural identity and the people in rural Alaska. Subsistence harvest is also the cornerstone of food security for many rural Alaskans, the vast majority of whom have only intermittent access to village stores and limited ability to purchase expensive foods these stores carry.

The multi-faceted, highly collaborative Federal Subsistence Management Program emphasizes a bottom-up approach which involves five Federal agencies, a Federal and public member decision-making board, ten subsistence regional advisory councils, partnerships with Alaska Native and rural organizations and the State of Alaska, as well as robust stakeholder input.

The ten subsistence regional advisory councils provide a direct conduit for local and traditional ecological knowledge in the decision-making process. Each council holds at least two public meetings every year to gather local information and make recommendations to the Federal Subsistence Board on subsistence take.

The FSB is statutorily-required to follow these recommendations except under certain circumstances. In turn and before making any regulatory decisions, the FSB also holds regular meetings to engage in tribal consultation, accept comments from the public, the FSB's technical review committee and from the State of Alaska. In addition, the board solicits comments from the public throughout the year.

To date, the FSB has adopted more than 90 percent of regional advisory council recommendations regarding the take of fish and wildlife on Federal public lands. Title VIII of ANILCA provides guidance on how the Federal subsistence priority should be implemented in the event available resources cannot feed all harvest demands.

The law emphasizes a multi-phased approach that reduces the number of authorized users or usage in order to ensure the subsistence priority is provided to as many federally-qualified users as possible.

The ability to restrict or eliminate wildlife and fish harvest by non-federally qualified users in order to prioritize the continuation of the harvest practices of rural Alaskans is a unique characteristic of the Federal program that is highly valued by rural Alaskans.

In conclusion, I want to emphasize that management of natural resources under Alaska's intersecting laws and agency mandates is complex, especially in light of declining populations of critical subsistence resources. Nevertheless, one of the program's greatest strengths is its bottom-up approach that relies on direct input from the local people who will be personally affected by the FSB's decisions.

The Federal Subsistence Management Program will continue working to balance the harvest needs of rural subsistence users

with the conservation mandates of land management agencies while considering the diverse values of the many user groups seeking opportunities to hunt and fish on Federal public lands in Alaska.

Thank you and I would be happy to answer any questions.

[The prepared statement of Dr. Hardin follows:]

PREPARED STATEMENT OF JENNIFER HARDIN, PH.D., SUBSISTENCE POLICY COORDINATOR, OFFICE OF SUBSISTENCE MANAGEMENT, U.S. FISH AND WILDLIFE SERVICE

Good afternoon Chairman Hoeven, Vice Chairman Udall, and Members of the Committee. I am Jennifer Hardin, Subsistence Policy Coordinator for the Office of Subsistence Management in Alaska, within the U.S. Fish and Wildlife Service. Thank you for the opportunity to testify before the Committee regarding the subsistence harvest of natural resources on Federal public lands in Alaska under the Alaska National Interest Lands Conservation Act (ANILCA).

The customary and traditional harvest and use of natural resources for food, shelter, clothing, transportation, handicrafts, customary trade barter and sharing, commonly called "subsistence," has a long history in Alaska. Alaska Native peoples have depended on subsistence for thousands of years and these practices are interwoven with their unique cultural identities and social ways of life. In more recent history, non-Native peoples living in rural Alaska have come to rely on natural resources for their social and economic livelihoods as well.

The management of subsistence harvests of natural resources in Alaska is complex. It is governed by a variety of laws dictating who and what resources are eligible to harvest. For example, management of subsistence harvest of marine mammals is governed by the Marine Mammal Protection Act (MMPA). Under the MMPA, coastal dwelling Alaska Natives may harvest marine mammals for subsistence purposes or for the creation and sale of authentic native handicrafts or articles of clothing.

Management of subsistence harvest of migratory birds is governed by the Migratory Bird Treaty Act (MBTA). The MBTA was amended to allow for spring/summer subsistence harvest of migratory birds by Alaska Natives and permanent resident non-natives with legitimate subsistence hunting needs living in designated subsistence hunting areas in Alaska.

The customary and traditional harvest of land mammals, fish outside of marine waters and upland birds in Alaska is governed by Title VIII of ANILCA. For the Committee's purposes today, my testimony will focus on the Federal Subsistence Management Program, which is charged with implementing the relevant provisions included in Title VIII of ANILCA.

## Background of the Alaska National Interest Lands Conservation Act (ANILCA)

ANILCA, which was passed in 1980, is a wide-ranging lands law that established more than 100 million additional acres of Federal land in Alaska, thereby enlarging federal holdings dedicated to conservation in Alaska to more than 131 million acres. Recognizing the unique characteristics of Alaska and the long history and important role of the subsistence way of life in Alaska, Congress established, through Title VIII of ANILCA, a priority for the taking of wild renewable resources on Federal public lands in Alaska for subsistence uses by Native and non-Native rural Alaskans. The Federal subsistence priority applies on approximately 50 percent of the lands within the state of Alaska.

Title VIII of ANILCA gave the State of Alaska the opportunity to implement the Federal subsistence priority for rural Alaskans on Federal lands. The State did so until 1989 when the State Supreme Court ruled in *McDowell v. State of Alaska* that providing a subsistence priority based on rural residency, as required by ANILCA, is unconstitutional because it violates several clauses of the Alaska State Constitution, including a clause that says that fish, wildlife and waters are reserved to the people for common use. As a consequence of this decision, the Federal government has engaged in subsistence management within Alaska's Federal public lands and waters since 1990.

In Title VIII of ANILCA, Congress found that the continuation of the subsistence way of life by rural Alaskans is essential to their physical, economic, traditional, cultural and social existence. Title VIII established a priority for the taking of fish and wildlife for nonwasteful subsistence purposes on Federal public lands in Alaska over

Exhibit CC
Page 12 of 70

the taking of those resources for other purposes. The subsistence hunting and fishing practices that are protected by ANILCA reflect and are an expression of vital relationships between people, land and cultural identity in rural Alaska.

The subsistence way of life is also a cornerstone of food security in rural Alaska. Approximately 34 million pounds of wild foods are harvested annually by rural Alaskans, which equates to about 275 pounds per person annually. If rural Alaskans did not have access to subsistence foods, substitutes would have to be purchased. Alaska is twice the size of the state of Texas but has only about 15,000 miles of public roads, most of which are gravel. The lack of roads in Alaska means that a large portion of rural residents have only limited access to stores. The variety of foods in many village stores is quite limited and the cost of store bought foods is prohibitively high for many rural Alaskans.

ANILCA emphasizes the need to balance subsistence opportunity with conservation of healthy populations of fish and wildlife in order to ensure the continuation of the subsistence way of life for future generations. In striking this balance, Congress echoed a central tenet of the traditional ecological knowledge that guided resource management long before the passage of ANILCA and is consistently expressed today by rural Alaskans engaged in the subsistence way of life.

**Federal Subsistence Management Program**

The Secretaries of the Interior and Agriculture have delegated authority to manage the subsistence priority on Federal public lands to the Federal Subsistence Board (FSB). The FSB is comprised of eight members, including: the Regional Directors of the U.S. Fish and Wildlife Service, National Park Service, and Bureau of Indian Affairs; the State Director of the Bureau of Land Management; and the Regional Forester of the U.S. Forest Service. Three public members who represent rural subsistence users are also members of the board, and one serves as the FSB's chair. The public board members are appointed by the Secretary of the Interior, with the concurrence of the Secretary of Agriculture. The FSB establishes all Federal subsistence hunting, trapping, and fishing regulations for fish and wildlife addressed by ANILCA.

The Federal Subsistence Management Program (Program) is multi-faceted, highly collaborative and, reflects a "bottom-up" approach to management. The Program involves five Federal agencies, a Federal and public-member decisionmaking board, 10 Subsistence Regional Advisory Councils, partnerships with Alaska Native and rural organizations, as well as with the State of Alaska, and robust stakeholder input.

Subsistence Regional Advisory Councils are a large part of what makes Alaska's Federal Subsistence Management Program unique. Title VIII required the establishment of at least six subsistence resource regions, with each having an advisory council whose members are local residents with knowledge of subsistence practices and uses in their respective areas. Alaska is currently divided into ten subsistence resource regions, each with its own Federal Advisory Committee Act (FACA) chartered subsistence regional advisory council to reflect subsistence harvest and cultural differences within the state and also balance population representation.

The Subsistence Regional Advisory Council system provides a direct conduit of local and traditional ecological knowledge in the decisionmaking process. This approach has been crucial to the Program's success. Each Council holds at least two public meetings every year to gather local information, and make recommendations to the FSB on subsistence issues. On issues related to the take of fish and wildlife within their respective regions, the Secretary (or his delegate, the FSB) is statutorily required to defer to the recommendations of the regional advisory councils unless a recommendation is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs. To date, the FSB has adopted more than 90 percent of regional advisory council recommendations regarding the take of fish and wildlife on Federal lands.

**The Federal Subsistence Priority**

The Federal Subsistence Management Program's focus on the sociocultural aspects of subsistence activities distinguishes it from other hunting and fishing programs. Title VIII explicitly defines "subsistence uses" as "customary and traditional." Customary and traditional uses are essential components of the subsistence way of life for rural residents in Alaska, and as such, once recognized by the FSB, are protected under ANILCA, to the maximum extent possible. These recognized practices, along with rural status, define the pool of federally qualified subsistence users who are eligible for the subsistence priority on Federal public lands.

The Board recognizes customary and traditional subsistence uses by adopting specific determinations, which identify the fish stocks and wildlife populations that

Exhibit CC
Page 13 of 70

have been customarily and traditionally used for subsistence by rural residents of specific communities or areas. The framework for making Federal customary and traditional use determinations is outlined in the Federal subsistence implementing regulations.

The implementing regulations list eight factors that exemplify customary and traditional uses. The factors emphasize a pattern of use that includes the sharing of knowledge and resources across the generations. The eight factors make clear that customary and traditional uses are part of a community's cultural, social, economic and nutritional wellbeing, affirming and codifying that the subsistence way of life in rural Alaska encompasses more than simply the acquisition of calories. Furthermore, the factors acknowledge that the methods and means of subsistence harvest are characterized by efficiency and economy and, therefore, changes to community practices over time are expected with the development of new technologies. At times, this has created challenges for the FSB when faced with regulatory proposals seeking to authorize in regulation hunting or fishing practices under Title VIII of ANILCA that conflict with agencyspecific regulations prohibiting such practices.

The eight-factor analysis applied by the FSB when considering customary and traditional use determinations is intended to protect subsistence use rather than limit it. Because of the important role of subsistence in rural Alaska, it is assumed that customary and traditional use determinations will necessarily be broad and inclusive. The Federal Subsistence Management Program does not employ a rigid checklist approach to assessing the eight factors. Instead, analyses in the Federal program take a holistic approach and the eight factors serve as a framework for considering whether an area or community generally exhibits the eight factors characteristic of customary and traditional uses. The regional advisory councils and the FSB recognize that there are regional, cultural, and temporal variations throughout the state and the application of the eight factors will likely vary by region and by resource depending on actual patterns of use. Therefore, the eight factors that characterize customary and traditional uses are applied in a manner that provides maximum flexibility to address regional variations across the state and offer protections for the subsistence way of life in rural Alaska.

Customary and traditional use determinations are not intended to restrict harvest or allocate resources among Federally qualified subsistence users. However, Title VIII of ANILCA also provides guidance on how the Federal subsistence priority should be implemented in the event that there are not enough resources available to meet all harvest demands on Federal public lands. The Federal prioritization process provides a multi-phased approach that reduces the number of users or uses authorized on Federal public lands. This process is generally triggered by threats to the conservation of healthy populations of fish or wildlife, threats to the continuation of subsistence uses, or threats to the viability of a fish stock or wildlife population. While the subsistence prioritization process often reduces the number of users and uses permitted on Federal public lands, the overall intent of these restrictions is to continue to provide harvest opportunity to as many users as possible in the long run.

When populations of fish or wildlife are abundant enough to support the harvest demands of all user groups and uses, then all harvest authorized by the State of Alaska as well as those authorized in Federal subsistence regulations for Federally qualified subsistence users are allowed on Federal public lands. However, if a conservation concern or increasing competition requires a reduction in harvest, ANILCA requires that subsistence uses by Federally qualified subsistence users are prioritized over other consumptive uses on Federal public lands. The ability to restrict or eliminate harvest by non-Federally qualified users due to threats to the continuation of culturally important harvest practices of rural Alaskans is a unique characteristic of the Program that is highly valued by rural Alaskans. This aspect of the Program has received greater focus and attention as the program has matured with the meaningful infusion of traditional ecological knowledge shared by rural Alaskans. ANILCA also stipulates that subsistence uses by rural Alaskans may be eliminated on Federal lands only in cases when there is a looming threat to the viability of a fish, shellfish or wildlife population.

**Federal Subsistence Regulatory Process**

Stakeholders and the general public play a vital role in initiating changes to Federal subsistence fishing, hunting and trapping regulations, and providing input on proposed changes to ensure regulations meet the needs of subsistence users while also conserving healthy populations of fish and wildlife. Any individual or group can submit proposals to request changes to the Federal subsistence regulations or the areas and users eligible for the subsistence priority. The FSB very rarely generates

**Exhibit CC**
**Page 14 of 70**

proposals to change Federal subsistence regulations. Instead, changes are almost exclusively initiated by users or resource managers through an annual public process.

The FSB receives administrative and technical support from the Department of the Interior Office of Subsistence Management (OSM), which is housed within the Alaska Regional Office of the U.S. Fish and Wildlife Service. The OSM is mandated to serve each of the agencies and rural members represented on the FSB.

The FSB recognizes the critical importance of local and traditional knowledge in informing management decisions in the Program. It relies on the knowledge shared by local people and strives to consider it equitably alongside of western scientific knowledge. This expertise can provide a spatial and temporal scale of knowledge that is otherwise unavailable to resource managers. All OSM analyses of proposals to change Federal subsistence regulations incorporate available traditional ecological knowledge to help the FSB better understand subsistence resources and the people who depend on them.

The FSB holds annual public meetings to make regulatory decisions. During its meetings, the FSB engages in tribal consultation, accepts verbal and written public comments, and hears regional advisory council recommendations as well as comments by the FSB's technical review committee called the Interagency Staff Committee and the State of Alaska. Only after receiving all of this input do the FSB members discuss and vote on each proposal.

**Conclusion**

Since 1990, the Federal Subsistence Management Program has endeavored to provide rural residents of Alaska the opportunity to pursue the subsistence way of life, as envisioned by Congress and enacted in ANILCA. One of the Program's greatest strengths is its bottom-up approach that relies on direct input from the local people who will be directly affected by the FSB's actions. The program is intentionally designed to be highly collaborative and primarily driven by stakeholder input, biological data and local and traditional knowledge. The Program will continue to seek balance between the harvest needs of rural subsistence users, conservation mandates of land management agencies and the diverse values that undergird each of the many user groups seeking opportunities to hunt and fish on Federal public lands.

We appreciate the Committee's interest in subsistence harvest on Federal public lands in Alaska under ANILCA. I would be happy to answer any questions the Committee may have.

The CHAIRMAN. Thank you, Dr. Hardin.

Chairman BROWN.

### STATEMENT OF HON. ROY B. BROWN, CHAIRMAN, NORTHERN ARAPAHO TRIBE

Mr. BROWN. [Greeting in native tongue.]

Good afternoon, Chairman Hoeven, Vice Chairman Udall and members of the Committee. Thank you for holding this oversight hearing and giving me the opportunity to testify.

My name is Roy Brown. It is an honor to represent the Northern Arapaho as their Chairman. The Wind River Reservation is located in west-central Wyoming and, for generations, has been the home of two sovereign Nations, the Northern Arapaho and the Eastern Shoshone Tribes.

The Northern Arapaho and Eastern Shoshone are unique in that we are the only separate sovereign tribes who share jurisdiction and ownership of the same reservation. Today, I share the perspective of the Northern Arapaho Tribe.

The reservation is over 2.2 million acres of gorgeous wide-open spaces with an abundance of natural resources, plants, and wildlife which are central to our culture and traditions. For this reason, we are very protective of the land and resources the land provides. One reason that is currently changing the landscape of the reservation is the invasion of wild and feral horses.

**Exhibit CC**

**Page 15 of 70**

In 2012, the tribes and the Wyoming Fish and Wildlife Service, in separate surveys, estimated there were over 2,100 horses in the lower mountainous areas in the northwest portion of the reservation.

Today, our best estimates are that there are over 6,500 horses in the wilderness of the reservation. As the wild and feral horse population increases, their impact to the natural resources, and thus our way of life, becomes more and more critical.

The emergence of this population can likely be attributed to a number of factors. Wild horses have been able to thrive because of lack of natural predators, little to no human contact, and the abundance of forage after the area recovered from a long drought.

Additionally, the lack of adequate horse markets in the last decade suppressed the horse industry and created a market where only the most desirable horses would have buyers which has resulted in more feral horses.

The cost of horse ownership becomes particularly burdensome if the horse is injured, sick, old, or untrainable. These horses are sometimes let out in the wilderness near or within the reservation boundary.

The Wind River Fish and Game Department has the budget to hire three wardens, three wardens to patrol 2.2 million acres, the vast majority of it wilderness. This has not proven to be effective in catching or deterring domestic horse abandonment.

As the horse herds increase in numbers, so does the negative impacts to the environment. The horses will take every opportunity to overgraze on grasslands they come across. A herd of horses can decimate the natural grasses and forbs not only through eating but by eroding the ground to the extent the plants are unable to grow back.

The overgrazing leads to noxious weed infestation, long term or permanent loss of native grass and forb species, and sedimentation and topsoil loss. Mule deer, elk bighorn sheep and moose have all been displaced because of increased shortage of grasslands.

This has been particularly taxing on tribal members who have traditionally depended on big game for subsistence. Each June, the Wind River Fish and Game sells permits to eligible tribal members participating in the Tribe's traditional Sundance ceremony.

Historically, this has been a way to allow tribal members to carry on the tribal tradition of taking big game for various uses in the tribal ceremony. The Sundance hunting season eases the financial burden of tribal members as well as fosters the continuation of tribal traditions.

However, with the growing impact of wild and feral horses, the game has been more and more difficult to locate and hunt because they have migrated off the reservation or in areas that are very difficult to access.

Additionally, as horse herds grow and migrate to different parts of the reservation, they begin to threaten the plants and materials used traditionally and ceremonially. A long-term or permanent loss of these plants and materials would be culturally devastating.

It will take a multi-partner approach to fully address the wild and feral horse problem on reservation lands across Indian Country. It will take the cooperation and input of tribes, government

agencies, and interest groups to assess current impacts and develop plans for removal and mitigation of future impacts.

On the Wind River, horse removal is a priority. The Tribes, along with government agencies, have developed a methodology for removal of the wild and feral horse population. However, this is only one step to addressing the issue.

We will require the knowledge of tribal members, wildlife and ecology experts, and Federal agencies to help return our lands to their former state. To protect the lands from future invasion of feral horses, the Wind River tribes will require more enforcement figures from our Fish and Game Department.

Thank you.

[The prepared statement of Mr. Brown follows:]

PREPARED STATEMENT OF HON. ROY B. BROWN, CHAIRMAN, NORTHERN ARAPAHO TRIBE

**Introduction**

Good afternoon Chairman Hoven, Vice-Chairman Udall and members of the Committee. Thank you for holding this oversight hearing and giving me the opportunity to testify. My name is Roy Brown. It is my honor to represent the Northern Arapaho Tribe as Chairman.

**Background**

The Wind River Reservation is located in west-central Wyoming and, for generations, has been the home of two sovereign nations, the Northern Arapaho and the Eastern Shoshone Tribes. The Northern Arapaho and Eastern Shoshone are unique in that we are the only separate sovereign tribes who share jurisdiction and ownership of the same Reservation. Today I share the perspective of the Northern Arapaho Tribe. The Reservation is over 2.2 million acres of gorgeous wide-open spaces with an abundance of natural resources, plants, and wildlife which are central to our culture and traditions. For this reason, we are very protective of the land and resources the land provides. We have encountered several threats to these natural resources throughout the years and have learned to adapt and manage so that our tribal citizens may still enjoy the full benefit of what the land provides. One recent threat that is currently changing the landscape of the reservation is the invasion of wild and feral horses.

In 2012, the Tribes and the Wyoming Fish and Wildlife Service, in separate surveys, estimated there were over 2,100 hoses in the lower mountainous areas in the northwest portion of the reservation. Today, our best estimates are that there are over 6,500 horses in the wilderness of the reservation. As the wild and feral horse population increases, their impact to the natural resources, and thus our way of life, becomes more and more critical.

**Contributing Factors of Invasive Horses**

The emergence of this problem can likely be attributed to a number of factors. Wild horses have been able to thrive because of lack of natural predators, little to no human contact, and the abundance of forage after the area recovered from a long drought. Additionally, the lack of adequate horse markets in the last decade suppressed the horse industry and created a market where only the most desirable horses would have buyers which has resulted in more feral horses. Individuals with horse ownership could no longer market aggressive or untrainable horses. The cost of horse ownership becomes particularly burdensome if the horse is injured, sick, old, or untrainable. These horses are sometimes let out in the wilderness near or within the reservation boundary.

Which leads to another contributing factor. Wind River Fish and Game department has the budget to hire three wardens, one of whom serves as the Director of the program and carries out day-to-day administrative tasks. Three wardens to patrol 2.2 million acres, the vast majority of it wilderness, has not proven to be effective in catching or deterring domestic horse abandonment.

**Ecological Impacts**

As the horse herds increase in numbers, so does the negative impacts to the environment. The horses will take every opportunity to overgraze on grasslands they come across. A herd of horses can decimate the natural grasses and forbs not only

**Exhibit CC**
**Page 17 of 70**

through eating but by eroding the ground to the extent the plants are unable to grow back. The overgrazing leads to noxious weed infestation, long-term or permanent loss of native grass and forb species, and sedimentation and topsoil loss. The reservation, particularly the northwestern portion, has many areas that used to be grasslands but are now eroded to point where only weeds and other invasive plants can grow. Other ecologically related impacts are loss of naturalized water such as springs, downcutting or downsizing perennial streams, and degrading water quality.

Below are pictures of a study from 2014 to measure the impact of wild and feral horse herds. Exclusion cages were put in place to prevent horses from grazing in small circles of grassland. The picture on the left is a wide shot of grasslands with the exclusion cage in place. The picture on the right is a close up of the circular plot of excluded grassland after the cage has been removed. The pictures illustrate the extent to which the horses overgraze by highlighting the comparison of what the grassland looked like prior to and after grazing by horse hers in the wilderness.




Exclusion Cage in place          Close up of plot excluded from grazing

## Impacts on Culture and Tradition

Mule deer, elk, big horn sheep and moose have all been displaced because of increasing shortage of grasslands. The Fish and Wildlife Service have observed less use by wintering groups of elk on crucial winter ranges in the northwest area of the reservation. When big game are not able to find grasslands on which to forage on the reservation, they will migrate to areas where they can find food. Many times, that means they migrate off the reservation or to higher elevations. This has been particularly taxing on tribal members who have traditionally depended on big game for subsistence. Each June, the Wind River Fish and Game sells permits to eligible tribal members participating in the Tribe's traditional Sundance ceremony. Historically, this has been a way to allow tribal members to carry on the tribal tradition of taking big game for various uses in the tribal ceremony. The Sundance hunting season eases the financial burden of tribal members as well as fosters the continuation of tribal traditions. However, with the growing impact of wild and feral horses, the game have been more and more difficult to locate and hunt because they have migrated off the reservation or in areas that are very difficult to access.

Additionally, tribal members have a traditional and/or ceremonial use for many plants and materials found on the reservation. As the horse herds grow and migrate to different parts of the reservation, they begin to threaten the plants and materials used traditionally and ceremonially. A long-term or permanent loss of these plants and materials would be culturally devastating.

## Unknown Impacts

The tribes and its partners are just beginning to discover the ways in which the wild and feral horse overpopulation is impacting our reservation. While we cannot know with specificity, we suspect the wild and feral horse population has the potential to permanently affect our culture, environment, ecology and economy.

## Addressing the Problem

It will take a multi-partner approach to fully address the wild and feral horse problem on reservation lands across Indian country. It will take the cooperation and input of tribes, government agencies, and interest groups to assess current impacts and develop plans for removal and mitigation of future impacts. On the Wind River, horse removal is a priority. The Tribes, along with government agencies, have developed a methodology for removal of the wild and feral horse population. However, this is only one step to addressing the issue. We will require the knowledge of tribal members, wildlife and ecology experts, and federal agencies to help return our lands to their former state. And to protect the lands from future invasion of feral horses,

**Exhibit CC**
**Page 18 of 70**

the Wind River tribes will require more enforcement figures in our Fish and Game Department.

Thank you.

Senator BARRASSO. Mr. Chairman, let me just point out the size of their reservation is, as you described, 2.2 million acres and is larger than the combined sizes of the State of Rhode Island and Delaware. It is an amazing amount of area.

The CHAIRMAN. Are you bragging now?

Senator BARRASSO. It is quite a place.

The CHAIRMAN. It is a very big area.

Thank you for being here, Chairman. We appreciate it very much.

I should not tease my fellow Senator. He does a fantastic job. I appreciate him being here.

