Erin C. Dougherty Lynch (AK Bar No. 0811067)
Heather R. Kendall Miller (AK Bar No. 9211084)
Matthew N. Newman (AK Bar No. 1305023)
Wesley James Furlong (AK Bar No. 1611108)
Megan R. Condon (AK Bar No. 1810096)
Sydney Tarzwell (AK Bar No. 1801001)
NATIVE AMERICAN RIGHTS FUND
745 W. 4th Avenue, Suite 502
Anchorage, Alaska 99501
Telephone: (907) 276-0680
Facsimile: (907) 276-2466
dougherty@narf.org
kendall@narf.org
mnewman@narf.org
wfurlong@narf.org
mcondon@narf.org
tarzwell@narf.org

*Counsel for Intervenor-Plaintiffs Association of Village Council Presidents,
Ivan Ivan, & Betty Magnuson*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>Plaintiffs,<br><br>and<br><br>ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS, IVAN IVAN, & BETTY MAGNUSON *et al.*,<br>Intervenor-Plaintiffs,<br><br>v.<br><br>THE STATE OF ALASKA *et al.*,<br>Defendants. | Case No. 1:22-cv-00054-SLG<br><br><br><br>**INTERVENOR-PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES .............................................................................. ii

CERTIFICATE OF COMPLIANCE ................................................................ 1

INTRODUCTION ............................................................................................... 2

BACKGROUND ................................................................................................. 3

I.     Alaska Native People Have Lived with and Relied Upon the Kuskokwim River Since Time Immemorial .......................................................................... 3

II.    Alaska Native Subsistence Rights Have Long Existed Regardless of—and Often in Spite of—the State of Alaska ............................................................. 5

     A.    Congress Has Exercised Authority Over Alaska Native Subsistence Since 1867 ................................................................................... 6

     B.    Congress's Protections for Alaska Native Subsistence Continued Through Statehood, ANCSA, and ANILCA ............................................ 7

     C.    Despite Years of Accommodations, Stays, and Extensions from Congress, the Courts, and Federal Agencies, the State has Failed to Operate a Rural Subsistence Program Consistent with ANILCA .......................................... 13

     D.    The State is Largely Responsible for the Problems it Now Claims it Must Solve ...................................................................................... 19

ARGUMENT ..................................................................................................... 25

I.     *Katie John* Remains Good Law and Controls the Outcome of this Case ............. 25

II.    Congress Invoked its Broad Constitutional Authority over Native Affairs in Title VIII to Protect and Provide the Opportunity for Continued Subsistence Hunting and Fishing ................................................................................ 32

     A.    The Framers of the United States Constitution Sought to Preempt State Interference in Indian Affairs ...................................................... 32

B.    Congress Understood the Need to Protect Alaska Native Subsistence Rights from State Interference and Thus Enacted ANILCA ...................... 33

III.    The Navigational Servitude is Both a Power and a Property Interest and thus Supports Federal Regulatory Authority over Subsistence Fishing in Navigable Waters ......................................................................................................................... 35

CONCLUSION ............................................................................................................. 42

CERTIFICATE OF SERVICE ...................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Babbitt*,
72 F.3d 698 (9th Cir. 1995), *cert. denied* 516 U.S. 1036 (1996), 517 U.S. 1187
(1996) .................................................................................................................*passim*

*Alaska v. Newland*,
No. 3:23-cv-00007-SLG (D. Alaska filed Jan. 17, 2023) ........................................... 22

*Alaska Pacific Fisheries Company v. United States*,
248 U.S. 78 (1918) ..................................................................................................... 30

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) .................................................................................................... 40

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................................................... 32

*Board of Trustees of University of Illinois v. United States*,
289 U.S. 48 (1933) ...................................................................................................... 41

*Bobby v. Alaska*,
718 F. Supp. 764 (D. Alaska 1989) ................................................................. 12, 13, 15

*Cappaert v. United States*,
426 U.S. 128 (1976) ........................................................................................ 27, 28, 30

*Confederated Tribes of Chehalis Indian Reservation v. Washington*,
96 F.3d 334, 340 (9th Cir. 1996) ............................................................................... 34

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) ....................................................................................... 1

*Dick v. United States*,
208 U.S. 340 (1908) .................................................................................................... 33

*Dugan v. Rank*,
372 U.S. 609 (1963) .................................................................................................... 27

*Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*,
466 U.S. 765 (1984) .................................................................................................... 28

*Federal Power Commission v. Niagra Mohawk Power Corp.*,
347 U.S. 239 (1954) ................................................................. 27

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ................................................................. 30

*Haaland v. Brackeen*,
143 S. Ct. 1609 (2023) ............................................................ 33

*International Paper Co. v. United States*,
282 U.S. 399 (1931) ................................................................. 28

*John v. United States*,
No. A90-0484-CV (HRH), 1994 WL 487830 (D. Alaska Mar. 30, 1994) ................. 36

*John v. United States*,
247 F.3d 1032 (9th Cir. 2001) (en banc) (per curiam) ................................... 25, 36, 37

*John v. United States*,
No. 3:05-cv-0006-HRH, 2007 WL 9637058 (D. Alaska May 17, 2007) ............. 29, 30

*John v. United States*,
No. 3:05-cv-0006-HRH, 2009 WL 10659579 (D. Alaska Sept. 29, 2009) ............... 37

*John v. United States*,
720 F.3d 1214 (9th Cir. 2013), *cert. denied sub nom. Alaska v. Jewell*, 572 U.S.
1042 (2014) ............................................................................. 25, 30

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) ................................................................. 36

*Kasayulie v. Alaska*,
No. 3AN-97-3782, 1999 WL 34793400 (Alaska Super. Ct. 1999) ............................ 21

*Kenaitze Indian Tribe v. Alaska*,
860 F.2d 312 (9th Cir. 1988) ....................................................... 12, 15, 20

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ................................................................. 41

*Kluti Kaah Native Village of Copper Center v. Alaska*,
No. A90-004 (D. Alaska Aug. 15, 1990) ................................................ 16

*Louisville Bridge Co. v. United States*,
    242 U.S. 409 (1917) ............................................................................... 39

*Madison v. Alaska Department of Fish & Game*,
    696 P.2d 168 (Alaska 1985) ................................................................... 14

*McDowell v. State*,
    785 P.2d 1 (Alaska 1989) ....................................................................... 16

*McGirt v. Oklahoma*,
    140 S. Ct. 2452 (2020) ...................................................................... 32, 43

*Metlakatla Indian Community v. Dunleavy*,
    58 F.4th 1034 (9th Cir. 2023) ............................................................ 30, 34

*Moore v. Alaska*,
    No. 3AN-04-9756, 2007 WL 8310251 (Alaska Super. Ct. 2007) ............... 21

*Organized Village of Kake v. Egan*,
    369 U.S. 60 (1962) .................................................................................. 8

*Sturgeon v. Frost*,
    139 S. Ct. 1066 (2019) ................................................................... *passim*

*Togiak v. United States*,
    470 U.S. 423, 428 (D. Alaska 1979) ...................................................... 34

*Totemoff v. Alaska*,
    905 P.2d 954, 965 (Alaska 1995) ........................................................... 40

*Toyukak v. Treadwell*,
    No. 3:13-cv-137-SLG (D. Alaska Sept. 3, 2014) ..................................... 22

*United States v. Adair*,
    723 F.2d 1394 (9th Cir. 1983) ............................................................... 29

*United States v. Berrigan*,
    2 Alaska Rep. 442 (D. Alaska 1905) ........................................................ 6

*United States v. California*,
    332 U.S. 19 (1947) ................................................................................ 38

*United States v. Chicago, Minneapolis, St. Paul & Pacific Railroad*,
    313 U.S. 592 (1941) ........................................................................... 39

*United States v. Commodore Park*,
    324 U.S. 386 (1945) ........................................................................... 39

*United States v. Estate of Hage*,
    810 F.3d 712 (9th Cir. 2016) ............................................................ 41

*United States v. Gerlach Live Stock* Co.,
    339 U.S. 725 (1955) ........................................................................... 27

*United States v. Louisiana*,
    339 U.S. 699 (1950) ........................................................................... 38

*United States v. New Mexico*,
    438 U.S. 696 (1978) ........................................................................... 29

*United States v. Rands*,
    389 U.S. 121 (1967) .............................................................. 36, 37, 39

*United States v. Rio Grande Dam & Irrigation Co.*,
    174 U.S. 690 (1899) ........................................................................... 27

*United States v. Texas*,
    339 U.S. 707 (1950) ........................................................................... 38

*United States v. Winans*,
    198 U.S. 371 (1905) ............................................................................. 5

*Village of Gambell v. Clark*,
    746 F.2d 572 (9th Cir. 1984) ........................................................ 9, 34

*Winters v. United States*,
    207 U.S. 564, 576–77 (1908) ............................................................ 27

**Constitutions, Treaties, and Statutes**

U.S. CONST. art. IV, § 3, cl. 2 .......................................................... 41

Articles of Confederation of 1781, art. IX, para. 4.............................. 32

The Treaty of Purchase, 15 Stat. 539, art. III (1867) ........................... 6

16 U.S.C. § 1152 ................................................................................................ 8

16 U.S.C. § 3101 ........................................................................................ 12, 30

16 U.S.C. § 3102 .............................................................................................. 11

16 U.S.C. § 3111 ........................................................................................ 20, 34

16 U.S.C. § 3112 ........................................................................................ 11, 30

16 U.S.C. § 3114 .............................................................................................. 41

16 U.S.C. § 3115 .............................................................................................. 13

43 U.C.S. § 1311 .............................................................................................. 38

43 C.F.R. § 1314 ........................................................................................ 38, 39

32 Stat. 327 (1902) ............................................................................................ 6

35 Stat. 102 (1908) ............................................................................................ 6

39 Stat. 1702 (1916) .......................................................................................... 7

43 Stat. 464 (1924) ............................................................................................ 7

43 Stat. 739 (1925) ............................................................................................ 7

46 Stat. 1111 (1931) .......................................................................................... 7

48 Stat. 594 (1934) ............................................................................................ 7

50 Stat. 900 (1937) ............................................................................................ 7

52 Stat. 1169 (1938) .......................................................................................... 7

55 Stat. 632 (1941) ............................................................................................ 7

57 Stat. 301 (1943) ............................................................................................ 7

72 Stat. 339 (1958) ............................................................................................ 8

Pub. L. No. 96-487, 94 Stat. 2371, 2388 (1980) ............................................ 28

Pub. L. No. 104-134, 110 Stat. 1321 (1996) ...................................................... 18

Pub. L. No. 104-208, 110 Stat. 3009 (1997) ...................................................... 18

Pub. L. No. 105-83, 111 Stat. 1543 (1998) ........................................................ 18

Pub L. No. 105-277, 112 Stat. 2681 (1998) ....................................................... 18

**Regulations**
5 A.A.C. 99.010 ..................................................................................................... 13

36 C.F.R. § 242.1-28 ............................................................................................ 18

50 C.F.R. § 100.1-28 ............................................................................................ 18

50 C.F.R. § 100.3 (1999) ...................................................................................... 18

**Congressional Materials**
104 Cong. Rec. 9488-89 (1958) .......................................................................... 34

126 Cong. Rec. 29,278 (1980) ...................................................................... 12, 34

H. CONF. REP. No. 92-746, 92d Cong., 1st Sess. (1971)...................................... 8

S. Rep. No. 413, 96th Cong., 1st Sess. (1979) .................................................... 37

*Inclusion of Alaska Lands in National Park, Forest Wildlife Refuge, and Wild and Scenic River Systems (1977): Hearings on H.R. 39 Before the Subcommittee on General Oversight and Alaska Lands of the House Committee on Interior and Insular Affairs*, 95th Congress, pt. XII .................................................................... 11

