**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 24-2251 |
| *Plaintiff - Appellee*, | D.C. No. 1:22-cv-00054-SLG |
| KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION; ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS; BETTY MAGNUSON; IVAN M. IVAN; AHTNA TENE NENE; AHTNA, INC.; ALASKA FEDERATION OF NATIVES, | OPINION |
| *Intervenor-Plaintiffs - Appellees,* | |
| v. | |
| STATE OF ALASKA; ALASKA DEPARTMENT OF FISH AND GAME; DOUG VINCENT-LANG, in his official capacity as Commissioner of the Alaska Department of Fish & Game, | |
| *Defendants - Appellants*. | |

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, Chief District Judge, Presiding

Argued and Submitted June 23, 2025
Seattle, Washington

Filed August 20, 2025

Before: Consuelo M. Callahan, Roopali H. Desai, and Ana
de Alba, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY[*]

### Alaska National Interest Lands Conservation Act

The panel affirmed the district court's summary
judgment in favor of the United States and Intervenors
("Plaintiffs"), and permanent injunction, in Plaintiffs' action
seeking to preclude the State of Alaska from taking actions
that interfere with federal efforts to implement a rural
subsistence priority established by the Alaska National
Interest Lands Conservation Act ("ANILCA").

Title VIII of ANILCA established the rural subsistence
priority, which generally provides that rural Alaska residents
who fish and hunt for subsistence purposes are given priority

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

over others in fishing and hunting on "public lands" whenever it is necessary to restrict fishing and hunting to protect the rural subsistence users' ability to continue their subsistence uses. The Ninth Circuit resolved the meaning of "public lands" as used in Title VIII, and the geographic scope of the rural subsistence priority, in a series of decisions dubbed the *Katie John* Trilogy. Subsequently, the Supreme Court considered the meaning of "public lands" as used in Title I of ANILCA, and declined to interpret the term to include navigable waters in which the United States holds reserved water rights, in *Sturgeon v. Frost (Sturgeon II)*, 587 U.S. 28, 42-45 (2019). Pursuant to 1999 Rules upheld in *Katie John III*, the United States implemented ANILCA's rural subsistence priority on the stretch of the Kuskokwim River within the Yukon Delta National Wildlife Refuge. In the wake of *Sturgeon II*, Alaska, apparently deciding it was no longer bound by the *Katie John* Trilogy, asserted authority over the entire River.

The panel rejected Alaska's argument that the *Katie John* Trilogy was wrongly decided and was overruled by *Sturgeon II*. The panel held that the decisions can be reasonably harmonized on the ground that the distinct context and statutory objective of Title VIII calls for an interpretation of "public lands" that includes navigable waters, where subsistence fishing has traditionally taken place. In addition, immediately after *Katie John I*, Congress passed appropriations acts that signaled its approval of *Katie John I*'s interpretation of "public lands" for purposes of Title VIII. Finally, the panel rejected Alaska's argument that the *Katie John* Trilogy was clearly irreconcilable with *Sackett v. Environmental Protection Agency*, 598 U.S. 651, 679 (2023), because *Sackett* did not constitute "intervening" authority sufficient to revisit the *Katie John* Trilogy.

**COUNSEL**

Daniel Halainen (argued), Paul A. Turcke, and Kevin W. McArdle, Attorneys, Environment & Natural Resources Division; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

Nathaniel Amdur-Clark (argued), Whitney A. Leonard, and Lloyd B. Miller, Sonosky Chambers Sachse Miller Monkman LLP, Anchorage, Alaska; Jahna M. Lindemuth (argued) and Scott M. Kendall, Cashion Gilmore & Lindemuth, Anchorage, Alaska; Wesley J. Furlong, Megan R. Condon, Sydney A. Tarzwell, Kirsten D. Gerbatsch, Erin C. Dougherty Lynch, and Heather R. Kendall Miller, Native American Rights Fund, Anchorage, Alaska; Ambriel Sandone and Nicholas P. Ostrovsky, Ahtna Inc., Anchorage, Alaska; Andrew B. Erickson, John M. Sky Starkey, Anna C. Crary, and River E.M. Sterne, Landye Bennett Blumstein LLP, Anchorage, Alaska; for Intervenor-Plaintiffs-Appellees.

J. Michael Connolly (argued), Steven C. Begakis, and Zachary P. Grouev, Consovoy McCarthy Park PLLC, Arlington, Virginia; Margaret Paton-Walsh and Aaron C. Peterson, Assistant Attorneys General; Treg Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; for Defendants-Appellants.

Lane Kisonak, Association of Fish & Wildlife Agencies, Washington, D.C., for Amicus Curiae Association of Fish & Wildlife Agencies.

Regina Lennox and Jeremy E. Clare, Safari Club International, Washington, D.C., for Amicus Curiae Safari Club International.

Thomas A. Berry and Alexander R. Khoury, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

---

**OPINION**

CALLAHAN, Circuit Judge:

The Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. L. No. 96-487, 94 Stat. 2371 (1980), has multiple purposes, including to "provide the opportunity for rural [Alaska] residents engaged in a subsistence way of life to continue to do so." 16 U.S.C. § 3101(c). To fulfill this purpose, Title VIII of ANILCA (codified at 16 U.S.C. §§ 3111-26) establishes the "rural subsistence priority," which generally provides that rural Alaska residents who fish and hunt for subsistence purposes are given priority over others in fishing and hunting on "public lands" whenever it is necessary to restrict fishing and hunting to protect the rural subsistence users' ability to continue their subsistence uses. *See id.* §§ 3111-15.

We resolved the meaning of the term "public lands" as used in Title VIII—and, therefore, the geographic scope of the rural subsistence priority—more than a decade ago in a series of decisions dubbed the *Katie John* Trilogy. In *Katie John I*, we held that "public lands" includes navigable waters in which the United States holds reserved water rights. *Alaska v. Babbitt (Katie John I)*, 72 F.3d 698, 704 (9th Cir. 1995), *cert. denied*, 517 U.S. 1187 (1996), *and cert. denied sub nom.*, *Alaska Fed'n of Natives v. United States*, 517 U.S. 1187 (1996). Then, sitting en banc in *Katie John II*, we maintained the holding of *Katie John I*. *John v. United States (Katie John II)*, 247 F.3d 1032 (9th Cir. 2001) (en

banc) (per curiam).  Finally, in *Katie John III*, we upheld
regulations identifying the navigable waters that constitute
"public lands" because the United States holds reserved
water rights in them.  *John v. United States (Katie John III)*,
720 F.3d 1214, 1245 (9th Cir. 2013), *cert. denied sub nom.*,
*Alaska v. Jewell*, 572 U.S. 1042 (2014).

Recently, the Supreme Court considered the meaning of
"public lands" as used in another part of ANILCA—Section
103(c) in Title I (codified at 16 U.S.C. § 3103(c))—and
declined to interpret the term to include navigable waters in
which the United States holds reserved water rights.
*Sturgeon v. Frost (Sturgeon II)*, 587 U.S. 28, 42-45 (2019).
In *Sturgeon II*, Alaska changed its prior course and defended
the *Katie John* Trilogy, arguing that "public lands" has a
different meaning in 16 U.S.C. § 3103(c) than in Title VIII,
that the *Katie John* Trilogy's reserved water rights
interpretation is proper in the latter context, and that the
*Katie John* Trilogy should be preserved because rural
Alaskans rely on it.  Br. of Amicus Curiae State of Alaska in
Support of Pet'r at 29-35, *Sturgeon II*, 587 U.S. 28 (No. 17-
949), 2018 WL 4063284, at \*29-35.  In response, the
Supreme Court, citing Alaska's amicus brief, included a
footnote in *Sturgeon II* stating that "[Title VIII's
subsistence-fishing] provisions are not at issue in this case,
and we therefore do not disturb the Ninth Circuit's holdings
[in the *Katie John* Trilogy] that the Park Service may
regulate subsistence fishing on navigable waters."  587 U.S.
at 45 n.2.