Ms. Peltola.

## STATEMENT OF MARY SATTLER PELTOLA, EXECUTIVE DIRECTOR, KUSKOKWIM RIVER INTER–TRIBAL FISH COMMISSION

Ms. PELTOLA. Thank you, Mr. Chairman and members of the Committee.

[Greeting in native tongue.]

My name is Mary Peltola. I am from the community of Bethel, Alaska. I am the Executive Director of the Kuskokwim Inter-Tribal Fish Commission.

As Senator Murkowski mentioned a moment ago, in May 2015, the Fish Commission was formed as a consortium of all of the 33 federally-recognized Alaska Native tribes located along the Kuskokwim River. This historical unity of tribes was driven by our understanding and insistence that we must have at least a co-management role if our Chinook salmon and way of life are to survive.

Despite agreements with the U.S. Department of the Interior for a tribal role in management of traditional subsistence fisheries, the burdensome Federal administrative structure and misplaced policy priorities of Fish and Wildlife have undermined the unified effort of the tribes to protect our salmon stocks and way of life.

Tribal self-determination is minimized in this most vital aspect of tribal health and well being. Two unique circumstances complicate the Fish Commission's efforts to manage the Kuskokwim River Chinook salmon stock.

We are federally-recognized tribes. We have a government-to-government relationship with the Department of the Interior and Interior has ample discretion to implement and administer the subsistence rights provided under Federal law for rural tribal members through co-management with our rural tribal governments.

Roughly half of the Kuskokwim River from the village of Aniak to the mouth of the Bering Sea flows through the Yukon Delta National Wildlife Refuge, and is subject to Federal jurisdiction. However, before the river passes through Aniak, it is subject to State jurisdiction. I should also note the Kuskokwim River is 900 miles long.

Under ANILCA, Federal managers are required to prioritize non-wasteful subsistence uses of fish and wildlife resources by Alaska's

rural residents, many of which include the Fish Commission's tribal members.

However, State law prohibits prioritizing subsistence uses of fish and game resources for Alaska's rural residents. Instead, State managers must provide all Alaskans with equal access and opportunities to take fish and wildlife resources.

Despite the obvious conflict between these two management regimes, it is Federal policy to defer to State management of the Federal portion of the Kuskokwim River Chinook salmon whenever possible.

Federal managers currently apply and enforce State regulations in Federal waters even though those regulations do not meet ANILCA's mandate to prioritize subsistence uses and they defer to State management decisions.

The Federal Subsistence Board administers the subsistence taking and uses of fish and wildlife under ANILCA. The regional directors who sit on the Subsistence Board frequently band together and at times their loyalty to support one another undermines their protection of subsistence interests.

The Federal Subsistence Board receives administrative support from another Federal agency, the Office of Subsistence Management. While OSM purports to represent the interests of Alaskan subsistence users, those interests are oftentimes in conflict with Fish and Wildlife Service political and bureaucratic interests limiting OSM's effectiveness.

These jurisdictional and administrative issues motivated the Fish Commission to enter into a Memorandum of Understanding with the Fish and Wildlife Service in February 2016. While on paper, the MOU places the Fish Commission as a management partner with the Fish and Wildlife Service, the equity of relationship has not been borne out in real life.

The Fish Commission needs clear and enhanced authority to develop and implement management plans without having to go through the burdensome administrative process required by ANILCA.

Congress should consider Federal legislation authorizing a pilot project for the Fish Commission that provides authority for the Commission to bypass the existing administrative structure and process of ANILCA and directly implement the Federal subsistence priorities for rural and tribal members.

Congress should also encourage the Secretary of Interior to engage in rulemaking to create a direct management structure between the Secretary and the Alaska tribal co-management commissioners such that the Secretary can simply delegate authority to our tribes to implement subsistence fishery management.

With that, I would be happy to answer any questions.

[The prepared statement of Ms. Peltola follows:]

PREPARED STATEMENT OF MARY SATTLER PELTOLA, EXECUTIVE DIRECTOR, KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION

My name is Mary Peltola. I am the Executive Director of the Kuskokwim Inter-Tribal Fish Commission (KRITFC). I come from Kwethluk, Alaska, a small Yupik Alaska Native village located on the Kuskokwim River. I have been fishing with my family in the Kuskokwim in our traditional ways my whole life. Despite agreements with the U.S. Department of Interior (DOI) for a tribal role in management of tradi-

tional subsistence fisheries, the burdensome federal administrative structure and misplaced policy priorities of the FWS have undermined the unified effort of the tribes to protect their salmon stocks and way of life. Tribal self-determination is minimized in this most vital aspect of tribal health and well-being. We are in a constant, ineffective struggle, and our tribes and salmon are suffering the consequences. After describing the KRITFC and our issues, I have some recommendations for Congress to address these issues.

In May 2015, the KRITFC was formed as a consortium of all of the 33 federally-recognized Alaska Native tribes that are located along the Kuskokwim River. This historical unity of the tribes was driven by their understanding, and insistence, that they must have at least a comanagement role if their Chinook salmon and way of life are to survive. Each tribe appoints a Commissioner to the KRITFC who is authorized to make decisions on behalf of the Tribe. The Commissioners select seven of their own members to serve on an Executive Council. The KRITFC strives to achieve consensus in all decisions.

For about a decade, the Chinook salmon stocks in the Kuskokwim River have been crashing. This has had disastrous consequences for Alaska Natives who depend on Chinook salmon for their nutritional, spiritual, and cultural well-being. In light of these conservation issues, the KRITFC has consistently and unanimously agreed to voluntary fishing restrictions to protect these stocks. The Commission uses its collective traditional knowledge and expertise concerning the Kuskokwim River to develop culturally appropriate conservation management plans. And, together with the Bering Sea Fishermen's Association, the KRITFC also designs and implements harvest data collection programs. The Commission's goal is to jointly implement those plans with U.S. Fish and Wildlife Service (FWS) and, when possible, with the State of Alaska. A central aspect of the tribal management plans is the unfulfilled goal that once a management plan is agreed to, and consistent with conservation, the tribes are authorized to implement and enforce that plan for their rural tribal members.

While each KRITFC member tribe has a unique relationship with the Kuskokwim River, all of our tribal members are unified by the vitally important role salmon—in particular, Chinook salmon—plays in our nutritional, cultural, and spiritual well-being. Since before contact with Russian traders and missionaries, and certainly before statehood, Alaska Natives were stewards of this resource. We successfully managed the harvest and conservation of all Kuskokwim River salmon stocks according to our traditional Yupik and Athabascan rules and values: Providing for children, the sick, and the elderly first. Only catching what you can eat. Sharing what you cannot. Treating our resources with respect.

However, since the advent of Federal and State management of Kuskokwim River Chinook salmon stocks, tribal management has been sidelined, our Chinook salmon stocks are crashing, and both our tribes and our salmon are suffering. Despite our proven expertise and interest in sustainably managing our river's resources, the current interpretation and administration of federal subsistence laws makes it very difficult for the KRITFC to fully engage in traditional subsistence ways of life and to exercise self-determination in this most essential right.

Two unique circumstances complicate the KRITFC's efforts to manage Kuskokwim River Chinook salmon stocks under the existing federal and state subsistence management programs. The first is that unlike the Lower 48, neither the Federal nor the State government recognizes our right as a matter of policy or law to manage our fish and wildlife resources, despite having successfully done just that for thousands of years. As you know, with the exception of the Metlakatla Reserve in Southeast Alaska, there are no reservations in Alaska. This is, however, simply one excuse used to minimize tribal co-management. We are federally recognized tribes, we have a government to government relationship with the DOI, and DOI has ample discretion to implement and administer the subsistence rights provided under federal law for rural tribal members through co-management with their rural tribal governments.

Empowering tribal management or co-management is the only way to overcome the ineffective and inefficient State/Federal dual management system currently in place. The Kuskokwim River salmon fisheries are subject to both Federal and State management. These management regimes are inescapably tangled by conflicting laws and policies. Roughly half of the Kuskokwim River, from its mouth on the Bering Sea to the village of Aniak, flows through the Yukon Delta National Wildlife Refuge, and is subject to federal jurisdiction. But, after the river passes through Aniak, it is subject to State jurisdiction. Some of our tribes must subsistence fish under State regulations, others under federal regulations, and at times it appears the purpose of the different regulatory schemes is to undermine tribal unity. Currently, there is no recognized place for all tribes to fish under a united tribal man-

Exhibit CC
Page 21 of 70

agement plan that has been negotiated with all management partners, which would thereby bring an effective, unified management plan throughout the entire drainage.

Under the Alaska National Interest Lands Conservation Act (ANILCA),[1] Federal managers are required to prioritize non-wasteful subsistence uses of fish and wildlife resources, such as Kuskokwim River Chinook salmon, by Alaska's rural residents,[2] many of which include the KRITFC's tribal members. If conservation concerns require Federal managers to restrict people from hunting or fishing from a certain stock, they must consider a user's customary and direct dependence upon the resource as the mainstay of livelihood, the user's local residency, and the availability of alternative resources before any restrictions are put in place.[3] ANILCA helps to ensure that the people who depend on a resource the most have the best opportunity to harvest that resource.

Absent FWS agreeing about the existence of a specific conservation concern or threat to subsistence uses, the State manages the Federal portion of the Kuskokwim River through State regulations. However, State law prohibits prioritizing subsistence uses of fish and game resources for Alaska's rural residents.[4] Instead, State managers must provide all Alaskans, regardless of whether they live in a rural village where food is costly and scarce or in an urban city where food is plentiful and relatively affordable, with equal access and opportunity to take fish and wildlife resources. This means that a lawyer who lives in Anchorage is provided the same opportunity to come to Bethel and fish for Kuskokwim River Chinook salmon as an elder subsistence user who is unemployed and depends on the nutrition provided by Chinook salmon to make it through the winter without going hungry.

Despite the obvious conflict between these two management regimes, it is Federal policy to defer to State management of the federal portion of the Kuskokwim River whenever possible.[5] These conflicting management regimes create serious problems that restrict our subsistence opportunities and impede our ability to fully engage in our traditional subsistence ways of life and to be fully self-determined in that engagement. One problem is that despite the fact that Federal management is required to prioritize subsistence opportunities for rural residents, Federal managers currently apply and enforce State regulations in Federal waters even though those regulations do not meet ANILCA's mandate to prioritize subsistence uses,[6] and defer to State management decisions. This is done over the KRITFC's objection, to the detriment of Alaska Native subsistence opportunity and self-determination.

Alaska's tribes do not have a direct role in either the Federal or the State management systems. This means that the people who depend on the resource the most have little to no say in how that resource is managed. The extent to which the KRITFC is able to fully engage in Federal management of the Kuskokwim River is controlled by an ineffective and inefficient federal administrative process that is stacked against tribal interests and designed to disenfranchise our tribal voices.

The Federal Subsistence Board (FSB or the Board) is an administrative body created by the Secretaries of Interior and Agriculture created to administer the subsistence taking and uses of fish and wildlife under ANILCA.[7] The FSB has eight members—a Chair, two public members appointed by the Secretaries of Interior and Agriculture, and the Regional Directors of FWS, the Bureau of Indian Affairs, the Bureau of Land Management, National Park Service, and U.S. Forest Service.[8] The Public Members are required to be familiar with subsistence users and uses; there is no such requirement for the agency Regional Directors. The FSB votes on all regulatory proposals and actions concerning subsistence uses of fish and wildlife on Federal public lands. The Regional Directors frequently band together and at times their loyalty to support each other undermines their protection of subsistence interests.

The FSB receives administrative support from another federal agency, the Office of Subsistence Management (OSM). It is staffed by anthropologists, biologists, technical and administrative employees, as well as liaisons to the ADFG and Alaska Native communities. OSM communicates with tribal members and other subsistence users to clarify regulatory proposals. OSM also conducts tribal consultations when

---

[1] 16 U.S.C. § 3101 et seq.
[2] 16 U.S.C. § 3114.
[3] 16 U.S.C. § 3114(1)-(3).
[4] *See McDowell v. State*, 785 P.2d 1 (Alaska 1989).
[5] 50 C.F.R. § 100.14(a)(State Fish and game regulations apply to public lands and such laws are hereby adopted and made a part of the regulations in this part to the extent they are not inconsistent with, or superseded by, the regulations in this part).
[6] 50 C.F.R. § 100.14(a).
[7] 50 C.F.R. § 100.10(a).
[8] 50 C.F.R. § 100.10(b)(1).

**Exhibit CC**
**Page 22 of 70**

deemed necessary by agency policy. And, OSM administers each FSB meeting, providing procedural guidance in an effort to ensure a consistent process. However, OSM is housed within FWS. While OSM purports to represent the interests of Alaska's subsistence users, those interests are oftentimes in conflict with FWS's political and bureaucratic interests, limiting OSM's effectiveness.

During public hearings held approximately every four months, the FSB considers regulatory proposals concerning subsistence uses of fish and game, recommends subsistence regulations for Federal public lands in Alaska for approval to the Secretary of Interior, and makes management decisions concerning eligibility to take, allocation, and restriction of subsistence resources.[9] The FSB also decides whether to delegate certain aspects of its authority to agency officials to make in-season subsistence management decisions consistent with frameworks established by the Board.[10]

These jurisdictional and administrative issues motivated the KRITFC to enter into a Memorandum of Understanding (MOU) with the FWS in February 2016.[11] The MOU was designed to enable the KRITFC, together with the FWS, to cooperatively manage Kuskokwim River Chinook salmon fisheries, to ensure a stronger, more self-determined management structure, and to avoid the burdensome administrative process. However, the KRITFC continues to face the same administrative delays and bureaucratic obstacles which exclude tribal participation and fail to prioritize subsistence opportunities for the rural users who need them the most.

It is difficult to maintain our traditional Alaska Native subsistence ways of life when a federal agency dictates every aspect of the administration of the Federal subsistence management program in ways that are often contrary to our self-determination and traditional subsistence way of life. While on paper, the MOU places the KRITFC as a management partner with FWS that equity of relationship has not been borne out in real life. The KRITFC has attempted to work in good faith to cooperatively develop and implement management plans and decisions for Kuskokwim River Chinook salmon stocks and subsistence fishing. But, the KRITFC continues to find its positions and suggestions diminished or wholly sidelined. FWS's number one priority often appears to be getting along with the State rather than ensuring that the subsistence needs of the Kuskokwim tribes and other rural users are fulfilled, and that the Chinook stocks are rebuilt. It appears that the FWS does not want to be in the position of protecting subsistence rights and managing the fishery. The solution is to take the FWS and FSB out of the process, and implement ANILCA's subsistence priority on the Kuskokwim River directly through these rural tribes pursuant to a management plan developed in consultation with the State.

The KRITFC needs clear and enhanced authority to develop and implement management plans without having to go through the burdensome administrative process required by ANILCA in order to address continued threats to stock conservation. This is vital given the growing impact of climate change on the natural resources Alaska Native subsistence users depend upon. The KRITFC offers these specific recommendations to ensure Tribes have central role in implementing and administering ANILCA.

Congress should consider federal legislation authorizing a pilot project for the KRITFC that provides authority for the Commission to bypass the existing administration structure and process of ANILCA, and directly implement the federal subsistence fishery for rural tribal members. The Commission suggests that upon adoption of a unified conservation and subsistence fishery management plan, the tribes would implement that plan for their rural tribal members, as well as non-tribal members residing in the villages so long as they agree to abide by the management plan. The Secretary of DOI would be authorized to review the plan to ensure conservation of fish stocks. If the Tribes and State could not agree on a management plan, the default would be federal management. Our Tribes have managed and depended upon Kuskokwim River Chinook salmon for thousands of years. Our Tribes understand salmon. They want to sustain it. They want to ensure its continued viability. Congress should recognize our conservation management experience and expertise and authorize this tribal co-management pilot project.

Congress should also encourage the Secretary of Interior to engage in rulemaking to create a direct management structure between Secretary and Alaska Tribal co-management commissions such that the Secretary can simply delegate authority to our Tribes to implement subsistence fishery management, relieving us of the burden of having to constantly engage in an ineffective, inefficient federal subsistence administrative structure.

---

[9] 50 C.F.R. 100.10(d).
[10] 50 C.F.R. § 100.10(d)(6).
[11] A copy of the MOU is appended to this testimony.

It has been the KRITFC's experience that having only two public members on the FSB is woefully insufficient representation for Alaska's subsistence users. The agency Regional Directors on the FSB often have not lived and don't really understand the subsistence way of life. An immediate fix that Congress could implement would be to require the appointment of additional tribal representatives to the FSB resulting in an equal number of public and agency members on the Board.

Finally, we recommend that it is essential to move OSM out from under FWS so that it operates independently of an agency whose policy and administrative actions are at times not consistent with providing fully for subsistence uses and needs. Ensuring that OSM is independently funded and managed would allow that agency to do its job free of potential ideological and political conflicts.

**Attachments**

PREPARED STATEMENT OF MICHAEL WILLIAMS, ELECTED TRIBAL OFFICIAL, AKIAK NATIVE COMMUNITY

Wha'Qaa! My name is Michael Williams, currently Vice Chairman of the Kuskokwim River Inter-Tribal Fish Commission (KRITFC), past Chairman of the KRITFC, Steering Committee Chair to organize KRITFC, former Area Vice President of the National Congress of American Indians, former Chairman of the Association of Village Council Presidents, Former President of the Rural Community Action Program, Board Member of the Native American Rights Fund, Former Vice Chairman on the Alaska State Board of Education, and an avid and long-time musher and Iditarod Sled Dog Race veteran and retired US Army Veteran. I also testified before Congress concerning the impacts of climate change on Indigenous Peoples in Alaska.

I appreciate the opportunity to submit my individual testimony in my capacity as a Tribal Council Member on an issue that is very close to my heart and mind. I am fortunate to have been raised in a Yupiaq Traditional way by my grandparents, my parents, and my uncles and aunts learning how to hunt, fish, and gather on our traditional lands in Western Alaska. They lived a Customary and Traditional way of life, living with the land, waters and air year-round. This life changed when the State and Federal Governments came to our communities with their laws that were crafted without our knowledge and participation. These laws continue to adversely affect the ability of Indigenous Peoples in Alaska to practice our ways of life.

Akiak Native Community requests that this Committee take the following actions:

1. Advance and protect Tribal Sovereignty;
2. Meet with Tribes to address the impacts of State and Federal laws on Indigenous Peoples of Alaska;
3. Secure ongoing funding for Tribes in Alaska to co-manage and manage natural resources.

**Advance Tribal Sovereignty**

The decision of Kuskokwim River Indigenous fishermen in 2012 to fish outside State regulations in order to feed their families resulted in the indictment of Indigenous fishermen.[1] While the Court found that the defendants were guilty of violating State law, Indigenous Peoples fished in order to uphold Tribal laws. We recognize that Tribal law and State and Federal laws are not always in agreement, and we strive to abide by the laws both by which we are governed and by which we also govern ourselves. Akiak Native Community is committed to working with Federal agencies to ensure that the Federal Government upholds its Trust Responsibilities to the 229 Federally-recognized Tribes in Alaska equally along with the other 338 Federally-recognized Tribes in the United States.

Indigenous Peoples are the first "Natural Resource Managers" of the lands and waters, and fish and wildlife, from which all Alaskans benefit. Because of Indigenous Knowledge—which draws upon Ancestral territorial ties, our understanding of our lands, and our respect and love for our Natural Resources—Tribal participation in management is paramount to managing fish and wildlife populations for conservation and to ensure future subsistence uses of such populations. Tribal sovereignty is upheld when Tribes are recognized as effective co-managers of the territories and fish and wildlife that sustain us.

On May 5, 2015, 33 Federally-recognized Tribes organized as the Kuskokwim River Inter-Tribal Fish Commission (KRITFC), modeling the Northwest Indian Fisheries Commission (NWIFC) that organized after the Boldt Decision in the 1970's

[1] *State of Alaska v. Felix Flynn et al.*, District Court for State of Alaska (Alaska 2013)

with the great Billy Frank, Jr. of the Nisqually Indian Tribe.[2] Billy traveled to our region to help Tribes in Alaska advocate to get on the management table. We are forever grateful for his contribution along with the ongoing support of the NWIFC Board.

In addition to the KRITFC, there have been numerous other agreements between Indigenous Peoples in Alaska and the Federal government concerning fish and wildlife management, including management of migratory birds, marine mammals, whales, polar bear, and walrus. These agreements have yielded successful results. Indigenous Knowledge and participation played a huge part. Fish and wildlife populations were replenished when Tribes co-managed and when Tribal sovereignty was recognized.

Following the creation of a Memorandum of Understanding between the KRITFC and the United States Fish and Wildlife Service (USFWS), KRITFC Tribes continue to work to increase their involvement as co-managers of Kuskokwim River fisheries with the USFWS.[3] However, as Mary Sattler Peltola addressed in her testimony before this Committee on May 20, 2018, the current Federal subsistence management structure impedes Tribal capacity to be effective co-managers.

We ask that Congress recognize the vital importance of Ancestral territories and fish and wildlife to Indigenous Peoples in Alaska by amending the Alaska National Interest Lands Conservation Act (ANILCA) to create a clear management role for Tribes separate from rural Alaska residents.

**Meet With Tribes**

Recognizing Tribal sovereignty requires, in part, that Federal agencies meaningfully negotiate with Tribes on issues that impact Tribal wellbeing. In this spirit, we ask that Congress authorize the Secretary of the Interior to conduct field hearings throughout Alaska with Tribes in order to better understand how Federal laws such as ANILCA affect Indigenous Peoples in Alaska. These hearings can inform legislators of the changes in Federal law necessary to more fully recognize Tribal sovereignty, protect Tribal uses of fish and wildlife, and support Tribal co-management of natural resources.

**Secure Funding For Tribes**

We ask that Congress secure ongoing funding for individual Tribes in Alaska as well as for Tribal bodies, including KRITFC, charged with co-managing fish and wildlife. Funding will support Tribal management efforts as well as Tribal capacity to address the welldocumented effects of climate change. The negative effects of climate change to which Indigenous Peoples of Alaska must adapt are experienced also by Indigenous Peoples on a global scale. Adequate funding from Congress will help position Indigenous Peoples of Alaska to be partners in addressing the effects of climate change and resource extraction nationally and internationally. Many Tribes are reviving management practices that are time-tested, climate-resilient, and have value to all Peoples, Indigenous and nonIndigenous alike. We ask Congress to nurture these efforts to help them grow across all our lands and waters.

Akiak Native Community is committed to preserving the health of our People and our fish and wildlife in perpetuity. Our goal is for our People and fish and wildlife to be well again. Without a meaningful role in the co-management and management of our Ancestral territories and fish and wildlife, the health of our People and our natural resources will remain threatened. Thank you very much.

————

MEMORANDUM OF UNDERSTANDING BETWEEN UNITED STATES DEPARTMENT OF THE INTERIOR U.S. FISH AND WILDLIFE SERVICE ALASKA REGION AND KUSKOKWIM RIVER INTER–TRIBAL FISH COMMISSION

This Memorandum of Understanding (MOU) is entered into in order to formalize the fishery management partnership between the United States Department of the Interior (Department), U.S. Fish and Wildlife Service (Service) and the Kuskokwim River Inter-Tribal Fish Commission (hereinafter referred to as "Commission").

ARTICLE I—*BACKGROUND AND OBJECTIVES*

In his address to the Alaska Federation of Natives Convention in October 2014, and to the National Congress of American Indians in February 2015, Deputy Secretary Mike Connor announced plans to develop a meaningful Partnership Project

——

[2] *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), affirmed, 520 F.2d 676 (9th Cir. 1975).
[3] See attached Memorandum of Understanding.

**Exhibit CC**

**Page 25 of 70**

that could be implemented administratively, with the goal of more meaningfully integrating Kuskokwim Tribes and Federally qualified users into Federal fisheries management on the Kuskokwim River drainage. Development of this MOU is one component of the Kuskokwim River Partnership Project. It formalizes a management partnership that begins to address the long-standing desire of Alaska Native Tribes in the Kuskokwim Drainage to engage as co-managers of fish resources.

The Association of Village Council Presidents (A VCP) and Tanana Chiefs Conference (TCC) are regional Tribal organizations whose membership includes all of the federally recognized tribes in the Kuskokwim drainage. The A VCP and TCC were instrumental in the establishment of the Commission and in the development of this MOU. Both AVCP and TCC have adopted resolutions that support the Commission's participation in the Kuskokwim River Partnership Project through the signing of this MOU.

The Partnership Project sets forth a two-part structure to meaningfully integrate Kuskokwim Tribes and Federally qualified users into the decisionmaking process for fisheries management on Federal public waters of the Kuskokwim River drainage. The MOU represents one component of a two part structure that will implement the 2014 directive from the Deputy Secretary to establish a demonstration project for the Kuskokwim River Drainage that integrates Alaska Natives into Federal fishery management into the decisionmaking process. The MOU builds upon the experience and success gained from consultations between the Commission and the Yukon Delta National Wildlife Refuge Manager related to Federal in-season fishery management decisions for the 2015 season, and will provide an opportunity to advance issues that are critical to the Commission and Federally qualified users in future years. The second component of the Partnership Project is a proposal cooperatively developed by the Commission, the Office of Subsistence Management (OSM), and the Service which was submitted to the two Regional Advisory Councils (Councils) in the Kuskokwim River drainage for a subcommittee jointly chartered by the two Councils. The goals of the proposal include providing a meaningful role for the Commission in the Federal subsistence management process and developing unified recommendations for fishery management for the Kuskokwim River drainage.