*Inclusion of Alaska Lands in National Park, Forest Wildlife Refuge, and Wild and Scenic River Systems (1977): Hearings on H.R. 39 Before the Subcommittee on General Oversight and Alaska Lands of the House Committee on Interior and Insular Affairs*, 95th Congress, pt. XIII............................................................... 5, 9, 10, 11

*Submerged Lands: Hearings Before the Senate Committee on Interior and Insular Affairs*, 83d Cong., 1st Sess. (1956)............................................................... 38

**Executive Materials**
U.S. DEPARTMENT OF INTERIOR, LEGAL STATUS OF ALASKA Natives (Feb. 24, 1932) ..... 6

57 Fed. Reg. 22,940 (May 29, 1992)................................................................ 17

64 Fed. Reg. 1279 (Jan. 8, 1999)..................................................................... 18

**Additional Authorities**

1862 COMMISSIONER OF INDIAN AFFAIRS ANNUAL REPORT ........................................... 24

ALASKA ADVISORY COMMITTEE TO U.S. COMMISSION ON CIVIL RIGHTS, RACISM'S
    FRONTIER: THE UNTOLD STORY OF DISCRIMINATION AND DIVISION IN ALASKA
    (April 2002)........................................................................... 21, 22, 23, 24

ALASKA COMMISSION ON RURAL GOVERNANCE & EMPOWERMENT, FINAL REPORT TO
    THE GOVERNOR (June 1999) ...................................................................... 21

ALASKA DEPARTMENT OF FISH & GAME, ALASKA POPULATION TRENDS AND PATTERNS,
    1960–2018 (July 2019) ........................................................................... 19

ALASKA DEPARTMENT OF FISH & GAME, ALASKA'S ECONOMIES AND SUBSISTENCE
    (n.d.) ............................................................................................... 31

ALASKA DEPARTMENT OF FISH & GAME, FOOD PRODUCTION AND NUTRITIONAL VALUES
    OF NONCOMMERCIAL FISH AND WILDLIFE HARVESTS IN ALASKA (2019)................. 31

ALASKA FEDERATION OF NATIVES, BRIEFING ON RECENT HATE CRIMES AGAINST
    ALASKA NATIVES AND OTHER ACTS OF DISCRIMINATION (2001) ............................. 23

ALASKA NATIVES COMMISSION, FINAL REPORT VOL. III (1994) ..............................*passim*

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (Nell Jessup Newton ed., 2012 ed. &
    2023 supp.)........................................................................................ 25

COMMONWEALTH NORTH, URBAN RURAL UNITY STUDY (Sept. 2000) ............... 17, 21, 23

DAVID CASE & DAVID VOLUCK, ALASKA NATIVES AND AMERICAN LAWS (3d ed.
    2012) ............................................................................................. 18, 25

DOCUMENTS OF UNITED STATES INDIAN POLICY (Francis Paul Prucha, ed., 2d ed. 1990)
    ....................................................................................................... 24

FRANCIS PAUL PRUCHA, THE GREAT FATHER: THE UNITED STATES GOVERNMENT AND
    AMERICAN INDIANS (1984)....................................................................... 24

Gregory Ablavsky, *The Savage Constitution*, 63 DUKE L.J. 999 (2014)......................... 33

HAROLD NAPOLEON, YUUYARAQ: THE WAY OF THE HUMAN BEING (2002) ................ 3, 4

INDIAN LAW & ORDER COMMISSION, A ROADMAP FOR MAKING NATIVE AMERICA
    SAFER: REPORT TO THE PRESIDENT & CONGRESS OF THE UNITED STATES (Nov.
    2013) .................................................................................................................. 21, 22

James Munroe, *The Navigation Servitude and the Severance Doctrine*, 6 LAND &
    WATER L. REV. 491 (1971) ....................................................................................... 39

KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION, KUSKOKWIM RIVER SALMON
    SITUATION REPORT (2021) ........................................................................................... 4

Letter from Deputy Under Secretary Horn to Legislator Goll (April 18, 1985) ............... 14

Letter from Assistant Secretary Horn to Governor Sheffield (Sept. 23, 1985) ................. 14

Letter from Assistant Secretary Horn to Governor Sheffield (Nov. 7, 1986) ................... 15

Letter from Governor Hammond to Secretary Watt (Dec. 23, 1981) ................................ 13

Letter from Secretary Watt to Governor Hammond (May 14, 1982) ................................ 13

Letter from Secretary Watt to Governor Hammond (Feb. 25, 1982) ................................ 13

Letter from Secretary Watt to Governor Hammond (Dec. 11, 1981) ................................ 13

Memorandum from Assistant Attorney General Jacobus to Attorney General Cole
    (Feb. 15, 1991) ......................................................................................................... 18

Memorandum from Assistant Attorney General Koester to Leader Navarre (May 6,
    1990) ........................................................................................................................ 41

Memorandum from Attorney General Condon to Assistant Attorney General Pegues
    (April 23, 1981) .................................................................................................. 12, 41

News Release: Hammond Comments on Certification of State Subsistence Program
    (May 14, 1982) .................................................................................................. 13, 14

NATIONAL PARKS SERVICE, ALASKA SUBSISTENCE: A NATIONAL PARK SERVICE
    MANAGEMENT HISTORY (Sept. 2002) ......................................................................... 11

Richard W. Bartke, *The Navigational Servitude and Just Compensation—Struggle for
    a Doctrine*, 48 OR. L. REV. 1 (1968) ......................................................................... 39

REPORT ON THE RECONVENING OF THE ALASKA COMMISSION ON RURAL GOVERNANCE AND EMPOWERMENT, RURAL GOVERNANCE REMAINS UNFINISHED BUSINESS IN ALASKA—A CALL TO ACTION (2014) ................................................................. 22, 23

ROBERT ARNOLD, ALASKA NATIVE LAND CLAIMS (1976) ................................................. 6

ROBERT J. WOLFE ET AL., SUBSISTENCE-BASED ECONOMIES IN COASTAL COMMUNITIES OF SOUTHWEST ALASKA (1984) ...................................................................................... 4

State of Alaska Submission #3 to Secretary Watt (May 3, 1982) ..................................... 13

**Court Filings**

Brief of *Amicus Curiae* Alaska in Support of Portioner, *Sturgeon v. Frost*, 2018 WL 4063284 (Aug. 14, 2018) ...................................................................................... 26, 27

Brief for the Petitioner Texas, *Haaland v. Brackeen*, 2022 WL 1785628 (filed May 26, 2022) ............................................................................................................ 24

Complaint for Declaratory and Injunctive Relief, *John v. Alaska*, No. A85-698 (D. Alaska filed Dec. 24, 1985) ........................................................................... 15

Hammond Affidavit, *Peninsula Marketing Association. v. Alaska*, No. 3An-88-12324 (Aug. 27, 1990) .................................................................................................. 18

Memorandum in Support of Motion for Partial Summary Judgment, *John v. Alaska*, No. A85-698 (D. Alaska filed April 6, 1987) ...................................................... 15

Memorandum of Katie John Plaintiffs in Opposition to the State's Motion for Partial Summary Judgment, *John v. United States*, No. A90-484 (D. Alaska filed May 10, 1993) ............................................................................................................ 43

State of Alaska's Complaint in Intervention for Declaratory Judgment and Injunctive Relief, *Sturgeon v. Salazar*, No. 3:11-cv-00183-HRH (D. Alaska filed Feb. 22, 2012) (Dkt. 33) ................................................................................................ 12, 18

Transcript of Hearing, *Native Village of Elim v. Alaska*, 2NO-92-80 CIV (Alaska Super. Ct. June 12, 1992) ............................................................................................... 2

# CERTIFICATE OF COMPLIANCE

Pursuant to this Court's July 29, 2022, Order,[1] Intervenor-Plaintiffs Association of Village Council Presidents, Betty Magnuson, and Ivan M. Ivan (together, AVCP) certify that they have conferred with Intervenor-Plaintiff Kuskokwim River Inter-Tribal Fish Commission (KRITFC), Intervenor-Plaintiffs Ahtna Tene Nené and Ahtna, Inc. (together, Ahtna), and Intervenor-Plaintiff Alaska Federation of Natives (AFN) about how to consolidate arguments. Accordingly, AVCP adopts and incorporates by reference the entirety of their arguments set forth in their respective briefs in support of Plaintiff United States's motion for summary judgment and opposition to Defendants State of Alaska's, Alaska Department of Fish and Game's (ADF&G), and Doug Vincent-Lang's (together, the State) motion for summary judgment.[2] AVCP also adopts and incorporates by reference the arguments made by the United States in Sections II through IV of its brief.[3] Despite their best efforts to consolidate briefs, the complexity of these issues and the importance and history of subsistence fishing necessitates filing this separate brief. None of the arguments raised by AVCP are addressed by other Parties.

---

[1] ECF 47, at 7-8.

[2] In addition to KRITFC's statute of limitations argument, the State's challenge to the 1999 Final Rule is barred by laches because it is twenty-four years late and the disruption to the existing subsistence management regime would highly prejudice AVCP and other rural subsistence users. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001).

[3] ECF 101, 21-40.

## INTRODUCTION

In the State's presentation of this case, there are three events around which all arguments revolve: (1) Statehood in 1959; (2) the Supreme Court's 2019 decision in *Sturgeon v. Frost* ("*Sturgeon II*");[4] and (3) a "breaking point" on the Kuskokwim River in the Spring of 2021. There is notably little discussion or analysis of the major federal laws that have shaped the state, the decades of litigation that preceded and distinguish *Sturgeon II*, or the subsistence rights of Alaska Native people that the State now seeks to erase.

The State's approach is, unfortunately, unsurprising. Though Alaska's population and infrastructure have expanded and evolved in the fifty-four years since statehood, two broad themes have remained consistent: the State's continued refusal to fully accept the terms of statehood to which Alaska's founders agreed as part of the compact with the United States and admission to the Union; and, coupled with that recalcitrance, the State's hostility towards Alaska Native people, their communities, and their ways of life.

Though the State frames its actions and arguments as a consequence of events that took place in one fishery two years ago, the fight over Alaska Native fishing rights has for decades been "the most divisive issue in Alaskan politics,"[5] and has, since Alaska's earliest days as a territory, served a proxy for the broader struggle between federal supremacy and state sovereignty.

---

[4] 139 S. Ct. 1066 (2019).

[5] ALASKA NATIVES COMM'N, FINAL REPORT VOL. III, at 4 (1994) [hereinafter ANC VOL. III], http://www.alaskool.org/resources/anc3/ANCIII.htm.

Now, rather than address the issues that prevent it from managing subsistence on federal lands, the State attempts to relitigate settled law and asks this Court to remedy its political failures. The Court should not be persuaded. The *Katie John* line of cases remain good law and control the outcome of this case. And if not, the United States retains other interests in navigable waters in Alaska sufficient to bring them within the definition of "public lands" for purposes of Title VIII of the Alaska National Interest Lands and Conservation Act (ANILCA). The Court should grant summary judgment against the State and in favor of Plaintiff and Intervenor-Plaintiffs.

## BACKGROUND

I. **Alaska Native People Have Lived with and Relied Upon the Kuskokwim River Since Time Immemorial**

*"Prior to the arrival of Western people, the Yup'ik were alone in their riverine and Bering Sea homeland—they and the spirit beings that made things the way they were. Within this homeland they were free and secure. They were ruled by the customs, traditions and spiritual beliefs of their people, and shaped by these and their environment: the tundra, the river and the Bering Sea.*[6]

Like Ahna Elders Katie John and Doris Charles, Intervenor-Plaintiffs Betty Magnuson and Ivan M. Ivan—as well as the Tribes that make up Intervenor-Plaintiff Association of Village Council Presidents and their people—are culturally, spiritually, and nutritionally bound to the rivers. The Kuskokwim River—at just over 700 miles long—is the longest free-flowing river in the United States. Like on the Copper River, subsistence

---

[6] HAROLD NAPOLEON, YUUYARAQ: THE WAY OF THE HUMAN BEING 4 (2002).

fishing on the Kuskokwim River is central to the identities, traditions, and survival of the Alaska Native communities who reside along or near it.