Alaska now claims that the *Katie John* Trilogy was
wrongly decided and has been overruled by *Sturgeon II*.
More specifically, because three-judge panels of this court
are bound by circuit precedent unless it is "clearly
irreconcilable" with intervening higher authority, *see Miller*

*v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), Alaska argues that the *Katie John* Trilogy is clearly irreconcilable with *Sturgeon II*.

We hold that it is not.  As explained below, the decisions can be reasonably harmonized on the ground that the distinct context and statutory objective of Title VIII call for an interpretation of "public lands" that includes navigable waters, where subsistence fishing "has traditionally taken place."  *Katie John I*, 72 F.3d at 702.  Additionally, immediately after *Katie John I*, Congress passed appropriations acts that signaled its approval of *Katie John I*'s interpretation of "public lands" for purposes of Title VIII. Although Katie John, the Ahtna woman who advocated for subsistence fishing rights on behalf of Alaska Natives, has since passed away, the precedent that bears her name lives on.

I.

To put it mildly, we do not write on a clean slate. Therefore, we begin with the relevant legal background.

A.

In 1980, Congress passed ANILCA, which "set aside 104 million acres of federally owned land in Alaska for preservation purposes."  *Sturgeon II*, 587 U.S. at 36 (citation omitted).  In doing so, Congress created or expanded a number of "conservation system units"—ANILCA's term for national parks, refuges, preserves, and the like.  *Id.* at 37 (citations omitted); *see* 16 U.S.C. § 3102(4).

Title I of ANILCA includes three sections: one setting forth ANILCA's purposes, 16 U.S.C. § 3101; another providing its definitions, *id.* § 3102; and a third concerning the boundaries of its conservation system units and the

8     USA V. STATE OF ALASKA

application of regulations within them, *id.* § 3103. As previously noted, one of Act's purposes is "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so," "consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded by or pursuant to this Act." *Id.* § 3101(c).

This is the purpose of Title VIII, in particular, *id.* § 3112(1), which includes its own declaration of supporting Congressional findings, *id.* § 3111. Title VIII establishes the "rural subsistence priority," *Katie John III*, 720 F.3d at 1219, which provides that with respect to "the taking on public lands of fish and wildlife," "nonwasteful subsistence uses" by rural Alaska residents "shall be accorded priority over . . . other purposes" whenever "it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses."[1] 16 U.S.C. § 3114; *see id.* §§ 3113-15. Such restrictions are to be implemented based on "(1) customary and direct dependence upon the populations as the mainstay of livelihood; (2) local residency; and (3) the availability of alternative resources." *Id.* § 3114.

Title VIII charges the Secretary of the Interior and the Secretary of Agriculture (collectively, "Secretaries") with

---

[1] "[S]ubsistence uses" are "the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade." 16 U.S.C. § 3113.

implementing the rural subsistence priority. *Id.* § 3115; *see id.* § 3102(12). However, Title VIII also provides that if Alaska "enacts and implements laws of general applicability which are consistent with" ANILCA's rural subsistence priority, then the Secretaries "shall not" implement it. *Id.* § 3115(d). "In other words, ANILCA expresses a preference for state management of the rural subsistence priority . . . but provides that [the Secretaries] may step in where the State fails to act." *Katie John III*, 720 F.3d at 1219 (citing 16 U.S.C. § 3202(a)).

### B.

In 1978, in anticipation of the enactment of ANILCA, the Alaska Legislature enacted a statutory subsistence priority. *Id.* State agencies subsequently adopted regulations to establish a preference for rural residents, and the Secretary of the Interior certified Alaska's law as consistent with ANILCA's rural subsistence priority. *Id.* But in 1985, the Alaska Supreme Court struck down the state regulations on the ground that their rural preference was inconsistent with the state statute. *Madison v. Alaska Dep't of Fish & Game,* 696 P.2d 168, 178 (Alaska 1985).

In response, the Alaska Legislature amended the state statute to limit its subsistence priority to rural residents. *See McDowell v. State*, 785 P.2d 1, 3 (Alaska 1989). But in 1989, the Alaska Supreme Court struck down the amended statute on the ground that the rural preference violated state constitutional provisions that protect equal access to fish and game. *Id.* at 5-9.

Although the Alaska Supreme Court temporarily stayed its decision to give the Alaska Legislature "an opportunity to amend the constitution or otherwise bring its program into compliance with ANILCA," the Alaska Legislature failed to

do so. *Katie John I*, 72 F.3d at 701. "Implementation of ANILCA's rural subsistence priority accordingly fell back to the federal government in July 1990." *Katie John III*, 720 F.3d at 1221.

C.

In connection with the federal government assuming management of ANILCA's rural subsistence priority, the Secretaries promulgated temporary regulations in 1990 and then permanent regulations in 1992 ("1992 Rules"). *See* Temporary Subsistence Management Regulations for Public Lands in Alaska, 55 Fed. Reg. 27114 (June 29, 1990); Subsistence Management Regulations for Public Lands in Alaska, 57 Fed. Reg. 22940 (May 29, 1992). Among other things, the rules addressed the geographic scope of the rural subsistence priority by interpreting the term "public lands" as used in Title VIII. 57 Fed. Reg. at 22942, 22951; *see also* 55 Fed. Reg. at 27115, 27118.

ANILCA's definitions section defines "public lands" as follows:

> (1) The term "land" means lands, waters, and interests therein.
>
> (2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.
>
> (3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except--
>
>> (A) land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska

> Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law;
>
> (B) land selections of a Native Corporation made under the Alaska Native Claims Settlement Act which have not been conveyed to a Native Corporation, unless any such selection is determined to be invalid or is relinquished; and
>
> (C) lands referred to in section 19(b) of the Alaska Native Claims Settlement Act.

16 U.S.C. § 3102. Thus, "public lands" generally includes "lands, waters, and interests therein" "situated in Alaska" "the title to which is in the United States." *Id.* § 3102(1)-(3).

The 1992 Rules interpreted "public lands" to generally exclude navigable waters because "the United States does not generally own title to the submerged lands beneath navigable waters in Alaska." 57 Fed. Reg. at 22942. For context, Alaska generally holds title to the submerged lands because the Alaska Statehood Act, Pub. L. No. 85-508, § 6(m), 72 Stat. 339, 343 (1958), incorporated the Submerged Lands Act, which granted states "title to and ownership of the lands beneath navigable waters within [their] boundaries," Pub. L. No. 83-31, § 3(a), 67 Stat. 29, 30 (1953) (codified at 43 U.S.C. § 1311(a)). Also, such title generally "brings with it regulatory authority over 'navigation, fishing, and other public uses.'" *Sturgeon II*,

587 U.S. at 35 (quoting *United States v. Alaska*, 521 U.S. 1, 5 (1997)).

The 1992 Rules led to the *Katie John I* litigation. "At one extreme," Alaska defended the rules' position that "public lands" generally excludes navigable waters because the United States "does not hold title to them." *Katie John I*, 72 F.3d at 702. "At the other extreme," Alaska Natives took the position that "public lands" includes *all* navigable waters in Alaska because the United States holds an "interest" in those waters—its navigational servitude. *Id.* "[I]n the middle," the United States adopted a new position: that "public lands" includes *some* navigable waters—those in which the United States holds an "interest" pursuant to the reserved water rights doctrine. *Id.* at 701-02. That doctrine generally provides that "[w]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Sturgeon II*, 587 U.S. at 43 (quoting *Cappaert v. United States*, 426 U.S. 128, 138 (1976)).