The Department of the Interior and the Service also share a mutual concern with the Commission for the conservation of fish resources and their habitats and ensuring the opportunity for the continuation of the subsistence way of life. Both are engaged in fish management strategies and programs and desire to develop and maintain a cooperative relationship which will be in the best interests of the Parties and the resource.

Additionally, the Department, Service, and Commission share the goal of meaningfully integrating the tribal governments located in Kuskokwim River drainage, through their membership and participation in the Commission, as broadly as possible, into the management of Federal public waters in the Kuskokwim River drainage fisheries.

The Parties share the goal of effective and timely communication of all information and consultation and collaboration for in-season fishery management actions;

ARTICLE II—*AUTHORITY*

The following authorities support the MOU:

- Alaska National Interest Lands Conservation Act (ANILCA) Title VIII
- Alaska Native Claims Settlement Act
- Executive Order 13175 "Consultation and Coordination with Indian Tribal Governments"
- Secretarial Order 3317, Department of Interior Policy on Consultation with Indian Tribes (December 2011)
- Secretarial Order 3335 "Reaffirmation of the Federal Trust Responsibility to Recognized Indian Tribes and Individual Indian Beneficiaries"
- U.S. Fish and Wildlife Service Native American Policy (1994)
- Federal Subsistence Board regulations 36 CFR 242 and 50 CFR 100

The Federal Subsistence Board (Board) is vested with authority delegated by the Secretaries of the Interior and Agriculture to manage subsistence uses and resources on the Federal public lands in Alaska. The Board may delegate specific regulatory authority related to the in-season management of fish species for the Federal public waters in the Kuskokwim Area. The manager of the Yukon Delta National Wildlife Refuge (Refuge is currently delegated this authority. The Letter of Delegation from the Board to the Refuge manager is attached as an appendix.

The Department has a government-to-government relationship and trust responsibility with the Federally recognized tribes in the Kuskokwim River Drainage and

is committed to implementing programs that further tribal self-determination. The Federally recognized Kuskokwim River Tribes are the governing bodies for the tribal members who are residents of these rural communities in the Kuskokwim River Drainage. The Kuskokwim River Tribes established the Commission for the purpose of engagement in the management of Kuskokwim River fisheries.

ARTICLE III—*STATEMENT OF WORK*

This MOU formalizes an agreement for substantive consultation between the Federal in-season manager and the Commission prior to in-season management decisions and actions. The MOU also acknowledges the collaborative development of a proposal by the Parties for a fisheries subcommittee jointly chartered by the Western Interior and Yukon-Kuskokwim Delta Regional Advisory Councils (Councils).

*THE SERVICE AGREES:*

1. The Federal in-season manager will consult with the Commission for the purpose of collaboratively making fisheries management decisions with the integration and application of Commission knowledge, information, and management strategies.

2. All relevant data and information will be provided by the Service to the Commission at the earliest practicable time before consultation.

3. The Federal in-season manager will serve as the primary point of contact for the agency.

4. To engage the Commission as partners in the development and implementation of fishery management projects for the Kuskokwim River drainage, such as research, monitoring, harvest surveys, subsistence studies, test fisheries, and other programs, and to enter into cooperative funding agreements with the Commission to support such capacity building to the degree funding is available from the Service or the Department.

5. To provide a timely written justification to the Commission when the Refuge manager is unable to reach consensus with the Commission regarding Kuskokwim Fisheries in-season management decisions. The justification will include an explanation of how the Commission's traditional and scientific information and position were integrated and considered in the management decision.

*THE COMMISSION AGREES:*

1. To maintain its status as a tribal organization with membership open to all of the Federally recognized Tribes in the Kuskokwim River drainage, that the Commission represents a significant majority Kuskokwim tribes representing all segments of the drainage, and that the Commission is authorized by its member tribes to engage in the management activities formalized through this MOU.

2. To recognize the Refuge Manager at Yukon Delta National Wildlife Refuge as the Federal in-season manager to the extent such authority has been delegated by the Board, including delegated authority to issue emergency special actions for the management of fish within the Federal public waters of the Kuskokwim River drainage. The scope of delegation set by the Board and limited by 36 CFR 242.10(d)(6) and 50 CFR 100.10(d)(6).

3. To provide all relevant data and information to the Service at the earliest practicable time before consultation, including local and traditional observations and knowledge and regional customary and traditional fishing practices.

4. To inform the Kuskokwim River Villages about in-season and other fishery management plans and actions.

5. To meaningfully engage in consultations with the Service to collaboratively manage fish in the Kuskokwim River drainage.

6. To designate an in-season consultation committee composed of the fewest number of Commissioners that can adequately represent the member tribes, understanding that the lower, middle, and upper regions of the watershed will be equitably represented.

7. To assist the Service with communication and outreach of critical biological and regulatory information to Commission members throughout the year.

*THE PARTIES MUTUALLY AGREE:*

1. To engage in consultation and collaboration throughout the year to coordinate planning for management actions regarding fish resources on Federal public waters of the Kuskokwim River, and to facilitate development of a unified management strategy that is informed by traditional ways of knowing and science that is biologically, environmentally and culturally sound.

2. Each party will engage in consultation and collaboration with an open mind and without committing to a special action before consultation occurs between the Parties. The Parties will notify each other, in a timely manner, of discussions with other management agencies and provide a summary of the information exchanged.

3. Both parties acknowledge the dynamics of in-season management and that in certain instances, due to the need for a timely decision, immediate consultation and collaboration may not be possible or will need to be abbreviated. Both parties will, in good faith, minimize the instances when abbreviated consultations occur and will meet soon thereafter to discuss the management action taken and modifications that may be necessary.

4. The Service and Commission will contribute to and support a Technical Advisory Body (TAB) that consists of fisheries biologists/scientists, social scientists, and traditional knowledge experts. The TAB will meet as requested by the Service or Commission, freely exchange information, and strive to cooperatively develop a unified presentation of information for consideration during negotiation, consultation and collaboration.

5. The Federal in-season manager and the Commission will negotiate for the purpose of striving to reach consensus on in-season management decisions. The parties expect that consensus will be reached for a large majority of issues. If consensus cannot be reached by negotiation, the Commission may take one or more of the actions below:

A. The Commission may request that a conference call or meeting occur with the Service Regional Director/Deputy Regional Director, the Assistant Regional Director of OSM, the Federal in-season manager, and, at the request of the Commission, the Bureau of Indian Affairs Regional Director or Deputy Regional Director, in a timely fashion to engage knowledgeable experts and key decision makers in a discussion for the purpose of achieving a mutually beneficial compromise. This strategy is consistent with the *qasgiq* model, a Yup'ik problem-solving framework, similar to a collaborative decisionmaking framework widely practiced among Federal agencies known as operational leadership. The Federal in-season manager maintains delegated authority. Members of the TAB may be requested to attend the meeting.

B. The Commission may submit a Special Action Request with urgency to the Board in an effort to address a concern. The Service agrees to request that the Commission's Special Action Request be addressed with urgency.

C. The Commission may submit a request to the Board to reconsider an in-season management action.

6. To support the development and establishment of a joint subcommittee appointed by the Councils. The goal for the Subcommittee is to develop recommendations to the Councils on the initiation, review, and evaluation of proposals for regulations, policies, management plans, special actions (in-season management), and other matters or potential impacts relating to management, conservation, and subsistence users of fish in the Kuskokwim River Area, or for fisheries which have impacts on Kuskokwim River Area stocks. Fishery proposals developed by the Subcommittee and forwarded to the Board by both Councils as recommendations will be entitled to deference in accordance with Section 805 of ANILCA and Board policy.

7. If the Councils choose not to establish a Subcommittee that incorporates the substance of the Parties' proposal, the Parties will jointly develop a proposal for the Department of the Interior under the authority of ANILCA Section 805(a) or other legal authority that incorporates the objectives of the Subcommittee.

8. To send the same representatives to attend consultations. The parties may send an alternate to consultations only when necessary, recognizing this should only occur on a very limited basis.

9. To develop supplemental memoranda of understanding between the Commission and the Refuge, as may be required to implement the objectives of the Partnership Project as it develops.

10. To attend and meaningfully participate in consultations during in-season fisheries management and at other times when requested by either Party, and to promote a professional, productive, and collaborative atmosphere, while avoiding confrontational speech or behaviors.

11. To actively encourage and seek the participation of the State of Alaska fishery managers in the consultation and collaboration process.

12. To jointly develop a proposal to the Board for an abbreviated process that will, to the degree practicable, provide an opportunity for timely relief when a request is submitted to reconsider an in-season management action.

ARTICLE IV—*TERMS OF AGREEMENT*

1. This MOU shall become effective upon the signature of the Service and the Commission.

2. This MOU shall continue until terminated by the Service or the Commission. A party may terminate this MOU by providing sixty (60) days advance written notice to the other party. Upon notice of termination, the Parties will meet promptly to discuss the reasons for the notice and to try to resolve their differences.

3. Amendments to this MOU may be proposed by the Service or the Commission and shall become effective upon the signature of the Parties.

4. If the Board changes the delegation of authority for the Kuskokwim River Federal in-season manager, this MOU will be carried forward and amended to reflect the new delegation.

5. Any significant change in the scope of Federal public lands or tribal lands in the Kuskokwim region will require a re-evaluation and possible amendment of this MOU.

6. This MOU shall be re-evaluated by the Parties after two (2) years from the date of execution.

The CHAIRMAN. Ms. Romero-Briones.

## STATEMENT OF A–DAE ROMERO–BRIONES, J.D., LL.M, DIRECTOR OF PROGRAMS, NATIVE AGRICULTURE AND FOOD SYSTEMS, FIRST NATIONS DEVELOPMENT INSTITUTE

Ms. ROMERO-BRIONES. [Greeting in native tongue.]

It is an honor to be here Chairman Hoeven, Vice-Chairman, and members of the Committee.

I come from the beautiful Cochiti Pueblo in New Mexico but I am also Kiowa from the Kiowa Tribe of Oklahoma.

I have the honor of working as the Director of Programs for First Nations Development Institute. I run the Native Agriculture and Food Systems Initiative. First Nation's mission is to support tribal communities in economic development with the fundamental belief that tribes have the wherewithal, knowledge and ability to create their own solutions for their communities.

I have submitted written comments for you to review at your pleasure. Those comments were generated by input from the many grantees we have. We currently serve or have served over 307 different grantees that are working on community-based food and agricultural projects. A large number of those grantees are focused on documenting their subsistence practices as a way of giving clout to the practices that have sustained their communities for generations.

I come to you at a special time in my community. We recently completed the harvesting of our scung which is wild celery. When you look at the harvesting time, it coincides with the different seasons and provides an important and sometimes the only source of iron and Vitamin C to the community after a long winter in New Mexico.

Senator Udall, thank you for your work on behalf of tribal communities and also for describing New Mexico as beautiful as most think of it as a desert. It has much to offer this Country.

I want to focus my oral comments on two important prospects. My community is located on the banks of the Rio Grande River. In order to manage whatever resources, whether elk, deer, turkey,

and fish that makes its way to the Rio Grande River and have made their existence part of our existence in the subsistence life-style, we have to deal with over seven different Federal agencies starting at the top of the mountain where we have the National Forest Service all the way down to the Bureau of Reclamation to the Bureau of Land Management, BIA and even the Department of Defense.

In order to manage our traditional lifestyles having to meet with so many different agencies, with so many different tribal consultation policies, and different perspectives from Federal managers, is a challenge. That is an understatement.

In addition, one of the most critical issues happening in a lot of our communities around the Country is the threat of commercialization of some of our traditional foods and traditional products.

I have the honor of serving as a National Organic Standards Board member within the Organic Food Production Act which does not recognize tribal communities. There is a provision allowing for organic certification of wild products. In California right now, when the tribes are making their way to process and save seaweed for the winter months, the commercialization of seaweed has created some conflicts along the coast.

Thank you.

[The prepared statement of Ms. Romero-Briones follows:]

PREPARED STATEMENT OF A-DAE ROMERO-BRIONES, J.D., LL.M, DIRECTOR OF PROGRAMS, NATIVE AGRICULTURE AND FOOD SYSTEMS, FIRST NATIONS DEVELOPMENT INSTITUTE

**Introduction**

Chairman Hoeven, Vice-Chairman, and members of the Committee, my name is A-dae Romero-Briones. I am a member of the Cochiti Pueblo, one of 19 Pueblo communities in New Mexico. I am also Kiowa from the Kiowa Tribe in Oklahoma.

I serve as the Director of Programs for the Native Agriculture and Food Systems Initiative (NAFSI) at First Nations Development Institute (First Nations). First Nations's mission is to strengthen American Indian economies to support healthy Native communities. We invest in and create innovative institutions and models that strengthen asset control and support economic development for American Indian people and their communities. We believe that when armed with appropriate resources, Native peoples hold the capacity and ingenuity to ensure the sustainable, economic, spiritual and cultural well-being of their communities. This belief largely stems from examples of long-standing food system management that includes subsistence practices in Indigenous communities.

NAFSI began in 2002 because of the need in Indian Country for financial support for community-based food system projects that include financial and policy support for traditional gathering, hunting, and management practices. Since 2002, First Nations has awarded 307 grants totaling more than $7.58 million to Native organizations dedicated to increasing food access and improving the health and nutrition of Native children and families. This number, however, pales in comparison to the more than 1,450 requests received that totali more than $49.7 millionover that time, illustrating that a huge unmet need for funding for these types of projects continues in Native communities.

These comments were generated with input from communities we support at First Nations Development Institute, our friends at the Indigenous Food and Agricultural Initiative at the University of Arkansas, and from personal experience coming from a community that relied heavily on subsistence agriculture. With increased pressures for energy, urban expansion, and ever changing environmental conditions, Indigenous subsistence practices are becoming all the more important to the communities that practice them. It is my hope that we all recognize and acknowledge the ecological managing that subsistence practices (hunting, gathering, fishing, etc.) offer to support Indigenous communities and people, ecosystems, regional environments, and our country. These comments are also made with the understanding that there is a government recognition of Tribal Sovereignty and Trust Responsi-

Case 1:22-cv-00054-SLG   Document 75-5   Filed 09/01/23   Page 60 of 107

**Exhibit CC**
**Page 30 of 70**

bility that underlies any government approach, whether through legislation or regulation or otherwise, meant to protect Tribal Nationhood which includes the food system institutions that sustain those nations. Lastly, these comments focus largely on Indigenous communities located in the lower 48 because Alaska presents its unique historical and present day circumstances.

## Subsistence Practices Are Ecological Management Practices

Subsistence should be recognized as sustainable ecological management practices worthy of protection. Far too often, subsistence practices are seen as passive activities isolated to Indigenous communities and focused solely on "food gathering." Yet, subsistence practices include hunting, gathering for food, medicine, tools, traditional arts like clothing, dying, basketmaking and building, fishing, and controlled burning. Subsistence is not a singular "food gathering" activity, but encompasses a multi-dimensional approach to environmental understanding and management that is embodied in the lifeways of a community.

In mainstream society, subsistence denotes production at a level sufficient only for one's own use or consumption without any surplus for trade or the action of maintaining or supporting oneself at a minimum level.[1] However, Indigenous subsistence practices are much more than minimal levels of production, they are the practical manifestation of generations of Indigenous knowledge institutionalized in ecological management systems. In short, subsistence practices empower Indigenous communities, allowing them to manage their environments, and the human presence within that environment, and to adjust to environmental changes with the goal of ensuring environmental health for generations.

This long-standing approach to environmental management ensures that a community is "balanced" within their own environments and eco-systems.. In communities where we see a disruption of subsistence lifeways, we also tend to see a greater dependence on retail markets and their support networks, and thus a greater likelihood of over-consumption and waste. Once lost, subsistence practices, that have been strengthened over generations, are much more difficult to re-create, re-teach, and re-learn.

As a Nation and at First Nations Development Institute, we have numerous examples of subsistence practices maintaining and improving local ecosystems from watershed improvement, species population balance, endemic plant and animal protection, and creating a blue print for climate change adaption. More often than not, subsistence communities are often the first alarm when environmental changes occur as we see with climate change.

Too often, we think of subsistence as a practice that is limited to places like Alaska where the remote nature of villages and communities is common.[2] Yet, subsistence practices (ecological management) occurs in almost every Indigenous community through the lower 48, Alaska, and Hawai'i. Subsistence practices are not only important to some of the most food insecure Indigenous populations, subsistence practices are practiced intentionally and by choice by many Indigenous people across this nation to perpetuate a shared responsibility to our human and non-human community, and shape environmental conditions to ensure the continued environmental and human health for future generations.

## Subsistence Practices Today

Toni Stanger-McLaughlin, an attorney, wife, and mother from the Coleville Tribe in Washington spent several years working for USDA in Washington, DC. She now resides with her family on Coleville where she practices a subsistence lifestyle with her husband and three children. She says, "My family survives on either three deer or one elk or one moose and a small deer for dried meat. Last year, we got a cow elk and only needed one other deer. Most years we get 3–4 smaller deer, just enough to get our family through an entire year. We need 6–7 large wild salmon, and three gallons of berries and a couple gallon size bags of other assorted roots and medicine. We also get a few small birds. All har-

---

[1] "Subsistence." Google Dictionary, Google, 19 June 2018, *www.google.com/search?q=subsistence&rlz=1C1EJFA* enUS800US800&oq=subsisten &aqs=chrome.0.69i59j69i60j69i57j0l3.1924j1j9&sourceid=chrome&ie=UTF-8.

[2] Subsistence use: The customary and traditional use by Native Americans of renewable resources. For Alaska, specific statutory definition of "subsistence uses" comes from section 803 of the Alaska National Interest Lands Conservation Act of 1980 and is paraphrased as "the customary and traditional uses by rural Alaska residents of wild renewable resources for direct personal or family consumption as food, shelter, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade."

vested on my reservation or in traditional seeded areas. I grew up like this and so will my children. I didn't buy salmon in a store until I was in law school. During certain times of the year, areas of my reservation can experience upwards of 67 percent unemployment and still survive through subsistence hunting and fishing.[3]

From the salmon fisherman and acorn gatherers on the California Coast to the maple syrup and clam shell gatherers on the coasts of New England, ecological management is tied directly to Indigenous food systems as a codification of the relationship between Indigenous people and their environment. When that environment changes, the effects of that change is directly tied to the people who depend on that environment. While modern science requires data collection over time, Indigenous people are perhaps the best examples of generational data keepers.

Subsistence is, in fact, a process by which a community maintains their relationship with the environment. Through this process, the community continues to gather data and information about changing environments, and assist in managing those changes through time-proven practices such as hunting and gathering.

Despite the presence and convenience of the American retail food system, many communities still continue to practice subsistence both by choice and necessity, as demonstrated earlier by Toni's story. Toni can live and work wherever she so chooses, yet chooses to live within her own community practicing subsistence. But also, there are many Tribal people who have no choice but to depend on subsistence.

Indian Country has some of the highest insecurity rates among any population, some of the highest food costs, and lowest incomes. One out of 12 Native individuals is so food insecure as to be classified as hungry.[4] American Indians have the highest food insecurity in the U.S., with Native households with children having a food insecurity rate of 28 percent compared to 16 percent for non-Natives.[5] An overlay of the USDA Food Deserts Locator map with Native communities shows an absence of retail supermarkets. Local convenience stores emphasize high-priced, nutritionally-deficient and preserved foods.

In a recent First Nations Development Institute study called *The Indian Country Food Price Index: Exploring Variation in Food Pricing Across Native Communities— A Working Paper II*, we found that Tribal communities in the contiguous United States (or lower 48), over the 12-month study, paid on average $8.41 more for a basket of food items than the national average. Similarly, in Alaska Native villages, shoppers on average paid $35.84 more when compared to the national average for the same basket of food items. The national average for the basket of items was $23.28.[6] These price differences are significant when you consider that the median income of American Indian and Alaska Native households was averaged at $35,062, compared with $50,046 for the nation as a whole.[7] In addition, 28.4 percent of American Indians and Alaska Natives that were in poverty in 2010, compared to 15.3 percent for the general nation.[8] Based on these statistics, many American Indian communities are more food insecure, have few retail food establishment options, and pay higher prices for small amounts of food. While this is seemingly a glum profile, many American Indian people thrive because of the Indigenous ecological management (subsistence) practices continue to provide purpose, continuity, and sustenance to the communities who practice them. However, increased environmental pressures for both energy and housing, urban sprawl, climate change, ecological management (subsistence) practices are consistently challenged and undermined.

**Barriers**

Although ecological management (subsistence) practices could once be exercised freely, the increasing limitations on Indian land ownership has created barriers that limit a Tribal Nation's ability to practice long-standing ecological management (subsistence). First, Indian Country is now only a small fraction of what Indigenous people once occupied, but even within those lands still under Indigenous ownership/oc-

---

[3] Email Communication. June 15, 2018.

[4] Henchy, G., Cheung, M., & Weill, J. (200). *WIC in Native American communities: Building a healthier America—Report summary*. Food Research and Action Center. Washington, DC.

[5] Gunderson C. (2008). MeasTuring the extent, depth, and severity of food insecurity: an application to American Indians in the USA. *Journal of Population and Economics.* 21: 191–215.

[6] First Nations Development Institute. (2018) "Indian Country Food Price Index: Exploring Variation in Food Pricing Across Native Communities—A Working Paper II". Longmont, Colorado: First Nations Development Institute.

[7] 2010 American Community Survey for the American Indian and Alaska Native alone population

[8] 2010 American Community Survey for the American Indian and Alaska Native alone population

cupation ecological management (subsistence) practices may be inhibited depending on the type of land title designation. Second, important lands outside of Tribal occupation are likely within federal agency like the US Forest Service, Bureau of Land Management, Bureau of Reclamation, and the Department of Defense. These lands are accessible at the discretion of the federal managers. While some progress has been made to develop protocols to allow for Tribal nations to access some federal lands, more needs to be done to ensure an objective, less discretionary, process.

*Land Holdings*

Indian Country encompasses over 56 million acres. There are 302 forested Indian reservations which encompass 17.9 million acres of Indian forest lands—7.7 million acres of timberlands and 10.2 million acres of woodlands. One hundred and ninety-nine reservations contain timberlands and 185 reservations contain woodlands.[9] While these landholding is seemingly large, complications in land management looms larger. The differences in land title, Tribal trust lands, allotted trust lands, and fee lands often results in different management rules on designated parcels, so access to these lands for hunting, gathering, and management may be limited, or worse, inaccessible to Tribal people despite being within Tribal boundaries.

It is recognized that Tribal Nations are fully in control of treaty rights that often include ecological management (subsistence practices) within the boundaries of a reservation, yet, treaty rights over hunting, fishing, and gathering are heavily impacted by activities outside of reservation boundaries. It should be recognized that the exercise of Tribal treaty rights within reservation boundaries MUST be considered when making determinations about off-reservation activities that would affect treaty rights within the reservation, such as management of habitats and how those habitats relate to National forest timber harvest, recreation, water, grazing, and mineral exploration.

*Federal Lands*

Federal land holdings are of significant importance and impact to Indigenous ecological management (subsistence) practices. A few, but not all, of the federal agencies that have impact on ecological management (subsistence) practices are listed and discussed below:

1. National Forest Service

"The Forest Service shares nearly 3,000 miles of contiguous border with AI/AN-owned lands and acknowledges that many lands now within the NFS are the ancestral homelands and ceded territories of many Tribes. This makes the agency and Tribes more than just neighbors; they are partners with common goals for social, cultural, ecological, and economic sustainability. Many Tribes have historically managed their own forests well and in ways the Forest Service hopes to emulate. Tribal land management is a testament to the Tribal land ethic, an ethic rooted in traditions, stories, and cultures. Sacred sites, both on AI/AN land and within the national forests, are important facets of that land ethic and a common bond between us." (p 14)[10]

There has been great strides in improving the relationship between the US Forest Service and Tribal Nations. Yet, more can still be done to ensure the shared goal of natural resource management. The US National Forest Service (NFS) is required to administer the NFS for outdoor recreation, range, timber, watershed, and wildlife and fish purposes; to analyze the environmental impacts of decisions it authorizes; to protect threatened and endangered species; to conduct research; and to carry out a host of other responsibilities on NFS lands. In the Report to the Secretary of Agriculture dated December of 2012 regarding *Policies and Procedures to Allow Tribal Access to Indian Sacred Sites*, there were several recommendations that should be implemented. These include: (1) improving relationships between Tribal Nations and the US Forest Service by creating a "meaningful" Tribal Consultation policy; (2) expanding the definitions used in E.O. 13007 of "Indian Sacred Sites;" and (3) utilizing legal tools to protect Indian sacred sites within US Forest Lands against 3rd party damage to sacred sites.