The salmon that return to the river are a cornerstone subsistence food: they make up the majority by poundage of subsistence harvests in the region.[7] For the communities along the Kuskokwim River, the annual calendar is organized around subsistence activities, and residents rely on Traditional Knowledge to target ideal harvest times and take care to steward the River so that fish will return the following summer.[8] In a region that is currently facing high levels of food insecurity, traditional healthy wild food sources are essential.[9]

But to frame salmon's importance to Kuskokwim-region communities in terms of calories, poundage, or even physical health is to flatten and minimize its importance. Subsistence fishing is also deeply intertwined with religion, worldview, values, and traditions.[10] Sharing subsistence harvests is a deeply-held cultural value in Kuskokwim-region communities, as it ensures that neighbors, elders, and the entire community are well cared for. As Intervenor-Plaintiff Magnuson has noted, sharing fish caught from the Kuskokwim River is a "part of our way of life."[11]

---

[7] KRITFC, KUSKOKWIM RIVER SALMON SITUATION REPORT 4 (2021) (ECF 12-5) (fish comprise up to 85% of the total poundage of subsistence harvests; salmon alone contribute up to 53% of subsistence harvests).

[8] *See* Ivan Decl. ¶8 (ECF 19-5); ROBERT J. WOLFE ET AL., SUBSISTENCE-BASED ECONOMIES IN COASTAL COMMUNITIES OF SOUTHWEST ALASKA 50-51, 311-13 (1984).

[9] *See* Korthuis Decl. ¶12 (ECF 19-3); Ivan Decl. ¶4.

[10] *See, e.g.*, NAPOLEON, *supra* note 6, at 5.

[11] *See* Magnuson Decl. ¶¶7, 8 (ECF 19-4).

Participating in subsistence activities is also fundamental for the transmission of culture: during salmon runs, families along the Kuskokwim gather at fish camps to practice and share Traditional Knowledge and ways of life.[12] Fish camps are multi-dimensional places of enrichment where families learn essential subsistence skills, pass Traditional Knowledge through generations, enjoy kinship and cultural growth, and set aside food for leaner seasons.[13]

Over 100 years ago, the Supreme Court recognized the centrality and interconnectedness of subsistence fishing to Native communities regardless of land ownership: "The right to resort to the fishing places in controversy . . . w[as] not much less necessary to the existence of the Indians than the atmosphere they breathed.[14] As Elders from the Kuskokwim-region explained to Congress nearly fifty years ago, "[i]t is the feeling of the villages that you cannot separate the land from the water. They are both together,"[15] and "with our lifestyle, everything is intermingled."[16]

## II. Alaska Native Subsistence Rights Have Long Existed Regardless of—and Often in Spite of—the State of Alaska

*"One of the fundamental reasons why subsistence is such a difficult issue in contemporary Alaskan politics is that it is really about Natives."*[17]

---

[12] Korthuis Decl. ¶14.

[13] *Id.*

[14] *United States v. Winans*, 198 U.S. 371, 381 (1905).

[15] *Inclusion of Alaska Lands in Nat'l Park, Forest Wildlife Refuge, & Wild & Scenic River Sys. (1977): Hr'gs on H.R. 39 Before the Subcomm. on Gen. Oversight & Alaska Lands of the House Comm. on Interior & Insular Affs.*, 95th Cong., pt. XIII, at 27 [hereinafter GOAL Hearings, Part XIII] (statement of Harold Sparck) (App., at A216).

[16] *Id.* at 19 (statement of Charlie Kairaiuak) (App., at A208).

[17] ANC VOL. III, *supra* note 5, at 11.

## A.    Congress Has Exercised Authority Over Alaska Native Subsistence Since 1867

The question of who gets to take fish—and specifically salmon—has been a significant issue in territorial, state, and federal policies in Alaska since the federal government took possession in 1867.[18] Since 1867, the hunting and fishing rights of Alaska Natives have been affirmatively recognized and protected, at least on paper, by Congress, the Executive Branch, and the federal courts.[19] Indeed, by the mid-1800s, Congress had passed a variety of laws articulating and protecting the hunting and fishing rights of Native people in various parts of the country. Alaska was no different, and Congress repeatedly acted to protect the fishing and hunting opportunities of Alaska Natives (as well as other rural residents and travelers), usually by exemptions from the operation of territorial fish and game laws or international treaties.

For example, Alaska's first game law, enacted June 1902, imposed season, bag limit and other restrictions on the taking of game animals, but expressly exempted hunting for food or clothing by "native Indians or Eskimos or by miners, explorers, or travelers on a journey when in need of food."[20] When the government negotiated the Migratory Bird

---

[18] The Treaty of Purchase left the land and land-related claims of Alaska Natives for future resolution by Congress. 15 Stat. 539, art. III (1867). Prior to Alaska's purchase, Native subsistence rights were protected by the "laws of an antecedent government[,]" *i.e.*, Russia. *United States v. Berrigan*, 2 Alaska Rep. 442, 446 (D. Alaska 1905).

[19] *See* ROBERT ARNOLD, ALASKA NATIVE LAND CLAIMS 84 (1976) (citing U.S. DEP'T OF INTERIOR, LEGAL STATUS OF ALASKA NATIVES (Feb. 24, 1932)) (Congress enacted laws to protect "special hunting, fishing and other particular privileges to enable" Alaska Native people "to support themselves").

[20] 32 Stat. 327, 327, § 1 (1902), *as amended* 35 Stat. 102 (1908).

Treaty of 1916, it exempted Alaska Natives from the closed seasons for certain species.[21]

In 1924, Congress passed legislation to protect fisheries, but exempted from methods and closed-season restrictions "the taking of fish for local food requirements."[22] When that legislation was amended ten years later, Congress excepted the "Karluk, Ugashik, Yukon, and Kuskokwim Rivers" from the restrictions on fish fences, traps, and fishwheels, as well as other methods and means restrictions, explaining that this exception "shall be solely for the purpose of enabling native Indians and bona fide permanent white inhabitants along the said river."[23]

### B. Congress's Protections for Alaska Native Subsistence Continued Through Statehood, ANCSA, and ANILCA

While the State is correct that Section 6(e) of the Alaska Statehood Act established the mechanism for transfer of primary fish and game management to the new State, Congress nonetheless reserved the land claims and hunting and fishing rights of Alaska

---

[21] 39 Stat. 1702, 1703 (1916).

[22] 43 Stat. 464, 466, §§ 4-5 (1924).

[23] 48 Stat. 594, 594-94, § 1 (1934). Multiple other acts of Congress contained language explicitly protecting Alaska Native subsistence practices and rights. *See, e.g.*, 43 Stat. 739 (1925) (§§ 10, 3) (exempting "any Indian or Eskimo, prospector, or traveler to take animals and birds during the close seasons when he is in absolute need of food and other food is not available"); 46 Stat. 1111 (1931) (amending Act of 13 January 1925 to extend to "cooperative stores" operated by and for Natives, or by missions for Natives. These exemptions were continued in the amending acts of 25 June 1938, 52 Stat. 1169, 1171-71, and 1 July 1943, 57 Stat. 301, 308); Reindeer Industry Act of 1 September 1937, 50 Stat. 900 (1937) (addressing Native "subsistence"); Act of 18 August 1941, 55 Stat. 632, 633 (prohibiting the taking of walruses, with exception that "walruses may be taken at any time by natives for food and clothing for themselves"); 57 Stat. 301 (1943).

Natives.[24] Put another way, Alaska's admission into the Union in 1959 did not compel Congress to address Alaska Native land rights or subsistence rights, but reserved the issue for future disposition.[25] Indeed, Congress continued to legislate on the subject of Alaska Native subsistence; just seven years after statehood, it enacted the Fur Seal Act, which exempted from its prohibitions "Indians, Aleuts, and Eskimos who dwell on the coasts of the North Pacific Ocean."[26]

In 1971, Congress confronted the lands issues that it had postponed for a century and enacted the Alaska Native Claims Settlement Act (ANCSA). ANCSA section 4(b) explicitly extinguished hunting and fishing rights based only on aboriginal title.[27] Congress did not view this extinguishment as ending federal protections for Alaska Native subsistence users. Indeed, the ANCSA Conference Report recognized these rights and expressed the belief that the Secretary of the Interior (Secretary) could "exercise his existing withdrawal authority" to "protect Native subsistence needs and requirements."[28] The Report directed that "[t]he Conference Committee expects both the Secretary and the State to take any action necessary to protect the subsistence needs of the Natives."[29]

---

[24] 72 Stat. 339, 341, § 4 (1958).

[25] *See, e.g.*, *Organized Vill. of Kake v. Egan*, 369 U.S. 60 (1962).

[26] 16 U.S.C. § 1152.

[27] *See* Ahtna Brief, at Argument Section II.

[28] H. CONF. REP. No. 92-746, 92d Cong., 1st Sess. 37 (1971).

[29] *Id.*

"[T]he Secretary['s] and the State['s] fail[ure] to heed Congress's admonition[]" led directly to Congress's enactment of ANILCA, and specifically Title VIII.[30] ANCSA and ANILCA, therefore, are "two chapters of the same congressional book of land and resource policy."[31] In 1977, during the early stages of drafting ANILCA, Congressman Udall contextualized the draft legislation that eventually became the framework for ANILCA by noting "[t]his is the end of a 20-year process, starting 20 years ago, when Alaska wanted to become a State. Statehood was granted," and "[e]ver since then we have been arguing about" what lands and resources would be under federal or state control.[32] Udall noted that Congress had "big decisions to make" about "the future of Alaska" including "the land, water, and resources."[33]

To inform these decisions, the House Subcommittee on General Oversight and Alaska Lands held a series of hearings around the country and around the state. Congress was especially interested in the views of Alaska Natives and their views on the management of subsistence resources. At a hearing held in Bethel, Representative Udall told attendees that Congress wanted "to make those decisions knowing what your needs are and what you think and what you believe."[34]

---

[30] *Vill. of Gambell v. Clark*, 746 F.2d 572, 580 (9th Cir. 1984).

[31] ANC VOL. III, *supra* note 5, at 13.

[32] GOAL Hearings, Part XIII, *supra* note 15, at 2 (App., at A191).

[33] *Id.*

[34] *Id.*

Alaska Natives responded to the invitation by urging Congress to (1) protect their subsistence rights, and (2) curtail State management of subsistence resources because of their distrust of the State of Alaska. These themes were strongest perhaps in the Yukon-Kuskokwim Delta, where hearing participants highlighted the failures of state subsistence management and, as a consequence, the criminalization of their traditional fishing and hunting practices. Charlie Kairaiuak testified that the federal refuge that was then contemplated by Congress "should be run by cooperative management between Federal Government and the local people because we do not trust the State anymore."[35] When asked about the draft bill's proposal for local subsistence boards, Glen Fredericks testified that he thought it was a good idea because "we have better relations with the federal government."[36] Harold Sparck spoke to the failures and hostility of state management: "Right now, we have our people lock-stepped into a system of laws and regulations that prohibits them from being the way they are. We have laws that make people criminals and they are only practicing their lifestyle."[37] These themes were repeated around the state.[38]

These comments left an impression. At a hearing in Fort Yukon, Representative Udall stated "[o]n this subsistence question, my bill gives priority to subsistence use. If there is one thing we have heard all over this State, it is the emphasis by the Native people

---

[35] *Id.* at 21 (App., at A210).

[36] *Id.* at 10 (App., at A199).

[37] *Id.* at 28 (App., at A217).