In *Katie John I*, we rejected Alaska's interpretation. In doing so, we explained that we had "no doubt that Congress intended that public lands include at least some navigable waters," because "ANILCA's language and legislative history" "clearly indicate that subsistence uses include subsistence fishing," and "subsistence fishing has traditionally taken place in navigable waters." *Katie John I*, 72 F.3d at 702 (citing 16 U.S.C. § 3113). Thus, Alaska's interpretation would "undermine congressional intent to protect and provide the opportunity for subsistence fishing." *Id.* at 704. We also rejected the Alaska Natives' preferred interpretation, including on the ground that the navigational

servitude is "'a concept of power, not of property'" and not an "interest" to which the United States holds "title" in the relevant sense. *Id.* at 702-03 (quoting *United States v. Certain Parcels of Land*, 666 F.2d 1236, 1238 (9th Cir. 1982)); *see also City of Angoon v. Hodel*, 803 F.2d 1016, 1027 n.6 (9th Cir. 1986). We further concluded that ANILCA did "not support" a "complete assertion of federal control" over all navigable waters in Alaska. *Katie John I*, 72 F.3d at 704.

Finally, applying *Chevron*, we adopted the United States' reserved water rights interpretation. *Id.* at 703-04. We reasoned that the United States holds "interests in some navigable waters" because when the United States "reserved vast parcels of land in Alaska for federal purposes through a myriad of statutes" (including ANILCA), it "also implicitly reserved appurtenant waters, including appurtenant navigable waters, to the extent needed to accomplish the purposes of the reservations." *Id.* at 703. Given that the 1992 Rules included a different interpretation of "public lands," we expressed "hope" that the Secretaries would "determine promptly" the navigable waters in which the United States holds reserved water rights such that the waters are "public lands subject to federal subsistence management." *Id.* at 704.

D.

In April 1996, just months after the *Katie John I* decision was published, the Secretaries issued an advance notice of proposed rulemaking to identify the navigable waters in which the United States holds reserved water rights. Subsistence Management Regulations for Public Lands in Alaska, 61 Fed. Reg. 15014, 15015, 15018 (proposed April 4, 1996). Meanwhile, Congress passed an appropriations act

("1996 Appropriations Act") that included a provision preventing the Secretaries from using appropriated funds to implement the rural subsistence priority on navigable waters where Alaska held title to the submerged lands. Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 336, 110 Stat. 1321, 1321-210 (1996). Later that year, Congress passed another appropriations act ("1997 Appropriations Act") with a similar provision. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 317, 110 Stat. 3009, 3009-222 (1996). Thus, in effect, Congress temporarily delayed federal implementation of *Katie John I*'s holding that "public lands" includes navigable waters in which the United States holds reserved water rights, even where Alaska holds title to the submerged lands.

A year later, in November 1997, Congress passed another appropriations act ("1998 Appropriations Act") that did two things. Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, 111 Stat. 1543 (1997). First, like the previous acts, it prevented the Secretaries from using appropriated funds prior to December 1, 1998, to implement the rural subsistence priority on navigable waters where Alaska held title to the submerged lands. *Id.* § 316(a). Second, it made amendments to Title VIII, which would be repealed if Alaska failed to amend state law to bring it into compliance with the rural subsistence priority by December 1, 1998. *Id.* § 316(d).

Specifically, the 1998 Appropriations Act amended Title VIII's declaration of Congressional findings to read as follows:

> (b) The Congress finds and declares further that . . .
>
>> (4) in accordance with title VIII of this Act, the Secretary of the Interior is required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of State law to provide a rural preference;
>>
>> (5) the Ninth Circuit Court of Appeals determined in 1995 in State of Alaska v. Babbitt (73 F.3d 698) that the subsistence priority required on public lands under section 804 of this Act applies to navigable waters in which the United States has reserved water rights as identified by the Secretary of the Interior;
>>
>> (6) management of fish and wildlife resources by State governments has proven successful in all 50 States, including Alaska, and the State of Alaska should have the opportunity to continue to manage such resources on all lands, including public lands, in Alaska in accordance with this Act, as amended; and
>>
>> (7) it is necessary to amend portions of this Act to restore the original intent of Congress to protect and provide for the

> continued opportunity for subsistence
> uses on public lands for Alaska Native
> and non-Alaska Native rural residents
> through the management of the State of
> Alaska.

*Id.* § 316(b)(3). Additionally, the act amended part of the definition of "public lands" by adding a second sentence to the definition of "Federal lands": "The term 'Federal land' means lands the title to which is in the United States after December 2, 1980. 'Federal land' does not include lands the title to which is in the State, an Alaska Native corporation, or other private ownership." *Id.* § 316(b)(2). Around the same time, the Secretaries issued a notice of proposed rulemaking consistent with the advance notice of proposed rulemaking they had previously published. Subsistence Management Regulations for Public Lands in Alaska, 62 Fed. Reg. 66216 (proposed Dec. 17, 1997).

The following year, in October 1998, Congress passed another appropriations act ("1999 Appropriations Act") that again delayed federal implementation of *Katie John I* and gave Alaska yet another chance to bring state law into compliance with ANICLA's rural subsistence priority. Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, Div. A, sec. 101(e), § 339, 112 Stat. 2681, 2681-251-52, 2681-271, 2681-295-96 (1998). The act appropriated a total of $11,000,000 for implementation of the rural subsistence priority and provided that the funds would go to Alaska if the Alaska Legislature passed a proposal to amend the state constitution by October 1, 1999. *Id.* But if the Alaska Legislature failed to do so, the funds would go to the

Secretaries, and the restriction on their ability to use the funds would be lifted. *Id.*

The Secretaries then published their final rule ("1999 Rules"), which interpreted "public lands" to include "all navigable and non-navigable water" within and appurtenant to more than 30 federal land units. Subsistence Management Regulations for Public Lands in Alaska, 64 Fed. Reg. 1276, 1287 (Jan. 8, 1999). Consistent with the 1999 Appropriations Act, the 1999 Rules provided that they would take effect on October 1, 1999, if the Alaska Legislature failed to pass the requisite constitutional proposal by then. *Id.* at 1276.

The Alaska Legislature failed to pass the proposal.[2] As a result, the 1999 Rules took effect, and the Secretaries were free to use the appropriated funds to implement *Katie John I*.

E.