Of particular importance is the expansion of the definition of sacred sites in E.O. 13007. This definition should include a recognition of ecological management (subsistence) practices. It currently reads as so:

---

[9] National Congress of American Indians. "Demographics." Home NCAI, 2018, *www.ncai.org/about-tribes/demographics*

[10] USDA Office of Tribal Relations and USDA Forest Service. "Report to the Secretary of Agriculture: USDA Policies and Procedures Review and Recommendations Indian Sacred Sites." (Dec 2012)

". . .any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian Tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site."[11]

It should read as so:

Any specific, ~~discrete~~, narrowly delineated location on Federal land that is identified by an Indian Tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious or *ecological management* significance to, or ceremonial use by, an Indian religion; provided that the Tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

## 2. Bureau of Land Management

The Bureau of Land Management (BLM) is a significant federal agency in protecting and supporting ecological management (subsistence) practices as it manages federal lands in states where Tribes are the most numerous such as Alaska, Arizona, California, Colorado, Montana, North Dakota, South Dakota, Idaho, Nevada, Oregon, Washington, New Mexico, Utah, and Wyoming. BLM is given authority and guided by the Federal Land Policy and Management Act (FLPMA). The FLPMA does give some consideration to Tribal Nations such as in Title II, section 202 (43 USC Section 1712(b)).[12] However, this provision is limited to lands within the National Forest System. Management Plans for federal land bases that have significant ecological management (subsistence) practice value should include Tribal input, not just those within the National Forest System.

Management plans for lands considered Outstanding Natural Areas, even if they are recognized as culturally significant lands to local Tribes, are not required to include Tribal consultation or considerations.[13] For example, the Pierdas Blancas Historic Lighthouse Station is designatedas an Outstanding Natural Area.[14] Within the same act, it is acknowledged that the Chumash and Salian Tribes used the area traditionally [for fishing and gathering].[15] Yet, they are not required to be consulted in the management plans surrounding that area. FLMPA states:

"The management plan shall be developed in consultation with appropriate Federal, State, and local government agencies, with full public participation, and the contents shall include—
(E) cultural resources management strategies for the Outstanding Natural Area, prepared in consultation with appropriate departments of the State of California, with emphasis on the preservation of the resources of the Outstanding Natural Area and the interpretive, education, and long-term scientific uses of the resources, giving priority to the enforcement of the Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa et seq.)"[16]

This intentional exclusion of Tribal input from significant areas that retain or are of importance to ecological management (subsistence practices) should, at the very least, include Tribal input into how these areas are managed. There is a recognition of Tribal significance by giving the land managers the ability to close the park for religious or ceremonial purposes, but does NOT give input into management plans of these lands, much less, give recognition of or ability to practice ecological management (subsistence) practices on these lands.[17]

---

[11] Sacred Sites, E.O. 13007, Public Notice; Request for Comment. 76 Fed. Reg. 47,538 (Aug. 5, 2011).

[12] b) Coordination of plans for National Forest System lands with Indian land use planning and management programs for purposes of development and revision In the development and revision of land use plans, the Secretary of Agriculture shall coordinate land use plans for lands in the National Forest System with the land use planning and management programs of and for Indian tribes by, among other things, considering the policies of approved tribal land resource management programs.

[13] *https://www.blm.gov/sites/blm.gov/files/uploads/MS%201780.pdf*

[14] 43 USC 1786 (a)(2)

[15] 43 USC 1786 (b)(4)

[16] 43 USC 1786 (3)(A–E)

[17] 43 USC 1786 (10) states: (10) Native American uses and interests In recognition of the past use of the Outstanding Natural Area by Indians and Indian tribes for traditional cultural and religious purposes, the Secretary shall ensure access to the Outstanding Natural Area by Indians and Indian tribes for such traditional cultural and religious purposes. In implementing this

Additionally, BLM has broad authority to enter into contracting agreements with Tribal Nations.[18] In some instances, the agreements entered into with Tribal Nations for management of culturally significant land bases resulted in agreements that failed to compensate Tribal Nations for beneficial land management practices because some subsistence practices like hunting and gathering are not recognized as ecological management. The end result was that Tribal Nations were burdened with executing a contract that did not adequately cover the cost of the contract. BLM contracts with Tribal Nations should include recognition as subsistence practices as beneficial ecological management with costs covered to execute those activities within the Tribal/BLM contract.

Lastly, BLM has a robust Tribal Consultation policy that still can be improved to recognize ecological management (subsistence) practices. Native American Cultural and Religious significant places are mentioned throughout the internal BLM consultation policy.[19] It should be recognized that this term includes traditional ecological management (subsistence) practices.[20]

### 3. National Park Service

Like other agencies, the National Park Service has a robust tribal consultation policy. Although, much like other agencies the ability to respond and work with Tribal communities with significant ties to lands with the National Park service charge is left to the discretion on the National Park service director/manager of a particular park. This discretion can be frustrating to Tribes if the relationship with the National Park Service director/manager is not cordial. The National Park Service director/manager is NOT required to allow for ecological management (subsistence) practices. They are only directed to follow National Park Service Policy which reads as such:

> "With regard to consumptive use of park resources, current NPS policy is reflected in regulations published at 36 CFR 2.1 and 36 CFR Part 13. These regulations allow superintendents to designate certain fruits, berries, nuts, or unoccupied seashells that may be gathered by hand for personal use or consumption if it will not adversely affect park wildlife, the reproductive potential of a plant species, or otherwise adversely affect park resources. The regulations do not authorize the taking, use, or possession of fish, wildlife, or plants for ceremonial or religious purposes, except where specifically authorized by federal statute or treaty rights or where hunting, trapping, or fishing are otherwise allowed."[21]

Because many ecological management (subsistence) practices are not specifically recognized by federal statute or treaty rights, many ecological management (subsistence) practices are disallowed and not practiced. It would be wise for federal legislatures to recognize ecological management (subsistence) practices as necessary environmental management tools even within Federal lands.

### 4. Bureau of Ocean and Energy Management

The Bureau of Ocean and Energy Management (BOEM) has an incredible impact on ecological management (subsistence) practices on ocean resources. Historically, Tribal communities not only in coastal regions, but even in mid-continent of North America, depended on ocean resources for ceremonial, diet, and cultural patrimony. In more recent times, the rapid change in ocean and sea conditions and ocean resources is extremely concerning. Tribal people see important subsistence resources like clams, oysters, abalone, and seaweed, to name a few, depleting at unconscionable rates. Because these resources play an important role in ecological balance,

---

subsection, the Secretary, upon the request of an Indian tribe or Indian religious community, shall temporarily close to the general public use of one or more specific portions of the Outstanding Natural Area in order to protect the privacy of traditional cultural and religious activities in such areas by the Indian tribe or Indian religious community. Any such closure shall be made to affect the smallest practicable area for the minimum period necessary for such purposes. Such access shall be consistent with the purpose and intent of Public Law 95–341 (42 U.S.C. 1996 et seq.; commonly referred to as the "American Indian Religious Freedom Act").

[18] Bureau of Land Management Manual. Rel. N0. 1–1780 (7)

[19] Bureau of Land Management Manual. Rel. N0. 1–1780 (7)

[20] Bureau of Land Management Manual. Rel. N0. 1–1780 defines as, "Traditional cultural property (TCP): A phrase often used in reference to a "property of traditional religious and cultural importance" as defined in the NHPA, which are identified by Indian tribes. The property derives significance from traditional values associated with it by a social and/or cultural group such as an Indian tribe or local community. It commonly refers to a culturally sensitive area that may qualify for the NRHP if it meets the criteria and criteria of exceptions at 36 CFR 60.4. See National Register Bulletin 38." (p 36).

[21] National Park Service. Management Policies: The Guide to Managing the Park Service System. 2006

Tribal Nations have been struggling to be recognized as stewards of these resources, participate in the management of these resources, and practice ecological management to ensure the continuation of these resources for future generations.

BOEM's Tribal Consultation policy is not as robust or articulated as other federal agencies. While it is subject to federal law, and recognized as a government-to-government relationship with Tribes, BOEM does not spell out how federal law and the government-to-government relationship is reflected in agency action, policy, and practice. Articulating a Tribal Consultation policy would help Tribal stakeholders understand where and how to influence BOEM agency decisionmaking in order to advocate for the practice ecological management (subsistence) practices.

Additionally, many of the ocean resources that are of importance to Tribal communities are within BOEM management scope. A full understanding of what ocean resources are of concern should be explored through a Tribal/BOEM relationship exploration process much like the US Forest Service did with sacred sites.[22] Many Tribal Nation concerns over ocean resources could be documented and explored, but this process may also provide valuable information and data about ocean resources to BOEM that have yet to be considered or documented.

5. US Fish and Wildlife Service

The US Fish and Wildlife Service (USFWS) has an important mechanism for including Tribal participation in ecological management (subsistence) practices through the State and Tribal Wildlife Grants Program. This program should continue to be supported, but should also be considered for expansion to include more Tribes. USFWS should also consider providing technical assistance webinars to increase Tribal participation by Tribes who do not normally participate.

*Recognition of Indigenous Ecological Management (Subsistence) Practices*

1. Fishing

Fishing is an important practice that is vital to many Tribal communities, particularly those along the coastal areas. However, I am honored to be sitting on the panel with communities who represent these communities and can articulate the issues around subsistence fishing more adequately than I can. I will defer my comments to them.   772. Hunting and Gathering

It has long been recognized that Tribal communities have treaty rights that extend beyond reservation borders. The phrase "usual and accustomed places" has been interrupted to include off-reservations, which is critical to Tribal Nations actively practicing Tribal ecological management (subsistence). The ability to exercise Treaty rights off-reservation interpretation should continue to be upheld. In *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 119 S. Ct. 1187, 143 L. Ed. 2d 270 (1999), the US Supreme Court ruled in favor of the Chippewa Indians' right to fish and hunt in northern Minnesota without state regulation. The ruling marked a final victory for the Tribe in its long fight to assert its treaty rights and to defend its cultural traditions.[23] Presently, the US Supreme Court has a similar case listed on its docket, Herrera v. Wyoming.[24] Tribal Nations throughout the country are watching anxiously for this court case to be adjudicated with the hopes that continued recognition of ecological management (subsistence) practices will be honored even in "usual and accustomed" places off reservation. The recognition of these ecological management (subsistence) practices will support the continuation of ecological tools that will keep our environments healthy.

*Organic Food Production Act—Wild Gathering Provision*

The Organic Foods Production Act (OFPA) and subsequent USDA regulations has a provision for gathering of wild crops.[25] Unfortunately, within this act there is NO recognition of Tribal Nations, communities, or people. Authorizing legislation, OFPA, and the subsequent USDA–AMS regulations specify that wild crop harvesting must "support the long-term viability of the habitat." However, organic crops like wild crops are certified organic bythird party certifiers. There is inconsistent enforcement of what it means to "support the long-term viability of habitat." Further-

---

[22] See USDA Office of Tribal Relations and USDA Forest Service. "Report to the Secretary of Agriculture: USDA Policies and Procedures Review and Recommendations Indian Sacred Sites." (Dec 2012)

[23] Read more: Native American Rights—Hunting And Fishing Rights—Court, Tribes, Tribe, and Treaties—JRank Articles *http://law.jrank.org/pages/8750/Native-American-Rights-Hunting-Fishing-Rights.html#ixzz5IhIKR38Z*

[24] US Supreme Court Docket No. 17–532

[25] (7 US 7 U.S.C. ch. 94, 7 U.S.C. § 6501 et seq.) and Section 5022 of the USDA–AMS Organic Handbook (can be found at: *https://www.ams.usda.gov/rules-regulations/organic/handbook/5022*)

**Exhibit CC**

**Page 36 of 70**

more, without the recognition of Tribal Nations, communities, and people and their relationship to some of these wild crops, some Tribal Nations are being purged of important traditional resources.

While many Tribes harvest and gather wild crops consistent with traditional ecological management practice that may include techniques, timing, and processes that ensure its propagation, non-tribal harvesting of the same crop for commercial purposes may not follow the same techniques, timing, and processes leaving the crops vulnerable for over-harvesting, and much worse, extinction. Abalone and seaweed are only two examples of over-harvesting. Had there been some recognition of the importance of these wild crops to Tribal Nations and Tribal Nations participated in the management of these crops, perhaps over-harvesting could have been slowed or even prevented. Commercialization of wild foods, especially those important to Tribal Nations, should be fully explored by USDA–AMS and the USDA Organic Program before permissive harvesting of wild crops is allowed for sale under the USDA Organic label.

We see a commercialization of culturally important foods typically gathered by Indigenous people. These foods, once relegated as a "commodity," become over-harvested significantly with no regional management systems in place. Indigenous people should be the managers of their culturally important foods like leeks, wild onions, seaweed, and maple sugar, among others. At the very least, Tribal Nations should be a stakeholder that develops management plans for these resources.

1. Seaweed in California

Of immediate concern is the over-harvesting of seaweed along the coasts of California. Seaweed has been an important product in ecological management (subsistence) lifestyles for thousands of years for California communities along the coast and as far in-land to Tribes in Nevada. Recently, seaweed has been deemed a "super food'" by American food culture. As a result, seaweed has been harvested by non-Tribal commercial harvesters that is resulting in shortages for Tribal Nations who follow traditionally timed seaweed gathering. Not only is there a concern for future seaweed harvests, but there is a concern for diet shortages of California Tribal people who rely on this source of food during winter months. BOEM should create a Tribal Resource Management Plan specifically for seaweed along the coast of California to ensure that this resource is not over harvested, Tribal communities have first priority, and that this resource is healthy for future generations.

Because of the lack of clarity between federal authority and Tribal recognition around ocean resource management, states have taken a large role in making determinations about ocean resources. There are times when practicing ecological management (subsistence) may be adverse to economic interests within a state, which can create a polarized environment for Tribes to advocate for ecological management (subsistence) practice. Federal recognition of the importance of ecological management (subsistence) practice would give a new perspective in environmental management that is greatly needed, particularly in seaweed commercialization.

**Supportive Legislation that should continue to be protected**

There are current pieces of legislation that serve as a solid beginning for the protection of ecological management (subsistence) practices. These pieces of legislation should continue to be supported. These are:

- The Agricultural Act of 2014 (Farm Bill) Section 4033 the Service of Traditional Foods in Public facilities [26]

[26] SEC. 4033. SERVICE OF TRADITIONAL FOODS IN PUBLIC FACILITIES. (a) PURPOSES.—The purposes of this section are—(1) to provide access to traditional foods in food service programs; (2) to encourage increased consumption of traditional foods to decrease health disparities among Indians, particularly Alaska Natives; and (3) to provide alternative food options for food service programs. (5) TRADITIONAL FOOD.—(A) IN GENERAL.-The term "traditional food" means food that has traditionally been prepared and consumed by an Indian tribe. (B) INCLUSIONS.—The term "traditional food" includes—(i) wild game meat; (ii) fish; (iii) seafood; (iv) marine mammals; (v) plants; and (vi) berries. (c) PROGRAM.-The Secretary and the Commissioner shall allow the donation to and serving of traditional food through food service programs at public facilities and nonprofit facilities, including facilities operated by Indian tribes and facilities operated by tribal organizations, that primarily serve Indians if the operator of the food service program—(1) ensures that the food is received whole, gutted, gilled, as quarters, or as a roast, without further processing; (2) makes a reasonable determination that—(A) the animal was not diseased; (B) the food was butchered, dressed, transported, and stored to prevent contamination, undesirable microbial growth, or deterioration; and (C) the food will not cause a significant health hazard or potential for human illness; (3) carries out any further preparation or processing of the food at a different time or in a different space from the preparation or proc-

Continued

However, there should be a change in the language under Section 4033(c)(7)
It currently reads:

> (7) follows Federal, State, local, county, tribal, or other non-Federal law regarding the safe preparation and service of food in public or nonprofit facilities; and

But this should read:

> (7) follows Federal, ~~State,~~ ~~local,~~ ~~county,~~ and tribal law regarding the safe preparation and service of food in public or nonprofit facilities; and

- (Proposed provision in current Farm Bill Discussions) Title VIII—Forestry Sec. 8624—Good Neighbor Authority

Includes Tribes as eligible under the Good Neighbor Authority; and Adds trust land, restricted fee, land held for a Tribe's benefit, fee land, Section 17 corporation owned land, and an Alaska Native Village Corporation.

- The Food, Conservation, and Energy Act of 2008 (Pub.L. 110–234) (2008 FARM BILL PROVISIONS)—

Previous Farm Bill Provisions, included a section that allowed for ecological management (subsistence) practices. It said:

> SEC. 8105. FOREST PRODUCTS FOR TRADITIONAL AND CULTURAL PURPOSES.(a) In General- Notwithstanding section 14 of the National Forest Management Act of 1976 (16 U.S.C. 472a), the Secretary may provide free of charge to Indian Tribes any trees, portions of trees, or forest products from National Forest System land for traditional and cultural purposes.

(b) Prohibition- Trees, portions of trees, or forest products provided under subsection (a) may not be used for commercial purposes.

This should be included and supported in future versions of the farm bill.

**Recommendations**

*1) Include Tribal Nations in Land Management Planning on Federally held lands*

While we do have laws and policies that protect sacred sites and protect historic places significant to the US Nation such Executive order 13007 and the National Historic Preservation Act (NHPA),[27] these laws are often used to designate protections to specific land sites. Protections should and need to extend to the ecological management (subsistence) activities that take place on these lands. Protecting a parcel or historic land base without the ecological management (subsistence) activities historically used to maintain its health is analogous to watching a house deteriorate from non-use.

Additionally, the FLMPA gives authority to land managers to allow closure of federal lands for cultural and ceremonial purposes, yet there is NO inclusion of Tribal Nations in the creation of the land management plans of these same areas. Tribal Nations should be included in the creation of land management plans of the places that have been and continue to be closed for the cultural and ceremonial purposes. In the alternative, ecological management (subsistence) practices should be included in the definition of cultural and ceremonial purposes stated in Executive Order 13007.[28]

---

essing of other food for the applicable program to prevent cross-contamination; (4) cleans and sanitizes food-contact surfaces of equipment and utensils after processing the traditional food; (5) labels donated traditional food with the name of the food; (6) stores the traditional food separately from other food for the applicable program, including through storage in a separate freezer or refrigerator or in a separate compartment or shelf in the freezer or refrigerator; (7) follows Federal, State, local, county, tribal, or other non-Federal law regarding the safe preparation and service of food in public or nonprofit facilities; and (8) follows other such criteria as established by the Secretary and Commissioner.

[27] E.O. 13007, 61 Fed. Reg. 26771 (May 24, 1996). E.O. 13007 refers to "Indian Sacred Sites." In this report we generally use the term "American Indian/Alaska Native" as a broadly inclusive term to refer to American Indians, Alaska Natives, First Nations, First Peoples, Native Americans, and other indigenous people. E.O. 13007 references Executive Memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments," which requires federal executive agencies to consult with Tribes on a Government-to-Government basis to the greatest extent practicable and to the extent permitted by law on actions that affect Federally Recognized Tribal Governments. National Historic Preservation Act, 16 U.S.C. § 470 et seq. (1966), Section 101(d)(6)(B).

[28] As used in Executive Order 13007, ". . .any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian Tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the Tribe

2) *Provide a budget within USDA to create Tribal Land Resource Management Plans*

There are several federal agencies, the US Forest Service and Bureau of Land Management that include Tribal Resource Management Plans for consideration and implementation within Federal lands. Typically, these Tribal Resource Management Plans are developed within the Department Interior Bureau of Indian Affairs. However, too few resources are allocated to developing these plans and are a limited to certain land designations. Congress should consider allocating more funding to developing Tribal Resource Management Plans and expanding the reach of these plans to include all Tribal lands, regardless of designation if the Tribe so chooses.

3) *Provide guidance to National Forest managers to support subsistence practices*

The Multiple Use—Sustained Yield Act of 1960 (or MUSYA) (Public Law 86–517) is a federal law passed by the United States Congress on June 12, 1960. This law authorizes and directs the Secretary of Agriculture to develop and administer the renewable resources of timber, range, water, recreation and wildlife on the national forests for multiple use and sustained yield of the products and services. This is the first law to have the five major uses of national forests contained in one law equally, with no use greater than any other.[29] The Multiple-Use Sustained-Yield Act of 1960 (MUSYA), does not currently include consideration of sacred sites and traditional subsistence practices, and states "It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C.§§528 (1960). This law makes it harder for forest land managers to give weight to Indigenous subsistence practices within those federal lands. Tribal Traditional subsistence practices should be included as a sixth major use in determining multiple use and sustained yield of the products and services.

4) *Ensure Co-management agreements duly compensate Tribal communities for their participation*

Federal agencies have broad power to contract with Tribal communities, whether through grants, co-management agreements, memorandums of understanding, cost-share agreements, Wyden agreements, participating agreements and stewardship agreements. These agreements should include a recognition of the important of ecological management through subsistence practices. Tribes should be adequately compensated for management of ecological management through subsistence practices. Far too often, we have seen agreements between federal agencies and Tribal Nations inadequately compensate Tribes for participation and management which creates a hardship on Tribal Nations to fully manage these contracts. Not only will compensation for ecological management through subsistence recognize subsistence practices as a vital practice, it will ensure that more funding is directed toward Tribal execution of any agreement between Tribal Nations and federal agencies.

5) *Increase Indigenous Representation on Advisory Boards*

Many agencies have advisory boards authorized under the Federal Committee Advisory Act.[30] These advisory boards are important bodies that allow non-federal stakeholder participation. Few of these boards ever include Tribal Nation citizenship. Agencies should increase outreach to Tribal Nations to include Tribal citizenship. Tribal citizenship participation should be included (but not limited to) the following advisory boards:

- Rural Schools Resource Act Advisory Committee
- Regional Recreational Advisory Committees (BLM)
- Regional Advisory Boards for the Bureau of Land Management
- National Organic Standards Board
- Hunting and Shooting Sports Conservation Council(FWS)
- Sport Fishing and Boating Council (FWS)
- Alaska Regional Subsistence Councils (These same councils should be created for the lower 48 and Hawaii)
- National Academies on Committee on Off-Science and Assessment
- The National Park Service Advisory Board (because it's site specific, Tribal Nations surrounding the sites should be included)

---

or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site."

[29]"Multiple-Use Sustained-Yield Act of 1960." Wikipedia, Wikimedia Foundation, 19 June 2018, en.wikipedia.org/wiki/Multiple-Use Sustained-yield Act of 1960.

[30]The Federal Advisory Committee Act (FACA) of 1972 (Public Law 92–463)

6) *Change the definition of "sacred sites" Executive Order 13007 to include lands significant to ecological management (subsistence) practices.*

The current definition of sacred sites in E.O. 13007 reads, "Any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian Tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the Tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

E.O. 13007 should be changed to read as follows:

Any specific, discrete, ~~narrowly~~ delineated location on Federal land that is identified by an Indian Tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious or *ecological management* significance to, or ceremonial use by, an Indian religion; provided that the Tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

**Conclusion**

Thank you for allowing me time to address the committee and to advocate for the recognition of Indigenous ecological management (subsistence) practices. There are increasing pressures on Tribal Nations economically and socially, yet subsistence practice is one of the few tools we have in monitoring environmental changes like climate change and resource depletion. Rather than viewing these practices as simplistic activities such as "just food gathering," we need to recognize these practices for the ecological management practices that have created and ensured the health of some of our country's greatest environmental treasures. The continued health our country's lands and Tribal Nations is inextricably tied. To ensure their continued existence, it's time to listen, recognize, acknowledge, and protect the traditional food systems of Tribal Nations and the long-standing practices that support those systems.

Na'cha,

The CHAIRMAN. Thank you.

We will begin with our five minute rounds of questioning. I would like to start with Dr. Hardin.

The Alaska National Interest Lands Conservation Act sets forth a broad and sweeping example of Federal management and oversight of subsistence activities specific to the needs and complexities in your State of Alaska.

Can you highlight some of the effective management approaches developed pursuant to that law which might be helpful in protecting and promoting subsistence lifestyles and practices in tribal communities throughout the rest of the Country?

Dr. HARDIN. Thank you, Mr. Chairman, for that question.

I think we are very fortunate in Alaska to have the Alaska National Interest Lands Conservation Act which does prioritize subsistence on Federal public lands. I think one of the keys to the success of that program is the bottom-up approach built into the law and implemented through the Federal program.

In that process, the drivers of the program and the regulations that guide the program are the users themselves. The Federal Subsistence Board does not generate regulations and initiate regulatory changes. Those are all driven from the local level, from local resource managers.

Similarly, recommendations to the board are directly from the local users themselves, with the board's understanding that people at the local level are really the ones who have the most knowledge about the resource and the conditions affecting the resources.

I think that process the Federal program has implemented and continues to develop over time is one that has broad applicability.

**Exhibit CC**

**Page 40 of 70**

The CHAIRMAN. Thank you, Doctor.

Ms. Peltola, the Federal Subsistence Management Program is designed to elicit input on the subsistence use of fish and wildlife within Alaska. The program includes five Federal agencies, the Federal Subsistence Board, ten regional advisory councils on subsistence issues and numerous partnerships from the State of Alaska as well as other stakeholders.

In your written testimony, you referenced some of the inefficiencies and concern about the lack of representation of Native subsistence users on the board. To address that piece in regard to having Alaska Natives who are subsistence users, talk about how they should be incorporated on the board and, in general, whether you think this type of stakeholder board is an appropriate method for managing or overseeing subsistence use?

Ms. PELTOLA. Thank you, Mr. Chairman.