[38] *See, e.g.*, *Id.* at 42-43 (testimony of Mrs. Amatunak (Togiak Hearing)) (App., at A223-24), 258-60 (testimony of Anna Bolger & Ted Angasan (Dillingham Hearing)) (App., at A228-31), 480 (testimony of Rosita Worl (Anuktuvuk Pass Hearing)) (App., at A236).

on the importance of subsistence."[39] Committee member Congressman Seiberling likewise confirmed that in "all of the native villages" he had visited, "the natives prefer to have the" federal government "instead of the State because their experience with State management has" not prioritized subsistence users[40]—a criticism for which Alaska Governor Jay Hammond candidly admitted to the Subcommittee that there was "some justification, I must admit."[41]

In 1980, after nearly four years of consideration and more than a dozen versions of the legislation, Congress enacted ANILCA. In Title VIII, Congress expressly recognized that subsistence is "essential to the Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence." In order to ensure these values were protected in perpetuity, Congress provided rural residents a priority for customary and traditional subsistence uses above other purposes on federal lands and waters during times of shortage.[42]

---

[39] *Id.* at 114 (App., at A225).

[40] *Id.* at 115(App., at A226). This dynamic was still evident decades later. Nat'l Parks Serv., Alaska Subsistence: A National Park Service Management History 262 (Sept. 2002) (testimony of Tom Boyd ) (reporting to Congress in early 2001: "I would say we've had some rough spots . . . We've walked into a legacy of distrust in rural Alaska.").

[41] *Inclusion of Alaska Lands in Nat'l Park, Forest Wildlife Refuge, & Wild & Scenic River Sys. (1977): Hr'gs on H.R. 39 Before the Subcomm. on Gen. Oversight & Alaska Lands of the House Comm. on Interior & Insular Affs.*, 95th Cong., pt. XII, at 12 (App., at A182).

[42] 16 U.S.C. §§ 3102(2), (3), 3112, 3114.

Though ANILCA is often described as a "carefully crafted compromise,"[43] Title VIII is more aptly described as an *offer* and an *accommodation* that Congress provided to the State. In anticipation of ANILCA's enactment, in 1978, the Alaska Legislature passed its first subsistence statute.[44] Mindful of the State's desire to manage all hunting and fishing within its borders, in the final bill, Congress *offered* the State the choice of either enacting and implementing laws of general applicability that conform to the requirements of Sections 803, 804, and 805 of ANILCA, or of surrendering subsistence management authority on federal public lands to the federal government. Indeed, as an accommodation to the State, Congress adjusted language from earlier drafts of the legislation that identified a Native subsistence priority and instead articulated a rural subsistence priority, at the State's request.[45] Congress provided the State this offer and accommodation in good faith and on the assumption that the State would honor it and ensure "the opportunity for rural residents engaged in a subsistence way of life to continue to do so."[46]

---

[43] St. of Alaska's Compl. in Intervention for Decl. J. & Inj. Relief at 6, *Sturgeon v. Salazar*, No. 3:11-cv-00183-HRH (D. Alaska filed Feb. 22, 2012) (Dkt. 33).

[44] *See Bobby v. Alaska*, 718 F. Supp. 764 (D. Alaska 1989).

[45] *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 313 n.1 (9th Cir. 1988) (quoting 126 Cong. Rec. 29,278-79 (1980) (statement of Rep. Udall)) ("Early drafts of Title VIII protected only subsistence uses by Alaska Natives. When the state advised Congress that the Alaska Constitution might bar the enforcement of a preference extended only to Natives, Congress broadened the preference to include all 'rural residents.' The State's subsequent narrowing of the definition of 'rural residents' to exclude the native villages here is thus more than a little ironic." (internal citations omitted)).

[46] 16 U.S.C. § 3101(c); *see also* Mem. from Att'y Gen. Condon to Assistant Att'y Gen. Pegues, at 4, 8 (April 23, 1981) (App., at A005, A009) (describing the "many hours of discussion" and effort to make sure that Title VIII was written "as closely as possible to

C. **Despite Years of Accommodations, Stays, and Extensions from Congress, the Courts, and Federal Agencies, the State has Failed to Operate a Rural Subsistence Program Consistent with ANILCA**

The nine years of "state compliance" with ANILCA between 1981 and 1989 were "confused and discontinuous."[47] While the Secretary certified the State's program as being in compliance with Title VIII at various points, each iteration was subsequently found to be defective.

Alaska's 1978 statute provided a priority for non-wasteful subsistence use of wild, renewable resources, but it did not limit the priority to rural Alaska residents, as ANILCA required.[48] When ANILCA was enacted on December 2, 1980, the State was given one year to amend its statute.[49] When the Alaska Legislature failed to amend the statute during its 1981 session, the State Boards of Fisheries and Game jointly adopted a regulation the following year that added the rural residency requirement.[50] In May 1982, the Secretary certified the State's statutory and regulatory program for protecting rural subsistence activities as complying with ANILCA.[51] In a press release recognizing the Secretary's

_____

existing state law" and that "ANILCA was drafted to afford the State maximum opportunity" for unified management).

[47] ANC VOL. III, *supra* note 5, at 15.

[48] *See Bobby*, 718 F. Supp. at 767.

[49] 16 U.S.C. § 3115(d).

[50] *See* 5 A.A.C. 99.010; Letter from Sec'y Watt to Gov. Hammond (Dec. 11, 1981) (App., at A011); Letter from Gov. Hammond to Sec'y Watt (Dec. 23, 1981) (App., A012-13); Letter from Sec'y Watt to Gov. Hammond (Feb. 25, 1982) (App., at A014-15); State of Alaska Submission #3 to Sec'y Watt (May 3, 1982) (App., at A022).

[51] Letter from Sec'y Watt to Gov. Hammond (May 14, 1982) (App., at A030); News Release: Hammond Comments on Certification of State Subsistence Program (May 14, 1982) [hereinafter News Release] (explaining that if "the Secretary [had] not been able to

actions, Governor Hammond noted that had the Secretary rejected the State's subsistence program as non-compliant, "there was no doubt that the federal law would have required federal management."[52]

In 1982, a coalition of groups opposed to subsistence gathered enough signatures to place a "subsistence repeal" initiative on the 1982 general election ballot that would have prohibited State law from providing any type of subsistence preference.[53] Though Ballot Measure 7 was defeated, it "helped to form rather stable pro-subsistence and anti-subsistence interest groups" that "continued the same fight in other political and legal arenas during the ensuing decade."[54]

Only three years after receiving permission from the Secretary to manage subsistence resources on federal lands, the State again fell out of compliance after the Alaska Supreme Court struck down the State regulations' limitation of the subsistence priority to rural Alaska residents in *Madison v. Alaska Department of Fish & Game*.[55] The Secretary thereafter notified the State that it was out of compliance and that it had until June 1, 1986, to revise its subsistence program.[56]

---

make such a finding, there was no doubt that the federal law would have required federal management") (App., at A031).

[52] News Release, *supra* note 51.

[53] ANC VOL. III, *supra* note 5, at 15.

[54] *Id.* at 17.

[55] 696 P.2d 168 (Alaska 1985).

[56] Letter from Deputy Under Sec'y Horn to Legislator Goll (April 18, 1985) (noting that *Madison* put "the State in a position of non-compliance") (App., at A033); Letter from Assistant Sec'y Horn to Gov. Sheffield, at 2 (Sept. 23, 1985) (App., at A033).

Three months later, Katie John, Doris Charles, and the Mentasta Village Council sued the State for restricting subsistence fishing at Batzulnetas and violating Title VIII's subsistence preference,[57] noting in later briefing that the State's "failure to provide priority for subsistence ha[d] caused precisely the economic hardship and cultural trauma the law is intended to prevent."[58]

In 1986, the Alaska Legislature amended the State's subsistence statute to remedy the inconsistency with ANILCA and limit the definition of "subsistence uses" to residents of "rural areas."[59] But in so doing, the State defined "rural area" as a community "in which the noncommercial, customary and traditional use of fish or game" is a "principle characteristic of the economy."[60] Though the Secretary restored the State's ability to manage subsistence activities on federal lands shortly thereafter,[61] this effort was short-lived. In October 1998, the Ninth Circuit found in *Kenaitze Indian Tribe v. Alaska* that the State was not in compliance with ANILCA because its definition of rural was inconsistent with ANILCA and the State had therefore failed to enforce the rural priority.[62] A year later, the Alaska Supreme Court held in *McDowell v. State* that the Alaska Constitution

---

[57] *See* Compl. for Decl. & Inj. Relief, *John v. Alaska*, No. A85-698 (D. Alaska filed Dec. 24, 1985) (App., at A046).

[58] Mem. in Supp. of Mot. for Partial Summ. J. 1, *John v. Alaska*, No. A85-698 (D. Alaska filed April 6, 1987) (App., at A053).

[59] *See Bobby*, 718 F. Supp. at 768.

[60] *Id*. at 788, app. I.

[61] Letter from Assistant Sec'y Horn to Gov. Sheffield (Nov. 7, 1986) (App., at A050).

[62] 860 F. 2d at 318.

prohibited the Alaska Legislature from enacting a subsistence priority limited to rural residents.[63] As this Court recognized, the *McDowell* decision effectively "repealed" the State's compliance with ANILCA entirely.[64]

After *McDowell*, the State asked for and received a stay of the decision's effect until July 1, 1990, so that it could evaluate its options, including potential amendments to the Alaska Constitution and potential efforts to amend ANILCA. Several bills proposing constitutional amendments were introduced during the 1990 regular legislative session, including a bill from Governor Cowper.[65] "Hearings were held, conflicting testimony received and alternative language debated. Newspapers urged legislative action to place a constitutional amendment on the general election ballot, as did the Governor, the Native community, the Congressional Delegation, and federal agency officials," including Secretary Manuel Lujan, who repeatedly urged state lawmakers to resolve the issue.[66] The Legislature adjourned in May 1990 without taking action on subsistence, but was called back into special session the following month.

With the July 1 deadline looming, Secretary Lujan wrote to the Governor stating that absent legislative action, he would "be compelled to implement a federal program to ensure that subsistence uses are given a preference on the public lands."[67] The Secretary

---

[63] 785 P.2d 1 (Alaska 1989).

[64] *Kluti Kaah Native Vill. of Copper Ctr. v. Alaska*, No. A90-004, slip op. at 15 (D. Alaska Aug. 15, 1990).

[65] ANC VOL. III, *supra* note 5, at 19 (citations omitted).

[66] *Id.* at 20.

[67] ANC VOL. III, *supra* note 5, at 21.

warned the Governor that "Federal authority may have to be extended, predicated on the Federal government's constitutional mandate to protect Native American interests and our fish, wildlife, and other natural resources."[68] Although the Alaska Senate adopted a constitutional amendment, the Alaska House failed to do so by one vote.

The subsistence debate "raged in the political, legislative[,] and judicial arenas" for years,[69] as did the now familiar pattern of federal accommodations and state failures to come into compliance. Even though public opinion surveys indicated Alaskans favored a rural subsistence constitutional amendment, efforts were "repeatedly stymied in the Legislature."[70] Despite numerous committees, studies, commissions, draft bills, special legislative sessions, and favors from Alaska's congressional delegation, all efforts to bring the State back into compliance failed.[71]

Accordingly, in 1992, pursuant to 16 U.S.C. § 3115(d), the federal government assumed responsibility for implementing ANILCA on public lands.[72] Following the Ninth Circuit's 1995 decision in *Alaska v. Babbitt* ("*Katie John I*"),[73] the Secretary promulgated permanent regulations explaining that the United States held reserved water rights in the navigable waters within Alaska conservation system units, and therefore that these waters

---

[68] *Id.*

[69] COMMONWEALTH NORTH, URBAN RURAL UNITY STUDY 7 (Sept. 2000) [hereinafter COMMONWEALTH NORTH].

[70] *Id.* at 4, 7-8.