The *Katie John I* district court, "which had retained jurisdiction over the consolidated challenges to the 1992 Rules on remand from *Katie John I*, concluded that the action should not serve as the vehicle for challenges to the 1999 Rules." *Katie John III*, 720 F.3d at 1222. After the district court entered a final judgment, Alaska appealed, and we granted initial hearing en banc. *Id.* at 1223. In a decision known as *Katie John II*, we issued a short opinion holding that *Katie John I* "should not be disturbed or altered by the

---

[2] Days before the deadline, the Alaska House of Representatives passed a proposal to amend the constitution. *See* H.R.J. Res. 202, 21st Leg., 2d Spec. Sess. (Alaska 1999); Alaska H.R.J., 21st Leg., 2d Spec. Sess., at 1854-55 (1999). But it fell just shy of the requisite two-thirds vote needed to pass the Senate. *See* Alaska S.J., 21st Leg., 2d Spec. Sess., at 1881-82 (1999).

en banc court." *Katie John II*, 247 F.3d at 1033. This time, Alaska declined to file a petition for certiorari, with Alaska's Governor announcing that he had decided to "stop a losing legal strategy that threatens to make a permanent divide among Alaskans." *Alaska Governor Won't Fight Subsistence Fishing Ruling*, L.A TIMES (Aug. 28, 2001), https://perma.cc/YT9H-68BX.

But the litigation continued, with Alaska and Alaska Natives both challenging the 1999 Rules. *Katie John III*, 720 F.3d at 1223-24. Alaska argued that the rural subsistence priority should have narrower application, and the Alaska Natives argued that it should have broader application. *Id.* In *Katie John III*, we rejected both sides' challenges, concluding that "in the 1999 Rules, the Secretaries have applied *Katie John I* and the federal reserved water rights doctrine in a principled manner." *Id.* at 1245.

F.

Several years later, the Supreme Court was presented with a case concerning the meaning of "public lands" as the term is used in 16 U.S.C. § 3103(c), within Title I of ANILCA. As noted above, that section concerns the boundaries of ANILCA's conservation system units and the application of regulations within them. By way of background, when Congress "sketch[ed]" the "boundary lines" of ANILCA's conservation system units, it "made an uncommon choice—to follow 'topographic or natural features,' rather than enclose only federally owned lands." *Sturgeon II*, 587 U.S. at 37 (quoting 16 U.S.C. § 3103(b)). This is in part because Congress's "prior cessions of property to the State and Alaska Natives had created a 'confusing patchwork of ownership'" that was "all but impossible to draw one's way around." *Id.* (citation

omitted). As a result, "more than 18 million acres of state, Native, and private land"—known as "inholdings"—"wound up inside" the conservation system units. *Id.* at 38 (citation omitted). To limit the geographic scope of regulations "applicable solely to public lands within such units," 16 U.S.C. § 3103(c) provides that "[o]nly those lands within the boundaries" of a unit "which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit" and that State, Native, or private lands shall not be subject to such regulations.

John Sturgeon was a hunter who wished to use his hovercraft on a portion of the Nation River within a conservation system unit to reach remote areas to hunt moose. *Sturgeon II*, 587 U.S. at 31-32. But a National Park Service ("NPS") regulation banned hovercrafts on waters "located within the boundaries of the National Park System, including navigable waters . . . without regard to the ownership of submerged lands. . . .'" 36 C.F.R. § 1.2(a). Relying on 16 U.S.C. § 3103(c), Sturgeon argued that NPS could not apply its regulatory hovercraft ban on the Nation River on the ground that the Nation River does not fall within the meaning of "public lands" as the term is used in that section.

The Supreme Court agreed with Sturgeon and rejected the United States' argument that, under the reserved water rights doctrine, it holds "title to" an "interest" in the relevant stretch of the Nation River. *Sturgeon II,* 587 U.S. at 42-45. First, the Court observed that reserved water rights "are 'usufructuary' in nature, meaning that they are rights for the [United States] to use—whether by withdrawing or maintaining—certain waters it does not own." *Id.* at 43 (citation omitted). Although the United States "ha[d] found a couple of old cases suggesting that a person can hold 'title'

to such usufructuary interests," the Court explained that "the more common understanding . . . is that 'reserved water rights are not the type of property interests to which title can be held'; rather, 'the term "title" applies' to 'fee ownership of property' and (sometimes) to 'possessory interests' in property like those granted by a lease." *Id.* at 43-44 (citations omitted). The Court "[saw] no evidence that the Congress enacting ANILCA meant to use the term in any less customary and more capacious sense." *Id.* at 44.

Second, "even assuming" it was possible for the United States to hold "title to" a reserved water right, the Court declined to adopt the United States' reserved water rights interpretation. *Id.* As the Court explained, the term "public lands" only includes the United States' "specific 'interest'" in the relevant body of water. *Id.* (citations omitted). And a reserved water right "by its nature" "merely enables the Government to take or maintain the specific 'amount of water'—and 'no more'—required to 'fulfill the purpose of [its land] reservation.'" *Id.* (quoting *Cappaert*, 426 U.S. at 141). Because the regulatory hovercraft ban was not intended to prevent "depletion or diversion" of the water or to otherwise "safeguard[] the water," it exceeded the United States' interest and therefore the river did not constitute "public lands" for purposes of 16 U.S.C. § 3103(c). *Id.* at 45.

Although Alaska had previously fought the *Katie John* Trilogy's reserved water rights interpretation of "public lands" for purposes of Title VIII, Alaska adopted a new position in *Sturgeon II*. In an amicus brief in support of Sturgeon, Alaska argued that while the Supreme Court should adopt Sturgeon's interpretation of "public lands" for purposes of 16 U.S.C. § 3103(c), the Court "need not and should not disturb the *Katie John* circuit precedents"

interpreting "public lands" for purposes of Title VIII. Br. of Amicus Curiae State of Alaska at 29, 2018 WL 4063284, at *29 (citation modified).    Alaska contended that "public lands" has a different meaning in Title VIII, *id.* at 34; that the *Katie John* Trilogy's interpretation of "public lands" is "proper[]" in that context, *id.*; and that the Court "should preserve the *Katie John* precedents" for "prudential and policy reasons," including because "in the nearly twenty years since the federal government assumed management of subsistence activities on federal lands in Alaska, rural Alaskans have depended on this subsistence priority to effectuate [the important values embodied by subsistence] and [to] preserve their way of life," *id.* at 31-32.

Citing Alaska's amicus brief, the Supreme Court included the following footnote 2 in its opinion:

> As noted earlier, the Ninth Circuit has held in three cases—the so-called *Katie John* trilogy—that the term "public lands," when used in ANILCA's subsistence-fishing provisions, encompasses navigable waters like the Nation River. See *Alaska v. Babbitt*, 72 F.3d 698 (1995); *John v. United States*, 247 F.3d 1032 (2001) (en banc); *John v. United States*, 720 F.3d 1214 (2013); *supra,* at 1078. Those provisions are not at issue in this case, and we therefore do not disturb the Ninth Circuit's holdings that the Park Service may regulate subsistence fishing on navigable waters. See generally Brief for State of Alaska as *Amicus Curiae* 29-35 (arguing that this case does not implicate

> those decisions); Brief for Ahtna, Inc.,
> as *Amicus Curiae* 30-36 (same).

*Sturgeon II,* 587 U.S. at 45 n.2.

## II.

That brings us to the present case. Before flowing into
the Bering Sea, the Kuskokwim River ("River") runs for
approximately 180 miles through the Yukon Delta National
Wildlife Refuge ("Refuge"). Within the Refuge, the River
is navigable, and Alaska holds title to the submerged lands.