I do think this type of board is effective for overseeing management of subsistence. I do believe, though, the board does not have parity among its voting members. There are five agency regional department heads, one from the Fish and Wildlife Service, one from the Bureau of Indian Affairs, one from Parks, and one from BLM.

Then there are three public members, one of whom is the Chair who does not have an active voting membership. In effect, there are two public members. In order for them to get on the Federal Subsistence Board, they have to have an in-depth knowledge of subsistence activities as well as regulations.

That same standard is not applied to the agency representative and the agency voting members, many of whom are very new to Alaska and do not stay in their posts longer than three to five years. Many of them also have alternates who sit in for them when they cannot make the meeting.

In my opinion, the way to make the Federal Subsistence Board more effective for actual subsistence users is to have at least as many public members as there are agency representatives. In my opinion, preferably, there would be one person from every region of the State. I see Alaska as having six different, distinct regions.

Having six public members or even five public members or maybe five public members, the chairman and then five agency members, I think would provide more equality, effectiveness and efficiency.

Thank you, Mr. Chairman.

The CHAIRMAN. Thank you.

Chairman Brown, in regard to the wild horse and burro management, BLM indicated that roughly their number for wild horses and burros on the 26.9 million acres of BLM-managed lands, their recommended management numbers would be to have about 26,000 to 27,000 animals but they estimate they have a population of 83,000 at this point.

Talk to me about some of the effects and recommendations you have in regard to those numbers.

Mr. BROWN. Thank you, Mr. Chairman.

Those numbers seem likely. On the Wind River Reservation in 2012, we did a couple of studies where we saw over 2,000 animals. It is widely known that wild horses and feral horses breed at the

rate of 20 percent per year. Every five years, the herd of horses doubles in size.

In 2012, we did the study and are estimating, through science and observations, the horses on the reservation number between 6,000 and 8,000 animals. A lot of what is happening on the reservation is we are surrounded by many public lands and feral horses on those public lands often migrate onto the reservation. The numbers we are seeing on the reservation still find their way to us. They are decimating our grasslands, displacing our elk, and displacing our mule deer, making it more difficult for tribal members to rely on traditional subsistence.

We recommend that money be diverted to addressing the removal of wild horses as well as returning the landscape to its former state and to addressing Federal legislation that creates a suppressed marketplace for horses and encourages or makes it easier for domestic horses to be abandoned on public or reservation lands.

The CHAIRMAN. Thank you.

Senator Udall.

Senator UDALL. Thank you, Mr. Chairman.

It is no secret the Trump Administration does not believe in climate change but Indian Country does not have the luxury of putting its head in the sand. In Hawaii, for example, sea level rise, salt water intrusion and long periods of drought threaten the cultivation of taro and other traditional crops.

Communities across Indian Country are fighting drought, wildfires, changing habitats, decreased biodiversity and the list goes on and on and on.

Dr. Hardin, what is the Office of Subsistence Management doing to make sure the Federal Government is providing Alaska Native villages and Indian Tribes with the tools to address climate change impacts to subsistence?

Dr. HARDIN. Thank you, Senator.

The Office of Subsistence Management is a mere advisor to the Federal Subsistence Board and regional advisory councils. First of all, I would emphasize that. However, we work very closely with all of the local users.

One of the very valuable methods and approaches we have is we coordinate and manage a program called the Fisheries Resource Monitoring Program. Through that program, we find, through a competitive proposal process, collaborative fisheries research throughout the State of Alaska that includes research to look at the stock status and trends of fish stocks, traditional ecological knowledge studies to better understand what is happening in communities and the important relationships between these resources and local communities and harvest monitoring.

Through these research projects, we track the status of the available stocks. In all of our analyses, we also utilize the best available data that we have to analyze what is causing declines in important subsistence resources. We will continue to do so as the information becomes available.

Of course traditional ecological knowledge is really key to understanding those over time.

Exhibit CC
Page 42 of 70

Senator UDALL. As we have heard from each of the tribal witnesses today, subsistence practices are vital to Native communities across the Country. However, Dr. Hardin, it is my understanding the U.S. Fish and Wildlife Service primarily supports tribal subsistence through the Office of Subsistence Management which, in turn, supports the Federal Subsistence Management Program established to serve rural and tribal Alaskan residents.

Does the Fish and Wildlife Service support tribal subsistence practices in the lower 48 and should it?

Dr. HARDIN. Thank you, Senator.

Again, I work at the Office of Subsistence Management. Our charge is to implement Title VIII of ANILCA. Although we are administratively housed in the Fish and Wildlife Service, we are mandated to serve all of the agencies represented on the Federal Subsistence Board, as well as the public members.

I am really not able to speak to the individual agency actions in the lower 48.

Senator UDALL. Maybe you can help me and the record on that, people in their department answering that question a little more thoroughly?

Dr. HARDIN. Absolutely, sir.

Senator UDALL. Thank you.

Chairman Brown and Ms. Romero-Briones, is the Federal Government, the Department of the Interior, and the U.S. Fish and Wildlife Service providing enough resources to support tribal subsistence practices?

Mr. BROWN. Thank you, Senator.

I think the Federal Government could do more to promote tribal traditional subsistence practices. I think part of it begins with consulting with tribes. Many times Federal agencies develop policies regarding wildlife management or ecosystem management without consultation with tribes.

I think tribal traditional knowledge is key in a lot of these discussions. Tribes have extensive knowledge on how their environment has operated in order to promote tribal traditional subsistence.

I think consulting with tribes is the first step and devoting more resources is another big step.

Senator UDALL. Director Romero-Briones.

Ms. ROMERO-BRIONES. Thank you, Senator.

I would echo Chairman Brown's comments. At First Nations Development Institute, we also have a grant program that was created largely to fill the hole that the Federal agencies have in Indian Country.

We have awarded over 307 grants to food and agriculture projects. Three-fourths of those are to support subsistence and traditional lifestyles. That pales to the $49 million ask that we are not able to fulfill.

There is definitely a need for more financial resources to support not only communities trying to document their practices, but also to create networks within Federal agencies to actually get the conversations and a seat at the table for the protection of these practices.

Senator UDALL. Thank you very much.

The CHAIRMAN. Senator Murkowski.

Senator MURKOWSKI. Thank you, Mr. Chairman.

Mary, thank you again for coming all the way as you have.

Mr. Chairman, if I was really thinking, I would have brought the jar of fish that Mary Sattler Peltola provided me in my office today because that would have given us all the get up and go you would need and reminded us all of the significance of the subsistence fishing that goes on. I understand you just had an opener out there in the YK area and people were happy to get out on the water.

I know when we talk about the agreement we have between the Kuskokwim Inter-Tribal Fish Commission and the Department of the Interior, it is probably best described as a cooperative agreement.

Can you help educate me on the difference between a cooperative agreement and co-management and the opportunities to the region if the Commission was involved in a co-management agreement as you described with this proposed pilot you mentioned earlier in your opening statement?

Ms. PELTOLA. Thank you, Senator Murkowski.

We have had two openings. Just for perspective, when I was growing up, subsistence fishing was unrestricted. We could go out any time we wanted as long as it was not in that buffer right before the commercial opening. We no longer have a commercial fishery for any of the species of salmon on our river.

In past years, the average harvest was about 96,000 Chinook salmon. Last year and this year, we estimate that the harvest will be around 16,000. The highest amount of harvest was 110,000 Chinook salmon. We are all the way down to 16,000. That has created a lot of anxiety and unhappiness.

The Fish Commission has done a very good job, if I can say so, in helping explain the issue of there being a lack of Chinook statewide and that our river is not the only river that is experiencing restrictions. Some rivers are experiencing full closure.

My belief is we should not be called to join the table and become managers only in times of crisis when things are bad. My preference is that we be asked to participate and be managers even in times of abundance with all our species.

Senator MURKOWSKI. Especially in times of abundance so you can ensure that abundance continues, that sustainability.

Ms. PELTOLA. Sustainability. That is my hope, that the Inter-Tribal Fish Commission can be a manager all the time, not just when we are facing this grim reality.

Cooperative management, cooperative agreements are usually discretionary partnerships. Those are not legally binding. The Kuskokwim Inter-Tribal Fish Commission is asking for a co-management structure where there is a specific legal basis, such as a treaty or statute, in this case, which would require the delegation of some aspect of Federal decision-making authority to tribes, in this case, specifically the 33 tribes that live along the Kuskokwim River.

Senator MURKOWSKI. It is that legal binding aspect of this that makes the difference in ensuring there really is this seat at the table, this level of participation.

Exhibit CC
Page 44 of 70

With regard to your suggestion that you move OSM out from Fish and Wildlife so that it can operate independently, making sure OSM is free from levels of conflict is important, I think. Are there functions of the Federal Subsistence Board and OSM that could perhaps be compacted or contracted right away?

Ms. PELTOLA. I am not 100 percent sure but I do believe there are opportunities to compact and contract.

Senator MURKOWSKI. Is that something we are looking to explore?

Ms. PELTOLA. Yes, absolutely.

Senator MURKOWSKI. Do we need to do more on this end to encourage our agencies, the Federal Subsistence Board and OSM, to work more directly with those of you involved on the ground to pursue something like that?

Ms. PELTOLA. We have a very good relationship with the Office of Subsistence Management. In my opinion, there is a difference within the culture of OSM and the culture of Fish and Wildlife.

In my opinion, there is a very strong desire for the Fish and Wildlife Service to work in concert or collaboration with great deference to the State of Alaska which does not have a rural subsistence priority.

OSM's mission, the way I have seen it over the last two years, is they are very focused on making sure we are in compliance with ANILCA, which I have not seen borne out at the refuge level.

Senator MURKOWSKI. All I know is that when I am out there on the river, when I am out there in the fish camps, people are not talking about compliance with some Federal laws. They are wondering how they are going to be able to feed their families.

Ms. PELTOLA. Yes.

Senator MURKOWSKI. And fair allocation of a fishery, not just for the resource that is there today, but going to be there next summer, the summer thereafter and thereafter.

Ms. PELTOLA. That is exactly right, Senator. I have not met anyone whose primary interest is jurisdictional boundaries or jurisdictional oversight.

Right now, on our river, we have a very bifurcated system. On the 12th when we had a chance to fish, the whole river, State and Federal waters, were open. On the 16th, only Federal waters were open. On the 18th, only State waters were open.

This is very confusing when you hear an announcement that there is a 24-hour chance to fish. You do not know if that is in State or Federal waters. I believe the Fish Commission can really address that issue.

Senator MURKOWSKI. The fish do not care whether it is Federal or State.

Mr. Chairman, thank you so much.

Thank you for being here.

Senator UDALL. [Presiding.] Thank you.

Senator Smith.

Exhibit CC

Page 45 of 70

## STATEMENT OF HON. TINA SMITH,
## U.S. SENATOR FROM MINNESOTA

Senator SMITH. Thank you, Vice Chairman Udall.

To our panelists, thank you all so much for being here today. It is very interesting to have this conversation.

Senator Murkowski, if I had been thinking, I would have brought wild rice and walleye to this hearing. We could have lunch which would have been great.

As I listened to this conversation about subsistence and traditional practices, I think a lot about the work we are in the middle of right now with the farm bill. With Senator Heitkamp and I serving on both the Indian Affairs Committee as well as on the Agriculture Committee, I think we are the two who have overlap on these committees.

I have been looking for areas where the opportunities and synergies are with those two committees. In Minnesota, I created a farm bill working group to bring together the issues and views from farmers in rural communities and also the tribes, along with those who care a lot about energy issues, nutrition and conservation.

That was extremely helpful to be able to bring all those views to the discussion about the farm bill. Certainly the farm bill touches the lives of every single American and certainly the lives of everyone who lives in tribal communities.

In the farm bill, we were able to include some of the issues brought forth as being important. We did this with the help of Senator Hoeven, Senator Udall and Senator Heitkamp, including strategies to help minority and disadvantaged farmers.

In Minnesota, that often includes helping Native farmers who are just getting going and also looking at issues related to expanding markets. In Minnesota, that is extending wild rice markets but I am sure it runs the gamut all across the Country. There is also the issue of especially fighting tribal food fraud which is a problem.

One thing that came up quite a bit with the Native Farm Bill Coalition was recommending we look at and understand how to do a better job of expanding consultation with tribes on conservation issues. I would like to touch on that a bit because it seems to relate a lot to your comments today.

I want to go to Ms. Romero-Briones for this, but I would be interested in hearing everyone's comments.

What should the Federal Government be doing to ensure that tribes have the appropriate jurisdiction under the Natural Resources Conservation Service and that Indian producers can engage in the kind of conservation work they desire that aligns with traditional practices? What can we be doing better there?

Ms. ROMERO-BRIONES. Thank you for the question.

First, there is an underlying issue about what subsistence means both to lawmakers and those working in agriculture. Often they are seen as separate issues. Like many of the panelists said today subsistence is actually ecological management and should be considered forms of sustainable agriculture which would put it in the purview of the farm bill.

With the conservation programs, particularly with NRCS, one of the limitations is the recognition of groups of tribal farmers and

Exhibit CC
Page 46 of 70

tribal communities as a collective of farmers as opposed to individual farmers with specified farm lands, which is one of the limitations to participating in many of the conservation programs.

I think there are several provisions the Native Farm Bill Coalition has put forward like those in EQUIP that recognize a collection of farmers as opposed to single farmers. Those are great starts in increasing tribal participation in these programs. That is a wonderful insight.

Thank you.

Senator SMITH. That is great. Does anyone else wish to comment on that?

Mr. BROWN. Thank you, Senator.

The farm bill serves as an excellent example of how valuable tribal input is. I think tribes are well prepared and well equipped to be able to have a common and comprehensive outlook on the things the farm bill addresses.

For example, the tribes on the Wind River own minerals, are stewards of the lands, and also owners of the lands. When we do mineral extraction, we also have to be aware of environmental protections.

We have Native ranchers with whom we lease lands but also have wildlife that is traditional and which we want to protect. Native tribes have been able for centuries to reconcile those different viewpoints among themselves.

I think that viewpoint is valuable when you are crafting such a massive bill like the farm bill. I appreciate your outreach to the tribes through the Native Farm Bill Coalition in which the Northern Arapaho was engaged.

I think that input will be critical moving forward when talking about sustaining subsistence as well as encouraging agricultural management as well.

Senator SMITH. I look forward to continuing that conversation and that work. In many ways, this is a strong farm bill but it is also certainly not a revolutionary bill. I appreciate there are many more opportunities to work together on this.

Thank you, Mr. Chair.

The CHAIRMAN. [Presiding.] Vice Chairman Udall.

Senator UDALL. Thank you, Mr. Chairman.

Director Romero-Briones, you testified Native peoples hold the capacity and ingenuity to ensure the sustainable economic, spiritual and cultural well being of their communities if given the right tools.

You go on to say this belief largely stems from longstanding food system management. I could not agree with you more. I have repeatedly said decisions made by tribes for tribes produce the best results.

That is why I have introduced legislation to allow tribes to manage their own child nutrition programs and joined the Chairman in legislation to allow tribes to 638 their own food distribution and forestry functions on adjacent forest lands. We are working to provide those tools.

What can we do to help push the envelope on food sovereignty? Do you feel the 638 model is best or are there other solutions?

Ms. ROMERO-BRIONES. The 638 model would revolutionize, and I use that word with a lot of reservation, how Federal feeding programs support Native communities. In addition, if you take that in conjunction with the traditional foods provision in the farm bill, you really have a good foundation for supporting subsistence practices and traditional lifestyles.

The caveat is that right now the USDA and the FDA are concerned about traditional foods entering these Federal programs because of food safety concerns. I think one further step would be trying to mitigate and insert ourselves into that conversation now.

Senator UDALL. An important tool for tribes to have direct involvement in their ecological management is through the BIA's integrated resource management planning process. Unfortunately, the process for tribes to create an IRMP is overly long and excessively technical and can take up to five years for a tribe to simply collect and compile its data.

Due to the effects of climate change, we are seeing more severe and unpredictable weather events that can have traumatic effects on the environment and subsistence activities.

Director Romero-Briones, how can tribes and the BIA make the IRMP process more efficient and adaptable to the effects of climate change?

Ms. ROMERO-BRIONES. Again, thank you for that comment because I think you hit on the most important. Those definitely need to come out of that agency much faster. I am not privy to the barriers causing the delay. Perhaps it is staffing or perhaps the way a tribe has to approach the BIA to get one started, but I would love to see those move faster.

Senator UDALL. Are there any comments from the other witnesses on what I just asked? Chairman Brown.

Mr. BROWN. I would like to emphasize that it would be incredibly beneficial to tribes to be able to 638 programs like food distribution which is at the core of our issues on the Wind River Reservation and I am sure across Indian Country.

I think the intent of the 638 Self Determination Act was really that tribes know how to best take care of their communities, having the ability to do that. I echo Director Romero-Briones' statements. That would revolutionize the way that we live.

Senator UDALL. Thank you.

Dr. Hardin, as I close, I just want to emphasize again the climate change front and how serious is the situation the tribes face. In northern New Mexico in one particular circumstance, there is a small canyon that Santa Clara of Pueblo has. It has been wiped out by forest fires and floods. It was a beautiful area where there were three ponds and people could fish. Now it is ground zero for climate change.

I do not care what you call it or if you want to call it adaptation. The issue is there is money there to do these kinds of things. I think we are being very shortsighted in saying because we call it something, we are not going to use that money at all.

I hope you take back that message to Interior because I think these tribal communities are right at ground zero, in the bulls-eye, when it comes to the impacts of climate change.

Exhibit CC
Page 48 of 70

Thank you very much, Mr. Chairman. I really appreciate your focusing on this issue.

The CHAIRMAN. Certainly, Vice Chairman Udall. Thank you.

With that, again, I want to thank our witnesses.

If there are no more questions, members may submit follow-up questions for the record. The hearing record will be open for two weeks.

With that, again, thank you.

The hearing is concluded.

[Whereupon, at 3:44 p.m., the Committee was adjourned.]

Exhibit CC
Page 49 of 70

Exhibit CC
Page 50 of 70

# A P P E N D I X

PREPARED STATEMENT OF KEVIN BARTLEY, RURAL RESIDENT OF ALASKA

Thank you for the opportunity to share my experiences with and recommendations for improving the Federal Subsistence Management Program. Effective and responsible management or care of our fish, wildlife, lands, and waters in Alaska requires meaningful communications and collaborations between federal, state, tribal, and public partners. Our children's future depends on our commitment to work together.

**A Way of Life**

Rural residents and residents of non-subsistence use areas harvest 33.8 million pounds of fish and game annually in Alaska.[1] There are vast differences in the ways in which people understand the term subsistence. Many urban peoples unfamiliar with Alaska understand subsistence in the context of the definition to subsist or acquire the minimum needs for survival. Some agency managers and scientists in Alaska understand the term subsistence to refer to customary and traditional harvest practices. Tribal and rural residents of Alaska understand subsistence as our culture; our way of life. Subsistence for Alaska Native Peoples and rural residents is associated with tastes, smells, and feelings. It is relationships and togetherness. It is community. It is life. When mismanagement and regulation deprive us from practicing our cultures or ways of life, we lose pieces of who we are. These hardships especially affect our children and elders.

**Background**

The 1971 Alaska Native Claims Settlement Act (ANCSA) extinguished all indigenous land claims in exchange for 44 million acres and 962.5 million dollars.[2] Four hundred million was distributed over 11 years among 13 Alaska Native Regional Corporations. The remaining 562.5 million was distributed following the completion of the Trans-Alaska Pipeline. One unforeseen consequence of ANCSA included the extinguishment of aboriginal hunting and fishing rights. To resolve this concern among Alaska Native Peoples, a 1971 House Conference Joint Statement declared:

> "All Native interests in subsistence resource lands can and will be protected by the Secretary through the exercise of his existing withdrawal authority. The Secretary could, for example, withdraw appropriate lands and classify them in a manner which would protect Native subsistence needs and requirements by closing appropriate lands to entry by non-residents.The Conference Committee expects both the Secretary and the State to take any action necessary to protect the subsistence needs of the Natives".[3]

The absence of a self-governance option or protections for Alaska Native hunting, fishing, and gathering rights remain unfinished business.[4] Congress broke their promise to protect Alaska Native Peoples hunting and fishing rights in the 1980 Alaska National Interests Lands Conservation Act (ANILCA). Instead, Congress strengthened hunting and fishing privileges for all rural residents in Alaska, exclaiming to do otherwise would constitute a discriminatory policy.

ANILCA Title VIII did take several important steps to ensure that the fish, wildlife, and people of Alaska remain healthy. Rural residents were provided a meaningful role in the management of fish and wildlife. Non-wasteful subsistence uses of fish and wildlife by federally qualified subsistence users were prioritized over all

---

[1] Alaska Department of Fish and Game. Division of Subsistence. Subsistence in Alaska: A Year 2014 Update. By James A. Fall. Anchorage, Alaska: ADF&G, 2016. 1-4.
[2] Alaska Native Claims Settlement Act, §43 U.S. Code Chapter 33 (1971)
[3] Joint Statement. In 2247 P.L. 92-746, Alaska Native Claims Settlement Act. Proceedings of House Republican Conference Report. Vol. 746. Washington, D.C.: 92ST Congress, 1971.
[4] Anderson, Robert. Alaska Native Rights, Statehood, and Unfinished Business. Tulsa Law Review 43, no. 17 (2007): 17-42.

(47)

other consumptive uses. A Federal Subsistence Board (FSB) and regional advisory councils were established to develop hunting and fishing regulations on federal lands. A duty and responsibility was created to ensure the continued viability of fish and wildlife and opportunity for subsistence uses. Finally, tools were identified to restrict the take of fish and wildlife to federally qualified subsistence users only and among these same users when necessary.

**Agreements with Tribes**

Federal agencies often refer to consultation as a unique and special privilege that tribes enjoy as sovereign nations. The term consult means to seek information or advice. This inadequately describes the relationship between tribes and the U.S. Government. Federally recognized tribes possess the right to negotiate government-to-government with the U.S. Government under the 1934 Indian Reorganization Act (IRA). The word negotiate means to arrange for and bring about through discussion and compromise. A negotiating role is more closely synonymous with a decision-making role than an advisory role. Any agreements with sovereign federally recognized tribes must honor tribes' right to negotiate towards a mutually beneficial compromise.

**Amending the ANILCA**

Congress declared, "that an administrative structure be established for the purpose of enabling rural residents. . .to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.[5] Two challenges remain in regards to ANILCA Section 801 (5). First, the still undefined term meaningful role is meaningless to Alaska Native Peoples and rural residents. Second, tribal and rural residents' involvement on the regional advisory councils and the FSB is limited to subsistence uses of fish and wildlife only. Twenty-one Western Alaskans define the term meaningful role as the capacity to work together and share equal decisionmaking authority.[6] Tribal and rural residents I work with across Alaska also share similar understandings of what a meaningful role is. Significant amendments will be necessary to improve the Federal Subsistence Management Program (FSMP) if a bottom up approach is desired as suggested by OSM Policy Coordinator Jennifer Hardin.

I echo and applaud Mary Sattler Peltola's testimony and recommendation to remove the Office of Subsistence Management (OSM) from under the U.S. Fish and Wildlife Service (USFWS).[7] Housing the OSM beneath the USFWS continues to present clear ethical concerns. How can the OSM adequately serve the rural residents of Alaska while also charged with the task of serving each of the five federal agencies that makeup the FSB? Many Alaskans observe the strong influence that advocacy groups like the Sierra Club, Defenders of Wildlife, and the Alaska Outdoor Council have on federal agencies and the State of Alaska. The missions of these five agencies and the many advocacy groups who support them often do not intertwine with tribes' and rural residents' fish and wildlife management goals. It is inappropriate to charge the OSM to serve in such a role mired by conflicts of interest. Nothing makes this point clearer than OSM Policy Coordinator Jennifer Hardin's testimony that, "the [Federal Subsistence Management] Program will continue to seek balance between the harvest needs of rural subsistence users, conservation mandates of land management agencies, and the diverse values of.the many user groups seeking opportunities to hunt and fish on Federal public lands". Balancing the conservation mandates of the federal agencies with the diverse values of many user groups seeking to hunt and fish on federal public lands is not the intent or purpose of ANILCA Title VIII.

I also support Mary Sattler Peltola's recommendation to restructure the FSB.[8] Rural residents must have equal representation and decisionmaking authority on the FSB to possess a truly meaningful role. The FSB includes five federal agency directors and three rural residents. Many FSB members representing the federal agencies begin their service the same year they arrive to Alaska and most rarely serve beyond five years. Failing to require all FSB Members to possess personal knowledge of local conditions presents a scary reality for many Alaskans. A single vote from a FSB member unknowledgeable about our unique ecospheres, fish, wildlife, and cultures could mean the difference between whether our children eat or go

---

[5] Alaska National Interests Lands Conservation Act, § Public Law 96-487 (1980).
[6] Bartley, Kevin, and Jeffrey J. Brooks. Understanding and Improving Collaborative Management of Fish and Wildlife in Western Alaska. Final Report. Office of Subsistence Management, U.S. Fish and Wildlife Service, 2014. 1-117.
[7] U.S. Senate, Committee on Indian Affairs, Oversight Hearing on *"Keep What You Catch: Promoting Traditional Subsistence Activities in Native Communities."* June 20, 2018.
[8] U.S. Senate, June 20, 2018.

hungry. Observing the food prices at any rural grocery store in Alaska will drive home the seriousness of this point. Most tribal and rural residents prefer wild caught foods and overwhelmingly attest to the physical, mental, and spiritual importance of harvesting, storing, sharing, and eating them.