[71] *See generally* ANC VOL. III, *supra* note 5, at 20-33.

[72] *See* 57 Fed. Reg. 22,940 (May 29, 1992).

[73] 72 F.3d 698 (9th Cir. 1995), *cert. denied* 516 U.S. 1036 (1996), 517 U.S. 1187 (1996).

constitute "public lands" under ANILCA.[74] Again, the State was given an opportunity to amend its laws and come into ANILCA compliance; Congress delayed the implementation of these regulations on several occasions to give the State more time.[75] Again, the State failed to act.[76] As a result, Congress directed the federal regulations to take effect.[77] The Secretaries of Agriculture and Interior thereafter directed the Federal Subsistence Board to take over the day-to-day management of subsistence hunting and fishing on federal public lands.[78] As the State described to this Court in one of its earliest filings in *Sturgeon*, "[t]he Federal Subsistence Management Program regulates subsistence uses of fish and wildlife, including harvest on federal lands and certain waters with a federal reserved water right and provides a priority opportunity for qualified rural residents. These federal regulations, at times, supersede state harvest regulations."[79]

---

[74] *See* 50 C.F.R. § 100.3 (1999); 64 Fed. Reg. 1279 (Jan. 8, 1999).

[75] *See* Pub. L. No. 104-134, § 336, 110 Stat. 1321 (1996); Pub. L. No. 104-208, § 317, 110 Stat. 3009 (1997); Pub. L. No. 105-83, § 316(a), 111 Stat. 1543 (1998).

[76] The State's failure was perhaps unsurprising, as a 1991 Department of Law memorandum outlined the benefits of the State's "refusal to comply with" ANILCA. Mem. from Assistant Atty' Gen. Jacobus to Att'y Gen. Cole, at 2–4 (Feb. 15, 1991) (App., at A107-9); *cf.* Hammond Aff. 4, *Peninsula Marketing Ass'n. v. Alaska*, No. 3An-88-12324 (Aug. 27, 1990) ("[T]he fish and game regulatory structure that I and other members of the First Alaska Legislature created is fatally flawed" because it inevitably prioritizes commercial interests) (App., at A102); DAVID CASE & DAVID VOLUCK, ALASKA NATIVES AND AMERICAN LAWS 294 (3d ed. 2012) ("It is a fact of Alaska political life that [ADF&G] is dominated by non-native urban, sport, and commercial hunting and fishing interests.").

[77] *See* Pub L. No. 105-277, §§ 101(e), 339(a)(1), 339(b)(2), 112 Stat. 2681 (1998).

[78] 36 C.F.R. § 242.1-28; 50 C.F.R. § 100.1-28.

[79] St. of Alaska's Compl. in Intervention for Declar. J. & Inj. Relief 7 n.1, *Sturgeon v. Salazar*, No. 3:11-cv-00183-HRH (filed Feb. 22, 2012) (Dkt. 33).

Though the State fails to mention this history, what was true in 1980 remains true today—the State lacks the political will to comply with ANILCA.

### D. The State is Largely Responsible for the Problems it Now Claims it Must Solve

In providing background as to why it believes it is entitled to ignore federal law, the State claims:

> Many Alaskans have cultural ties to rural fisheries but have been displaced to urban areas of the state for health, education, economic, or other reasons. Today, 60% of Alaska Natives reside in the state's urban cities, not its rural villages, and 87% live outside of tribal areas. State laws and regulations protecting subsistence fishing for all Alaskans ensure that individuals can return "home" to practice their culture and traditions.[80]

These statements are not atmospheric; instead, they misrepresent the number of Alaska Native people who "live outside" of the state's rural "tribal areas,"[81] and then imply that, based on these circumstances, the State must assert authority over the Kuskokwim River

---

[80] ECF 72, at 6.

[81] The sources the State cites in support of this assertion are irrelevant, misleading, and raise questions about their accuracy. At the outset, it appears these demographic statistics are based on nationwide Census information and are not specific to Alaska. The State cites a report from the International Association for Indigenous Aging, stating that "87% of *all* [American Indian/Alaska Native] people identified in the Census lived outside of tribal statistical areas, with 60% living in metropolitan areas" and relies on nationwide maps in support of these statistics. Begakis Decl., Ex. H at 7, 10 (ECF 75-1) (emphasis added). The State also cites testimony from a private Alaska resident to Congress, which discusses the increased percentage of Alaska Natives living in non-subsistence areas since 1980 when ANILCA was enacted. Begakis Decl., Ex. CC at 53. The demographic information included in that personal testimony is seemingly based on a chart included in a 2019 ADF&G report. That report, however, provides no description of its methodology, precluding meaningful evaluation of the information. ADF&G, ALASKA POPULATION TRENDS AND PATTERNS, 1960–2018 (July 2019), https://www.adfg.alaska.gov/static/home/library/pdfs/subsistence/Trends_in_Population_Summary_2019.pdf.

in order to protect the interests of urban Alaska Native people who do not qualify for the federal subsistence priority. The State opines that its "laws and regulations protect[] subsistence fishing for all Alaskans" and "ensure that individuals can return "home" to practice their culture and traditions."[82] But the State tells on itself—it created or exacerbated the problems it now hides behind.

First, as discussed above, Title VIII was originally drafted to benefit only Alaska Natives. At the State's insistence,[83] Title VIII was amended to include both "Native and non-Native rural residents."[84] Accordingly, the rural priority the State now recognizes has disadvantaged Alaska Natives in urban communities is the precise priority for which the State advocated. Had the State not insisted on a rural priority, all Alaska Natives would have been eligible for the subsistence priority, irrespective of where they live.

Second, the State opines that "[m]any Alaskans have cultural ties to rural fisheries but have been displaced to urban areas of the state for education, health, economic or other reasons."[85] The use of the passive voice in this sentence is telling—"displaced" implies

---

[82] ECF 72, at 6, 32; Vincent-Lang Decl., ¶ 17 (ECF 74); ECF 5-2, at 10.

[83] *See Kenaitze*, 860 F.2d at 313 n.1.

[84] 16 U.S.C. § 3111(4).

[85] ECF 72, at 6; Vincent-Lang Decl. ¶17. The State cites no source for demographic observation other than Commissioner Vincent-Lang's personal experience. Vincent-Lang Decl. ¶ 58. The State first cites Vincent-Lang Decl., Ex. G at 13 (ECF 75-1, 74), which says nothing about Alaska Native "displacement" or causes. The second citation is to Commissioner Vincent-Lang's declaration in which he repeats this statement almost word for word but has no source other than his personal observations. The third citation is to a five-sentence letter from Attorney General Taylor that uses nearly identical language, but again with no support.

that Alaska Native people moved involuntarily, but there is no actor in the sentence and no indication of who or what caused this displacement. But it is the State that is, in large part, responsible for the inequities that have made life in rural Alaska more difficult than in the state's few urban areas. This "urban/rural divide"[86] has been a feature of Alaska law, politics, and social policy since before statehood. Rural Alaska has long received inferior State support and services compared to urban Alaska, and State services and programs are centralized in urban commercial centers.[87] The State's inequitable treatment of rural Alaska in "health, education, economic, or other" areas[88] has been well documented and the

---

[86] *See* COMMONWEALTH NORTH, *supra* note 69, at 3 (describing "urban" as "shorthand" for a cash economy, "ready access to public services, competitive individualism" and non-Native, and "rural" as "a subsistence economy[,]" "inadequate access to public services," and Native).

[87] ALASKA COMM'N ON RURAL GOVERNANCE & EMPOWERMENT, FINAL REPORT TO THE GOVERNOR 13 (June 1999) [hereinafter 1999 RURAL GOVERNANCE REPORT], https://www.commerce.alaska.gov/web/portals/4/pub/RGC_Final_6_99.pdf; *see also* INDIAN LAW & ORDER COMM'N, A ROADMAP FOR MAKING NATIVE AMERICA SAFER: REPORT TO THE PRESIDENT & CONGRESS OF THE UNITED STATES 44-45 (Nov. 2013) [hereinafter LAW & ORDER REPORT], https://www.aisc.ucla.edu/iloc/report/ (report from Congressional Commission describing the manner in which the State of Alaska "tends to marginalize and frequently ignore" rural communities: "[T]he overall organization of Alaska State government[ ]is more centralized than any other U.S. state's. In Alaska, most State programs and functions operate from a designated hub or hubs, and less attention is paid in Alaska than in other States to developing local capacity").

[88] *See, e.g.*, ALASKA ADVISORY COMM. TO U.S. COMM'N ON CIV. RIGHTS, RACISM'S FRONTIER: THE UNTOLD STORY OF DISCRIMINATION AND DIVISION IN ALASKA 51 (April 2002) [hereinafter RACISM'S FRONTIER], https://files.eric.ed.gov/fulltext/ED468839.pdf. (identifying "a disparity in the financial and human resources for educational facilities between urban and rural districts."); *Moore v. Alaska*, No. 3AN-04-9756, 2007 WL 8310251, at *84 (Alaska Super. Ct. 2007) (holding that the State violated its constitutional obligation to maintain a public school system because the State failed to provide adequate supervision and oversight in many rural schools); *Kasayulie v. Alaska*, No. 3AN-97-3782, 1999 WL 34793400 (Alaska Super. Ct. 1999) (holding that the State's method for funding schools violated the State Constitution's Education and Equal Protection Clauses and

impetus for numerous Congressional commissions, State commissions, studies, and roundtables, spanning decades.[89] There have been so many reports and so little change in the State's approach that twenty-two years ago, then State Senator Georgianna Lincoln stated: "A number of studies completed by state agencies and other groups address these daily inequities, injustices, and discriminations. Frequently it seems as if these reports are filed away and quickly forgotten. Perhaps what lies at the heart of the matter is indifference."[90]

To be clear, the "disparities found in rural Alaska" translate to disparities for Alaska Natives "since they make up such a large proportion of the state's rural residents."[91] And

---

discriminated against Alaska Native students in violation of the Civil Rights Act); Transcript of Partial Decision on Record, *Toyukak v. Treadwell*, No. 3:13-cv-137-SLG, (Sept. 3, 2014) (ECF 223 at 15:8–20) (concluding that the State violated the Voting Rights Act's language assistance requirements because the State did not provide substantially equivalent election information to Alaska Native language speakers as English speakers); RACISM'S FRONTIER, supra note 88, at 51 (identifying "a disparity in the law enforcement services."); LAW & ORDER REPORT, *supra* note 87, at ch. 2, 45-49 (documenting the State's refusal to provide adequate law enforcement in Native communities, and refusal to support Tribal law enforcement); *Alaska v. Newland*, No. 3:23-cv-00007-SLG (D. Alaska filed Jan. 17, 2023) (State's challenge to Department of Interior's trust land acquisition for Central Council of Tlingit and Haidai Indian Tribes of Alaska).

[89] *See* REPORT ON THE RECONVENING OF THE ALASKA COMMISSION ON RURAL GOVERNANCE AND EMPOWERMENT, RURAL GOVERNANCE REMAINS UNFINISHED BUSINESS IN ALASKA—A CALL TO ACTION (2014) [hereinafter 2014 RURAL GOVERNANCE REPORT], https://ruralgov.org/wp-content/uploads/2014/11/RGC-Report2014.pdf (noting that "Alaska has achieved little progress" and that "nothing has significantly changed" in the fifteen years since the Rural Governance Commission's 1998 findings and recommendations addressing "the disempowerment of Native and rural people.").

[90] RACISM'S FRONTIER, supra note 88, at 49.