Pursuant to the 1999 Rules upheld in *Katie John III*, the
Secretaries have implemented ANILCA's rural subsistence
priority on the stretch of the River within the Refuge. *See
Katie John III*, 720 F.3d at 1232-33 & n.107; *see* 36 C.F.R.
§ 242.3(b); 43 C.F.R. § 51.3(b). But in the wake of *Sturgeon
II*, Alaska's Department of Fish & Game ("ADF&G")—
apparently deciding that it was no longer bound by the *Katie
John* Trilogy—asserted authority over the entire River,
notwithstanding efforts by the Refuge Manager to
implement the rural subsistence priority.[3]

The River is home to five types of salmon—Chinook,
chum, sockeye, coho, and pink—all of which follow the
same life cycle. The salmon hatch from fertilized eggs in
freshwater, then migrate to the ocean to feed for several
years, and later return to the freshwater to spawn. Upon their
return, the females deposit eggs, the males fertilize them, and
the cycle begins anew.

---

[3] The Refuge Manager exercises authority delegated by the Federal
Subsistence Board ("FSB"), which administers the rural subsistence
priority. 36 C.F.R. § 242.10; 43 C.F.R. § 51.10.

As the Refuge Manager has explained, the residents of the local villages within the Refuge along the River and its tributaries "are almost entirely federally qualified subsistence users, both native and nonnative, who are highly dependent on salmon as a source of food." Also, for these communities, subsistence fishing is more than a source of food; it is deeply engrained in their culture and identity.

In recent years, the populations of Chinook and chum have declined, causing concern among the federal and state authorities, as well as the Kuskokwim River Inter-Tribal Fish Commission. In response, the Refuge Manager issued emergency special actions for the 2021 and 2022 fishing seasons to ensure that Chinook escapement targets[4] would be met, while also "allowing at least some opportunity for federally qualified local residents to address their subsistence needs."

In 2021, the Refuge Manager closed parts of the River to gillnet fishing starting on June 1 but provided exceptions for federally qualified rural subsistence users to use gillnets on specified days. ADF&G issued conflicting orders, including orders that purported to authorize gillnet fishing by *all* subsistence users (i.e., including non-rural subsistence users) on a different set of days. (Recall that Alaska's subsistence law, unlike ANILCA, does not provide preference for *rural* subsistence users. *See generally State v. Kenaitze Indian Tribe*, 894 P.2d 632 (Alaska 1995); *McDowell*, 785 P.2d at 1, 5-9.)

---

[4] Per the Refuge Manager, "escapement" refers to "the number of fish that are allowed to reach the spawning grounds with the goal of ensuring the continuation of healthy populations into the future."

In 2022, the Refuge Manager once more closed parts of the River to gillnet fishing starting on June 1 but provided exceptions for federally qualified rural subsistence users to use gillnets on specified days. Again, ADF&G issued conflicting orders that purported to authorize fishing by all subsistence users.

### III.

On May 17, 2022, the United States sued the State of Alaska, ADF&G, and the Commissioner of ADF&G (collectively, "Alaska"), seeking declaratory and injunctive relief to preclude Alaska from taking actions that interfere with federal efforts to implement ANILCA's rural subsistence priority. The district court granted motions to intervene in support of the United States by the Kuskokwim River Inter-Tribal Fish Commission; the Association of Village Council Presidents; Betty Magnuson and Ivan Ivan; Ahtna Tene Nené and Ahtna, Inc.; and the Alaska Federation of Natives.

After initially granting a preliminary injunction in the summer of 2022, *United States v. Alaska*, 608 F. Supp. 3d 802 (D. Alaska 2022), the district court granted summary judgment to the United States and the Intervenors (collectively, "Plaintiffs") and entered a permanent injunction in the spring of 2024, *United States v. Alaska*, No. 1:22-cv-00054-SLG, 2024 WL 1348632 (D. Alaska Mar. 24, 2024). As is relevant here, the district court concluded that the *Katie John* Trilogy was not clearly irreconcilable with *Sturgeon II* and therefore remained binding law. *Alaska*, 2024 WL 1348632, at *8.

Alaska timely appealed.[5]

IV.

"[W]here the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled." *Miller*, 335 F.3d at 893. However, "we are bound by our prior precedent if it can be reasonably harmonized with the intervening authority." *Lair v. Bullock*, 697 F.3d 1200, 1206 (9th Cir. 2012) (citation omitted). Clear irreconcilability is a "high standard." *Id*. at 1207 (citation omitted). "It is not enough for there to be 'some tension' between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast doubt' on the prior circuit precedent." *Id.* (citations omitted).

We review the district court's order de novo. *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1121 (9th Cir. 2024).

V.

Alaska's primary argument is that the *Katie John* Trilogy is clearly irreconcilable with *Sturgeon II*. Assuming that *Sturgeon II*'s footnote 2 does not resolve this argument[6] and

---

[5] In the proceedings below, Alaska also challenged the constitutionality of the FSB under the Appointments Clause. The district court rejected those arguments. *Alaska*, 2024 WL 1348632, at \*8-12. Alaska initially raised them again on appeal, but it has since withdrawn them.

[6] Plaintiffs read *Sturgeon II*'s footnote broadly, arguing that because the Supreme Court apparently adopted the "do not disturb" language from the cited amicus briefs (including Alaska's), the Supreme Court agreed with the amici's argument that "public lands" has a different meaning in

that this argument is not barred by judicial estoppel or issue preclusion, we conclude that the cases are not clearly irreconcilable.

A.

1.

To begin, the definition of "public lands" applies to both 16 U.S.C. § 3103(c) and to Title VIII. *See* 16 U.S.C. § 3102. Thus, the *Katie John* Trilogy and *Sturgeon II* may only be reconciled on the basis that the term as defined may be given different meanings in the two different parts of ANILCA. And, as Alaska stresses, according to the presumption of consistent usage, a word "is presumed to bear the same meaning throughout a text." *Meza-Carmona v. Garland*, 113 F.4th 1163, 1167 (9th Cir. 2024) (citations omitted).

However, this presumption "'readily yields' to context, and a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S.

---

Title VIII than it does in 16 U.S.C. § 3103(c). *See* Br. of Amicus Curiae State of Alaska at 29, 2018 WL 4063284, at *29 (arguing that "[The Supreme] Court Need Not and Should Not Disturb the Katie John Circuit Precedents"); Amicus Curiae Br. for Ahtna, Inc. in Support of Neither Party at 30, *Sturgeon II*, 587 U.S. 28 (No. 17-949), 2018 WL 3952032, at *30 (arguing that "The Katie John Doctrine Effectuates the ANILCA Balance and Should Not Be Disturbed"). At a minimum, Plaintiffs contend, the footnote means that the *Katie John* Trilogy and *Sturgeon II* are not *clearly* irreconcilable. Alaska reads footnote 2 narrowly—as the Supreme Court merely clarifying that it was not expressing any view on whether the *Katie John* Trilogy's interpretation of "public lands" is correct for purposes of Title VIII. We assume without deciding that Alaska reads the footnote correctly.

561, 574 (2007)).  For example, the Supreme Court has given a defined term different meanings in different sections of a statute when "the term standing alone is necessarily ambiguous and each section must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 343-44 (1997).  The Court has also "declined to apply a statutory definition that ostensibly governed where doing so would have been 'incompatible with . . . Congress' regulatory scheme,' or would have 'destroy[ed] one of the [statute's] major purposes.'"  *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 163-64 (2018) (first quoting *Util. Air Regul. Grp.*, 573 U.S. at 322; and then quoting *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949)). Here, Plaintiffs argue that the presumption against consistent usage is rebutted because the distinct context and objective of Title VIII call for an interpretation of "public lands" that is broader than *Sturgeon II*'s interpretation of the term in 16 U.S.C. § 3103(c).