Figure 1 demonstrates the rising percentage of Alaska Native Peoples living in non-subsistence areas of Alaska. The percentage of Alaska Native Peoples living in non-subsistence areas of Alaska in 1980 was 27.7 percent.[9] An average of 52.4 percent of Alaska Native Peoples were living in non-subsistence areas of Alaska during the period between 2012 and 2016.[10] Prior to 2000, census polls asked only whether people were Alaska Native. Census polling in 2000 began asking whether people identified themselves as Alaska Native alone or in combination with other racial descents. A rising percentage of Alaska Native Peoples living in non-subsistence areas of Alaska presents significant implications for and further substantiates the need to amend the ANILCA. ANILCA Title VIII can no longer deliver on the promise and intent to protect Alaska Native hunting, fishing, and gathering rights with more than 52.4 percent of Alaska Native peoples now living in non-subsistence areas of Alaska.



**Figure 1.** Percentage of Alaska Native Population Living in State Non-Subsistence Areas, 1980, 2016. *Source: Fall, James A. "Governance Systems for Subsistence in Alaska"*. Proceedings of Western Division, American Fisheries Society, Anchorage, Alaska. 2018.

Congress should consider the following amendments to fulfill the intent and promises associated with the ANILCA. Insert the words "Alaska Native Peoples and" in front of each use of the words "rural residents". Create a truly meaningful and equal decisionmaking role for Alaska Native Peoples and rural residents in the management of fish and wildlife. Revise tribal consultation procedures to ensure tribes possess the negotiating role they are due under the IRA with an obligation from federal partners to seek and achieve mutually beneficial compromises. Expand Alaska Native Peoples and rural residents' involvement to include equal representation on all boards and committees deciding on federal undertakings that may affect the health of lands, waters, fish, and wildlife in Alaska. This should include equal representation on the North Pacific Fisheries Management Board. Developing an outreach and scoping plan to gather additional insights from each tribe and rural community in

---

[9] Fall, James A. "Governance Systems for Subsistence in Alaska". Proceedings of Western Division, American Fisheries Society, Anchorage, Alaska. 2018.
[10] Fall, James A. "Governance Systems for Subsistence in Alaska". 2018.

Alaska will increase the potential for a meaningful, pragmatic, and lasting amendment to the ANILCA.

**Improving Relationships and Understanding**

Communication challenges and partners' lack of understanding of each other's cultures, worldviews, and management approaches are significant challenges to meaningful and effective collaborative management of fish and wildlife in Alaska.[11] We can overcome this challenge by investing in and sharing informal interactions with each other. Frequent communications and collaborations between partners is critical.[12] Productive negotiations are linked to how well stakeholders know and understand each other. Strong relationships are the product of shared experiences.

Urban-based training seminars are not enough to educate FSB Members about Alaska. Funding to develop and implement a program that brings FSB Members and rural residents together to engage in informal activities such as hunting and fishing will strengthen their understandings of and relationships with each other. Sharing informal experiences with those we do not know in settings that we are unfamiliar with are often uncomfortable. Such experiences are opportunities to grow because we tend to listen more. Conversations and collaborations help us to reflect, see, learn, process, and act.[13] Truly listening to each other will enable us to stretch our understandings and create new and promising realities together.[14]

**Climate Change**

"It's no secret the Trump Administration does not believe in climate change, but Indian Country doesn't have the luxury to put its head in the sand".[15] Senator Udall's words hit home to those of us living in rural Alaska. Failing to respond to our changing climate is not an option. Global famine and war will surely follow if we do not invest in sustainable futures, technologies, and infrastructure. Funding to better understand, plan for, and respond to climate change is critical to the health of all Alaskans.

Climate changes in Alaska and across the Arctic are outpacing changes observed across the globe.[16] Land and sea ice loss is accelerating. Anthropogenic or human derived forces are linked to and exacerbating ocean acidification, increasing river runoff, warming permafrost, and rising sea levels. Annual average Arctic sea ice is decreasing 3.5 percent and 4.1 percent per decade since 1980.[17] There is high confidence that human activities are contributing to more than half of the observed rise in Arctic surface temperatures and September sea ice decline since 1979.[18] Warming permafrost poses a significant and potentially uncontrollable release of carbon.[19] Coastal permafrost is warming faster than interior regions in northern Alaska and northwest Canada. Ground temperatures rose from 16.5oF to 21.5 oF in Deadhorse, Alaska between 1977 and 2015.[20]

We are observing significant declines in salmon populations across Alaska. Most Alaska Native and rural residents share a deep relationship with salmon. Salmon declines are affecting the physical, mental, and spiritual health of Alaska Native and rural residents. Commercial fishing harvest accounted for 3.667 billion pounds in 2014.[21] This number represents 98.5 percent of all fish and game harvested among user groups in pounds. It is clear that commercial fishing represents single most significant human impact on fisheries and those dependent on fish living across rural Alaska. How commercial fishing operations in Alaska directly and

---

[11] Bartley, Kevin A. They Don't Know How We Live: Understanding Collaborative Management in Western Alaska. Master's thesis, University of Alaska Anchorage, 2014. 1-423.

[12] Jacobs, Melanie, and Jeffrey J. Brooks. "Alaska Natives and Conservation Planning: A Recipe for Meaningful Participation." Native Studies Review 20, no. 2 (2011): 91-135.

[13] Scharmer, Otto. The Essentials of Theory U: Leading from the Future as It Emerges. 2nd. ed. San Francisco, CA: Berrett-Koehler Publishers, 2016.

[14] Kahane, Adam. Solving Tough Problems: An Open Way of Talking, Listening, and Creating New Realities. San Francisco, CA: Berrett-Koehler Publishers, 2007.

[15] U.S. Senate, June 20, 2018.

[16] USGCRP, Climate Science Special Report: Fourth National Climate Assessment, Volume I [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, 2017. 1-669. doi:10.7930/J0J964J6.

[17] USGCRP, Climate Science Report, 446.

[18] USGCRP, Climate Science Report, 443.

[19] Tarnocai, et al. Soil Organic Carbon Pools in the Northern Circumpolar Permafrost Region. Global Biogeochemical Cycles 23, no.2 (2009): 1-11.

[20] Cable, et al. Scaling-up Permafrost Thermal Measurements in Western Alaska Using an Ecotype Approach. The Cryosphere 10 (2016): 2517-2532.

[21] Alaska Department of Fish and Game, Subsistence in Alaska: A Year 2014 Update, 2.

indirectly affect the continued viability of fish and opportunity for subsistence fishing warrants further exploration.

Ensuring that continual hard funding exists to support the upstart and operations of intertribal resource commissions will help to address the many resource challenges we are experiencing throughout rural Alaska. The recently established Ahtna Intertribal Resource Commission and Yukon and Kuskokwim Inter-tribal Fish Commissions are improving partnerships and expanding opportunities between tribes and federal land and resource management agencies. Making these funds available through the Bureau of Indian Affairs with the option for compacting and contracting will present a more flexible, pragmatic, and effective fiscal pathway.

I hope these insights and recommendations lead to meaningful negotiations and actions in the near future. Forming a Statewide Committee to address fish and wild-life management and climate change in Alaska would be an excellent next step. Thank you for your time in reviewing this testimony.

———

PREPARED STATEMENT OF KAREN LINNELL, EXECUTIVE DIRECTOR, AHTNA INTERTRIBAL RESOURCE COMMISSION

Thank you for the opportunity to share our experiences with and recommendations for improving the Federal Subsistence Management Program. Effective and responsible stewardship of our fish, wildlife, lands, and waters in Alaska requires dialogue and collaborations between federal, state, tribal, and public partners. Future generations depend on our commitment to work together.

The Ahtna Intertribal Resource Commission (AITRC) was established in 2011 as part of a long-standing desire of Ahtna tribes and organizations to conserve, manage, and develop the fish, wildlife, and plant resources of the Ahtna region according to culturally-relevant values. AITRC's core purpose is to exercise tribal sovereignty and self-determination to promote traditional resource stewardship on the ancestral lands of the Ahtna people.

A Memorandum of Agreement was adopted on November 29, 2016, between the U.S. Department of the Interior and the AITRC to promote co-management with Ahtna tribes. This agreement formalizes our wildlife management partnership and seeks to resolve the disappearance of a reasonable opportunity to practice our customary and traditional moose and caribou hunting patterns. We agreed:

> The Department will immediately commence rulemaking to allow the issuance of AITRC-managed community harvest permit(s).Such permit(s) may be for the benefit of the AITRC's member tribal communities only [and]. . .will allow AITRC to establish harvest limits, quotas, season dates, and methods and means.[1]

Increasing participation in Community Subsistence Hunts managed by the State of Alaska drove us to begin negotiations with the DOI on this MOA. Challenges stemming from this hunt continue to intensify. Roadside pull-offs are plugged with trucks, trailers, and four wheelers. Some report that they are unable to bring their children hunting due to the growing prevalence of unsafe hunting practices observed in the Copper Basin. Once quiet and peaceful places to teach our children are becoming noisy and trash filled areas. There is nothing respectful or customary and traditional about the intensive hunting observed on our ancestral homelands today.

Ahtna Elder Roy S Ewan spoke to a group of young people days before his passing. Roy's message focused on the unfinished business pertaining to the Alaska Native Claims Settlement Act. He recalled the promise by federal and state congressional leaders during the House Conference Committee. On the protection of Alaska Native hunting and fishing rights, the House Conference Joint Statement declared:

> The Conference Committee. . .believes that all Native interests in subsistence resource lands can and will be protected by the Secretary through the exercise of his existing withdrawal authority. . ..The Conference Committee expects both the Secretary and the State to take any action necessary to protect the subsistence needs of the Natives".[2]

Many Alaska Native Peoples believe the promise to protect their subsistence needs has been largely unrealized. We view this MOA as an opportunity for Ahtna

---

[1] MOA: Memorandum of Agreement between United States Department of the Interior and Ahtna Intertribal Resource Commission. Anchorage: Department of the Interior, 2016.

[2] Joint Statement." In 2247 P.L. 92–746, Alaska Native Claims Settlement Act. Proceedings of House Republican Conference Report. Vol. 746. Washington, D.C.: 92ST Congress, 1971.

Exhibit CC

Page 55 of 70

Peoples to exercise our right to negotiate as sovereign Nations with the United States Government to protect our subsistence needs, culture, and ways of life.

Since the signing of the MOA, we have been met with delays and resistance to the implementation of our MOA. We believe that this is because the Office of Subsistence Management is housed within the US Fish and Wildlife (USFWS). AITRC agrees and endorses Mary Sattler Peltola's testimony and recommendation to remove the Office of Subsistence Management (OSM) from under the U.S. Fish and Wildlife Service.[3] Housing the OSM beneath the USFWS continues to present clear ethical concerns. How can the OSM adequately serve the rural residents of Alaska while also charged with the task of serving each of the five federal agencies that makeup the FSB? Moving the Office of Subsistence Management out of the US Fish & Wildlife Service would be a move to strengthen and lend autonomy to the OSM.

We would also like to see tribal representation at the Interagency Staff Committee meetings to represent tribal interests to the FSB. Currently, proposals are submitted to the Federal Subsistence Board are reviewed by an Interagency Staff Committee (ISC). The ISC makes comments and recommends whether or not the proposals go on a consent or non-consent agenda. The opportunity to participate in all future ISC meetings would provide us with a more meaningful role in the Federal Subsistence Management Program. AITRC defines a meaningful role as a decisionmaking role engaged in all levels of management, including planning, negotiation, and implementation. Input at this table will undoubtedly improve the recommendations before the Board. Participating in ISC meetings will also present opportunities to learn about each other's concerns and discuss pragmatic and mutually beneficial solutions. Certainly, there could be no harm from working together; a goal all stakeholders seem to share.

Rural FSB members must meet a criteria of personal knowledge of local conditions. No such criteria exist for Agency FSB members. Agency representatives are often new to Alaska and here for a short time before beginning their service on the Federal Subsistence Board. Expanding the FSB to include additional tribal/rural seats will strengthen our meaningful participation and improve the Board's overall personal knowledge of rural Alaska.

AITRC's vision is to manage our traditional lands to ensure that our lands, waters, air, fish, wildlife, and people remain healthy. We look to regain a meaningful role in the management of our traditional lands through this MOA. The opportunity to work together as negotiating partners is a welcome change. Building strong partnership will help us accomplish our mutual goals and prepare our young people to respond responsibly to our changing world.

We sincerely thank and respect the Committee of Indian Affairs for their time and support.

———

RESPONSE TO WRITTEN QUESTIONS SUBMITTED BY HON. CATHERINE CORTEZ MASTO TO MARY SATTLER PELTOLA

*Question 1.* You stated that tribal subsistence fishers are often subject to conflicting laws and policies governing natural resources. The clash between State, Federal, and Tribal regulations complicates the practice of subsistence fishing and undermines tribal sovereignty. You also suggested that there should be specific locations set aside for tribal communities to engage in subsistence fishing. Who should be responsible for identifying and reserving areas specifically for tribal subsistence fishing?

Answer. The Kuskokwim River Inter-Tribal Fish Commission (KRITFC or Commission) appreciates the additional opportunity to discuss its members' traditional subsistence activities, and ways in which those activities are being helped and hindered by existing government actions. As I discussed during my testimony on June 20, 2018, the Commission believes that a legislative fix to the Alaska National Interest in Lands Conservation Act (ANILCA) is essential. Until Congress acts, significant reform in the regulations and administration of the Federal Subsistence Management Program (FSMP), is necessary maintain existing subsistence opportunity and advance self-determination in managing Alaska's fish and wildlife.

In order to fully address the numerous problems with Title VIII, Congress needs to amend ANILCA to explicitly recognize the right of Alaska Natives to hunt and fish on federal lands and waters, and to regulate these uses for their tribal members on lands and waters traditionally used for subsistence. Alaska Natives have well-established, identified, traditional hunting and fishing territories within the bound-

---

[3] U.S. Senate, Committee on Indian Affairs, Oversight Hearing on *"Keep What You Catch: Promoting Traditional Subsistence Activities in Native Communities". June 20, 2018.*

**Exhibit CC**
**Page 56 of 70**

aries of federal parks, forests and refuges. These are the public lands where tribes should have hunting, fishing and management rights.

Additionally, Congress needs to ensure that Alaska Natives have the right to use and manage the traditional lands retained by Alaska Native Corporations through the Alaska Native Claims Settlement Act (ANCSA) for hunting and fishing. Many Alaska Native Corporations chose their settlement lands based on their value for subsistence uses. Yet, the State of Alaska currently claims jurisdiction to manage all hunting and fishing on these Native lands, and the Department of Interior has done nothing to challenge this injustice. Some of the prime Alaska Native hunting and fishing grounds were identified, claimed and conveyed to ANCSA corporations more than 50 years ago. It is time for Congress and DOI to ensure that Alaska Natives can use these lands without being restricted or forbidden by State management.

However, the situation demands action until Congress acts. The DOI Secretary needs to revise the regulations establishing the administrative structure for implementing Title VIII. The revisions need to be based on recognition of the government to- government status of Alaska's tribes and maximum implementation of self-determination in implementing subsistence hunting and fishing. Title VIII needs to be recognized by DOI as "Indian" legislation, despite the "rural" priority since it was clearly the intent of Congress to protect the Alaska Native cultural, nutritional and traditional subsistence way of life.[1] DOI should then enter into 638 compacts and annual funding agreements with tribes for federal subsistence management programs. DOI can do all of this without diminishing the protection for those rural residents who are dependent on subsistence resources and are not tribal members. Much of the current administrative structure can be retained for these rural residents.

The existing federal protections for Alaska Native hunting and fishing rights are inadequate to provide the full and meaningful access and opportunity to meet traditional, nutritional and cultural needs. Title VIII of ANICLA fails to explicitly recognize the right of Alaska Natives to use federal public lands and waters to hunt, fish and sustain their way of life. Instead section 804 of ANILCA provides for a "rural" instead of Native priority. It is therefore not currently accepted as legislation adopted for the benefit of Native Americans and not interpreted pursuant to the cannons of construction that favor decisions supporting Native rights. Federal agencies resist compacting federal programs related to subsistence management because Title VIII is not "Indian" legislation or a right reserved for Alaska Natives. The administrative structure established for implementing Title VIII fails to provide the tribes with any regulatory, management or enforcement authority over their members hunting and fishing. Instead, those who have practiced this way of life as far back as we can remember, and whose culture and welfare remain tied to their traditional lands and resources, are completely sidelined while federal boards and agencies make all of the rules. This kind of dominant and culturally destructive policy was abandoned in most all other cases in favor of a policy of maximizing self-determination.

Congress has clearly empowered the Secretary of the Interior (the Secretary) with discretion to implement the federal subsistence rights mandated in ANILCA. However, conflicting State and Federal regulations, and the nature of the political relationship between the State and the Federal government have resulted in a Federal subsistence management program that is highly deferential to the State of Alaska (the State), to the detriment of our tribes, our self-determination, and our customary and traditional subsistence uses of available fish and wildlife resources.

The State interprets its Constitution and statutes such that every resident is a subsistence user regardless of whether those residents are genuinely engaged in living a subsistence way of life. Federal regulations prioritize subsistence uses by rural residents, emphasizing the importance of food security and historical dependence on subsistence resources in Alaska's rural communities. These conflicting eligibility requirements create a number of regulatory, political, and cultural conflicts frustrating effective subsistence management in our state, and confirm the need for the Secretary of the Interior actively engage in reforms that fully implement the rights protected in ANILCA and do so through empowering those most impacted and knowledgeable, Alaska Natives.

---

[1] 16 U.S.C. § 3111.

There is only one reservation in Alaska.[2] Outside of the Annette Islands Indian Reserve, no public lands are reserved specifically for Alaska Native subsistence uses.

Following the enactment of ANCSA in 1971, Alaska Native Corporations selected and withdrew from the public domain millions of acres of land based upon their historical significance and importance to Alaska Native subsistence uses of available fish and wildlife resources. However, these lands are not recognized as Indian Country, and the State with the passive acceptance by DOI, has simply presumed the regulation of fish and wildlife resources found on and adjacent to these ANCSA lands. The result is that the traditional hunting and fishing territory retained by Alaska Natives in exchange for extinguishment of their aboriginal land claims have no federal protection, and in some cases state law forbids providing for a subsistence priority on Native lands."[3] Alaska Native allotments, and the fish and wildlife resources found on and accessed from these lands, are also managed under State jurisdiction, despite the fact that most Alaska Native allotments are held in trust by the federal government on behalf of the Alaska Native allottee.

In 1971, when Alaska Native land claims were addressed by the passage of ANCSA,[4] a House Conference Joint Statement stated Congress's intent that Alaska Native interests in subsistence resources would be protected by the Secretary of Interior and the State of Alaska:

> "All Native interests in subsistence resource lands can and will be protected by the Secretary [of the Interior] through the exercise of his existing withdrawal authority. The Secretary could, for example, withdraw appropriate lands and classify them in a manner which would protect Native subsistence needs and requirements by closing appropriate entry by non-residents. . . . The Conference Committee expects both the Secretary and the State [of Alaska] to take any action necessary to protect the subsistence needs of the Natives."[5]

Despite Congress's clearly stated intent about the role the Secretary and the State were to take in protecting our subsistence uses, the protections provided to us by both parties are not sufficient. Both the State and federal subsistence management systems are broken and simply cannot succeed for Alaska Natives because of the complete lack of self-determination in this most essential right. We know what is needed for our cultures, the health of our peoples, our culture, and resources, but have no power to act.

Congressional action, taken in consultation with our tribes, is critical to continued protections for our subsistence uses of fish and wildlife. Such action is not without precedent. For example, Congress has acted to ensure continued protections for Alaska Native subsistence uses of marine mammals and migratory birds through passage of Alaska Native exemptions in the Marine Mammal Protection Act and the Migratory Bird Treaty Act.[6] And, Congress recently passed the Huna Tlingit Traditional Gull Egg Use Act of 2014 that authorizes the Secretary of the Interior to allow the collection of glaucous-winged gull eggs in Glacier Bay National Park by members of the Hoonah Indian Association.[7] This type of congressional intervention is needed to address ongoing challenges faced by the Kuskokwim River Inter-Tribal Fish Commission.

Congress's broad authority to restore tribal powers over people and territory should be used to restore tribal territorial jurisdiction over fish and wildlife resources in Alaska. This should include recognition of Native hunting and fishing rights on ANCSA corporation land, Federal public, and even State lands.[8] Congress's obligation to recognize and assist our self-determination demands such action. Without congressional action amending Title 8 of ANILCA to specifically provide for an Alaska Native subsistence preference, OSM, through its administration of the FSMP, will not take action to implement strengthened protections solely for

---

[2] The Metlakatla Indian Community is located on Annette Islands in southeastern Alaska and is the only Indian Reservation in the State of Alaska called the Annette Islands Reserve. See *www.metlakatla.com/* for more information.

[3] Anderson, Robert T. 2016. Sovereignty and Subsistence: Native Self-Governance and Rights to Hunt, Fish, and Gather After ANCSA, Legal Studies Research Paper No. 2017-01, 33 Alaska Law Review 187-227, p. 218.

[4] Alaska Native Claims Settlement Act, § 43 U.S. Code Chapter 33 (1971).

[5] Joint Statement, in 2247 P.L. 92-746, Alaska Native Claims Settlement Act. Proceedings of House Republican Conference Report. Vol. 746. Washington, D.C.: 92ST Congress, 1971.

[6] Anderson 2016:217.

[7] Pub. L. No. 113-142, 128 Stat. 1749 (2014).

[8] Anderson 2016:218.

Alaska Native subsistence uses through ANILCA, as doing so would be considered discriminatory.

*Question 1a.* What sort of regulations should or would be in place for non-tribal individuals that visit these natural resources?

Answer. The Commission is not aware of a meaningful conflict between tribal hunting and fishing and the public's right to visit and enjoy the federal parks, refuges and forests, and therefore does not have a position on any regulations to manage the visiting public to protect subsistence opportunity.

The Commission also wants to be clear that in advocating for explicitly recognizing a subsistence right for Alaska Natives, and self-determination, it is not discounting the need or right of other non-tribal Alaska residents who are truly dependent on subsistence resources for their nutritional and social way of life to have a federally protected opportunity to do so. Congress and the Secretary can explicitly protect Native subsistence opportunity and self-determination while also establishing a right for non-tribal subsistence users and an administrative system that serves the needs of these users.

*Question 2.* Many tribes are facing additional barriers due to state regulations. Indigenous peoples who have practiced subsistence fishing and hunting for generations are experiencing large fines for not abiding by state regulations and a seizure of goods and supplies necessary for subsistence harvesting at the hands of the state. How can the federal government assume an active role in protecting the sovereignty of native peoples and continuing this tradition and what would tribal co-management over subsistence activities look like?

Answer. Our answers to the above questions explain the Commission's position on necessary Congressional and Secretarial action. We will therefore take this opportunity to further discuss the existing shortcomings with the current federal subsistence regulation process.

The existing federal administrative process is contrary to self-determination and tribal engagement in federal management of subsistence uses of salmon in the Kuskokwim River in several ways. Every year, the Commission spends an exorbitant amount of time navigating and participating in the federal subsistence management administrative process, at great expense and inconvenience to the Commission's members, many of whom live in rural areas hundreds of roadless miles away from where administrative events take place. This hinders the Commission's ability to regularly and effectively engage the thousands of tribal citizens living along the Kuskokwim River and who make up the Commission's thirty-three member tribes.

Too commonly, the Commission's positions and management plans are diminished by its Federal management "partners." At times, it appears that U.S. Fish and Wildlife's primary priority is getting along with the State rather than ensuring that our subsistence needs are fulfilled. The Commission needs clear and enhanced authority to develop and implement management plans that will serve the needs of its tribal members, provide for conservation, and allow for the needs of other federally qualified subsistence users. The Secretary needs to revise the administrative structure so that there is a clear path between the Secretary and tribes for subsistence management. The Secretarial authority that is currently delegated to the Federal Subsistence Board should be delegated to the Commission. This is vital given the growing impacts of climate change on natural resources we depend on. It is vital that tribes have a central role in implementing and administering ANILCA, rather than be relegated to the sidelines as the Federal and State governments implement their own uninformed policies.

Alaska Native tribes and tribal entities have successfully co-managed the subsistence use of fish and wildlife resources throughout Alaska under other federal statutes for a number of years. These successful co-management programs provide excellent examples of how the Commission should be empowered for co-management under Title VIII. For example, the Alaska Eskimo Whaling Commission (AEWC), in partnership with NOAA, co-manages the take of bowhead whales, and enforces the provisions of a management plan with its own members with great success. Through co-management, the AEWC has expanded the collective scientific and traditional understandings of bowhead whale biology and behavior while providing sustainable, customary, and traditional whaling hunts. As a result, the numbers of bowhead whales in Alaskan waters have increased while ensuring that AEWC-member subsistence needs are met.