[91] *Id.* at 9.

the State's decades-long fight against Alaska Native subsistence rights is a key feature of

the State's overall disregard for its rural communities:

> The Urban/Rural divide is rooted in the unequal treatment accorded Native villages in terms of education, law enforcement, clean water and sanitation, and the double-digit unemployment in rural communities. It is also reflected in the legislature's systematic effort to undermine federal protections for hunting and fishing rights of rural Alaskans and its refusal to allow Alaskans to vote on a constitutional amendment on subsistence. It ignores the huge subsidies the urban areas enjoy as a result of the wealth of resources located in rural Alaska.[92]

Indeed, the State's own reports have found that "the State's failure to resolve the

subsistence issue divides rural and urban Alaskans and alienates rural Alaskans from State

government."[93] As a joint federal-state commission recognized nearly thirty years ago,

"Subsistence cannot be understood as a subset of fish and game management. It is a subset

of social policy. What is at stake in it is the survival of human communities and cultures."[94]

---

[92] *Id.* at 10 (citing AFN, BRIEFING ON RECENT HATE CRIMES AGAINST ALASKA NATIVES AND OTHER ACTS OF DISCRIMINATION 16-17 (2001)); *see also id.* at 11-13; 2014 RURAL GOVERNANCE REPORT, *supra* note 89, at 6-7, 17, 70, 83; COMMONWEALTH NORTH, *supra* note 69, at 4, 7-8.

[93] 1999 RURAL GOVERNANCE REPORT, *supra* note 87, at 69.

[94] ANC VOL. III, *supra* note 5, at 4 (internal quotations omitted); *see also* Transcript of Hr'g 5-6, *Native Vill. of Elim v. Alaska*, 2NO-92-80 CIV (Alaska Super. Ct. June 12, 1992) (Acknowledging that management by the State Board of Fish and ADF&G resulted in the loss of subsistence chum fishery and the corresponding crisis for northern Norton Sound communities, Judge Erlich stated: "[T]his Court wants to leave no doubt as to the harm suffered by the plaintiffs . . . . The irreparable harm described is ultimately one of cultural genocide") (App., at A119-20).

Where Commissioner Vincent-Lang sees a "balkanized regulatory regime,"[95] others see "apartheid."[96]

In sum, the State attempts to use *its* insistence on a rural preference in ANILCA and *its* chronic disinvestment in rural Alaska and the corresponding conditions those policies have caused as justification for erasing a federally-protected right and a key component of economic security in rural Alaska. The State's framing is essentially, "I have already harmed you twice, but now in order to help you I must harm you again." Alaska is not unique in this approach—States and entities that are hostile to Native interests frequently position themselves as acting in the best interest of Native communities.[97] Rather than

---

[95] Vincent-Lang Decl. ¶ 45.

[96] RACISM'S FRONTIER, *supra* note 88, at 9 ("Apartheid is a very real thing here in Alaska. It runs deep, it's covert, it's different than outright killing, but the net effects are the same. You manage to separate a people from their lands and from their resources. You manage to take away the customary rights of people that are very ancient rights.").

[97] *See, e.g.*, State of Texas justifying its attempts to overturn the Indian Child Welfare Act—a law meant to curtail the widespread removal of Indian children by States—because it "depriv[es] Indian children of the loving, stable homes that would be in their best interests." Br. for the Petr. Texas, *Haaland v. Brackeen*, 2022 WL 1785628, at *15 (filed May 26, 2022); Statement of President Andrew Jackson justifying removal to protect Native communities from the settlers that his policies encouraged, FRANCIS PAUL PRUCHA, THE GREAT FATHER: THE UNITED STATES GOVERNMENT AND AMERICAN INDIANS 72 (1984) ("You may rest assured that I shall adhere to the just and humane policy towards the Indians which I have commenced. In this spirit I have recommended them to quit their possessions on this side of the Mississippi, and go to a country in the west where there is every probability that they will always be free from the mercenary influence of White men[.]"); Statement of Indian Commissioner William P. Dole justifying the reservation policy, 1862 COMMISSIONER OF INDIAN AFFAIRS ANNUAL REPORT, *reprinted in* DOCUMENTS OF UNITED STATES INDIAN POLICY 95 (Francis Paul Prucha, ed., 2d ed. 1990) ("The policy, recently adopted, of confining the Indians to reservations . . . is the best method yet devised for their reclamation and advancement in civilization."); Allotment was likewise justified "as necessary for the moral improvement of native people and the progress of civilization" by "[z]ealous humanitarian reformers, many of whom called

bolstering the State's arguments, this passage illustrates precisely why Congress codified

subsistence rights in ANILCA, regardless of State action.

## ARGUMENT

### I.      *Katie John* Remains Good Law and Controls the Outcome of this Case

The State argues that the *Katie John* litigation[98] no longer serves as a basis for

federal authority to regulate subsistence fishing in federal waters. Specifically, the State

argues that in *Sturgeon II*, the Supreme Court rejected the reserved waters doctrine as an

interest in waters sufficient to bring navigable rivers in Alaska within ANILCA's definition

of "public lands" for purposes of federal regulation of subsistence fisheries. The State is

incorrect. The reserved waters doctrine continues to serve as a valid basis for regulating

subsistence fisheries under Title VIII.

First, in *Sturgeon II*, the Supreme Court held that the Nation River was not "public

land" for purposes of regulating Mr. Sturgeon's activity "wafting along the River's surface

toward his preferred hunting ground."[99] Mr. Sturgeon's activity involved the operation of

a hovercraft "above the water[,]" rather than in it.[100] The Supreme Court specifically noted

that "the so-called *Katie John* trilogy" and "the term 'public lands,' when used in

---

themselves 'friends of the Indian.'" COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.04, at 72 (Nell Jessup Newton ed., 2012 ed. & 2023 supp.).

[98] *Katie John I*, 72 F.3d at 698; *John v. United States* ("*Katie John II*"), 247 F.3d 1032 (9th Cir. 2001) (en banc) (per curiam); *John v. United States* ("*Katie John III*"), 720 F.3d 1214 (9th Cir. 2013), *cert. denied sub nom. Alaska v. Jewell*, 572 U.S. 1042 (2014).

[99] 139 S. Ct. at 1080.

[100] *Id.*

ANILCA's subsistence-fishing provisions," were not at issue in the case.[101] The Court, therefore, "did not disturb the Ninth Circuit's holdings that the Park Service may regulate subsistence fishing on navigable waters."[102]

In stating that its decision in *Sturgeon II* did not disturb *Katie John*, the Court cited the State's *amicus curiae* brief, wherein the State "argu[ed] that this case does not implicate [the *Katie John*] decisions[.]"[103] Contrary to the State's current assertion, and in fact at the State's urging, the Court did not reject the proposition that the reserved waters doctrine is an interest in waters sufficient to bring them within the definition of "public lands" for *all* purposes, much less for purposes of federal regulation of subsistence fisheries in navigable waters.

Second, in addressing the United States' primary defense of its regulation, the Court analyzed whether "the United States has 'title' to an 'interest' in the Nation River, under the reserved-water-rights doctrine[.]"[104] In parsing whether reserved waters are an "interest," the Court opined that the reserved right, by its nature, is limited. It is usufructuary and therefore does not give the Government plenary authority over the waterway to which it attaches. "Rather, the interest merely enables the Government to take or maintain the specific 'amount of water'—and 'no more'—required to 'fulfill the purpose

---

[101] *Id*. at 1080 n.2.

[102] *Id*. (citations omitted).

[103] *Id* (discussing Br. of *Amicus Curiae* Alaska in Supp. of Pet., *Sturgeon v. Frost*, 2018 WL 4063284, at *29-36 (Aug. 14, 2018)).

[104] *Id*. at 1078 (citation omitted).

of its land reservation.'"[105] "So, for example, . . . the Government could control only the volume of water necessary for the tribe to farm or the fish to survive."[106] After finding the reserved right, by its nature, to be limited, the Court nonetheless assumed *arguendo* that "[e]ven if the United States holds title to a reserved water right in the Nation river," that interest was ultimately irrelevant for purposes of regulating Mr. Sturgeon's activity because his activity took place "above the water" not in it.[107]

Perhaps because the issue before the Court concerned regulatory authority over activities above the water, the Court did not examine the numerous authorities holding that riparian interests in waters such as reserved waters, although usufructuary as opposed to possessory, nonetheless constitute real property interests that may be assigned and mortgaged; bought, leased and sold; and may not be taken without just compensation.[108] Nor may a state, absent specific congressional authority, "destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters; so far at least as may be necessary for the beneficial uses of the government property."[109] Nor did the Court review its prior holding that owners of state law water rights possess a

---

[105] *Id.* at 1079 (citing *Cappaert v. United States*, 426 U.S. 128, 141 (1976) (brackets omitted).

[106] *Id.* (citing *Winters v. United States*, 207 U.S. 564, 576–77 (1908); *Cappaert*, 426 U.S. at 141).

[107] *Id*. at 1080.

[108] *See, e.g.*, *Dugan v. Rank*, 372 U.S. 609 (1963); *Fed. Power Comm'n v. Niagra Mohawk Power Corp.*, 347 U.S. 239 (1954); *United States v. Gerlach Live Stock* Co., 339 U.S. 725 (1955).

[109] *United States v. Rio Grande Dam & Irrigation Co*., 174 U.S. 690, 703 (1899).

property interest for which the United States must pay compensation if it takes the water pursuant to any power except the navigational servitude.[110] In short, the reserved waters appurtenant to federal reservations in Alaska are an essential part of the reservations themselves, to which the United States holds "title" as that term is employed in the statutory definition and context.

Third, the Court's interpretation of the nature of the reserved waters doctrine does not foreclose the federal management of subsistence fishing pursuant to Title VIII. That is because the Court in *Sturgeon II* clearly linked the government's "control" of the volume of the water to the specific purpose of the reserve itself.[111] The protection of the "opportunity for continued subsistence uses by local residents" is one of the four express purposes for which the Yukon Flats National Wildlife Refuge, through which the Kuskokwim River flows, was established by Congress.[112] The Refuge was also established for the express purposes of conserving fish and wildlife, including salmon, and fulfilling the international treaty obligations of the United States with respect to fish and wildlife and their habitats.[113] To achieve these purposes, the Refuge was also established to ensure "water quality and necessary *water quantity*" within the refuge to achieve the Refuge's

---

[110] *See International Paper Co. v. United States*, 282 U.S. 399, 407 (1931); *see also Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 781 (1984) (noting "that for many purposes water rights are considered to be interests in lands.").

[111] *Sturgeon II*, 139 S. Ct. at 1079 (citing *Cappaert*, 426 U.S. at 141).

[112] Pub. L. No. 96-487, § 302(9)(B)(iii), 94 Stat. 2371, 2388 (1980).

[113] *Id.* § 302(9)(B)(i)-(ii), 94 Stat. at 2388.

other purposes, including subsistence.[114] Applying the *Cappaert* analysis as reaffirmed by

the Court in *Sturgeon II*, it is clear that an unquantified amount of water appurtenant to the

refuge was reserved for the purpose of protecting fish, fish habitat, and continued

subsistence uses of fisheries.[115] It is also clear "that without the water the purposes of the

reservation would be entirely defeated."[116] Indeed, lack of appurtenant water would defeat

the purposes of most federal reservations in Alaska.

Importantly, as Judge Holland found during the *Katie John* litigation, it is

unnecessary to quantify the minimum amount of water necessary for fulfillment of

Congress' purpose; it is simply enough that they exist to bring them into the definition of

ANILCA's "public lands."[117] This is because "the identification of the existence of a

reserved water rights claim is not the equivalent of a conclusive determination of the

validity of such claim for purposes of establishing the priority of water use rights."[118] As

Judge Holland explained:

> For purposes of ANILCA public lands determinations, no adjudication of
> water rights is needed. A formal adjudication, whether it be in a state or
> federal court, is not the only means of identifying reserved water rights.
> Reserved water rights vest on the date of the reservation. They do not

---

[114] *Id.* § 302(9)(B)(iv), 94 Stat. at 2388 (emphasis added).

[115] *Sturgeon II*, 139 S. Ct. at 1079 (citations omitted); *see also United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1983).