Again, "public lands" is generally defined as "lands, waters, and interests therein" "situated in Alaska" "the title to which is in the United States."  16 U.S.C. § 3102(1)-(3). As *Sturgeon II* recognized, the words "title to" at times have been used broadly to apply to "usufructuary interests," which are rights to use property that one does not own, such as reserved water rights.  587 U.S. at 43-44 (citing *Fed. Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 246 (1954); *Crum v. Mt. Shasta Power Corp.*, 30 P.2d 30, 36 (Cal. 1934); *Radcliff's Ex'rs v. Mayor of Brooklyn*, 4 N.Y. 195, 196 (1850)).  But "title to" is more commonly understood to apply only to fee interests and "possessory interests."  *Id.* at 44 (citations omitted).  Seeing "no evidence that the Congress enacting ANILCA meant to use" these

words in the less common, broader sense, *id.* at 44, *Sturgeon II* did not find 16 U.S.C. § 3103(c) to be ambiguous, *id.* at 46 n.3.

But that is not the end of the matter. "[O]ftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)); *accord Robinson*, 519 U.S. at 341. Accordingly, "when deciding whether the language is plain," we "must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King*, 576 U.S. at 486 (quoting *Brown & Williamson*, 529 U.S. at 133). Under *Sturgeon II*'s interpretation of "title to," the term "public lands" generally excludes navigable waters. That is because no one can own "running waters," *Sturgeon II*, 587 U.S. at 42 (citing *Niagara Mohawk Power*, 347 U.S. at 247, n.10), or "acquire anything more than a mere usufructuary right" in them, *Niagara Mohawk Power*, 347 U.S. at 247, n.10 (citation omitted). In *Sturgeon II*, that did not pose a problem, because the context of 16 U.S.C. § 3103(c)—which concerns the scope of "regulations applicable solely to public lands within [conservation system units]"—did not indicate that the term "public lands" as used in that section includes navigable waters. But *Sturgeon II* did not consider Title VIII. *Id.* at 45 n.2.

2.

Title VIII contains a number of contextual clues that "public lands"—and, therefore, "title to"—carries a broader meaning in Title VIII, and they are sufficient to rebut the presumption of consistent usage.

The Title begins with a declaration of Congressional findings, including that "the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands . . . is essential," 16 U.S.C. § 3111(1), and "threatened," including by the "taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management," *id.* § 3111(3). Congress also found that, "in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses," *id.* § 3111(2). "[I]nvok[ing] its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause," *id.* § 3111(4), Title VIII then establishes the rural subsistence priority, *id.* §§ 3113-15, the purpose of which "is to provide the opportunity for rural residents engaged in a subsistence way of life to do so," "in accordance with . . . the purposes for each unit established, designated, or expanded by or pursuant to titles II through VII of this Act," *id.* § 3112(1); *accord id.* § 3101(c) (emphasis added).

In turn, these cross-referenced titles provide that many of ANILCA's conservation system units shall offer the opportunity for rural residents to continue to engage in subsistence uses. In particular, Title III, which established and added to 16 national wildlife refuges, provides that each "is established and shall be managed" "to conserve fish and wildlife populations" and "to provide . . . the opportunity for continued subsistence uses by local residents."**[7]**

---

[7] ANILCA, §§ 302(1)(B)(i) & (iii) (Alaska Peninsula National Wildlife Refuge), (2)(B) (i) & (iii) (Becharof National Wildlife Refuge), (3)(B)(i)

Additionally, Title II, which established and added to 13 national parks, provides that most of them either "shall be managed" "to protect the viability of subsistence resources"**8** or that "[s]ubsistence uses by local residents shall be permitted" within them "where such uses are traditional in accordance with the provisions of title VIII."**9**

Collectively, the foregoing provisions make clear that Congress intended the rural subsistence priority to apply to the waters and to the fish populations that rural subsistence users have *traditionally* fished and depended upon within conservation system units. In particular, the sections setting forth Title VIII's purpose and findings explain that the rural subsistence priority was established "to assure the *continued* viability of . . . fish population[s]" and "the *continuation* of subsistence uses of such population[s]," *id.* § 3112(2) (emphases added); *accord id.* §§ 3111(1), (3), (4), (5), and

---

& (iii) (Innoko National Wildlife Refuge), (4)(B)(i) & (iii) (Kanuti National Wildlife Refuge), (5)(B)(i) & (iii) (Koyukuk National Wildlife Refuge), (6)(B)(i) & (iii) (Nowitna National Wildlife Refuge), (7)(B)(i) & (iii) (Selawik National Wildlife Refuge), (8)(B)(i) & (iii) (Tetlin National Wildlife Refuge), (9)(B)(i) & (iii) (Yukon Flats National Wildlife Refuge), 303(1)(B)(i) & (iii) (Alaska Maritime National Wildlife Refuge), (2)(B)(i), (iii) (Arctic National Wildlife Refuge), (3)(B)(i) & (iii) (Izembek National Wildlife Range), (4)(B)(i) & (iii) (Kenai National Wildlife Refuge), (5)(B)(i) & (iii) (Kodiak National Wildlife Refuge), (6)(B)(i) & (iii) (Togiak National Wildlife Refuge), (7)(B)(i) & (iii) (Yukon Delta National Wildlife Refuge).

[8] ANILCA, § 201(2) (Bering Land Bridge National Preserve), (3) (Cape Krusenstern National Monument), (6) (Kobuk Valley National Park).

[9] ANILCA, § 201(1) (Aniakchak National Monument), (3) (Cape Krusenstern National Monument), (4)(a) (Gates of the Arctic National Park), (6) (Kobuk Valley National Park), (7)(b) (Lake Clark National Park), (9) (Wrangell-Saint Elias National Park), ANILCA, § 202(3) (Mount McKinley National Park).

that it shall be managed with the input from rural subsistence users who have "personal knowledge of local conditions and requirements," *id.* § 3111(5); *accord* § 3115. And the section that establishes the rural subsistence priority states that it shall be applied to "populations of fish" based on rural subsistence users' "customary and direct dependence upon the [fish] populations as the mainstay of livelihood." *Id.* § 3114.

As *Katie John I* recognized, "subsistence fishing has traditionally taken place in navigable waters." 72 F.3d at 702; *see also, e.g.*, *Native Village of Quinnagak v. United States,* 35 F.3d 388, 393 (9th Cir. 1994) ("Most subsistence fishing (and most of the best fishing) is in the large navigable waterways rather than in the smaller non-navigable tributaries upstream and lakes where [fishermen] have access to less fish."). Accordingly, it follows that Title VIII's provisions indicate that "public lands" includes navigable waters within conservation system units, as *Katie John I* held.