In the 1980s, migratory bird populations experienced historic declines. Conservation efforts resulted in prohibiting the subsistence take of specific species. One such species was the Emperor Goose, a valued subsistence food. Along with U.S. Fish and Wildlife and the State, the Native Caucus of the Alaska Migratory Bird Co-Management Council (AMBCC) began co-managing the subsistence take of migratory birds

in Alaska pursuant to the Migratory Bird Treaty Act. Through the co-management of the AMBCC, the Emperor Goose population began to climb again, and a subsistence and non-subsistence hunt for Emperor Goose was recently implemented for first time since 1983. Yet another example of exemplary co-management is found in the many Alaska Native marine mammal commissions, which develop and implement management plans regulating the take of specific marine mammals pursuant to the Marine Mammal Protection Act (MMPA).

Kuskokwim River tribes are the most dependent users of returning spawning runs of Pacific salmon, yet are most vulnerable if populations crash and become extinct. These examples demonstrate that not only is tribal co-management of fish and wildlife resources important, but necessary to our ongoing physical and spiritual wellness.

The Commission has actively participated in the management of subsistence fisheries on the Kuskokwim River since 2015. A tangible benefit of our involvement has been the widespread compliance with stringent salmon fishing restrictions necessitated by the poor returns of Chinook salmon. In the past, compliance with harvest restrictions was difficult or otherwise impossible to ensure because there was no role for our own tribes to provide input and become actively engaged in the promotion and implementation of these conservation measures.

The Commission's goal is to assume primary responsibility for the management of Kuskokwim River subsistence fisheries for its tribal members through co-management with the State and Federal governments. The Commission believes that a demonstration project authorized and funded by Congress would be the logical vehicle to enable the Commission to do this. With input and involvement from other stakeholders, including the State and U.S. Fish and Wildlife Service, the Commission would draft and implement a management plan for tribal subsistence fisheries throughout the Kuskokwim River. Conservation of healthy fish stocks would be a primary concern for all parties, as well as providing subsistence opportunity for other qualified non-tribal users. The Commission's member tribes would be responsible for implementing and enforcing the management plan for its own members. Subsistence users who are not tribal members would have their opportunity and rights implemented and protected pursuant to applicable state and federal systems and regulations.

Providing the Commission this enhanced authority could happen in a number of ways:

1. The only way to solve the numerous obstacles presented by Title VIII is for Congress to enact federal legislation that explicitly recognizes Alaska Native subsistence rights and tribal management of this right.

2. In the meantime, Congress could direct the Secretary to engage in rulemaking to create a direct management structure between the Secretary and the Commission under which the Secretary delegates authority directly to our tribes to manage subsistence uses of fish on the Kuskokwim.

These remedies will allow KRITFC to focus efforts on important engagement and research efforts with the 33-member tribes including discussions about issues of concern, documentation of traditional knowledge, and current observations of tribal elders. This type of work is vital to support more effective salmon management.

The Commission also continues its outreach role to inform and educate the public about salmon conservation initiatives and the management approaches taken by the KRITFC's In-Season Managers and federal and state agency actions. State and federal agencies face ongoing challenges in interacting with the public and it is necessary that the KRITFC have more opportunity to serve as a critical bridge in overcoming communication gaps.

*Question 2a.* How could we balance state interest to protect endangered species with tribal rights to subsistence activities?

Answer. The current regulatory structure in place under ANILCA builds in ample protections for state interests and endangered species. For example, federal management must defer to State regulations except where those State regulations conflict with federal regulations.[9] Alaska Native co-management of fish and wildlife resources, examples of which I discussed above, effectively maintains the balance between State and Federal interests in protecting endangered species and tribal rights to engage in customary and traditional subsistence uses of available fish and wildlife resources.

Traditional tribal management principles shared by to the Commission's members also protect endangered species without harming tribal subsistence rights. For ex-

---

[9] 50 CFR 100.14(a).

ample, one such principle enforced by all of the Commission's tribal members includes "Take only what you need, don't waste or play with your food, and keep what you catch, it is food." The Commission and its members firmly believe that disrespecting fish and wildlife resources will cause those resources to decline such that human beings will suffer. Tribal co-management principles implicitly incorporate protections for endangered species, and balance those protections against tribal rights to continue engaging in subsistence uses of those species.

*Question 3.* One of the prominent barriers to subsistence activities is the harmful role of climate change in natural ecosystems in Indian Country. We know that when lakes and other natural resources are polluted, and communities are unable to harvest resources, they lose an important source of nutrition? Have you collected any data or research on the relationship between environmental pollution and native health in communities that practice subsistence fishing, hunting, or fishing? If so, can you talk about how native health is impacted by climate change?

Answer. Climate change is affecting the lives of all residents of the 33 KRITFC member tribes in the Kuskokwim region. The Commission lacks the resources to conduct "formal" climate change studies demonstrating how climate change is affecting our subsistence resources. However, by the measure of the traditional knowledge used and recognized by our elders, the Commission is well aware that climate change is making it more challenging to predict weather, river conditions, and fish and wildlife behavior. Tribal elders are observing changes in weather, temperature, river water levels, returning species, and other indicators of natural resource status, health, changes which all suggest that climate change and the coincident escalation of global temperatures is having a detrimental effect upon our subsistence resources—which, in turn, has a detrimental effect upon our physical, psychological, and spiritual well-being.

With regard to pollution, the Commission is fortunate in that point sources of pollution are not something that is widespread in our region. However it is an area of significant concern for us, especially in light of proposed development projects. While the historical mineral mining and the development of a military industrial complex has resulted in polluted waters and other areas of concern, efforts are underway to minimize impacts to protected tribal rights, resources, and lands. Such programs include the Native American Lands Environmental Mitigation Program (NALEMP) and CERCLA or the Superfund which has been recently mitigating mercury contamination associated with historic mining activities in Red Devil.

In 2007, state and federal agencies issued a health advisory regarding high levels of mercury contamination found in northern pike, one of our resident fish species that is widely enjoyed by area residents. A 2001–2003 state household survey found that Bethel residents alone harvested about 25,000 to 44,000 pounds of northern pike.[10] However, pregnant women and children were advised not to eat northern pike because of concerns about mercury. This is especially concerning when you realize how much pike we eat on the Kuskokwim River, not to mention all the other fish we catch for food and is a good example of why the Commission's member tribes are concerned about point sources of pollution.

It is of the utmost importance that the Commission continues to monitor the effects of global warming and pollution upon available fish and wildlife resources necessary to maintain our subsistence ways of life. There have been funding proposals, unsuccessful to date, to establish a discharge and temperature monitoring network throughout the Kuskokwim River. However, the Commission cannot do this while operating on a shoestring budget. The Commission's operating budget for the current fiscal year is only $550,000.00. It is highly unlikely that the Commission will be able to fund, or otherwise develop the capacity to administer, projects and programs that take an enhanced look at the effect of climate change and pollution on our subsistence lifestyle. This network would be established by contracting scientists, then maintained by participants in select villages.

Climate change has a broad range of impacts upon the lands, waters, and natural resources of Alaska. From milder, drier winters to warmer, wetter summers, these impacts change our physical landscape right before our eyes. These impacts also affect health and strength of the natural resources we depend on, as well as the lives and health of our tribal members. We need secure, dependable funding in order to build our capacity and commit to monitoring the effects of climate change. Additional congressional appropriation is one of the only ways to secure this necessary funding.

---

[10] Simon, J. et al. 2007. Bethel Subsistence Fishing Harvest Monitoring Report, Kuskokwim Fisheries Management Area, Alaska, 2001–2003. Alaska Department of Fish and Game, Division of Subsistence, Technical Paper No. 330, pp. 30–32.

Exhibit CC

Page 61 of 70

It is difficult to know the full extent to which climate change has affected the health and bounty of Kuskokwim River Chinook salmon stocks. But recent years of disastrously low Chinook salmon returns have deeply impacted our emotional, nutritional, economic, social, and spiritual well-being. We are no longer able to harvest enough Chinook salmon to meet our family's nutritional needs throughout Alaska's long and harsh winters. When our families can barely feed themselves, it then becomes additionally challenging for us to engage in our traditional practices of sharing and trading food resources with our friends and family who cannot otherwise provide for themselves. The Commission believes that the negative effects of climate change have created an ongoing scarcity of essential resources, which in turn is causing an ongoing crisis in our tribal communities as we lose our food security and watch one another suffer.

*Question 4.* I understand that Native populations are the most vulnerable group to climate change and that environmental pollution of tribal lands and resources generally comes from surrounding businesses, plants, and communities that do not belong to the tribal community. What can we do to protect tribal lands from surrounding environmental pollution and what course of action can tribes or the government take against organizations, communities, or individual who contaminant tribal lands?

Answer. Alaska Natives are highly vulnerable to climate change and environmental pollution. Climate change and environmental pollution compromise our food security, damage our lands, and are responsible for rapidly changing the physical and cultural landscape in which we exist. This is why it is so important for Congress to support laws, programs, and projects, such as the Commission's proposed co-management and tribal stewardship of Kuskokwim River salmon stocks, which enfranchise our members and support our self-determination by enabling us to directly address these negative influences. Without an enfranchised tribal management system in place, these vulnerabilities, and the legal and administrative roadblocks preventing our ability to successfully address these vulnerabilities, will only deepen. Tribes need a real seat at the table to address these significant issues.

Congress must also resist efforts to water down existing environmental protections found within the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA), and must continue enforcing the full scope of protections found in these important laws. Climate change and environmental pollution are directly caused by business and industry's failure to voluntarily put adequate protections in place for the development of their products. The answer to addressing climate change and environmental pollution is not to water-down legal obligations and protections with regard to industry and business actions, but to strengthen and continue enforcing those obligations and protections.

*Question 4a.* How can traditional knowledge help address climate change impacts facing tribes? Do you think western science takes your suggestions seriously?

Answer. There is a role for both western science and traditional knowledge to address the impacts of climate change affecting our members. While I personally do not think that western science values traditional knowledge in the same way that it values empirical data, there is increasing interest in and attention being paid to traditional knowledge in the context of resource management. Traditional knowledge passed down from our tribal ancestors helps us understand how we are to act and behave to ensure future success for our children and communities. Traditional knowledge guides our customs, ceremonies, cultural practices, and our individual behaviors to ensure that respect is shown to the land, water, and natural resources upon which our people depend.

Traditional knowledge should not need to be "proven" by western scientific methods and ways of knowing before it is considered in making resource management decisions, but oftentimes, our traditional knowledge is disregarded in favor of western scientific predictions and models. For example, in 2017, the Commission and U.S. Fish and Wildlife agreed on a conservative harvest of 40,000 Chinook salmon during pre-season negotiations and meetings. This harvest estimate was based upon the State's estimated Chinook returns—estimates based wholly on western science.

However, when the run actually started, the U.S. Fish and Wildlife Service and the Commission disagreed about the size and timing of the Chinook salmon run in the Kuskokwim River. Real-time western science used by U.S. Fish and Wildlife suggested that the Chinook run was weak, whereas real-time traditional knowledge suggested that the Chinook run was strong, but returning in ways—running deeper in the river, and returning later in the summer—for which western science could not account. At the end of the summer, the post-season escapement numbers confirmed that the traditional knowledge advanced by the Commission was correct, and there was a surplus of at least 10,000 Chinook salmon. While the conservation of

these fish was important, those 10,000 fish represent lost opportunity and food security for hundreds of our tribal members. Had our traditional knowledge been fully acknowledged and recognized, we would not have lost important fishing opportunity.

Many people misunderstand traditional knowledge or are confused by what it means. Traditional knowledge is holistic. Often one species can be used as an indicator of presence and abundance of a completely different species. Indigenous peoples' ways of knowing are holistic in nature. What one thinks, what one says, and what one does, all has the potential to impact or influence another aspect of one's world. Wasting a resource or treating a resource disrespectfully incurs consequences for the individual, those around them, as well as the resource. In comparison, the western way of knowing is compartmentalized and specialized, some might say narrow. A western scientific observer may study a particular aspect of the world, like salmon run-timing and abundance, take notes, gather data, test hypotheses, confirm or formulate new theories, and develop a predicted salmon run forecast for the next season based on mathematic models.

Here are some examples of traditional knowledge. In 2014, my mom's younger brother taught me how to use a little set net to fish for red (sockeye) salmon. We went to the mouth of the Gweek River, a small tributary of the Kuskokwim River north of Bethel, where his grandparents had their fish camp. He knew exactly where to put the net to catch 95 percent reds, and avoid Chinook salmon. Many biologists and fisheries managers imagine that gill nets are indiscriminate killers of fish. But if you know where each species tends to swim, if they prefer sandbars, slower currents or deeper depths, gill nets can be a very targeted and discreet gear type. To me, traditional knowing is having a detailed and deep understanding of an ecosystem. My friend Charlie Wright on the Yukon River told me that on his section of the Yukon, an indicator of the arrival of Chinook salmon is yellow butterflies. When he sees a yellow butterfly, he knows the Chinook salmon are there. He also said the abundance of yellow butterflies reflects the abundance of Chinook salmon. In 2017 when the Chinook salmon came back in real numbers, there were big swarms of butterflies again. These interconnections are inherent to indigenous knowledge systems and represent a very different way of viewing the relationship between human beings and the natural world compared western science.

Our Commission's four In-Season Managers all value the western science that is presented by our state and federal managing partners and used to make management decisions. However, our In-Season Managers also recognize the value of traditional knowledge, and know that incorporating traditional knowledge into resource management decisionmaking strengthens the end result.

The Commission's In-Season Managers are skilled at incorporating western science and traditional knowledge into their consideration of management decisions. For example, upon receiving a mathematical forecast of the anticipate salmon return, our In-Season Managers will also use other traditional information before deciding when and how long to fish. These additional considerations include observations about river water levels, snow depth of the previous season, height of grasses, when shoots of green grass emerge, numbers of migrating birds arriving and when they arrive, when mosquitos present themselves, where people have been catching certain kinds of fish and which stock of fish are presently migrating, the nature of and direction of winds at the river mouth, when cotton flies, when there are storms in Kuskokwim Bay, river water temperatures, water clarity, amount of debris floating downriver, anticipated fishing interests, and fish-drying weather conditions, and the effect that these interconnected observations have on one another insofar as fisheries management is concerned.

The recognition and incorporation of traditional knowledge is essential in any study of climate change in the Kuskokwim River region. Traditional knowledge represents the most significant data set of systematic observations of our ecosystem.

*Question 5.* A large part of our discussion today has revolved around the numerous barriers to subsistence activities, particularly focusing on the role of the Federal Subsistence Board in management. However, we know that for native communities, subsistence activities are an important source of cultural identity and heritage. We know that cultural connections including traditional values, customs, activities, and ceremonies serve as protective factors in the lives of tribal youth by discouraging delinquent behavior, encouraging academic success, and alleviating various stressors on native youth. Could you talk about the emotional, spiritual, and cultural toll these barriers to subsistence activities have had on native communities, specifically related to native youth?

Answer. I really think that the restrictions and barriers to subsistence activities negatively impacts our youth, in many ways. One way is in the development of work ethic. We prepare fish to smoke and dry at fish camp, where there is a role for everyone, no matter what gender or what age., even a 2 or 3-year old has a role to

Exhibit CC
Page 63 of 70

play in the productivity at fish camp—by retrieving needed objects like nets and buckets, for example. Five-year olds can cut notches in salmon belly strips, tie strings, or help people apply bug spray. 7, 8, and 9 year olds help inspect drying fish for blue fly maggots and remove them. 11 and 12 year olds often help start or tend the smoke house fire. It is especially important for teens to experience fish camp because that is when you learn your skills and develop confidence.

When we don't have family time at fish camp it leaves a void in our family seasonal rounds. The biggest risk in my opinion is to the youngest family members, because they miss out on learning about and experiencing the opportunity we've always had to instill in them their self-worth and need to be productive. It is at fish camp where our youth learn that their family needs them. I think about my cousins and their girls. Their kids (girls and boys) are so proud to show me their cuts of salmon and whitefish. It makes such a difference to grow up at fish camp and every year, as children learn more, it is truly transformative.

—————

RESPONSE TO WRITTEN QUESTIONS SUBMITTED BY HON. CATHERINE CORTEZ MASTO TO A-DAE ROMERO-BRIONES

Question 1. Many Tribes are facing additional barriers due to state regulations. Indigenous peoples who have practices subsistence fishing and hunting for generations are experiencing large fines for not abiding by state regulation and a seizure of goods and supplies necessary for subsistence harvesting at the hands of the state. How can the federal government assume and active role in protecting the sovereignty of native peoples and continuing this traditional and what would tribal co-management over subsistence activities look like?

Question 1a. How could we balance state interest to protect endangered species with tribal rights to subsistence activities?

Answer. Tribal subsistence hunters, gatherers, and fishermen and women are a Tribal nation's and the United State's most important conservationists. Their dependence on a resource requires knowledge, management, and protection of that very resource. However, subsistence hunting, gathering, and fishing practices are not often acknowledged as a conservation or ecological management practices. In worst case scenarios, subsistence hunters, gatherers, and fishermen and women are labeled "poachers" or "rule-breakers" when subsistence practices, behaviors, and timing are not acknowledged or recognized in state hunting, fishing, and gathering regulation. More often than not, Tribal Nations' and state conservation goals are often aligned in that both State and Tribal Nations have shared goals of natural resource perpetuation for future generations. Unfortunately, Tribal Nations and State conservation offices may define "practicing" conservation and resource protection differently.

In general, many Tribal communities practice conservation through interaction with the resource. On the contrary, mainstream conservation efforts almost always require resources to "be left alone" or remain untouched. There is some evidence that suggests human interactions with nature, that closely imitate natural disturbances have allowed ecosystems to co-evolve with human and thus creating stronger eco-systems.[1] M. Kat Anderson and Eric Wholgemuth in an article called California Indian Proto-Agriculture: Its Characterization and Legacy state, "indigenous disturbance was so finely tuned and similar to certain types and scales of natural disturbances that it conserved the renewal capacity of individual plants, populations, and whole ecosystems" (Pp 204). This ecological knowledge is a critical resource for environmental and conservation practices, but in order to maintain this knowledge, Indigenous people must be allowed access to ancestral territories and resources to practice management in the form of harvesting, hunting, fishing, and gathering.

There are several Federal actions that can be taken to ensure the continued practice of Indigenous ecological management.

1) Ensure federal agencies with land holdings in Indigenous ancestral territories have processes for allowing Tribal nations access to those lands. I go into more detail about specific processes of federal agencies who have lands significant to Indigenous communities in the written comments.

2) The Multiple Use Sustained Yield Act requires a balance in land use planning among the competing values of recreation, grazing, timber, watershed

—————

[1] Harlan JR. 1992. *Crops and Man*, 2nd Edition. Madison, WI: American Society of Argonomy and Crop Science Society of America. Harris DR. 1989. An evolutionary continuum of people-plant interaction. Pp. 11–26 in DR. Harris and GC Hillman (eds.) *Forging and Farming: The Evolution of Plant Exploitation*. London: Unwin Hyman.

protection, wildlife and fish, and wilderness.[2] The Multiple Use Sustained Yield Act should be amended to include Tribal nations' consideration on federal lands within Tribal ancestral territories.

3) Federal Government should invest in research dollars for documenting and strengthening Indigenous conservation and ecological management practices.

4) Amend the Organic Foods Production Act (OFPA) and subsequent USDA regulations to include Tribal authority where state authority is recognized in the act. Specifically, the provision for gathering of wild crops[3] should include Tribal consultation.

There are some co-management examples that offer some promising models. In the state of New Mexico, there is a licensing system where Tribal Nations are given a certain number of hunting licenses for state hunts. The Tribal Nation in turn uses those licenses in an internal process in accordance with their subsistence practices. While the model is not perfected, the this model shows that is possible for State and Tribal agencies to cooperate within both systems of management.

We also have co-management examples from the Bureau of Land Management (BLM) and the Forest Service where Tribal communities co-manage significant national monuments. For example, there was a co-management agreement between Pueblo de Cochiti and Bureau of Land Management over Kasha Katuwe National Park. From this model we can glean several lessons:

1) Tribal Nations should be duly compensated for their expertise and knowledge in managing their ancestral homelands. In fact, Indigenous management of federal lands often improves the land. Since the federal government is ultimately the land owner, Tribal Nations should be compensated for the improvements. Often, Indigenous land management practices through subsistence are not recognized as land management.

2) Co-management agreements should mean that Tribal Nations have equal or ample authority to manage the land. Often times, co-management agreements give greater power to federal agencies.

3) Co-management agreements should also be financially sound in that all costs of Tribal Nations are adequately covered in order to fully manage and engage according to the co-management agreements. Too often, Tribal Nations are inadequately compensated to execute co-management agreements, yet expected to fulfill co-management provisions.

Balancing state interests to protect endangered species and tribal interests to practice subsistence activities are often thought of as different goals, but in fact, they are often aligned. Indigenous subsistence practitioners, more often than not, have vested interest in ensuring endangered animals endure. One perspective is that endangered species become endangered because subsistence practices are hampered. While this concept may seem counter-intuitive, it is quite practical to understand species disappearance when animal and plant species are NOT intimately and closely monitored. Random and periodic observation are not intimate observation. In order to intimately and closely monitor animal and plant species, human interaction, if not dependence, on those species are guarantee real time monitoring and understanding of the health of specific species. Even more profound is that subsistence practices often require a thorough understanding of ecological relationships. If one plant species is endangered, more often than not, the animals and other organisms dependent on that plant is also endangered. However, learning and understanding of ecological relationships requires practice, often over long periods of time. Indigenous communities are often the longest standing residents of specific places, but their interaction and presence in those lands may be limited by the many barriers already discussed surrounding subsistence practice. These not only damages the cultural practices of a people, but on the health of our ecosystems nationally. For these reasons, Indigenous subsistence practices should be encouraged and protected in order to ensure endangered species do endure.

Endangered Species designation and conversations should include Indigenous perspectives whether on boards, in consultation, or in key staff positions where such

---

[2] The Multiple Use—Sustained Yield Act of 1960 (or MUSYA) (Public Law 86–517) is a federal law passed by the United States Congress on June 12, 1960. This law authorizes and directs the Secretary of Agriculture to develop and administer the renewable resources of timber, range, water, recreation and wildlife on the national forests for multiple use and sustained yield of the products and services.

[3] (7 U.S.C. ch. 94, 7 U.S.C. §6501 et seq.) and Section 5022 of the USDA–AMS Organic Handbook (can be found at: *https://www.ams.usda.gov/rules-regulations/organic/handbook/5022*)

determinations are made. Again, federal investment in ecological management practices, particularly of endangered species, may give new perspectives on endangered species recovery, new approaches to recovery, and I would argue, faster recovery times. Indigenous people, in their wealth of understanding of the environments that they have cultivated for centuries have so much to offer to the world of conservation and management.

*Question 2.* One of the prominent barriers to subsistence activities is the harmful role of climate change in natural ecosystems in Indian Country. We know that when lakes and other natural resources are polluted and communities are unable to harvest resources, they lost an important source of nutrition. Have you collected any data or research on the relationship between environmental pollution and native health in communities that practice subsistence fishing, hunting, or farming?

*Question 2a.* If so, can you talk about how native health is impacted by climate change?

Answer. First Nations Development Institute has worked with over 300+ Tribal Nation or Tribal non-profit grantees on Indigenous food systems throughout Indian Country. We have collected antidotal information/data on connections between environmental pollution and health or on connections between subsistence practice disruption and the effects on health. We do have information on specific tribal communities who have collected their own empirical data on health and environmental factors such as the Akwesasne Community in New York, the Pueblo de Cochiti in New Mexico and the White Earth Community in Minnesota, just to name a few. There are several other Tribal specific organizations that collect and analyze such data such as the Tribal Epidemiology Center and the Center for Native American Environmental Health Equity Research.

There are a few conclusions we can make about climate change and native health based on the projects that have been funded under the Native Agriculture and Food Sovereignty Initiative at First Nations. One, is that subsistence practices are an important process for building the resiliency capacities of Tribal communities, individuals, and surrounding regional communities. Subsistence practices allow Tribal Nations to monitor their environments, take note of the changes in that environment, and eventually, adjust behaviors to that changing environment. Two, we know that climate change rates are outpacing the rates of adjustment of Tribal Nations. With limited access to land bases, disrupted subsistence practices, the ability to move or transition to other areas is hampered in Tribal Nations. This causes reliance on outside sources to help Tribal Nations adjust to climate change factors. To bring balance to rates of adjustment and climate changes, it is critical for Tribal Nations to be supported in subsistence practice.

*Question 3.* I understand that Native populations are the most vulnerable group to climate change and that environmental pollution of tribal lands and resources generally comes from surrounding businesses, plants, and communities that do not belong to the tribal community. What can we do to protect tribal lands from surrounding environmental pollution and what course of action can tribes or the government take against organizations, communities, or individuals who contaminate tribal lands?

*Question 3a.* How can traditional knowledge help address climate change impacts facing tribes? Do you think western science takes your suggestions seriously?

Answer. Surrounding environmental pollution is always a concern for Tribal communities. Over the course of development of Tribal law, there have been innovative and effective mechanisms to hinder surrounding environmental pollution. Unfortunately, many of those mechanisms and tools have been undermined in the last few years. Perhaps the best example of controlling surrounding environmental pollution is the Clean Water Act (CWA), The Clean Air Act (CAA), Clean Water Act (CWA), and Safe Drinking Water Act (SDWA). These statutes allow Tribal Nations to set environmental quality standards and to implement strategies to meet those standards. These acts should be protected, used as models for other pieces of environmental legislation, and expanded in other environmental quality statutes. These acts can be strengthened in that rather than having Tribal Nations apply for status as States, status as state should be assumed unless a Tribal Nations opts out of such treatment.