[116] *United States v. New Mexico*, 438 U.S. 696, 700 (1978).

[117] *See John v. United States*, No. 3:05-cv-0006-HRH, 2007 WL 9637058, at *10-11 (D. Alaska May 17, 2007). Anticipating that the State may refute this argument, their arguments on this point are barred by issue preclusion as set forth in United States Brief, ECF 101, at 21-31, and KRITFC Brief, at Argument Section I.A-B.

[118] *John*, 2007 WL 9637058, at *10.

depend upon an adjudication for their existence.[119]

The Ninth Circuit affirmed Judge Holland on this point in *Katie John III*.[120]

ANILCA's express purposes and provisions relating to subsistence uses within the various conservation system units (CSU) make little sense unless public lands encompass the navigable waters within CSU boundaries. Congress specifically sought to "provide the opportunity for rural residents engaged in a subsistence way of life," including subsistence fishing, to continue that way of life on "public lands" within CSUs.[121] The Ninth Circuit has recently affirmed that the reserved waters doctrine requires courts to infer rights that support the reservation's purpose.[122] These implied rights can include the right to fish, when the central purpose of the reservation is to support subsistence fishing.[123]

As the Supreme Court has often said, statutes must be construed as a whole, and isolated sections must be considered in their context, with an eye toward accomplishing the broad objectives of the statute.[124] Congress could not achieve its express purpose of protecting the subsistence way of life in Alaska, which centrally depends upon subsistence fishing, without including navigable waters as part of ANILCA's "public lands." The importance of subsistence fishing to Alaska Native subsistence users cannot be overstated.

---

[119] *Id.* (citing *Cappaert*, 426 U.S. at 138) (internal citation omitted).

[120] *See* 720 F.3d at 1227.

[121] 16 U.S.C. §§ 3101(c), 3112.

[122] *Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034, 1042 (9th Cir. 2023).

[123] *Id.* at 1044; *see Alaska Pac. Fisheries Co. v. United States*, 248 U.S. 78 (1918).

[124] *See Sturgeon II*, 136 S. Ct. at 1070; *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000).

A ruling removing federal reserved waters from the definition of "public lands" would be a disaster for subsistence users, considering 95% of rural households eat subsistence-caught fish and that fish make up nearly 60% of all subsistence foods harvested by subsistence users.[125]

ANILCA's provisions clearly contemplate the protection of "subsistence activities" on public lands, which must include navigable waters to be effective. There can be no dispute that subsistence fishing "has traditionally taken place in navigable waters."[126] Yet the State's reading of ANILCA would have the nonsensical consequence of effectively removing subsistence fishing from the coverage of a statute that in Title VIII mentions "fish" forty-five times.

Accordingly, the *Katie John* litigation remains good law and the federal government's interest in reserved waters remains a sufficient interest to bring navigable waters within ANILCA's definition of public lands to carry out the purposes of Title VIII.

---

[125] *See* ADF&G, ALASKA'S ECONOMIES AND SUBSISTENCE (n.d.), https://www.adfg.alaska.gov/static/home/library/pdfs/subsistence/ak_economies_subsistence.pdf; ADF&G, FOOD PRODUCTION AND NUTRITIONAL VALUES OF NONCOMMERCIAL FISH AND WILDLIFE HARVESTS IN ALASKA (2019), https://www.adfg.alaska.gov/static/home/subsistence/pdfs/Wild_Harvest_Notebook.pdf; *see also* AFN Brief, at Background Section V.

[126] *Katie John I*, 72 F.3d at 702.

## II. Congress Invoked its Broad Constitutional Authority over Native Affairs in Title VIII to Protect and Provide the Opportunity for Continued Subsistence Hunting and Fishing

Alternatively, the United States holds other authorities, and retains other interests in navigable waters in Alaska, sufficient to bring those waters within the definition of "public lands" for purposes of Title VIII.

### A. The Framers of the United States Constitution Sought to Preempt State Interference in Indian Affairs

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."[127] Within that construct, Congress "wields significant constitutional authority when it comes to tribal relations, possessing even the authority to breach its own promises[.]"[128] That power, as the Supreme Court has cautioned, "belongs to Congress alone."[129]

When drafting the Articles of Confederation, the Continental Congress chose to not include the concept of broad federal authority later found in the Constitution. Instead, the Articles granted the new Continental Congress the power to regulate "the trade and manage all affairs with the Indians, not members of any of the states; provided that the legislative right of any state, within its own limits, be not infringed or violated."[130] This ambiguity implied, to states at least, a shared power in Indian affairs, wherein states routinely

---

[127] *Arizona v. United States*, 567 U.S. 387, 398 (2012).

[128] *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) (citation omitted).

[129] *Id.*

[130] Articles of Confederation of 1781, art. IX, para. 4.

challenged the Federal Government's authority, even purporting to nullify Indian treaties.[131] Division between states and between states and Tribes led to confusion, frustrated purposes, and violence against Native people.

At the Constitutional Convention, the Framers sought to restructure the balance of power between the federal government and state governments as it related to Tribes. The new Constitution gave to Congress what the Supreme Court has described as "plenary and exclusive" power over Native affairs.[132] This power is firmly rooted in the Indian Commerce and Treaty Clauses of the Constitution and the federal government's overriding trust relationship with Tribes.[133] Accordingly, as the Supreme Court most recently articulated, "Congress's power [over Native affairs] is muscular, superseding . . . state authority."[134]

### B.    Congress Understood the Need to Protect Alaska Native Subsistence Rights from State Interference and Thus Enacted ANILCA

As described above, Congress has exercised authority over Alaska Native subsistence since 1867, understanding the need to protect subsistence rights from State interference, both pre- and post-statehood.[135] In enacting Title VIII, Congress explicitly

---

[131] Gregory Ablavsky, *The Savage Constitution*, 63 DUKE L.J. 999, 1018-38 (2014).

[132] *Haaland v. Brackeen*, 143 S. Ct. 1609, 1627 (2023) (citation omitted).

[133] *Id*. at 1627-30.

[134] *Id*. at 1627 (citations omitted); *Dick v. United States*, 208 U.S. 340, 353 (1908) ("[S]uch power is superior and paramount to the authority of any State within whose limits are Indian tribes[.]").

[135] For example, during the congressional debate on the Alaska Statehood Act there was concern about how the territorial legislature had failed to provide adequately for "the rights and privileges of a large and important part of Alaska's population, our native people,

"invoke[d] its constitutional authority over Native affairs . . . to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents[,]"[136] differentiating Title VIII from all other titles of ANILCA.[137] In enacting Title VIII, Congress was fulfilling its "fiduciary duties . . . to protect the subsistence resources of Indian communities and to preserve such communities as distinct cultural entities against interference by the State[]."[138] Congress expressly recognized that while ANILCA "is not Indian legislation in its entirety, the subsistence [T]itle [VIII] and the other subsistence related provisions are."[139]

Since Title VIII is Indian legislation enacted to benefit Alaska Natives, the definition of public lands "must be liberally construed in favor of establishing Indian rights."[140] Accordingly, "[a]ny ambiguities in construction [of Title VIII] must be resolved in favor of the Indians."[141] The Ninth Circuit has already held that ambiguous terms in Title VIII must be interpreted in favor of Alaska Native subsistence users.[142] Here, the Court must interpret the definition of public land, as used in Title VIII, in favor of preserving

which are safeguarded under existing legislation." 104 Cong. Rec. 9488-89 (1958) (statement of Congressman Westland).

[136] 16 U.S.C. § 3111(4).

[137] *See Vill. of Gambell*, 746 F.2d at 581 ("Title VIII was adopted to benefit the Natives.")

[138] *Togiak v. United States*, 470 F.Supp. 423, 428 (D. Alaska 1979).

[139] *Vill. of Gambell*, 746 F.2d at 581 (quoting 126 Cong. Rec. 29,279 (1980)).

[140] *Confederated Tribes of Chehalis Indian Res. v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) (citation omitted); *see also Metlakatla*, 58 F.4th at 1042 (citations omitted).

[141] *Chehalis*, 96 F.3d at 340 (citation omitted).

[142] *See Vill. of Gambell*, 746 F.2d at 581.

Alaska Native subsistence rights and upholding federal authority to manage subsistence activities on navigable waters.

Congress's authority over Native affairs reflects an intentional decision by the framers to design a federal constitutional system in which states may not infringe on rights that Congress has provided to Native people, including the subsistence fishing priority of the rural residents of Kuskokwim River communities.

## III. The Navigational Servitude is Both a Power and a Property Interest and thus Supports Federal Regulatory Authority over Subsistence Fishing in Navigable Waters

In her concurrence in *Sturgeon II*, Justice Sotomayor (joined by Justice Ginsburg) noted that the Court's majority opinion was actually quite limited, and that the federal government is not entirely without authority over navigable rivers within CSUs.

> The Court holds only that the National Park Service may not regulate the Nation River as if it were within Alaska's federal park system, not that the Service lacks all authority over the Nation River. A reading of ANILCA § 103(c) that left the Service with no power whatsoever over navigable rivers in Alaska's parks would be untenable in light of ANILCA's other provisions, which state Congress' intent that the Service protect those very same rivers. Congress would not have set out this aim and simultaneously deprived the Service of all means to carry out the task.[143]

Importantly, Justice Sotomayor noted that the Navigational Servitude Doctrine remains an important power that supports Congress's regulation of subsistence fishing in navigable waters.

> Notably, the Park Service does nor argue—*nor does the Court's opinion address*—whether navigable waters may qualify as "public lands" because the United States has title to some interest other than an interest in reserved

---

[143] 139 S. Ct. at 1088 (Sotomayor, J., concurring).

water rights. In particular, the United States did not press the argument that the Federal Government functionally holds title to the requisite interest because of the navigational servitude.[144]

While the Ninth Circuit rejected the navigational servitude as a basis for federal jurisdiction over subsistence uses in all navigable waters in Alaska in *Katie John I*,[145] Justice Sotomayer's concurrence in *Sturgeon II* strongly suggests that the Ninth Circuit's holding should be revisited.

Indeed, in his concurrence in *Katie John II*, Judge Tallman (joined by Judges Tashima and Fletcher), stated: "The United States has exclusive possession and control of two interests in navigable waters in Alaska, its navigational servitude and its reserved water rights. All navigable waters are therefore 'public lands' upon which the rural subsistence priority applies."[146] Justice Sotomayor's concurrence suggests that the Court may be open to statutory construction that views the navigational servitude as the preferred vehicle for fulfilling congressional intent to protect the opportunity for continued subsistence fisheries. Again, it would be absurd to assume that Congress intended the federal government to protect subsistence fisheries, but left it without any tools to do so. Throughout Title VIII's development, Congress noted the dependence of rural Native villages on subsistence

---

[144] *Id.* at 1090 n.3 (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 177 (1979); *United States v. Rands*, 389 U.S. 121, 123 (1967); 43 U.S.C. § 1314) (internal citation omitted, emphasis added).

[145] 72 F.3d at 703.

[146] 247 F.3d at 1039-40 (Tallman, J. concurring); *see also John v. United States*, No. A90-0484-CV (HRH), 1994 WL 487830, at *13-18 (D. Alaska Mar. 30, 1994).

fishing, at times even naming many of them.[147]

In *Katie John II*, Judge Tallman wrote separately because he did "not believe Congress intended the reserved water rights doctrine to limit the scope of ANILCA's subsistence priority."[148] Rather, Judge Tallman found that "Congress invoked its powers under the Commerce Clause to extend federal protection of traditional subsistence fishing to *all* navigable waters within the State of Alaska, not just to waters in which the United States has a reserved water right."[149] Similarly, Judge Holland has also noted:

> In focusing upon the "vast parcels of land in Alaska reserved for federal purposes," the circuit court overlooked the fact that the congressional purpose of preserving the subsistence way of life was not limited to those reserved lands—not limited to conservation system units. The preference for subsistence hunting and fishing expressly applies to all "public lands," not just CSUs created by ANILCA.[150]

Given the views of Justice Sotomayor (and Justice Ginsberg), Judge Tallman (and Judges Tashima and Fletcher), and Judge Holland, absent Congressional clarification, the navigational servitude serves as the best basis to effectuate Congressional intent to protect continued subsistence uses in Alaska's navigable waters.