The facts of this case help illustrate why that is so. The rural subsistence communities here—like many others throughout Alaska—have long lived and fished on a navigable river. That is unsurprising because these communities depend on salmon.[10] And, as explained above,

---

[10] *See* Kuskokwim River Inter-Tribal Fish Comm'n, *Kuskokwim River: Salmon Situation Report* 3 (2021), https://perma.cc/8SD3-23KC (by weight, fish comprises up to 85% and salmon up to 53% of subsistence harvests by village residents in the Kuskokwim region); *see also* Alaska Dep't of Fish and Game: Div. of Subsistence, *Food Production and Nutritional Values of Noncommercial Fish and Wildlife Harvests in Alaska* 3-4 (2019), https://perma.cc/G7GL-GF3F (by weight, fish comprises 56.8 percent and salmon 32.3% of wild food harvests by communities outside nonsubsistence areas).

salmon run in navigable rivers in order to get from the ocean to their spawning grounds.[11] *See Katie John II*, 247 F.3d at 1036 (Tallman, J., concurring) ("Fishing Alaska's navigable, salmonid-bearing waters has sustained Alaska's native populations since time immemorial." (citations omitted)); *Metlakatla Indian Cmty. v. Egan,* 369 U.S. 45, 46 (1962) ("Long before the white man came to Alaska, the annual migrations of salmon from the sea into Alaska's rivers to spawn served as a food supply for the natives." (emphasis added)). Further, when fish populations are threatened, these communities draw on their longstanding knowledge of local conditions to advise the federal authorities on implementation of the rural subsistence priority, including through the Kuskokwim River Inter-Tribal Fish Commission, an inter-tribal consortium that represents the interests of 33 federally recognized tribes in the Kuskokwim drainage area.

Alaska does not dispute that subsistence fishing has traditionally occurred on navigable waters. Instead, it insists that its interpretation of "public lands" would still include some non-navigable bodies of water to which the United States holds "title." But it has not shown that subsistence fishing traditionally occurred in those waters.[12] Therefore,

---

[11] It is also unsurprising that these communities live on a navigable river because they are unconnected to the road system, and the River therefore serves as their road. *See Sturgeon II*, 587 U.S. at 57 ("[R]ivers function as the roads of Alaska, to an extent unknown anyplace else in the country. Over three-quarters of Alaska's 300 communities live in regions unconnected to the State's road system." (citation omitted)).

[12] At most, Alaska's citations merely indicate that the FSB currently manages subsistence fishing on "lakes and ponds" affiliated with the Kasilof River and the Kenai River. *See* Dep't of Interior: Off. of Subsistence Mgmt., *Management Regulations for the Harvest of Fish*

it has failed to persuasively explain how its interpretation—
which excludes the waters and fish populations that rural
subsistence users have traditionally fished and depended
upon—can be harmonized with Title VIII's provisions that
establish a rural subsistence priority to protect subsistence
fishing as traditionally practiced.

Accordingly, in light of Title VIII's subsistence fishing
provisions, which *Sturgeon II* did not consider, Alaska has
not shown that the presumption of consistent usage does not
"yield to" the distinct context and objective of Title VIII,
*Util. Air Regul. Grp.*, 573 U.S. at 320 (citation modified),
such that "public lands" may have a broader meaning within
that title that includes navigable waters.

## B.

Alaska additionally argues that the *Katie John* Trilogy's
reserved water rights interpretation is clearly irreconcilable
with the second part of *Sturgeon II*'s reasoning that "even
assuming" the United States may hold "title to" a reserved
water right, the term "public lands" only includes the United
States' interest in the body of water, which is limited to
preserving the volume or quality of water needed to fulfill
the purposes of a land reservation. *See Sturgeon II*, 587 U.S.
at 44. In Alaska's view, just as the river in *Sturgeon II* did
not constitute "public lands" in 16 U.S.C. § 3103(c) because
the regulation banning hovercrafts was "not related to" the
United States' interest in "safeguarding the water," *id.* at 45
(citation omitted), so too the navigable waters within and
appurtenant to conservation system units do not constitute
"public lands" in Title VIII because the rural subsistence

---

*and Shellfish on Federal Public Lands and Waters in Alaska* 60, 67
(2021), https://perma.cc/BK3Z-KFDU.

priority is not related to the United States' interest in safeguarding the water.[13]  Plaintiffs counter that the *Katie John* Trilogy's reserved water rights interpretation is nevertheless reconcilable with *Sturgeon II* because Congress ratified that interpretation through the 1998 and 1999 Appropriations Acts. *See Katie John I*, 72 F.3d at 703-04.

According to the ratification canon, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978)).  Thus, we begin with the observation that Congress was aware of *Katie John I*'s reserved water rights interpretation when it passed the 1998 and 1999 Appropriations Acts.[14]  Indeed, when amending Title VIII's

---

[13] To be clear, Alaska does not dispute that Congress has the power to regulate fishing on navigable waters where Alaska holds title to the submerged lands.  Alaksa argues only as a matter of statutory interpretation that Congress did not do so in Title VIII of ANILCA.

[14] Alaska claims that the 1998 and 1999 Appropriations Acts cannot shed any light on the meaning of "public lands" because *Katie John I*'s interpretation was not sufficiently "settled" at the time. As Alaska notes, the ratification canon does not apply when the "supposed judicial consensus" was not "so broad and unquestioned" that courts "must presume Congress knew of and endorsed it." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005).  But here Congress was aware of *Katie John I*'s interpretation, and there is no evidence that Congress deemed the interpretation "unsettled."  The 1998 and 1999 Appropriations Acts were passed after the Ninth Circuit—the only circuit likely to interpret the provision, given its geographic scope limited to Alaska—had issued a precedential opinion and after the Supreme Court had denied certiorari. *See Alaska*, 517 U.S. 1187; *Alaska Fed'n of Natives*, 517 U.S. 1187.  In short, this is not an instance where

declaration of Congressional findings in the 1998 Appropriations Acts, Congress expressly recognized that:

> [T]he Ninth Circuit Court of Appeals determined in 1995 in State of Alaska v. Babbitt (73 F.3d 698) that the subsistence priority required on public lands under section 804 of this Act applies to navigable waters in which the United States has reserved water rights as identified by the Secretary of the Interior . . . .

1998 Appropriations Act, § 316(b)(3). Additionally, the temporary restrictions on the use of appropriated funds in the 1996, 1997, 1998, and 1999 Appropriations Acts were undoubtedly responses to *Katie John I*, as those provisions temporarily prevented the Secretaries from implementing *Katie John I*'s holding. *See* 1996 Appropriations Act, § 336; 1997 Appropriations Act, § 317; 1998 Appropriations Act, § 316(a); 1999 Appropriations Act, § 339; *see also* H.R. REP. NO. 104-537, at 428 (1996) (Conf. Rep.).

The 1998 and 1999 Appropriations Acts also provide "convincing support for the conclusion that Congress accepted and ratified" *Katie John I*'s reserved water rights interpretation. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015). In the 1998 Appropriations Act, Congress recognized *Katie John I*'s interpretation while amending Title VIII's subsistence fishing provisions and the definition of "public lands," but it left *Katie John I*'s interpretation in place. 1998

---

Congress may have declined to act while waiting to see if a judicial interpretation would be overturned upon further judicial review.