Additionally, Tribal Courts should be recognized as having the authority to prosecute environmental pollution on Tribal lands. It has taken an act of Congress to acknowledge Tribal court jurisdiction over non-Indian perpetrators of domestic violence. A similar action should be taken to acknowledge Tribal jurisdiction over non-Indian perpetrators of environmental population.

As stated earlier, subsistence practices ensure resiliency in Tribal Nations specifically in response to climate change. In order for the development of climate change

resiliency, it is critical for Tribal Nations to practice subsistence. There are currently so many barriers to subsistence practice such as land access, transference of traditional knowledge, rates of climate change, prosecution of Indigenous subsistence practitioners under state hunting/gathering/fishing laws that subsistence practice is hampered, thereby weakening a community's ability to respond to climate change.

Western Science, often, dismisses subsistence practices. Hunting, gathering, and fishing are often viewed as a "lesser" form of existence than efficient market systems where a person has to work less for more. However, subsistence practices often ensure that demand doesn't outpace supply in that demand is directly tied to hard work, ecological understandings, and direct interactions with natural resources. In short, subsistence practices have to be balanced within the environments and natural

resources that support those practices, humans being included in those environments. Federal investment into documenting these concepts would have far reaching consequences for not only Indigenous communities, but for our larger national approach to conservation.

*Question 4.* A large part of our discussion today has revolved around the numerous barriers to subsistence activities, particularly focusing on the role of the Federal Subsistence Board in management. However, we know that for native communities subsistence activities are an important source of cultural identity and heritage. We know that cultural connections including traditional values, customs, activities, and ceremonies serve as protective factors in the lives of tribal youth by discouraging delinquent behavior, encouraging academic success, and alleviating various stressors on native youth. Could you talk about the emotional, spiritual, and cultural toll these barriers to subsistence activities have had on native communities, specifically related to native youth?

Answer. While I am not a mental health expert, I can relate to the question through personal experience as a once native youth who comes from a community where barriers to subsistence farming disrupted my entire community's way of life. Within a period of ten years, the ill social effects of losing a Pueblo lifestyle, based on subsistence farming, were raging in my community. The loss of a life way, a connection to ancestral ties, changes in diet, and a dependence on sources of food outside of one's one community and hands, is unquantifiable, but can be seen in the detrimental health and social ills that have come to characterize many Tribal Nations.

As one might predict, a community not only struggles with the loss, but also has to determine a substitute for that loss. During that period of transition, many young people struggle with a sense of identity because often identity is transmitted from one generation to the next through subsistence activities. Subsistence activities offer young people orientation and a place in the world. For example, in Cochiti, young people cultivate corn. It teaches young people how to care for life, learn the seasons of our community and environment, understand community behaviors and ceremony, and become part of something larger than oneself. When agriculture was disrupted in Cochiti because of a loss of agricultural lands, young people had to learn all these lessons somewhere else, if we learned these lessons at all after agricultural disruption. In short, an efficient social food-system, deliberately cultivated over generations that synchronized our existence with our environment, is usually replaced with systems less powerful. As one might imagine, the effects on young people is simply struggle or a need to leave their home base to find a life outside of the community to fill that loss. In all cases, self-identity suffers and, in turn, the community suffers, and lastly, our environments suffer.

———

Response to Written Questions Submitted by Hon. Catherine Cortez Masto to Jennifer Hardin, Ph.D.

*Question 1.* Many tribes are facing additional barriers due to state regulations. Indigenous peoples who have practiced subsistence fishing and hunting for generations are experiencing large fines for not abiding by state regulations and a seizure of goods and supplies necessary for subsistence harvesting at the hands of the state. How can the Federal Government assume an active role in protecting the sovereignty of native peoples and continuing this tradition and what would tribal co-management over subsistence activities look like?

Answer. Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA) dictates that the subsistence harvest of fish and wildlife is the priority consumptive use on Federal public lands in Alaska. This means that in the event that there are not enough resources to meet the harvest demands of all users, only

Federally-qualified rural residents (both Native and non-Native) may hunt or fish on Federal lands under Federal regulations, and that Federal public lands are closed to all other consumptive uses. In these instances, state regulations no longer apply on Federal public lands. While some subsistence users may find this type of dual management system to be confusing at times, it can also be quite protective of the hunting and fishing practices that are central to the Native and non-Native rural subsistence way of life in Alaska by ensuring that these practices can continue on Federal public lands even if state mandates or priorities differ. The Federal Subsistence Board's charge is to act on behalf of rural subsistence users in providing for the subsistence priority on Federal public lands, per the ANILCA mandate. The State of Alaska is not obligated under the law to carry out this same mandate.

ANILCA outlines the regulatory decisionmaking structure for subsistence harvest on Federal public lands in Alaska. Federal subsistence regulatory decisions are the responsibility of the Secretaries of the Interior and Agriculture and the ten Subsistence Regional Advisory Councils. Subsistence Regional Advisory Councils are composed of representatives who are knowledgeable about subsistence issues in their respective regions and are appointed by the Secretaries. Many Regional Advisory Council members are Alaska Native.

The Secretaries have delegated regulatory decisionmaking authority related to the subsistence take of fish and wildlife to the Federal Subsistence Board (Board). In turn, the Board is statutorily required to defer to the recommendations of the Subsistence Regional Advisory Councils unless recommendations are not supported by substantial evidence, violate recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs. The subsistence decisionmaking structure outlined in ANILCA is designed to ensure that the Federal Subsistence Management Program is characterized by a bottom-up approach that is primarily driven by the concerns of the rural Alaskans who will be directly affected by Board decisions.

Currently, "co-management" is not defined in relation to the subsistence provisions contained in Title VIII of ANILCA. It is assumed that any future proposed Federal subsistence co-management structures would conform to the provisions of Title VIII of ANILCA, which define the subsistence priority for rural Alaskans throughout the state.

*Question 1a.* How could we balance state interest to protect endangered species with tribal rights to subsistence activities?

Answer. The Federal Subsistence Management Program in Alaska provides a good model for balancing subsistence opportunity with conservation of healthy populations of fish and wildlife in order to ensure the continuation of the subsistence way of life for future generations. Striking this balance requires close collaboration between rural subsistence users, the Federal Subsistence Board, Federal land management agencies and the State of Alaska. In accordance with Section 815(4) of ANILCA, the endangered species program is not administered by the Federal Subsistence Management Program. At this time, no subsistence resources managed by the Federal Subsistence Management Program are listed as endangered species.

*Question 2.* One of the prominent barriers to subsistence activities is the harmful role of climate change in natural ecosystems in Indian Country. We know that when lakes and other natural resources are polluted and communities are unable to harvest resources, they lose an important source of nutrition. Have you collected any data or research on the relationship between environmental pollution and native health in communities that practice subsistence fishing, hunting, or farming? If so, can you talk about how native health is impacted by climate change?

Answer. This is an important issue of concern for subsistence users in rural Alaska but it is not an area of research that is within the purview of the Federal Subsistence Management Program. The Federal Subsistence Management Program provides funding for fisheries research through the Fisheries Resource Monitoring Program. Research conducted through that program examines, among other issues, the health of subsistence fisheries throughout Alaska, including the impact of changing environmental conditions on subsistence fish populations.

The Office of Subsistence Management also administers the Partners for Fisheries Monitoring Program (Partners Program) on behalf of the Federal Subsistence Management Program. The Partners Program is a competitive grant program directed at providing funding for biologist, social scientist, and educator positions in Alaska Native and rural organizations with the intent of building capacity in rural Alaska to actively participate in Federal subsistence management.

*Question 3.* I understand that Native populations are the most vulnerable group to climate change and that environmental pollution of tribal lands and resources generally comes from surrounding businesses, plants, and communities that do not

belong to the tribal community. What can we do to protect tribal lands from surrounding environmental pollution and what course of action can tribes or the government take against organizations, communities, or individual who contaminate tribal lands?

Answer. The situation in Alaska is unique in that more than 50 percent of lands within the state are managed by the Federal government and subject to the subsistence priority afforded by Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA). In accordance with Section 810 of ANILCA, Federal agencies are required to evaluate and minimize the potential effects of other uses or activities on subsistence uses prior to authorizing such actions on Federal lands. All other lands within the State of Alaska, including those belonging to Alaska Native Claims Settlement Act (ANCSA) Corporations, fall under state jurisdiction.

*Question 3a.* How can traditional knowledge help address climate change impacts facing tribes? Do you think western science takes your suggestions seriously?

Answer. The Federal Subsistence Management Program recognizes the critical importance of local and traditional ecological knowledge in informing decisions about subsistence harvest by rural Alaskans. The Federal Subsistence Board (Board) relies on the knowledge shared by local people and strives to consider it equitably alongside of western scientific knowledge. Because traditional ecological knowledge is obtained through systematic observations and repeated interactions with the natural world over long spans of time, it can be particularly useful in assessing the impacts of environmental change on the natural resources that subsistence users depend upon. Traditional ecological knowledge often provides a spatial and temporal scale that is otherwise unavailable to resource managers.

The Board strives to obtain traditional ecological knowledge from a variety of sources in an effort to inform management decisions. All staff analyses of wildlife and fishery proposals to change Federal subsistence regulations, make customary and traditional use determinations, and rural determination proposals incorporate available traditional ecological knowledge to help the Board better understand subsistence resources and the people who depend on them. The Federal Subsistence Management Program consults with local federally recognized tribes on proposals that might impact their members, and incorporates the knowledge learned during those consultations. The Subsistence Regional Advisory Council system provides a direct conduit of traditional ecological knowledge in the decisionmaking process. The Board considers traditional ecological knowledge along with biological and sociocultural data when making decisions about the take of fish and wildlife on Federal public lands.

*Question 4.* A large part of our discussion today has revolved around the numerous barriers to subsistence activities, particularly focusing on the role of the Federal Subsistence Board in management. However, we know that for native communities subsistence activities are an important source of cultural identity and heritage. We know that cultural connections including traditional values, customs, activities, and ceremonies serve as protective factors in the lives of tribal youth by discouraging delinquent behavior, encouraging academic success, and alleviating various stressors on native youth. Could you talk about the emotional, spiritual, and cultural toll these barriers to subsistence activities have had on native communities, specifically related to native youth?

Answer. In Title VIII of ANILCA, Congress found that the continuation of the subsistence way of life by rural Alaskans is essential to their physical, economic, traditional, cultural and social existence. Title VIII established a priority for the taking of fish and wildlife for nonwasteful subsistence purposes on Federal public lands in Alaska over the taking of those resources for other purposes. In ANILCA, Congress recognized the vital relationships between people, land and cultural identity that are reflected in subsistence hunting and fishing practices in rural Alaska. These practices are part of a community's cultural, social, economic, and nutritional wellbeing. The Federal Subsistence Management Program's focus on the sociocultural aspects of subsistence activities distinguishes it from other hunting and fishing programs.

The Federal Subsistence Management Program tries to facilitate the continuation of cultural practice associated with the subsistence way of life in rural Alaska by supporting culture camps designed to pass on important cultural knowledge to future generations, providing for community harvest systems that are organized and managed by communities according to customary and traditional practices and offering the ability to harvest fish or wildlife outside of established season or harvest limits, for food in traditional religious ceremonies, including potlaches.

The Federal Subsistence Management Program regularly conducts outreach to connect with rural youth. For example, the program offers presentations and work-

shops within rural village schools in conjunction with Subsistence Regional Advisory Council meetings and often holds those meetings within village schools so youth may attend and participate. Engagement with rural youth during meetings allows for council members to interact and influence the next generation, securing the subsistence way of life for the future. The Federal Subsistence Management Program regularly holds an art contest focusing on wildlife and fish related subsistence activities for all students in Alaska in grades K–12.

The Federal Subsistence Board, Subsistence Regional Advisory Councils, and the Office of Subsistence Management will continue to seek additional mechanisms to increase youth involvement in the Federal Subsistence Management Program to support generations of conservation leaders. These future leaders will protect the continuation of the opportunity for subsistence uses on federal lands, which is essential to the physical, traditional, cultural, and social existence of rural residents in Alaska. This unique existence has withstood natural, institutional, and social challenges for many generations.

———

**\*RESPONSES TO THE FOLLOWING QUESTIONS WERE NOT AVAILABLE AT THE TIME THIS HEARING WENT TO PRINT\***

WRITTEN QUESTIONS SUBMITTED BY HON. CATHERINE CORTEZ MASTO TO HON. ROY B. BROWN

*Question 1.* Many tribes are facing additional barriers due to state regulations. Indigenous peoples who have practiced subsistence fishing and hunting for generations are experiencing large fines for not abiding by state regulations and a seizure of goods and supplies necessary for subsistence harvesting at the hands of the state. How can the federal government assume an active role in protecting the sovereignty of native peoples and continuing this tradition and what would tribal co-management over subsistence activities look like?

How could we balance state interest to protect endangered species with tribal rights to subsistence activities?

*Question 2.* One of the prominent barriers to subsistence activities is the harmful role of climate change in natural ecosystems in Indian Country. We know that when lakes and other natural resources are polluted and communities are unable to harvest resources, they lose an important source of nutrition?

Have you collected any data or research on the relationship between environmental pollution and native health in communities that practice subsistence fishing, hunting, or farming?

If so, can you talk about how native health is impacted by climate change?

*Question 3.* I understand that Native populations are the most vulnerable group to climate change and that environmental pollution of tribal lands and resources generally comes from surrounding businesses, plants, and communities that do not belong to the tribal community. What can we do to protect tribal lands from surrounding environmental pollution and what course of action can tribes or the government take against organizations, communities, or individual who contaminate tribal lands?

How can traditional knowledge help address climate change impacts facing tribes? Do you think western science takes your suggestions seriously?

*Question 4.* A large part of our discussion today has revolved around the numerous barriers to subsistence activities, particularly focusing on the role of the Federal Subsistence Board in management. However, we know that for native communities subsistence activities are an important source of cultural identity and heritage. We know that cultural connections including traditional values, customs, activities, and ceremonies serve as protective factors in the lives of tribal youth by discouraging delinquent behavior, encouraging academic success, and alleviating various stressors on native youth. Could you talk about the emotional, spiritual, and cultural toll these barriers to subsistence activities have had on native communities, specifically related to native youth?

○

```
0143
 1              YUKON KUSKOKWIM DELTA SUBSISTENCE
 2                 REGIONAL ADVISORY COUNCIL
 3
 4                     PUBLIC MEETING
 5
 6                       VOLUME II
 7
 8
 9                     TELECONFERENCE
10                     March 2, 2022
11                       9:08 a.m.
12
13
14
15   MEMBERS PRESENT:
16
17   Raymond Oney, Chair
18   Wasilly Alexie
19   Thomas Alstrom
20   John Andrew
21   Jackie Cleveland
22   Norma Evan
23   Robert Hoffman
24   James Landlord
25   Henry Parks
26   Phillip Peter
27   Alissa Rogers
28
29
30
31
32
33
34   Regional Council Coordinator, Eva Patton
35
36
37
38
39
40
41   Recorded and transcribed by:
42
43   Computer Matrix Court Reporters, LLC
44   329 F Street, Suite 222
45   Anchorage, AK  99501
46   907-227-5312/sahile@gci.net
47
48
49
50
```

```
0144
 1                  P R O C E E D I N G S
 2
 3               (Teleconference - 3/2/2022)
 4
 5                  (On record)
 6
 7               CHAIRMAN ONEY:  I'll go ahead and open
 8  the meeting.  The time now is 9:08 a.m.  Today is March
 9  2, 2022.  Again, welcome to our meeting this morning.
10  We'll go ahead and do an agency checkup.  If you could
11  at least announce that you're with us I'll just go down
12  the line.  First on line we have Orutsararmiut Native
13  Council.
14
15               MS. LOWERY:  Good morning.  This is
16  Danielle Lowery with ONC.
17
18               CHAIRMAN ONEY:  Thank you.
19
20               UNIDENTIFIED VOICE:  (Indiscernible)
21  Good morning.
22
23               CHAIRMAN ONEY:  Good morning, Quyana,
24  thank you.  Next is Native Village of Napaimute.
25
26                  (No comments)
27
28               CHAIRMAN ONEY:  Native organizations,
29  do we have Association of Village Council Presidents.
30
31               MS. JONES:  Good morning.  Paige Jones
32  is on for AVCP.
33
34               CHAIRMAN ONEY:  Thank you, good
35  morning.  Kuskokwim River InterTribal Fish Commission.
36
37               MS. PELTOLA:  Good morning, Mr.
38  Chairman.  This is Mary Peltola.
39
40               CHAIRMAN ONEY:  Good morning, Mary.
41
42               Yukon River InterTribal Fish
43  Commission.
44
45               MS. PELTOLA:  Mr. Chairman.  They're
46  doing their Yukon Salmon Summit.
47
48               CHAIRMAN ONEY:  Okay.  So they'll be on
49  tomorrow, okay, thank you.  Yukon River Drainage
50
```

```
0194
 1                     Thank you, Mr. Chair.
 2
 3                     MR. LANDLORD:  Is there a deadline for
 4     us to respond to when this is going to be submitted --
 5     it's going to be submitted to the Federal Subsistence
 6     Board, is there a deadline for us to respond to this?
 7
 8                     MS. KENNER:  Mr. Chair, this is Pippa.
 9
10                     CHAIRMAN ONEY:  Pippa, go ahead.
11
12                     MS. KENNER:  Thank you, Mr. Chair.  To
13     the speaker, this is Pippa Kenner with OSM.  So right
14     now we're asking for recommendations from this Federal
15     Subsistence Regional Advisory Council so we're asking
16     them to take action on it today to recommend to the
17     Board to either approve or reject or defer.  In
18     addition to that we're having two public hearings that
19     have been organized on March 29th and March 31st and
20     that information will be added to our web page and
21     distributed through other ways.
22
23                     Thank you, Mr. Chair.
24
25                     CHAIRMAN ONEY:  Does that answer your
26     question, James.
27
28                     MR. LANDLORD:  Yes, take action today.
29     Action for recommendations and take action today on 22-
30     01, 02, and 03.
31
32                     CHAIRMAN ONEY:  Yes.  Recommendations.
33     I'm hoping that the Council will at least give some
34     recommendations on how they want to approach this
35     special action request.
36
37                     MS. PELTOLA:  Mr. Chairman, this is
38     Mary Peltola again.
39
40                     CHAIRMAN ONEY:  Yes, Mary, I was just
41     going to call on you to maybe give us some ideas, you
42     know, of how the Kuskokwim dealt with this, maybe you
43     could give us ideas on how we could move forward here.
44
45                     Thank you.
46
47                     MS. PELTOLA:  Okay, thank you, Mr.
48     Chairman.  so my name is Mary Peltola. I work for the
49     Kuskokwim River InterTribal Fish Commission.  A couple
50
```

0195
1   weeks ago the Western Interior RAC met and that has --
2   that's compromised of the upper Kuskokwim and mostly
3   the Yukon.  So their RAC had a lot of discussion
4   because most of their RAC are Yukon fishermen.  Also at
5   their RAC meeting, Charlie Wright, who is the proponent
6   of 22-01, the Rampart SAR, he spoke really well and at
7   the end of like a one or two hour discussion with lots
8   of questions the Western Interior RAC voted unanimously
9   to support Federalizing the Yukon River.  A lot of the
10  questions that they had were, I think, based on some
11  miss-information that they've received over the years.
12
13              One of the kind of myths that was out
14  there was that families can't come back and help if
15  they don't live -- if they're not designated as a
16  Federally-qualified user, and on the Kuskokwim, you
17  know, I use the example of our -- the fish camp that my
18  husband and his dad and I work on together and my
19  husband and my seven kids.  I have one school that goes
20  to school in Bethel, he's 15, he's in the 10th grade
21  and I have an 8th grader, a girl who's 13 and then our
22  five other kids have -- they're in their 20s and
23  they're off, you know, either in the military or in
24  college of the beginning of their professional careers.
25  So the five older kids aren't really able to come back
26  as much as they used to help.  So it's my father-in-law
27  who lives in Bethel year-round, me and my kids that go
28  to school in Bethel, and then my husband, he -- many of
29  you know him, his name is Gene Peltola, Jr., he works
30  for the BIA right now and he's stationed in Anchorage
31  so he is not a Federally-qualified user so he is not
32  able to participate in the take of the fish.  That
33  means he can't drive the boat, he can't set the net, he
34  can't pull the net and he can't pull the fish out of
35  the net.  But he does help with gas.  He gets all of
36  our boats ready, and trailers, he makes sure our fish
37  camp structures are all good, he gets all the smoke
38  wood, he helps cut fish, he does everything except the
39  take of the fish, and then Gene, Sr., and I fish
40  together and our teenage kids help.
41
42              And then another question they had on
43  the Yukon is they had heard that if you are not a
44  Federally-qualified user you can't -- even if you're
45  helping, you can't take any fish home.  And that is not
46  -- that has not been our experience on the Kusko
47  either.  The way we divide our fish is in thirds.
48  Buzzy gets a third, or Gene, Jr., gets a third, Gene,
49  Sr., gets a third, and I get a third.
50

```
 1                  So, you know, for those of us who rely
 2   on people who don't live -- who are not Federally-
 3   qualified users, they can still participate in the
 4   cultural components and everything except the actual
 5   take.  And I don't know how that would work with
 6   fishwheels on the upper Yukon but, you know.
 7
 8                  I guess for the folks on the Yukon, the
 9   Western Interior RAC did support this unanimously.  And
10   Charlie Wright's comments were, how bad does it need to
11   get before we do have a rural subsistence priority.
12   And the difference between State management and Federal
13   management is the State does not recognize any
14   difference, whether you live in Willow or Wasilla or,
15   you know, on our rivers, everybody's equal but under
16   Title VIII of ANILCA the first priority goes to rural
17   subsistence users.
18
19                  And then the other thing is, under
20   Title VIII of ANILCA there is language in there that
21   says there has to be some allowance for customary and
22   traditional harvest.  So under Title VIII of ANILCA,
23   under the Federal law, there has to be some amount of
24   subsistence fishing provided, even if it's a tacid
25   amount, even if it's like barely anything.  There has
26   to be something, it can't just be completely shut down.
27
28                  That's -- those are my comments, Mr.
29   Chairman, thank you.
30
31                  CHAIRMAN ONEY:  Thank you, Mary, for
32   that clarification.  Any other Council member have any
33   recommendations or comments relating to this special
34   action request at this time.
35
36                  MS. KENNER:  Mr. Chair, this is Pippa.
37
38                  MR. LANDLORD:  Mr. Chair -- oh, go
39   ahead.
40
41                  MS. KENNER:  I'll defer to the speaker,
42   thank you.
43
44                  MR. LANDLORD:  This is James again.  I
45   think I support that, that we can't be completely shut
46   down, we need to have some allowance for subsistence
47   users, I think we need some chum -- fall chum and some
48   chinook, we can't be completely shut down when it's
49   Title VIII.  Those people that live out of town for a
50
```

Exhibit DD
Page 5 of 5



# Alaska Department of Fish and Game

---

ADF&G Home » Fishing » Sport

# Sport Fisheries

## Highlights

- Reel Times Newsletter for Anglers
- Free ADF&G Mobile App Download
- Free Sport Fishing Harvest Record Card
- How to Report an Invasive Species
- Get the most up to date Emergency Order Info



● ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○

## Overview

Alaska is a world-renowned sport fishing destination. In fact, in this land of 3,000 rivers, 3 million lakes and 6,640 miles of coastline, a sport angler's greatest challenge can just be deciding where to go. Adding to this challenge is the reality that Alaska is enormous; fishing it all would require one to cast across a million acres of streams, lakes and water-lapped shorelines every day for a full year. Think of it as the old anglers' quandary – so many fish, so little time.

The mission of the Division of Sport Fish is to protect, maintain and improve these valuable sport fisheries, by overseeing Alaska's wide range of sport fisheries, as well as many personal use fisheries. Established in the territorial days of 1951, the division's creation coincided with the passage of the Dingell-Johnson Act, which established an excise tax on items such as fishing tackle, and motor boat fuel. These Sport Fish Restoration funds are then distributed back to the states to conduct activities such as sport fisheries management, research, and restoration.

Our biologists, researchers, and technicians are in the field 12 months per year, monitoring and managing a wide range of fish species, from Alaska's Southeast Panhandle to the high Arctic. Look for us when you're out enjoying your day on the water. But check in here first. We'll strive to have the answers to your questions, and we can help you get settled on where to start your next fishing adventure.



# Fisheries by Area



Click on the map to navigate by Area

## Quick Links

- ✉ Fishing Update Subscription
- 📄 Press Releases/EOs
- BUY Buy Licenses Online
- ℹ How-To Videos
- 🐟 Fishing I Can Do
- 📈 Harvest Info
- 🔧 Regulations
- 📖 e-Library
- 🐟 Species Information
- 🎣 Sport Fish Guiding

---

Division Strategic Plan

Regulations Angler Survey Report

Publications

Fishing with Bears