The navigational servitude constitutes a paramount federal right to and power over navigable waters, which is derived from the Commerce Clause of the Constitution.[151] In

---

[147] *See, e.g.*, S. Rep. No. 413, 96th Cong., 1st Sess. 233 (1979).

[148] 247 F.3d at 1034 (Tallman, J. concurring).

[149] *Id.* (emphasis in original).

[150] *John v. United States*, No. 3:05-cv-0006-HRH, 2009 WL 10659579, at *4 (D. Alaska Sept. 29, 2009) (quoting *Katie John I*, 72 F.3d at 703) (internal citation omitted).

[151] *Rands*, 389 U.S. at 123.

the so-called "Paramountcy Cases," the Supreme Court recognized that while the states held title to submerged lands within their territorial waters, the federal government exercised "paramount rights in and power over" those waters as the sovereign.[152] The Supreme Court characterized this paramount right as ownership.[153]

The Submerged Lands Act confirms the principle made explicit by the Paramountcy Cases, that the navigational servitude is an "interest in water" to which the United States holds title. Since the Paramountcy Cases had cast a cloud upon the presumed state title to the submerged lands beneath navigable waters, the states lobbied Congress for legislation that would remove the cloud.[154] In 1953, Congress enacted the Submerged Lands Act, which conveyed to the states "title to and ownership of the lands beneath navigable waters."[155] Additionally, and of greatest importance here, the Submerged Lands Act expressly retains the United States' interests in the navigational servitude, together with all powers of regulation and control for the constitutional purposes of commerce, navigation, defense and international affairs.[156] This reservation of the navigational servitude expressly declares the servitude "shall be paramount to, but shall not be deemed to include" the states'

---

[152] *United States v. California*, 332 U.S. 19, 38 (1947); *see also United States v. Texas*, 339 U.S. 707 (1950); *United States v. Louisiana*, 339 U.S. 699 (1950).

[153] *California*, 332 U.S. at 34.

[154] *See e.g., Submerged Lands: Hearings Before the Senate Comm. on Interior & Insular Affs.*, 83d Cong., 1st Sess. 256 (1953) (statement of Harry Brockel).

[155] 43 U.S.C. § 1311(a).

[156] *Id.* § 1314(a).

rights of ownership and control of those lands and resources conveyed by other sections of the act.[157]

The proposition that the United States holds title to the navigational servitude is confirmed by the Supreme Court's treatment of the servitude for Fifth Amendment purposes. While the Fifth Amendment precludes takings without just compensation, the Supreme Court has held that the United States need not compensate property owners when exercise of the navigational servitude results in loss of riparian access,[158] loss of use of submerged lands,[159] or loss of structures blocking navigation.[160] Even in the context of otherwise compensable takings, the Supreme Court has refused to grant compensation for losses of property value attributed to, or dependent upon, exercise of the servitude.[161]

Since the United States holds title to the navigational servitude, it need not pay compensation for using an interest which it already owns. Indeed, as the commentators have consistently pointed out, prior decisions issued by the Supreme Court make sense only if the United States owns the navigational servitude.[162] Accordingly, the navigational

---

[157] *Id.*

[158] *See, e.g.*, *United States v. Commodore Park*, 324 U.S. 386 (1945).

[159] *See, e.g.*, *United States v. Chicago, Minneapolis, St. Paul & Pac. R.R.*, 313 U.S. 592 (1941).

[160] *See, e.g.*, *Louisville Bridge Co. v. United States*, 242 U.S. 409 (1917).

[161] *See, e.g.*, *Rands*, 389 U.S. at 121.

[162] Richard W. Bartke, *The Navigational Servitude and Just Compensation—Struggle for a Doctrine*, 48 OR. L. REV. 1, 41 (1968) ("This unifying principle is a frank recognition of the fact that the federal navigation servitude is proprietary in nature.") (App., at A297); James Munroe, *The Navigation Servitude and the Severance Doctrine*, 6 LAND & WATER

servitude is tantamount to a property interest of the United States. Reserved to the United States by the Submerged Lands Act, the servitude is clearly an "interest" of which the United States is the owner.

In *Sturgeon II*, relying on Alaska law, rather than its own precedent, and divorcing the term title from its legislative context, the Court seized on the "common understanding" of title something that applies only to "fee ownership of property."[163] In doing so, the Court failed to recognize that the term "title" simply connotes a right of control and disposition— rights the United States unquestionably exercises over waters subject to the navigational servitude. This reasoning ignores the Court's prior admonition in *Amoco Production Co. v. Village of Gambell* against "the assertion that the phrase 'public lands,' in and of itself, has a precise meaning, without reference to a definitional section or its context in a statute."[164] It also ignores the language of ANILCA and its legislative history, which compel the conclusion that Congress intended the priority to extend to all customary and traditional subsistence uses occurring in all navigable waters in Alaska. Under the plain language of ANILCA section 102 and *Gambell*, the United States's paramount right to and power over navigable waters is an "interest" to which the United States holds title.

---

L. REV. 491, 503 (1971) ("in effect ownership of the entire stream-flow[] [and] . . . is regarded as a property right under the administration of Congress.") (App., at A249).

[163] *Sturgeon II*, 136 S. Ct. at 1079 (majority) (citing *Totemoff v. Alaska*, 905 P.2d 954, 965 (Alaska 1995) ("[T]he term title applies to fee ownership of property and (sometimes) to possessory interests in property like those granted by a lease." (quotation marks omitted)).

[164] 480 U.S. 531, 548 n.15 (1987).

That the navigational servitude constitutes an interest in water for purposes of ANILCA is further confirmed by the fact that Congress derived its authority for enacting Title VIII not only from the Property Clause and its authority over Indian affairs, but also from the Commerce Clause—the same clause in which the navigational servitude is grounded.[165] Under the Property Clause,[166] which the Supreme Court has described as vesting Congress with authority over public lands "without limitation,"[167] Congress possesses all the authority it needs to regulate fish and wildlife on public lands.[168] In light of Congress exercising its "exclusive and plenary"[169] authority under the Commerce Clause in enacting Title VIII, the authority exists to extend the subsistence priority for fishing to all navigable waters in Alaska. To accomplish that goal, Congress defined "public lands" broadly to include lands, waters, and interests therein, thus placing all navigable waters within the scope of the definition.

---

[165] 16 U.S.C. § 3114(4).

[166] U.S. CONST. art. IV, § 3, cl. 2

[167] *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976). The State has acknowledged, at least privately, that under *Kleppe*, the Federal Government can control "the subsistence taking of fish on all federal lands in Alaska" and that federal regulations would "take precedence over any conflicting state fish and game regulations, and will establish a federal subsistence-priority management system which will supersede any state laws or regulations in conflict with it." Mem. from Att'y Gen. Condon, *supra* note 46, at 7 (App., at 8); *see also*, Mem. from Assistant Att'y Gen. Koester to Leader Navarre, at 2 (May 6, 1990) (App., at A097) (acknowledging that the federal government "probably has the constitutional authority to authorize the takeover of fish and wildlife management on federal lands").

[168] *See United States v. Estate of Hage*, 810 F.3d 712, 716 (9th Cir. 2016) ("The United States can prohibit absolutely or fix the terms on which its property may be used." (citation omitted)).

[169] *Bd. of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 56 (1933).

The navigational servitude represents a substantial interest of the United States in the Alaska Native villages' customary fishing waters. The United States is the owner of that interest, thus bringing all waters subject to the servitude within the ambit of ANILCA's "public lands" definition.

## CONCLUSION

In the end, the State pairs an incomplete version of its history with a misleading assertion of its powers, its rights, and its perceived burdens. Tellingly, the State's brief includes virtually no discussion of federalism, federal constitutional powers, ANILCA, or the obligations the State carries to the Union or to its Native citizens. Instead, the State tells us how good it is at its job, and then presents its actions on the Kuskokwim River in 2020 and 2021 as a straightforward necessity. But in reality, the State's actions were lawless. A state asserting jurisdiction over an area in which it has no authority to the detriment of Native people is exactly why the Framers reserved specific powers to Congress, and Congress only. An application of Justice Gorsuch's opinion in *McGirt v. Oklahoma* proves prophetic for the circumstances on the Kuskokwim:

> In the end, only one message rings true. Even the carefully selected history [Alaska] . . . recite[s] is not nearly as tidy as [it] suggest[s]. It supplies us with little help in discerning the law's meaning and much potential for mischief. If anything, the persistent if unspoken message here seems to be that we should be taken by the "practical advantages" of ignoring the written law. How much easier it would be, after all, to let the State proceed as it has always assumed it might. But just imagine what it would mean to indulge that path. A State exercises jurisdiction over [Alaska Natives subsistence users] with such persistence that the practice seems normal. [Subsistence users] lose their [customary fishing rights] by fraud or otherwise in sufficient volume that no one remembers whose land it once was. All this continues for long enough that a [federally-protected right] that was once beyond doubt becomes questionable, and then even farfetched. Sprinkle in a few

predictions here, some contestable commentary there, and the job is done, a [federally-protected right] is disestablished. None of these moves would be permitted in any other area of statutory interpretation, and there is no reason why they should be permitted here. That would be the rule of the strong, not the rule of law.[170]

As the *Katie John* plaintiffs noted to this Court 30 years ago, "[t]he State finds itself in an unhappy dilemma. It does not want to share responsibility for fish and wildlife management with the federal government, but neither is it willing to afford the subsistence priority that ANILCA requires."[171] While this Court cannot force the State of Alaska to come into compliance with the role that Congress offered it in ANILCA, it can halt the State's efforts to assert jurisdiction it does not possess and violate the federal protections that Congress provided to rural subsistence users when it passed ANILCA. The Plaintiff-Intervenors respectfully request that the Court grant summary judgment in favor of all Plaintiffs.

RESPECTFULLY SUBMITTED this 3rd day of November, 2023.

<div style="margin-left:40%">

*/s/ Erin C. Dougherty Lynch*
*/s/ Wesley James Furlong*
*/s/ Sydney Tarzwell*
Erin C. Dougherty Lynch (AK Bar No. 0811067)
Heather R. Kendall Miller (AK Bar No. 9211084)
Matthew N. Newman (AK Bar No. 1305023)
Wesley James Furlong (AK Bar No. 1611108)
Megan R. Condon (AK Bar No. 1810096)
Sydney Tarzwell (AK Bar No. 1801001)
NATIVE AMERICAN RIGHTS FUND
745 W. 4th Avenue, Suite 502

</div>

---

[170] *McGirt*, 140 S. Ct. at 2474.

[171] Mem. of Katie John Pls. in Opp'n to the State's Mot. for Partial Summ. J., *Katie John v. U.S.*, Case No. A90-484 at 45 (filed May 10, 1993) (App., at A172).

Anchorage, Alaska 99501
Telephone: (907) 276-0680
Facsimile: (907) 276-2466
dougherty@narf.org
kendall@narf.org
mnewman@narf.org
wfurlong@narf.org
mcondon@narf.org
tarzwell@narf.org

*Counsel for Intervenor-Plaintiffs Association of Village Council Presidents, Ivan Ivan, & Betty Magnuson*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2023, I electronically filed the foregoing **INTERVENOR-PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court for the United States District Court for the District of Alaska by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Wesley James Furlong*
Wesley James Furlong (AK Bar No. 1611108)
NATIVE AMERICAN RIGHTS FUND