Appropriation Act, § 316(b). Subsequently, in the 1999 Appropriations Act, Congress appropriated $11 million to implement the rural subsistence priority and set a deadline by which the temporary restriction on using appropriated funds to carry out *Katie John I*'s holding would be lifted. 1999 Appropriations Act, Div. A, sec. 101(e), § 339, 112 Stat. at 2681-251-52, 2681-271, 2681-295-96.[15]

Alaska contends that the 1998 and 1999 Appropriations Acts were intended to give Alaska time to amend state law, not to endorse *Katie John I*. But that poses a false dichotomy. Congress certainly hoped that Alaska would conform state law to ANILCA's rural subsistence priority in a timely manner. To this end, in the 1998 Appropriations Act, Congress extended the temporary restriction on the Secretaries' implementation of *Katie John I* through December 1, 1998, determining that Alaska "should have the opportunity" to resume management of the rural subsistence priority. *See* 1998 Appropriations Act § 316(a), (b). And in the 1999 Appropriations Act, Congress again extended the

---

[15] In light of the 1998 Appropriations Act's statutory amendments regarding the meaning of "public lands" and the 1999 Appropriations Act's provision lifting the restriction on the use of appropriated funds to implement *Katie John I*'s holding regarding the scope of "public lands," we are not persuaded by Alaska's reliance on cases where Congress passed legislation that did not include any provisions relevant to the interpretive issue, *e.g.*, *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 81-82 (2021); *Alexander v. Sandoval*, 532 U.S. 275, 291-92 (2001). *See Tex. Dep't of Hous. & Cmty. Affairs*, 576 U.S. at 521 (holding that amendments "that would have been superfluous" absent the prior judicial interpretation "signal[ed] that Congress ratified" the interpretation); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 244, n.11 (2009) ("When Congress amended [the Act] without altering the text of [the relevant provision], it implicitly adopted [the judicial] construction of the statute").

temporary restriction on the Secretaries' implementation of *Katie John I* to October 1, 1999. *See* 1999 Appropriations Act, § 339. Congress also provided that if Alaska took the necessary action to amend its law by that deadline, it would not only get to manage ANILCA's rural subsistence priority but also receive $11,000,000 to do so. *See id.* at Div. A, sec. 101(e), 112 Stat. at 2681-251-52, 2681-271. But if Alaska failed to take the necessary action, the funds would go to the Secretaries, and they could implement *Katie John I*. *See* Div. A, sec. 101(e), § 339, 112 Stat. at 2681-251-52, 2681-271, 2681-295-96. In sum, after four years of delaying implementation of *Katie John I*, Congress decided that enough was enough and that in either scenario—whether it be state management or federal management—the rural subsistence priority would be implemented as interpreted by *Katie John I* come October 1, 1999, including on navigable waters in which the United States holds reserved water rights.

Alaska also contends that the legislative history does not support this conclusion. But the legislative history indicates that the 1998 Appropriations Act was a compromise between Alaska, which opposed federal implementation of ANILCA's rural subsistence priority with respect to fishing, and President Clinton's Administration, which opposed any further delay in federal implementation. *See* 143 Cong. Rec. 23453 (1997) (statement of Sen. Slade Gorton); 143 Cong. Rec. 23459 (1997) (statement of Sen. Frank Murkowski). That compromise—which was extended in the 1999 Appropriations Act—gave Alaska additional time to amend its law, but it also decidedly left *Katie John I*'s interpretation regarding the scope of the rural subsistence priority in place. Further, the legislative history of the 1998 Appropriations Act specifically provides that its amendments of Title VIII

did not "overturn[]" and shall not be "construed to overturn the decision of the Ninth Court of Appeals in State of Alaska v. Babbitt (73 F.3d 698) (commonly known as the Katie John case)." H.R. REP. NO. 105-337, at 94-95 (1997) (Conf. Rep.).[16]

In sum, because we find Plaintiffs' ratification argument persuasive, we conclude that the *Katie John* Trilogy is not clearly irreconcilable with the second part of *Sturgeon II*'s reasoning regarding the scope of any reserved water rights interpretation of "public lands" as used elsewhere in ANILCA. *See Sturgeon II*, 587 U.S. at 44-45.[17]

---

[16] Alaska asserts that "the mere appropriation of funds cannot change substantive law," citing cases that concern whether appropriations acts may overcome the presumption against implied repeals. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189-91 (1978); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 574-75 (9th Cir. 2000). But this case does not concern the presumption against implied repeals. Rather than impliedly repealing any provision of ANILCA, the 1998 and 1999 Appropriations Acts signal Congressional approval of a judicial interpretation of ANILCA. Moreover, the 1998 Appropriations Act made substantive amendments to ANILCA, and we held that the same appropriations acts supported a Congressional ratification argument in *Alaska Department of Fish & Game v. Federal Subsistence Board*, 139 F.4th 773, 786-87 (9th Cir. 2025).

[17] Alaska also contends that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), supports the conclusion that the *Katie John* Trilogy "is no longer good law." In its reply brief, Alaska clarifies that it does not argue that *Katie John I* is clearly irreconcilable with *Loper Bright*; instead, it argues that the *Katie John* Trilogy cannot be reconciled with *Sturgeon II* on the basis that *Katie John I* deferred to an agency interpretation under *Chevron*, while *Sturgeon II* did not. We do not reconcile the cases on this basis.

## VI.

Finally, Alaska claims that the *Katie John* Trilogy is clearly irreconcilable with *Sackett v. Environmental Protection Agency*, 598 U.S. 651, 679 (2023), which applied the canon of statutory interpretation that Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Id.* at 679 (citations omitted). But this canon pre-dates *Katie John I*, and Alaska already unsuccessfully raised an argument based on it in *Katie John II*. *See Katie John II*, 247 F.3d at 1042-44 (Tallman, J., concurring); *id.* at 1044-50 (Kozinski, J., dissenting). Thus, *Sackett* does not constitute "intervening" authority sufficient for us to revisit the *Katie John* Trilogy. *See Silva v. Garland*, 993 F.3d 705, 717 (9th Cir. 2021) ("a three-judge panel must apply binding precedent even when" that precedent was "clearly wrong" in its application of the law at the time it was decided (citation omitted)), *abrogated on other grounds by Loper Bright*, 603 U.S. 369, *as recognized in Lopez v. Garland*, 116 F.4th 1032, 1039 (9th Cir. 2024); *accord Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1189 (9th Cir. 2011) (per curiam) ("[*Miller*'s] rule makes sense because we cannot continually re-litigate issues that our court has already decided simply because a party puts forth a new argument about why we should rule differently.").

## VII.

We acknowledge that there is some tension between the *Katie John* Trilogy and *Sturgeon II*.**18** But for purposes of

---

[18] We also appreciate that judges of this court have expressed reservations about *Katie John*'s interpretation of "public lands," including by referring to it as "shov[ing] a square peg into a hole we acknowledge is round." *Sturgeon v Frost*, 872 F.3d 927, 938 (9th Cir.

*Miller*, "[n]othing short of 'clear irreconcilability' will do." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1074 (9th Cir. 2018). Because Alaska has not met this high standard, our precedent remains binding, and we affirm the judgment below.

   **AFFIRMED.**

---

2017) (Nguyen, J., concurring); *see also Katie John I*, 72 F.3d at 704; *id.* at 706 (Hall, J., dissenting); *Katie John II*, 247 F.3d at 1034, 1038-40 (Tallman, J., concurring); *id.* at 1044-50 (Kozinski, J., dissenting); *Katie John III*, 720 F.3d at 1245. But for purposes of Title VIII, Alaska's alternative interpretation has never been a round peg itself. *See supra* Section V(A)(2); *see also Katie John I*, 72 F.3d at 704; *Katie John II*, 247 F.3d at 1034-44 (Tallman, J., concurring); *see also Katie John I*, 72 F.3d at 706 (Hall, J., dissenting); *Sturgeon*, 872 F.3d at 938 (Nguyen, J., concurring).